**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IN RE:<br><br>EX PARTE APPLICATION OF IRAQ TELECOM LIMITED FOR AN EXPEDITED ORDER TO TAKE DISCOVERY PURSUANT TO 28 U.S.C. § 1782<br><br>                          Applicant. | Case No. _____ |

## MEMORANDUM IN SUPPORT OF IRAQ TELECOM LIMITED'S *EX PARTE* APPLICATION FOR EXPEDITED JUDICIAL ASSISTANCE PURSUANT TO 28 U.S.C. § 1782 TO TAKE DISCOVERY FROM CITIBANK, N.A., HSBC BANK (USA), N.A., STANDARD CHARTERED INTERNATIONAL (USD) LTD., THE BANK OF NEW YORK MELLON, N.A., AND WELLS FARGO BANK, N.A.

QUINN EMANUEL URQUHART & SULLIVAN LLP

1300 I Street NW, Suite 900
Washington, DC 20001
Telephone:  (202) 538-8000
Facsimile:  (202) 538-8100

865 South Figueroa Street, 10th Floor
Los Angeles, CA 90017
Telephone:  (213) 443-3000
Facsimile:  (213) 443-3100

SKARZYNSKY BLACK LLC

One Battery Park Plaza
New York, New York 10004
Telephone: (212) 820-7700

*Counsel for Applicant, Iraq Telecom Limited*

## TABLE OF CONTENTS

**Page**

INTRODUCTION AND SUMMARY STATEMENT ....................................................1

FACTUAL BACKGROUND ................................................................................4

I.  Korek................................................................................................4

    A.  Overview ...............................................................................4

    B.  Investments by Agility and Orange into Korek ............................4

II.  Investment Transaction ......................................................................5

    A.  Overview ...............................................................................5

    B.  Shareholder Loan and Korek Guarantee ...................................7

    C.  Governing Agreements ...........................................................7

        1.  The Subscription Agreement ........................................7

        2.  The IHL Shareholders' Agreement ...............................8

III.  Corporate Governance of IHL and Korek ..............................................8

    A.  IHL.......................................................................................8

    B.  Korek's Corporate Structure ...................................................9

MISCONDUCT AT ISSUE IN THE FOREIGN PROCEEDINGS........................10

I.  IBL Loan Scheme .............................................................................10

    A.  Background ...........................................................................10

    B.  Korek's Failure to Pay the IBL Loan.......................................11

    C.  True Nature of IBL Loan ........................................................11

        1.  The IBL Loan is Fully Cash Collateralized .................11

        2.  Mr. Barzani Receives Kick Backs from Excess Interest Payments...........12

    D.  IBL Bank Refuses to Provide Iraq Telecom with Information about the IBL Loan .......................................................13

    E.  CS Ltd Directors Breached Their Duties to Korek and IHL in Connection with the IBL Loan ........................................13

II.  Undisclosed Self-Dealing and Improper Supplier Payments....................14

III.  Mismanagement of Korek....................................................................15

    A.  Mismanagement by Mr. Barzani as CS Ltd Director and Statutory Manager ...................................................................15

    B.  Breaches by the Remaining CS Ltd Directors .........................15

REQUESTED DISCOVERY ................................................................................16

I.      Discovery Relating to the IBL Loan Scheme ..................................................17

        A.      IBL Loan Scheme Involved USD Transactions...................................17

        B.      Summary of Discovery Requests.........................................................18

II.     Discovery Relating to Undisclosed Self-Dealing and Improper Supplier Payments ........19

        A.      Improper Supplier Payments Involve USD Transactions......................19

        B.      Summary of Discovery Requests.........................................................19

FOREIGN PROCEEDINGS.................................................................................21

I.      DIFC Litigation.............................................................................................21

        A.      Breach of Duty Claims Against Messrs. Aqrawi, Jundi and Rahmeh ..................21

        B.      Self-Dealing Claims against Mr. Rahmeh ..........................................22

II.     LAMC Arbitration ........................................................................................23

III.    ICC Arbitration ............................................................................................23

        A.      The Breach of Agreement RFA ..........................................................23

        B.      The Contemplated Self-Dealing RFA.................................................24

ARGUMENT ......................................................................................................25

I.      Iraq Telecom's Application Meets the Statutory Requirements of Section 1782 ..........25

        A.      The Correspondent Banks "Reside" or are "Found In" SDNY ............25

                1.      Citibank...................................................................................26

                2.      HSBC.......................................................................................27

                3.      Standard Chartered..................................................................27

                4.      The Bank of New York Mellon ...............................................27

                5.      Wells Fargo .............................................................................28

        B.      The Requested Discovery is "For Use" In Foreign Proceedings...........28

                1.      The DIFC Litigation ...............................................................29

                2.      The LAMC and ICC Arbitrations ............................................30

        C.      Iraq Telecom Is an "Interested Person" .............................................31

II.     Discretionary Factors Weigh in Favor of Iraq Telecom's Application ............32

        A.      The Correspondent Banks are Not Participants in the Underlying Proceedings..........32

        B.      The Foreign Tribunals are Receptive to U.S. Judicial Assistance.........33

        C.      The Application Does Not Circumvent the Rules of the Foreign Tribunals ........34

        D.      The Application is Tailored to Avoid Unnecessary Burdens in Accordance With the Federal Rules Of Civil Procedure ..........35

CONCLUSION.............................................................................................................................37

# **TABLE OF AUTHORITIES**

**Page**

**Cases**

*In re Accent Delight Int'l Ltd.*,
  No. 16-MC-125(JMF), 2018 WL 2849724 (S.D.N.Y. June 11, 2018) .................................... 36

*Ahmad Hamad Algosaibi & Bros. Co. v. Standard Chartered Int'l (USA) Ltd.*,
  785 F. Supp. 2d 434 (S.D.N.Y. 2011) ................................................................................ 28, 32

*In re Application of 000 Promneftstroy for an Order to Conduct Discovery for use in a Foreign Proceeding*,
  134 F. Supp. 3d 789 (S.D.N.Y. 2015) ...................................................................................... 33

*In re Application of Chevron Corp.*,
  709 F. Supp. 2d 283 (S.D.N.Y. 2010) ...................................................................................... 30

*In re Application of Gemeinshcaftspraxis Dr. Med. Schottdorf*,
  No. CIV.M19-88 BSJ, 2006 WL 3844464 (S.D.N.Y. Dec. 29, 2006) ................................ 27, 28

*In re Application of Gorsoan Ltd. & Gazprombank OJSC for an Order Pursuant to 28 U.S.C. 1782 to Conduct Discovery for Use in a Foreign Proceeding*,
  2014 WL 7232262 (S.D.N.Y. Dec. 10, 2014) .......................................................................... 35

*In re Application of Hornbeam Corp.*,
  No. 14 MISC. 424, 2014 WL 8775453 (S.D.N.Y. Dec. 24, 2014) ........................................... 29

*Application of Malev Hungarian Airlines*,
  964 F.2d 97 (2d Cir. 1992) ........................................................................................................ 38

*In re Babcock Borsig AG*,
  583 F. Supp. 2d 233 (D. Mass. 2008) ....................................................................................... 32

*In re BNP Paribas Jersey Tr. Corp. Ltd. for an Order Pursuant to 28 U.S.C. §1782 to Conduct Discovery for Use in Foreign Proceedings*,
  No. 18-MC-00047 (PAC), 2018 WL 895675 (S.D.N.Y. Feb. 14, 2018) .................................. 34

*Certain Funds, Accounts and/or Investment Vehicles v. KPMG, LLP*,
  798 F.3d 113 (2d Cir. 2015) ...................................................................................................... 30

*Chevron Corp. v. Berlinger*,
  629 F.3d 297 (2d Cir. 2011) ...................................................................................................... 30

*In re Edelman*,
  295 F.3d 171 (2d Cir. 2002) ........................................................................................... 26, 30, 36

*Esses v. Hanania*, (In re Esses),
101 F.3d 873 (2d Cir. 1996) ............................................................................ 26

*Euromepa S.A. v. R. Esmerian, Inc.*,
51 F.3d 1095 (2d Cir. 1995) ........................................................................... 35

*In re Ex Parte Application of Kleimar N.V.*,
220 F. Supp. 3d 517 (S.D.N.Y. 2016) ....................................................... 31, 37

*In re Furstenberg Fin. SAS*,
No. 18-MC-44(JGK), 2018 WL 3392882 (S.D.N.Y. July 12, 2018) ............... 32, 34

*Gorsoan Ltd. v. Bullock*,
652 F. App'x 7 (2d Cir. 2016) ..................................................................... 33, 35

*In re Grupo Unidos por el Canal, S.A.*,
No. 14MC80277JST(DMR), 2014 WL 5456520 (N.D. Cal. Oct. 27, 2014) ...... 31, 35

*In re Grynberg*,
223 F. Supp. 3d 197 (S.D.N.Y. 2017) ............................................................ 29

*Gushlak v. Gushlak*,
486 F. App'x 215 (2d Cir. 2012) ................................................................. 1, 34

*In re Hornbeam Corp.*,
722 F. App'x 7 (2d Cir. 2018) ........................................................................ 32

*Intel Corp. v. Advanced Micro Devices, Inc.*,
542 U.S. 241 (2004) ...................................................... 26, 30, 31, 33, 35

*In re MacDonell*,
No. 2:17-MC-00189 TLN AC, 2017 WL 6448050 (E.D. Cal. Dec. 15, 2017) ...... 37

*Mees v. Buiter*,
793 F.3d 291 (2d Cir. 2015) .................................................................. 29, 31, 36

*In re O'Keeffe*,
650 F. App'x 83 (2d Cir. 2016) ...................................................................... 33

*Purolite Corp. v. Hitachi Am., Ltd.*,
No. 17 MISC. 67(PAE), 2017 WL 1906905 (S.D.N.Y. May 9, 2017) ....... 27, 28, 36

*In re Sargeant*,
278 F. Supp. 3d 814 (S.D.N.Y. 2017) ............................................................ 27

## <u>Statutory Authorities</u>

28 U.S.C. § 1782 ................................................................................................................ 1, 3

28 U.S.C. §1782 ........................................................................................................ 34, 35, 37

31 U.S.C. § 5318(i) ................................................................................................................ 17

## <u>Rules and Regulations</u>

31 C.F.R. § 1010.610(a) ......................................................................................................... 18

31 C.F.R. §§ 1010.610(b)(1)(i) ................................................................................... 18, 22, 24

Fed. R. Civ. P. 26 ...................................................................................................... 36, 37, 38

Fed. R. Civ. P. 26(b)(2)(C)(i) ................................................................................................ 38

Fed. R. Civ. P. 26(c) ............................................................................................................. 38

## INTRODUCTION AND SUMMARY STATEMENT

Iraq Telecom Limited ("**Iraq Telecom**" or the "**Applicant**") respectfully files this *ex parte*[1] application (the "**Application**") for expedited judicial assistance pursuant to 28 U.S.C. §1782 ("**Section 1782**") authorizing the Applicant to take discovery.

