# APPENDIX B

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| |
|---|
| IN RE:<br><br>EX PARTE APPLICATION OF IRAQ TELECOM LIMITED FOR AN EXPEDITED ORDER TO TAKE DISCOVERY PURSUANT TO 28 U.S.C. § 1782<br><br>Applicant. |

Case No. _____

## DECLARATION OF GRAHAM KENNETH LOVETT

Pursuant to 28 U.S.C. § 1746, I, Graham Kenneth Lovett, declare under penalty of perjury as follows:

1.      I am a solicitor of the High Court of England and Wales, admitted in September 1995. I am currently a partner in the firm of Gibson, Dunn & Crutcher LLP, based in the firm's Dubai office. I have been living and working in Dubai since February 2004 (prior to Gibson Dunn I was a partner in the firm of Clifford Chance LLP). I am the partner responsible for the claims being made in the Dubai International Financial Center ("DIFC") Courts, referred to in more detail in this Declaration.

2.      I submit this declaration in support of the application submitted by Iraq Telecom Limited ("Iraq Telecom") for an order under 28 U.S.C. § 1782 permitting Iraq Telecom to take discovery from Citibank, N.A. ("Citibank"), the Bank of New York Mellon, N.A. (the "Bank of New York Mellon"), HSBC Bank (USA), N.A. ("HSBC"), Standard Chartered International (USA), Ltd. ("Standard Chartered"), and Wells Fargo Bank, N.A. ("Wells Fargo") (collectively, the "Correspondent Banks") in the Southern District of New York (the "Application"). I understand that Iraq Telecom seeks documents from the Correspondent Banks relating to, among other things: (1) the relationship between (a) Korek Telecom Company LLC ("Korek")—in which

1

Iraq Telecom is a major shareholder, holding an indirect interest of 44 percent—and (b) IBL Bank SAL ("IBL Bank"); (2) USD loan payments by Korek to IBL Bank (the "IBL Loan"); and (3) other USD payments relating to Korek's business (collectively, the "Requested Discovery"). I further understand that the Requested Discovery relates to (1) two pending complaints before the DIFC Courts (the "DIFC Litigation"); (2) a pending arbitration administered by the Lebanese Arbitration and Mediation Center ("LAMC") (the "LAMC Arbitration"); and (3) one pending and one contemplated arbitration administered by the ICC (the "ICC Arbitrations") (collectively, the "Foreign Proceedings").

3.      As Iraq Telecom's counsel in the DIFC Litigation, as well as counsel to Agility Public Warehousing Company, K.S.C.P. ("Agility"), one of Iraq Telecom's shareholders, on a number of matters, I am familiar with the information set forth in this declaration either from personal knowledge or on the basis of documents I have reviewed. These documents include the two complaints filed by Iraq Telecom against Abdulhameed Abdullah Mohammed Salih Aqrawi ("Mr. Aqrawi"), Nozad Hussein Jundi ("Mr. Jundi"), Raymond Samir Zina Rahmeh ("Mr. Rahmeh"), and International Holdings Limited ("IHL") in the DIFC Litigation, attached hereto as **Exhibits A** (the "Breach of Duty DIFC Complaint," dated March 12, 2018) and **B** (the "Self-Dealing DIFC Complaint," dated April 16, 2018).[1]  The facts and matters testified to are true to the best of my own knowledge and belief. Because I submit this declaration specifically in support of the Application, it does not contain each and every fact within my knowledge regarding the topics discussed herein.

---

[1]      I certify that Exhibits A and B are true and correct copies of the Breach of Duty DIFC Complaint and Self-Dealing DIFC Complaint, as filed in the DIFC.

## I.   AUTHORITY AND PROCEDURES OF THE DIFC COURTS

4.      The daily operations of the DIFC[2] are governed by three administrative bodies, one of which is the DIFC Judicial Authority.  *See* Dubai Law No. 9 of 2004.  The DIFC Judicial Authority is made up of two court systems:  (i) the Court of First Instance; and (2) the Court of Appeal (collectively, the "DIFC Courts"), which have exclusive jurisdiction over all civil and commercial disputes arising within the DIFC as well as consent jurisdiction over national and international disputes with the agreement of both parties.[3]  *See* DIFC Law No. 10 of 2004; Dubai Law No. 12 of 2004; Dubai Law No. 16 of 2011.

5.      All submissions to and proceedings before the DIFC Courts must comply with the DIFC Court Rules.  Dubai Law No. 12 of 2004 Art. 5(C).  Hearings before the Court of First Instance are presided over by a single judge, who may issue binding rulings to resolve civil and commercial cases.  DIFC Law No. 10 of 2004 Art. 19.  These rulings may be contested before a three-judge panel of the Court of Appeal.  Dubai Law No. 12 of 2004 Art. 5(B)(1)(a).  Judgments rendered by the Court of Appeal are final; there is no superior appellate court.  Dubai Law No. 12 of 2004 Art. 5(B)(2).

6.      Because the Correspondent Banks are not parties to the DIFC Litigation, are based outside Dubai, and are not within the jurisdiction of the DIFC, Iraq Telecom cannot obtain the Requested Discovery through the DIFC Courts.  Accordingly, Iraq Telecom must seek the Requested Discovery through other means, such as the Application.

---

[2]      The DIFC is an independent free-zone in Dubai, which has its own independent laws and regulations.  The DIFC was established to act as "a global financial [center] strategically located between the East and West, providing a stable and secure platform for businesses and financial institutions to tap into the emerging markets of the Middle East, Africa and South Asia."  *In the DIFC,* DIFC.AE, https://www.difc.ae/about (last accessed Aug. 22, 2018).

[3]      Such consent may arise either pre-dispute, *i.e.,* where the parties to a dispute include a forum selection clause in their contract providing for the DIFC Courts' jurisdiction, or post-dispute, *i.e.,* where the parties agree to bring their case before the DIFC Courts.  Dubai Law No. 12 of 2004 Art. 5(A)(2).

## II.   DIFC COURT RULES PERTAINING TO DISCOVERY AND THE DISCLOSURE OF EVIDENCE

7.     The DIFC Court Rules provide for the disclosure of documents between the parties to a litigation. *See generally* DIFC Court Rule 28.  A party must disclose documents on which it intends to rely in support of its case that are reasonably available to it, as well as other documents it is required to produce by law. *See* DIFC Court Rule 28.15.

8.     In general, the DIFC Court Rules do not prohibit the discovery of specific categories of documents or information; however, the DIFC Courts may exclude certain documents and information from production upon objection of the party from whom such discovery is sought for the following reasons:  (a) "lack of sufficient relevance or materiality"; (b) "legal impediment or privilege under the legal or ethical rules determined by the Court to be applicable"; (c) "unreasonable burden to produce the requested evidence"; (d) "loss or destruction of the document that has been reasonably shown to have occurred"; (e) "grounds of commercial or technical confidentiality that the Court determines to be compelling"; (f) "grounds of special political or institutional sensitivity (including evidence that has been classified as secret by a government or a public international institution) that the Court determines to be compelling"; or (g) "considerations of procedural economy, proportionality, fairness or equality of the parties that the Court determines to be compelling."  DIFC Court Rule 28.28.  DIFC Courts may also permit a party to withhold a document from production if it is within the public interest to do so. *See* DIFC Court Rule 28.31.

9.     Additionally, the DIFC Court Rules permit parties to request discovery from third parties to the litigation (DIFC Court Rule 28.51), and a Court of First Instance may order said discovery as long as it is "likely to support the case of the applicant or adversely affect the case of one of the other parties to the proceedings" and "production is necessary in order to dispose fairly

of the claim or to save costs" (DIFC Court Rule 28.52).  However, the DIFC Court cannot compel

third parties located outside of the DIFC (*e.g.*, the Correspondent Banks) to produce documents or

provide testimony in the DIFC Litigation.  Accordingly, Iraq Telecom must seek the Requested

Discovery through other means, such as the Application.

10.     Based on the DIFC Court Rules and my experience as a legal practitioner in the

DIFC, the DIFC Courts would not prohibit discovery of financial or bank records due to their

commercial or institutional sensitivity or to protect the public interest.  Nor would the DIFC Courts

prohibit litigants from seeking discovery from the Correspondent Banks as third parties to the

litigation (although the DIFC Courts could not compel production or testimony from the

Correspondent Banks).  Thus, provided the Requested Discovery (i) exists; (ii) is relevant to the

underlying claims; and (iii) is proportional to the needs of the case, the DIFC Court Rules would

permit the discovery and use of the Requested Discovery in a proceeding before the DIFC Courts.

11.     In other words, the Application for the Requested Discovery does not constitute a

circumvention of DIFC law or the DIFC Court Rules.

### III.     DIFC COURT RULES PERTAINING TO EVIDENCE LAWFULLY OBTAINED FROM FOREIGN AND INTERNATIONAL TRIBUNALS

12.     DIFC Courts have the authority to receive and respond to requests for evidence

from foreign and international tribunals.  If the Court is satisfied that (1) "the application is made

in pursuance of a request issued by or on behalf of a [foreign or international] court or tribunal";

and (2) "that the evidence to which the application relates is to be obtained for the purposes of

proceedings which either have been instituted before the requesting court or whose institution

before that court is contemplated," it may make provisions for the gathering of such evidence from

within the DIFC.  DIFC Court Rule 30.65.  Given that DIFC Courts will receive and respond to

requests from foreign and international tribunals, it follows that they would permit Iraq Telecom

5

to obtain and use evidence obtained from foreign tribunals (*e.g.*, the Requested Discovery) in the DIFC Litigation.

13.     Furthermore, as a general matter, the DIFC Court Rules do not prohibit the use of evidence gathered abroad in proceedings before the DIFC Courts.

14.     In sum, DIFC Courts are receptive to evidence lawfully gathered abroad, including by foreign courts or through foreign litigation.

## IV.     IRAQ TELECOM'S DIFC LITIGATION

### A.     Summary of Claims and Relief Sought

#### 1.     *Breach of Duty Claims*

15.     In the Breach of Duty DIFC Complaint, Iraq Telecom brought claims against Messrs. Aqrawi, Jundi and Rahmeh for (1) breach of directors' duties under Articles 53 and 133 of the DIFC Companies Law of 2009; and (2) breach of fiduciary duties under Article 159 of the DIFC Law of Obligations.

16.     Under DIFC law, the members of a company's board of directors are required to do the following:

    i.     Act honestly, in good faith, and in the best interests of the company;

    ii.    Exercise the care, diligence, and skill that a reasonably prudent person would exercise in comparable circumstances;

    iii.   Disclose personal interests in transactions;

    iv.   Not engage in activities that create a conflict of interest and, if there is a conflict, to account to the company for any benefit received from the transaction or disclose the conflict to the company and obtain approval;

    v.    Not use the company's property, information or opportunities for their own or anyone else's benefit unless the company consents or the use has been fully disclosed and the company has not objected to it; and

6

vi.    Only use information obtained in confidence from the company for the benefit of the company and must not use it for their own advantage or for the benefit of any other person.

17.    Iraq Telecom alleges, *inter alia*, that Messrs. Aqrawi, Jundi and Rahmeh breached their duties to IHL and Korek by failing to: (1) respond to or otherwise investigate the serious allegations against Sirwan Saber Mustafa Barzani ("Mr. Barzani"), a shareholder and director of Korek, relating to, among other things, the IBL Loan and undisclosed self-dealing; (2) question Mr. Barzani or seek explanations in connection with his alleged wrongdoing; (3) appoint third party experts to analyze the books and records of Korek or procure such books and records; (4) mitigate, or attempt to mitigate, further harm caused to Korek (and therefore IHL) by Mr. Barzani's wrongdoing; (5) suspend or remove Mr. Barzani as the Statutory Manager of Korek; and (6) take other necessary steps to protect the interests of IHL and preserve its assets (*i.e.*, Korek).

18.    Iraq Telecom also alleges that Messrs. Aqrawi and Rahmeh breached their duties under DIFC law for failing to disclose substantial, personal interests in companies which (1) are in direct competition with Korek (*i.e.*, IraqCell and Mobitel); and/or (2) provide products and services to Korek (*i.e.*, DoubleU, D&A Offshore SAL, Halabja Group, International Company for Legal Consulting, K-Energy, ZR Collection, and ZR Group).

19.    As a remedy for the breaches of duty described above, Iraq Telecom seeks:

i.     A declaration that Messrs. Aqrawi, Jundi and Rahmeh breached their duties pursuant to Article 53 of the DIFC Companies Law and Article 159 of the DIFC Law of Obligations;

ii.    An interim order from the Court appointing an authorized representative of IHL ("authorized representative") to (a) appoint a forensic accountant with full power to (i) review Korek's records and evaluate the allegations of wrongdoing, (ii) prepare a report on Korek's assets and liabilities and business activities, and (b) take whatever other actions are necessary to protect IHL and Korek, including by removing and appointing a new Statutory Manager; and (c) requiring Messrs. Aqrawi, Jundi and Rahmeh to

7

fully cooperate with and provide all assistance required by the authorized representative;[4]

iii.   An interim order requiring the following before Korek's Statutory Manager and/or Chairman of IHL's Board may issue decisions:(i) IHL's Directors must be consulted before a liability exceeding USD 50,000 is incurred by Korek or IHL; (ii) IHL's Directors must approve any disposal of assets belonging to either Korek or IHL with a market value of USD 100,000 or more; and (iii) IHL's Directors must approve any commitment with a duration of one year or more; and

iv.   Damages and/or compensation for any loss to Iraq Telecom and/or IHL caused by Messrs. Aqrawi, Jundi and Rahmeh for their breaches of duty and/or as a result of the misconduct alleged.

2.   *Self-Dealing Claims*

20.   In the Self-Dealing DIFC Complaint, Iraq Telecom brought additional claims against Mr. Rahmeh for, among other things, (1) undisclosed self-dealing in violation of Articles 54 and 133 of the DIFC Companies Law; and (2) breach of fiduciary duties pursuant to Article 159 of the Law of Obligations.  The factual basis for these claims is Mr. Rahmeh's failure to disclose his interest in certain of Korek's suppliers (*see supra*) as well as his interest in the special purpose vehicle Korek Telecom SAL, which was incorporated by an associate of Mr. Rahmeh in Lebanon in 2013 and has no apparent purpose.

