# APPENDIX D

Pasteur St., Pasteur 40 Bldg. 8th Floor
Medawar, Achrafieh
P.O.Box: 17-5429
Beirut - Lebanon

LAW OFFICES
*Nabil B. Abdel-Malek*_____
ATTORNEY AT LAW

Phone: +961 1 564105
Fax:    +961 1 564104
Email: nabil@abdel-malek.com
Website: www.abdel-malek.com

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IN RE:<br><br>EX PARTE APPLICATION OF IRAQ TELECOM LIMITED FOR AN EXPEDITED ORDER TO TAKE DISCOVERY PURSUANT TO 28 U.S.C. § 1782<br><br>Applicant. | Case No. _____ |

**DECLARATION OF NABIL ABDEL MALEK**

Pursuant to 28 U.S.C. § 1746, I, Nabil Abdel-Malek, declare under penalty of perjury as follows:

1.      I am a practicing attorney with Nabil Abdel-Malek Law Offices, a firm located in Beirut, Lebanon.  I have been a member of the Beirut Bar Association since 1987.  I earned a bachelor's degree in economics in 1982, as well as a master's degree in economics in 1985, from the American University of Beirut in Beirut, Lebanon.  I earned a bachelor's degree in law and a master's degree in private and corporate law from the Lebanese University in Beirut, Lebanon in 1985 and 1990, respectively.   Lastly, I earned an executive master's degree in business administration from the American University of Beirut in 2014.  I speak three languages: Arabic, English, and French.

2.      I submit this declaration in support of the application submitted by Iraq Telecom Limited ("Iraq Telecom") for an order under 28 U.S.C. § 1782 permitting Iraq Telecom to take discovery from Citibank, N.A. ("Citibank"), the Bank of New York Mellon, N.A. (the "Bank of

1

New York Mellon"), HSBC Bank (USA), N.A. ("HSBC"), Standard Chartered International (USA), Ltd. ("Standard Chartered"), and Wells Fargo Bank, N.A. ("Wells Fargo") (collectively, the "Correspondent Banks") in the Southern District of New York (the "Application").   I understand that Iraq Telecom seeks documents from the Correspondent Banks relating to, among other things: (1) the relationship between (a) Korek Telecom LLC ("Korek")—in which Iraq Telecom is a major shareholder, holding an indirect interest of 44 percent—and (b) IBL Bank SAL ("IBL Bank"); (2) USD loan payments by Korek to IBL Bank (the "IBL Loan"); and (3) other USD payments relating to Korek's business (collectively, the "Requested Discovery").   I further understand that the Requested Discovery relates to (1) two pending complaints before the Dubai International Financial Center ("DIFC") Courts (the "DIFC Litigation"); (2) a pending arbitration administered by the Lebanese Arbitration and Mediation Center ("LAMC") (the "LAMC Arbitration"); and (3) one pending and one contemplated arbitration administered by the ICC (the "ICC Arbitrations") (collectively, the "Foreign Proceedings").

3.     As Iraq Telecom's counsel in the LAMC Arbitration, as well as the former general counsel for Agility Public Warehousing Company, K.S.C.P. ("Agility"), a shareholder of Iraq Telecom, I am familiar with the information set forth in this declaration either from personal knowledge or on the basis of documents I have reviewed.  These documents include the request for arbitration filed by Iraq Telecom against IBL Bank, Korek, and International Holdings Limited ("IHL") in the LAMC (the "LAMC RFA") on June 26, 2018, attached hereto as **Exhibit A**.[1]  The facts and matters testified to are true to the best of my own knowledge and belief. Because I submit this declaration specifically in support of the Application, it does not contain each and every fact within my knowledge regarding the topics discussed herein.

---

[1]     I certify that Exhibit A is a true and correct copy of the LAMC RFA, as filed in the LAMC Arbitration.

## I.   AUTHORITY AND PROCEDURES OF THE CCIA-BML AND LAMC

### A.   Chambers of Commerce Industry and Agriculture

4.     The Chambers of Commerce, Industry and Agriculture of Beirut Mt. Lebanon ("CCIA-BML") is a non-profit institution supported by the Lebanese government, which provides a number of advisory services to both the government as well as member businesses. Over 14,000 businesses have subscribed to the services of the CCIA-BML.[2]  It is led by a 26-member Board of Directors, as well as a General Assembly.[3]

5.     A main activity of the CCIA-BML is providing mediation and arbitration services through its subdivision: the Lebanese Arbitration and Mediation Center (the "LAMC").[4]

### B.   The Lebanese Arbitration and Mediation Center

6.     The LAMC "is the sole institution that provides administration and monitoring services for arbitration proceedings in Lebanon."[5]  The LAMC and, more specifically, the Court of Arbitration (the "LAMC Court") exercise general oversight over the arbitration process, including (i) confirming the appointment of the arbitrator or panel of arbitrators selected by the parties (hereinafter, the "Arbitrator") (Lebanese Arbitration Center ("LAC") Rules Art. 2, Cl. 1); and (ii) fixing the amount of advance costs (*i.e.,* the amount of money the parties must pay the LAMC Court before the arbitration to cover any costs that will be incurred during such arbitration) (LAC Rules Art. 9, Cl. 1).