The factual underpinnings of the proceedings underlying the Application are complex, but in summary involve significant disputes arising from Iraq Telecom's investment of hundreds of millions of dollars in Korek Telecom Company LLC ("**Korek**"), an Iraqi enterprise that, *inter alia*, provides cell phone services in Iraq.  Korek is owned (through its holding company International Holdings Limited ("**IHL**")) by Iraq Telecom (44%) and another entity, Korek International (Management) Ltd. ("**CS Ltd**") (56%).  CS Ltd is in turn owned by four Iraqi nationals, including Sirwan Saber Mustafa (also known as and referred to herein as "**Mr. Barzani**").  Mr. Barzani also serves as a director of IHL and the Statutory Manager of Korek. As alleged in detail in several pending and contemplated foreign proceedings (the "**Foreign Proceedings**"),[2] Mr. Barzani and others have engaged in self-dealing, material misappropriation, and mismanagement in connection with the business activities of Korek, causing Iraq Telecom great economic loss.  Seeking redress, Iraq Telecom has commenced multiple legal proceedings

---

[1]      This Court routinely entertains *ex parte* applications pursuant to Section 1782.  *See Gushlak v. Gushlak*, 486 F. App'x 215, 217 (2d Cir. 2012) ("[I]t is neither uncommon nor improper for district courts to grant applications made pursuant to § 1782 *ex parte*.").  This is because an opposing party may move to quash a subpoena issued pursuant to a Section 1782 application, thereby preserving its due process rights.  *See id.*

[2]      The Foreign Proceedings include pending proceedings in (1) the Dubai International Financial Centre ("DIFC") Courts; (2) an arbitration administered by the International Chamber of Commerce ("ICC"); and (3) an arbitration administered by the Lebanese Arbitration and Mediation Centre ("LAMC") of the Chamber of Commerce, Industry and Agriculture of Beirut and Mount-Lebanon ("CCIA-BML") (collectively, the "Pending Proceedings").  In addition to the Pending Proceedings, Iraq Telecom will use any evidence obtained pursuant to this Application in other contemplated but related proceedings, including an additional arbitration administered by the ICC (the "Contemplated Proceedings").

in Dubai (one of The United Arab Emirates) and Lebanon against Mr. Barzani and CS Ltd as well as other individuals and entities believed to be culpable.[3]

As alleged in the Foreign Proceedings, Mr. Barzani, CS Ltd, and others have engaged in an active campaign of deceit and concealment designed to obfuscate and cover up their profuse misdeeds.  As a result, Iraq Telecom has been substantially hamstrung in its to efforts to obtain evidence to support its claims.  It is therefore critical for Iraq Telecom to obtain discovery from non-party sources.   Accordingly, it brings this Application seeking permission to subpoena documents and information for use in the Foreign Proceedings from five non-party U.S. banks located in the Southern District of New York ("SDNY"):  (1) **Citibank, N.A. ("Citibank")**; (2) **HSBC Bank (USA), N.A. ("HSBC")**; (3) **Standard Chartered International (USA) Ltd. ("Standard Chartered")**; (4) **The Bank of New York Mellon, N.A. ("The Bank of New York Mellon")**; and (5) **Wells Fargo Bank, N.A. ("Wells Fargo")** (collectively, the "Correspondent Banks").

Through its proposed subpoenas (*see* the Sworn Declaration of Kristin N. Tahler, annexed hereto as Appendix A, at Exhibits A through E), Iraq Telecom broadly seeks from the Correspondent Banks the following:

- <u>**First**</u>, documents and information from **Citibank, The Bank of New York Mellon and Wells Fargo** about certain USD transactions at issue in the Foreign Proceedings, including as related to a USD 150 million loan to Korek and

---

[3]     Under the DIFC Companies Law of 2009 and DIFC Law more broadly, Iraq Telecom was empowered to sue certain individuals and entities in the DIFC for their (1) breaches of duty to IHL (which is registered in the DIFC); and (2) mismanagement of Korek.  However, in order to enforce its rights under various shareholder and other agreements discussed below, Iraq Telecom had to file actions in multiple additional forums due to the agreements' forum selection clauses.  For example, the IHL Shareholders' Agreement requires that, in the event that the parties cannot resolve a dispute using alternative dispute resolution, they must submit to arbitration under the ICC Arbitration Rules.  *See* Sworn Declaration of Ehab Aziz Fekri Bassilios, annexed hereto as Appendix E, at Exhibit C at § 48.1.  By comparison, the terms of the IBL Loan require the parties to resolve their disputes in accordance with the Lebanese Arbitration Center Rules of Conciliation and Arbitration ("LAMC Rules").  *See id.* at Exhibit D at § 14.2.  Thus, Iraq Telecom had to file requests for arbitration with both the ICC and the LAMC, albeit for similar underlying conduct, to seek redress for violations of these agreements.

payments to Korek's suppliers.  Iraq Telecom's investigation to date indicates that these U.S. correspondent banks would have processed such USD transactions.

- **Second**, documents and information from **HSBC** about certain relevant USD transactions executed by or involving **HSBC Bank Middle East Limited ("HSBC UAE")**, such as (1) transactions involving the HSBC UAE accounts of Korek and Mr. Barzani; and (2) Korek's payments to one or more suppliers through its HSBC UAE account(s).  Because these transactions involved USD and HSBC is the correspondent bank for HSBC UAE (or is otherwise involved in processing or reviewing USD transactions for HSBC branches outside the United States), HSBC likely could have documents and information relevant to these transactions.

- **Third**, documents and information from **Citibank, Standard Chartered**, and **The Bank of New York Mellon** about certain USD payments executed by or involving **Banque Pharaon & Chiha ("BPC")** (acquired by **Byblos Bank ("Byblos")** in 2016), including Korek's USD payments to an allegedly sham law firm located in Lebanon which, as the U.S. correspondent banks for BPC and/or Byblos during the relevant time period, these banks could likely possess.

(collectively, the "Requested Discovery").

As demonstrated in detail below, Iraq Telecom amply meets each of the statutory *and* discretionary factors routinely considered by this Court in determining whether to grant relief under 28 U.S.C. § 1782.   Indeed, the tribunals handling the Foreign Proceedings will be receptive to any extraterritorial discovery obtained by Iraq Telecom – precisely the circumstance §1782 was designed to assist.  *See* Sworn Declaration of Graham Kenneth Lovett, annexed hereto as Appendix B, at ¶¶ 13-14; Sworn Declaration of Rajinder Bassi, annexed hereto as Appendix C, at ¶ 14; Sworn Declaration of Nabil Abdel Malek, annexed hereto as Appendix D, at ¶¶ 16-17.[4]  Accordingly, the Application ought to be granted.

Finally, and importantly, Iraq Telecom respectfully requests expedited judicial assistance in obtaining the Requested Discovery to ensure that such discovery can be utilized in the Foreign Proceedings.  *See* Appendix B, at 8, n.4; Appendix C, at ¶¶ 21-22.

---

[4]    This Application is supported by multiple sworn declarations which address the need for the Requested Discovery as well as the subject matter and process in the Foreign Proceedings.

## FACTUAL BACKGROUND

As indicated above, the factual background of the disputes underlying the Foreign Proceedings is complex. For instant purposes, Iraq Telecom attempts to briefly summarize that background (and the misconduct alleged) to illustrate the necessity for the Application, as well as to frame and contextualize the Requested Discovery.

### I.    Korek

#### A.    Overview

Korek is an Iraqi telecommunications company.[5]  *See* Appendix E, at ¶ 4. The original shareholders of Korek were three Iraqi individuals, namely Mr. Barzani, Jawshin Hassan Jawshin Barazany ("Mr. Barazany"), and Jiqsy Hamo Mustafa ("Mr. Hamo Mustafa") (together the "Original Shareholders"). *Id*. at ¶ 8. Korek commenced operations in 2000 and initially held a regional mobile telephone license for Kurdistan. *Id*. at ¶ 4. In 2007, the Iraqi Communication and Media Commission (the "CMC") – the Iraqi government agency responsible for mobile telephone regulation and licensing – awarded Korek a nationwide mobile telecommunications license (the "License"). *Id*. at ¶ 5. Pursuant to the terms of the License, Korek was required to pay the government a fee of over USD 1.2 billion, payable in a number of installments, together with interest. *Id*. at ¶ 9.

#### B.    Investments by Agility and Orange into Korek

Korek did not have sufficient funds to pay the second installment of the License fee; therefore, it sought external funding. Appendix E, at ¶ 9. In September 2007, Agility Public

---

[5]    Korek was incorporated as a limited liability company ("LLC") with the Registration Directorate of Companies of the Kurdistan Regional Government in the Republic of Iraq. *See* Appendix E, at ¶ 4.

Warehousing Company KSCP ("Agility") invested USD 250 million in Korek through a convertible senior loan note,[6] guaranteed by the Kurdistan Regional Government of Iraq.  *Id.*

In late 2009, Korek required additional financial support as well as technical expertise to roll out its mobile network beyond Kurdistan.  *Id.* at ¶ 10.  Agility identified Orange S.A. ("Orange"), formerly France Télécom S.A., a French multinational telecommunications corporation, as a potential investor.  *Id.*  In 2011, Agility and Orange formed a joint venture – Iraq Telecom – through which Agility and Orange ultimately invested more than USD 800 million into Korek in return for, among other things, an indirect stake of 44% in Korek.  *Id.*  Iraq Telecom's investment in Korek was executed through various agreements and reorganizations, collectively referred to here as the "Investment Transaction."  *See infra* at 5-6.

## II.      Investment Transaction

### A.      Overview

In connection with the Investment Transaction, the parties transferred Korek's entire shareholding to IHL, a holding company organized under the laws of the DIFC (Appendix E, at ¶ 11), which is an independent free zone in Dubai with its own independent laws and regulations (Appendix B, at 3, n.2).  Iraq Telecom holds 44% of the shares in IHL (and thereby an indirect 44% shareholding in Korek).  Appendix E, at ¶ 11.  CS Ltd, which was established by the Original Shareholders, holds 56% of the shares in IHL.  *Id.*  Mr. Barzani is Korek's single largest indirect shareholder (holding 75% of CS Ltd and thus indirectly 42% of Korek).[7]

Figure 1 below details the group structure following the Investment Transaction:[8]

---

[6]      Convertible senior loan notes take priority over other debt securities issued by the same organization and provide the creditor with an option to convert the note into a predefined amount of the issuer's shares.

[7]      *See* Appendix E, at 4, n.4; *see also id.* at Exhibit A (April 25, 2013 Letter from Korek to the CMC).

[8]      Appendix E, at ¶ 11.

**FIGURE: 1**



(A)    Agility's interest is held indirectly via a number of holding entities, including amongst others Alcazar Capital Partners (*Cayman Islands*).  *See* Appendix E, at 5 n.5.

(B)    Orange's interest is held indirectly via a number of holding entities, including amongst others Atlas Services Nederland B.V. (*the Netherlands*).  *See* Appendix E, at 5, n.6.

(C)    It is understood that on or around the time of the Investment Transaction, Mr. Aso Ali ("Mr. Ali") acquired an interest in CS Ltd and that CS Ltd is jointly owned by the Original Shareholders and Mr. Ali.  *See* Appendix B, at Exhibit A at 6.

B.       **Shareholder Loan and Korek Guarantee**

As part of the Investment Transaction, Iraq Telecom also extended a USD 285 million loan to IHL (the "Iraq Telecom Shareholder Loan").  Appendix E, at ¶ 12.  IHL, in turn, entered into a back-to-back shareholder loan agreement with Korek dated July 27, 2011, pursuant to which IHL provided the USD 285 million loan to Korek.  *Id*.  Separately, Korek provided a guarantee to Iraq Telecom, dated July 27, 2011, guaranteeing IHL's obligations to Iraq Telecom under the Iraq Telecom Shareholder Loan (the "Korek Guarantee").  *Id.*

C.       **Governing Agreements**

Although the parties have entered into several agreements relating to Korek, those most relevant to the Application are:  (1) the July 27, 2011 subscription agreement among several parties, including IHL, Korek, the Original Shareholders, CS Ltd, and Iraq Telecom (the "Subscription Agreement"); and (2) the March 10, 2011 shareholders' agreement among IHL, Korek, Mr. Barzani, CS Ltd and Iraq Telecom (the "IHL Shareholders' Agreement").  Appendix E, at ¶ 13.