21.   In the Self-Dealing DIFC Complaint, Iraq Telecom seeks the following, relief:

i.   A declaration that Mr. Rahmeh is in breach of Article 54 of the DIFC Companies Law and/or his fiduciary duty to IHL pursuant to Article 158(2)(c) of the DIFC Law of Obligations;

ii.   A declaration that Mr. Rahmeh is a constructive trustee for monies received in breach of his fiduciary duty or otherwise received unconscionably;

---

[4]   The Applicant intends to file a request in short order with the DIFC court seeking appointment of the authorized representative to investigate the affairs of Korek.  If the DIFC court grants this request, the authorized representative will, among other things, review the information and documents presently available to the Applicant regarding Korek's finances.  The Requested Discovery, *if obtained before the authorized representative commences the investigation*, will allow the authorized representative to conduct a more thorough and comprehensive evaluation, including by tracing the inflow and outflow of Korek funds and identifying any improper uses of such assets by Defendants.

iii. Orders removing Mr. Rahmeh from the IHL Board and requiring him to explain in a sworn statement how much Korek has paid to (a) companies controlled by Mr. Rahmeh (whether indirectly/directly) and/or of which he or a member of his family is a shareholder; and/or (b) Mr. Rahmeh in his personal capacity, whether directly or indirectly through third parties;

iv. An order pursuant to Article 54(4) of the DIFC Companies Law, setting aside the transactions concerned and, in the event that the transactions cannot be set aside, directing that Mr. Rahmeh account to IHL for any profit, gain or benefit realized;

v. Damages and/or compensation for any loss caused by Mr. Rahmeh to Iraq Telecom or IHL for his breaches of duty and misconduct, as well as interests and costs.

B. Status of Proceedings

22. On March 12, 2018, Iraq Telecom filed the Breach of Duty DIFC Complaint with the DIFC Courts.

23. On April 16, 2018, Iraq Telecom filed the Self-Dealing DIFC Complaint with the DIFC Courts.

24. Although the Breach of Duty and Self-Dealing DIFC Complaints have been filed, none of the defendants have been served (with the exception of IHL, the Fourth defendant in the DIFC Litigation), because service needs to be effected pursuant to the Riyadh Convention, which will take a number of months. Once the defendants are served, the DIFC Litigation may proceed.

C. Iraqi Law

25. In addition to DIFC law, Iraqi law is applicable to both complaints in the DIFC Litigation.

26. As an Iraqi LLC, Korek is managed by a sole director or "statutory manager," rather than a board of directors. Under Iraqi law, the statutory manager must perform certain duties, including (1) reporting to shareholders on the company's activities; (2) preparing financial accounts; (3) preparing annual plans regarding the company's activities and budgets; (4)

9

implementing an annual plan and submitting periodic reports to the auditor and an annual report to shareholders on the results of the implementation; and (5) preparing statistical studies in connection with developing the company's business. Importantly, the statutory manager must not have direct or indirect interests in deals involving the company without the permission of the shareholders with full disclosure of the nature and extent of such interests.

     D.     <u>IBL Bank Annual Reports</u>

     27.     Based on its investigation to date in connection with the DIFC litigation as well as other pending matters, Iraq Telecom has determined that, since 2012, IBL Bank's Annual Reports appear to reference the IBL Loan and the fact that it is cash collateralized. For example, IBL Bank's 2016 Annual Report states that:

> Performing corporate loans to large enterprises, outstanding at year end 2015, include **an amount of LBP [Lebanese Pound] 226 billion related to a non-resident customer which is covered by LBP 234 billion cash collateral. Related interest income** and expense amounted to **LBP30.7 billion** and LBP28.83 billion respectively during 2016 and 2015.[5]

* * * * *

     I declare under penalty of perjury under the laws of the United States and the DIFC that the foregoing is true and correct.

     Executed in Dubai, United Arab Emirates, on this the 27th day of September 2018.

_____
Graham Kenneth Lovett

---

[5]     Annual     Report     2016,     IBL     Bank,     S.A.L.     (2016), https://www.ibl.com.lb/library/assets/Gallery/IBL/AnnualReports/2016.pdf (last accessed Aug. 22, 2018).

# Exhibit A



محاكم
**DIFC**
COURTS

Ground Level, Building 4
The Gate District
Dubai International
Financial Centre
PO Box 211724,
Dubai UAE

Tel  +971 4 427 3333
Fax  +971 4 427 3330
www.difccourts.ae

# Claim Form - Court of First Instance

**Issued Date:03/12/18**
**Claim No:CFI-013-2018**

## Claimant(s)

| | | |
|---|---|---|
| **Name** | : | Iraq Telecom Limited |
| **Is Resident of UAE** | : | Yes |
| **Emirates ID** | : | 000-0000-0000000-0 |
| **Address Line 1** | : | Unit 11, Level 3, Gate Village Building 10 |
| **Address Line 2** | : | DIFC, Dubai, United Arab Emirates |
| **Location** | : | United Arab Emirates |
| **Postal code / PO Box** | : | PO Box 507043 |
| **Email** | : | glovett@gibsondunn.com |

## Defendant(s)

| | | |
|---|---|---|
| **Name** | : | Abdulhameed Abdullah Mohammed Salih Aqrawi |
| **Is Resident of UAE** | : | No |
| **Location** | : | Iraq |
| **Email** | : | Hammed.Akrawi@korektel.com |
| **Name** | : | Nozad Hussein Jundi |
| **Is Resident of UAE** | : | ~~Yes~~  No |
| **Location** | : | Iraq |
| **Email** | : | Nawzad.Junde@korektel.com |
| **Name** | : | Raymond Samir Zina Rahmeh |
| **Is Resident of UAE** | : | No |

| | | |
|---|---|---|
| **Location** | : | Lebanon |
| **Email** | : | com@comlb.com |
| | | |
| **Name** | : | International Holdings Limited |
| **Is Resident of UAE** | : | ~~No~~ Yes |
| **Address Line 1** | : | Unit 11, Level 3, Gate Village Building 10 |
| **Address Line 2** | : | DIFC, Dubai |
| **Location** | : | United Arab Emirates |
| **Postal code / PO Box** | : | 507043 |
| **Email** | : | glovett@gibsondunn.com |

## Claim Type

**Type of Claim** : P7

## Claim Value

**Currency** : ~~USD~~ Damages to be quantified

## Particulars of Claim - (Attached)

**Brief Details of Claim** : This is a claim against company directors arising out of self-dealing, undisclosed interests and mismanagement on a breathtaking scale involving the dissipation of tens of millions of US dollars and losses to International Holdings Limited (the "Company"), a DIFC-registered joint venture company which wholly owns Korek Telecom LLC ("Korek"), an Iraqi telecommunications company. The Claimant is a shareholder in the Company and the First to Third Defendants are directors of the Company. The Company is also a Defendant pursuant to Rule 20.64 of the Rules of the DIFC Courts. The Claimant's claim against the Defendants is for breach of directors' duties pursuant to Articles 53 and 133 of the DIFC Companies Law 2009 and/or for breach of fiduciary duties pursuant to Article 159 of the Law of Obligations. The First, Second and Third Defendants have been made aware of the mismanagement of Korek and a multitude of wrongful, unlawful and damaging actions affecting both Korek and the Company. They have ignored these facts and matters

because at least two of the Defendants are also engaged in self-dealing on a massive scale and/or are complicit with the management of Korek.

## Law

**Law governing the Dispute**          : DIFC law

**Law giving Rise to the Jurisdiction** : DIFC Companies Law 2009 (as amended)
**of the DIFC Courts**

## Remedy Sought

a) A Declaration that the First, Second and Third Defendants are in breach of their duties pursuant to Article 53 of the DIFC Companies Law and Article 159 of the DIFC Law of Obligations; b) An interim Order from the Court: (i) appointing an authorised representative of the Company (such as an administrator or other professional) who shall, with full power, acting on behalf of the Company to: 1. appoint a professional forensic accountant with full power to inspect, preserve and take copies of documents and records of Korek (including copying of documents, records and information held electronically) and make all other necessary enquiries of third parties, so that the allegations of wrongdoing can be properly investigated, information gathered relating to the transactions concluded by Mr Barzani and those related to the interests of the First, Second and Third Defendants and other related parties (including CS Ltd directors), and a report provided on the assets and liabilities of Korek and its business activities; and 2. for the purpose of (i) above and for any other purpose that the administrator or other professional deems necessary, undertake whatever actions are required on behalf of and for the benefit of the Company and all of its shareholders including but not limited to the suspension, removal and appointment of a Statutory Manager of Korek. (ii) requiring the authorised representative of the Company to report to the Court on the matters set out in sub-paragraphs 1 and 2 above. (iii) requiring the First, Second and Third Defendants to fully cooperate with and provide all assistance required by the authorised representative appointed pursuant to paragraph (i) above; c) Pending determination of these proceedings, an interim Order imposing certain measures of control for future decisions to be made by Korek's Statutory Manager and by the Chairman of the Company's Board, that: (i) the Company's Directors must be consulted before a liability exceeding US$ 50,000 is considered to be incurred by Korek or the Company; (ii) the Company's Directors must approve any disposal of assets belonging to either Korek or the Company with a market value of US$ 100,000; and (iii) the Company's Directors must approve any commitment with a duration of one year or more. d) Subject to any further order of the Court, an order appointing Mr Froissart to the Company's Board subject to his reappointment by a resolution of the Company's shareholders and subject to Mr Rennard ceasing to be a director on the Company Board if such a resolution is not passed at the next general meeting of the Company's shareholders. e) Damages and/or compensation pursuant to Article 133 of the DIFC Companies Law and/or Article 160(1) of the DIFC Law of Obligations for any loss caused by the First, Second and Third Defendants to the Claimant and/or the Company for their breaches of duty and/or as a result of their conduct as alleged; f) Any other order as the Court sees fit; g) Liberty to apply; and h) Costs.

## Service Location

Outside Dubai

## Statement of Truth

Our Client believes that the facts stated in this claim form are true.

| | |
|---|---|
| **Full name** | : Graham Kenneth Lovett |
| **Signature** | : *Graham Kenneth Lovett* |

## Legal Representative

| | |
|---|---|
| **Firm/Name** | : Gibson, Dunn & Crutcher LLP |
| **Court Registration No.** | : 676A |
| **Address** | : The Exchange Building 5 Level 4 PO Box 506654 |
| **Email** | : JOwens@gibsondunn.com |
| **Telephone No.** | : +971 4 318 4605 |
| **Your Reference** | : 04891-00015 |

Once your claim form has been submitted successfully you will receive a confirmation and an invoice to be settled before your claim can be accepted and progressed. If your submission is unsuccessful you will receive a message explaining the error and how to rectify it.

If you have any problems filling out the form or need further assistance please contact us on + 97144273333 or by email on registry@difccourts.ae.

The DIFC Courts are open between 10am and 4pm, Sunday to Thursday. Please address all correspondence with the court to the Registry (registry@difccourts.ae) and quote the case number if you don't have a case number yet.



Claim No: [•]

**THE DUBAI INTERNATIONAL FINANCIAL CENTRE COURTS**
**IN THE COURT OF FIRST INSTANCE**

**BETWEEN**

**IRAQ TELECOM LIMITED**

<u>**Claimant**</u>

**-and-**

1. **ABDULHAMEED ABDULLAH MOHAMMED SALIH AQRAWI**

2. **NOZAD HUSSEIN JUNDI**

3. **RAYMOND SAMIR ZINA RAHMEH**

4. **INTERNATIONAL HOLDINGS LIMITED**

<u>**Defendants**</u>

_____

**PARTICULARS OF CLAIM**

_____

**INTRODUCTION**

1.      This is a claim against company directors  arising out of self-dealing, undisclosed interests and mismanagement on a breathtaking scale involving the dissipation of tens of millions of US dollars and losses to a DIFC-registered company.

2.      The Claimant is a shareholder in International Holdings Limited (the "**Company**") and the First to Third Defendants are directors of the Company.  The Company is also a Defendant pursuant to Rule 20.64 of the Rules of the DIFC Courts ("**RDC**").  The claim arises in connection with the Company's investment in Korek Telecom Company LLC ("**Korek**"),[1] an Iraqi telecommunications company.  Korek is 100% owned by the Company and, pursuant to the DIFC Companies Law 2009 (as amended) (the "**DIFC Companies Law**") it is a subsidiary of the Company.[2]

3.      The Claimant's claim against the First, Second and Third Defendants is for breach of directors' duties pursuant to Articles 53 and 133 of the DIFC Companies Law 2009 and/or for breach of fiduciary duties pursuant to Article 159 of the Law of Obligations. The First, Second and Third Defendants have been made aware of the mismanagement of Korek and a multitude of wrongful, unlawful and damaging actions affecting both Korek and the Company.  They have ignored these facts and matters because at least two of the Defendants are also engaged in self-dealing on a massive scale and/or are complicit with the management of Korek.  In particular:

   a.   the First Defendant, Mr Aqrawi, has been involved as CEO in a company called Sada Tech, a company that claims to have undertaken works for Korek, and cooperates with IraqCell (a company owned by Sirwan Saber Mustafa Barzani ("**Mr Barzani**")), which is not only in direct competition with Korek (*see* sub-paragraph (d) and paragraphs 44-45 below), but is a company with which Mr Barzani is causing Korek to conclude transactions on undisclosed terms to access to fibre-optic cables (*see* paragraph 48 below);

   b.   the Third Defendant, Mr Rahmeh, has also failed to disclose a substantial interest in one of Korek's competitors.  He is also in breach of his fiduciary

---

[1]      The structure of the investment is shown below but Korek is the Company's only asset.

[2]      DIFC Companies Law, Schedule 1, Article 4.

duties through transactions involving Korek with companies in which he also has a substantial personal interest and to whom Korek has paid tens of millions of US dollars;

c.   The Third Defendant and Mr Barzani have colluded with a Lebanese Bank, IBL Bank SAL, to obtain a loan for US$ 150 million (the "**IBL Loan**") for Korek at an interest rate of 13.25% per annum in circumstances where the Third Defendant and Mr Barzani falsely represented to the Claimant's appointed directors of the Company that the loan was unsecured (albeit guaranteed by Mr Barzani).  A secured loan (which is what the IBL Loan in fact is) would attract interest of around 4% per annum.  As set out below, the Claimant believes that Mr Barzani (at least) has profited from the difference in interest rates at the expense of Korek; and

d.   The first three Defendants are also aware of, and complicit in, the mismanagement of Korek by its sole director and "Statutory Manager" Mr Barzani, who is in day-to-day control of Korek, to the detriment of the Company (and certain of its shareholders), including the lack of transparency of Korek's operations, a lack of accountability of its management, and transactions with connected persons also involving the wrongful dissipation of tens of millions of US dollars.

4.   Despite the fact that the first three Defendants are aware of serious irregularities/wrongdoing in relation to the management of Korek, and the consequential damage to the value of the Company, they have done nothing about these matters and are, in effect, facilitating that wrongdoing and continuing to cause loss to the Company.