---

[2]     *Profile,* CHAMBER OF COMMERCE, INDUSTRY & AGRICULTURE OF BEIRUT & MT. LEBANON, https://www.ccib.org.lb/en/?p=post&id=3 (last accessed Jun. 14, 2018).

[3]     *Board of Directors,* CHAMBER OF COMMERCE, INDUSTRY & AGRICULTURE OF BEIRUT & MT. LEBANON, https://www.ccib.org.lb/en/?p=post&id=5.

[4]     *Arbitration & Mediation,* CHAMBER OF COMMERCE, INDUSTRY & AGRICULTURE OF BEIRUT & MT. LEBANON, http://www.ccib.org.lb/en/?p=post&id=8 (last accessed Jun. 13, 2018).

[5]     *Id.*

7.      The LAMC Court is also responsible for administering the LAC Rules, which govern arbitrations occurring under the authority of the LAMC.[6]

8.      The LAMC Court does not preside over individual arbitrations; rather, it oversees the conduct and awards of the Arbitrator appointed by the parties or the LAMC Court itself. LAC Rules Art. 2 Cls. 2-3.  The LAMC Court also resolves challenges to the Arbitrator (LAC Rules Art. 2 Cl. 8), as well as challenges to the jurisdiction of the LAMC over the arbitration (LAC Rules Art. 8 Cl. 3).  Lastly, the LAMC Court must approve all draft awards issued by the arbitral tribunal before they are finalized and announced to the parties.  LAC Rules Art. 21.

9.      By contrast, the Arbitrator will (i) review the parties' submissions, including any documentary evidence they submit with said submissions (LAC Rules Art. 14, Cl. 1); (ii) appoint any necessary expert witnesses and review their reports (LAC Rules Art. 14, Cl. 2); (iii) administer the arbitration hearing (LAC Rules Art. 15, Cl. 4); and (iv) draft the award based on the evidence received (LAC Rules Art. 21).

10.      A party may initiate an arbitration under the LAC Rules by submitting a request for arbitration, along with supporting documentation relating to the case, to the Secretariat General of the LAMC Court.  LAC Rules Art. 3, Cl. 1.  The proceedings then move apace, including the request being forwarded to the adverse party, who responds with an answer and any counterclaims.  LAC Rules Art. 3, Cl. 3, Art. 4, Cl. 1.  An Arbitrator is appointed to preside over the arbitration, and render a final award.  LAC Rules Art. 2, Cl. 3, Art. 18, Cl. 1.  In addition, the merits decisions of the Arbitrator are final and binding on the parties.

11.      Because the Correspondent Banks are not parties to the LAMC Arbitration, Iraq Telecom cannot obtain the Requested Discovery through the LAMC Court or Arbitrator, which

---

[6]      *Arbitration & Mediation,* CHAMBER OF COMMERCE, INDUSTRY & AGRICULTURE OF BEIRUT & MT. LEBANON, http://www.ccib.org.lb/en/?p=post&id=8 (last accessed Jun. 13, 2018).

do not have jurisdiction over the Correspondent Banks.  Accordingly, Iraq Telecom must seek the Requested Discovery through other means, such as the Application.

## II.     LAC RULES PERTAINING TO DISCOVERY AND THE DISCLOSURE OF EVIDENCE

14.     The Arbitrator may consider evidence in the form of "relevant documents," witness statements and expert opinions in evaluating the case and issuing a decision.  The LAC Rules state, "The [Arbitrator] shall proceed within as short a time as possible to establish the facts of the case by all appropriate means."  LAC Rules Art. 14 Cl. 1.  The LAC Rules, however, do not set forth specific discovery or evidentiary procedures or requirements, including for the submission of evidence to the arbitrator.  LAC Rules Art. 14, Cls. 1-2.

15.     Based on my experience with arbitrations administered by the LAMC, I am familiar with its evidentiary procedures generally, and further am aware that the LAC Rules would not prevent Iraq Telecom from obtaining, or an Arbitrator from considering, financial or banking records obtained from third-parties, such as the Requested Discovery.  Therefore, the Application for the Requested Discovery does not constitute a circumvention of the LAC Rules or the LAMC Court procedures.

## III.    LAC RULES PERTAINING TO EVIDENCE GATHERED FROM FOREIGN AND  INTERNATIONAL TRIBUNALS

16.     Although the LAC Rules do not specifically set forth procedures for collecting evidence from foreign jurisdictions, the LAC Rules do not preclude or prohibit the use of evidence obtained abroad.  Indeed, based on my experience, in practice, arbitral tribunals acting under the authority of the LAC Rules will accept and consider evidence collected from foreign jurisdictions.

17.     In sum, the LAMC Arbitrator will accept evidence lawfully gathered abroad including by foreign courts or through foreign litigation.

IV.     **IRAQ TELECOM'S LAMC ARBITRATION**

A.     <u>Summary of Claims and Relief Sought</u>

18.     In the LAMC RFA, Iraq Telecom alleges that Sirwan Saber Mustafa Barzani ("Mr. Barzani"), a shareholder and director of Korek, and IBL Bank fraudulently induced Iraq Telecom to enter into an agreement, pursuant to which Iraq Telecom subordinated hundreds of millions of dollars in debts owed to it by IHL and Korek in favor of the USD 150 million loan from IBL Bank to Korek (the "Subordination Agreement").