1.       *The Subscription Agreement*

Under the Subscription Agreement, (1) CS Ltd was required to, among other things, make cash payments totaling approximately USD 75 million to IHL in respect of certain shares in IHL issued to CS Ltd in the context of the Investment Transaction; and (2) Mr. Barzani provided an unconditional and irrevocable guarantee in respect of CS Ltd's obligations under the Subscription Agreement.[9]  Appendix E, at ¶ 14.

---

[9]       CS Ltd defaulted on its USD 75 million payment obligation towards IHL under the Subscription Agreement.  Appendix E, at ¶ 15.  As a result, before December 2011, the Iraq Telecom Shareholder Loan and the equity contributions made by Iraq Telecom as part of the Investment Transaction were the sole source of funding to IHL and thereby to Korek.  *Id.*

2.      *The IHL Shareholders' Agreement*

Pursuant to the IHL Shareholders' Agreement, the parties agreed, among other things, (1) not to compete with Korek in Iraq, and (2) to immediately give notice if their interests were (or were reasonably likely) to conflict with the interests of Korek, in which case specific restrictions or exclusions applied.[10]   Appendix E, at ¶ 16.

## III.   Corporate Governance of IHL and Korek

### A.      IHL

Pursuant to the IHL Shareholders' Agreement and IHL's Articles of Association, IHL's board of directors (the "IHL Board") consists of seven members, namely: (1) three directors nominated by Iraq Telecom (the "Iraq Telecom Directors"); (2) three directors nominated by CS Ltd (the "CS Ltd Directors"); and (3) one independent director also nominated by CS Ltd (the "Independent Director").   Appendix E, at ¶ 17.   The three CS Ltd Directors include Mr. Barzani, Abdulhameed Abdullah Mohammed Salih Aqrawi ("Mr. Aqrawi") and Nozad Hussein Jundi ("Mr. Jundi").   *Id*.   Mr. Barzani is also the Chairman of the IHL Board.   *Id*.   Mr. Rahmeh is the Independent Director nominated by CS Ltd.[11]   *Id*.   As directors of IHL, a DIFC company, Messrs. Aqrawi, Barzani, Jundi and Rahmeh are required by DIFC law to, among other things, act honestly, in good faith, and in the best interests of IHL, to disclose personal interests in transactions, and to refrain from engaging (without approval) in activities that create a conflict of interest.[12]

---

[10]      When the parties entered the IHL Shareholders' Agreement, it was also intended that all shareholder loans should be *pari passu*.

[11]      Mr. Rahmeh is not genuinely independent and is in fact closely affiliated with CS Ltd and Mr. Barzani, having consistently represented their interests on the IHL Board and otherwise, including in IHL Board meetings and dispute resolution proceedings between Iraq Telecom, CS Ltd and Mr. Barzani, including acting as Chairman of various meetings.   Appendix E at 6, n.7.

[12]      *See*, *e.g*., Articles 53 and 54 of the DIFC Companies Law [2009]; Article 159 of the DIFC Law of Obligations.   *See also* Appendix B, at ¶ 16.

### B.     Korek's Corporate Structure

As an Iraqi LLC, Korek does not have a board of directors but is managed by the sole director or "Statutory Manager."   Appendix E, at ¶ 6.   IHL (in its capacity as Korek's sole shareholder) appointed Mr. Barzani as the Statutory Manager following the Investment Transaction.[13]   Under Iraqi law, as Statutory Manager, Mr. Barzani is subject to several requirements, including the obligation to not have direct or indirect interests in deals involving Korek without the permission of IHL and with full disclosure of the nature and extent of such interests.[14]

In addition, pursuant to the Investment Transaction, the parties established the Korek Supervisory Committee (the "KSC"), which is responsible for the overall direction and management of Korek.   The KSC consists of seven members, which currently include the same individuals as the members of the IHL Board.   *See* Appendix E, at ¶¶ 7, 11, *see also id.* at 3, n.2. Initially, the KSC met on a regular basis, however, the KSC has not met regularly during the last two years.   *Id.* at ¶ 7.

---

[13]        *See* Appendix E, at ¶ 6; *see also* Iraqi Companies Law Articles 117, 119-20.

[14]        *Id.*

## MISCONDUCT AT ISSUE IN THE FOREIGN PROCEEDINGS[15]

I. **IBL Loan Scheme**

A. **Background**

In December 2011, less than one year after the Investment Transaction, Korek required additional funds to pay an installment of the License fee.  Appendix E, at ¶ 19.  Iraq Telecom and CS Ltd agreed that any additional funding needed to come from third party banks, and to that end, Messrs. Barzani and Rahmeh arranged for Korek to obtain a loan of USD 150 million from IBL Bank S.A.L. ("IBL Bank") at an interest rate of 13.25% per annum (the "IBL Loan").[16]  *Id.*  Iraq Telecom approved the proposed terms of the IBL Loan on the basis of representations by Messrs. Barzani and Rahmeh that the IBL Loan was (1) an unsecured, third party bank loan at market terms; and (2) the only bank loan that Korek could procure.  *Id.*

Pursuant to the terms of the IBL Loan, Mr. Barzani provided IBL Bank with a personal guarantee (the "Barzani Guarantee").[17]  Appendix E, at ¶ 20.  Iraq Telecom, in turn, agreed to indemnify Mr. Barzani for its pro rata share of any amounts Mr. Barzani may have to pay pursuant to the Barzani Guarantee.[18]  *Id.*  The terms of the IBL Loan also required Iraq Telecom to subordinate the Iraq Telecom Shareholder Loan in favor of the IBL Loan ("Subordination Agreement").[19]  *Id.*  Furthermore, the IBL Loan required Korek to deposit all operating revenue

---

[15]     The following summary is offered simply to provide this Court with sufficient information to understand the need for the Requested Discovery and its potential relevance to and use in the Foreign Proceedings.  It is not an exhaustive list of the misdeeds by Mr. Barzani, the CS Ltd Directors and others, or a detailed presentation of the substantive evidence.  Nothing in this Application should be read to limit Iraq Telecom's ability to plead additional or differently framed claims in the Foreign Proceedings.

[16]     *See also* Appendix E, at Exhibit D (IBL Loan Agreement).

[17]     *Id.* at Exhibit D, § 6.1.

[18]     *Id.* at Exhibit E (Deed of Indemnity between Iraq Telecom, Mr. Barzani, Korek, and IHL).

[19]     *Id.* at Exhibit F (IBL Loan Subordination Agreement) at § 1.1.

into an IBL Bank account.[20]  *Id.* at ¶ 21.  USD 40 million of the IBL Loan as repayable by July 21, 2012, with the remaining USD 110 million repayable by June 21, 2014.[21]  *Id.* at ¶ 23.

**B.      Korek's Failure to Pay the IBL Loan**

The loan due dates were ultimately extended to 2015.  Korek, however, failed to repay the loan when due.  Appendix E, at ¶ 24.  IBL Bank wrote to Korek on July 9, 2015, asserting that Korek's failure to repay the IBL Loan constituted an "Event of Default" under the terms of the IBL Loan and demanding repayment in one month.[22]  *Id.*

Despite the fact that Korek failed to repay in the required time frame, IBL Bank granted Korek another extension in September 2015, conditioned upon (among other things) "continued compliance with the terms of the Subordination Agreement."[23]  *Id.* at ¶ 25.  Korek again failed to repay.  *Id.*  Nevertheless, IBL Bank declined to seek repayment until August 2017, when IBL Bank insisted on full repayment, but at the same time demanding "**additional collateral**" to secure the supposedly uncollateralized loan.[24]  *Id.* at ¶¶ 25-26.

**C.      True Nature of IBL Loan**

> **1.      *The IBL Loan is Fully Cash Collateralized***

Contrary to the express terms of the IBL Loan[25] and representations by Messrs. Barzani and Mr. Rahmeh to Iraq Telecom, the IBL Loan is in fact *fully cash collateralized*, which

---

[20]      *Id.* at Exhibit D at § 8.1.9.  Based on Iraq Telecom's investigation to date, Korek has at least one bank account with IBL Bank:  account number 007 002 244 0700716 016.  *See* Sworn Declaration of Nicholas Bortman, annexed hereto as Appendix F, at 3, n.2.  Iraq Telecom understands that Korek paid the interest on the IBL Loan in USD from this account.  *Id.*

[21]      Appendix E, at Exhibit D at § 3.1.

[22]      *Id.* at Exhibit G (July 9, 2015 Letter from IBL Bank to Korek).

[23]      Although the Subordination Agreement was extended a number of times, it ultimately lapsed when the IBL Loan was informally extended in June 2014 without a corresponding extension of the Subordination Agreement.  *Id.* at ¶ 23.

[24]      *Id.*, at Exhibit H at 1 (Aug. 30, 2017 Letter from IBL Bank to Korek).

[25]      *Compare* Appendix E, at Exhibit D § 7.1.6.

Messrs. Barzani and Rahmeh failed to disclose to Iraq Telecom (and which Mr. Rahmeh specifically denied).[26]  Appendix E, at 9 n. 16.

The existence of such secret cash collateral reasonably explains IBL Bank's failure to meaningfully attempt to recover the loan.  *See* Appendix E, at ¶¶ 25-26.  Furthermore, neither IBL Bank, Mr. Barzani, CS Ltd nor any of their respective representatives have denied the fact of cash collateral.  *Id*. at ¶ 28.  Instead, its existence has been all but admitted by a CS Ltd representative.  *Id.*   Based on its investigation to date, Iraq Telecom understands that Mr. Barzani provided IBL Bank with the cash collateral for the IBL Loan.   Specifically, Iraq Telecom has information that Mr. Barzani paid for some or all of the cash collateral with funds received from Korek in repayment of a shareholder loan.  Appendix F, at ¶ 10.  Specifically, on July 24, 2011, Korek transferred over USD 307 million from its HSBC UAE account number 022 2522 414 35 to Mr. Barzani's HSBC UAE account number 022 2525 22 100.  *Id*.  Iraq Telecom understands that Mr. Barzani then transferred some of those funds to IBL Bank, either directly or indirectly, for the cash collateral, unbeknownst to Iraq Telecom.  *Id*.

### 2.   *Mr. Barzani Receives Kick Backs from Excess Interest Payments*

In addition, IBL Bank and Messrs. Barzani and Rahmeh entered into a secret, side arrangement under which IBL Bank agreed to pay Mr. Barzani 12.75% of the 13.25% total interest payments made by Korek to IBL Bank under the terms of the IBL Loan.  Appendix E, at ¶ 29.  In other words, IBL Bank gave Mr. Barzani "kick backs" of more than 96% of the interest paid by Korek to IBL Bank in connection with the IBL Loan.  Based on Iraq Telecom's

---

[26]     The fact that the IBL Loan is fully cash collateralized finds support both in IBL's annual reports since 2012, as well as the plain fact that if the loan was *not* cash collateralized in the first place, then there would be no reason to ask for "additional collateral."   *See* Bank Annual Reports: 2011 to present, IBL BANK, *available at* https://www.ibl.com.lb/english/about-ibl/annual-reports (last accessed Oct. 4, 2018); *see also* Appendix B, at ¶ 27 (noting that IBL's annual bank reports from 2012 appear to reference the IBL Loan and the fact that it is cash collateralized).

investigation to date, it appears that Mr. Barzani has received at least some of these "kick backs" from IBL Bank in his IBL Bank account.  Appendix F, at ¶ 12.