**THE STRUCTURE OF THE CLAIM**

5.   This claim describes the way in which Korek has been (and continues to be) mismanaged on a day-to-day basis and how that mismanagement has not been addressed by the first three Defendants.  It also sets out breaches of fiduciary and statutory duties on the part of two of the Defendants in connection with undisclosed interests and/or self-dealing.  The undisclosed/self-dealing claims will be the subject of

separate claims against the concerned Defendants, but they are also relevant to the claim for mismanagement and consequent breaches of Article 53 of the DIFC Companies Law.

6.    The Claimant reserves the right to add to or supplement the claims made in due course in the event it becomes aware of additional facts (albeit the Claimant's access to Korek's financial and commercial information is hampered by the withholding of information and a lack of transparency).

7.    These Particulars of Claim set out:

   a.  The Parties and their roles;

   b.  The background to the claim (including allegations made against the Third Defendant that are the subject of a separate claim);

   c.  The duties owed by Mr Barzani (an appointee of the Company who as the Statutory Manager is in day-to-day control of Korek and who is also the majority shareholder of CS Ltd (*see* below as to CS Ltd)) and the various breaches of duty on the part of Mr Barzani;

   d.  Duties owed by the first three Defendants to the Company;

   e.  Facts giving rise to a breach of duty on the part of the first three Defendants;

   f.  Article 133 of the DIFC Companies Law.

**A.  THE PARTIES AND THEIR ROLES**

8.    The Claimant, Iraq Telecom Limited ("**IT Ltd**"), is a private company limited by shares, incorporated in the Dubai International Financial Centre ("**DIFC**") with registered number 1019, having its registered office at Unit 11, Level 3, Gate Village Building 10, DIFC, Dubai, 507043, United Arab Emirates.

9.    The Defendants Abdulhameed Abdullah Mohammed Salih Aqrawi (the "**First Defendant**"), Nozad Hussein Jundi (the "**Second Defendant**") and Raymond Samir Zina Rahmeh (the "**Third Defendant**") are directors of the Company.

10.    The Company, as the Fourth Defendant, is a Defendant pursuant to RDC 20.64.  The Company is a private company limited by shares, incorporated in the DIFC with registered number 1020, having its registered office at Unit 11, Level 3, Gate Village Building 10, DIFC, Dubai 507043, United Arab Emirates.

## B.  THE BACKGROUND TO THE CLAIM

11.    Korek is a limited liability company incorporated with the Registration Directorate of Companies of the Kurdistan Regional Government in the Republic of Iraq. Korek started operations in Iraq in 2000 and initially held a regional mobile telephone licence for Kurdistan. Then, in 2007, Korek was awarded a nationwide mobile telecommunications licence (the "**Licence**") by the Iraqi Communication and Media Commission (the "**CMC**"), the Iraqi government body responsible for mobile telephone regulation and licensing.

12.    As Korek did not have sufficient funds to pay the second instalment of the licence fee payable pursuant to the Licence, it sought external funding. In September 2007, Agility Public Warehousing Company KSC ("**Agility**") invested US\$ 250 million in Korek by way of a convertible senior loan note, guaranteed by the Kurdistan Regional Government of Iraq.  The US\$ 250 million that Agility invested was transferred directly from Agility's bank account to the CMC's bank account.

13.    In late 2010, it became clear that Korek needed further financial support and additional technical know-how to roll out its network outside of Kurdistan into the rest of Iraq. In this context, Orange S.A. ("**Orange**"), formerly France Télécom S.A., a French multinational telecommunications corporation, was identified as a suitable joint venture partner. Orange subsequently agreed to invest in the structure.

14.    As part of the investment transaction (the "**Investment Transaction**"), it was agreed that, in return for an investment of approximately US\$ 800 million, including a shareholder loan of US\$ 285 million, Agility and Orange would acquire an indirect stake of 44% in Korek by subscribing for new shares and diluting the shares of the then shareholders (three high net worth Iraqi individuals, namely Mr Barzani, Jawshin Hassan Jawshin Barazany and Jiqsy Hamo Mustafa, together the "**Original Shareholders**").

15.   In this context, the Claimant was established as a joint venture vehicle between Agility and Orange.   Korek International (Management) Ltd ("**CS Ltd**") was established as a joint venture vehicle for the Original Shareholders. The Claimant understands that Mr Barzani is CS Ltd's controlling shareholder.

16.   The Claimant and CS Ltd, in turn, hold their respective interests via the Company, which was established to hold 100% of the shares in Korek.

17.   The group's structure following the Investment Transaction, implemented in July 2011, is as follows:



(a)   Agility's interest is held indirectly via a number of holding entities, including amongst others Alcazar Capital Partners (*Cayman Islands*).

(b)   Orange's interest is held indirectly via a number of holding entities, including amongst others Atlas Services Netherlands B.V. (*the Netherlands*).

(c)   It is understood that on or around the time of the Investment Transaction, Mr Aso Ali acquired an interest in CS Ltd and that CS Ltd is jointly owned by the Original Shareholders and Mr Ali.

18.    The Investment Transaction was implemented pursuant to the terms of a subscription agreement dated 27 July 2011, entered into between the Company, Korek, Mr Barzani, Mr Jawshin Hassan Jawshin Barazany, Mr Jiqsy Hamo Mustafa, CS Ltd, the Claimant, Alcazar Capital Partners and Atlas Services Nederland B.V. (the "**Subscription Agreement**").

19.    The ongoing relationship between the parties is further governed by a shareholders' agreement dated 10 March 2011 and entered into by the Company, Korek, Mr Barzani, CS Ltd and the Claimant (the "**IH Shareholders' Agreement**").

20.    Pursuant to the terms of the IH Shareholders' Agreement and the Company's Articles of Association, the Company's board of directors (the "**IH Board**") consists of seven members, namely:

(a)    three directors nominated by the Claimant (the "**IT Ltd Directors**");

(b)    three directors nominated by CS Ltd (the "**CS Ltd Directors**"); and

(c)    one independent director also nominated by CS Ltd (the "**Independent Director**").

21.    The First and Second Defendants are two of the three CS Ltd Directors. Mr Barzani is the third CS Ltd Director but is not a party to these proceedings. This is because the appropriate forum for any claim against him in relation to the subject matter of these proceedings is arbitration pursuant to the IH Shareholders' Agreement.  Mr Barzani acts as Chairman of the Company's Board.

22.    The Third Defendant is the Independent Director (*i.e.* paragraph 20(c) above) nominated by CS Ltd.  However, the Third Defendant is not genuinely independent and is in fact closely affiliated with CS Ltd and Mr Barzani, having consistently represented their interests on the Company Board and otherwise, including in dispute resolution proceedings between the Claimant and CS Ltd/Mr Barzani.

23.    Korek, being an Iraqi limited liability company (LLC), does not have a board of directors as a matter of Iraqi law but is managed by the sole director (the "**Statutory Manager**"). In this respect, the Company (in its capacity as Korek's sole shareholder) appointed Mr Barzani as the Statutory Manager following implementation of the

Investment Transaction.  The Company's shareholders had also agreed that the Claimant would be entitled to designate a CEO for Korek for appointment by Mr Barzani. However, since June 2015, and in breach of his contractual obligations, Mr Barzani has refused to appoint any of the four candidates proposed by the Claimant after Korek's last CEO resigned, leaving him effectively in sole control of Korek.

24.    In addition, the parties to the Investment Transaction agreed to establish a contractual body, the Korek Supervisory Committee (the "**KSC**"), with responsibility for the overall direction and management of Korek. The KSC consists of seven members, currently being the same persons as the members of the IH Board.  While during the first years of Korek's life, the KSC met on a regular basis, the KSC has not met regularly during the last two years.  The last meeting took place in Milan in March 2017 after a one-year interruption and following numerous letters sent by certain directors of the Company appointed by the Claimant to Mr Barzani and the first three Defendants regarding the lack of proper governance resulting from the absence of regular meetings of the KSC.  Since then, Mr Barzani (who is the sole person authorised to convene KSC meetings) has not convened any KSC meetings.  Effectively, Korek currently operates under the sole management and control of Mr Barzani.

25.    Under the effective control of Mr Barzani, the affairs of Korek are now kept hidden away from the Claimants.  Indeed, since the date of the Investment Transaction more than 7 years ago, the Company has not finalized or approved any audited accounts, in breach of DIFC law.  This is due almost entirely to the failure of Mr Barzani to provide any meaningful financial information to the Claimants which would enable them to assess the accuracy of the draft financial statements provided by him.  As a result of Mr Barzani's deliberate refusal to provide any responses to the Claimant's queries, the Claimants have been unable to validate the accuracy of any of the draft monthly, quarterly or annual accounts provided by Korek, which have been characterized by very significant, questionable payments to suppliers.  Numerous legitimate and proper questions asked about such payments remain unanswered.  For example, questions concerning Korek's draft 2016 financials remain unanswered, as do questions relating to the financials for February, March, May, June, July, September, October, November and December 2017.  Further questions on specific issues also remain unanswered.

## C.   THE DUTIES OWED BY MR BARZANI TO KOREK, AND HIS BREACHES OF THOSE DUTIES

26.   This section sets out the duties that are owed by Mr Barzani in relation to his position as Statutory Manager of Korek.  The duties are similar to those owed by directors or other officers of DIFC companies.  Although the purpose of this section is not to make any claim against Mr Barzani in these proceedings (since the claims are subject to parallel arbitration proceedings), it provides to this Court the full picture of the numerous breaches of duty that he has committed in relation to Korek, and in connection with which the first three Defendants, in breach of their own duties under DIFC Law, have done nothing to investigate or address.  These breaches are dealt with in Section E below.

*Duties owed by Mr Barzani as Statutory Manager of Korek*

27.   In his capacity as the Statutory Manager of Korek, and pursuant to Iraqi law, Mr Barzani, also owes duties to Korek. These comprise a duty:

(a)   to serve the interests of Korek as he would serve his own personal interests (Article 120 of the Iraqi Companies Law No. 21 of 1997 as amended (the "**Iraqi Companies Law**"));

(b)   to run Korek in a sound and legal manner (Article 120 of the Iraqi Companies Law);

(c)   not to have direct or indirect interests in deals that are concluded with Korek, except after obtaining the permission of the general assembly (which in the present case means the Company) with full disclosure of the nature and extent of such interests (Article 119(1) of the Iraqi Companies Law);

(d)   to carry out the general assembly's decisions and follow up on their implementation (Article 117(2) of the Iraqi Companies Law);

(e)   to prepare final accounts and submit them to the general assembly for discussion and approval (Article 117(3) of the Iraqi Companies Law);

(f)     to discuss and approve an annual plan for Korek's activities in the following year (Article 117(4) of the Iraqi Companies Law);

(g)     to follow up on the implementation of the annual plan and submit periodic reports to the auditor and an annual report to the general assembly on the results of the implementation (Article 117(5) of the Iraqi Companies Law); and

(h)     to prepare statistical studies with the view to developing Korek's business (Article 117(6) of the Iraqi Companies Law).

*Breaches of duty by Mr Barzani as Statutory Manager of Korek*

28.   Mr Barzani has repeatedly acted (or failed to act), in his capacity as Statutory Manager, in breach of his duties owed to Korek under Iraqi law. This has damaged the value of Korek and consequently the Company's investment in Korek.  Without prejudice to the generality of the foregoing, Mr Barzani:

a)     has engaged (and continues to engage) in self-dealing by:

   i.    misrepresenting (and/or failing to disclose) key terms with respect to Korek's entry into a US$ 150 million bank loan, causing substantial harm to Korek (and thus the Company) and personally benefiting himself (*see* paragraphs 30 to 42 below);

   ii.   maintaining a significant interest in businesses that are in competition with Korek (*see* paragraphs 44 to 48 below);

   iii.  causing Korek to engage suppliers in relation to whom Mr Barzani has a personal interest (*see* paragraphs 49 to 52 below);

b)     has refused to appoint a CEO for Korek, which has been without a CEO for nearly three years (*see* paragraphs 52 to 54 below);

c)     has operated Korek in a secretive fashion and refuses to share critical information with the KSC, including in respect of substantial liabilities incurred by Korek (*see* paragraphs 55 to 58 below);

29.   The following paragraphs set out the breaches of duty by Mr Barzani in more detail.

*The IBL Loan*

30.     As part of the Investment Transaction, the Claimant and the Company also entered into a facility agreement dated 27 July 2011 pursuant to which the Claimant provided a shareholder loan of US$ 285 million to the Company (the "**IT Shareholder Loan**"). The Company in turn entered into a back-to-back shareholder loan agreement with Korek dated 27 July 2011 (the "**IH-Korek Facility Agreement**"), pursuant to which the Company on-lent the loan to Korek. Separately, Korek provided a guarantee to the Claimant, dated 27 July 2011, guaranteeing the Company's obligations to the Claimant under the IT Shareholder Loan (the "**Korek Guarantee**").

31.     Although it would have been appropriate for CS Ltd to also provide its pro rata portion of shareholder loan funding to the Company, it refused to do so, thereby resulting in the IT Shareholder Loan, and the equity contributions made by the Claimant as part of the Investment Transaction, being the sole source of funding to Korek.

32.     In December 2011, less than one year from the date of the Investment Transaction, Korek required additional funds to pay an instalment of the licence fee.   The shareholders of the Company agreed that any additional funding would need to come from third party banks.  This need for additional funding occurred at a time when CS Ltd failed to provide a first payment of US$ 14,985,000 as committed shareholder funding.

33.     As a result, Mr Barzani and the Third Defendant arranged a loan of US$ 150 million from IBL Bank SAL (the "**IBL Loan**" and "**IBL**" respectively). IBL charged Korek interest at a rate of 13.25% per annum.

34.     The Claimant approved Korek's entry into the IBL Loan on the basis of representations made by Mr Barzani and the Third Defendant that the IBL Loan was an unsecured, third party bank loan (albeit with a personal guarantee provided by Mr Barzani) and was the only bank loan that could be procured, thereby representing market terms.

35.     Korek warranted that its obligations to IBL would constitute its "*direct, general, unconditional, unsubordinated, unsecured obligations*". In order to facilitate the IBL Loan, the Claimant also agreed to subordinate the IT Shareholder Loan in favour of the IBL Loan. Mr Barzani personally guaranteed Korek's performance under the IBL loan.