19.     Based on the above, Iraq Telecom seeks the following relief from the LAMC arbitrator:

i.     An order declaring the Subordination Agreement null and void or alternatively that it has lapsed and is no longer in force and effect;

ii.     An order that IBL Bank pay damages to Iraq Telecom in an amount to be determined during the course of this arbitration; and

iii.     Damages, expenses relating to the LAMC Arbitration, and legal fees.

B.     <u>Status of Proceedings</u>

20.     Clause 5.2 of the Subordination Agreement requires that any dispute arising out of or relating to the Agreement must be resolved by binding arbitration "in accordance with the Rules of Conciliation and Arbitration of the Beirut Chamber of Commerce and Industry."

21.     Pursuant to this provision, Iraq Telecom filed the LAMC RFA on June 26, 2018. On August 17, 2018, IBL Bank sought a 45-day extension to respond to the LAMC RFA.  On August 31, the LAMC granted IBL Bank's request and extended the deadline to submit its response until October 8, 2018.

* * * * *

I declare under penalty of perjury under the laws of the United States and Lebanon that the foregoing is true and correct.

Executed in Beirut, Lebanon, on this the 18th of September, 2018.

_____

Nabil Abdel Malek

7

# Exhibit A

**IN THE MATTER OF AN ARBITRATION UNDER
THE RULES OF CONCILIATION AND ARBITRATION OF THE
BEIRUT CHAMBER OF COMMERCE AND INDUSTRY**

**IRAQ TELECOM LIMITED
(United Arab Emirates)**

*Claimant*

**v.**

**IBL BANK SAL
(Lebanon)**

**KOREK TELECOM COMPANY LLC
(Iraq)**

**INTERNATIONAL HOLDINGS LIMITED
(United Arab Emirates)**

*Respondents*

------------------------------------------------

**REQUEST FOR ARBITRATION**

------------------------------------------------

Kirkland & Ellis International LLP
30 St Mary Axe
London, EC3A 8AF
United Kingdom

Jones Day
2 rue Saint-Florentin
75001 Paris
France

Nabil Abdel-Malek Law Offices
Achrafieh, Medawar, Pasteur Str.
Pasteur 40 Bldg, 8th Floor
Postal Code 2072 6801
P.O.Box 17-5429, Beirut
Lebanon

Counsel for the Claimant

26 June 2018

# TABLE OF CONTENTS

**(A)   THE PARTIES** .................................................................................................**4**
   A.1   The Claimant ............................................................................................4
   A.2   The Respondents ......................................................................................5
**(B)   THE DISPUTE** ..................................................................................................**7**
   B.1   Background ...............................................................................................7
   B.2   Entry into the IBL Loan and the Subordination Agreement .................10
   B.3   Extension of the IBL Loan and lapse of the Subordination Agreement .............11
   B.4   Korek's failure to repay the IBL Loan ..................................................12
   B.5   The true nature of the IBL Loan ...........................................................13
**(C)   THE ARBITRATION AGREEMENT** .............................................................**16**
**(D)   RELIEF SOUGHT** ...........................................................................................**16**
**(E)   COMMENTS AS TO PROCEDURE** ...............................................................**17**

## INTRODUCTION

1.     Iraq Telecom Limited ("**IT Ltd.**") hereby files this Request for Arbitration pursuant to (i) Clause 5.2 of the subordination agreement entered into on or around 14 December 2011 between IBL Bank SAL ("**IBL**"), Korek Telecom Company LLC ("**Korek**"), International Holdings Limited ("**International Holdings**") and IT Ltd. (the "**Subordination Agreement**");[1] and (ii) the Rules of Conciliation and Arbitration of the Beirut Chamber of Commerce and Industry (the "**Rules**").

2.     Pursuant to Article 3(2) of the Rules, the Claimant sets out the following in this Request for Arbitration:

    (a)     the name, description, address, and contact details of each of the parties and their respective representatives;

    (b)     a statement of the Claimant's case describing the nature and circumstances of the dispute giving rise to the claims and the basis upon which the claims are made;

    (c)     details of the relevant agreements, including the arbitration agreement;

    (d)     a statement of the relief sought; and

    (e)     IT Ltd.'s comments as to procedure, including as to the number of arbitrators.

3.     In summary, the dispute centres around an elaborate fraud orchestrated by certain stakeholders and representatives of Korek with IBL's knowledge and cooperation. This resulted in fraudulently inducing the Claimant to enter into the Subordination Agreement, pursuant to which it agreed to subordinate certain obligations and liabilities owed to it by International Holdings and Korek in favour of a USD 150 million loan extended by IBL to Korek.

4.     As further set out below, the Claimant therefore seeks damages for the losses it has suffered as a result of IBL's actions, as well as a declaration that the Subordination Agreement is null and void and/or no longer in force and effect.

---

[1]     Subordination Agreement (**Exhibit C-1**).