### D.    IBL Bank Refuses to Provide Iraq Telecom with Information about the IBL Loan

Iraq Telecom's representatives have sought further information from IBL Bank regarding the matters set forth above;[27] however, to date, IBL Bank has not substantively responded to Iraq Telecom.[28]  Moreover, as alleged in the Pending Proceedings, IBL Bank continues to engage in a pattern of deception and obfuscation surrounding the IBL Loan.

### E.    CS Ltd Directors Breached Their Duties to Korek and IHL in Connection with the IBL Loan

As alleged in the Pending Proceedings, Messrs. Barzani and Rahmeh breached their duties to IHL and Korek by (1) negotiating the IBL Loan terms to their benefit, (2) misrepresenting the true nature of the loan to the Iraq Telecom Directors, and (3) orchestrating and concealing the "kick back" side agreement between Mr. Barzani and IBL Bank.  *See supra* at 10, 12-13.

As additionally alleged, Messrs. Aqrawi, Jundi and Rahmeh violated their duties to IHL and Korek by failing to raise any questions or concerns about the IBL Loan or take any steps to protect Korek or the interests of IHL.  *See infra* at 15.  As described herein, Messrs. Aqrawi, Jundi and Rahmeh were put on substantial notice of issues relating to the IBL Loan.  Appendix E, at ¶ 33; *see also id.* at Exhibit L.  Moreover, Mr. Rahmeh, having arranged for the IBL Loan, surely understood its true nature, including the artificially inflated interest payments.  *See supra* at 12.

---

[27]    *See generally* Appendix E, at Exhibit H at 2-9, 12-17 (September 2017-March 2018 Correspondence with IBL Bank).

[28]    *See id.* at Exhibit H at 10 (January 29, 2018 Letter from IBL Bank to Korek), 11 (February 1, 2018 Letter from IBL Bank to Mr. Barzani); 20-21 (March 29, 2018 Letter from IBL Bank to Korek).

## II.      Undisclosed Self-Dealing and Improper Supplier Payments

The Pending Proceedings also allege that Messrs. Barzani and Rahmeh engaged in undisclosed self-dealing by causing Korek to hire and pay suppliers in which they have substantial, undisclosed personal interests in violation of their: (1) agreements with Iraq Telecom; and (2) duties as directors of IHL (as well as Mr. Barzani's separate duties as Statutory Manager of Korek).  *See*, *e.g*., Appendix F, at ¶ 5.  Such suppliers identified to date are set forth in detail in Appendix F, attached hereto.[29]  *See* Appendix F, at ¶ 7, Figure 1.

On multiple occasions between November 2017 and January 2018, Iraq Telecom raised concerns with the CS Ltd Directors (including Messrs. Rahmeh and Barzani) about Korek's payments to suppliers in which Messrs. Barzani and Rahmeh have substantial, yet undisclosed interests.  Appendix E, at ¶¶ 33-34.  But, the CS Ltd Directors have neither responded to Iraq Telecom's inquiries nor taken any action in response thereto, in violation of their agreements with Iraq Telecom and duties as directors of IHL.  *Id*; *see also generally* Appendices B-D.  Because the CS Ltd Directors refuse to provide Iraq Telecom with any information or documents relating to Korek's relationships with suppliers, and, in fact, have an apparent desire to conceal the same, the full extent of the undisclosed self-dealing is not yet known.

---

[29]      Based on the Applicant's investigation to date, certain of Korek's payments to suppliers in which Mr. Rahmeh has an interest may have been used by Mr. Rahmeh, through his long-time business partner and nominee Pierre Youssef, to purchase property in London (*i.e*., 59 Barn Hill, Wembley HA9 9LLL) in September 2014 for a CMC official in order to improperly influence the CMC to act in a manner adverse to Iraq Telecom.  Appendix F, at ¶ 5.  There is no mortgage on this property so it appears to have been a cash transaction.  *Id*.  UK electoral roll data demonstrates that the CMC official and his family moved into 59 Barn Hill approximately four months after it was purchased.  *Id*.  Iraq Telecom's investigation further suggests that the CMC official paid off the mortgage on his previous home (located at Flat 5, William Saville House) in cash, which Iraq Telecom suspects was provided by Mr. Rahmeh.  *Id*.

### III.     Mismanagement of Korek

#### A.     Mismanagement by Mr. Barzani as CS Ltd Director and Statutory Manager

Mr. Barzani operates Korek in a secretive fashion and refuses to share critical information with the KSC or Iraq Telecom (despite legitimate requests for the same), even though Mr. Barzani is obligated to keep the KSC (and thus the IHL Board) up to date with information received by him or Korek.  Appendix E, ¶ 32.  Among other things, Mr. Barzani has not been forthcoming with:  (1) financial information relating to the assets and liabilities of Korek;  (2) significant and unexplained capital expenditures, such as unspecified and unsubstantiated "*consulting and legal fees*" of millions of dollars; and (3) responses to questions in respect of Korek's draft 2016 financials or the February, March, May, June, July, September, October, November and December 2017 financials.  *Id.*

#### B.     Breaches by the Remaining CS Ltd Directors

Late in 2017, Iraq Telecom raised several concerns with the CS Ltd Directors, including the mismanagement of Korek, and requested that certain actions be taken, including the removal of Mr. Barzani as Statutory Manager of Korek.  Appendix E, at ¶¶ 33-34.  In addition, Iraq Telecom subsequently raised concerns about Mr. Barzani's material, undisclosed interests and self-dealing transactions.[30]  *Id.* at ¶ 34.  Despite the urgency with which the CS Ltd Directors should have dealt with these matters – which would have been in the best interests of IHL (and Korek) – Iraq Telecom's apprehensions went unaddressed and uninvestigated.  *Id.* at ¶¶ 33-34.  This reveals a complete disregard of IHL's interests and clearly constitutes a breach of the CS Ltd Directors' fiduciary duties.

---

[30]     *Id.* at Exhibit N (raising concerns about Mr. Barzani's ownership of Darin Group, which during the period from 2011 to 2016, received purchase orders totaling USD 262.3 million from Korek, as well as his ownership (with other shareholders of CS Ltd) of K-Energy which during the same period received purchase orders from Korek exceeding USD 13 million).

## REQUESTED DISCOVERY

With the exception of the limited information Iraq Telecom has gathered from public sources and its own investigation, Iraq Telecom lacks visibility into Korek's finances, business activities, supplier payments and the IBL Loan because Messrs. Barzani and Rahmeh, the other CS Ltd Directors and IBL Bank have refused to provide Iraq Telecom with information about these topics, and instead have engaged in a pattern and practice of active concealment. *See supra* at 13-15; Appendix E, at ¶¶ 31-34. As a result, Iraq Telecom has been unable to fully investigate or substantiate the misconduct and wrongdoing by these parties.

Accordingly, Iraq Telecom must obtain information about Korek's finances and business activities – including the IBL Loan and improper payments to suppliers – from other sources, such as the Correspondent Banks, which process USD transactions for several of the foreign banks involved in the relevant transactions (*e.g.*, IBL Bank, HSBC UAE and BPC/Byblos).[31] Such information will be of significant use to Iraq Telecom in the Pending and Contemplated Proceedings.[32]

---

[31] According to IBL Bank's annual report and website, **IBL Bank** had the following correspondent relationships with U.S. banks for the time periods noted:  (1) **Citibank (2013 to present)**; (2) **The Bank of New York Mellon (2011 to present)**; and (3) **Wells Fargo (2011-2012)**. *See* Bank Annual Reports: 2011 to present, IBL BANK, *available at* https://www.ibl.com.lb/english/about-ibl/annual-reports (last accessed Oct. 4, 2018). In addition, **HSBC** processed or otherwise has information about USD transactions involving **HSBC UAE between 2011 and the present.** *See Ways to Bank with Us: Correspondent Banks,* HSBC, *available at* https://www.expat.hsbc.com/1/2/hsbc-expat/ways-to-bank-with-us/international-money-transfers/money-in#correspondent (last accessed Oct. 4, 2018). Lastly, public sources indicate that **Citibank**, **Standard Chartered**, and **The Bank of New York Mellon** processed USD transactions for **BPC/Byblos** during the relevant period. *See About Us: Major Correspondent Banks*, BYBLOS BANK, *available at* https://www.byblosbank.com/about-us (last accessed Oct. 4, 2018); Annual Report 2016 at 204, BYBLOS BANK, *available at* https://www.byblosbank.com/Library/Assets/Gallery/FinancialResult/AnnualReports/Downloadthefull2015AnnualReport/Annual%20Report%20 2016.pdf (last accessed Oct. 4, 2018); Annual Report 2017 at 212, BYBLOS BANK, *available at* https://www.byblosbank.com/Library/Assets/Gallery/FinancialResult/AnnualReports/Downloadthefull2017Annual Report/Annual%20Report%202017.pdf (last accessed Oct. 4, 2018); *see also* Appendix F, at 6, n. 9 (before Byblos Bank's acquisition of BPC, BPC's primary U.S. correspondent bank was The Bank of New York Mellon).

[32] In order to comply with their Anti-Money Laundering ("AML") and Anti-Terrorist Financing ("ATF") obligations, the Correspondent Banks should have obtained information and supporting documentation from the foreign banks about, *inter alia*, the following: (1) key details about the transfer(s) such as date, currency, names of sending/receiving banks, relevant account numbers, and other information relating to the flow of funds between various parties; (2) the purpose of the transfer(s); and (3) the beneficial owners of the sending/receiving accounts.

## I.      Discovery Relating to the IBL Loan Scheme

### A.      IBL Loan Scheme Involved USD Transactions

The IBL Loan scheme likely involved numerous USD transactions through IBL Bank and HSBC UAE, which their U.S. correspondent banks would have processed.  For example, as noted above, Korek paid the interest due on the IBL Loan to IBL Bank **in USD** from **Korek's IBL Bank account(s), including from account number 007 002 244 0700716 016**.  Appendix E, at ¶ 22; *see also id.* at Exhibit D; *see also* Appendix F, at 3, n.2.  In addition, because Korek made the interest payments in USD, IBL Bank likely distributed the "kick backs" to Mr. Barzani's IBL Bank account **in USD**.  Appendix F, at ¶¶ 11-12.  Furthermore, Mr. Barzani likely provided IBL Bank with the cash collateral for the IBL Loan from his HSBC UAE account number 022 2525 22 100 **in USD**, which he funded from some or all of the **USD 307 million** Korek transferred to that same account from Korek's own HSBC UAE account number 022 2522 41 435 in repayment of a shareholder loan.  Appendix F, at ¶ 10.

The Correspondent Banks for IBL Bank (*i.e.*, Citibank, The Bank of New York Mellon and Wells Fargo) and HSBC UAE (*i.e.*, HSBC) would have processed such USD transactions and obtained information relevant to the Foreign Proceedings in connection therewith.

---

*See, e.g.*, 31 U.S.C. § 5318(i) (requiring covered banks to "establish appropriate, specific, and, where necessary, enhanced, due diligence policies, procedures, and controls that are reasonably designed to detect and report instances of money laundering through [the foreign bank account]"); 31 C.F.R. § 1010.610(a) (describing the required due diligence program as including "[a]ssessing the money laundering risk presented by such correspondent account, based on a consideration of all relevant factors" and "[a]pplying risk-based procedures and controls to each such correspondent account reasonably designed to detect and report known or suspected money laundering activity, including a periodic review of the correspondent account activity sufficient to determine consistency with information obtained about the type, purpose, and anticipated activity of the account").