36.   The Claimant believes that Mr Barzani created a "sham" arrangement of which the Third Defendant is aware, in that the IBL Loan is not, in fact, unsecured.  In fact, at a board meeting of the KSC held on 13 October 2015, the Third Defendant was specifically asked about the IBL Loan by one of the Claimant's appointed directors, who asserted a belief that it was "*fully collateralised*".  The Third Defendant falsely replied that it was not collateralised, as Mr Barzani had provided a guarantee (*i.e.* that the guarantee was the only form of security put up for the loan).

37.   Since 2012, IBL's Annual Reports appear to reference the IBL Loan and the fact that it is cash collateralised. For instance, in the 2016 Annual Report, it is stated that:

> "*Performing corporate loans to large enterprises, outstanding at year end 2015, include an amount of LBP 226 billion related to a non-resident customer which is covered by LBP 234 billion cash collateral. Related interest income and expense amounted to LBP30.7 billion and LBP28.83 billion respectively during 2016 and 2015*".

The IBL Loan of US$ 150 million equates to approximately LBP 226 billion (1 US$ = 1,506.6 LBP), which accords with the amount of the performing corporate loan to a "*non-resident customer*" referenced in IBL's accounts. Furthermore, the interest due on this loan for 2015 is said to be LBP 30.7 billion which is just over 13% of the principal amount said to be owing; this also accords with the interest rate of the IBL Loan of 13.25%.

38.   Furthermore, by way of a letter from IBL to Korek dated 30 August 2017, IBL requested that Korek provide "*additional collateral*" for the IBL Loan. The use of the word "*additional*" in the letter further confirms the Claimant's belief that the IBL Loan is in fact collateralised.

39.   The Claimant believes that Mr Barzani secretly provided cash collateral to secure the IBL Loan as part of an arrangement designed to have Korek mask the interest payments under the IBL Loan as unsecured interest payments at a rate of 13.25% from which Mr Barzani would take a share through interest payments on the cash collateral, rather than

pay IBL a true market rate of around 4% for the collateralised loan.  This had the effect of Korek paying money indirectly to Mr Barzani.

40.     Korek is paying 13.25% interest on what is in reality a fully collateralised loan, for which an appropriate market rate would be around 4%. Mr Barzani and the Third Defendant did not disclose the position to the Claimant as shareholder of the Company; nor was it disclosed to any of the Claimant's representatives on the Company's Board or the KSC.

41.     As a result of Mr Barzani's actions (assisted by the Third Defendant), to date Korek has paid a far higher amount of money in respect of the IBL Loan (based on the 13.25% interest rate in the IBL Loan Agreement), than it should have done  (based on a market interest rate of 4% for a fully secured loan). A separate claim is in the process of being made against Mr Barzani under the IH Shareholders' Agreement and will be the subject of arbitration proceedings.

42.     Mr Barzani's actions were in breach of his duty to Korek under Article 119 of the Iraqi Companies Law (as particularised in paragraph 28(c) above) and have caused Korek loss and damage for which he is liable under that Article.  In assisting Mr Barzani to negotiate the IBL Loan (and keep the fact of the collateralisation of such a loan from the Claimant appointed directors), the Third Defendant is also in breach of his fiduciary duties to the Company as the payment by Korek of unnecessarily high interest rates has caused (and continues to cause) the Company (whose sole asset is Korek) loss.

*Engaging in Competition with Korek*

43.     Pursuant to Clause 17 of the IH Shareholders' Agreement, CS Ltd and Mr Barzani agreed that neither they nor their Affiliates (as defined therein) would compete with the Group[3] in the Republic of Iraq. In this context, the IH Shareholders' Agreement defines "*compete*" as "*undertaking, or being interested in any business which carries out, any Core Restricted Activities*". Core Restricted Activities, in turn, are defined as:

                    "*(i) the provision of mobile voice and data communications services, (ii) the provision of any service in connection with or in relation to the*

---

[3]    Defined therein as the Company, Korek and their subsidiaries from time to time.

*telecommunications industry permitted by the National Mobile License, (iii) the provision of Wimax telecommunication services, (iv) the making, directly or indirectly, of any application for a telecommunications License in the Republic of Iraq, (v) the carrying on of a mobile virtual network operator business, or (vi) the carrying on of any tower or mobile infrastructure business; in each case in the Republic of Iraq, whether alone or jointly with others or whether as principal, agent, shareholder or otherwise and whether for the relevant entity's or person's own benefit or that of others".*

44. Contrary to Clause 17 of the IH Shareholders' Agreement, Mr Barzani holds an 80% equity interest in, and serves as a director of, IraqCell Telecommunication Limited ("**IraqCell**"), a mobile infrastructure business operating in the Republic of Iraq. On 23 March 2014, the Kurdistan Regional Government of Iraq awarded IraqCell a licence to install and run a fibre optic network between all towns and cities in the Kurdistan Region. Furthermore, the Claimant understands that the CMC awarded IraqCell a provisional CDMA and WiMax[4] licence for the southern region of Iraq. On the basis of the above, it is clear that IraqCell engage in Core Restricted Activities and therefore that Mr Barzani and CS Ltd (on the basis that Mr Barzani is an Affiliate of CS Ltd) are in breach of Clause 17 of the IH Shareholders' Agreement. The actions on the part of Mr Barzani are breaches of his duties particularised in paragraphs 28 (a), (b) and (c) above.

45. Furthermore, in breach of Clause 17.3 of the IH Shareholders' Agreement, which requires the immediate removal from the Company Board and the KSC of any person appointed to the governing body of a company which competes with the Group, Mr Barzani continues to act as a director of the Company and a member of the KSC. None of the First, Second or Third Defendants have taken any steps to even question Mr Barzani's actions, let alone implement the provisions of Clause 17.3.

---

[4]   "CDMA" means Code-Division Multiple Access and refers to protocols used in second-generation (2G) and third-generation (3G) wireless communications.  "WiMax" means Worldwide Interoperability for Microwave Access and is a standard for long-range wireless networking.

46. In addition, pursuant to Clause 1.2 of a letter agreement entered into on or around 27 July 2011 between Mr Barzani, the Claimant and the Company (the "**IraqCell Agreement**"),  Mr Barzani undertook and agreed that:

   a.  he would not take any action or decision in respect of his shareholding in IraqCell and would procure that IraqCell does not trade and does not compete in any way with Korek without the prior written consent of the Claimant; and

   b.  unless otherwise agreed in writing by the Claimant, he would use all reasonable endeavours to liquidate or dissolve IraqCell as soon as reasonably practicable following the date of the IraqCell Agreement (without any liability for Korek, the Company or the Claimant).

47. Mr Barzani is in breach of his obligations under the IraqCell Agreement, which incorporates the arbitration agreement contained in the Subscription Agreement. The actions on the part of Mr Barzani are a breach of his duties particularised in paragraphs 28(a), (b) and (c) above.

48. It has also come to the Claimant's attention that Mr Barzani personally benefits from an undisclosed arrangement whereby IraqCell has been engaged to install fibre-optic cable for Korek, in breach of Clauses 6.8 and 28 of the IH Shareholders' Agreement. The actions on the part of Mr Barzani are also breaches of his duties particularised in paragraphs 28(a), (b) and (c) above.

*Undisclosed self-dealing – Korek's Suppliers*

49.  Mr Barzani has caused substantial purchase orders to be issued by Korek to companies in which Mr Barzani has substantial undisclosed personal interests. For example, for the years 2011 through 2016, Mr Barzani caused Korek to issue, directly or through third parties, purchase orders to:

   (a)  the Darin Group (widely reported to be beneficially owned by Mr Barzani), which received purchase orders totalling at least US$ 262.3 million during that period; and

(b)     K-Energy (owned by Mr Barzani, together with the other Original Shareholders), which have received purchase orders exceeding US$ 13 million during the same period.

50.     Furthermore, Mr Barzani has caused Korek to engage suppliers directly or through third parties. For example, in the period between October 2016 and March 2017, Mr Barzani caused substantial purchase orders amounting to US$ 17 million to be issued by Korek to Ersal FZCO ("**Ersal**").   One of Ersal's directors and a 50% shareholder is Ms Nathalie Attiya, who the Claimant believes to be a dietician and café owner based in Dubai, as well as having an interest in a company called Right Bite Nutrition and Catering Services LLC.  The ownership profile of Ersal appears inconsistent with its licenced trading activity which is to trade in antennae, solar energy systems & components and telecommunications equipment.   Furthermore, although Ersal was incorporated on 29 October 2012 in Dubai, it also appears that the company was awarded purchase orders by Korek of over US$ 325,000 in May 2012, some five months before it was even incorporated.

51.     Mr Barzani's actions amount to a breach of his duties under Article 119 of the Iraqi Companies Law (as particularised in paragraph 28 (c) above).

*No Proper Governance – The Refusal to appoint a CEO*

52.     Pursuant to Clause 8.3 of the IH Shareholders' Agreement, and in accordance with its responsibilities to act in the best interests of the Company and Korek, the Claimant has the right to propose candidates for appointment as the CEO of Korek. Further, pursuant to Clause 8.4 of the IH Shareholders' Agreement, Mr Barzani, as the Statutory Manager, must formally appoint the CEO proposed by the Claimant.

53.     Korek's CEO, Ms Ghada Gebara, resigned with effect from 15 June 2015. Since then, the Claimant has proposed no less than four CEO candidates for formal appointment by Mr Barzani. However, Mr Barzani has refused to appoint any of them, thus leaving Korek without a CEO for nearly three years.

54.     Mr Barzani's conduct has been in breach of his duty under paragraphs 28 (a) and (b) above and has caused damage to Korek and the Company as it has been denied the

leadership, governance oversight and strategic vision which would have been provided by a CEO.

*The refusal to provide financial information*

55.     As CS Ltd's (and thus the group's) controlling shareholder and Korek's Statutory Manager, Mr Barzani has day-to-day control over Korek and its operations. In addition, Mr Barzani has control over relevant financial and other information.

56.     In this respect, pursuant to the terms of a management agreement between Mr Barzani and Korek, Mr Barzani is contractually obliged to keep the KSC (and thus the Company's Board) up to date with information received by him and/or Korek. However, despite numerous and repeated information requests by the Claimant and the Claimant's directors, Mr Barzani has failed to provide even the most basic and essential information.

57.     For example, and without prejudice to the generality of the foregoing, to date, the Claimant's directors have made clear and repeated requests to Mr Barzani, concerning:

(a)     key financial information relating to the assets and liabilities of Korek;

(b)     information in respect of significant claims faced by Korek, including an alleged US$ 150 million liability relating to a claim by the Iraqi Telecommunication and Post Company; and

(c)     information in respect of significant and unexplained capital expenditures, such as unspecified and unsubstantiated "*consulting and legal fees*" of up to US$ 18 million per year.

Requests for information have been made in connection with Korek's draft 2016 financials, as well as the February, March, May, June, July, September, October and November 2017 financials, and a withholding tax issue that was raised in an e-mail of 9 July 2017.  To date, the Company's Board has not received answers to questions raised concerning any of the above information.

58.     As a result of the breaches by Mr Barzani in failing to share the financial information of Korek, the Company's Board has no proper visibility of Korek's financial position,

and as a result, the Company Board members are hampered in discharging their functions to the Company to its disadvantage. The lack of visibility further compounds the issues surrounding the lack of leadership, governance oversight and strategic vision of the Company that have resulted from the Company not having a CEO.

59.    The above is also a clear breach of Mr Barzani's duty to manage Korek in a sound and legal manner as set out in paragraph 28(b) above.

*Other breaches of duty on the part of Mr Barzani*

60.    Mr Barzani, as Statutory Manager of Korek and representative of the shareholder CS Ltd in Korek, has failed to perform his duties under Article 117 of the Iraqi Companies Law, and in doing so has acted as an obstacle to the success of the Company and to the Company's detriment.  In particular, he has failed to:

(a)    convene a general assembly in seven years by meeting with the Company's appointed representative(s) as required by Article 87 of the Iraqi Companies Law;

(b)    prepare annual plans comprising Korek's activities and budgets since 2011 as per Article 117(4) above;

(c)    report, transparently and continuously, to the Company on Korek's activities as per Article 117(5) and refused to share critical information with KSC on Korek and its operations; and

(d)    prepare any studies for developing Korek's business as per Article 117(6).

61.    The final accounts of an Iraqi LLC must be signed by the Statutory Manager, who is responsible for the truth of their contents pursuant to Article 138 of the Iraqi Companies Law. As per Article 139 of the Iraqi Companies Law, copies of the report on the final accounts, the annual plan, as well as the general assembly's decisions on the final accounts, must be submitted to the Companies Registrar. The submission should be within seven days from the adoption of the final accounts pursuant to Article 99 of the Iraqi Companies Law.  Mr Barzani, in his capacity as the representative of the Company has failed to observe his duty to issue any resolutions adopting the financial accounts or annual plans of Korek since 2011, and consequently to report the same to the Companies Registrar since that time.

### D.  THE DUTIES OWED BY THE FIRST THREE DEFENDANTS TO THE COMPANY

62.  As directors of the Company, the First, Second and Third Defendants (and Mr Barzani) owe duties to the Company pursuant to Article 53 of the DIFC Companies Law 2009 (as amended), which provides:

> "*A Director or other officer of a Company, in exercising his powers and discharging his duties, shall:*
>
> *(a)   act honestly, in good faith and lawfully, with a view to the best interests of the Company; and*
>
> *(b)   exercise the care, diligence and skill that a reasonably prudent person would exercise in comparable circumstances.*"

63.  Directors of a DIFC Company are also under a duty to disclose interests in transactions. Article 54 of the DIFC Companies law provides that:

> *(1)   A Director of a Company who has, directly or indirectly, an interest in a transaction entered into or proposed to be entered into by the Company or by a subsidiary of the Company which to a material extent conflicts or may conflict with the interests of the Company and of which he is aware, shall disclose to the Company the nature and extent of his interest.*
>
> *(2) The disclosure under Paragraph (1) shall be made as soon as practicable after the Director becomes aware of the circumstances which gave rise to his duty to make it.*
>
> *(3) A notice in writing given to the Company by a Director that he is to be regarded as interested in a transaction with a specified person is sufficient disclosure of his interest in any such transaction entered into after the notice is given.*
>
> *(4) Subject to Paragraphs (5) and (6), where a Director fails to disclose an interest of his under this Article, the Company or a Shareholder of the Company or the Registrar may apply to the Court for an order setting aside the transaction concerned and directing that the Director account to the Company for any profit, gain or benefit realised, and the Court may so order or make such other order as it thinks fit.*

*(5) A transaction is not voidable, and a Director is not accountable, under Paragraph (4) where, notwithstanding a failure to comply with this Article:*

*(a)    the transaction is confirmed by Resolution; and*

*(b) the nature and extent of the Director's interest  in  the  transaction were disclosed in reasonable detail in the notice calling the General Meeting at which the Resolution is passed.*

*(6) Without prejudice to its power to order that a Director account for any profit, gain or benefit realised, the Court shall not set aside a transaction unless it is satisfied that:*

*(a)  the interests of third parties who have acted in good faith there under would be unfairly prejudiced if the transaction were not set aside; and*

*(b)  the transaction was not reasonable and fair in the interests of the Company  at the time it was entered into.*

64.    For the purpose of Article 54, Schedule 1, Article 4 of DIFC Companies Law provides that a body corporate (Korek) is a subsidiary of another body corporate (the Company) if the second body corporate (the Company):

(a) holds a majority of the voting rights in the first body corporate;

(b) is a shareholder or member of the first body corporate and has the right to appoint or remove a majority of the board of directors or managers of the first body corporate; or

(c) is a shareholder or member of the first body corporate and controls alone, pursuant to an agreement with other shareholders or members, a majority of the voting rights in the first body corporate,

or if the first body corporate is a subsidiary of a body corporate which is itself a subsidiary of the second body corporate.