(A)    **THE PARTIES**

A.1    **The Claimant**

5.     IT Ltd. is a private company limited by shares, incorporated in the Dubai International Financial Centre ("**DIFC**") with registered number 1019, having its registered office at:

> Unit 11, Level 3
> Gate Village Building 10
> Dubai International Financial Centre
> Dubai, 507043
> United Arab Emirates

6.     IT Ltd. is ultimately owned by Agility Public Warehousing Company K.S.C. ("**Agility**") and Orange S.A. (formerly France Télécom S.A.) ("**Orange**").

7.     IT Ltd. has duly authorised Kirkland & Ellis International LLP, Jones Day and Nabil Abdel-Malek Law Offices to represent it in these proceedings. All communications in these proceedings intended for the Claimant should be addressed as follows:

> KIRKLAND & ELLIS INTERNATIONAL LLP
> 30 St. Mary Axe
> London EC3A 8AF
> United Kingdom
>
> Telephone: +44 (0)20 7469 2000
> Fax: +44 (0)20 7469 2001
>
> Attention:
> Chris Colbridge (chris.colbridge@kirkland.com)
> Rajinder Bassi (rajinder.bassi@kirkland.com)
> Philipp Kurek (philipp.kurek@kirkland.com)
> Kartikey Mahajan (kartikey.mahajan@kirkland.com)
>
> JONES DAY
> 2 rue Saint-Florentin
> 75001 Paris

4

France

Telephone: + 33 1 56 59 39 39

Fax: +33 1 56 59 39 38

Attention:

Jean-Pierre Harb (jpharb@jonesday.com)

Ileana Smeureanu (ismeureanu@jonesday.com

Alexandre Meyniel (ameyniel@jonesday.com)

NABIL ABDEL-MALEK LAW OFFICES

Achrafieh, Medawar, Pasteur Str., Pasteur 40 Bldg, 8th Floor

Postal Code 2072 6801

P.O.Box 17-5429 - Beirut - Lebanon

Telephone:  + 961 1 564105

Fax: + 961 1 564104

Attention:

Nabil Abdel-Malek (nabil@abdel-malek.com)

## A.2     The Respondents

8.      The Respondents in this arbitration are IBL, Korek, and International Holdings.

9.      IBL is a joint-stock company registered with the Commercial Registry of Beirut under number 10472 and whose registered office is located at:

> Al Itihadia Building
> Charles Malek Avenue
> Achrafieh, Beirut
> Lebanon

10.     Korek is a company incorporated with the Registration Directorate of Companies of the Kurdistan Regional Government of Iraq with registered number 167 and whose registered office is located at:

> 45 Kurdistan Street
> Pirmam

Erbil

Kurdistan

Republic of Iraq

11. International Holdings is a private company limited by shares incorporated in the DIFC with registered number 1020, having its registered office at:

Unit 11, Level 3

Gate Village Building 10

Dubai International Financial Centre

Dubai 507043

United Arab Emirates[2]

12. Pursuant to Clause 2 of the Subordination Agreement, any notice to International Holdings should also be copied to:

Nawzad Junde

English Village

Villa 203

Erbil, Kurdistan

Republic of Iraq

and

Ehab Aziz

Agility Logistics Head Office

Sulaibia, 6th Ring Road

Near Land Customs Clearing Area

PO Box 25418, 13115

Safat, Kuwait

---

[2] The address specified for International Holdings in Clause 2 (*Notices*) of the Subordination Agreement (Suite 904, Level 9, Park Place, Sheikh Zayed Road, PO Box 506672, Dubai, United Arab Emirates) is for International Holdings' previous registered office and it is IT Ltd.'s understanding that it is no longer in use.

**(B)**     **THE DISPUTE**

**B.1     Background**

13.     As noted above, the dispute centres around an elaborate fraud orchestrated by certain
        stakeholders and representatives of Korek with IBL's knowledge and cooperation. This
        resulted in fraudulently inducing the Claimant to enter into the Subordination
        Agreement, pursuant to which it agreed to subordinate certain obligations and liabilities
        owed to it by International Holdings and Korek in favour of a USD 150 million loan
        extended by IBL to Korek.

14.     Korek is an Iraqi telecommunications company founded in 2000 by a number of high
        net worth Iraqi individuals (the "**Original Shareholders**"), including Mr. Sirwan Saber
        Mustafa (also known as and defined herein as "**Mr. Barzani**"), a member of the
        prominent and politically connected Iraqi Barzani family. Initially, Korek only held a
        regional mobile telephone licence for Kurdistan. Then, in 2007, Korek was awarded a
        mobile telecommunications licence to operate nationwide (the "**License**")[3] by the Iraqi
        Communications and Media Commission (the "**CMC**"), the regulatory authority
        responsible for the licensing, management and oversight of the telecommunications
        industry in Iraq.

15.     Pursuant to the terms of the License, Korek was required to pay a licence fee of
        USD 1,250 million, payable in a number of instalments, together with interest accruing
        on the unpaid instalments. As Korek did not have sufficient funds to pay the second
        instalment of the licence fee, Korek sought external funding. It was in this context that
        Agility first invested in Korek. Accordingly, in September 2007 Agility made an
        investment of USD 250 million into Korek, structured as a convertible senior loan note.
        The USD 250 million that Agility invested was transferred directly from Agility's bank
        account to the CMC's bank account.