Additionally, if the Correspondent Banks determined that the foreign banks were money laundering risks, they should have applied enhanced due diligence procedures including (1) "[m]onitoring transactions to, from, or through the correspondent account in a manner reasonably designed to detect money laundering and suspicious activity"; and (2) "[o]btaining information from the foreign bank about the identity of any person with authority to direct transactions through any correspondent account that is a payable-through account, and the sources and beneficial owner of funds or other assets in the payable-through account."  31 C.F.R. §§ 1010.610(b)(1)(i), (iii).

### B.     Summary of Discovery Requests

Iraq Telecom seeks any documents or information in the possession or control of Citibank, The Bank of New York Mellon, HSBC and Wells Fargo regarding the IBL Loan, such as:

(1) the nature and purpose of the (a) IBL Loan, the (b) "kickbacks", and (c) the cash collateral;

(2) agreements relating to the same, particularly any agreements between IBL Bank and Messrs. Barzani or Rahmeh;

(3) transfers from Korek to IBL Bank in connection with the IBL Loan;

(4) transfers from IBL Bank to Messrs. Barzani and Rahmeh in connection with the IBL Loan, including but not limited to any transfers from IBL Bank to Mr. Barzani's (a) IBL Bank account, or (b) HSBC UAE account number 022 2525 22 100;

(5) transfers from Korek's HSBC account number 022 2522 414 35 to Mr. Barzani's HSBC UAE account number 022 2525 22 100;

(6) transfers to/from Mr. Barzani's HSBC UAE account number 022 2525 22 100 from/to IBL Bank, either directly or indirectly;

(7) beneficial ownership information about various IBL Bank account numbers and HSBC UAE account number 022 2525 22 100 (which belongs to Mr. Barzani);

(8) beneficial ownership information about the accounts that received funds from Mr. Barzani in connection with the IBL Loan, including with respect to the cash collateral; and

(9) any other transfers relating to or referencing the IBL Loan.[33]

See Appendix A, at Exhibits A-E.

---

[33]     For example, Iraq Telecom also seeks information about an entity named "Korek Telecom S.A.L." which is a separate and distinct entity from Korek and which Iraq Telecom understands is owned by a business associate of Mr. Rahmeh.  As detailed in several of the attached sworn declarations, Iraq Telecom's investigation has revealed a connection between Korek Telecom S.A.L., the IBL Loan, and Messrs. Barzani's and Rahmeh's misconduct.  See Appendix E, at 8, n.14; Appendix F, at ¶¶ 13-15.

## II.     Discovery Relating to Undisclosed Self-Dealing and Improper Supplier Payments

### A.     Improper Supplier Payments Involve USD Transactions

As discussed above, Iraq Telecom has evidence that Korek paid the majority of its suppliers in **USD** using its **IBL Bank account (account number 007 002 244 0700716 016)**. Appendix F, at ¶¶ 6-7, Figure 1.  Iraq Telecom also has information that Korek paid certain of its suppliers in **USD** using its **HSBC UAE account (account number 022 2522 41 435)**. Appendix F, at ¶ 7, Figure 1, ¶ 10.  Furthermore, Iraq Telecom has evidence that Korek made **USD** payments to the sham law firm **IC4LC via IC4LC's account(s) at BPC/Byblos**. Appendix F, at ¶ 7, Figure 1.

The correspondent banks of IBL Bank (*i.e.*, Citibank, The Bank of New York Mellon and Wells Fargo), HSBC UAE (*i.e.*, HSBC) and BPC/Byblos (*i.e.*, Citibank, Standard Chartered and The Bank of New York Mellon) would have processed these various USD payments from Korek to its suppliers and obtained information relevant to the Foreign Proceedings in connection therewith.

### B.     Summary of Discovery Requests

Accordingly, Iraq Telecom seeks any documents or information in the possession or control of the Correspondent Banks regarding or involving Korek's USD payments to specified suppliers,[34] including but not limited to:

(1) the date(s) and amount(s) of any and all transfers between Korek and its suppliers;

(2) beneficial ownership information for the supplier accounts that received Korek's payments;

---

[34]     Based on its investigation to date, Iraq Telecom has the following banking information for certain of Korek's suppliers:  (1) D&A's IBL Bank account number is 403 599 (IBAN number LB45 0052 0004 0023 0104 0359 9015); (2) DoubleU's IBL Bank account number is 700 675 (IBAN number LB 50005200070023010700675013); (3) IC4LC's BPC account number is 033 180 (IBAN number LB81 0035 0004 0000 0000 0003 3180); (4) ZR Collection's IBL Bank IBAN number is LB82005200070023010704371010; and (5) ZR Group's IBL Bank account number is 169 160 (IBAN number LB 8000520007002302 or LB80005200070021100169160013). *See* Appendix F, at ¶ 7, Figure 1.

(3) any agreements, contracts or invoices justifying the transfers from Korek to the suppliers;

(4) any information or documents provided by the foreign banks (*i.e.*, IBL Bank, HSBC UAE, and BPC/Byblos) to the Correspondent Banks explaining or supporting the transfers;

(5) any information or documents identifying the Korek employee(s) who approved the transfers; and

(6) any other documents or information relating to transfers from Korek to its suppliers.

*See generally* Appendix A, at Exhibits A-E.

## FOREIGN PROCEEDINGS

Because the misconduct outlined above includes violations of several agreements, disputes relating to such violations are subject to the dispute resolution provisions of each agreement.  Unfortunately, the agreements contain different forum clauses thereby mandating multiple, interrelated foreign proceedings before three forums:  the DIFC Courts, LAMC and ICC.  The accompanying sworn declarations explain the nature of these tribunals in more detail.

## I.  DIFC Litigation[35]

### A.  Breach of Duty Claims Against Messrs. Aqrawi, Jundi and Rahmeh

On March 12, 2018, Iraq Telecom brought claims against Messrs. Aqrawi, Jundi and Rahmeh[36] in the DIFC Courts for (1) breach of directors' duties under Articles 53 and 133 of the DIFC Companies Law of 2009; and (2) breach of fiduciary duties under Article 159 of the DIFC Law of Obligations (the "Breach of Duty DIFC Complaint").  *See* Appendix B, at ¶¶ 15, 22; *see also id.* at Exhibit A (March 12, 2018 Claim Form and Complaint).  Messrs. Aqrawi, Jundi and Rahmeh have not yet been served with the complaint as service must be effected pursuant to a regional treaty (the "Riyadh Convention"), which will take a number of months.  *Id.* at ¶ 24.

The Breach of Duty DIFC Complaint alleges, *inter alia*, that Messrs. Aqrawi, Jundi and Rahmeh breached their duties to IHL and Korek by failing to: (1) respond to or otherwise investigate the serious allegations against Mr. Barzani relating to, among other things, the IBL Loan and undisclosed self-dealing; (2) question Mr. Barzani or seek explanations in connection

---

[35]     The DIFC Courts, comprised of a Court of First Instance and a Court of Appeal, constitute the judicial system for the DIFC.  Appendix B, at ¶ 4.  The DIFC Courts have *exclusive jurisdiction* over civil and commercial cases arising from within the DIFC, and *consent jurisdiction* over national and international civil and commercial cases with the consent of all parties.  *Id.*  All proceedings before the DIFC Courts must comply with the Rules of the DIFC Courts (the "DIFC Courts Rules").  *Id.* at ¶ 5.

[36]     Iraq Telecom also brought claims against IHL, even though it has not committed any wrongdoing, but rather because it is a necessary party to the derivative claim, as the company for whom the remedy is sought.  *See* DIFC Courts Rule 20.64.  Additionally, Mr. Barzani is *not* named as a party in the Breach of Duty DIFC Complaint because, under the IHL Shareholders' Agreement, any claims against Mr. Barzani must be resolved through arbitration.  *See* Appendix E, at Exhibit C (IHL Shareholders' Agreement).

with his alleged wrongdoing; (3) appoint third party experts to analyze the books and records of Korek or procure such books and records; (4) mitigate, or attempt to mitigate, further harm caused to Korek (and therefore IHL) by Mr. Barzani's wrongdoing; (5) suspend or remove Mr. Barzani as the Statutory Manager of Korek; and (6) take other necessary steps to protect the interests of IHL and preserve its assets (*i.e*., Korek).  *Id*. at ¶ 17.  The Breach of Duty DIFC Complaint also alleges that Messrs. Aqrawi and Rahmeh breached their duties under DIFC law for failing to disclose substantial, personal interests in companies which (1) are in direct competition with Korek; and/or (2) provide products and services to Korek (*e.g*., suppliers).  *Id*. at ¶ 18.  For the breaches and the misconduct described above in the Breach of Duty DIFC Complaint, Iraq Telecom seeks specified relief, including damages.  *Id.* at ¶ 19.

### B.        Self-Dealing Claims against Mr. Rahmeh

On April 16, 2018, Iraq Telecom brought additional claims against Mr. Rahmeh in the DIFC Courts for, among other things, (1) undisclosed self-dealing in violation of Articles 54 and 133 of the DIFC Companies Law; and (2) breach of fiduciary duties pursuant to Article 159 of the Law of Obligations (the "Self-Dealing DIFC Complaint").  *See* Appendix B at ¶¶ 20, 23; *see also id.* at Exhibit B (April 16, 2018 Claim Form and Complaint).  Similarly to the Breach of Duty DIFC Complaint, Mr. Rahmeh has not yet been served with the Self-Dealing DIFC Complaint because service must be effected pursuant to the Riyadh Convention, which can take a number of months.  *Id*. at ¶ 24.  The background to the allegations against Mr. Rahmeh in the Self Dealing DIFC Complaint are similar to those against Mr. Rahmeh and the other CS Ltd Directors in the Breach of Duty DIFC Complaint.  *Id*. at ¶ 20.  However, in the Self-Dealing DIFC Complaint, Iraq Telecom seeks, among other things, relief that is specific to Mr. Rahmeh's misconduct.  *Id.* at ¶ 21.

## II.     LAMC Arbitration[37]

Iraq Telecom filed a Request for Arbitration ("RFA") against IBL Bank (and others) with the LAMC on June 26, 2018 (the "LAMC RFA").  Appendix D, at ¶ 21.  Clause 5.2 of the Subordination Agreement requires that any dispute arising out of or relating to the Subordination Agreement must be resolved by binding arbitration "in accordance with the Rules of Conciliation and Arbitration of the Beirut Chamber of Commerce and Industry."  *Id.* at ¶ 20.  IBL Bank must submit its answer to the LAMC RFA on October 8, 2018.  *Id.* at ¶ 21.

The LAMC RFA alleges that Mr. Barzani and IBL Bank fraudulently induced Iraq Telecom to enter into the Subordination Agreement, pursuant to which Iraq Telecom subordinated the debts owed to it by IHL and Korek in favor of the USD 150 million loan from IBL Bank to Korek.  *Id.* at ¶ 18.  In support of this claim, the LAMC RFA details the IBL Loan scheme devised by IBL Bank and Messrs. Barzani and Rahmeh.  Among other relief, in the LAMC RFA, Iraq Telecom seeks damages and declaratory relief.  *Id.* at ¶ 19.