65.    Therefore and pursuant to DIFC Companies Law, Korek is a subsidiary of the Company as the Company is a shareholder of Korek and has the right to appoint or remove the Statutory Manager.

66. The First, Second and Third Defendants also owe fiduciary duties to the Company pursuant to Article 159 of the DIFC Law of Obligations.  Pursuant to Schedule 3 of that law the following duties are owed:

*1. Loyalty*

A fiduciary must act in good faith in what he considers to be the interests of the principal without regard to his own interests.

*2. Conflict of interest*

(a)     A fiduciary must not place himself in a position where his own interest conflicts with that of his principal.

(b)     If there is a conflict between an interest or duty of a fiduciary, and an interest of the principal in any transaction, he must account to the principal for any benefit he receives from the transaction.

(c)     A fiduciary does not have to account for the benefit if the interest or duty has been disclosed to and approved by the principal.

*3. No secret profits*

A fiduciary must not use the principal's property, information or opportunities for his own or anyone else's benefit unless his principal has consented or the use has been fully disclosed to the principal and the principal has not objected to it.

*4. Confidentiality*

A fiduciary must only use information obtained in confidence from his principal for the benefit of the principal, and must not use it for his own advantage or for the benefit of any other person.

*5. Care, skill and diligence*

A fiduciary owes the principal a duty to exercise the care, skill and diligence which would be exercised in the same circumstance by a reasonable person having both:

(a)     the knowledge and experience that may reasonably be expected of a person in the same position as the fiduciary; and

(b)     the knowledge and experience which the fiduciary has.

## E.  FACTS GIVING RISE TO THE BREACH OF DUTY ON THE PART OF THE FIRST THREE DEFENDANTS

67.    This section sets out the facts giving rise to the breaches of duty on the part of the First, Second and Third Defendants in failing to address the serious allegations set out above concerning the acts and omissions of Mr Barzani.  It also sets out the facts giving rise to separate breaches of duty against named defendants.

68.    The matters set out in paragraphs 30 to 61 above individually and collectively constitute gross breaches of Mr Barzani's duties to Korek under Iraqi law. Moreover, Mr Barzani's wrongdoings have resulted in serious prejudice to the Company, as the sole owner of Korek. The above matters either individually or collectively warrant the removal of Mr Barzani as Director of the Company and his removal as Statutory Manager of Korek.

69.    As set out above, the First, Second and Third Defendants were all nominated for appointment to the Company's Board by CS Ltd.  However, they have, in breach of the duties set out in paragraphs 62 to 66 above, failed to act in the Company's best interests. Instead, and in breach of Article 53 of the DIFC Companies Law and/or Article 159 of the Law of Obligations, the named Defendants have improperly sought to favour their own interests and/or the interests of Mr Barzani, and/or CS Ltd and/or CS Ltd's other shareholders to the detriment of the Company and the Claimant.

70.    By letter dated 1 November 2017, the Claimant's directors wrote to the First, Second and Third Defendants setting out Mr Barzani's wrongful actions, as pleaded above, and requesting that the Company's Board:

(a)     take steps to ensure the full disclosure of information and transactions entered into by Mr Barzani on behalf of Korek and assess the financial consequences of those transactions on Korek;

(b)   procure that the Company, as the sole shareholder of Korek, takes appropriate steps to obtain the appointment of a professional inspector by the Companies Registrar under Iraqi Law with the power to investigate the alleged mismanagement of Korek, gather information related to the transactions concluded by Mr Barzani, and provide a report on the assets and liabilities of Korek; and

(c)   take steps to ensure the removal of Mr Barzani as the Statutory Manager of Korek and any other steps to prevent the further deterioration of Korek's financial situation through the conclusion of other transactions detrimental to Korek's interests and transactions with third parties in which Mr Barzani has a personal interest.

71.   In the absence of a response to their letter dated 1 November 2017, the Claimant's directors sent a further letter to the First, Second and Third Defendants on 19 November 2017 seeking their confirmation within 10 days that they intended to take the steps outlined in paragraph 70 above.

72.   A further letter to Mr Barzani dated 18 January 2018 concerning material undisclosed interests and self-dealing transactions was copied to the First, Second and Third Defendants (as directors of the Company) on 19 January 2018.  That letter referred to Mr Barzani's ownership of Darin Group, which during the period 2011 to 2016 had received purchase orders totalling US$ 262.3 million, as well as his ownership (with other shareholders of CS Ltd.) of K-Energy which during the same period received purchase orders from Korek exceeding US$ 13 million.

73.   Despite the urgency with which the Company's Board should have dealt with these matters in the best interests of the Company, in complete disregard of the Company's interests and in breach of their fiduciary duties the First, Second and Third Defendants failed to respond to these letters let alone address the matters raised by them.  Their failures to act are each breaches of their duties to the Company under Article 53 of the DIFC Companies Law and Article 159 of the DIFC Law of Obligations.  In particular:

   *The IBL Loan*

a. The First, Second and Third Defendants were put on notice of the Claimant's concerns regarding the IBL Loan by letters dated 1 and 19 November 2017 (referred to below).  The Third Defendant was also directly involved in the negotiations with IBL and it is to be inferred that he was fully aware of the nature and status of the loan, the inflated interest payments paid under it (given that it was secured by collateral) and the losses occasioned to Korek as a result.  In breach of their duties set out above, no questions have been raised with respect to the IBL Loan and its detrimental impact on Korek and therefore the Company and none of the first three Defendants have taken steps to protect the interests of the Company.

*Competition with Korek*

b. The First, Second and Third Defendants were also formally notified of Mr Barzani's interest in IraqCell by the letters dated 1 and 19 November 2017 (referred to above), and his interests in Darin Group and K-Energy by the letter dated 18 January 2018.

*Korek's Suppliers*

c. The First, Second and Third Defendants were put on notice that Mr Barzani had supplied Korek through companies in which he had a substantial interest without disclosing that interest by the letters dated 1 and 19 November 2017 (referred to above).  In the further letter dated 18 January 2018, the First, Second and Third Defendants were informed that Mr Barzani has substantial undisclosed interests in a number of Korek's key suppliers for which Korek had issued sizeable purchase orders.

*Failure to appoint a CEO*

d. The First, Second and Third Defendants were put on notice in the letters dated 1 November 2017 and 19 November 2019 that Mr Barzani must formally appoint a CEO proposed by the Claimant.  Four candidates were proposed over a period of two years but Mr Barzani has failed to appoint any one of them.  The First, Second and Third Defendants were informed that this was particularly

concerning given Mr Barzani's violation of his non-compete obligation and his entering into self-dealing transactions without being authorised to do so.

*Refusal to provide information*

e.  As set out at paragraphs 55 to 58 above, the Company's Board has no visibility on Korek's financial position and the Board members are hampered in discharging their functions to the Company to its disadvantage.  Although the First, Second and Third Defendants have been aware of the requests for information and the fact that such information has not been forthcoming, they were formally notified again in the letters dated 1 November and 19 November 2017.  They have failed to seek any of the above information or, if available to them, to disclose such information to the other Company Board members.

74.  The letters addressed to the First, Second and Third Defendants of 1 November 2017 and 19 November 2019 went unanswered.  None of the First, Second and Third Defendants have responded to or commented on the matters raised in the letter to Mr Barzani dated 18 January 2018, to which they were copied.

## F.  FURTHER BREACHES OF DUTY DIRECTLY INVOLVING THE FIRST THREE DEFENDANTS

75.  As well as breaching their duty to the Company by failing to respond to the serious allegations concerning Mr Barzani, the First, Second and Third Defendants have also, again in breach of Article 53 of the DIFC Companies Law and Article 159 of the DIFC Law of Obligations failed to act honestly, in good faith and lawfully, with a view to the best interests of the Company, or to exercise the care, diligence and skill that a reasonably prudent person would exercise in comparable circumstances in respect of the following matters:

*Failure to enforce the Company's contractual rights*

76.     Pursuant to Clause 2.2(b) of the Subscription Agreement, CS Ltd was required to make cash payments totalling approximately US$ 75 million to the Company in respect of certain shares in the Company issued to CS Ltd in the context of the Investment Transaction. Under the Subscription Agreement, Mr Barzani also provided an unconditional and irrevocable guarantee in respect of CS Ltd's obligations under the Subscription Agreement.

77.     However, in breach of Clause 2.2(b) of the Subscription Agreement, CS Ltd failed to make any payments to the Company in respect of the amounts due. Mr Barzani has failed to take any steps to procure CS Ltd's compliance with its contractual obligations and has failed to meet his liability under his guarantee.

78.     Despite repeated requests by the Claimant and the Claimant's directors, the First, Second and Third Defendants refused to take any action as Directors of the Company against CS Ltd in respect of the substantial sums owed by CS Ltd to the Company. This was a breach of the statutory duties pleaded at paragraph 62 above owed by the First, Second and Third Defendants to the Company and of the fiduciary duties pleaded at paragraph 66 above.

79.     In that context, the Claimant was left with no choice but to enforce Clause 28.5 of the IH Shareholders Agreement, which allows a shareholder of the Company to bring a claim against another shareholder in the name of, and on behalf of, the Company. The Claimant's claim against CS Ltd and Mr Barzani in this respect is currently the subject of ongoing arbitration proceedings.

*Defendants' failure to appoint Mr Olivier Froissart to the IH Board*

80.     Pursuant to Article 52(3) of the DIFC Companies Law, in the absence of a resolution of the Company's shareholders, the First, Second and Third Defendants have the power to fill a vacancy on the Company's Board upon the resignation of a director on an interim basis until that director is reappointed by a resolution of the Company's shareholders.

81.  By way of a letter dated 8 April 2016, Mr Rennard[5] tendered his resignation from the Company's Board to take effect from the date on which Board appointed his replacement on an interim basis pursuant to Article 52(3) of the DIFC Companies Law. By way of a letter of the same date, the Claimant informed CS Ltd and the Company of its intention to appoint Mr Olivier Froissart to the Company's Board as the replacement Claimant appointed director of Mr Rennard.

82.  Despite numerous attempts by the Claimant inviting CS Ltd to pass a shareholders' resolution appointing Mr Froissart to the Company's Board since April 2016, CS Ltd failed to confirm that appointment. This is in circumstances where Clause 6.3(b) of the IH Shareholders' Agreement provides that the Claimant has the right to propose the replacement of any Claimant appointed director on the Board; and where Clause 6.6 of the IH Shareholders' Agreement requires the Company's shareholders to approve, and procure that the Company Board approve and appoint any director proposed as a replacement of a Claimant appointed director by the Claimant.

83.  However, even in the face of an acknowledgment of such resignation during the meeting between all stakeholders held in Milan in March 2017, the First, Second and Third Defendants (together with Mr Barzani) consistently failed to exercise their powers pursuant to Article 52(3) of the DIFC Companies Law to register Mr Froissart's appointment to the Company's Board on an interim basis. This failure is a breach of their statutory and fiduciary duties in circumstances where:

(a)  Article 16 of the Company's Articles of Association dated 27 July 2011 (the "**Articles of Association**") and Clause 6.2 of the IH Shareholders' Agreement state that the Company's Board should consist of 7 members;

(b)  Article 20A(a) of the Articles of Association and Clause 6.3(b) of the IH Shareholders' Agreement provide that the Claimant may propose the replacement of any Claimant appointed director; and

(c)  Clause 6.6 of the IH Shareholders' Agreement provides that the Company's shareholders should procure that the Company's Board approve and

---

[5]  *i.e.* Mr Marc François Rennard, one of the Claimant's directors appointed on the Company's Board.

appoint any director proposed as a replacement of a Claimant appointed director by the Claimant.

## G.  SELF-DEALING BY THE FIRST AND THIRD DEFENDANTS

84.     The First Defendant has been involved as CEO in a company called Sada Tech, a company that claims to have undertaken works for Korek Telecom, and cooperates with IraqCell (a company of which Mr Barzani is a director and also has an ownership interest), which is not only in direct competition with Korek but is a company with which Mr Barzani is causing Korek to conclude transactions on undisclosed terms to access to fibre-optic cables.

85.     The precise nature of the First Defendant's involvement with IraqCell is not yet known to the Claimant, but the First Defendant features in a promotional video that was commissioned by IraqCell, numerous databases and directories reference the First Defendant and IraqCell jointly, and at least two websites list the First Defendant's telephone number and address under "IraqCell" and describe him as either IraqCell's "*contact person*" or "*Director/CEO/General Manager*".   The First Defendant's apparent activities with, and/or involvement in, IraqCell were not disclosed to the Claimant or the Company and in any event constitute a breach of his duty to the Company, given that IraqCell is a direct competitor of Korek.

86.     In addition, the Third Defendant:

   a.   is also in breach of his fiduciary duties through transactions involving Korek with companies in which he has a substantial personal interest in that:

      i.   he has directed services required by Korek to a company in which he has a beneficial interest.  The company, called DoubleU, provides Korek with so-called value added services, and receives significant sums of money for such services; and

      ii.   he controls payments to third party suppliers via interposed third party companies (Al Hajras, ZR Collection and ZR Group) which have no apparent purpose, but which are in turn controlled by a close associate

(Al Hajras) or owned by the Third Defendant himself (ZR Collection, ZR Group);

b.  has an interest in International Company for Legal Consulting (IC4LC), a legal practice based in Lebanon, which allegedly provides legal services to Korek in Iraq.  The fees charged to Korek for legal work are exorbitant and cannot be reconciled with the business activities of Korek or its requirement for legal services.  In the period 2013 to 2015, IC4LC was paid in excess of US$ 29 million.  However, in reality, IC4LC is the unregistered trading name of a legal practice run by a Lebanese lawyer, Michel Azar.  Mr Azar appears to be a close associate of the Third Defendant.  The IP domain name for IC4LC was registered by the Third Defendant's brother and payments to the firm were made into a bank that was at the relevant time owned by the Third Defendant.

c.  he has misrepresented and/or failed to disclose the nature of the IBL Loan, as set out in paragraphs 3230 to 42 above; and

d.  he has failed to disclose a substantial interest in one of Korek's competitors. The Claimant has recently become aware that the Third Defendant has a substantial undisclosed interest in a competing Iraqi mobile telecommunications company, Mobitel Ltd ("**Mobitel**"), with substantial operations in Kurdistan. The Third Defendant's beneficial interest in Mobitel is disguised via an opaque ownership structure and has been concealed from the Claimant's appointed directors and the Claimant.