16.     By late 2009, it became clear that Korek needed further financial support and additional
        technical expertise to roll out its network outside of Kurdistan into the rest of Iraq. In

---

[3]     License Agreement between the CMC and Korek dated August 2007 (**Exhibit C-2**).

this context, Agility identified Orange, a French multinational telecommunications corporation, as a suitable joint venture partner.

17.   In 2011, it was decided that a joint venture would be set up between Korek's existing shareholders and Agility and Orange, pursuant to which Agility and Orange would invest approximately USD 800 million into Korek (structured as debt and equity) in return for an indirect stake of 44% in Korek.

18.   A holding structure was devised pursuant to which:

(a)   Korek's entire shareholding was transferred to International Holdings, a DIFC holding company;

(b)   Agility and Orange would hold their 44% stake in International Holdings via IT Ltd., a DIFC holding company; and

(c)   the Original Shareholders would hold their 56% stake in International Holdings via a Cayman holding company, Korek International (Management) Ltd. ("**CS Ltd.**").

19.   The group's structure following implementation of the above transaction is set out below:

*(The remaining part of this page has been intentionally left blank)*



<sup></sup>(a)  Agility's interest is held indirectly via a number of holding entities, including amongst others Alcazar Capital Partners (*Cayman Islands*).

(b)  Orange's interest is held indirectly via a number of holding entities, including amongst others Atlas Services Nederland B.V. (*the Netherlands*).

(c)  It is understood that on or around the time of the joint venture transaction, Mr. Aso Ali acquired an interest in CS Ltd. and that CS Ltd. is jointly owned by the Original Shareholders and Mr. Ali.

20.    As part of the transaction, IT Ltd. also extended a USD 285 million loan to International Holdings (the "**IT-IH Loan**"),[4] which International Holdings on-lent to Korek pursuant to a back-to-back loan agreement (the "**IH-Korek Loan**").[5] Separately, Korek provided a guarantee to IT Ltd. guaranteeing International Holdings' obligations under the IT-IH Loan (the "**Korek Guarantee**").[6]

21.    Although it would have been appropriate for CS Ltd. to also provide funding to International Holdings, not only did it not provide any funding, but it also defaulted on its contractual payment obligation towards International Holdings under a subscription

---

[4]    Facility agreement for a USD 285 million facility between International Holdings and IT Ltd. dated 27 July 2011 (**Exhibit C-3**).

[5]    Shareholder loan agreement between International Holdings and Korek dated 27 July 2011 (**Exhibit C-4**).

[6]    Guarantee made by Korek in favour of IT Ltd. dated 27 July 2011 (**Exhibit C-5**).

agreement pursuant to which the transaction was implemented. As a result, the IT-IH Loan, and the equity contributions made by IT Ltd. as part of the transaction, were the sole source of funding to International Holdings and thereby to Korek.

22.    Mr. Barzani remains Korek's single largest indirect shareholder (holding 75% of CS Ltd. and thus indirectly 42% of Korek).[7] In addition, Mr. Barzani acts as Korek's managing director and a director and chairman of the International Holdings Board of Directors (the "**IH Board**") and the Korek Supervisory Committee (the "**KSC**").[8]

## B.2    Entry into the IBL Loan and the Subordination Agreement

23.    In December 2011, less than one year from the date of the investment by IT Ltd., Korek required additional funds to pay an instalment of the licence fee. It was in this context that Mr. Barzani and one of his close associates, Mr. Raymond Rahmeh (a CS Ltd. appointee to the IH Board and the KSC, and frequent representative of Mr. Barzani and CS Ltd.) arranged for Korek to obtain a USD 150 million loan from IBL at an interest rate of 13.25% (the "**IBL Loan**").[9]

24.    Although IT Ltd. was surprised by the stringent proposed commercial terms of the IBL Loan, IT Ltd. approved Korek's entry into the IBL Loan on the basis of representations by Mr. Barzani and Mr. Rahmeh that the IBL Loan was an unsecured third-party bank loan on market terms and that IBL was the only bank willing to provide funding. The unsecured nature of the IBL Loan was reflected in the legal documentation related to the IBL Loan.[10]

25.    Furthermore, as a precondition to the IBL Loan being made available to Korek, IT Ltd. was required to enter into the Subordination Agreement and in doing so subordinate its rights under the IT-IH Loan and the Korek Guarantee to IBL's rights under the IBL Loan.

---

[7]    Letter from Korek to the CMC dated 24 April 2013 (**Exhibit C-6**).

[8]    The IH Board and KSC are made up of seven members each. Four members of the IH Board/KSC are appointed by CS Ltd. and the remaining three are appointed by IT Ltd.

[9]    Term Loan Agreement between IBL, Korek and Mr. Barzani dated 21 December 2011 (the "**IBL Loan Agreement**") (**Exhibit C-7**).

[10]    See, for example, Clause 7.1.6 of the IBL Loan Agreement (**Exhibit C-7**).