## III.    ICC Arbitration[38]

### A.     The Breach of Agreement RFA[39]

Having undertaken the pre-arbitral steps set forth in the IHL Shareholders' Agreement, on June 4, 2018, Iraq Telecom filed a RFA with the Secretariat of the ICC against CS Ltd and Mr. Barzani for various breaches of the IHL Shareholders' Agreement and the Subordination Agreement (the "Breach of Agreement RFA").  Appendix C at ¶ 20.  On September 10, 2018,

---

[37]     The CCIA-BML is a non-profit institution supported by the Lebanese government which offers dispute resolution services through the LAMC.  Appendix D, at ¶¶ 4-5.  The LAMC and its Court of Arbitration oversee arbitrations and administer the LAMC Rules.  *Id*. at ¶ 6.

[38]     The ICC is an international business organization which, among other things, facilitates dispute resolution through the ICC Court of International Arbitration (the "ICC Court").  Appendix C, at ¶¶ 5-6.  The ICC Court administers arbitrations conducted under the ICC Rules of Arbitration (the "ICC Rules").  *Id.* at ¶ 6.

[39]     The IHL Shareholders' Agreement and Subscription Agreement require that any disputes relating to these agreements must be resolved by arbitration under the ICC Rules.  *See* Appendix C, at ¶ 20; Appendix E, at Exhibit B at § 34.2, Exhibit C at § 48.2.

CS Ltd and Mr. Barzani filed their answer to the Breach of Agreement RFA.  *Id.*  The ICC arbitral tribunal is still in the process of being constituted.  *Id.*

In the Breach of Agreement RFA, Iraq Telecom claims that CS Ltd and Mr. Barzani violated the IHL Shareholders' Agreement and Subscription Agreement by, among other things, (1) mismanaging Korek; (2) failing to provide IHL and Iraq Telecom with information about Korek's finances and operations; and (3) obtaining Iraq Telecom's approval of the IBL Loan through misrepresentation.  *Id.* at ¶ 15.  In the Breach of Agreement RFA, Iraq Telecom seeks an order requiring, various actions, declarations, and damages.  *Id.* at ¶ 17.

### B.     The Contemplated Self-Dealing RFA

Iraq Telecom will likely commence an additional arbitration under the ICC Rules against CS Ltd and Mr. Barzani for violating the IHL Shareholders' Agreement and Subscription Agreement on the basis of, among other things: (i) Mr. Barzani's and other CS Ltd representatives' alleged involvement in self-dealing transactions between Korek and companies in which they have an interest; and (ii) CS Ltd's failure to notify Iraq Telecom of Mr. Barzani's and others' relationships with these companies and failure to ensure that the provisions of the IHL Shareholders' Agreement were observed and performed (the "Contemplated Self-Dealing RFA").  Appendix C, at ¶ 18.  Based on the foregoing, in the Contemplated Self-Dealing RFA, Iraq Telecom intends to seek an order requiring various matters and damages.  *Id.* at ¶ 19.

Iraq Telecom has not yet filed the Contemplated Self-Dealing RFA with the ICC; thus, an arbitral tribunal has yet been constituted for this matter.  *Id.* at ¶ 23.

**ARGUMENT**

Iraq Telecom respectfully submits that this Court should grant the Application because (1) it meets the statutory requirements set forth in Section 1782 (*i.e.*, the person from whom discovery is sought resides in the district to which the application is made, the discovery is for use in proceedings before a foreign tribunal and the applicant is an "interested person"); and (2) the discretionary factors established by controlling case law weigh substantially in its favor (*e.g.*, whether (a) the target of discovery is a participant in the foreign proceedings, (b) the foreign tribunal is receptive to the use of the Requested Discovery, (c) the request is an attempt to circumvent foreign law, and (d) the request is unduly burdensome). Indeed, granting the Application will serve Section 1782's "twin aims of providing efficient assistance to participants in international litigation and encouraging foreign countries by example to provide similar assistance to [U.S.] courts." *Intel Corp. v. Advanced Micro Devices, Inc.*, 542 U.S. 241, 252 (2004) (internal quotations and citation omitted).

**I.      Iraq Telecom's Application Meets the Statutory Requirements of Section 1782**

For the reasons discussed below, the Application meets each of the requirements set forth in Section 1782. Specifically, Section 1782 requires "(1) that the person from whom discovery is sought **reside (or be found)** in the district of the district court to which the application is made, (2) that the discovery be **for use in a proceeding before a foreign tribunal**, and (3) that the application be **made by** a foreign or international tribunal or '**any interested person**.'" *In re Edelman*, 295 F.3d 171, 175-76 (2d Cir. 2002) (emphasis added) (quoting *Esses v. Hanania (In re Esses)*, 101 F.3d 873, 875 (2d Cir. 1996)).

**A.      The Correspondent Banks "Reside" or are "Found In" SDNY**

To satisfy the first statutory requirement, Iraq Telecom must demonstrate that the Correspondent Banks "reside" or are "found" in SDNY. For purposes of Section 1782, a

corporation "resides or is found in" a jurisdiction if it is "at home" there, such as when the jurisdiction is the corporation's place of incorporation or its principal place of business. *In re Sargeant*, 278 F. Supp. 3d 814, 820 (S.D.N.Y. 2017). Additionally, in certain circumstances, a corporation may "reside or be found in" a jurisdiction where its operations are "substantial and of such a nature as to render the corporation at home in that State." *Id.* As discussed further below, Citibank, HSBC, Standard Chartered, and The Bank of New York Mellon have their principal place of business in the SDNY, and Wells Fargo conducts substantial activities that are central to its business in this District.[40] The first statutory requirement is therefore satisfied.

1. *Citibank*

As stated in its most recent SEC filing,[41] Citibank's principal executive offices are located at 388 Greenwich Street, New York, New York 10013. Thus, Citibank resides in the SDNY for purposes of Section 1782. *See Purolite Corp. v. Hitachi Am., Ltd.*, No. 17 MISC. 67 (PAE), 2017 WL 1906905, at *2 (S.D.N.Y. May 9, 2017) ("Because HAL is headquartered in Tarrytown, New York, and conducts business out of its New York headquarters that requirement is met."); *In re Application of Gemeinshcaftspraxis Dr. Med. Schottdorf*, No. CIV.M19-88 BSJ, 2006 WL 3844464, at *4 (S.D.N.Y. Dec. 29, 2006) ("McKinsey maintains its headquarters in New York, and thus is "found" within this district . . . .").

---

[40]    Notably, the Correspondent Banks' business activities in the SDNY directly relate to the conduct alleged by Iraq Telecom in the Foreign Proceedings. For example, IBL Bank's annual reports state that it specifically utilized the New York branches of Citibank, The Bank of New York Mellon and Wells Fargo as its correspondent banks. *See* Bank Annual Reports: 2011 to present, IBL BANK, *available at* https://www.ibl.com.lb/english/about-ibl/annual-reports (last accessed Oct. 4, 2018). Byblos similarly identified the New York branches of Citibank and The Bank of New York Mellon as its correspondent banks. *See About Us: Correspondent Banks*, BYBLOS BANK, *available at* https://www.byblosbank.com/about-us (last accessed Oct. 4, 2018).

[41]    Citibank, Current Report Pursuant to Section 13 or 15(d) (Form 8-K) (Sept. 6, 2018), *available at* https://www.sec.gov/Archives/edgar/data/831001/000114420418048306/tv502434_8k.htm.

2.   *HSBC*

HSBC maintains its principal executive offices at HSBC Tower, located at 452 Fifth Avenue, New York, New York 10005.[42]  Thus, it too "resides" in the SDNY for purposes of Section 1782.   *See Purolite Corp.*, 2017 WL 1906905, at *2; *In re Application of Gemeinshcaftspraxis Dr. Med. Schottdorf*, 2006 WL 3844464, at *4.

3.   *Standard Chartered*

Standard Chartered is also headquartered in the SDNY.   According to its website, Standard Chartered's U.S. hub is located at 1095 Avenue of the Americas, New York, New York 10036.[43]  This corresponds with Standard Chartered's records with the Federal Reserve System's National Information Center.[44]  *See also Ahmad Hamad Algosaibi & Bros. Co. v. Standard Chartered Int'l (USA) Ltd.*, 785 F. Supp. 2d 434, 438 (S.D.N.Y. 2011) (finding that Standard Chartered "resides" in the SDNY for purposes of 1782 application).

4.   *The Bank of New York Mellon*

The Bank of New York Mellon also is headquartered in the SDNY.   As noted in its records with the Federal Reserve System's National Information Center[45] and the Federal Deposit Insurance Corporation's Institution Directory,[46] The Bank of New York Mellon's

---

[42]     *HSBC Holdings plc, HSBC Bank USA, National Association U.S. Resolution Plans* (Dec. 31, 2015), FDIC, *available at* https://www.fdic.gov/regulations/reform/resplans/plans/hsbc-idi-1512.pdf (last accessed Oct. 4, 2018).

[43]     *Our Locations: Americas*, STANDARD CHARTERED BANK, *available at* https://www.sc.com/en/our-locations/#americas (last accessed Oct. 4, 2018).

[44]     *Standard Chartered Bank International (Americas) Limited*, FEDERAL RESERVE SYSTEM NATIONAL INFORMATION CENTER, *available at* https://www.ffiec.gov/nicpubweb/nicweb/InstitutionProfile.aspx?parID_Rssd=169877&parDT_END=99991231 (last accessed Oct. 4, 2018).

[45]     *The Bank of New York Mellon*, FEDERAL RESERVE SYSTEM NATIONAL INFORMATION CENTER, *available at* https://www.ffiec.gov/nicpubweb/nicweb/InstitutionProfile.aspx?parID_Rssd=541101&parDT_END=99991231 (last accessed Oct. 4, 2018).

[46]     *BankFind: The Bank of New York Mellon*, FEDERAL DEPOSIT INSURANCE CORPORATION, *available at* https://research.fdic.gov/bankfind/detail.html?bank=639&name=The%20Bank%20of%20New%20York%20Mellon&searchName=Bank%20of%20New%20York%20Mellon&searchFdic=&city=&state=&zip=&address=&searchWithin=&activeFlag=&searchByTradename=false&tabId=2 (last accessed Oct. 4, 2018).

primary offices are located at 225 Liberty Street, New York, New York 10286.  Thus, The Bank of New York Mellon is "found" in this District for purposes of Section 1782.

5.   *Wells Fargo*

Wells Fargo, though headquartered in Sioux Falls, South Dakota,[47] conducts substantial activities in SDNY.  For example, Wells Fargo has 24 full service banks within Manhattan alone.[48]  Moreover, its international branch, which is the institution associated with its SWIFT Code, is located at 375 Park Avenue, New York, New York 10152.[49]  This Court has also previously found that Wells Fargo is "found" in this District for purposes of Section 1782's statutory requirements.  *See In re Application of Hornbeam Corp.*, No. 14 MISC. 424, 2014 WL 8775453, at *3 (S.D.N.Y. Dec. 24, 2014) (finding that Wells Fargo resides in the SDNY under Section 1782).  For these reasons, Wells Fargo is "found" in the SDNY and the first statutory requirement is thereby satisfied as to each of the Correspondent Banks.

**B.    The Requested Discovery is "For Use" In Foreign Proceedings**

Turning to the second statutory requirement, an applicant must also demonstrate "that the materials [it] seeks are to be used at some stage of a foreign proceeding that was within reasonable contemplation at the time of the proceedings below."  *Mees v. Buiter*, 793 F.3d 291, 301 (2d Cir. 2015); *see also In re Grynberg*, 223 F. Supp. 3d 197, 201 (S.D.N.Y. 2017) ("Evidence is 'for use in a foreign proceeding' if it is 'something that will be employed with some advantage or serve some use in the proceeding.'" (quoting *Certain Funds, Accounts and/or*

---

[47]     *BankFind: Wells Fargo Bank*, FEDERAL DEPOSIT INSURANCE CORPORATION, *available at* https://research.fdic.gov/bankfind/detail.html?bank=3511&name=Wells%20Fargo%20Bank%2C%20National%20 Association&searchName=wells%20fargo%20bank&searchFdic=&city=&state=&zip=&address=&searchWithin= &activeFlag=&searchByTradename=false&tabId=2 (last accessed Oct. 4, 2018).