The above breaches of statutory and fiduciary duties and undisclosed self-dealing on the part of the Third Defendant are matters which are to be the subject of a separate claim against him in the DIFC Courts.

87.  The Claimant also continues to investigate instances of apparent self-dealing and Related Party Transactions (as set out in the IH Shareholders' Agreement).  For example, Mr Aso Ali, a shareholder of CS Ltd (the company that is the 56% co-shareholder of the Company alongside the Claimant), is the owner of Halabja Group, which received purchase orders from Korek totalling at least US$ 103.5 million between 2011 and 2016.

88.   It is to be inferred that the instances of self-dealing on the part of the First and Third Defendants lay behind their failure to comply with their obligations under DIFC Law with respect to the breaches by Mr Barzani.  Those acts, in and of themselves, also constitute breaches of Article 53 of the DIFC Companies Law and Article 159 of the DIFC Law of Obligations.

## H.  SUMMARY OF THE FIRST THREE DEFENDANTS' BREACHES

89.   In breach of Article 53 of the DIFC Companies Law the First, Second and Third Defendants have failed to act honestly, in good faith and lawfully, with a view to the best interests of the Company, and have failed to exercise the care, diligence and skill that a reasonably prudent person would exercise in comparable circumstances in a way that protects the interests of the Company and its shareholders (or at least a significant shareholder).  Two of the Defendants (at least) are benefitting financially from their breaches of duty and the gross mismanagement of Korek.

90.   Without prejudice to the foregoing the First, Second and Third Defendants have failed to:

    (i)    take any steps to respond to the serious allegations made against Mr Barzani (whether by requesting further information or seeking clarification);

    (ii)   take any steps to investigate the serious allegations being made;

    (iii)  question Mr Barzani or seek explanations in connection with his alleged wrongdoing;

    (iv)   take any steps to appoint third party experts to analyse the books and records of Korek in order to substantiate the claims;

    (v)    take any steps to try and procure such books and records of Korek (such requests being made exclusively by the Claimant-appointed directors of the Company);

    (vi)   mitigate, or take steps to try and mitigate, further harm caused to Korek (and therefore the Company) by Mr Barzani's wrongdoing;

(vii)   take any action to suspend or remove Mr Barzani as the Statutory Manager; and/or

(viii)  take other necessary steps to protect the interests of the Company and preserve its assets.

(a)   The First, Second and Third Defendants have failed to engage in the enforcement of the Company's contractual rights against CS Ltd and Mr Barzani, specifically in respect of their obligation to pay the Company approximately US$ 75 million due under the Subscription Agreement as set out in paragraphs 76-77 above.

(b)   The First, Second and Third Defendants have failed to engage in the appointment of a CEO to ensure that Korek can be properly run and managed in a transparent and accountable way;

(c)   The First, Second and Third Defendants have failed to exercise their powers under Article 52(3) of the DIFC Companies Law to appoint Mr Froissart as Mr Rennard's replacement on the Company Board, despite Mr Rennard tendering his resignation from the Company's Board with effect from the appointment of his replacement and IT Ltd nominating Mr Froissart as his replacement as set out in paragraphs 80 to 83.

(d)   The First and Second Defendants have similarly failed to investigate alleged wrongdoing by the Third Defendant or take steps to protect the interests of the Company.  In particular they have failed to take steps in connection with the Third Defendant's acts as set out in paragraph 86 above.  The Claimant repeats the same breaches by the First and Second Defendants set out in paragraphs 89 and 90 above as they relate to the alleged wrongdoing by the Third Defendant.

(e)   The Second and Third Defendants have failed to address the apparent breach of fiduciary duty on the part of the First Defendant in connection with his involvement in IraqCell.

## I. ARTICLE 133 OF THE DIFC COMPANIES LAW 2009

91.     It is clear that with its current governance structure the Company is paralysed and unable to act in the face of very serious allegations made concerning Korek, the Company's only, albeit substantial, asset.

92.     The Claimant is permitted to bring a claim against the First, Second and Third Defendants under Article 133 of the DIFC Companies Law in respect of their breaches of duties owed by them to the Company under Articles 53 and 54.

93.     Under Articles 133(2), 133(3) the Court also has a wide discretion as to the orders it may make in response to a claim made pursuant to Articles 53 and 54.

## J. RELIEF SOUGHT

### _AND THE CLAIMANT CLAIMS_

a)  A Declaration that the First, Second and Third Defendants are in breach of their duties pursuant to Article 53 of the DIFC Companies Law and Article 159 of the DIFC Law of Obligations;

b)  An interim Order from the Court:

   (i)     appointing an authorised representative of the Company   (such as an administrator or other professional) who shall, with full power, acting on behalf of the Company to:

   1.     appoint a professional forensic accountant with full power to inspect, preserve and take copies of documents and records of Korek (including copying of documents, records and information held electronically) and make all other necessary enquiries of third parties, so that the allegations of wrongdoing can be properly investigated, information gathered relating to the transactions concluded by Mr Barzani and those related to the interests of the First, Second and Third Defendants and other related parties (including CS Ltd directors), and a report provided on the assets and liabilities of Korek and its business activities; and

2. for the purpose of (i) above and for any other purpose that the administrator or other professional deems necessary, undertake whatever actions are required on behalf of and for the benefit of the Company and all of its shareholders including but not limited to the suspension, removal and appointment of a Statutory Manager of Korek.

(ii) requiring the authorised representative of the Company to report to the Court on the matters set out in sub-paragraphs 1 and 2 above.

(iii) requiring the First, Second and Third Defendants to fully cooperate with and provide all assistance required by the authorised representative appointed pursuant to paragraph (i) above;

c) Pending determination of these proceedings, an interim Order imposing certain measures of control for future decisions to be made by Korek's Statutory Manager and by the Chairman of the Company's Board, that: (i) the Company's Directors must be consulted before a liability exceeding US$ 50,000 is considered to be incurred by Korek or the Company; (ii) the Company's Directors must approve any disposal of assets belonging to either Korek or the Company with a market value of US$ 100,000; and (iii) the Company's Directors must approve any commitment with a duration of one year or more.

d) Subject to any further order of the Court, an order appointing Mr Froissart to the Company's Board subject to his reappointment by a resolution of the Company's shareholders and subject to Mr Rennard ceasing to be a director on the Company Board if such a resolution is not passed at the next general meeting of the Company's shareholders.

e) Damages and/or compensation pursuant to Article 133 of the DIFC Companies Law and/or Article 160(1) of the DIFC Law of Obligations for any loss caused by the First, Second and Third Defendants to the Claimant and/or the Company for their breaches of duty and/or as a result of their conduct as alleged;

f) Any other order as the Court sees fit;

g) Liberty to apply; and

h) Costs.

# Exhibit B



Ground Level, Building 4
The Gate District
Dubai International
Financial Centre
PO Box 211724,
Dubai UAE

Tel   +971 4 427 3333
Fax  +971 4 427 3330
www.difccourts.ae

# Claim Form - Court of First Instance

**Issued Date:04/16/18**
**Claim No:CFI-019-2018**

## Claimant(s)

| | | |
|---|---|---|
| **Name** | : | Iraq Telecom Limited |
| **Is Resident of UAE** | : | No |
| **Address Line 1** | : | Unit 11 Level 3 |
| **Address Line 2** | : | Gate Village Building 10 |
| **Location** | : | Dubai |
| **Email** | : | glovett@gibsondunn.com |

## Defendant(s)

| | | |
|---|---|---|
| **Name** | : | Raymond Samir Zina Rahmeh |
| **Is Resident of UAE** | : | No |
| **Address Line 1** | : | Residence Zina Zone Verte |
| **Address Line 2** | : | Rue No 1 Kfaryassine Adma Kesrouan |
| **Location** | : | Lebanon |
| **Email** | : | ray.rahmet@zr-group.net |

| | | |
|---|---|---|
| **Name** | : | International Holdings Limited |
| **Is Resident of UAE** | : | No |
| **Address Line 1** | : | Unit 11 Level 3 Gate Village Building 10 |
| **Address Line 2** | : | Dubai International Financial Centre |
| **Location** | : | Dubai |
| **Email** | : | djain@agility.com |

## Claim Type

**Type of Claim** : P7

## Claim Value

**Currency** : USD

## Particulars of Claim - (Attached)

**Brief Details of Claim** : This claim relates to the way in which Korek Telecom Company LLC ("Korek", an Iraqi company which is 100% owned by the Second Defendant) has been, and continues to be, mismanaged on a day to day basis and how that mismanagement has extended to an environment where powerful individuals who are in fiduciary positions engage in undisclosed self-dealing and/or have related business interests for which Korek is paying tens of millions of US dollars, payments which are in many cases inexplicable and unaccountable. The First Defendant is one such individual. As a close lieutenant to Mr Barzani, who is in day to day control of Korek, the First Defendant is in a position of significant influence over the affairs of the Second Defendant, as well as Korek and its operations. Indeed, the Claimant believes that the First Defendant has been entrusted by Mr Barzani with a significant amount of discretion to administer the affairs of Korek. The First Defendant has exercised this discretion to benefit himself personally, as well as Mr. Barzani, to the detriment of the Claimant and the Second Defendant.

## Law

**Law governing the Dispute** : DIFC

**Law giving Rise to the Jurisdiction of the DIFC Courts** : Judicial Authority Law (Dubai Law No. 12 of 2004) and DIFC Law

## Remedy Sought

Multiple Damages

## Service Location

Outside Dubai

## Statement of Truth

Our Client believes that the facts stated in this claim form are true.

**Full name** : Graham Lovett

**Signature** : *Graham Lovett*

## Legal Representative

**Firm/Name** : Gibson, Dunn & Crutcher LLP

**Court Registration No.** : 676A

**Address** : The Exchange Building 5 Level 4 PO Box 506654

**Email** : JOwens@gibsondunn.com

**Telephone No.** : +971 4 318 4605

**Your Reference** : GDC

Once your claim form has been submitted successfully you will receive a confirmation and an invoice to be settled before your claim can be accepted and progressed. If your submission is unsuccessful you will receive a message explaining the error and how to rectify it.

If you have any problems filling out the form or need further assistance please contact us on + 97144273333 or by email on registry@difccourts.ae.

The DIFC Courts are open between 10am and 4pm, Sunday to Thursday. Please address all correspondence with the court to the Registry (registry@difccourts.ae) and quote the case number if you don't have a case number yet.

Claim No:

**THE DUBAI INTERNATIONAL FINANCIAL CENTRE COURTS
IN THE COURT OF FIRST INSTANCE**

**BETWEEN**

## IRAQ TELECOM LIMITED

**Claimant**

-and-

### 1.  RAYMOND SAMIR ZINA RAHMEH

### 2.  INTERNATIONAL HOLDINGS LIMITED

**Defendants**

---

## PARTICULARS OF CLAIM

---

## A.  INTRODUCTION

1.    The Claimant is a shareholder in International Holdings Limited (the "**Company**") and the First Defendant is a director of the Company.   The Company, as the Second Defendant, is a party to this claim pursuant to Rule 20.64 of the Rules of the DIFC Courts ("**RDC**").

2.    The claim arises in connection with the Company's investment in Korek Telecom Company LLC ("**Korek**"),[1] an Iraqi telecommunications company.   Korek is 100% owned by the Company and, pursuant to DIFC Companies Law 2009 (as amended) (the "**DIFC Companies Law**"), it is a subsidiary of the Company.[2]

3.    The Claimant's claim against the First Defendant is for a breach of his duty as a director pursuant to Articles 54 and 133 of the DIFC Companies Law and for a breach of his fiduciary duties pursuant to Article 159 of the Law of Obligations.   The First Defendant has been engaged in self-dealing on a massive scale and has a number of undisclosed interests that have resulted in exorbitant loss and damage to the Company and, through its shareholding in the Company, the Claimant.

4.    A separate claim has been made against the First Defendant and other directors of the Company for breaches of duty under Article 53 of the DIFC Companies Law (*see* CFI 013-2018).

5.    The Claimant reserves the right to add to or supplement the claims made in due course in the event it becomes aware of additional facts (albeit the Claimant's access to Korek's financial and commercial information is hampered by the withholding of information and a lack of transparency).

## B.  BACKGROUND TO THE CLAIM

6.    This claim describes the way in which Korek has been (and continues to be) mismanaged on a day to day basis and how that mismanagement has extended to an environment where powerful individuals who are in fiduciary positions engage in undisclosed self-dealing and/or have related business interests for which Korek is

---

[1]    The structure of the investment is shown below but Korek is the Company's only asset.

[2]    DIFC Companies Law, Schedule 1, Article 4.

2

paying tens of millions of US dollars, payments which are in many cases inexplicable and unaccountable. The First Defendant is one such individual.

*The Parties*

7.  The Claimant, Iraq Telecom Limited ("**IT Ltd**"), is a private company limited by shares, incorporated in the Dubai International Financial Centre ("**DIFC**") with registered number 1019, having its registered office at Unit 11, Level 3, Gate Village Building 10, DIFC, Dubai, 507043, United Arab Emirates.

8.  The First Defendant is a director of the Company.

9.  The Company, as the Second Defendant, is a defendant pursuant to RDC 20.64. The Company is a private company limited by shares, incorporated in the DIFC with registered number 1020, having its registered office at Unit 11, Level 3, Gate Village Building 10, DIFC, Dubai 507043, United Arab Emirates.

*The Claimant's Investment in Korek*

10. Korek is a limited liability company incorporated with the Registration Directorate of Companies of the Kurdistan Regional Government in the Republic of Iraq. Korek started operations in Iraq in 2000 and initially held a regional mobile telephone licence for Kurdistan. Then, in 2007, Korek was awarded a nationwide mobile telecommunications licence (the "**Licence**") by the Iraqi Communication and Media Commission (the "**CMC**"), the Iraqi government body responsible for mobile telephone regulation and licensing.