26.     Separately, pursuant to the IBL Loan Agreement, Mr. Barzani provided IBL with a
        personal guarantee, guaranteeing Korek's obligations (including full repayment of the
        IBL Loan) under the IBL Loan Agreement (the "**Barzani Guarantee**").[11] IT Ltd., in
        turn, agreed to indemnify Mr. Barzani for its *pro rata* share of any amounts Mr. Barzani
        may have to pay pursuant to the Barzani Guarantee.[12]

**B.3     Extension of the IBL Loan and lapse of the Subordination Agreement**

27.     USD 40 million of the IBL Loan (the "**Short Term Loan**") was repayable by 21 July
        2012, with the remaining USD 110 million (the "**Long Term Loan**") repayable 21 June
        2014.[13] However, pursuant to a supplemental agreement dated 21 July 2012 between
        IBL, Korek, and Mr. Barzani, IBL agreed to extend the Short Term Loan until
        1 February 2013 in return for a 1% waiver fee (i.e. USD 400,000), and accordingly
        entered into a supplemental agreement to the IBL Loan Agreement (the "**First
        Extension**").[14] Pursuant to a supplemental agreement to the Subordination Agreement,
        IT Ltd. agreed that the Subordination Agreement would remain in full force and effect
        and would extend to the IBL Loan Agreement as amended and supplemented pursuant
        to the First Extension.[15]

28.     Furthermore, on 1 February 2013 the parties to the IBL Loan Agreement again agreed
        to extend the Short Term Loan for another year until 1 February 2014, and accordingly
        entered into a further supplemental loan agreement (the "**Second Extension**").[16] IT Ltd.
        again agreed to enter into a supplemental subordination agreement, confirming its
        agreement that the Subordination Agreement would remain in full force and effect and
        would extend to the IBL Loan Agreement as amended and supplemented pursuant to
        the Second Extension.[17]

---

[11]   IBL Loan Agreement (**Exhibit C-7**), Clause 6.

[12]   Deed of Indemnity entered into between IT Ltd., Mr. Barzani, Korek and International Holdings (**Exhibit C-8**).

[13]   IBL Loan Agreement (**Exhibit C-7**), Clause 3.1.

[14]   Supplemental Agreement to the IBL Loan Agreement dated 21 July 2012 (**Exhibit C-9**).

[15]   Supplemental Agreement to the Subordination Agreement dated 21 July 2012 (**Exhibit C-10**).

[16]   Supplemental Agreement to the IBL Loan Agreement dated 1 February 2013 (**Exhibit C-11**).

[17]   Supplemental Agreement to the Subordination Agreement dated 1 February 2013 (**Exhibit C-12**).

29.     Under the IBL Loan Agreement, as amended, the Short Term Loan was therefore due and payable by Korek by 1 February 2014, and the Long Term Loan by 21 June 2014. However, on or around 21 June 2014, the parties to the IBL Loan Agreement agreed a further extension of the loans, extending the Short Term Loan until 31 January 2015 and the Long Term Loan until 21 June 2015 (the "**Third Extension**").[18]

30.     Crucially, however, IT Ltd. did <u>not</u> agree to any further extension or variation of the Subordination Agreement in respect of the Third Extension. IT Ltd. did <u>not</u> agree to the continued subordination of its rights for yet another extension of the IBL Loan.

31.     The Subordination Agreement (as amended) refers solely to the IBL Loan Agreement dated 14 December 2011, as amended on 21 July 2012 and 1 February 2013 pursuant to the First Extension and Second Extension. It does not, however, refer to the IBL Loan Agreement as amended or varied from time to time and does not contain any language indicating it was the intention of the parties for the subordination to remain in place no matter the status of the IBL Loan.

32.     Accordingly, upon variation and extension of the IBL Loan pursuant to the Third Extension, the Subordination Agreement lapsed with the effect that the IT-IH Loan and the Korek Guarantee were no longer subordinated to the IBL Loan.

**B.4     Korek's failure to repay the IBL Loan**

33.     When International Holdings failed to make interest payments to IT Ltd. under the IT-IH Loan and failed to repay the loan when due on 14 June 2015, IT Ltd. issued a Notice of Default under the IT-IH Loan on 18 June 2015.[19]

34.     Shortly thereafter, on 9 July 2015, IBL wrote to Korek, purporting to invoke an Event of Default under the IBL Loan on the basis that Korek had failed to repay the IBL Loan pursuant to the terms of the Third Extension which, as noted above, required the Short Term Loan to be repaid by 31 January 2015 and the Long Term Loan by 21 June 2015.[20] IBL demanded repayment of the IBL Loan by 9 August 2015, whilst also purporting to

---

[18]   See, for example, the letter from IBL to Korek dated 9 July 2015 (**Exhibit C-13**).

[19]   Letter from IT Ltd. to International Holdings and Korek dated 18 June 2015 (**Exhibit C-14**); see also letter from IT Ltd. to International Holdings dated 24 June 2017 (**Exhibit C-15**).

[20]   Letter from IBL to Korek dated 9 July 2015 (**Exhibit C-13**).

invoke the terms of the Subordination Agreement. As set out in Section **B.5** below, it has since become apparent that the IBL Loan is, and at the relevant time was, in fact fully cash collateralised, and IBL's purported Notice of Default was sent only to further a sham arrangement between Mr. Barzani and IBL, to the detriment of IT Ltd. and designed to prevent IT Ltd. from ever being able to recover its USD 285 million loan.