[48]     *See id.* (search locations by state and filter New York locations).  Wells Fargo has an additional 41 full service branches across Bronx, Dutchess, Orange, Putnam, Rockland, and Westchester Counties.  *Id.*

[49]     *See Online BIC Search: Wells Fargo Bank, N.A.*, SWIFT, *available at* https://www2.swift.com/bsl/facelets/ bicsearch.faces (search SWIFT Code PNBPUS3NNYC) (last accessed Oct. 4, 2018).

*Investment Vehicles v. KPMG, LLP*, 798 F.3d 113, 120 (2d Cir. 2015)); *In re Edelman*, 295 F.3d at 175-76 (the discovery must be for use in a proceeding before a foreign tribunal) (quotations omitted). The Application also satisfies this requirement.

            1.   *The DIFC Litigation*

      As discussed herein, Iraq Telecom has commenced two actions in the DIFC Courts (collectively, the "DIFC Litigation"). *See supra* at 21-22. The DIFC Courts are a judicial body which adjudicates civil and commercial matters occurring in the DIFC. Appendix B, at ¶¶ 4-5. DIFC Courts may also adjudicate any national or international cases with the consent of all parties. *Id.* at ¶ 4. One DIFC Court acts as a first instance decision maker, empowered to receive evidence and decide disputes, while the other DIFC Court hears appeals of the lower court's decisions. *Id.* at ¶ 5. Thus, the DIFC courts are indisputably a "foreign tribunal" or "foreign proceeding" for purposes of Section 1782. *See, e.g., Intel,* 542 U.S. at 258 (finding European Commission satisfies "foreign tribunal" requirement "to the extent that it acts as a first-instance decisionmaker"); *In re Application of Chevron Corp.,* 709 F. Supp. 2d 283, 291 (S.D.N.Y. 2010), *as corrected* (May 10, 2010), *aff'd sub nom. Chevron Corp. v. Berlinger,* 629 F.3d 297 (2d Cir. 2011) (noting Supreme Court precedent that "[t]he term 'tribunal' . . . includes investigating magistrates, administrative and arbitral tribunals, and quasi-judicial agencies, as well as conventional civil, commercial, criminal, and administrative courts").

      The Requested Discovery is also for "use" in the DIFC Litigation. As discussed above, the DIFC Litigation includes claims that Messrs. Aqrawi, Jundi and Rahmeh breached their duties to Korek and IHL by, among other things, not investigating Mr. Barzani's misconduct in connection with the IBL Loan or his undisclosed, substantial personal interests in some of Korek's suppliers. *See supra* at 14-15, 21-22. The DIFC Litigation also includes allegations that, in addition to Mr. Barzani, Messrs. Aqrawi and Rahmeh engaged in undisclosed self-

dealing in violation of their duties to Korek and IHL by, among other things, causing Korek to pay suppliers in which they also have personal interests without informing Iraq Telecom. *See supra* at 14, 21-22. The Requested Discovery seeks documents and information relating to, among other things: (1) the IBL Loan, including evidence that the loan was in fact cash collateralized and that Mr. Barzani received "kickbacks" from IBL Bank from the excess interest payments; and (2) payments from Korek to suppliers in which Messrs. Barzani and Rahmeh have personal interests. *See supra* at 16-20.

Iraq Telecom will use the Requested Discovery in the DIFC Litigation to support its claims that: (1) Mr. Barzani engaged in misconduct, which further supports its claims against the other CS Ltd Directors for breach of duty for failing to investigate or respond to such misconduct; and (2) Mr. Rahmeh breached his duties by failing to disclose his interest in Korek's suppliers. Thus, the Requested Discovery is "to be used at some stage of a foreign proceeding," within "reasonable contemplation at the time of the [Application]." *See Mees*, 793 F.3d at 301. As such, the second statutory requirement is satisfied with respect to the DIFC Litigation.

## 2. *The LAMC and ICC Arbitrations*

As discussed *supra* at 23-24, Iraq Telecom filed (1) the LAMC RFA on June 26, 2018; and (2) the Breach of Agreement RFA with the ICC on June 4, 2018. Although arbitrations previously were excluded from the definition of "foreign or international tribunals" under Section 1782, since the decision in *Intel*, this Court has held that private commercial arbitration tribunals may be considered "a 'foreign tribunal' within the domain of Section 1782." *In re Ex Parte Application of Kleimar N.V.*, 220 F. Supp. 3d 517, 521 (S.D.N.Y. 2016) (holding that the London Maritime Arbitrators Association constituted a "foreign tribunal" for purposes of Section 1782). Following this Court's reasoning, other jurisdictions have agreed that arbitrations, including ICC arbitrations in particular, satisfy the "foreign tribunal" requirement. *See In re*

*Grupo Unidos por el Canal, S.A.,* No. 14MC80277JST (DMR), 2014 WL 5456520, at *2 (N.D. Cal. Oct. 27, 2014); *In re Babcock Borsig AG*, 583 F. Supp. 2d 233, 240 (D. Mass. 2008).  As an analogous arbitral body to ICC tribunals, arbitral tribunals constituted under the LAMC Rules and administered by the LAMC should also be considered a "foreign tribunal" for purposes of Section 1782.[50]

Both the LAMC RFA and Breach of Agreement RFA include allegations relating to the IBL Loan scheme and/or undisclosed self-dealing by Messrs. Barzani and Rahmeh.  As discussed above, the Requested Discovery from the Correspondent Banks relates to the IBL Loan and Korek's payments to suppliers in which Messrs. Barzani and Rahmeh have personal interests.  *See supra* at 16-20.  Accordingly, the Requested Discovery is for "use" in the pending arbitrations, thereby satisfying the second statutory requirement with respect to the LAMC RFA and the Breach of Agreement RFA.[51]

### C.     Iraq Telecom Is an "Interested Person"

Lastly, Iraq Telecom's status as a litigant (*i.e.*, Plaintiff) in the Pending and Contemplated Proceedings renders it the prototypical example of an "interested person" under Section 1782. *See Ahmad Hamad Algosaibi & Bros. Co. v. Standard Chartered Int'l (USA) Ltd.,* 785 F. Supp.

---

[50]     Like the ICC, the LAMC is an arbitral body that functions to administer national and international disputes through arbitration or mediation under its own set of procedural rules.  *Compare* Appendix C, at ¶¶ 5-8, *with* Appendix D, at ¶¶ 5-8.  Moreover, as with the ICC Rules, under the LAMC Rules, (1) arbitral tribunals may receive documentary evidence in support of a party's position; and (2) merits decisions (and the resulting arbitral awards) of the arbitral tribunals are final and binding on the parties.  *Compare* Appendix C, at ¶¶ 9-10, *with* Appendix D, at ¶ 10.  Thus, to the extent that these attributes render the ICC tribunals a "tribunal" for purposes of Section 1782, they render the LAMC tribunals a "tribunal" as well.

[51]     Although the Contemplated Proceedings (*e.g.*, the Contemplated Self-Dealing RFA) have not yet commenced, Iraq Telecom may still seek discovery for use in such proceedings because Iraq Telecom has demonstrated that they are "more than just a twinkle in counsel's eye."  *In re Hornbeam Corp.*, 722 F. App'x 7, 9 (2d Cir. 2018).  Here, Iraq Telecom has (1) taken the necessary pre-arbitral steps required by the IHL Shareholders' Agreement and the Subscription Agreement; and (2) certified that it will file the Contemplated Self-Dealing RFA in the future (*see* Appendix C at ¶ 23); thus, Iraq Telecom has offered sufficient proof to satisfy the second statutory factor.  *See In re Furstenberg Fin. SAS*, No. 18-MC-44 (JGK), 2018 WL 3392882, at *4 (S.D.N.Y. July 12, 2018) (finding that potential proceeding was within reasonable contemplation where counsel issued sworn statement that proceeding would be filed and articulated legal theory on which they would rely).

2d 434, 438 (S.D.N.Y. 2011).  Indeed, as the Supreme Court has acknowledged, "no doubt litigants are included among, and may be the most common example of, the interested persons who may invoke [Section] 1782."  *Intel,* 542 U.S. at 256.  Thus, the third statutory requirement plainly is satisfied.

## II.    Discretionary Factors Weigh in Favor of Iraq Telecom's Application

The discretionary factors set out by the Supreme Court in the seminal *Intel* decision also weigh in favor of granting the Application.  These factors include:  (1) "whether the person from whom discovery is sought is a participant in the foreign proceeding"; (2) "the nature of the foreign tribunal, the character of the proceedings underway abroad, and the receptivity of the foreign government or the court or agency abroad to U.S. federal-court judicial assistance"; (3) "whether the § 1782(a) request conceals an attempt to circumvent foreign proof-gathering restrictions or other policies of a foreign country or the United States"; and (4) "whether the request is otherwise unduly intrusive or burdensome."  *Intel,* 542 U.S. at 264-65; *see also In re O'Keeffe,* 650 F. App'x 83, 85 (2d Cir. 2016); *Gushlak,* 486 F. App'x at 218.

### A.    The Correspondent Banks are Not Participants in the Underlying Proceedings

"The first discretionary factor asks the Court to evaluate whether the documents or testimony sought by the application are within the foreign tribunal's jurisdictional reach, and thus accessible without resort to § 1782."  *In re Application of 000 Promneftstroy for an Order to Conduct Discovery for use in a Foreign Proceeding*, 134 F. Supp. 3d 789, 792 (S.D.N.Y. 2015).  Courts typically find that where the target of discovery is not a party to the underlying litigation, this factor weighs in favor of granting the application.  *See Gorsoan Ltd. v. Bullock,* 652 F. App'x 7, 9 (2d Cir. 2016) ("Indisputably, Remmel, Smith, and RIGroup are not parties to the Cyprus proceedings, and so the first Intel factor weighs in favor of discovery against them."); *In*

*re BNP Paribas Jersey Tr. Corp. Ltd. for an Order Pursuant to 28 U.S.C. §1782 to Conduct Discovery for Use in Foreign Proceedings*, No. 18-MC-00047 (PAC), 2018 WL 895675, at *3 (S.D.N.Y. Feb. 14, 2018). The Correspondent Banks are not participants in the Pending and Contemplated Proceedings, nor can the tribunals handling the Foreign Proceedings order or otherwise compel the Correspondent Banks to produce discovery. Appendix B, at ¶ 6; Appendix C, at ¶ 11; Appendix D, at ¶ 11. As such, this factor favors granting the Application.

### B. The Foreign Tribunals are Receptive to U.S. Judicial Assistance

The DIFC Courts, as well as the ICC and LAMC tribunals, are receptive to assistance from U.S. district courts in terms of gathering relevant evidence for use in proceedings before them. *See* Appendix B, at ¶¶ 13-14; Appendix C, at ¶ 14; Appendix D, at ¶¶ 16-17. In addition, the DIFC Courts are receptive to requests for evidence from foreign tribunals, provided that the application is made on behalf of a foreign or international court or tribunal and seeks evidence relevant to a proceeding before said court or tribunal. *See* Appendix B, ¶ 12 (citing DIFC Courts Rule 30.65). On March 29, 2015, a Memorandum of Guidance was issued between the DIFC Courts and this Court.[52] The stated purpose of the memorandum was to "set out the parties' understanding of the procedures for the enforcement of each party's money judgments in the other party's courts."[53] Although it does not directly relate to the use of evidence gathered in the United States in proceedings before the DIFC Courts, the memorandum demonstrates cooperation between the DIFC and this Court. Accordingly, the memorandum provides further support for the notion that the DIFC Courts would be receptive to and consider evidence obtained abroad for use in proceedings before them.