11. As Korek did not have sufficient funds to pay the second instalment of the licence fee payable pursuant to the Licence, it sought external funding. In September 2007, Agility Public Warehousing Company KSC ("**Agility**") invested US$ 250 million in Korek by way of a convertible senior loan note, guaranteed by the Kurdistan Regional Government of Iraq. The US$ 250 million that Agility invested was transferred directly from Agility's bank account to the CMC's bank account.

12. In late 2010, it became clear that Korek needed further financial support and additional technical know-how to roll out its network outside of Kurdistan into the rest of Iraq. In this context, Orange S.A. ("**Orange**"), formerly France Télécom S.A., a French

multinational telecommunications corporation, was identified as a suitable joint venture partner. Orange subsequently agreed to invest in the structure.

13.   As part of the investment transaction (the "**Investment Transaction**"), it was agreed that, in return for an investment of approximately US$ 800 million, including a shareholder loan of US$ 285 million, Agility and Orange would acquire an indirect stake of 44% in Korek by subscribing for new shares and diluting the shares of the then shareholders (three high net worth Iraqi individuals, namely Mr Sirwan Saber Mustafa Barzani ("**Mr Barzani**"), Jawshin Hassan Jawshin Barazany and Jiqsy Hamo Mustafa, together the "**Original Shareholders**").

14.   In this context, the Claimant was established as a joint venture vehicle between Agility and Orange. Korek International (Management) Ltd. ("**CS Ltd**") was established as a joint venture vehicle for the Original Shareholders. The Claimant understands that Mr Barzani is CS Ltd's controlling shareholder. Mr Barzani is an extremely powerful and influential member of the Kurdistan community. The First Defendant is a close associate of Mr Barzani.

15.   The Claimant and CS Ltd, in turn, hold their respective interests via the Company, which was established to hold 100% of the shares in Korek.

16.   The group's structure following the Investment Transaction, implemented in July 2011, is as follows:

4



(a) Agility's interest is held indirectly via a number of holding entities, including amongst others Alcazar Capital Partners (*Cayman Islands*).

(b) Orange's interest is held indirectly via a number of holding entities, including amongst others Atlas Services Nederland B.V. (*the Netherlands*).

(c) It is understood that on or around the time of the Investment Transaction, Mr Aso Ali acquired an interest in CS Ltd and that CS Ltd is jointly owned by the Original Shareholders and Mr Ali.

17. The Investment Transaction was implemented pursuant to the terms of a subscription agreement dated 27 July 2011, entered into between the Company, Korek, Mr Barzani, Mr Jawshin Hassan Jawshin Barazany, Mr Jiqsy Hamo Mustafa, CS Ltd, the Claimant, Alcazar Capital Partners and Atlas Services Nederland B.V. (the "**Subscription Agreement**").

18. The ongoing relationship between the parties is further governed by a shareholders' agreement dated 10 March 2011 and entered into by the Company, Korek, Mr Barzani, CS Ltd and the Claimant (the "**IH Shareholders' Agreement**").

19.     Pursuant to the terms of the IH Shareholders' Agreement and the Company's Articles of Association, the Company's board of directors (the "**Board**") consists of seven members, namely:

(a)     three directors nominated by the Claimant (the "**IT Ltd Directors**");

(b)     three directors nominated by CS Ltd (the "**CS Ltd Directors**"); and

(c)     one independent director also nominated by CS Ltd (the "**Independent Director**").

20.     Mr Barzani is one of the three CS Ltd appointee Directors but is not a party to these proceedings. This is because the appropriate forum for any claim against him in relation to the subject matter of these proceedings is arbitration pursuant to the IH Shareholders' Agreement. Mr Barzani acts as Chairman of the Company's Board.

21.     The First Defendant is the Independent Director (*i.e.* paragraph 19(c) above) nominated by CS Ltd. However, the First Defendant is not genuinely independent and is in fact closely affiliated with CS Ltd and Mr Barzani. Indeed, not only has the First Defendant consistently represented their interests on the Company Board and otherwise, (including in dispute resolution proceedings between the Claimant and CS Ltd/Mr Barzani), but he has orchestrated a number of the self-dealing transactions through which he and Mr. Barzani have benefitted (as described below).

22.     While during the first years of the Company's life, the Board met on a regular basis, the Board has not met regularly during the last two years. The last meeting took place in Milan in March 2017 after a one-year interruption and following numerous letters sent by certain directors of the Company appointed by the Claimant to Mr Barzani and the First Defendant (as well as to the two other CS Ltd Directors) regarding the lack of proper governance resulting from the absence of regular meetings of the Board.[3] Since then, Mr Barzani (who is the sole person authorised to convene Board meetings), in breach of applicable DIFC law, the Company's Articles of Association, and the terms of the IH Shareholders' Agreement, has not convened any Board meetings.

---

[3]     The Claimant believes that Mr Barzani has disputed whether the Milan meeting was even a meeting of the Board – in which case the last Board meeting would have taken place before March 2017.

23.     Korek, being an Iraqi limited liability company (LLC), does not have a board of directors as a matter of Iraqi law but is managed by the sole director (the "**Statutory Manager**"). In this respect, the Company (in its capacity as Korek's sole shareholder) appointed Mr Barzani as the Statutory Manager following implementation of the Investment Transaction.  The Company's shareholders had also agreed that the Claimant would be entitled to designate a CEO for Korek for appointment by Mr Barzani. However, since June 2015, and in breach of his contractual obligations, Mr Barzani has refused to appoint any of the four candidates proposed by the Claimant after Korek's last CEO resigned, leaving him, together with the First Defendant, to whom Mr. Barzani entrusts some of his business affairs, effectively in sole control of Korek.

24.     In addition, the parties to the Investment Transaction agreed to establish a contractual body, the Korek Supervisory Committee (the "**KSC**"), with responsibility for the overall direction and management of Korek. The KSC consists of seven members, currently being the same persons as the members of the Company's Board.   Like the Company's Board, the KSC has not met regularly during the last two years.  Also, as with the Company's Board, Mr. Barzani is the sole person authorised to convene KSC meetings.  Effectively, Korek currently operates under the sole management and control of Mr Barzani and the First Defendant, to whom the Claimant believes Mr. Barzani entrusts some of his business affairs.

25.   Under the effective control of Mr Barzani and the First Defendant, the affairs of Korek are now kept hidden away from the Claimant.  Indeed, since the date of the Investment Transaction more than 7 years ago, the Company has not finalised or approved any audited accounts.  A financial statement was issued in 2011 but in 2012 and 2013 a disagreement between the shareholders regarding a liability of US$13 million for withholding tax resulted in no financial statements being issued.  From 2014 to date, the dispute regarding the governance of the company has been responsible for the lack of financial statements being issued, in breach of DIFC law, the Company's Articles of Association and the IH Shareholders' Agreement.  This is due almost entirely to the refusal by Mr Barzani to provide any meaningful financial information to the Claimant which would enable it to assess the accuracy of the draft financial statements provided by him.

26. As a result of Mr Barzani's refusal to provide any responses to the Claimant's queries, the Claimant has been unable to verify the accuracy of any of the draft monthly, quarterly or annual accounts provided by Korek, which have been characterized by very significant, questionable payments to certain suppliers. Numerous legitimate and proper questions asked about such payments remain unanswered. For example, questions concerning Korek's draft 2016 financials remain unanswered, as do questions relating to the financials for February, March, May, June, July, September, October, November and December 2017.

27. As a close lieutenant to Mr Barzani, as well as being an "independent" director of the Company, the First Defendant is in a position of significant influence over the affairs of the Company, as well as Korek and its operations. Indeed, the Claimant believes that the First Defendant has been entrusted by Mr Barzani with a significant amount of discretion to administer the affairs of Korek. The First Defendant has exercised this discretion to benefit himself personally, as well as Mr. Barzani.

*The First Defendant's breaches of Article 53 of the DIFC Companies Act*

28. In separate proceedings in the DIFC Courts (Claim No. CFI 013-2018), the First Defendant is subject to a claim under, *inter alia,* Article 53 of the DIFC Companies Act in that he has failed to act in the Company's best interests by not investigating or following up serious allegations of wrongdoing (including self-dealing) made by the Claimant against Mr Barzani. It is alleged in those proceedings that in failing to do anything about such matters, the First Defendant (and the other defendants to that claim) are, in effect, facilitating that wrongdoing and continuing to cause loss to the Company.

29. Allegations are also made against the First Defendant (amongst the other defendant directors) that he failed to act in the Company's best interests by refusing to take action against CS Ltd in respect of substantial sums owed by CS Ltd to the Company. It is also alleged that he has (with others) wrongly failed to approve the appointment of a replacement nominee director of the Claimant to the Board of the Company.

## C. SELF DEALING ON THE PART OF THE FIRST DEFENDANT

*Self-Dealing Through Supplier Arrangements*

30.    The First Defendant is in breach of his fiduciary duties through transactions involving Korek with companies in which he has a substantial personal interest in that he:

    a.    benefits from an arrangement between Korek and International Company for Legal Consulting ("**IC4LC**"), a legal practice based in Lebanon which supposedly provides legal services to Korek in Iraq. The fees charged to Korek for legal work are exorbitant and cannot be reconciled with the business activities of Korek or its requirement for legal services. In the period 2013 to 2015, IC4LC was paid a sum in excess of US$ 20 million. Korek's February 2018 financial statements reveal that in the present financial year it has incurred in excess of US$ 1.45 million in unbudgeted legal fees: the Claimant knows of no significant cases involving Korek that would justify this legal spend, and the Claimant suspects the fees have also been paid to IC4LC. All of Claimant's queries relating to these legal fees have been ignored by Mr Barzani. In reality, IC4LC is the unregistered trading name of a legal practice run by a Lebanese lawyer, Michel Azar. IC4LC is not, as far as Claimant is aware, registered with any lawyers' association in Lebanon. Rather, Mr Azar appears to be a close associate of the First Defendant and is a director of numerous companies owned by the First Defendant. The IP domain name for IC4LC was registered by the First Defendant's brother and payments to the firm were made into a bank that was at the relevant time owned by the First Defendant.

    b.    has directed services required by Korek to a company in which he has a beneficial interest. The company, called DoubleU, is the largest provider of so-called value added services to Korek, for which it receives millions of dollars per year;

    c.    controls payments to third party suppliers via interposed third party companies (Al Hajras, ZR Collection and ZR Group) which have no apparent purpose, but which are in turn controlled by a close associate (Al Hajras) or owned by the

First Defendant himself (ZR Collection, ZR Group).   The initials "ZR" correspond to the First Defendant's surname "Zina Rameh".

*Misrepresentation of the IBL Loan*

31.   The First Defendant also misrepresented and/or failed to disclose the nature of a loan obtained by Korek (of which he took a significant part in negotiating) that has caused significant losses to Korek.

32.   As part of the Investment Transaction, the Claimant and the Company also entered into a facility agreement dated 27 July 2011 pursuant to which the Claimant provided a shareholder loan of US$ 285 million to the Company (the "**IT Shareholder Loan**"). The Company in turn entered into a back-to-back shareholder loan agreement with Korek dated 27 July 2011 (the "**IH-Korek Facility Agreement**"), pursuant to which the Company on-lent the loan to Korek. Separately, Korek provided a guarantee to the Claimant, dated 27 July 2011, guaranteeing the Company's obligations to the Claimant under the IT Shareholder Loan (the "**Korek Guarantee**").

33.   Although it would have been appropriate for CS Ltd. to also provide its pro rata portion of shareholder loan funding to the Company, it refused to do so, thereby resulting in the IT Shareholder Loan, and the equity contributions made by the Claimant as part of the Investment Transaction, being the sole source of funding to Korek.

34.   In December 2011, less than one year from the date of the Investment Transaction, Korek required additional funds to pay an instalment of the licence fee of US$125 million as well as interest payments due on the licence fee of approximately US$30 million. At that time, the shareholders of the Company had agreed that any additional funding would need to come from third party banks. As a result, Mr Barzani and the First Defendant arranged a loan of US$ 150 million from IBL Bank SAL (the "**IBL Loan**" and "**IBL**" respectively). The IBL Loan was signed on 21 December 2011. IBL charged Korek interest at an exorbitant rate of 13.25% per annum. One week before the conclusion of the IBL Loan, CS Ltd defaulted on its own payment obligation towards the Company for an amount of US$14,985,000 under Clause 2.2(b)(i) of the Subscription Agreement. CS Ltd subsequently defaulted on the remaining two payment obligations under Clause 2.2(b) of the Subscription Agreement on 15 March 2012 and

15 June 2012, bringing the total default of CS Ltd to US$74,925,000.  The payment obligations of CS Ltd were guaranteed by Mr. Barzani under Clause 14 of the Subscription Agreement.

35.   The Claimant approved Korek's entry into the IBL Loan on the basis of representations made by Mr Barzani and the First Defendant that the IBL Loan was an unsecured, third party bank loan (albeit with a personal guarantee provided by Mr Barzani) and was the only bank loan that could be procured, thereby representing market terms.

36.   These representations were repeated at a board meeting of the KSC held on 13 October 2015, when the First Defendant was specifically asked about the IBL Loan by one of the Claimant's appointed directors, who asserted a belief that it was *"fully collateralised"*.  The First Defendant falsely replied that it was not collateralised, as Mr Barzani had provided a guarantee (*i.e.* that the guarantee was the only form of security put up for the loan).

37.   Further, Korek warranted that its obligations to IBL would constitute its *"direct, general, unconditional, unsubordinated, unsecured obligations"*.  In order to facilitate the IBL Loan, the Claimant, acting in good faith and having no reason to believe there was a side agreement which effectively redirected interest payments to Mr Barzani, agreed to subordinate the IT Shareholder Loan in favour of the IBL Loan.  Mr Barzani personally guaranteed Korek's performance under the IBL loan.  The Claimant, in turn, agreed to indemnify Mr Barzani for its *pro rata* share of any amounts Mr Barzani may have to pay pursuant to his guarantee.

38.   The Claimant now believes that Mr Barzani and the First Defendant, in collusion with IBL Bank, created a "sham" arrangement of which the First Defendant is aware, in that the IBL Loan is not, in fact, unsecured but is fully collateralised.

39.   The Claimant believes that Mr Barzani secretly provided cash collateral to secure the IBL Loan as part of an arrangement designed to:

    a.   prioritise Mr. Barzani's creditor rights over those of the Claimant (in particular because, as noted above, one of the purported conditions of IBL granting the loan was that it should take priority over the IT Shareholder Loan); and

b.  effect payments to Mr Barzani alone by having Korek mask these as interest payments to IBL.