35.     When Korek failed to repay the loan by the requested date, IBL wrote to Korek once again on 15 September 2015, granting Korek yet another extension of the IBL Loan until 15 October 2015. IBL again conditioned its extension of the IBL Loan (amongst other things) upon "*continued compliance with the terms of the Subordination Agreement.*"[21] At no point did IT Ltd. agree to such subordination. However, International Holdings has since refused (and continues to refuse) to repay the IT-IH Loan on the basis of the Subordination Agreement.[22]

36.     Korek failed to repay the IBL Loan by 15 October 2015 - and in fact has not repaid the IBL Loan as at the date hereof. However, as far as the Claimant is aware, to date IBL has not taken any steps to recover its loan from Korek under the IBL Loan Agreement or from Mr. Barzani under the Barzani Guarantee.

37.     After sending its two letters in June and September 2015, IBL took no further steps to seek repayment of the IBL Loan for almost two years. Then, on 30 August 2017, IBL unexpectedly wrote to Korek insisting on full repayment of the IBL Loan, but at the same time also demanding "*additional collateral*" to secure the loan.[23]

**B.5     The true nature of the IBL Loan**

38.     As noted in Section **B.2** above, the Claimant entered into the Subordination Agreement on the understanding that the IBL Loan was a third party bank loan on market terms provided against a personal guarantee from Mr. Barzani without any collateral.

---

[21]  Letter from IBL to Korek dated 15 September 2015 (**Exhibit C-16**).

[22]  See, for example, letter from CS Ltd. to IT Ltd. dated 5 July 2017 (**Exhibit C-17**); letter from IT Ltd. to CS Ltd. dated 25 July 2017 (**Exhibit C-18**); letter from International Holdings to IT Ltd. dated 27 July 2017 (**Exhibit C-19**); and letter from CS Ltd. to IT Ltd. dated 8 August 2017 (**Exhibit C-20**).

[23]  Letter from IBL to Korek dated 30 August 2017 (**Exhibit C-21**).

39.   However, it has since come to the Claimant's attention that, contrary to the express terms of the IBL Loan Agreement,[24] the loan is in fact fully cash collateralised. In truth, the IBL Loan is nothing more than a sham arrangement designed to benefit Mr. Barzani.

40.   First, the Claimant notes that statements in IBL's own annual reports since 2012 appear to reference the IBL Loan and the fact that it is cash collateralised. For example, IBL's Annual Report for 2016 states that:

> "*Performing corporate loans to large enterprises, outstanding at year end 2016 and 2015, include an amount of LBP226billion related to a non-resident customer which is covered by LBP234billion cash collateral. Related interest income and expense amounted to LBP30.7billion and LBP28.83billion respectively during 2016 and 2015.*"[25]

41.   The IBL Loan of USD 150 million equates to approximately LBP 226 billion (l USD = 1,506.60 LBP), which accords with the amount of the performing corporate loan to a "non-resident customer" referenced in IBL's accounts. Furthermore, the interest due on this loan for 2015 is said to be LBP 30.7 billion which is just over 13% of the principal amount said to be owing. This also accords with the interest rate of the IBL Loan of 13.25%.

42.   Moreover, IBL's demand in August 2017 for "***additional** collateral*" further confirms the Claimant's belief that the IBL Loan is, in fact, already cash collateralised.

43.   Secondly, the Claimant has since learnt that IBL entered into a secret arrangement with Mr. Barzani pursuant to which IBL undertook to pay to Mr. Barzani an amount equal to 12.75% of the 13.25% total interest received by IBL under IBL Loan Agreement. In other words, IBL agreed to "kick back" to Mr. Barzani more than 96% of the interest expense paid to it by Korek.

44.   Based on the above, Mr. Barzani secretly provided cash collateral to secure the IBL Loan as part of an arrangement designed to do the following:

---

[24]   IBL Loan Agreement (**Exhibit C-7**), Clause 7.1.6; the IBL Loan is stated to be an "*unsecured*" obligation.

[25]   IBL 2016 Annual Report (**Exhibit C-22**), p. 59.

(a)     to prioritise Mr. Barzani's creditor rights over those of IT Ltd. (in particular because, as noted above, one of the conditions of IBL granting the loan was that it should take priority over the IT-IH Loan); and

(b)     to enable Mr. Barzani to extract funds from Korek by having Korek mask these as interest payments to IBL.

45.    Therefore, the effect of the arrangement is that the IBL Loan is, in reality, nothing more than a shareholder loan provided by Mr. Barzani with the benefit of a subordination agreement vis-a-vis the IT-IH Loan. Korek is paying 13.25% interest on what is in reality a fully collateralised loan, for which an appropriate market rate would be significantly lower (as reflected by the arrangement between IBL and Mr. Barzani). Mr. Barzani and Mr. Rahmeh did not disclose this position to the Claimant, nor was it disclosed to any of the Claimant's representatives on the IH Board or the KSC.

46.    The existence of such secret cash collateral also explains why IBL has taken no action whatsoever to recover the IBL Loan. Instead, save for sending a small handful of letters over the course of the last three years since Korek defaulted on the IBL Loan, IBL has been perfectly content to maintain the status quo. Furthermore, despite repeated information requests by IT Ltd. and its representatives, the existence of the cash collateral has never been denied by IBL, Mr. Barzani, CS Ltd., or any of their respective representatives. To the contrary, its existence has since been all but admitted by a representative of CS Ltd. in separate proceedings before the DIFC courts.