---

[52]    *Memorandum of Guidance between the DIFC Courts & United States District Court for the Southern District of New York (SDNY)*, DIFC Courts (Mar. 29, 2015), *available at* https://www.difccourts.ae/2015/03/29/memorandum-of-guidance-between-the-difc-courts-united-states-district-court-for-the-southern-district-of-new-york-sdny/ (last accessed Oct. 4, 2018).

[53]    *Id.*

While the ICC and LAMC Rules do not include similar provisions regarding gathering evidence abroad, they do not limit the type(s) of discovery that may be presented to the tribunal in support of a particular litigant's case.  *See* Appendix C, at ¶¶ 12-14; Appendix D, at ¶¶ 14-17. Indeed, in practice, both ICC and LAMC tribunals accept and consider evidence gathered from third parties abroad through international evidence-gathering procedures.  *See id*.  Thus, there is no indication that ICC or LAMC tribunals would reject evidence collected pursuant to Section 1782.  This factor weighs in favor of granting the Application.[54]  *See, e.g., In re Grupo Unidos,* 2014 WL 5456520, at *3 ("[T]he ICC Rules of Arbitration provide that the arbitral tribunal may consider the documents submitted by the parties without explicit limitations on the types of documents presented, and there is no indication in the Rules that the tribunal would reject documentary evidence obtained pursuant to Section 1782.  Accordingly, this [factor] also weighs in GUPC's favor." (internal citations omitted)).

### C.    The Application Does Not Circumvent the Rules of the Foreign Tribunals

The Application does not "attempt to circumvent" proof-gathering restrictions of the DIFC Courts, the ICC or the LAMC Rules, or U.S. courts; thus, the third discretionary factor also weighs in favor of granting discovery.  *Intel*, 542 U.S. at 264-65.  For purposes of this inquiry, proof-gathering restrictions "'are best understood as rules akin to privileges that *prohibit* the acquisition or use of certain materials, rather than as rules that *fail to facilitate* investigation of claims by empowering parties to require their adversarial and non-party witnesses to provide

---

[54]    In the absence of explicit evidence that a foreign tribunal would reject evidence gathered through U.S. discovery, courts have found that the second factor weighs in favor of granting discovery under Section 1782. *Euromepa S.A. v. R. Esmerian, Inc.*, 51 F.3d 1095, 1100 (2d Cir. 1995); *see also In re Application of Gorsoan Ltd. & Gazprombank OJSC for an Order Pursuant to 28 U.S.C. 1782 to Conduct Discovery for Use in a Foreign Proceeding,* 2014 WL 7232262, at *7 (S.D.N.Y. Dec. 10, 2014), *aff'd sub nom Gorsoan Ltd. v. Bullock*, 652 F. App'x 7 (2d Cir. 2016) ("Where courts have found that analysis of the second *Intel* factor weighs against a Section 1782 discovery request, evidence demonstrating the non-receptiveness of the foreign tribunals to U.S. discovery has been explicit.").

information.'"  *In re Accent Delight Int'l Ltd.,* No. 16-MC-125 (JMF), 2018 WL 2849724, at *4 (S.D.N.Y. June 11, 2018) (quoting *Mees,* 793 F.3d at 303 n.20).

The DIFC Courts do not prohibit the use of evidence gathered abroad in proceedings before the DIFC Courts.  Appendix B, at ¶¶ 13-14.  Moreover, they do not prohibit the use of the types of evidence sought through this Application (*i.e.*, financial records from third parties to the underlying litigation, namely, the Correspondent Banks).  *Id.* ¶¶ 9, 10.

In the same way, the ICC and LAMC Rules provide for the submission of documentary evidence as well as expert and oral testimony, regardless of whether it was obtained from within the jurisdiction of the tribunal.  *See* Appendix C, at ¶¶ 12-14; Appendix D, at ¶¶ 14-17.  And neither the ICC nor LAMC have rules *barring* a party from using specific categories of evidence, like financial records.  *See id*.  Thus, the third discretionary factor is therefore satisfied.  *See Purolite Corp.*, 2017 WL 1906905, at *3 ("HAL does not point to any affirmative prohibition under Japanese law on receiving the evidence that Purolite seeks.  As Purolite notes, that is the pertinent issue as to Japan.").

### D.    The Application is Tailored to Avoid Unnecessary Burdens in Accordance With the Federal Rules Of Civil Procedure

Finally, the fourth factor favors granting discovery because the Application is narrowly tailored to include only relevant, non-privileged information and avoid any undue burden on the Correspondent Banks.  *See* Appendix A, at Exhibits A-E.  "[A] district court evaluating a § 1782 discovery request should assess whether the discovery sought is overbroad or unduly burdensome by applying the familiar standards of Rule 26 of the Federal Rules of Civil Procedure."  *Mees*, 793 F.3d at 302 (citing *In re Edelman,* 295 F.3d at 179 ("Limits may be proscribed on [§ 1782] discovery or an existing order may be quashed under Rule 26(c).")).  Under a Section 1782 discovery order, relevancy is defined as any information that "bears on, or

reasonably could lead to other matter that could bear on" the Applicant's claims or defenses in the foreign action. *In re Ex Parte Application of Porsche Automobil Holding SE for an Order Pursuant to 28 U.S.C. §1782 Granting Leave to Obtain Discovery for Use in Foreign Proceedings*, No. 15-MC-417 (LAK), 2016 WL 702327, at *9 (S.D.N.Y. Feb. 18, 2016) (internal citations and quotation marks omitted).[55]

As described above (*see supra* at 16-20), the Requested Discovery directly bears on the Correspondent Banks' involvement in transmitting, receiving, and/or maintaining funds relating to the IBL Loan and payments to Korek's suppliers. Given the centrality of the IBL Loan and the supplier payment issues to Iraq Telecom's claims of breach of duty, self-dealing, mismanagement and fraud, *inter alia*, in the Pending and Contemplated Proceedings, the Requested Discovery is highly relevant to each of the foreign proceedings.

Furthermore, the Requested Discovery would not be unduly burdensome for the Correspondent Banks to produce, as the requests are targeted in scope[56] and are of the type regularly maintained by and easily accessible to the Correspondent Banks.[57] *See*, *e.g.*, *In re MacDonell*, No. 2:17-MC-00189 TLN AC, 2017 WL 6448050, at *4 (E.D. Cal. Dec. 15, 2017) (finding no undue burden in requests issued to bank pursuant to Section 1782 because "the

---

[55]     The 2015 Amendment to Rule 26(b)(1) omits express reference to discovery regarding "the existence, description, nature, custody, condition, and location of any documents." This omission has no effect on the continued permissibility of such discovery. Indeed, the Advisory Committee's note regarding the 2015 Amendment confirms that "[d]iscovery of such matters is so deeply entrenched in practice that it is no longer necessary to clutter the long text of Rule 26 with these examples. The discovery identified in these examples should still be permitted under the revised rule when relevant and proportional to the needs of the case." Fed. R. Civ. P. 26 Advisory Committee Notes (2015).

[56]     For example, the requests (1) are limited to the date(s) in which the Correspondent Banks processed USD transactions for IBL Bank, HSBC UAE, and BPC/Byblos; (2) are limited to transactions relating to the IBL Loan and payments to Korek suppliers, rather than *all* potential transactions involving IBL Bank, HSBC UAE, and BPC/Byblos and Korek; and (3) do not seek privileged information.

[57]     As discussed above, the Requested Discovery seeks information and documents collected by the Correspondent Banks *in the normal course of business* for various transactions relating to the IBL Loan and payments to Korek's suppliers. *See supra* at 16-20; Appendix A, at Exhibits A-E.

universe of responsive documents is likely to be manageable and readily accessible to the subpoenaed entities"). Indeed, where available, Iraq Telecom has provided the Correspondent Banks with relevant account numbers and the names of the sending and receiving parties in order to assist the Correspondent Banks in identifying and producing the Requested Discovery.[58] *See supra* at 16-20; Appendix A, at Exhibits A-E.

Because the Requested Discovery (1) seeks material, non-privileged documents and information collected by the Correspondent Banks in connection with processing USD transactions for IBL Bank, HSBC UAE and BPC/Byblos relating to the IBL Loan and Korek's supplier payments; (2) is limited by date and transaction-type; (3) is maintained in the normal course of business by the Correspondent Banks; and (4) is sufficiently specific to allow the Correspondent Banks to conduct targeted searches to identify and produce the documents and information with minimal burden (*see supra* at 16-20; *see also* Appendix A, at Exhibits A-E), the Application comports with the Federal Rules of Civil Procedure and should be granted.

## CONCLUSION

Based on the foregoing, Iraq Telecom respectfully requests the Court to issue an Order, on an expedited basis, granting the Application and authorizing the Applicant to serve the Correspondent Banks with the subpoenas, attached as Exhibits A-E to Appendix A, directing Citibank, HSBC, Standard Chartered, The Bank of New York Mellon, and Wells Fargo to

---

[58]     To the extent that the Court finds that the discovery requests are overbroad, it need not deny the Application altogether; rather, it may exercise its authority under Federal Rule of Civil Procedure 26 to limit the requests, thereby reducing the burden on the Correspondent Banks. *See Application of Malev Hungarian Airlines,* 964 F.2d 97, 102 (2d Cir. 1992) ("On remand, we wish to note that the district court can utilize its powers under the Federal Rules of Civil Procedure to lessen significantly the burden of handling this discovery."); *see also* Fed. R. Civ. P. 26(b)(2)(C)(i); Fed. R. Civ. P. 26(c). In addition, once the subpoenas are served upon the Correspondent Banks, if there are ways in which the discovery requests can be more finely focused to reduce any burdens while still providing Iraq Telecom with the documents and information it requires, Iraq Telecom will, in good faith, meet and confer with the Correspondent Banks to address any such burdens. That said, however, there is no reason to believe that the Requested Discovery is, in any way, unduly burdensome.

produce the Requested Discovery in their possession, custody and control no later than one month from the date of this Court's Order.

Date: October 5, 2018                    Respectfully submitted,

                                         */s/ Gabriel F. Soledad*

                                         QUINN EMANUEL URQUART & SULLIVAN, LLP

                                         Gabriel F. Soledad, Esq.
                                           gabrielsoledad@quinnemanuel.com
                                         Kristin N. Tahler, Esq.
                                           kristintahler@quinnemanuel.com
                                         Lauren H. Dickie, Esq.
                                           laurendickie@quinnemanuel.com

                                         1300 I Street NW, Suite 900
                                         Washington, DC 20005
                                         Telephone:  (202) 538-8000
                                         Facsimile:  (202) 538-8100

                                         865 South Figueroa Street, 10th Floor
                                         Los Angeles, CA 90017
                                         Telephone:  (213) 443-3000
                                         Facsimile:  (213) 443-3100

                                         SKARZYNSKI BLACK LLC

                                         James Sandnes, Esq.
                                           jsandnes@skarzynski.com

                                         One Battery Park Plaza
                                         New York, New York 10004
                                         Telephone: (212) 820-7700

                                         *Counsel for Applicant Iraq Telecom*