40.  The Claimant believes that Mr Barzani and IBL entered into an agreement pursuant to which IBL undertook to pay to Mr Barzani, an amount equal to 12.75% of the 13.25% total interest received by IBL under Section 2.1 of the Term Loan Agreement dated December 21, 2011.  In short, IBL agreed to pay back to Mr Barzani more than 96% of the interest expense paid by Korek.  This "kick-back" arrangement (which is how it can only be described) was orchestrated almost entirely by the First Defendant and Mr Barzani.

41.  The above scheme is corroborated by IBL's own audited financial statements. Consistently, since 2012, IBL's Annual Reports appear to consistently reference the IBL Loan every year and the fact that it is cash collateralised.  Those accounts state, for example in the 2016 Annual Report, that:

> *"Performing corporate loans to large enterprises, outstanding at year end 2016 and 2015, include an amount of LBP 226 billion related to a non-resident customer which is covered by LBP 234 billion cash collateral. Related interest income and expense amounted to LBP30.7 billion and LBP28.83 billion respectively during 2016 and 2015."*

42.  No similar statements appeared in IBL's Annual Reports prior to 2012.  The IBL Loan of US$ 150 million equates to approximately LBP 226 billion (1 US$ = 1,506.6 LBP), which accords with the amount of the performing corporate loan to a "non-resident customer" referenced in IBL's accounts. Furthermore, the interest due on this loan for 2015 is said to be LBP 30.7 billion which is just over 13% of the principal amount said to be owing; this also accords with the interest rate of the IBL Loan of 13.25%.  The kick-back to Mr Barzani of 12.75% also accords with the purported "interest expense" of LBP 28.83 billion paid in that year.

43.  In summary, Korek is paying 13.25% interest on what is in reality a fully cash collateralised loan, for which the true market rate is 0.5%.  The losses to Korek over the last six years alone as a result of this undisclosed scheme are estimated to be in excess of US$114 million. A separate claim is in the process of being made against Mr

12

Barzani under the IH Shareholders' Agreement and will be the subject of arbitration proceedings.

44.   It is not known to the Claimant whether the First Defendant has personally financially benefitted from the IBL Loan but it is inferred that he has done so, given his involvement in the negotiation of the IBL Loan and the incidents of self-dealing set out in this section.  Further, or in the alternative, the First Defendant was under a duty, not only to negotiate the best terms for Korek's loan with IBL (which he, by design, failed to do), but also, as required by Article 53 of the DIFC Companies Law, to act honestly in disclosing the collateralised nature of the IBL Loan.  The Claimant reserves the right to plead further in this regard.

*Self-Dealing Through Mobitel*

45.   The First Defendant has also failed to disclose a substantial interest in one of Korek's competitors.  The Claimant has recently become aware that the First Defendant has a substantial undisclosed interest in a competing Iraqi mobile telecommunications company, Mobitel Ltd ("**Mobitel**"), with substantial operations in Kurdistan.  The First Defendant's beneficial interest in Mobitel is disguised via an opaque ownership structure and has been concealed from the Claimant's appointed directors and the Claimant.

*Unauthorised Transactions In the Name of Korek*

46.   The First Defendant has also failed to disclose his interest in a special purpose vehicle, Korek Telecom SAL Holding ("**Korek Telecom SAL**"), incorporated by his close associates in Lebanon on 12 September 2013.  Korek Telecom SAL, which has no apparent legitimate purpose and has been concealed from the Claimant, has a banking relationship with IBL and has issued bearer shares, leading the Claimant to believe it is being used to harm the Claimant's interests.  The Claimant also believes that legal and beneficial ownership rests with shareholders other than Korek.  The Claimant reserves the right to plead further in relation to this allegation.

## D. THE DUTIES OWED BY THE FIRST DEFENDANT TO THE COMPANY – PURSUANT TO CONTRACT AND APPLICABLE LAW

47.   As a director of the Company, the First Defendant owes duties to the Company pursuant to Article 53 of the DIFC Companies Law, which provides:

*"A Director or other officer of a Company, in exercising his powers and discharging his duties, shall:*

*(a)   act honestly, in good faith and lawfully, with a view to the best interests of the Company; and*

*(b)   exercise the care, diligence and skill that a reasonably prudent person would exercise in comparable circumstances."*

48.   Directors of a DIFC Company are also under a duty to disclose interests in transactions. Article 54 of the DIFC Companies law provides that:

*(1)   A Director of a Company who has, directly or indirectly, an interest in a transaction entered into or proposed to be entered into by the Company or by a subsidiary of the Company which to a material extent conflicts or may conflict with the interests of the Company and of which he is aware, shall disclose to the Company the nature and extent of his interest.*

*(2)   The disclosure under Paragraph (1) shall be made as soon as practicable after the Director becomes aware of the circumstances which gave rise to his duty to make it.*

*(3)   A notice in writing given to the Company by a Director that he is to be regarded as interested in a transaction with a specified person is sufficient disclosure of his interest in any such transaction entered into after the notice is given.*

*(4)   Subject to Paragraphs (5) and (6), where a Director fails to disclose an interest of his under this Article, the Company or a Shareholder of the Company or the Registrar may apply to the Court for an order setting aside the transaction concerned and directing that the Director account to the Company for any profit, gain or benefit realised, and the Court may so order or make such other order as it thinks fit.*

14

(5)   *A transaction is not voidable, and a Director is not accountable, under Paragraph (4) where, notwithstanding a failure to comply with this Article:*

(a)   *the transaction is confirmed by Resolution; and*

(b)   *the nature and extent of the Director's interest in the transaction were disclosed in reasonable detail in the notice calling the General Meeting at which the Resolution is passed.*

(6)   *Without prejudice to its power to order that a Director account for any profit, gain or benefit realised, the Court shall not set aside a transaction unless it is satisfied that:*

(a)   *the interests of third parties who have acted in good faith there under would be unfairly prejudiced if the transaction were not set aside; and*

(b)   *the transaction was not reasonable and fair in the interests of the Company at the time it was entered into.*

49.   For the purposes of Article 54, Schedule 1, Article 4 of DIFC Companies Law provides that a body corporate (Korek) is a subsidiary of another body corporate (the Company) if the second body corporate (the Company):

> (a) holds a majority of the voting rights in the first body corporate;
>
> (b) is a shareholder or member of the first body corporate and has the right to appoint or remove a majority of the board of directors or managers of the first body corporate; or
>
> (c) is a shareholder or member of the first body corporate and controls alone, pursuant to an agreement with other shareholders or members, a majority of the voting rights in the first body corporate,

or if the first body corporate is a subsidiary of a body corporate which is itself a subsidiary of the second body corporate.

50.   Therefore, and pursuant to DIFC Companies Law, Korek is a subsidiary of the Company for the purpose of Article 54, as the Company is the sole controlling shareholder of Korek and has the right to appoint or remove the Statutory Manager.

51.   The First Defendant also owes fiduciary duties to the Company pursuant to Article 159 of the DIFC Law of Obligations.  Pursuant to Schedule 3 of that law the following duties are owed:

*1. Loyalty*

A fiduciary must act in good faith in what he considers to be the interests of the principal without regard to his own interests.

*2. Conflict of interest*

(a) A fiduciary must not place himself in a position where his own interest conflicts with that of his principal.

(b) If there is a conflict between an interest or duty of a fiduciary, and an interest of the principal in any transaction, he must account to the principal for any benefit he receives from the transaction.

(c) A fiduciary does not have to account for the benefit if the interest or duty has been disclosed to and approved by the principal.

*3. No secret profits*

A fiduciary must not use the principal's property, information or opportunities for his own or anyone else's benefit unless his principal has consented or the use has been fully disclosed to the principal and the principal has not objected to it.

*4. Confidentiality*

A fiduciary must only use information obtained in confidence from his principal for the benefit of the principal, and must not use it for his own advantage or for the benefit of any other person.

*5. Care, skill and diligence*

A fiduciary owes the principal a duty to exercise the care, skill and diligence which would be exercised in the same circumstance by a reasonable person having both:

(a) the knowledge and experience that may reasonably be expected of a person in the same position as the fiduciary; and

(b) the knowledge and experience which the fiduciary has

52. Pursuant to Article 18 of the Company's Articles of Association, directors of the Company can attend any meeting of the directors which relates to a situation where a director has, or can have, and interest which conflicts, or may possibly conflict, with the interests of the Group (as defined), provided that (i) he has disclosed to the Board the nature and extent of his interest; and (ii) he shall not vote on, or be counted in the quorum in relation to, any resolution of the Board or any committee of the Board concerning such matter.

53. The DIFC Trust Law (DIFC Law No. 11 of 2005 – the "**Trust Law**") provides that the common law of trusts and principles of equity supplement the Trust Law, except to the extent modified by the Trust Law or other DIFC law or by the Court.  In addition to the duties and obligations set out above the Claimant relies upon the principles of common law and equity as the First Defendant is in a fiduciary position and a constructive trust arises by operation of law in connection with monies or payments received from Korek.

### E.  SUMMARY OF THE FIRST DEFENDANT'S BREACHES

54. In breach of Article 54 of the DIFC Companies Law the  First Defendant was aware that the undisclosed interests and self-dealing set out above were harmful to the interests of Korek causing it, and the Company as a 100% shareholder of Korek, loss and damage.   Such losses have also been incurred by the Claimant as a substantial shareholder in the Company.  In breach of Article 54 of the DIFC Companies Law the First Defendant has:

   a.  Failed to disclose his interest in DoubleU, a company that receives substantial business from Korek;

   b.  Failed to disclose his interests in third party suppliers to Korek, namely Al Hajras, ZR Collection and ZR Group;

    c.   Failed to disclose his interests in IC4LC, the so-called law firm to which Korek has paid exorbitant fees; Failed to disclose his interest in Mobitel, a direct competitor of Korek;

    d.   Failed to disclose an interest in the IBL Loan, and failed to disclose that the loan was secured by collateral; and

    e.   Failed to disclose his interest in Korek Telecom SAL.

55.    The facts and matters set out in paragraphs 30 to 46 above also constitute breaches of the First Defendant's obligations to the Company as a 100% shareholder in Korek under Article 159 of the DIFC Law of Obligations, as a result of which both Korek (and therefore the Company and the Claimant) continue to suffer significant loss and damage.

56.    The First Defendant is also in breach of his obligation under Article 18 of the Articles of Association of the Company in that he failed to disclose any interests to the other directors of the Company.

## F.  ARTICLE 133 OF THE DIFC COMPANIES LAW 2009 AND 160 OF THE DIFC LAW OF OBLIGATIONS 2005

57.    It is clear that with its current governance structure the Company is paralysed and unable to act in the face of very serious allegations made concerning Korek, the Company's only, albeit substantial, asset.

58.    The Claimant is permitted to bring a claim against the First Defendant under Article 133 in respect of his breach of duty he owed to the Company under Article 54.

59.    Article 133 of the DIFC Companies Law provides that:

    (1)   Where a person intentionally, recklessly or negligently commits a breach of any requirement, duty, prohibition, responsibility or obligation which is imposed by or under the Law or Regulations or other legislation administered by the Registrar, the person is liable to compensate any other person for any loss or damage caused to that other person as a result of such conduct, and is otherwise

18

liable to restore such other person to the position they were in prior to such conduct.

(2)     Where a person suffers loss or damage caused as a result of conduct described in paragraph (1), the Court may, on application brought by the person, make orders for the recovery of damages or for compensation or for the recovery of property or any other order as the Court sees fit, except where such liability is excluded under the Law or Regulations or other legislation administered by the Registrar.

60.     The First Defendant is also in breach of Article 159 of the DIFC Law of Obligations (breach of fiduciary duty).  Pursuant to Article 160 of that law:

(1)     Where a fiduciary breaches his obligation of loyalty:

(a)     he is liable to pay damages to his principal in respect of any loss suffered by the principal in accordance with the Law on Damages and Remedies; and

(b)     he is liable to account to his principal for any benefit he has acquired in consequence of the breach.

## G. RELIEF SOUGHT

_AND THE CLAIMANT CLAIMS (on its own behalf and/or on behalf of the Company)_

a)  A Declaration that the First Defendant is in breach of Article 54 of the DIFC Companies Law;

Further, or in the alternative;

A Declaration that the First Defendant is in breach of his fiduciary duty to the Company pursuant to Article 158(2)(c) of the DIFC Law of Obligations;

b)  An Order removing the First Defendant from the Board of the Company;

c)  A Declaration that the First Defendant is a Constructive Trustee for monies received in breach of his fiduciary duty or otherwise received unconscionably;

19

d) An Order requiring the First Defendant to explain in a sworn statement what monies or payments have been received from Korek by (a) companies controlled by the First Defendant (whether indirectly or directly) and/or of which he or a member of his family is a shareholder; (b) the First Defendant in his personal capacity, whether directly or indirectly through third parties;

e) Damages and/or compensation pursuant to Article 133(2) of the DIFC Companies Law for any loss caused by the First Defendant to the Claimant and/or the Company for his breach of duty;

Further, or in the alternative:

Damages to be payable to the Company pursuant to Article 160(1)(a) of the DIFC Law of Obligations and an account to the Company for any benefit acquired in consequence of his breach in accordance with Article 160(1)(b) of the DIFC Law of Obligations;

Further, or in the alternative:

An order, pursuant to Article 54(4) of the DIFC Companies Law, setting aside the transactions concerned and in any event (to the extent that the transactions cannot be set aside) directing that the First Defendant account to the Company for any profit, gain or benefit realised;

f) Multiple damages pursuant to Article 40 (2) of the DIFC Law of Damages and Remedies to reflect that the First Defendant's conduct in producing actual damages was deliberate and particularly egregious;

g) Pursuant to Article 54(4) of the DIFC Companies Law any other such order as the Court thinks fit;

h) Interest on damages; and

i) Costs.

**Statement of truth**

The Claimant believes that the facts stated in this Particulars of Claim are true.

Graham Lovett, Gibson Dunn & Crutcher LLP

Signed: ...................................................

For and on behalf of **Iraq Telecom Limited**

**Graham Lovett**                                          **Pierre R. Heitzmann**
**Gibson, Dunn & Crutcher LLP**                           **Jones Day**
**Building 5, Level 4**                                    **Al Fattan Currency House, Tower 2**
**P.O. 506654**                                            **Floor 33**
**Dubai International Financial Centre**                   **P.O. Box 506662**
**Dubai, United Arab Emirates**                            **Dubai International Financial Centre**
                                                          **Dubai, United Arab Emirates**

546251.1

21