47.    IT Ltd.'s representatives sought further information from IBL in four separate letters, and confronted IBL with the matters set out above.[26] However, to date, IBL has refused to provide the Claimant with any substantive response to these letters.[27] In so doing, IBL continues to engage in a pattern of deception and obfuscation by behaving as if the IBL Loan is unsecured: there can be no commercial justification for a bank to require "*additional collateral*" when, in fact, such bank already maintains as collateral a cash deposit that equates to 103.5% of the total size of the loan.

---

[26]  Letter to IBL dated 25 September 2017 (**Exhibit C-23**); letter to IBL dated 25 October 2017 (**Exhibit C-24**); and letter to IBL dated 17 December 2017 (**Exhibit C-25**); letter to IBL dated 21 March 2018 (**Exhibit C-26**).

[27]  See letter from IBL to Korek dated 29 January 2018 (**Exhibit C-27**); letter from IBL to Mr. Barzani dated 1 February 2018 (**Exhibit C-28**); letter from IBL to Korek dated 29 March 2018 (**Exhibit C-29**).

48.     Accordingly, the Claimant was left with no choice but to commence these proceedings
        in order to seek compensation for the losses it has suffered, as well as a declaration that
        the Subordination Agreement is null and void pursuant to Articles 202, 208 and 209 of
        the Lebanese Code of Obligations and Contracts, or alternatively that it is has lapsed
        and is no longer in force and effect.

**(C)     THE ARBITRATION AGREEMENT**

49.     Clause 5.2 of the Subordination Agreement provides:

> "*Any dispute, claim, question or disagreement arising out of or relating to
> this Agreement or the transactions contemplated herein (a "Dispute"), shall
> be settled by binding arbitration in accordance with the Rules of Conciliation
> and Arbitration of the Beirut Chamber of Commerce and Industry by one or
> more arbitrators, and the procedures set forth below. Judgment upon the
> award rendered by the arbitrator may be enforced in any court having
> jurisdiction over such dispute. The Arbitration is to take place in Beirut in the
> English language unless otherwise agreed by the parties. The award shall be
> final and binding and the parties waive their rights to lodge an appeal against
> the award. Nothing in this Agreement including this Section 5.2 shall prevent
> a party from seeking injunctive relief including but not limited to injunctive
> relief before the Fast Track Judge in the case of any breach or alleged breach
> by another party.*"

50.     Accordingly, the Claimant hereby refers the dispute to arbitration pursuant to
        Clause 5.2 of the Subordination Agreement.

**(D)     RELIEF SOUGHT**

51.     Whilst reserving the right to claim further and/or other relief in due course, the Claimant
        indicates at this stage that it seeks the following relief:

        (a)     an order declaring that the Subordination Agreement is null and void; or
                alternatively an order that the Subordination Agreement has lapsed and is no
                longer in force and effect;

(b)     an order that IBL pay damages to the Claimant in an amount to be determined during the course of this arbitration;

(c)     an order that the Respondents pay to the Claimant the amount of all documented costs and expenses (including legal fees) incurred by the Claimant in connection with these arbitral proceedings, including the costs of the Tribunal, the Court of Arbitration of the Beirut Chamber of Commerce and Industry, as well as any legal and other fees, costs and/or expenses incurred by the Claimant, including, but not limited to, legal fees, expert fees and costs in respect of the time spent by the Claimant's representatives on a full indemnity basis;

(d)     an order that the Respondents pay post-award interest on all sums awarded at the maximum permitted rate until payment in full; and

(e)     such other relief as the Tribunal may deem appropriate.

52.     The Claimant reserves its right to plead its case further and to advance further arguments and produce such further evidence (whether factual or legal) as may be necessary to complete or supplement the presentation of its claims or to respond to any arguments or allegations advanced by the Respondents. The Claimant also reserves its right to produce further documentary evidence and expert evidence, and to produce witness evidence in order to supplement and support the claims made in this Request for Arbitration.

## (E)     COMMENTS AS TO PROCEDURE

53.     Pursuant to Clause 5.2 of the Subordination Agreement, the parties have agreed that:

(a)     the number of arbitrators shall be one or more;

(b)     the language to be used in the arbitration shall be English; and

(c)     the seat of the arbitration shall be the Beirut.

54.     As Clause 5.2 does not prescribe a fixed number of arbitrators, the Claimant requests that, in light of the nature, complexity and size of the dispute, the Court of Arbitration appoint a three-member arbitral tribunal in accordance with Article 2(5) of the Rules. Should the Claimant's request be granted, the Claimant will nominate an arbitrator within the timeframe prescribed by the Court of Arbitration.

Respectfully submitted on behalf of **Iraq Telecom Limited,**

By: _Kirkland & Ellis International LLP_

Kirkland & Ellis International LLP
30 St. Mary Axe
London EC3A 8AF
United Kingdom

By: _Jones Day_

Jones Day
2 rue Saint-Florentin
75001 Paris
France

By: _____

Nabil Abdel-Malek Law Offices
Achrafieh, Medawar, Pasteur Str., Pasteur 40 Bldg, 8th Floor
Postal Code 2072 6801
P.O.Box 17-5429 - Beirut - Lebanon

26 June 2018

18