# APPENDIX E

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IN RE:<br><br>EX PARTE APPLICATION OF IRAQ TELECOM LIMITED FOR AN EXPEDITED ORDER TO TAKE DISCOVERY PURSUANT TO 28 U.S.C. § 1782<br><br>Applicant. | Case No. _____ |

## DECLARATION OF EHAB FEKRI AZIZ BASSILIOS

Pursuant to 28 U.S.C. § 1746, I, Ehab Fekri Aziz Bassilios, declare under penalty of perjury as follows:

1.     I am a director of Iraq Telecom Limited ("Iraq Telecom"), as well as a director of International Holdings Limited ("IHL"), the entity through which Iraq Telecom holds a 44 percent interest in Korek Telecom Company LLC ("Korek").

2.     I submit this declaration in support of the application submitted by Iraq Telecom for an order under 28 U.S.C. § 1782 permitting Iraq Telecom to take discovery from Citibank, N.A. ("Citibank"); the Bank of New York Mellon, N.A. (the "Bank of New York Mellon"); HSBC Bank (USA), N.A. ("HSBC"); Standard Chartered International (USA), Ltd. ("Standard Chartered"); and Wells Fargo Bank, N.A. ("Wells Fargo") (collectively, the "Correspondent Banks") in the Southern District of New York (the "Application").  I understand that Iraq Telecom seeks documents from the Correspondent Banks relating to, among other things: (1) the relationship between (a) Korek, and (b) IBL Bank SAL ("IBL Bank"); (2) U.S. dollar ("USD") loan payments by Korek to IBL (the "IBL Loan"); and (3) other USD payments relating to Korek's business (collectively, the "Requested Discovery").  I further understand that the Requested Discovery relates to (1) two pending complaints before the Dubai International Financial Center

1

("DIFC") Courts (the "DIFC Litigation"); (2) a pending arbitration administered by the Lebanese Arbitration and Mediation Center ("LAMC") (the "LAMC Arbitration"); and (3) one pending and one contemplated arbitration administrated by the International Chamber of Commerce ("ICC") (the "ICC Arbitrations") (collectively, the "Foreign Proceedings").

3.      As a director of Iraq Telecom and IHL, I am familiar with the information set forth in this declaration from (1) personal knowledge; (2) documents I have prepared and/or reviewed; and/or (3) information obtained during the course of Iraq Telecom's investigation into these matters.  Because I submit this declaration specifically in support of the Application, it does not contain each and every fact within my knowledge regarding the topics discussed herein.[1]

## I.      KOREK TELECOM COMPANY LLC

4.      Korek is an Iraqi telecommunications limited liability company incorporated with the Registration Directorate of Companies with the Kurdistan Regional Government in the Republic of Iraq.  Korek began operations in 2000, and was initially licensed to provide mobile telecommunications services only to the Kurdistan region.

5.      In 2007, however, Korek obtained a nationwide mobile telecommunications license (the "License") from the Iraqi Communications and Media Commission (the "CMC"), the government agency responsible for mobile telephone regulation and licensing.  The License permitted Korek to expand its network from Kurdistan to all of Iraq.

6.      As an Iraqi LLC, Korek is managed by a sole director or "statutory manager," rather than a board of directors.  Under Iraqi law, the statutory manager must perform certain duties, including (1) reporting to shareholders on the company's activities; (2) preparing financial statements; (3) preparing and implementing annual plans regarding the company's activities and

---

[1]      I also certify that the exhibits attached hereto are true and correct copies of the original documents.

budgets; (4) submitting periodic reports to the auditor and an annual report to shareholders on the results of the implementation of the annual plan; and (5) preparing statistical studies in connection with developing the company's business.  Importantly, the statutory manager must not have direct or indirect interests in deals involving the company without the permission of the shareholders with full disclosure of the nature and extent of such interests.  After July 2011, Korek's statutory manager was Sirwan Saber Mustafa (also known as and referred to herein as "Mr. Barzani").

7.      Korek is also managed by the Korek Supervisory Committee (the "KSC") established by the parties during the Investment Transaction (discussed below), a seven-member body responsible for the overall direction and management of Korek.[2]  Initially, the KSC met on a regular basis; however, it has not met regularly during the past two years.  The last meeting took place in Milan, Italy in March 2017, and was ended prematurely by certain directors appointed by Korek International (Management) Ltd. ("CS Ltd") (*see infra* at ¶ 17).  Since then, Mr. Barzani has not convened any KSC meetings[3] and, as a result, Korek currently operates effectively under the sole management and control of Mr. Barzani.

## II.    KOREK'S SHAREHOLDERS AND INVESTORS

8.      Korek's original shareholders were three Iraqi citizens: Mr. Barzani, Jawshin Hassan Jawshin Barazany ("Mr. Barazany"), and Jiqsy Hamo Mustafa ("Mr. Hamo Mustafa") (together, the "Original Shareholders").  These three individuals held 100 percent of Korek's shares until 2007, when Korek obtained the License.

9.      Under the terms of the License, Korek was required to pay the CMC a fee of USD 1,250 million, payable in a number of installments, together with interest on unpaid installments.

---

[2]      The seven members of the KSC also serve on the board of IHL, which, in 2011, became the sole shareholder of Korek.  *See infra* at ¶ 11.

[3]      As the statutory manager, Mr. Barzani is the only individual authorized to convene meetings of the KSC.

Because Korek lacked sufficient funds to pay the second installment of the License fee, it was forced to seek external funding. In September 2007, Agility Public Warehousing Company, K.S.C.P. ("Agility") offered to provide this external funding to Korek though a convertible senior loan note valued at USD 250 million guaranteed by the Kurdistan Regional Government of Iraq. Agility transferred these funds directly from its own bank account to that of the CMC.

10.     Recognizing that Korek would require additional financial and technical support to expand its services to other parts of Iraq, in late 2009, Agility identified Orange, S.A., formerly France Télécom S.A. ("Orange"), a French multinational telecommunications corporation, as a potential investor. In 2011, Agility and Orange formed Iraq Telecom, a joint venture through which they invested a total of USD 800 million into Korek. In connection with the investment, Agility and Orange obtained an indirect interest of 44% in Korek.

11.     Iraq Telecom's investment in Korek was part of a large scale reorganization of Korek's ownership structure, which took place in July 2011 (the "Investment Transaction"). The Investment Transaction, which is described more fully in the attached exhibits, entailed the following:

  i.     100 percent of Korek's shares were transferred to IHL, a DIFC holding company;

  ii.    Iraq Telecom, a private DIFC company, received a 44% interest in IHL, and thereby an indirect 44% interest in Korek; and

  iii.   CS Ltd, a Cayman Islands company established by the Original Shareholders, received the remaining 56% interest in IHL, and thereby an indirect 56% interest in Korek.[4]

12.     As part of the Investment Transaction, Iraq Telecom also extended a USD 285 million loan to IHL (the "Iraq Telecom Shareholder Loan"). IHL, in turn, provided this loan to

---

[4]     Mr. Barzani is the single largest indirect shareholder of Korek, as he holds a 75 percent interest in CS Ltd, and thus holds a 42 percent indirect interest in Korek. *See* Exhibit A (4/25/2013 letter from Korek to CMC).

Korek through a back-to-back shareholder loan agreement dated July 27, 2011 (the "IHL-Korek Facility Agreement").   Also on July 27, 2011, Korek provided a guarantee to Iraq Telecom guaranteeing IHL's obligations to Iraq Telecom under the Iraq Shareholder Loan (the "Korek Guarantee").

13.   The relationships between Korek's investors, which are at issue in the DIFC Litigation, the LAMC Arbitration, and the ICC Arbitrations, are primarily governed by two agreements: (1) a July 27, 2017 subscription agreement between IHL, Korek, the Original Shareholders, CS Ltd, Iraq Telecom, Alcazar Capital Partners[5] and Atlas Services Nederland B.V.[6] (the "Subscription Agreement," attached hereto as Exhibit B); and (2) a March 10, 2011 shareholders' agreement between IHL, Korek, Mr. Barzani, CS Ltd and Iraq Telecom (the "IHL Shareholders' Agreement," attached hereto as Exhibit C).

14.   Under the Subscription Agreement, (1) CS Ltd was required to, among other things, make cash payments totaling approximately USD 75 million to IHL in respect of certain shares in IHL issued to CS Ltd in the context of the Investment Transaction; and (2) Mr. Barzani also provided an unconditional and irrevocable guarantee in respect of CS Ltd's obligations under the Subscription Agreement.

15.   CS Ltd defaulted on the cash payments to IHL required by the Subscription Agreement, and failed to provide any further funding to IHL.   Thus, before December 2011, the Iraq Telecom Shareholder Loan and equity contributions made by Iraq Telecom as part of the Investment Transaction were the sole source of funding to IHL and, by extension, to Korek.

---

[5]      Agility's interest in Iraq Telecom is held indirectly via a number of holding entities, including, amongst others, Alcazar Capital Partners in the Cayman Islands.

[6]      Orange's interest in Iraq Telecom is held indirectly via a number of holding entities, including, amongst others, Atlas Services Nederland B.V. in the Netherlands.

16.     Pursuant to the IHL Shareholders' Agreement, the parties agreed, among other things, (1) not to compete with Korek in the Republic of Iraq; and (2) to immediately give notice if their interests were (or reasonably likely) to conflict with the interests of Korek, in which case specific restrictions or exclusions applied.

17.     The IHL Shareholders' Agreement, along with IHL's Articles of Association, also provided for the creation of a seven-member board of directors, including (1) three directors nominated by Iraq Telecom (the "Iraq Telecom Directors"); (2) three directors nominated by CS Ltd (the "CS Ltd Directors"); and (3) one independent director also nominated by CS Ltd (the "Independent Director").  The three CS Ltd Directors include Abdulhameed Abdullah Mohammed Salih Aqrawi ("Mr. Aqrawi"), Nozad Hussein Jundi ("Mr. Jundi"), and Mr. Barzani.  Mr. Barzani is also the Chairman of the IHL Board.  Raymond Samir Zina Rahmeh ("Mr. Rahmeh") is the Independent Director nominated by CS Ltd.[7]

## III.    WRONGFUL CONDUCT AT ISSUE IN THE FOREIGN PROCEEDINGS

18.     As set forth in detail in the pleadings filed (or that will be filed) in the Foreign Proceedings, Iraq Telecom alleges that certain of Korek's shareholders and directors engaged in wrongful conduct in connection with the management of Korek.   This conduct is briefly summarized below.

### A.      IBL Loan Agreement Fraud and Kickbacks

19.     In December 2011, Iraq Telecom and CS Ltd agreed to seek additional funding from third-party banks to pay an installment of the License fee.  Pursuant to this agreement, Messrs. Barzani and Rahmeh brokered an agreement with IBL Bank to obtain a loan of USD 150

---

[7]      Despite his designation as an "independent" director, Mr. Rahmeh is closely affiliated with CS Ltd and Mr. Barzani, representing their interests in a number of situations including IHL board meetings and dispute resolution proceedings between Iraq Telecom, CS Ltd and Mr. Barzani, including acting as a Chairman of various meetings.

million at an interest rate of 13.25% per annum (the "IBL Loan").  In presenting the IBL Loan to the other shareholders, Messrs. Barzani and Rahmeh represented that the IBL Loan was (1) unsecured, and as such, the high interest rate represented market terms;[8] and (2) the only bank loan that Korek could obtain.  Pursuant to these representations, Iraq Telecom approved the IBL Loan.

20.     Under the terms of the IBL Loan, Mr. Barzani provided IBL Bank with a personal guarantee (*i.e.*, guaranteeing Korek's obligations under the loan, including full repayment of the IBL Loan) (the "Barzani Guarantee").[9]  Iraq Telecom, in turn, agreed to indemnify Mr. Barzani for its pro rata share of any amounts Mr. Barzani may have to pay pursuant to the Barzani Guarantee.[10]  The IBL Loan terms also required Iraq Telecom to subordinate the Iraq Telecom Shareholder Loan in favor of the IBL Loan (the "Subordination Agreement").[11]

21.     Furthermore, the IBL Loan terms required Korek to deposit operating revenue into an IBL Bank account.[12]

22.     Upon information and belief and based on the terms of the IBL Loan, Korek made its monthly loan payments to IBL Bank in USD from Korek's IBL Bank account.[13]

23.     Pursuant to the terms of the IBL Loan, USD 40 million of the IBL Loan (the "Short Term Loan") was repayable by July 21, 2012, with the remaining USD 110 million (the "Long

---

[8]      *See* Exhibit D (IBL Loan Agreement) at 6, § 7.1.6 ("[T]he obligations of the Borrower in respect of the Loan and otherwise under this Agreement constitute . . . the direct, general, unconditional, unsubordinated and **unsecured** obligations of the Borrower . . . .") (emphasis added).

[9]      *Id*. at 5, § 6.1.

[10]     *See* Exhibit E (Deed of Indemnity between Iraq Telecom, Mr. Barzani, Korek and IHL) at 3-4, § 3.1.

[11]     *See* Exhibit F (IBL Loan Subordination Agreement) at 3, § 1.1.

[12]     Exhibit D at 9, § 8.1.9 ("[T]he Borrower will pay all of its operating revenues into the bank account opened with the Lender . . . .").

[13]     *See id*. at 4, § 3.7 ("Each payment by the Borrower under this Agreement shall be made in United States Dollars . . . .").

Term Loan") repayable by June 21, 2014.  The parties to the IBL Loan (*i.e.,* IBL Bank, Korek, and Mr. Barzani) subsequently agreed to a number of extensions to the IBL Loan, eventually extending the repayment deadlines to January 31, 2015 and June 21, 2015, respectively.[14]  While the Subordination Agreement was also extended a number of times, it ultimately lapsed when the IBL Loan was informally extended in June 2014 without a corresponding extension of the Subordination Agreement.

24.     Korek failed to repay both the Short Term Loan and the Long Term Loan by the extended deadlines.  Consequently, on July 9, 2015, IBL Bank wrote to Korek stating that Korek's failure to pay the IBL Loan was an "Event of Default" and demanded that Korek pay the IBL Loan in full by August 9, 2015.[15]  IBL Bank also purported to invoke the terms of the Subordination Agreement, despite the fact that the Subordination Agreement had since lapsed.

25.     Korek failed to pay the IBL Loan in full by August 9; however, IBL Bank wrote to Korek on September 15, 2015 granting Korek an additional extension of the IBL Loan through October 15, 2015 (among other things) upon "continued compliance with the terms of the Subordination Agreement."  Korek again failed to repay the IBL Loan, and to date has not repaid.

26.     Although Korek failed to repay the loan by October 15, 2015, IBL Bank did not seek repayment of the loan until August 30, 2017, through a letter in which IBL Bank insisted on full repayment of the IBL Loan, while simultaneously demanding "**additional collateral**" to

---

[14]     In connection with the first IBL Loan extension, dated July 21, 2012, "Korek Telecom S.A.L." is listed as the borrower on the cover page.  The signature block, however, lists "Korek Telecom Company LLC" as the borrower. Similarly, in connection with the second IBL Loan extension, dated February 1, 2013, the cover page indicates that "Korek Telecom S.A.L." is the borrower while the signature blocks lists "Korek Telecom LLC" as the borrower. Lastly, the first extension of the Subordination Agreement includes similar inconsistencies and inaccuracies.  Korek Telecom S.A.L. is in fact a separate and distinct entity from Korek, and based upon Iraq Telecom's investigation to date, I understand that Korek Telecom S.A.L. is 99.9 percent owned by Pierre Youssef, a business associate of Mr. Rahmeh.

[15]     *See generally* Exhibit G (7/9/2015 Letter from IBL Bank to Korek).

secure the IBL Loan despite that, according to the terms of the IBL Loan, it was supposedly uncollateralized.[16]

27.     This representation prompted Iraq Telecom to further investigate the nature of the IBL Loan because, among other reasons, the market rate for interest on a fully collateralized loan at that time was significantly less than the purported 13.25% for an uncollateralized loan.

28.     IBL Bank, Mr. Barzani, CS Ltd and their representatives have never denied that the IBL Loan is collateralized when confronted with requests for information by Iraq Telecom.[17]   In fact, a representative of CS Ltd all but admitted as much in separate proceedings in the DIFC Courts.

29.     As further alleged in the Foreign Proceedings, IBL Bank and Messrs. Barzani and Rahmeh entered into a secret agreement under which IBL Bank agreed to pay Mr. Barzani 12.75% of the 13.25% total interest payments made by Korek to IBL Bank under the IBL Loan Agreement. And, as further alleged, in return, Mr. Barzani provided IBL Bank with cash collateral to secure the IBL Loan as part of an arrangement designed to: (1) prioritize his creditor rights over those of Iraq Telecom (because, as noted above at ¶ 20, one of the conditions of the IBL Loan was that it should take priority over the Iraq Telecom Shareholder Loan); and (2) enable Mr. Barzani to extract funds from Korek by having Korek mask these as interest payments to IBL Bank.

---

[16]      *See* Exhibit H (8/30/2017-3/29/2018 correspondence between IBL Bank and members of KSC) at 1.  Indeed, at a meeting of the KSC on October 13, 2015, Mr. Rahmeh specifically denied that the IBL Loan was collateralized, stating that Mr. Barzani had only put up a guarantee.

[17]      IBL has refused to substantively respond to Iraq Telecom's letters seeking additional information regarding the true nature of the IBL Loan.  *See generally* Exhibit H.

B.    Undisclosed Self-Dealing

30.    The Foreign Proceedings describe at length how Messrs. Barzani and Rahmeh have caused Korek to hire and pay suppliers in which they have substantial, undisclosed personal interests.

31.    Iraq Telecom has repeatedly raised questions and concerns about these relationships to the CS Ltd Directors; however, the CS Ltd Directors have not responded to Iraq Telecom's inquiries or otherwise taken action to address Iraq Telecom's concerns.[18]

C.    Mismanagement of Korek

32.    Lastly, Mr. Barzani has mismanaged Korek by failing to share critical information about Korek's business, despite repeated requests to do so.[19]  He has also failed to keep the KSC and Iraq Telecom up to date with information received by him or Korek, again despite repeated requests to do so.  For example, Iraq Telecom has requested, but not received, information about: (1) the assets and liabilities of Korek; and (2) significant and unexplained capital expenditures, such as "consulting and legal fees" of up to USD 18 million per year.  Nor has Iraq Telecom received, despite repeated requests, substantive answers to its legitimate questions regarding Korek's draft 2016 financials[20] or the February, March, May, June, July, September, October, November and December 2017 financials.[21]

33.    On November 1, 2017, Iraq Telecom sent a letter to Messrs. Aqrawi, Jundi and Rahmeh regarding Iraq Telecom's concerns about the mismanagement of Korek, including but not

---

[18]    *See, e.g.,* Exhibit I (10/2/2017 email from D. Jain to L. Abou Charaf, *et al.*).

[19]    Moreover, Mr. Barzani is contractually obligated to share such information pursuant to a management agreement between himself and Korek.

[20]    Exhibit J (7/9/2017 email from D. Jain to L. Abou Charaf).

[21]    *See generally* Exhibit K (5/4/2017- 3/19/2018 email correspondence between D. Jain to L. Abou Charaf).

limited to the IBL Loan and undisclosed personal self-dealing in connection with supplier engagements, and requesting that they remove Mr. Barzani as statutory manager of Korek, among other things.[22]  Receiving no response to this initial letter, Iraq Telecom sent a follow-up letter on November 19, 2017.[23]  Again, Messrs. Aqrawi, Jundi and Rahmeh did not answer.

34.     On January 18, 2018, Iraq Telecom sent a letter to Mr. Barzani, as well as to Messrs. Aqrawi, Jundi and Rahmeh, concerning his mismanagement of Korek.[24]  Messrs. Aqrawi, Jundi and Rahmeh also failed to acknowledge this letter.

* * * * *

I declare under penalty of perjury under the laws of the United States and Kuwait that the foregoing is true and correct to the best of my knowledge and belief.

Executed in Kuwait City on this the _____ .

_____

Ehab Fekri Aziz Bassilios

---

[22]     *See* Exhibit L (11/1/2017 Letter from D. Jain to C.S. Ltd Directors).

[23]     *See* Exhibit M (11/19/2017 Letter from D. Jain to C.S. Ltd Directors).

[24]     *See* Exhibit N (1/18/2018 Letter from D. Jain to S. Barzani, *et al.*).

# Exhibit A

  

كۆرەك ﺗﯿﻠﯿﻜﯚﻡ
بەڕێوەبەرایەتی گشتی

Head Office

كۆرەك ﺗﯿﻠﯿﻜﯚﻡ
المديرية العامة

**PRIVILEGED AND CONFIDENTIAL**

April 25, 2013

**To Whom It May Concern:**

Dear Sirs,

**RE:     Korek Telecom Limited (the "Company") – Shareholder Structure**

Pursuant to your request, please find below the Company's best information as to the shareholder structure of the Company as at the date hereof:



Sincerely yours,

Korek Telecom Co.
45 Kurdistan Str.
Salahideen . Erbil-IRAQ

Tel:(066) 2423406   Mob: (0750) 4450022   Fax: 00964750 4460022

www.korektel.com
mail: Info@korektel.com

# Exhibit B

**C-015**

NORTON ROSE

CONFIDENTIAL

Dated 27 July 2011

# AMENDED AND RESTATED SUBSCRIPTION AGREEMENT
# Relating to Korek Telecom Company LLC

**INTERNATIONAL HOLDINGS LIMITED**

**KOREK TELECOM COMPANY LLC**

**MR. SIRWAN SABER MUSTAFA**

**MR. JAWSHIN HASSAN JAWSHIN BARAZANY**

**MR. JIQSY HAMO MUSTAFA**

**KOREK INTERNATIONAL (MANAGEMENT) LTD.**

**IRAQ TELECOM LIMITED**

**ALCAZAR CAPITAL PARTNERS**

**ATLAS SERVICES NETHERLANDS B.V.**

Norton Rose LLP
3 More London Riverside
London
SE1 2AQ

# Contents

| Clause | | Page |
|---|---|---|
| 1 | Subscription and Korek Reorganisation | 2 |
| 2 | Consideration | 3 |
| 3 | Condition to Closing | 6 |
| 4 | Closing | 7 |
| 5 | Pre-Closing Undertakings | 8 |
| 6 | Leakage | 10 |
| 7 | Company Indebtedness | 11 |
| 8 | Post Closing Undertakings | 13 |
| 9 | Current Shareholder Indemnities | 13 |
| 10 | CS Warranties | 14 |
| 11 | Payments under Indemnities and CS Warranties | 15 |
| 12 | IT Ltd Warranties | 16 |
| 13 | Alcazar and ASN Warranties | 16 |
| 14 | Guarantee | 17 |
| 15 | Conduct of Third Party Claims | 20 |
| 16 | Tax | 20 |
| 17 | Payments | 21 |
| 18 | Rights to Terminate | 21 |
| 19 | Current Shareholders' Representative | 22 |
| 20 | Announcements | 23 |
| 21 | Confidentiality | 23 |
| 22 | Assignment | 24 |
| 23 | Further Assurances | 25 |
| 24 | Costs | 25 |
| 25 | Notices | 25 |
| 26 | Conflict with other Agreements | 27 |
| 27 | Whole Agreement | 27 |

28    Waivers, Rights and Remedies ...................................................................................27

29    Counterparts ..............................................................................................................27

30    Definitions, Interpretations and Variations ...............................................................28

31    Third Party Rights ......................................................................................................28

32    Invalidity ....................................................................................................................28

33    Governing Law ...........................................................................................................28

34    Dispute Resolution .....................................................................................................28


Schedule 1 Details Of Korek .................................................................................................30

Schedule 2 Conduct of Business between Original Signing and Closing ...............................31

Schedule 3 CS Warranties ....................................................................................................34

Part A : General/Commercial .................................................................................................34

Part B : IP/IT ..........................................................................................................................46

Part C : Real Estate ..............................................................................................................47

Part D : Environmental Matters .............................................................................................48

Part E : Employment .............................................................................................................48

Part F : Retirement Benefits ..................................................................................................48

Schedule 4 Limitations on Liability ........................................................................................49

Schedule 5 IT Ltd Warranties ................................................................................................53

Schedule 6 Alcazar and ASN Warranties ..............................................................................54

Part A : Alcazar Warranties ...................................................................................................54

Part B : ASN Warranties ........................................................................................................54

Schedule 7 Tax ......................................................................................................................56

Part A : Tax Warranties .........................................................................................................56

Part B : Tax Covenant ...........................................................................................................59

Part C : Other tax provisions .................................................................................................63

Schedule 8 Closing Arrangements ........................................................................................64

Schedule 9 Permitted Leakage .............................................................................................72

Schedule 10 Definitions and Interpretation ...........................................................................73

Schedule 11 Capitalisation Worked Examples ......................................................................89

**AGREED FORM DOCUMENTS REFERRED TO IN THIS AGREEMENT**

**Description**

Alcazar Management Services Agreement
Announcement
Articles of Association of International Holdings
By-Laws of Korek
CEO Shareholders' Resolution
Change of Control Notice
Current Shareholders' Representative Loan Release
Current Shareholders' Representative Services Agreement
General Assembly Resolution
Initial Business Plan
IT Ltd Shareholder Loan Agreement
Management Consultancy Agreement
Management Fee Termination Agreement
Promissory Note Release
Promissory Note Transfer Agreements
Sanatel Letter
Share Transfer Agreement
Sourcing and Procurement Agreement

## AMENDED AND RESTATED SUBSCRIPTION AGREEMENT

Dated 27 July 2011

**PARTIES:**

(1)    **INTERNATIONAL HOLDINGS LIMITED**, a company duly incorporated under the laws of the Dubai International Financial Centre with the registered number 1020 and whose registered office is located at suite 904, Level 9, Park Place, Sheikh Zayed Road, PO Box 506672, Dubai, UAE (**International Holdings**);

(2)    **KOREK TELECOM COMPANY LLC**, a private company limited by shares incorporated with the Registration Directorate of Companies of the Kurdistan Regional Government with registered number 167 and whose registered office is located at Kurdistan Street nr. 45, Pirmam, Erbil, Kurdistan, the Republic of Iraq (**Korek**);

(3)    **MR. SIRWAN SABER MUSTAFA**, a citizen of the Republic of Iraq and holder of Iraqi passport number G1053857, in his capacity as the Managing Director and a Shareholder, both as defined herein;

(4)    **MR. JAWSHIN HASSAN JAWSHIN BARAZANY**, a citizen of the Republic of Iraq and holder of Iraqi passport number G1557948;

(5)    **MR. JIQSY HAMO MUSTAFA**, a citizen of the Republic of Iraq and holder of Iraqi passport number G1311403,

Mr. Sirwan Saber Mustafa, Mr. Jawshin Hassan Jawshin Barazany and Mr. Jiqsy Hamo Mustafa, together, being the **Current Shareholders**;

(6)    **KOREK INTERNATIONAL (MANAGEMENT) LIMITED**, an exempted company duly incorporated with limited liability under the laws of the Cayman Islands and whose registered office is located at Close Brothers (Cayman) Limited, Box 1034, 4th Floor Harbour Place, 103 South Church Street, George Town, Grand Cayman KY1-1102, Cayman Islands (**CS Ltd**);

(7)    **IRAQ TELECOM LIMITED,** a company duly incorporated under the laws of the Dubai International Financial Centre with the registered number 1019 and whose registered office is located at suite 904, Level 9, Park Place, Sheikh Zayed Road, PO Box 506672, Dubai, UAE (**IT Ltd**);

(8)    **ALCAZAR CAPITAL PARTNERS**, a company organised under the laws of the Cayman Islands having its registered office at Maples & Calder, PO Box 309 GT, Ugland House, South Church Street, George Town, Grand Cayman, Cayman Islands (**Alcazar**) for the purposes of clauses 1.1(b)(ii), 13 and 14 and Schedule 6 only; and

(9)    **ATLAS SERVICES NETHERLANDS B.V.** a private company with limited liability (*besloten vennootschap met beperkte aansprakelijkheid*) registered with the Chamber of Commerce of Amsterdam under number 33157047 and whose corporate seat is at 1043 BW Amsterdam, Naritaweg 165, The Netherlands (**ASN**) for the purposes of clauses 13 and 14 and Schedule 6 only,

International Holdings, Korek, the Current Shareholders, CS Ltd, IT Ltd, Alcazar and ASN each being a **party**, and together the **parties**.

**RECITALS:**

(A)    International Holdings is a private limited company incorporated under the laws of the Dubai International Financial Centre. Korek is a private company limited by shares and incorporated in the Republic of Iraq. The Current Shareholders together own the entire issued and allotted

1

share capital of Korek. Upon the Initial Steps Date, the Current Shareholders shall transfer all of the Existing Shares held by them to International Holdings in consideration for the issue of the CS IH Shares to the Current Shareholders in the same proportion as the Current Shareholders hold the Existing Shares. Prior to Closing, the Current Shareholders shall transfer the IT Ltd Initial Shares and the CS IH Shares to CS Ltd in accordance with clause 5.9.

(B) Alcazar is the holder of a Convertible Senior Promissory Note issued by Korek dated September 11 2007 with a principal amount of US$250,000,000 together with accrued interest (**Promissory Note**) which will be transferred to IT Ltd at or immediately prior to Closing and then transferred, on the Closing Date, by IT Ltd to International Holdings in consideration for the issue of the Promissory Note Shares.

(C) IT Ltd wishes to subscribe for the New IT Ltd Shares in International Holdings.

(D) The Current Shareholders wish to have CS Ltd subscribe for the New CS Ltd Shares.

(E) The Current Shareholders (whether directly or indirectly) do not wish to sell a majority or controlling stake in Korek at this stage. Following the steps envisaged in Recitals (A) to (D) above, the Current Shareholders (through CS Ltd) shall own 56% (fifty six per cent.) of the share capital of International Holdings and IT Ltd shall own 44% (forty four per cent.) of the share capital of International Holdings. International Holdings shall own 100% (one hundred per cent.) of Korek.

(F) CS Ltd and IT Ltd have agreed the terms of a shareholders' agreement governing their relationship as Shareholders in International Holdings.

(G) The parties entered into a subscription agreement on 10 March 2011 (**Original Agreement**) to set out the terms and conditions relating to the investment into International Holdings and Korek and have entered into this amended and restated subscription agreement on the terms set out below, which shall be effective as of 13 March 2011.

**IT IS AGREED:**

**1      Subscription and Korek Reorganisation**

1.1      The following shall occur in the following sequence:

(a) On a date prior to the CP Satisfaction Date (**Incorporation Shares Transfer Date**), IT Ltd shall transfer the IT Ltd Initial Shares to the Current Shareholders in the same proportion as the Current Shareholders hold the Existing Shares in consideration for the payment by the Current Shareholders to IT Ltd of an aggregate amount equal to US$50,000;

(b) On the Initial Steps Date, the Current Shareholders shall transfer all the Existing Shares to International Holdings in consideration for the issue by International Holdings of the CS IH Shares to the Current Shareholders (**Transfer**);

(c) As soon as possible, and no later than the second Business Day, after the Decree is received by IT Ltd in a form reasonably satisfactory to IT Ltd, all of the IT Ltd Initial Shares and the CS IH Shares, shall be transferred from the Current Shareholders to CS Ltd on terms such that (i) CS Ltd is the legal and beneficial holder of the entire issued and fully diluted share capital of International Holdings, and (ii) no liability of International Holdings is created or increased as a result of such transfer and the Current Shareholders shall provide evidence reasonably satisfactory to IT Ltd of the completion of such steps;

(d) On the Closing Date:

(i) CS Ltd shall transfer the IT Ltd Initial Shares to IT Ltd in consideration for the payment by IT Ltd to CS Ltd of an aggregate amount equal to US$50,000;

2

(ii)   CS Ltd shall subscribe for and International Holdings shall issue the New CS Ltd Shares in consideration for the payments by CS Ltd in accordance with clause 2.2;

(iii)   Alcazar shall transfer the benefit of the Promissory Note and the benefit of the Convertible Loan Agreement to IT Ltd in consideration for, *inter alia*, the issue by IT Ltd of shares in IT Ltd;

(iv)   IT Ltd shall transfer the benefit of the Promissory Note and the benefit of the Convertible Loan Agreement to International Holdings in consideration for the issue by International Holdings of the Promissory Note Shares to IT Ltd;

(v)   IT Ltd shall subscribe for and International Holdings shall issue the New IT Ltd Shares in consideration for the payment by **IT Ltd** of the New IT Ltd Share Consideration, such payment to be made in accordance with clause 2.1(c); and

(vi)   International Holdings shall, as the sole shareholder of Korek, subscribe for new shares in Korek (**New Korek Shares**) and enter into the New Korek Facility in accordance with paragraphs 3.2, 3.3 and 3.4 of Schedule 8 and on-lend to Korek the funds made available under the IT Ltd Shareholder Loan pursuant to the terms of the Korek/IH Shareholder Loan Agreement (as such term is defined in the IT Ltd Shareholder Loan Agreement).

1.2   On the Closing Date, IT Ltd and International Holdings shall enter into the IT Ltd Shareholder Loan Agreement pursuant to which IT Ltd shall make the IT Ltd Shareholder Loan available to International Holdings.

1.3   The New Shares shall be issued, with full legal and beneficial title and free from all Third Party Rights, fully paid up and with all rights attaching to them, including the right to receive all distributions declared or made in respect of them after Closing.

1.4   Upon completion of the steps set out in Schedule 8, the IT Ltd Shares shall comprise 44% (forty four per cent.) and the CS Ltd Shares shall comprise 56% (fifty six per cent.) of the issued and allotted fully diluted share capital of International Holdings and International Holdings shall be the sole holder of the entire issued and allotted fully diluted share capital of Korek.

## 2   Consideration

2.1   The consideration payable in respect of:

(a)   the issue by International Holdings of the CS IH Shares to the Current Shareholders, shall be the transfer of the Existing Shares from the Current Shareholders to International Holdings;

(b)   the issue by International Holdings of the Promissory Note Shares to IT Ltd, shall be the transfer by IT Ltd to International Holdings of the benefit of, and all rights in, the Promissory Note;

(c)   the issue by International Holdings of the New IT Ltd Shares shall be a cash payment by IT Ltd to International Holdings in an aggregate amount equal to the New IT Ltd Share Consideration, such payment to be made in accordance with paragraph 3.2 of Schedule 8;

2.2   The consideration payable in respect of the New CS Ltd Shares shall be an aggregate amount equal to the New CS Ltd Shares Aggregate Par Value and the New CS Ltd Shares Aggregate Premium, which amount shall be reduced pursuant to clauses 2.5 and 7.8 to the extent applicable, and which amounts shall be payable as follows:

(a)   an amount equal to the  New CS Ltd Shares Aggregate Par Value shall be payable by CS Ltd to International Holdings at Closing; and

(b)     the New CS Ltd Shares Aggregate Premium shall be satisfied by CS Ltd by payment to International Holdings of the following cash instalments;

    (i)     an amount of US$14,985,000 shall be paid on 15 December 2011;

    (ii)    an amount of US$29,970,000 shall be paid on 15 March 2012; and

    (iii)   an amount of US$29,970,000 shall be paid on 15 June 2012.

2.3     Each New CS Ltd Share shall be a Nominal Value Share (together the **Nominal Value Shares**) until the New CS Ltd Shares Premium per Share in respect of such New CS Ltd Share has been paid. Any payment made by CS Ltd pursuant to clause 2.2(b) or reduction pursuant to clauses 2.4, 2.5 or 7.8 (but excluding for the avoidance of doubt any interest paid pursuant to clause 2.9) shall reduce the number of Shares deemed to be Nominal Value Shares by an amount equal to the amount of such payment or reduction divided by the New CS Ltd Shares Premium per Share.

2.4     No dividends shall be payable by International Holdings in respect of any Nominal Value Shares and to the extent that any dividends are paid to CS Ltd in respect of any of its Shares which have been fully paid, such dividends shall be set-off against CS Ltd's obligations pursuant to clause 2.2.

2.5     If prior to the CMC Reduction End Date, Korek receives a CMC Reduction, subject to clause 2.10, 56% (fifty six per cent.) of any CMC Reduction received by Korek (**CS Consideration Reduction Amount**) shall be applied as follows:

    (a)     firstly, set-off against the amount of the New CS Ltd Shares Aggregate Premium payable by CS Ltd pursuant to clause 2.2(b)(ii) with any excess being applied as set out in clause 2.5(b);

    (b)     secondly, set-off against the amount of the New CS Ltd Shares Aggregate Premium payable by CS Ltd pursuant to clause 2.2(b)(iii) with any excess being applied as set out in clause 2.5(c);

    (c)     thirdly, set-off against the amount of the New CS Ltd Shares Aggregate Premium payable by CS Ltd pursuant to clause 2.2(b)(i) with any excess being applied as set out in clause 2.5(d); and

    (d)     any CS Consideration Reduction Amount available after the application, if any and if applicable, under clauses 2.5(a) to 2.5(c), shall be paid by Korek (or its nominee) as soon as reasonably practicable to CS Ltd or its nominee net of any Tax required to be withheld or deducted by means of such tax efficient mechanism as shall be agreed by the parties (each acting reasonably).

2.6     In the event that CS Ltd fails to satisfy in full its obligations pursuant to clause 2.2(b), IT Ltd shall have the right, in respect of any unpaid amount (together with any interest accrued pursuant to clause 2.9) up to a maximum amount of US$59,940,000 (**Unpaid Sum**), to require International Holdings to:

    (a)     issue a written notice to CS Ltd (**IH Transfer Notice**) that IT Ltd shall acquire from CS Ltd such number of Nominal Value Shares as shall be equal to the Unpaid Sum divided by the New CS Ltd Shares Premium per Share. The IH Transfer Notice shall detail (i) the aggregate number of Nominal Value Shares to be acquired by IT Ltd (**IH Transfer Shares**) and (ii) the terms on which the IH Transfer Shares shall be acquired by IT Ltd; and

    (b)     in the event that the Unpaid Sum is not satisfied in full by CS Ltd within 30 (thirty) days of the issue of an IH Transfer Notice, IT Ltd shall (i) acquire the IH Transfer Shares from CS Ltd on the terms set out in the IH Transfer Notice, (ii) pay to CS Ltd an amount equal to the New CS Ltd Shares Par Value per Share in respect of each IH Transfer Share, and (iii) assume the obligation of CS Ltd to pay the Unpaid Sum to International Holdings. The

obligation of IT Ltd to pay the Unpaid Sum to International Holdings shall be set off against the release of the obligation of International Holdings to repay to IT Ltd an amount of the IT Ltd Shareholder Loan equal to the Unpaid Sum. For the avoidance of doubt, no further consideration shall be payable to CS Ltd in respect of the IH Transfer Shares,

and for the avoidance of doubt, any amount due under clause 2.2(b) together with any interest thereon which is not set-off under this clause 2.6 shall remain due and payable and shall continue to accrue interest pursuant to clause 2.9.

2.7    In the event that prior to the CMC Reduction End Date, any CS Consideration Reduction Amount is received by Korek after any IH Transfer Shares have been transferred to IT Ltd pursuant to clause 2.6 and there are no amounts outstanding under clause 2.2, subject to clause 2.10 an amount equal to such CS Consideration Reduction Amount shall be paid to CS Ltd or its nominee net of any Tax required to be withheld or deducted by means of such tax efficient mechanism as shall be agreed by the Parties (each acting reasonably).

2.8    IT Ltd grants to CS Ltd a call option (**Buy-Back Call Option**) exercisable by CS Ltd only after receipt of payment under clause 2.7 and up until the CMC Reduction End Date, pursuant to which IT Ltd shall sell to CS Ltd the IH Transfer Shares acquired by IT Ltd pursuant to clause 2.6(b) for a price per Share equal to the Closing Share Price together with interest at the rate of 12% (twelve per cent.) per annum on the Closing Share Price for the period from the date such IH Transfer Shares were acquired by IT Ltd pursuant to clause 2.6(b) until the exercise of the Buy-Back Call Option. The Buy-Back Call Option shall be exercisable in accordance with the provisions of this clause 2.8 by CS Ltd at any time during the period from the acquisition of the Shares by IT Ltd pursuant to clause 2.6(b) up until the CMC Reduction End Date upon written notice (**Call Option Notice**) from CS Ltd to IT Ltd. The sale and purchase of the IH Transfer Shares under the Buy-Back Call Option shall complete within 15 (fifteen) Business Days of the Call Option Notice being delivered to IT Ltd.

2.9    Subject to clause 2.6, any amount of the New CS Ltd Shares Aggregate Premium which remains unsatisfied or unpaid pursuant to clause 2.2 shall be paid by CS Ltd to International Holdings. Any amount of the New CS Ltd Shares Aggregate Premium which remains unsatisfied or unpaid following the due dates set out in clause 2.2 (**Overdue Amount**) shall bear interest from such date at the rate of 6% (six per cent.) per annum on such sum until the date of payment or satisfaction under clauses 2.5, 2.6. or 7.8 (as applicable). Following the CMC Reduction End Date, without prejudice to clause 2.4, IT Ltd shall have the right to require International Holdings to:

(a)    issue a written notice to CS Ltd (**Cancellation Notice**) that International Holdings shall buy-back from CS Ltd and cancel all of the then outstanding Nominal Value Shares (**Cancellation Shares**); and

(b)    in the event that the Overdue Amount is not paid or satisfied by CS Ltd within 30 (thirty) days of the issue of the Cancellation Notice, International Holdings shall purchase the Cancellation Shares from CS Ltd and the purchase price payable in respect of such Cancellation Shares shall be satisfied by (i) a payment by International Holdings to CS Ltd for each Cancellation Share of an amount equal to the New CS Ltd Shares Par Value per Share, which amount shall be set-off against the aggregate amount of accrued but unpaid interest pursuant to this clause 2.9, and (ii) the set-off of the obligation of CS Ltd to pay the Overdue Amount,

and immediately following the purchase by International Holdings of the Cancellation Shares pursuant to this clause 2.9, the Cancellation Shares shall be cancelled. CS Ltd shall warrant to International Holdings that there is no encumbrance, and there is no agreement, arrangement or obligation to create or give an encumbrance in relation to any of the Cancellation Shares.

2.10    For the avoidance of doubt, once the CS Consideration Reduction Amount reaches US$75,000,000, any further CMC Reduction shall be for the benefit of Korek only and neither the

5

Current Shareholders nor CS Ltd shall be entitled to any amount in respect of such CMC Reduction, by way of set-off or otherwise.

2.11   Upon the application of clauses 2.6 or 2.8, CS Ltd shall transfer to IT Ltd or IT Ltd shall transfer to CS Ltd (as the case may be) the IH Transfer Shares with full title guarantee, free from all Third Party Rights and with all rights attaching to them. IT Ltd or CS Ltd, as the case may be, shall warrant to CS Ltd or IT Ltd, as the case may be, that there is no encumbrance, and there is no agreement, arrangement or obligation to create or give an encumbrance, in relation to any of the IH Transfer Shares being acquired.

2.12   If an Adjustment Event (as defined in the IT Ltd Shareholder Loan Agreement) occurs, the parties shall make such corresponding adjustments to the number of shares to be transferred pursuant to this clause 2, and the terms on which they are to be transferred, as shall be required to give effect to the terms of the adjustment under the IT Ltd Shareholder Loan Agreement.

## 3   Condition to Closing

3.1   Closing shall be conditional on the following conditions precedent having been fulfilled or waived in accordance with clause 3.5, where applicable, in accordance with this Agreement:

(a)   approval of the Proposed Transaction by the CMC in terms and on conditions satisfactory to the Current Shareholders and IT Ltd, each acting reasonably;

(b)   no party having become aware of or having received any communication from or threatened by a Governmental Entity prior to the Closing Date:

(i)   making a bona fide claim that the Proposed Transaction cannot be consummated without a Governmental Entity's approval or it being notified prior to Closing (and such claim not having been fully addressed), where such claim would, in the opinion of either IT Ltd or the Current Shareholders each acting reasonably, either (A) be material in the context of the Proposed Transaction, or (B) have a material impact on the business, financial performance or reputation of IT Ltd, the Current Shareholders or their respective Affiliates; or

(ii)   having or being likely to result in a materially adverse effect on the Proposed Transaction or resulting in or having the effect that the consummation of the Proposed Transaction would or would be likely to result in a material adverse effect on the business of Korek; or

(iii)   regarding any order or other legal restraint, whether temporary, preliminary or permanent, which has or would have the effect of making the Proposed Transaction illegal or otherwise prohibiting or preventing Closing and/or the consummation of the Proposed Transaction; and

(c)   evidence in a form reasonably satisfactory to IT Ltd that the MOC Litigation has been resolved on terms which are satisfactory to IT Ltd and Korek has no residual liability in respect thereof,

(**Conditions**).

3.2   The parties shall each notify each other promptly in writing upon becoming aware that a Condition in clause 3.1 has been fulfilled. The Business Day on which the Conditions in clauses 3.1(a) and (c) are satisfied and none of the matters set out in clause 3.1(b) has arisen shall be the **CP Satisfaction Date**.

3.3   Korek, the Current Shareholders and IT Ltd shall use all reasonable endeavours to procure that the approval set out in the Condition in clause 3.1(a) is satisfied as soon as reasonably possible in accordance with applicable laws and, where necessary and only with the prior written approval of the Current Shareholders, IT Ltd (not to be unreasonably withheld) and Korek, shall offer any

relevant Governmental Entity any reasonable lawful commitment or undertaking as may be reasonably required for the purposes of obtaining any such approval provided that nothing in this clause 3.3 shall require any party to make any payment (whether in cash or in kind) to any Governmental Entity in connection with the satisfaction of any Condition and, save for any breach of this Agreement, the parties shall incur no liability for the failure to procure the consent in clause 3.1(a).

3.4 Korek, CS Ltd and the Current Shareholders shall use all reasonable endeavours to procure that the Condition set out in clause 3.1(c) is satisfied as soon as reasonably possible in accordance with applicable laws.

3.5 Each party shall furnish to each other relevant party such necessary information about itself and provide all reasonable assistance as may be required in connection with the preparation of any filing or submission that is necessary for the purpose of procuring the approvals set out in the Conditions, provided that the provision of any confidential information or business secrets to the other party shall not be required (such information to be provided to counsel for the other party on a counsel-to-counsel basis only) and take due account of any reasonable comments and requests of the other party and/or its advisors prior to making the relevant notification, submission, communication or response. Each party shall enter into discussions with the others upon becoming aware of any communication, order or other legal restraint arising under the Condition set out at clause 3.1(b), in order that such communication, order or other legal restraint is fully addressed as soon as reasonably possible. The Conditions (other than pursuant to clause 3.1(a) or 3.1(b)) may be waived with the written consent of IT Ltd.

3.6 If the CP Satisfaction Date has not occurred on or before 19 July 2011 (**Longstop Date**), this Agreement shall, unless otherwise agreed by the parties, automatically terminate (other than the Surviving Provisions). In such event, no party (nor any of its Affiliates) shall have any claim under this Agreement of any nature whatsoever against any other party (or any of its Affiliates) except in respect of any rights and liabilities which have accrued before termination or under any of the Surviving Provisions.

## 4    Closing

4.1 On the Initial Steps Date, the parties shall procure that the steps and actions set out in paragraph 2 of Schedule 8 shall be completed, and, subject to clause 18, thereafter that Closing shall take place on the Closing Date in Dubai, or at such other place and on such other date as may be agreed by the parties in writing.

4.2 At Closing, each of the parties shall deliver all those documents and perform all those items and actions (or ensure that they are delivered and performed) listed in relation to that party or any of its Affiliates (as the case may be) in Schedule 8. If any party fails to comply with a material obligation in Schedule 8 or if any of the steps set out in Schedule 8 does not occur (subject to the rights of the parties to agree to waive any of the obligations or any of the steps set out in Schedule 8 which the parties agree are not required to effect Closing), Closing shall not take place and any actions or steps that have occurred pursuant to this Agreement in contemplation of Closing (including relating to the payment of consideration and/or the acquisition of any interest in shares in the capital of Korek) shall (to the extent possible) be unwound and this Agreement shall then terminate (other than the Surviving Provisions).

4.3 Without prejudice to clause 18, the parties agree that, in the event that the CP Satisfaction Date has occurred before the Longstop Date but Closing does not occur within 10 Business Days after the Longstop Date (or such later date as the parties shall agree), this Agreement is terminated pursuant to clause 18:

    (a) all steps shall be taken to ensure that the parties are put back in the position they would have been in had no action been taken to implement the transactions contemplated by this Agreement or the Transaction Documents; and

    (b) no party shall have any rights, benefits or obligations that were not existing previously; and

7

(c)     no party shall be deemed to have exercised or waived any of its rights existing previously,

and notwithstanding the foregoing, in the event that the CS Ltd Reorganisation has been completed at such time and the Current Shareholders elect not to unwind the CS Ltd Reorganisation, CS Ltd shall assume Mr. Sirwan Saber Mustafa's obligations under the Share Pledge Agreement.

## 5     Pre-Closing Undertakings

5.1     From the date of Original Signing until Closing, CS Ltd and the Current Shareholders:

(a)     shall (except as may be approved in writing by IT Ltd) ensure that the business of Korek is carried on in all material respects in the Ordinary Course of Business; and

(b)     shall comply with the obligations set out in Schedule 2.

5.2     The parties agree that it is beneficial to Korek to be provided with the services under the Management Consultancy Agreement and the Alcazar Management Services Agreement and they shall procure that Korek shall enter into the Management Consultancy Agreement and the Alcazar Management Services Agreement upon Closing or prior to Closing if agreed by the respective counterparties to such agreements.

5.3     Following Original Signing, the parties shall together procure that an analysis is undertaken to determine the appropriate capital and tax structure for Korek and any consequences to Tax for a conversion of the Promissory Note. The parties agree that the Promissory Note shall be converted into shares in Korek at Closing unless such analysis determines that such conversion will result in a material adverse effect to Tax to the parties taken as a whole or for Korek, in which case, the parties shall use reasonable endeavours to identify and determine alternative treatment of, and mechanisms for dealing with, the Promissory Note, including, for the avoidance of doubt, a cancellation of or an amendment to the terms of the Promissory Note that would be more beneficial to all the parties.

5.4     In the event that the parties determine that, following receipt of advice relating to Tax pursuant to clause 5.3, it will be beneficial to all parties not to convert the Promissory Note into shares in Korek in accordance with clause 5.3, the parties shall procure that the provisions of the Promissory Note shall, subject to the tax analysis received under clause 5.3, be amended with effect from Closing to eliminate the conversion rights thereunder, and to procure that interest shall no longer accrue on the Promissory Note and that the aggregate principal and interest outstanding under the Promissory Note shall be capped at US$330,000,000 (unless the parties mutually agree otherwise). The parties shall also procure that the Alcazar Loan Documents are amended or terminated accordingly.

5.5     Following Original Signing and prior to Closing, the parties shall seek confirmation (in a form reasonably acceptable to each party) from the Companies Registrar:

(a)     that the By-Laws and the Korek Resolutions in the Agreed Form, will be able to be validly registered by the Companies Registrar (as contemplated by this Agreement); and

(b)     of the number and denomination of the Existing Shares and that Korek's file at the Companies Registrar is complete and up-to-date in respect of the Existing Shares.

5.6     International Holdings shall submit an application for an Investment Licence upon or as soon as reasonably practicable following Original Signing and the other parties shall provide such reasonable assistance as may be required by International Holdings in connection with such application and following submission of such application, International Holdings shall, in accordance with applicable laws, use all reasonable endeavours to obtain this Investment Licence.

5.7     Each party shall for the purposes of the Conditions:

(a)     as soon as practicable following the date of Original Signing and prior to making any notification, submission, response or other communication (excluding communications of an administrative nature) to any person in relation to the Proposed Transaction, discuss and agree a strategy to be adopted in respect of submitting the application referred to in clause 5.6 and/or obtaining any approval in connection with the Conditions, including whether clarifications should be sought in conjunction with such application and/or approval;

(b)     promptly notify in writing the other parties (and provide copies or, in the case of non-written communications, details) of any communications relating to any consent, approval or action or otherwise having a bearing on the application referred to in clause 5.6 and/or any Condition in clauses 3.1(a) or 3.1(b);

(c)     promptly notify in writing the other parties sufficiently in advance of any material notification, submission, response or other communication (excluding communications of an administrative nature) in relation to the Proposed Transaction which it proposes to make or submit to any person and at the same time provide any supporting documentation or information requested by the other party, provided that the provision of any confidential information or business secrets to the other party shall not be required (such information to be provided to counsel for the other party on a counsel-to-counsel basis only) and take due account of any reasonable comments and requests of the other party and/or its advisers prior to making the relevant notification, submission, communication or response;

(d)     promptly inform the other parties in writing of all meetings in relation to the Proposed Transaction with any Governmental Entity or other persons or bodies and will consult with the other parties as to the identity of the required attendees of such meetings; and

(e)     regularly review with the other parties the progress of any notifications or filings in relation to the Proposed Transaction.

5.8     For the avoidance of doubt, no party shall make any filing in connection with the Proposed Transaction, which is not required in order to fulfil a Condition in clauses 3.1(a) or 3.1(b) without obtaining the prior written consent of the others (not to be unreasonably withheld or delayed) to the making of it and to its form and content. No party shall unreasonably withhold or delay its consent to a filing under this clause 5.8 if such filing is required by applicable law. Each party shall provide the others with any necessary information and documents reasonably required for the purpose of making any submissions, notifications and filings under this clause 5.8.

5.9     As soon as possible, and not later than the second Business Day, after the Decree is received by IT Ltd in a form reasonably satisfactory to IT Ltd, the Current Shareholders and CS Ltd shall procure that:

(a)     all of the IT Ltd Initial Shares and the CS IH Shares, shall be transferred from the Current Shareholders to CS Ltd on terms such that (i) CS Ltd is the legal and beneficial holder of the entire issued and fully diluted share capital of International Holdings, and (ii) no liability of International Holdings is created or increased as a result of such transfer;

(b)     16% (sixteen per cent.) of the issued share capital of CS Ltd is transferred by the Current Shareholders (in such proportions as they may agree between themselves) to Mr. Aso Ali Bamoki; and

(c)     copies of all relevant documents to implement the steps set out above are provided to IT Ltd upon becoming available and prior to Closing.

5.10    The parties shall agree upon a mechanism reasonably acceptable to IT Ltd and CS Ltd by which the New IT Ltd Share Consideration and such amount of the IT Ltd Shareholder Loan which is to be available at Closing shall be paid into the IT Ltd Closing Bank on the Initial Steps Date and, subject to clause 18, upon delivery of the Decree shall be released, following completion of the

9

steps set out in paragraphs 2 and 3.1 of Schedule 8, in accordance with paragraph 3.2 of Schedule 8.

5.11   IT Ltd warrants as at 10 March 2011 and shall be deemed to warrant as at the Incorporation Shares Transfer Date, that:

    (a)   International Holdings is a newly established company, incorporated in the Dubai International Financial Centre on 10 February 2011 and since such date has not traded, carried on any activity or, other than the transactions contemplated under this Agreement, entered into or agreed to enter into any transaction or arrangement. International Holdings does not have any assets or liabilities and, other than the transactions contemplated under this Agreement, has not entered into any transaction or arrangement which may lead to the creation of any liability; and

    (b)   the entire issued share capital of International Holdings will, prior to the Initial Steps Date, be wholly owned by IT Ltd free from all Third Party Rights, other than those contemplated under this Agreement.

5.12   IT Ltd undertakes:

    (a)   that prior to the Incorporation Shares Transfer Date, save as contemplated under this Agreement, they shall not permit International Holdings to take any action or decision (save in respect of increasing the authorised share capital of International Holdings) without the prior written consent of CS Ltd; and

    (b)   that other than the transfer to the Current Shareholders envisaged by clause 1.1(a) they shall not transfer any Shares prior to the Closing Date.

5.13   From the Incorporation Shares Transfer Date and until the Closing Date or any date for termination under clause 18, CS Ltd and the Current Shareholders undertake that, save as contemplated under this Agreement, they shall not permit International Holdings to take any action or decision without the prior written consent of IT Ltd and, without prejudice to the generality of the foregoing, the provisions of Schedule 2 shall apply to International Holdings as if references in such Schedule to Korek included an additional reference to International Holdings.

## 6   Leakage

6.1   The Current Shareholders and CS Ltd jointly undertake to IT Ltd that since 30 June 2010:

    (a)   and up to Closing there has not been any Leakage and there will not be any Leakage in the Pre-Closing Period; and

    (b)   no arrangement, understanding or agreement has been made prior to Original Signing or will be made in the Pre-Closing Period that will result in any Leakage.

6.2   Subject to clause 6.3, the Current Shareholders and CS Ltd jointly undertake to IT Ltd:

    (a)   that if there is a breach of any of the undertakings set out in clause 6.1, they shall pay or procure (by a person other than Korek or International Holdings) the payment in cash to IT Ltd of a sum equal to the aggregate of: (i) the product of $\alpha$ multiplied by $\beta$ where: $\alpha$ equals the amount which would be necessary to put Korek into the financial position which would have existed had there been no breach of the undertaking set out in clause 6.1, and $\beta$ equals such percentage as corresponds to the Relevant Percentage Shareholding to be acquired by IT Ltd on Closing and, if Leakage results, after Closing, from a breach of the undertaking set out in clause 6.1(b) $\beta$ shall then equal the IT Ltd's Relevant Percentage Shareholding at the time of such Leakage; and (ii) all losses, liabilities or reasonably incurred costs or expenses (including all taxes) suffered or incurred by IT Ltd

(b)    to notify IT Ltd in writing promptly after becoming aware of anything which constitutes a breach of any of the undertakings set out in this clause 6.

6.3    In the event that the Current Shareholders are required to make a payment under clause 6.2, such amount shall be reduced to the extent, if any, that a payment has been made by CS Ltd under clause 7.5 in circumstances where the transaction which caused the Leakage which requires a payment to be made under clause 6.2 is the same transaction which caused a payment to be made under clause 7.5.

## 7    Company Indebtedness

7.1    By no later than the earlier of (i) the date of completion of the 31 December Audit, and (ii) 30 September 2011, the Current Shareholders shall procure that the Auditors shall deliver to IT Ltd and the Current Shareholders a certificate (together with all working papers related to the same **(Auditors' Certificate)**) setting out the Auditors' determination of:

(a)    the 31 December Cash Amount;

(b)    the 2010 Indebtedness; and

(c)    the 2010 Capital Expenditure,

(the **Key Financial Performance Figures**).

7.2    IT Ltd and the Current Shareholders shall each have 30 (thirty) Business Days from the date of receipt of the Auditors' Certificate, provided however that if the Auditors' Certificate is received prior to 5 September the 30 (thirty) Business Days shall commence on 5 September:

(a)    to review the Auditors' Certificate and the papers and information related to the Auditors' Certificate;

(b)    in the case of IT Ltd, to serve written notice on the Current Shareholders specifying that it disputes any item or items, in which case it shall provide reasonable details of the items in dispute and the grounds for such dispute; and

(c)    in the case of the Current Shareholders, to serve written notice on IT Ltd specifying either that it disputes any item or items, in which case it shall provide reasonable details of the items in dispute and the grounds for such dispute,

and if neither IT Ltd nor the Current Shareholders serve a notice under clause 7.2(b) or 7.2(c) above (**AC Dispute Notice**), the amounts set out in the Auditors' Certificate shall be agreed, or deemed to be agreed, to comprise the Key Financial Performance Figures for the purpose of clauses 7.5 and 7.8 below.

7.3    Within 5 (five) Business Days of receipt of an AC Dispute Notice, the Current Shareholders and IT Ltd shall meet to try to reach agreement on the amounts of the Key Financial Performance Figures. If within 15 (fifteen) Business Days of receipt of an AC Dispute Notice, the Current Shareholders and IT Ltd are unable to reach agreement Korek shall appoint an Expert to determine the amounts of the Key Financial Performance Figures in accordance with clause 7.4. If the Current Shareholders and IT Ltd agree on the amounts of the Key Financial Performance Figures such amounts shall apply for the purpose of clauses 7.5 and 7.6 below.

7.4    The Expert shall be engaged by Korek (or in the event that Korek shall fail to appoint such Expert within 5 (five) Business Days of such obligation arising pursuant to clause 7.3, IT Ltd shall appoint such Expert), to determine the amounts of the Key Financial Performance Figures on terms agreed jointly by the Current Shareholders and IT Ltd provided that neither party shall unreasonably refuse its agreement to those terms proposed by the Expert or by the other party, such terms to include a requirement that the Expert shall:

(a)   determine its own procedure, which shall include:

    (i)   a reasonable opportunity for each of the Current Shareholders and IT Ltd to make written and oral representations to the Expert;

    (ii)   a requirement that the parties supply each other with a copy of any written representations at the same time as they are made to the Expert; and

    (iii)   permit each of the Current Shareholders and IT Ltd to be present while oral submissions are being made by the other.

(b)   make its determination as soon as is reasonably practicable but in any event, within 30 (thirty) days of appointment;

(c)   act as an expert and not as an arbitrator and its determination of any matter falling within its jurisdiction shall be final and binding on the parties save in the event of fraud or manifest mathematical error (when the relevant part of its determination shall be void and the matter shall be remitted to it for correction); and

(d)   have its costs and expenses paid by Korek.

7.5   If T+U+Q equals an amount less than US$120,000,000 (such figure to be reduced by the amount (if any) by which Korek's EBITDA for the period from 1 January 2010 to 31 December 2010 is less than US$190,000,000) (**Shortfall**), then the Current Shareholders shall pay an amount equal to such Shortfall (**up to a maximum amount equal to US$15,000,000**) to Korek, in cash in immediately available funds, within 90 (ninety) days of the determination of the Key Financial Performance Figures in accordance with clauses 7.2 to 7.4.

7.6   For the purposes of clauses 7.5 and 7.8:

    T = the 31 December Cash Amount;

    U = the 2010 Capital Expenditure; and

    Q = any payment made under clause 6.2 for any Leakage which occurred prior to 31 December 2010,

in each case, as agreed or determined pursuant to clauses 7.2 to 7.4.

7.7   If there is any 2010 Indebtedness then the Current Shareholders shall pay an amount equal to the 2010 Indebtedness to Korek, in cash in immediately available funds, within 90 (ninety) days of the determination of the Key Financial Performance Figures in accordance with clauses 7.2 to 7.4.

7.8   If and to the extent that T+U+Q equals an amount in excess of US$140,000,000 (such figure to be reduced by the amount (if any) by which Korek's EBITDA for the period from 1 January 2010 to 31 December is less than US$190,000,000) then such excess (up to a maximum amount equal to US$15,000,000) shall be set off against (x) any amount payable by CS Ltd under clause 2.2(b)(ii), or (y) to the extent that no amount remains payable by CS Ltd under clause 2.2(b)(ii), any amount payable by CS Ltd under clause 2.2(b)(iii), or (z) to the extent that no amount remains payable by CS Ltd under clause 2.2(b)(iii), any amount payable by CS Ltd under clause 2.2(b)(i), and for the avoidance of doubt, if all amounts payable under clause 2.2 have been settled, any excess amount pursuant to this clause 7.8 shall not be paid to CS Ltd.

7.9   The Current Shareholders and Korek shall procure that, with effect from Original Signing, IT Ltd shall be provided with access to all the books, records, accounts, employees and other information which it may reasonably require in order to review the Key Financial Performance Figures and shall be provided with copies of all management accounts and any draft audited accounts for the 12 month period ending 31 December 2010, in each case, as soon as they are made available to Korek by the Auditors.

## 8   Post Closing Undertakings

8.1   As soon as reasonably practicable following Closing, CS Ltd and the Current Shareholders undertake to use all reasonable endeavours to procure written confirmation and evidence reasonably satisfactory to IT Ltd and the Current Shareholders from the CMC of a reduction or cancellation of the CMC Liability Amount.  In the course of attempting to secure such reduction or cancellation, the Current Shareholders and Korek shall, at all times, consult with IT Ltd and act in accordance with applicable laws of the Republic of Iraq.  The amount, if any, of any reduction or cancellation of the CMC Liability Amount, obtained from the CMC in writing, net of any applicable Taxes or Tax liabilities incurred or accrued by Korek in respect thereof shall be referred to as the **CMC Reduction**. To the extent that there are any conditions attached to the CMC Reduction then such conditions must be satisfactory to IT Ltd (acting reasonably) and the CMC Reduction must not, in IT Ltd's reasonable opinion, negatively impact any future liabilities or obligations of Korek to the CMC.

8.2   Following Closing, CS Ltd and the Current Shareholders undertake to use all reasonable endeavours to procure the consent, in writing, of the CMC and any other relevant Governmental Entity:

(a)   to a cancellation or postponement of Korek's obligations pursuant to the Licence to procure a Listing;

(b)   to the extension of the provisions of the Licence to permit Korek to offer 3G and/or 4G services to customers; and

(c)   to delay or prevent the issue to any entity other than Korek of a licence permitting the provision of GSM services in the Republic of Iraq for a period of at least 2 years from the date of Closing or, in the event that such a licence is issued, the consent of the CMC or any other relevant Governmental Entity to a reduction in the annual fee payable by Korek in respect of the Licence,

and CS Ltd, the Current Shareholders and Korek shall, at all times, consult with IT Ltd and act in accordance with applicable laws in the Republic of Iraq in seeking to obtain the consents set out above.

8.3   Following Closing, CS Ltd and the Current Shareholders undertake to use all reasonable endeavours to obtain from the CMC or the Iraqi Ministry of Communications or other Governmental Entity confirmation of the absence of liabilities in respect of the MOC Litigation.

8.4   Following Closing, CS Ltd and the Current Shareholders shall procure that the CEO Resolution is filed with the Registrar of Companies in Erbil

8.5   IT Ltd shall, to the extent it is able, and shall procure that ASN and Alcazar shall, provide all reasonable support required by Korek, CS Ltd and the Current Shareholders to fulfil their obligations pursuant to this clause 8.

## 9   Current Shareholder Indemnities

9.1   With effect from Closing, CS Ltd and the Current Shareholders (amongst themselves jointly) on the one hand and Korek on the other hand jointly and severally undertake to indemnify fully and hold IT Ltd harmless on demand, against all Costs (including, but not limited to, all reasonable Costs suffered, sustained or incurred in connection with investigating, preparing for and/or pursuing a successful claim under the indemnity set out in this clause 9.1) which IT Ltd or any of its Affiliates suffers, sustains or incurs, in either case in the event of, as a result of or in connection with:

(a)   any and all fines, interest, delayed fines, penalties or other amounts levied by the CMC against Korek directly in connection with any breach by Korek prior to Closing of the Licence (for the avoidance of doubt, including interest accrued and payable in respect of

13

late payments of licence fee instalments under the Licence), any applicable regulation, agreement with or requirement imposed by the CMC, save for such amounts as are Fairly Disclosed at the date of this Agreement;

(b)   the loss, suspension or forfeiture of the Licence directly as a result of any breach by Korek of the terms of the Licence, occurring prior to Closing;

(c)   any action, claim or proceeding brought against IT Ltd, Korek, International Holdings or any of their Affiliates in respect of the Al Warka Facility, the repayment thereof, the failure to make repayment of the Al Warka Facility or otherwise in respect of the Al Warka Facility;

(d)   the Dividend having been paid, not properly cancelled or cancelled in a way which gives rise to a liability of Korek;

(e)   a breach of paragraphs 1(f), 1(i), 1(m) and 2(f) (other than in respect of the transfer of the Existing Shares under clause 5.9) of Schedule 2; or

(f)   the Current Shareholders wilfully suppressing relevant information which comes to their notice in relation to any fact or matter (whether existing on or before the date of Original Signing or arising afterwards) which constitutes a breach of any CS Warranty (including as repeated under clause 10.2),

**(Indemnities)**.

9.2   IT Ltd confirms to the Current Shareholders and Korek that as at the date of this Agreement neither IT Ltd nor any of its Affiliates is preparing any claim under the Indemnities. Nothing in this clause 9.2 shall restrict, prohibit or in any way constrain IT Ltd or any of its Affiliates from making any claim under the Indemnities at any time following Closing.

9.3   The Indemnities in clauses 9.1(a), 9.1(b), 9.1(e) and 9.1(f) are given subject to the limitations on liability set out in paragraphs 1, 3, 9 and 12 of Schedule 4.

9.4   Clause 11 shall apply in respect of any payment under the Indemnities.

## 10   CS Warranties

10.1   CS Ltd and the Current Shareholders (amongst themselves jointly) on the one hand, and Korek on the other hand, jointly and severally warrant to IT Ltd, (i) as at Original Signing, in the terms of the CS Warranties and (ii) as at the date of Signing, in the terms of paragraph 1 of Part A of Schedule 3.

10.2   The CS Warranties shall be deemed to be repeated immediately before Closing by reference to the facts and circumstances then existing as if references in the CS Warranties to the date of Original Signing were references to the Closing Date. The Current Shareholders may (subject to the fair disclosure requirement in paragraph 7(a) of Schedule 4) amend or supplement the Disclosure Letter at any time up until the 3 (three) Business Days prior to the Closing Date (**Supplemental Disclosure Letter**) solely in respect of any material new matter resulting from the actions of a third party or an event or matter outside the control of the Current Shareholders and Korek which arises following the date of Original Signing (and for the avoidance of doubt this shall not include CS Ltd, the Current Shareholders and/or Korek becoming aware after the date of Original Signing of facts, events or circumstances which arose or occurred before the date of Original Signing) that would constitute a breach of the CS Warranties as repeated, by delivering a written copy thereof to IT Ltd.

10.3   Upon receipt of a Supplemental Disclosure Letter, IT Ltd shall have the right, upon written notice to the other parties, to require a postponement of the Original Closing Date to such other date as shall be no later than 1 (one) week from the Original Closing Date (**Deferred Closing Date**) and CS Ltd, the Current Shareholders and Korek shall use their reasonable endeavours to co-operate

14

with IT Ltd's investigations, and to the extent that they are able, provide any information reasonably requested by IT Ltd .

10.4    Each CS Warranty shall be separate and independent and (except as expressly otherwise provided) no CS Warranty shall be limited by reference to any other CS Warranty.

10.5    Except as set out in clause 18, IT Ltd acknowledges and agrees that the only remedy available to it for breach of the CS Warranties shall be damages, provided that nothing in this clause 10.5 shall exclude or affect any right or remedy available to IT Ltd in respect of fraud or fraudulent misrepresentation.

10.6    Clause 11 shall apply in respect of any payment due to IT Ltd in respect of a breach of a CS Warranty.

10.7    IT Ltd confirms to the Current Shareholders and Korek that as at the date of this Agreement, it is not actually aware of any matter which is reasonably likely to give rise to a Claim.

**11      Payments under Indemnities and CS Warranties**

11.1    Subject to clause 11.3 (only in respect of the Indemnities and not in respect of a breach of a CS Warranty), any payment due to IT Ltd in respect of the Indemnities or in respect of a breach of a CS Warranty by Korek, shall be satisfied by Korek to the extent that Korek's available funds (in the form of cash, cash equivalents or borrowings (excluding all amounts: (i) repayable by or available to International Holdings under the IT Ltd Shareholder Loan and any other loan provided by IT Ltd, and (ii) necessary to fund the Business Plan over the 2 (two) years following the date payment is due under an Indemnity or CS Warranty) **(Available Funds)** are sufficient to satisfy the amount due to IT Ltd in full.  To the extent that the Available Funds are insufficient to satisfy the amount due to IT Ltd in respect of the Indemnities or in respect of a breach of a CS Warranty, the Available Funds shall be applied to part pay the amount due to IT Ltd and the difference between the amount due to IT Ltd and the Available Funds shall be satisfied or met by the Current Shareholders.

11.2    In the event that the Current Shareholders pay any amounts to IT Ltd in the place of Korek under clause 11.1, once Korek has Available Funds Korek shall reimburse the Current Shareholders by paying to CS Ltd (on behalf of the Current Shareholders) amounts equal to the amounts paid by the Current Shareholders under this clause 11. If Korek reimburses any amount to the Current Shareholders pursuant to this clause 11.2 it shall also pay an amount to IT Ltd equal to US$P where:

$$P = Q \, x \, \frac{R}{100 - R}$$

Q = the amount paid to the Current Shareholders under this clause 11.2; and

R = IT Ltd's Relevant Percentage Shareholding at the time the payment was made by the Current Shareholders under clause 11.1.

11.3    Neither Korek nor the Current Shareholders shall have any liability to IT Ltd in respect of the Indemnities in clauses 9.1(a) and 9.1(b) unless Korek or any of the parties receives written notification from the CMC of the relevant event giving rise to a claim under the Indemnities.

11.4    If Korek is required to pay an amount of money to IT Ltd in respect of any Claim or under the Indemnities, Korek shall also pay an additional amount to IT Ltd equal to US$X; where:

$$X = Y \, x \, \frac{Z}{100 - Z}$$

Y = the amount owing by Korek to IT Ltd under the terms of this Agreement in US$ (other than the additional amount as calculated in accordance with this clause 11.4); and

Z = IT Ltd's Relevant Percentage Shareholding at the time that IT Ltd was notified of or otherwise became aware of the payment obligation.

(and, for the avoidance of doubt, paragraph 1 of Part C of Schedule 7 shall apply to a payment under clause 11.4)

11.5   Where the Current Shareholders (instead of Korek) are required to make a payment to IT Ltd under the terms of this Agreement, instead of making the payment to IT Ltd, if IT Ltd has received legal advice confirming that a payment to Korek would be more beneficial then, at IT Ltd's option (by giving advance notice to the Current Shareholders' Representative), the Current Shareholders shall, instead of making the payment to IT Ltd, make such payment to Korek plus an additional amount equal to US$X; where:

$$X = Y\,x\,\frac{100-Z}{Z}$$

Y = amount owing by the Current Shareholders to IT Ltd under the terms of this Agreement in US$ (other than the additional amount as calculated in accordance with this clause 11.5); and

Z = IT Ltd's Relevant Percentage Shareholding at the time that IT Ltd was notified of or otherwise became aware of the payment obligation,

(and, for the avoidance of doubt, paragraph 1 of Part C of Schedule 7 shall apply to a payment under clause 11.5).

11.6   If the Current Shareholders and/or Korek have a liability arising under this Agreement, any amounts due in satisfaction of that liability shall be paid in full without deduction or retention, except as may be required by law. The Current Shareholders and Korek hereby waive and relinquish any right of set-off or counterclaim which they may have in respect of the payment of any such amount.

## 12   IT Ltd Warranties

12.1   IT Ltd warrants to the Current Shareholders (i) as at Original Signing and (ii) as at the date of Signing in the terms of the warranties set out in Schedule 5. Such warranties shall be deemed to be repeated immediately before Closing by reference to the facts and circumstances then existing as if references in such warranties to the date of Original Signing were references to the Closing Date.

12.2   The limitations set out in Schedule 4 (other than those set out in paragraphs 1 to 3) shall apply *mutatis mutandis*, in respect of any claim against IT Ltd under the warranties set out in Schedule 5.

12.3   The Current Shareholders acknowledge and agree that the only remedy available to them for breach of the warranties set out in Schedule 5 shall be damages, provided that nothing in this clause 12.3 shall exclude or affect any right or remedy available to the Current Shareholders in respect of fraud or fraudulent misrepresentation.

## 13   Alcazar and ASN Warranties

13.1   Alcazar warrants to the Current Shareholders (i) as at Original Signing and (ii) as at the date of Signing in the terms of the warranties set out in Part A of Schedule 6. Such warranties shall be deemed to be repeated immediately before Closing by reference to the facts and circumstances then existing as if references in such warranties to the date of Original Signing were references to the Closing Date.

16

13.2    ASN warrants to the Current Shareholders (i) as at the date of Original Signing and (ii) as at the date of Signing in the terms of the warranties set out in Part B of Schedule 6. Such warranties shall be deemed to be repeated immediately before Closing by reference to the facts and circumstances then existing as if references in such warranties to the date of Original Signing were references to the Closing Date.

13.3    The limitations set out in Schedule 4 (other than those set out in paragraphs 1 to 3) shall apply *mutatis mutandis*, in respect of any claim against Alcazar or ASN under the warranties set out in Schedule 6.

13.4    The Current Shareholders acknowledge and agree that the only remedy available to them for breach of the warranties set out in Schedule 6 shall be damages, provided that nothing in this clause 13.4 shall exclude or affect any right or remedy available to the Current Shareholders in respect of fraud or fraudulent misrepresentation.

13.5    The aggregate liability of IT Ltd, Alcazar and ASN in respect of any claim under or in connection with the warranties set out in Schedule 5 and Schedule 6 shall not exceed US$525,000,000.

## 14    Guarantee

### *IT Ltd Guarantee*

14.1    Each of the Guarantors severally, and in their respective Guarantee Proportions irrevocably and unconditionally, guarantees to the Current Shareholders or Korek the due and punctual performance of the obligations of IT Ltd contained in clause 17 of the Shareholders' Agreement and clauses 2, 4 and 5.6 of the IT Ltd Shareholder Loan and, in the case of ASN, clause 2.1(c) of this Agreement, and in the case of Alcazar, the warranty set out in paragraph 6 of Part A of Schedule 6 (**Guarantee Liabilities**). In the event that IT Ltd shall become liable to pay an amount to International Holdings under or pursuant to the Guarantee Liabilities and IT Ltd fails to satisfy such obligation within 30 days of a written demand in respect thereof (for the avoidance of doubt, a utilisation request under the IT Ltd Shareholder Loan shall constitute a written demand for the purposes of this clause 14.1) from International Holdings, the Guarantors shall pay to International Holdings, in their respective Guarantee Proportions, such sum of money which IT Ltd has failed to pay to International Holdings to satisfy such liability. The Guarantors' obligations under this clause 14 are primary obligations and not those of a mere surety.

14.2    International Holdings acknowledges and agrees that any amount paid in respect of clauses 2, 4 or 5.6 of the IT Ltd Shareholder Loan by either of the Guarantors pursuant to the terms of the guarantee set out in clause 14.1 above shall be deemed to constitute an advance (in the amount of the payment to International Holdings by the relevant Guarantor) made by IT Ltd under, and in accordance with the terms of, the IT Ltd Shareholder Loan.

14.3    The Guarantors' obligations under clause 14.1 are continuing obligations and are not satisfied, discharged or affected by an intermediate payment or settlement of account by, or a change in the constitution or control of, or merger or consolidation with any other person of, or the insolvency of, or bankruptcy, winding up or analogous proceedings relating to, IT Ltd.

14.4    The Guarantor's liabilities under clause 14.1 are not affected by an arrangement which International Holdings may make with IT Ltd or with another person which (but for this clause 14.4) might operate to diminish or discharge the liability of or otherwise provide a defence to a surety.

14.5    Without affecting the generality of clause 14.4, International Holdings may at any time it thinks fit, and without reference to the Guarantors and without prejudice to the Guarantors' obligations under this clause 14:

(a)    grant a time for payment or grant another indulgence or agree to an amendment, variation, waiver or release in respect of an obligation of IT Ltd under this Agreement;

(b) give up, deal with, vary, exchange or abstain from perfecting or enforcing other securities or guarantees held by International Holdings;

(c) discharge a party to other securities or guarantees held by International Holdings and realise all or any of those securities or guarantees; and

(d) compound with, accept compositions from and make other arrangements with IT Ltd or a person or persons liable on other securities or guarantees held or to be held by International Holdings.

14.6 So long as IT Ltd is under an actual or contingent obligation under this Agreement the Guarantors shall not exercise a right which it may at any time have by reason of the performance of its obligations under clause 14.1 to be indemnified by IT Ltd, to claim a contribution from another surety of IT Ltd's obligations or to take the benefit (wholly or partly and by way of subrogation or otherwise) of any of IT Ltd's rights under this Agreement or of any other security taken by IT Ltd in connection with this Agreement.

14.7 The Guarantors' liabilities under clause 14.1 are not affected by the avoidance of an assurance, security or payment or a release, settlement or discharge which is given or made on the faith of an assurance, security or payment, in either case, under an enactment relating to bankruptcy or insolvency.

14.8 The Guarantors waive any right they may have of first requiring International Holdings (or any trustee or agent on its behalf) to proceed against or enforce any other rights or security or claim payment from any person before claiming from the Guarantors under this clause 14. This waiver applies irrespective of any law or any provision of this Agreement or any other agreement entered into pursuant to this Agreement to the contrary.

14.9 In the event that prior to the payment of the sums due under clause 2.1(c): (i) ASN ceases to be a wholly owned subsidiary of FT; or (ii) the financial condition of either Guarantor materially deteriorates such that its net assets falls below 50% (fifty per cent.) of the net assets as set out in its audited accounts for the financial year ended 31 December 2009, IT Ltd shall notify International Holdings in reasonable time prior to the occurrence of either (i) or (ii) and promptly procure another entity, such entity to be agreed to by International Holdings, acting reasonably **(New Guarantor)**, to be the Guarantor in the place of the Guarantor which ceased to satisfy the test set out above. IT Ltd shall procure that the New Guarantor executes a deed of adherence in a form which is satisfactory to Korek, acting reasonably.

14.10 It is agreed that:

(a) the aggregate liability of Alcazar pursuant to this clause 14 and all of the Transaction Documents shall not exceed an amount equal to the lesser of (i) Alcazar's respective Guarantee Proportion of the guaranteed liability, and (ii) the Fair Market Value (measured at the time an agreement is reached between the parties or the date an arbitral award shall have been made, in either case, in respect of the relevant liability claim) of Alcazar's indirect Relevant Percentage Shareholding plus any indirect interest in International Holdings transferred (whether for value or otherwise) by Alcazar plus US$100,000,000 and none of the Current Shareholders, Korek or International Holdings shall be entitled to bring a claim against Alcazar for any sum in excess of such amount;

(b) the aggregate liability of ASN in respect of its obligations set out in this clause 14 and all of the Transaction Documents shall not exceed an amount equal to the lesser of (i) ASN's respective Guarantee Proportion of the guaranteed liability, and (ii) the Fair Market Value (measured at the time an agreement is reached between the parties or the date an arbitral award shall have been made, in either case, in respect of the relevant liability claim) of ASN's indirect Relevant Percentage Shareholding plus any indirect interest in International Holdings transferred (whether for value or otherwise) by ASN plus US$100,000,000 and none of the Current Shareholders, Korek or International Holdings shall be entitled to bring a claim against ASN for any sum in excess of such amount; and

18

(c)    whenever it has a claim under clause 14, in respect of the aggregate amount of such claim the Current Shareholders, Korek or International Holdings may only seek recovery of the respective Guarantee Proportion from each Guarantor.

**CS Ltd Guarantee**

14.11    Mr. Sirwan Saber Mustafa unconditionally and irrevocably guarantees to IT Ltd and to each of its Affiliates as a continuing obligation to procure that CS Ltd and the Current Shareholders will comply properly and punctually with their respective obligations under this Agreement and the Transaction Documents.

14.12    Mr. Sirwan Saber Mustafa's obligations under clause 14.11 are continuing obligations and are not satisfied, discharged or affected by an intermediate payment or settlement of account by, or a change in the constitution or control of, or merger or consolidation with any other person of, or the insolvency of, or bankruptcy, winding up or analogous proceedings relating to, CS Ltd.

14.13    Mr. Sirwan Saber Mustafa's liabilities under clause 14.11 are not affected by an arrangement which International Holdings may make with CS Ltd or with another person which (but for this clause 14) might operate to diminish or discharge the liability of or otherwise provide a defence to a surety.

14.14    Mr. Sirwan Saber Mustafa's liability under clause 14.11 shall not be discharged or impaired by:

(a)    any amendment, variation or assignment of this Agreement or any Transaction Document or any waiver of its or their terms;

(b)    any release of, or granting of time or other indulgence to, CS Ltd, a Current Shareholder or any third party;

(c)    any winding up, bankruptcy, dissolution, reconstruction, legal limitation, incapacity or lack of corporate power or authority or other circumstances affecting CS Ltd or a Current Shareholder (or any act taken by IT Ltd in relation to any such event); or

(d)    any other act, event, neglect or omission (whether or not known to CS Ltd, a Current Shareholder, IT Ltd or Mr. Sirwan Saber Mustafa) which would or might (but for this clause 28) operate to impair or discharge Mr. Sirwan Saber Mustafa's liability or afford Mr. Sirwan Saber Mustafa any legal or equitable defence.

14.15    So long as CS Ltd is under an actual or contingent obligation under this Agreement Mr. Sirwan Saber Mustafa shall not exercise a right which he may at any time have by reason of the performance of his obligations under clause 14.11 to be indemnified by CS Ltd, to claim a contribution from another surety of CS Ltd's obligations or to take the benefit (wholly or partly and by way of subrogation or otherwise) of any of CS Ltd's rights under this Agreement or of any other security taken by CS Ltd in connection with this Agreement.

14.16    Mr. Sirwan Saber Mustafa's liabilities under clause 14.11 are not affected by the avoidance of an assurance, security or payment or a release, settlement or discharge which is given or made on the faith of an assurance, security or payment, in either case, under an enactment relating to bankruptcy or insolvency.

14.17    Mr. Sirwan Saber Mustafa waives any right he may have of first requiring International Holdings (or any trustee or agent on its behalf) to proceed against or enforce any other rights or security or claim payment from any person before claiming from him under this clause 14. This waiver applies irrespective of any law or any provision of this Agreement or any other agreement entered into pursuant to this Agreement to the contrary.

14.18    The aggregate liability of Mr Sirwan Saber Mustafa pursuant to this clause 14 and all of the Transaction Documents shall not exceed an amount equal to the Fair Market Value (measured at the time an agreement is reached between the parties or the date an arbitral award shall have been made, in either case, in respect of the relevant liability claim) of Mr Sirwan Saber Mustafa's

indirect Relevant Percentage Shareholding plus any indirect interest in International Holdings transferred (whether for value or otherwise) by Mr Sirwan Saber Mustafa, plus US$100,000,000.

## 15  Conduct of Third Party Claims

15.1  Korek or the Current Shareholders shall promptly notify IT Ltd in writing upon becoming aware of any claim by any third party against Korek or International Holdings (**Third Party Claim**) where it appears that Korek or the Current Shareholders, as relevant, is likely to become liable under any Non Tax Claim, any Tax Claim or any claim under the Indemnities. IT Ltd shall notify Korek and the Current Shareholders upon it becoming aware of a Third Party Claim.

15.2  Subject to IT Ltd being indemnified to its reasonable satisfaction by Korek or the Current Shareholders against all reasonable out-of-pocket costs, fees and expenses, including those of its legal advisers, incurred in respect of a Third Party Claim:

(a)  the parties agree that Korek shall take such action and give such information and assistance as the Current Shareholders may reasonably require to avoid, dispute, resist, mitigate, compromise or defend any Third Party Claim and to appeal against any judgment given in respect thereof including (without limitation) applying to postpone so far as legally possible the payment of any Tax; and

(b)  on the written request of the Current Shareholders in accordance with clause 15.3, the sole conduct of any legal proceedings of whatsoever nature arising out of any Third Party Claim (**Proceedings**) shall be delegated to the Current Shareholders.

15.3  The rights of the Current Shareholders under clause 15.2(b) shall only apply to a Third Party Claim if the Current Shareholders give notice to IT Ltd in writing of their intention to exercise their rights within 45 (forty-five) days of IT Ltd giving notice of the Third Party Claim.

15.4  Where Proceedings are delegated to the Current Shareholders in accordance with clause 15.2(b):

(a)  the Current Shareholders shall keep IT Ltd fully and promptly informed of the Proceedings, shall consult IT Ltd on any matter which is or is likely to be material in relation to any Proceedings and shall take account of all reasonable requirements of IT Ltd in relation to such Proceedings; and

(b)  the Current Shareholders shall not make any settlement or compromise of the Third Party Claim which is the subject of Proceedings, or agree to any matter in the conduct of such Proceedings which may affect the amount of the liability in connection with such Third Party Claim without the prior written approval of IT Ltd, such approval not to be unreasonably withheld or delayed and provided always that, in the event of IT Ltd unreasonably refusing approval of such settlement or compromise, the Current Shareholders shall have no liability to IT Ltd in respect of any Non Tax Claim, any Tax Claim arising therefrom in excess of the figure at which they could have settled or compromised the relevant Third Party Claim but that IT Ltd shall have no liability to Korek and/or the Current Shareholders in respect of such Third Party Claim.

15.5  IT Ltd shall not be required to take any action or refrain from taking any action pursuant to this clause 15 if the action or omission requested would in the reasonable opinion of IT Ltd, be materially prejudicial to IT Ltd (other than in so far as the action or omission itself is prejudicial to IT Ltd), to International Holdings or to Korek (including, for the avoidance of doubt, any action or omission if the action or omission requested would, in IT Ltd's reasonable opinion, be likely to adversely affect the liability of either IT Ltd, International Holdings or Korek to Tax).

## 16  Tax

16.1  The provisions of Schedule 7 shall apply in relation to Taxation.

20

16.2    Schedule 7 (apart from the Tax Covenant) shall come into effect on the date of Original Signing. The Tax Covenant shall come into effect at Closing.

## 17    Payments

17.1    Save as otherwise provided in this Agreement, any payment to be made to Korek pursuant to this Agreement shall be made to Korek's Bank Account or such other account as Korek directs.

17.2    Any payment to be made to IT Ltd pursuant to this Agreement (or any of its Affiliates) shall be made to the IT Ltd Bank Account or such other account as IT Ltd directs.

17.3    Save as otherwise provided in this Agreement, any payment to be made to CS Ltd or the Current Shareholders pursuant to this Agreement shall be made to the Current Shareholders' Representative bank account or as the Current Shareholders otherwise direct.

17.4    Payments under clauses 17.1 to 17.3 shall be in immediately available funds by electronic transfer on the due date for payment. Receipt of the amount due shall be an effective discharge of the relevant payment obligation.

17.5    If any sum due for payment in accordance with this Agreement is not paid on the due date for payment, the person in default shall pay Default Interest on that sum from but excluding the due date to and including the date of actual payment calculated on a daily basis.

## 18    Rights to Terminate

18.1    IT Ltd may terminate this Agreement (other than the Surviving Provisions) by written notice to the Current Shareholders' Representative and Korek at any time before the Closing Date if any of the following circumstances arises or occurs at any time before the Closing Date, namely:

(a)    any person (other than pursuant to this Agreement) has or alleges that they have any rights over or interest in: (i) the Existing Shares, the New Shares or any other share capital of Korek, or (ii) any loan capital or other securities of Korek, except for loan capital or other securities of Korek of an immaterial amount;

(b)    a material breach of any CS Warranty as given on the date of Original Signing and such breach, if capable of remedy, is not remedied by the earlier of: (i) the date which is 30 (thirty) days from such breach being notified in writing by IT Ltd to the other parties; and (ii) 2 (two) Business Days prior to the Closing Date;

(c)    any Event occurs which would constitute a material breach of any of the CS Warranties if they were repeated at any time on or before the Closing Date by reference to the facts and circumstances then existing (on the basis that reference in the CS Warranties to the date of Original Signing are references to the relevant date of repetition and disregarding any disclosure made under any Supplemental Disclosure Letter or amended disclosure letter delivered under clause 10.2) and such breach, if capable of remedy, is not remedied by the earlier of: (i) the date which is 30 (thirty) days from such breach being notified in writing by IT Ltd to the other parties; and (ii) 2 (two) Business Days prior to the Closing Date;

(d)    a material breach by either Korek or the Current Shareholders of a term of this Agreement which, if capable of remedy, has not been remedied by the earlier of: (i) the date which is 30 (thirty) days from such breach being notified in writing by IT Ltd to the other parties; and (ii) 2 (two) Business Days prior to the Closing Date;

(e)    a material breach of paragraphs 1(d), 1(m) or 2(g) of Schedule 2 which, if capable of remedy, has not been remedied by the earlier of: (i) the date which is 30 (thirty) days from such breach being notified in writing by IT Ltd to the other parties; and (ii) 2 (two) Business Days prior to the Closing Date;

21

    (f)    any Material Adverse Change occurs; or

    (g)    an Event under the Letter Agreement occurs.

18.2    CS Ltd and the Current Shareholders may terminate this Agreement (other than the Surviving Provisions) by written notice to IT Ltd and Korek at any time before Closing if any of the following circumstances arises or occurs at any time before the Closing Date, namely:

    (a)    a material breach of any of the warranties set out in Schedule 5 or Schedule 6 as given on the date of Original Signing and such breach, if capable of remedy, is not remedied by the earlier of: (i) the date which is 30 (thirty) days from such breach being notified in writing by CS Ltd to the other parties; and (ii) 2 (two) Business Days prior to the Closing Date;

    (b)    any Event occurs or is properly disclosed which would constitute a material breach of any of any of the warranties set out in Schedule 5 or Schedule 6 if they were repeated at any time before Closing by reference to the facts and circumstances then existing (on the basis that reference in any of the warranties set out in Schedule 5 and Schedule 6 to the date of Original Signing are references to the relevant date of repetition) and such breach, if capable of remedy, is not remedied by the earlier of: (i) the date which is 30 (thirty) days from such breach being notified in writing by CS Ltd to the other parties; and (ii) 2 (two) Business Days prior to the Closing Date; or

    (c)    an Event under the Letter Agreement occurs.

18.3    Save as otherwise agreed between the parties, if IT Ltd becomes entitled to terminate this Agreement pursuant to clause 18.1(b) or 18.1(c) but elects in writing not to do so, it shall not be entitled to bring a Claim or any claim in respect of the Indemnity set out in clause 9.1(e) by reference to the facts, matters and circumstances actually known to IT Ltd to constitute a Claim at the time at which IT Ltd made such election.

18.4    No party shall be entitled to rescind or terminate this Agreement in any circumstances whatsoever (whether before or after Closing) except where exercising those rights specifically set out in this Agreement.

18.5    In the event that the CP Satisfaction Date has not occurred by the Longstop Date then this Agreement shall terminate in accordance with clause 3.6.

## 19    Current Shareholders' Representative

19.1    Each of the Current Shareholders shall, on the date of Original Signing, appoint Mr. Sirwan Saber Mustafa (**Current Shareholders' Representative**) as their attorney (pursuant to a power of attorney in the Agreed Form) and they each hereby appoint the Current Shareholders' Representative as their agent, in each case with authority at any time or from time to time to represent each and all of the Current Shareholders collectively for the purposes of this Agreement and the Transaction Documents. Any decision by the Current Shareholders' Representative pursuant to this clause 19 shall bind each of the Current Shareholders.

19.2    Each party agrees that the Current Shareholders' Representative shall:

    (a)    receive any notice given under or in accordance with the terms of this Agreement and the Transaction Documents to a Current Shareholder or the Current Shareholders on behalf of any and all Current Shareholders but if the Current Shareholders' Representative is no longer able or authorised to receive such notice, the parties may be entitled to serve notice on each of the Current Shareholders;

    (b)    be the only party within the Current Shareholders entitled to give any notice to be given under or in accordance with the terms of this Agreement and the Transaction Documents by any of the Current Shareholders;

22

(c) exercise any discretion or right which is conferred on a Current Shareholder or the Current Shareholders under the terms of this Agreement and the Transaction Documents on behalf of any and all Current Shareholders; and

(d) be the only party to appoint an arbitrator on behalf of (i) the Current Shareholders and (ii) CS Ltd under clause 34,

and each party, and Korek, declares and agrees that each and every document, notice, deed, matter and thing which may be given, made, executed or done by the Current Shareholders' Representative on behalf of one or more of the Current Shareholders in accordance with this clause 19 shall be as good, valid and effectual to all intents and purposes as if the same had been given, made, executed or done by such Current Shareholder or Current Shareholders personally.

19.3 Any change in the identity of the Current Shareholders' Representative shall be notified in writing to IT Ltd and Korek.

## 20    Announcements

20.1 Following Original Signing, the parties shall make an announcement in the Agreed Form.

20.2 Other than under clause 20.1, no party (nor any of their respective Affiliates) shall make any announcement or issue any circular in connection with the existence or subject matter of this Agreement (or any other Transaction Document) without the prior written approval of the other parties.

20.3 At Closing, the parties shall jointly agree the form of any announcement in respect of the existence and subject matter of this Agreement and use their best endeavours to issue such announcement at the same time, and no party (nor any of their respective Affiliates) shall make any other announcement or issue any circular in connection with the existence or subject matter of this Agreement (or any other Transaction Document) providing information not previously disclosed to the public without the prior written approval of the others (such approval not to be unreasonably withheld or delayed).

20.4 The restriction in clause 20.2 shall not apply to the extent that the announcement or circular is required by applicable law, by any applicable stock exchange or any applicable regulatory or other applicable supervisory body or authority of competent jurisdiction, whether or not the requirement has the force of law. If this exception applies, the party making the announcement or issuing the circular shall (to the extent lawful) use its reasonable efforts to consult with the other party in advance as to its form, content and timing.

## 21    Confidentiality

21.1 For the purposes of this clause 21:

**Confidential Information** means:

(a) (in relation to the obligations of Korek and/or the Current Shareholders) any information received or held by Korek and/or the Current Shareholders (or any of their respective Representatives) relating to IT Ltd, Alcazar, ASN or any of their Affiliates; or

(b) (in relation to the obligations of IT Ltd) any information received or held by IT Ltd (or any of its Representatives) relating to Korek or the Current Shareholders; or

(c) information relating to the provisions of, and negotiations leading to, this Agreement and the other Transaction Documents,

and includes written information and information transferred or obtained orally, visually, electronically or by any other means; and

23

**Representatives** means: (i) in relation to IT Ltd, its respective Affiliates and the directors, officers, employees, agents, advisers, accountants and consultants of that party and/or of its respective Affiliates, and (ii) in relation to any other party, its respective Affiliates and the directors, officers, employees, agents, advisers, accountants and consultants of that party and/or of its respective Affiliates.

21.2 Each party shall (and shall ensure that each of its Representatives shall) maintain Confidential Information in confidence and not disclose Confidential Information to any person except: (i) as this clause 21 permits; or (ii) as each other party approves in writing.

21.3 Clause 21.2 shall not prevent disclosure by a party or its Representatives to the extent it can demonstrate that:

(a) disclosure is required by law or by any stock exchange or any regulatory, governmental or antitrust body (including any Tax Authority) having applicable jurisdiction (provided that the disclosing party shall first inform each other party of its intention to disclose such information and take into account the reasonable comments of the other party);

(b) disclosure is required for the purpose of any judicial or arbitral proceedings arising out of any of the Transaction Documents;

(c) disclosure is of Confidential Information which was lawfully in the possession of that party or any of its Representatives (in either case as evidenced by written records) without any obligation of secrecy prior to it being received or held;

(d) disclosure is of Confidential Information which has previously become publicly available other than through that party's fault (or that of its Representatives); or

(e) disclosure is required for the purpose of any arbitral or judicial proceedings arising out of this Agreement (or any other Transaction Document).

21.4 Each party undertakes that it (and its Affiliates) shall only disclose Confidential Information to Representatives if it is reasonably required for purposes connected with this Agreement and only if the Representatives are informed of the confidential nature of the Confidential Information.

21.5 If this Agreement terminates, each party shall as soon as practicable on request by the other:

(a) destroy all information or other documents derived from such Confidential Information; and

(b) so far as it is practicable to do so, expunge such Confidential Information from any computer, word processor or other device.

21.6 The provisions of this clause 21 shall cease to apply from Closing and the parties shall instead comply with the provisions of clause 16 of the Shareholders' Agreement.

## 22   Assignment

22.1 Without prejudice to the remainder of this clause 22, the parties may assign the benefit of this Agreement in accordance with the terms of the Shareholders' Agreement.

22.2 If IT Ltd has been merged or consolidated, pursuant to clause 20.1 of the Shareholders' Agreement, then the transferee or successor in title or interest of the shares shall enter into a deed of adherence (on terms reasonably satisfactory to the parties) to this Agreement, and agree to be bound by the terms of and have all of the rights and benefits under this Agreement as if it had been an original party hereto to the extent not automatically transferred by the operation of law.

24

## 23      Further Assurances

23.1    Each party shall take (or procure the taking of) all such steps and execute (or procure the execution of) such further documents as may be required by law or be reasonably necessary to give full effect to this Agreement and the other Transaction Documents.

23.2    Each party shall procure that its Affiliates comply with all obligations under this Agreement and/or the Transaction Documents which are expressed to apply to any such Affiliates.

23.3    The liability of a party under this clause 23 shall not be discharged or impaired by any amendment to or variation of this Agreement, any release of or granting of time or other indulgence to any other member of its group or any third party or any other act, event or omission which but for this clause 23 would operate to impair or discharge the liability of such party under this clause 23.

## 24      Costs

24.1    Subject to clause 24.2 and except as otherwise provided in this Agreement (or any other Transaction Document), each party shall be responsible for its own costs, charges and other expenses (including those of its Affiliates) incurred in connection with the Proposed Transaction (including, without limitation, costs, charges and expenses incurred by the parties in connection with the drafting, negotiation and signing of the Transaction Documents). For the avoidance of doubt, this provision does not relate to costs incurred by the parties in respect of any Dispute.

24.2    All costs, charges and expenses incurred by any party which are directly attributable to the issue of the New Korek Shares shall be borne by Korek. In addition, Korek shall pay the costs of the advisors of Korek in an amount up to the sum specified in paragraph 3 of Schedule 9.

## 25      Notices

25.1    Any notice in connection with this Agreement shall be in writing, in English and delivered by hand, registered post, courier using an internationally recognised courier company or facsimile transmission. A notice shall be effective upon actual receipt delivered by hand, registered post or courier or, in the case of facsimile transmission, on completion of the transmission.

25.2    The addresses of the parties for the purpose of clause 25.1 are:

| | |
|---|---|
| **International Holdings** | Address: |
| International Holdings Limited | Suite 904, Level 9 Park Place<br>Sheikh Zayed Road<br>PO Box 506672<br>Dubai, UAE |
| **With copies to IT Ltd and CS Ltd to the addresses set out below:** | Fax: +971 4 329 6967 |
| **IT Ltd** | Address: |
| Iraq Telecom Limited | Suite 904, Level 9 Park Place<br>Sheikh Zayed Road<br>PO Box 506672<br>Dubai, UAE |
| | Fax: +971 4 329 6967 |
| **ASN** | Address: |
| Atlas Services Netherlands BV | 1043 BW Amsterdam,<br>Naritaweg 165, |

25

|  | The Netherlands |
| Copy to France Telecom Legal Department M&A and International | Fax: +32 2 745 8645<br>Address:<br>6 Place d'Alleray<br>75015 Paris<br>France |
| **Alcazar**<br>Alcazar Capital Partners | Fax: + 33 1 44 44 86 00<br>Address:<br>c/o Agility Public Warehousing Company KSC<br>Sulaibiya<br>6th Ring Road<br>Besides Land Customs Clearing area<br>PO Box 25418<br>Safat 13115<br>Kuwait<br>Attn: Chief Financial Officer and Group General Counsel |
| **Korek**<br>Korek Telecom Company LLC | Fax: +965 2 467 3098<br>Address:<br>Kurdistan Street nr. 45<br>Pirmam<br>Erbil<br>Kurdistan<br>Republic of Iraq<br>Attn: Managing Director |
| **The Current Shareholders and the Current Shareholders' Representative** | Address: |
| Mr. Sirwan Saber Mustafa | Kurdistan Street nr. 45<br>Pirmam<br>Erbil<br>Kurdistan<br>Republic of Iraq |
| Copy to Camille Abousleiman | Erbil-Massief-Sailahaddin<br>Dar Althiafa-House Number 3<br>Erbil<br>Kurdistan<br>Republic of Iraq<br>Dewey & LeBoeuf LLP<br>1 Minster Court<br>Mincing Lane<br>London EC3R 7YL<br>United Kingdom |
| Mr. Jawshin Hassan Jawshin Barazany | Kurdistan Street nr. 45<br>Pirmam<br>Erbil<br>Kurdistan<br>Republic of Iraq |
| Mr. Jiqsy Hamo Mustafa | Kurdistan Street nr. 45<br>Pirmam<br>Erbil<br>Kurdistan<br>Republic of Iraq |

26

| | |
|---|---|
| **CS Ltd**<br>Korek International (Management) Ltd. | Address:<br>Korek International (Management) Ltd.<br>Close Brothers (Cayman) Limited<br>Box 1034<br>4th Floor Harbour Place<br>103 South Church Street<br>George Town<br>Grand Cayman KY1-1102<br>Cayman Islands |
| Copy to Nawzad Junde | Fax: +1 345 949 8499<br>English Village<br>Villa 203<br>Erbil<br>Kurdistan<br>Republic of Iraq |

## 26   Conflict with other Agreements

If there is any conflict between the terms of this Agreement and any other agreement, this Agreement shall prevail unless: (i) such other agreement expressly states that it overrides this Agreement in the relevant respect, and (ii) the parties otherwise expressly agree in writing that such other agreement shall override this Agreement in that respect.

## 27   Whole Agreement

27.1    This Agreement and the other Transaction Documents set out the whole agreement between the parties in respect of the Proposed Transaction and supersede any prior agreement (whether oral or written and including for the avoidance of doubt the Term Sheet entered into between the parties on 27 November 2010) relating to the Proposed Transaction. It is agreed that:

(a)    no party shall have any claim or remedy in respect of any statement, representation, warranty or undertaking, made by or on behalf of the other party in relation to the Proposed Transaction which is not expressly set out in this Agreement or any other Transaction Document; and

(b)    except for any liability in respect of a breach of this Agreement or any other Transaction Document, no party shall owe any duty of care or have any liability in tort or otherwise to the other party in relation to the Proposed Transaction.

27.2    This clause 27 shall not exclude any liability for, or remedy in respect of, fraudulent misrepresentation.

## 28   Waivers, Rights and Remedies

Except as expressly provided in this Agreement, no failure or delay by any party in exercising any right or remedy relating to this Agreement or any of the Transaction Documents shall affect or operate as a waiver or variation of that right or remedy or preclude its exercise at any subsequent time. No single or partial exercise of any such right or remedy shall preclude any further exercise of it or the exercise of any other remedy.

## 29   Counterparts

This Agreement may be executed in any number of counterparts, and by each party on separate counterparts. Each counterpart is an original, but all counterparts shall together constitute one and the same instrument. Delivery of a counterpart of this Agreement, by e-mail attachment or telecopy shall be an effective mode of delivery.

### 30      Definitions, Interpretations and Variations

30.1    No amendment of this Agreement (or of any other Transaction Document) shall be valid unless it is in writing and duly executed by or on behalf of all of the parties to it.

30.2    Words and expressions used in this Agreement shall have the meaning given in Schedule 10.

### 31      Third Party Rights

Except for the rights of Affiliates of Alcazar pursuant to clause 4.3, a person who is not a party to this Agreement shall have no right under the Contracts (Rights of Third Parties) Act 1999 to enforce any of its terms.

### 32      Invalidity

Each of the provisions of this Agreement and any of the other Transaction Documents is severable. If any such provision is held to be or becomes invalid or unenforceable in any respect under the law of any jurisdiction, it shall have no effect in that respect and the parties shall use all reasonable efforts to replace it in that respect with a valid and enforceable substitute provision the effect of which is as close to its intended effect as possible.

### 33      Governing Law

This Agreement, including any non-contractual obligations arising out of or in connection with this Agreement, shall be governed by and construed in accordance with English law.

### 34      Dispute Resolution

34.1    If any dispute, controversy or claim of whatever nature arises under, out of or in connection with this Agreement, including any question regarding its existence, validity or termination or any non-contractual obligations arising out of or in connection with this Agreement (a **Dispute**), the parties shall use all reasonable endeavours to resolve the matter amicably. If one party gives notice that a Dispute has arisen and the parties are unable to resolve the Dispute within 30 (thirty) days of service of such notice then the Dispute shall be referred to two IT Ltd Representatives and two CS Ltd Representatives who shall attempt to resolve the Dispute and the parties agree that such IT Ltd Representatives and CS Ltd Representatives shall have full power to resolve such Dispute on behalf of all parties.

34.2    If such IT Ltd Representatives and CS Ltd Representatives are unable to resolve the Dispute within 30 (thirty) days, the parties agree to submit the matter to settlement proceedings under the ADR Rules of the ICC (**ADR Rules**). If the Dispute has not been settled pursuant to the ADR Rules within 45 (forty five) days following the filing of a Request for ADR (as defined in the ADR Rules) or within such other period as the parties to the Dispute may agree in writing, the parties to the Dispute shall have no further obligations under this clause 34.2.  No party shall resort to arbitration against another under this Agreement until the expiry of this 45 (forty five) day period.

34.3    If the parties fail to resolve a Dispute in accordance with clauses 34.1 and 34.2, such Dispute shall be referred to and finally resolved by arbitration under the Arbitration Rules of the ICC (**Rules**), which Rules are deemed to be incorporated by reference into this clause. The number of arbitrators shall be three (3).

34.4    In the event that CS Ltd and/or Mr. Sirwan Saber Mustafa, on the one hand, and IT Ltd, on the other hand, are the only parties to the Dispute, (i) 1 (one) of the arbitrators shall be appointed by IT Ltd, (ii) one of the arbitrators shall be appointed by CS Ltd and/or Mr Sirwan Saber Mustafa, (iii) the third arbitrator shall be jointly appointed by the 2 (two) arbitrators appointed by IT Ltd and CS Ltd and/or Mr Sirwan Saber Mustafa; and (iv) in the event that such arbitrators are unable to agree on the identity of the third arbitrator, such arbitrator shall be appointed by the ICC in accordance with the Rules.

28

34.5    In the event that CS Ltd and/or Mr Sirwan Saber Mustafa, on the one hand, and IT Ltd, on the other hand, are not the only parties to the Dispute, the three arbitrators shall be appointed by the ICC in accordance with the Rules.

34.6    The parties hereby agree that any restriction in the Rules upon the nomination or appointment of an arbitrator by reason of nationality shall not apply to any arbitration commenced pursuant to this clause. The seat, or legal place, of arbitration shall be the Dubai International Financial Centre. The language to be used in the arbitration shall be English.

34.7    Consolidation of multiple Disputes:

(a)    If multiple Disputes (as the term is defined in each of the Transaction Documents) arise out of or in connection with one or more of the Transaction Documents, then any or all such Disputes may be determined in a single arbitration, provided that the dispute resolution clauses contained in the Transaction Documents giving rise to the Disputes are compatible and the subject matter of the various Disputes is substantially connected.

(b)    At any time prior to the commencement of the oral phase of the first of any arbitrations commenced under any of the Transaction Documents, the tribunal in such arbitration (**First Tribunal**) shall have the power to order consolidation of such arbitration with any other existing or pending arbitrations commenced under any of the Transaction Documents where: (a) the existing or pending arbitrations relate to substantially similar questions of law or of fact; (b) none of the parties would be unduly prejudiced; (c) consolidation under these circumstances would not result in undue delay for any existing or pending arbitration; and (d) no arbitral tribunal has yet been constituted in the other existing or pending arbitrations.

(c)    The tribunal in such a consolidated arbitration shall be selected as follows: (a) the parties to the consolidated arbitration shall agree that the First Tribunal remains the tribunal in the consolidated arbitration or (b) failing such agreement within 30 (thirty) days of consolidation being ordered by the First Tribunal, the Court of the International Chamber of Commerce will appoint all members of the tribunal within 30 (thirty) days of a written request by any of the parties to the consolidated arbitration.

(d)    The parties agree that upon consolidation, the parties to the existing or pending arbitration proceedings, the subject of which has been consolidated into the arbitration before the First Tribunal in accordance with this clause 34.7, shall promptly take all necessary steps to discontinue such existing or pending proceedings in favour of the consolidated arbitration.

**Schedule 1**

**Details Of Korek**

| | |
|---|---|
| **Date of Incorporation:** | 16 August 2000 |
| **Registered Number:** | 167 |
| **Registered Office:** | Kurdistan Street nr. 45<br>Pirmam<br>Erbil<br>Kurdistan<br>Republic of Iraq |
| **Issued Share Capital:** | 23,700,000,000 Iraqi Dinar subject to confirmation by the Companies Registrar |
| **Shareholders:** | Mr Sirwan Saber Mustafa - holding shares in Korek representing 75% (seventy five per cent.) of the Existing Shares.<br><br>Mr Jawshin Hassan Jawshin Barazany- holding shares in Korek representing 20% (twenty per cent.) of the Existing Shares.<br><br>Mr Jiqsy Hamo Mustafa – holding shares in Korek representing 5% (five per cent.) of the Existing Shares |
| **Managing Director:** | Mr. Sirwan Saber Mustafa |
| **Auditors:** | Ernst & Young |
| **Accounting Reference Date:** | 31 December |
| **Charges / Encumbrances over Company's business and/or assets:** | Nil |

## Schedule 2

## Conduct of Business between Original Signing and Closing

1    From the date of Original Signing until Closing, CS Ltd and the Current Shareholders shall procure that (except with IT Ltd's written consent, such consent not to be unreasonably withheld or delayed):

    (a)    the affairs of Korek are conducted only consistently with its customs and practices as at 1 January 2010 and in the Ordinary Course of Business and that Korek does not make or agree to make any payment other than payments in the Ordinary Course of Business;

    (b)    the assets of Korek are preserved and protected in the ordinary and usual course of a reasonably prudent operator in the Republic of Iraq and that Korek's goodwill (including the existing relationships with customers and suppliers) is preserved and retained in the ordinary and usual course of a reasonably prudent operator in the Republic of Iraq;

    (c)    IT Ltd's Representatives (which for the avoidance of doubt shall be Representatives for the purposes of clause 21.1) shall be allowed such access as is reasonably requested, upon reasonable notice and during Working Hours, to: (i) the books and records of Korek (including all statutory books, minute books, leases, contracts, supplier lists and customer lists), with the right to take copies (subject to any contractual confidentiality restrictions), and (ii) the premises used by, and management of, Korek;

    (d)    all relevant information which comes to their notice in relation to any fact or matter (whether existing on or before the date of Original Signing or arising afterwards) which constitutes or is reasonably likely to constitute a breach of any CS Warranty (including as repeated under clause 10.2), is promptly disclosed in writing to IT Ltd;

    (e)    Korek does not declare, authorise, make or pay any dividend or other distribution (whether in cash, stock or in kind) or reduce, purchase or redeem any part of its paid-up share capital;

    (f)    Korek does not: (i) create, allot or issue or agree to create, allot, or issue any share or loan capital or other security, or (ii) grant any option over, interest in or right to subscribe for any share or loan capital or other security;

    (g)    other than directly in relation to the Roll-Out Operations only, Korek does not incur, prepay or materially change the terms of any Financial Debt including, without limitation, incurring, prepaying or materially changing the terms of the Roll-Out Agreements and the Delta Agreement;

    (h)    all transactions between (i) Korek and the Current Shareholders; or (ii) Korek and any Affiliate of the Current Shareholders, shall be on arm's length terms and subject to the prior written approval of IT Ltd;

    (i)    no changes are made in terms of employment (including any pension fund commitments) other than those required by law, which could increase in aggregate the total staff costs of Korek by more than 5% (five per cent.) per annum or the remuneration of any one director or employee engaged in the business of Korek by more than US$20,000 per annum;

    (j)    except to replace employees on substantially the same terms, Korek does not employ or agree to employ any new persons fully or part time where the total staff costs of Korek would be increased in aggregate by more than 15% (fifteen per cent.) per annum or dismiss any existing employees (except for incompetence or gross misconduct or other reasonable cause justifiable in law) where the total staff costs of Korek would be reduced in aggregate by more than US$500,000 per annum;

31

(k)   no Key Manager is given notice of termination of employment or is dismissed or changes role;

(l)   Korek does not redeploy a Key Manager; and

(m)   no action is taken by any Current Shareholder or Korek, which is knowingly inconsistent with the provisions of this Agreement or implementation of the Proposed Transaction.

2   Pending Closing, the Current Shareholders shall procure that no Current Shareholder or Korek agrees to or permits (except with IT Ltd's written consent, such consent not to be unreasonably withheld or delayed):

(a)   the reorganisation of Korek, or the discontinuance of any material part of its business;

(b)   any failure to settle in accordance with the payment procedures and timescales normally observed by Korek any significant debts incurred by Korek in the normal course of trading provided that the Current Shareholders shall not in any circumstances have any financial obligation to commit funds to Korek or on behalf of Korek to settle such debts;

(c)   the amendment, variation or modification of (or agreement to amend, vary or modify) any Approval;

(d)   the institution or settlement of any litigation where it could result in a payment to or by Korek of US$100,000 or more except for collection in the ordinary course of trading debts;

(e)   the entry into or material modification of any agreement with any trade union or other body representing its Employees or relating to any works council;

(f)   the creation of any Third Party Right over the Existing Shares or the New Shares or the shares of Korek;

(g)   other than in respect of equipment purchased in accordance with the Roll-Out Agreements, the acquisition or disposal of any material asset or material stocks, in each case, involving consideration, expenditure or liabilities in excess of US$1,000,000 or, in the case of Roll-Out Operations, consideration, expenditure or liabilities in excess of US$1,000,000 in aggregate (in each case exclusive of value added tax or any similar tax, if any);

(h)   Korek to become tax resident or to establish a permanent establishment in a jurisdiction outside of the Republic of Iraq;

(i)   in connection with the Properties, the termination or serving of any notice to terminate, surrender or accept any surrender of or waiving the terms of any lease, tenancy or licence; or

(j)   the entering into by Korek of any agreement with any Tax Authority or the seeking by Korek of any ruling, clearance or confirmation from any Tax Authority.

3   Pending Closing, the Current Shareholders shall procure that no Current Shareholder or Korek agrees to or permits (except with IT Ltd's written consent, such consent not to be unreasonably withheld or delayed):

(a)   other than in respect of any purchase order made pursuant to any of the Roll-Out Agreements, any entry into or termination by Korek (or as a result of Korek's acts or omissions) of any contract or arrangement (or agreement to amend any existing contract or arrangement) (i) having a value or involving or likely to involve expenditure in excess of US$1,000,000 per annum or (ii) which cannot be performed within its terms within 12 (twelve) months after the date on which it is entered into or undertaken or cannot be terminated on less than 12 (twelve) months' notice or (iii) which may result in any material

32

change in the nature or scope of the operations of Korek (or any modification of an existing contract or arrangement which would itself fall, or cause the contract or arrangement concerned to fall, within any of (i) to (iii)) or the making of any bid, tender, proposal or offer likely to lead to any such contract or arrangement;

(b)    the giving of any guarantee, indemnity or other agreement to secure an obligation of a third party which if called would result in a cost to Korek of US$2,000,000 or more;

(c)    entry into or modification of any Third Party Assurance which may, in aggregate, have the effect of increasing the total costs of Korek by more than US$1,000,000 per annum;

(d)    the creation of any Third Party Right over assets of Korek (other than the retention of title arising in the Ordinary Course of Business); and

(e)    in connection with the Properties, entering into or varying any agreement, lease, tenancy, licence or other commitment.

**Schedule 3**

**CS Warranties**

**Part A : General/Commercial**

1   **The Current Shareholders, CS Ltd and the New Shares**

(a)   <u>The Current Shareholders and Korek - authorisations, valid obligations, filings and consents.</u>

(i)   The Current Shareholders and Korek have obtained all corporate authorisations and (except to the extent relevant to the Condition) all other governmental, statutory, regulatory or other consents, licences, authorisations, waivers or exemptions required to empower them to enter into and perform their obligations under this Agreement and any other Transaction Document to which they are a party.

(ii)   The Current Shareholders are not party to any pre-existing written agreement or arrangement which governs their behaviour and/or relationship as shareholders in Korek. The actions and decisions of the Managing Director have been authorised by all of the Current Shareholders.

(iii)   This Agreement and the Transaction Documents which are to be entered into by the Current Shareholders and Korek will, when executed, constitute valid and binding obligations of the Current Shareholders and Korek.

(iv)   Entry into and performance by Korek of this Agreement and/or any Transaction Document to which it is a party will not breach any provision of its memorandum and articles of association, by-laws, or equivalent constitutional documents in any way that would adversely affect to a material extent its ability to enter into or perform its obligations under this Agreement and/or any Transaction Document to which it is a party.

(v)   Entry into and performance by Korek of this Agreement and/or any Transaction Document to which it is a party will not result in a breach of, or constitute a default under, any material agreement or material instrument to which Korek is a party or by which Korek is bound.

(vi)   Subject to fulfilment of the Conditions, neither entry into this Agreement nor implementation of the Proposed Transaction will (i) result in violation or breach of any applicable laws or regulations in any relevant jurisdiction or (ii) amount to a violation or default with respect to any applicable statute, regulation, order, decree or judgment of any relevant court or any relevant governmental or regulatory authority in any relevant jurisdiction, by any of the Current Shareholders or Korek, where, in each case, the breach, conflict or violation would adversely affect to a material extent its ability to enter into or perform its obligations under this Agreement and/or any Transaction Document to which it is a party.

(vii)   Subject to fulfilment of the Conditions and except as referred to in this Agreement, no Current Shareholder nor Korek: (i) is required to make any announcement, consultation, notice, report or filing, or (ii) requires any consent, approval, registration, authorisation or permit, in each case in connection with the execution and performance of this Agreement or any other Transaction Document.

(b) Details of the Shares and Korek.

    (i)    Korek is validly incorporated, in existence and duly registered under the laws of the Republic of Iraq and it has full power to conduct its business as conducted at the date of Original Signing.

    (ii)    The Current Shareholders are the sole legal and beneficial owners of the Existing Shares free from all Third Party Rights and comprise Iraqi shareholders for the purposes of the Licence.

    (iii)    The Existing Shares constitute the whole of the issued and allotted or, to the extent appropriate, registered, share capital of Korek. All the Existing Shares are fully paid or properly credited as fully paid and there is no liability to pay any additional contributions on the Existing Shares. The Existing Shares are denominated in Iraqi Dinars in accordance with the laws of the Republic of Iraq.

    (iv)    No person has the right (exercisable now or in the future and whether contingent or not) to call for the allotment or issue of any share or loan capital in Korek.

    (v)    The information in respect of Korek set out in Schedule 1 is true, accurate and not misleading.

    (vi)    Following completion of the steps set out in clause 5.9, CS Ltd shall be the sole legal and beneficial owner of the Existing Shares free from all Third Party Rights.

(c) CS Ltd - authorisations, valid obligations, filings and consents.

    (i)    CS Ltd is duly incorporated with limited liability, is validly existing under the laws of the Cayman Islands and has full power to conduct its business as conducted at the date of Original Signing.

    (ii)    CS Ltd has obtained all corporate authorisations and (other than to the extent relevant to the Condition) all other governmental, statutory, regulatory or other consents, licences, authorisations, waivers or exemptions required to empower it to enter into and perform its obligations under this Agreement and any other Transaction Document to which it is a party.

    (iii)    This Agreement and the Transaction Documents which are to be entered into by CS Ltd will, when executed, constitute valid and binding obligations of CS Ltd.

    (iv)    Entry into and performance by CS Ltd of this Agreement and/or any Transaction Document to which it is a party will not breach any provision of its memorandum and articles of association, by-laws, or equivalent constitutional documents in any way that would adversely affect to a material extent its ability to enter into or perform its obligations under this Agreement and/or any Transaction Document to which it is a party.

    (v)    Subject to fulfilment of the Condition, neither entry into this Agreement nor implementation of the Proposed Transaction will: (i) result in violation or breach of any applicable laws or regulations in any relevant jurisdiction, or (ii), amount to a violation or default with respect to any applicable statute, regulation, order, decree or judgment of any relevant court or any relevant governmental or relevant regulatory authority in any jurisdiction, by CS Ltd, where, in each case, the breach, conflict or violation would adversely affect to a material extent its ability to enter into or perform its obligations under this Agreement and/or any Transaction Document to which it is a party.

(d) Other interests. Korek does not own or have any interest of any nature in any shares, debentures or other securities issued by any undertaking.

2    **Financial Matters**

(a)    <u>The Last Accounts</u>. Except for the effects of the matters described in the paragraph entitled "Basis of Qualification" included in the Last Accounts, the Last Accounts present fairly, in all material respects, the financial position of Korek as at the Last Accounts Date and its financial performance and its cash flows for the 6 (six) month period ended on the Last Accounts Date in accordance with IFRS and:

(i)    the Accounts for each of the last two and a half financial years ended on the Last Accounts Date were prepared in accordance with the requirements of all relevant laws and IFRS then in force; and

(ii)    the Accounts for each of the last two and a half financial years ended on the Last Accounts Date either make full provision for or disclose in accordance with IFRS all liabilities (whether actual, contingent or disputed and including finance lease commitments and pension liabilities), all outstanding capital commitments and all bad or doubtful debts of Korek then in existence.

(b)    <u>The December Accounts</u>. Subject to the adjustments set out in the Last Accounts, the December Accounts present fairly, in all material respects, the financial position of Korek as at 31 December 2009 and its financial performance and its cash flows for the 12 (twelve) month period ended 31 December 2009, in accordance with IFRS.

(c)    Position since 30 June 2010:

(i)    there has been no Material Adverse Change;

(ii)    Korek has carried on business in the Ordinary Course of Business, and Korek has not made or agreed to make any payment other than routine payments in the Ordinary Course of Business;

(iii)    Korek has not declared, authorised, paid or made, any dividend or other distribution (whether in cash, stock or in kind) (except for any dividends provided for in the Accounts) nor has it reduced paid-up share capital;

(iv)    Korek has not issued or agreed to issue any share capital or similar interest;

(v)    Korek has not issued or agreed to issue any loan capital or other similar interest;

(vi)    other than in connection with the Roll-Out Agreements (but including any purchase order made pursuant to the Roll-Out Agreements which is outstanding), Korek has not entered into any contract, liability or commitment (whether in respect of capital expenditure or otherwise) which:

(A)    cannot be performed within its terms within 12 (twelve) months after the date on which it was entered into or cannot be terminated on less than 12 (twelve) months' notice; or

(B)    involved or may involve any expenditure in excess of US$2,000,000 or an obligation of a similar magnitude;

(vii)    other than in connection with the Roll-Out Agreements (but including any purchase order made pursuant to the Roll-Out Agreements which is outstanding), Korek has not acquired or disposed of, or agreed to acquire or dispose of, any one or more assets in a single transaction or series of connected transactions, where the value of such assets, exceeds US$1,000,000;

(viii)    Korek has not made any changes in terms of employment, including any pension fund commitments, which taken together could increase the total staff costs by

36

more than US$1,000,000 or the remuneration of any Key Employee by more than US$20,000 per annum;

(ix) Korek has not repaid any borrowing or indebtedness in advance of its stated maturity; and

(x) there has been no material increase or decrease in the levels of debtors or creditors or in the average collection or payment periods for the debtors and creditors respectively of Korek.

(d) no debtor of Korek has been released on terms that it pays less than the book value of its debt and no debt in excess of US$100,000 owing to Korek has been deferred, subordinated or written off or has proved to any extent irrecoverable.

(e) No undisclosed liabilities. There are no material actual or contingent liabilities of Korek except for (i) liabilities disclosed or provided for in the Last Accounts (ii) liabilities incurred in the Ordinary Course of Business since the Last Accounts Date which, taken together, do not result in a Material Adverse Change or (iii) liabilities Fairly Disclosed.

(f) Past transactions in accordance with applicable laws. So far as the Current Shareholders are aware, Korek has carried out all transactions in all material respects in accordance with all applicable laws and regulations.

(g) Accounting and other records. The statutory books, books of account and other records of Korek required to be kept by applicable laws in any relevant jurisdiction are up-to-date and have been maintained in accordance with those laws and comprise in all material respects complete and accurate records of all information required to be recorded. All such statutory books, books of account and other records are in the possession or under the control of Korek together with all documents of title and executed copies of all existing agreements which are necessary for the proper conduct of its business and to which Korek is a party.

3    Debt position

(a) Debts owed to Korek. Korek has not lent any money which is due to be repaid and as at the date of this Agreement has not been repaid to it and Korek owns the benefit only of debts incurred in the Ordinary Course of Business which do not exceed US$20,000,000 in aggregate (and none of which exceeds US$1,000,000) and no more than US$3,000,000 of debts owed to Korek is unrelated to cash deposits in respect of Vendor Financing;

(b) Loans to Current Shareholders. There is no loan, borrowing or other indebtedness owed by the Current Shareholders to Korek;

(c) Book debts. There are no book debts recorded in the Last Accounts which will not, so far as the Current Shareholders are aware, be paid or collected in full.

(d) Debts owed by Korek.

(i) Korek does not owe any Financial Debt other than as set out in the Disclosure Letter.

(ii) Other than any amounts owing to CMC, Korek has not received any notice to repay any Financial Debt which is repayable on demand.

(iii) No Financial Debt of Korek has become due and payable, or capable of being declared due and payable, before its normal or originally stated maturity and Korek has not received a demand or other notice requiring any Financial Debt of Korek to be paid or repaid before its normal or originally stated maturity.

(iv) No event of default or any other event or circumstance which would entitle any person to call for early repayment of any Financial Debt of Korek or to enforce any security given by Korek (or, in either case, any event or circumstance which with the giving of notice would constitute such an event or circumstance) has occurred.

(v) Other than:

(A) trade debts assumed in connection with the Roll-Out Agreements; and

(B) accrued expenses assumed and payable to:

1) the CMC in connection with the Licence, being simple interest at a rate of 6% (six per cent.) per annum on an aggregate principal outstanding amount of US$625,000,000;

2) Alcazar in connection with the Promissory Note, being interest compounding daily at a rate of 7% (seven per cent.) per annum plus default interest of 2% (two per cent.) per annum accruing on an initial principal amount of $250,000,000; and

3) the Current Shareholders' Representative in connection with the Current Shareholders' Representative Loan of an aggregate outstanding principal amount of US$285,373,194, together with interest accruing daily at a rate of 8% (eight per cent.) per annum accruing from 12 August 2010

trade debts and accrued expenses incurred by Korek in the Ordinary Course of Business since 30 June 2010 and outstanding at the date of Original Signing do not exceed US$13,000,000 in aggregate.

(vi) Korek is not a party to any vendor financing arrangements with suppliers of goods or services other than in relation to the NSN Agreement, the Ericsson Agreement, the Darin Agreement and the EMEK Agreement, copies of which are attached to the Disclosure Letter.

(vii) Following payment of the amount of US$285,373,194, together with interest accruing daily at a rate of 8% (eight per cent.) per annum accruing from 12 August 2010 to the Current Shareholders' Representative in connection with the repayment and satisfaction of the Current Shareholders' Representative Loan, Korek shall have no further Financial Debt owing to any of the Current Shareholders, CS Ltd or their Affiliates.

4     **Regulatory matters**

(a) Licences.

(i) Korek has validly obtained such licences, permissions, permits, authorisations (public or private) and consents (together, **Approvals**) as are materially required for carrying on its business effectively in the places and in the manner in which it is carried on at the date of Original Signing and in accordance with all applicable laws and regulations. These Approvals are in full force and effect and, except as expressly set out in the Disclosure Letter, are not limited in duration or subject to any materially unusual or onerous conditions and have been complied with in all material respects. There are no circumstances which indicate that any Approval will or is likely to be revoked or not renewed, in whole or in part, in the ordinary course of events (whether as a result of the Proposed Transaction or any of the Transaction Documents or otherwise).

(ii) The Licence is in full force and effect and there has been no breach that will or is likely to lead to termination of such licence or a fine, penalty or other payment

(including interest) being levied. So far as the Current Shareholders are aware, no circumstances exist at the date of Original Signing which constitute or are likely to lead to a breach of the Licence, agreements between Korek and the CMC, requirements imposed by the CMC or applicable laws or regulations (including without limitation to network Roll-Out Commitments) where such breach will or is likely to lead to termination of such licence or a fine, penalty or other payment (including interest) being levied.

(iii) Korek has complied with all obligations in relation to licence fee and regulatory fee payments under the Licence including any revised terms of such payments as agreed with the CMC or as imposed by any Governmental Entity.

(iv) Korek has not received any correspondence from the CMC or other Governmental Entity containing details of any breach of the Licence or any other requirement imposed by the CMC or applicable laws or regulations including, without limitation, failure to meet coverage or quality of service obligations.

(v) Korek is the sole company with the exclusive right to use and operate within the paired spectrum in the frequency ranges (i) 891.8-903.3 MHz paired with 936.8-948.3 MHz; and (ii) 1740.1-1747.6 MHz uplink paired with 1835.1-1842.6 downlink, as assigned by the CMC under the Licence.

(vi) Korek is not a party to any project under which an Investment Licence has been applied for or granted by the National Investment Commission in the Republic of Iraq or the Investment Board in Kurdistan.

(vii) Korek has not received any notice informing it that it has failed to meet any of the Roll-Out Commitments of Korek, as required by the Licence. Korek has complied with all such targets for periods up to and including 30 September 2010. So far as the Current Shareholders are aware, Korek is on course to comply with such targets when they fall due.

(viii) Korek has complied with all notices or requests received from the CMC which Korek is required by applicable laws or regulations (or equivalent order, decree or judgment of any relevant court or any relevant governmental or regulatory authority) to comply with.

(ix) Korek has not been required or requested by the CMC to amend any rates or tariffs nor has is otherwise agreed to or discussed doing so with any party.

(b)   Compliance with laws.

(i) Korek has conducted its business and corporate affairs in accordance with its memorandum and articles of association, by-laws or other equivalent constitutional documents and in accordance with all those applicable laws and regulations (including, without limitation, Company Law) which are, in each case, material and/or significant in the context of Korek's operations.  Korek has remedied any default of any applicable statute, regulation, order, decree or judgment of any relevant court or any relevant governmental or regulatory authority in any relevant jurisdiction during the 2 (two) years prior to Original Signing. In the 2 (two) years prior to Original Signing, Korek has not been in default of any applicable statute, regulation, order, decree or judgment of any relevant court or any relevant governmental or regulatory authority in any relevant jurisdiction.

(ii) Korek is not party to any agreement, transaction, dealing or relationship:

(A) with, for the benefit of, or involving any property of, any Sanctioned Person; or

(B) involving a Sanctioned Territory; or

39

(C)     that would otherwise violate any Economic Sanctions Law.

(iii)   Korek has not, directly or indirectly, in violation of any applicable laws offered, paid, promised or authorised payment of a material value during the past 3 (three) years to any government official, political party or political candidate for the purpose of: (i) influencing any act or decision of such person in their official capacity, (ii) inducing such person to do or omit to do any act in violation of the lawful duty of such person, (iii) securing any improper advantage, or (iv) inducing such person to use their influence with a government to affect or influence any act or decision of such government, in each case in order to assist Korek in obtaining or retaining business.

(iv)   Korek and its employees have caused Korek to conduct its business in compliance with the anti-corruption, anti terrorist financing and anti money laundering laws of the Republic of Iraq.

(v)    Korek has not maintained during the past 3 (three) years any off-book accounts, slush funds or any unrecorded transactions.

(c)   Competition and fair trading laws.

(i)    Korek is not a party to (or concerned in) any agreement or arrangement which infringes the competition legislation or practice of any jurisdiction where Korek conducts business or, so far as the Current Shareholders are aware, any other jurisdiction.

(ii)   Korek has not received any process, notice or other communication (formal or informal) by or on behalf of any Governmental Entity having jurisdiction in competition matters in relation to: (i) any agreement or arrangement to which Korek is, or is alleged to be, a party; or (ii) any action, conduct or practice of Korek; or (iii) any other discharge of that Governmental Entity's regulatory functions, other than any such process, notice or other communication received from any such Governmental Entity in connection with an application, a notification or any other form of submission seeking merger clearance under applicable laws in any relevant jurisdiction.

(iii)  Korek is not subject to any order, judgment, decision or direction given by any Governmental Entity, or is party to any undertaking or assurance given to any such Governmental Entity, in relation to competition matters which is still in force.

(iv)   No Key Manager or any person who advises or instructs Korek: (i) has received any process, notice or other communication (formal or informal) by or on behalf of any Governmental Entity having jurisdiction in competition matters in relation to the enforcement of any personal breach of any competition legislation, or (ii) is subject to any order, judgment, decision or direction given by any Governmental Entity, or is party to any undertaking or assurance given to such Governmental Entity, in relation to competition matters which is still in force; nor, so far as the Current Shareholders, are aware is there any circumstance which may give rise to any personal breach of any competition legislation.

5   **The Business Assets**

(a)   Ownership. Each of the assets included or reflected in the Last Accounts of Korek is the absolute property of Korek and is free from all Third Party Rights except for:

(i)    any hire or lease agreement in the Ordinary Course of Business involving expenditure of less than US$500,000 per annum (where the aggregate expenditure under all such agreements is less than US$5,000,000 per annum);

40

(ii) title retention provisions in respect of goods and materials supplied to Korek in the ordinary course of its business; or

(iii) liens arising in the ordinary course of its business by operation of law.

(b) <u>Possession and third party facilities</u>. All of the assets used in the businesses of Korek are in its possession or under its control and Korek has not received any notice informing it and is not otherwise aware that any Governmental Entity intends to expropriate any such assets. Where Korek uses assets but does not own them or any person provides facilities or services to Korek which are material to Korek's activities, no default event or any other event or circumstance has occurred which may entitle any person to terminate any agreement in respect of that use or provision (or any event or circumstance which with the giving of notice and/or the lapse of time and/or a relevant determination would constitute such an event or circumstance).

(c) <u>Adequacy of assets</u>. The rights, properties and assets of Korek, the facilities and services to which Korek has a contractual right include all rights, properties, assets, facilities and services which are necessary for Korek to carry on its business after Closing in the places and substantially in the manner in which it is carried on as at the date of Original Signing. Korek does not depend on the use of assets owned, or facilities and services provided, by any of the Current Shareholders.

(d) <u>Condition</u>. Substantially all the plant, machinery, equipment and vehicles used by Korek and required for the conduct of Korek's activities are in a good state of repair and can, in all material respects, be efficiently and properly used for the purposes for which they were acquired or are retained.

(e) <u>Cash</u>. Details of the cash balances of Korek as at the Last Accounts Date are set out in the Disclosure Letter.

(f) <u>Insurances</u>. Korek does not and has never had any insurance arrangements or policies in respect of its business or affairs.

## 6    Contractual matters

(a) <u>Material contracts</u>. Korek is not a party to any agreement or arrangement:

(i) under which, by virtue of the Proposed Transaction, (i) any other party will be entitled to be relieved of any material obligation or become entitled to exercise any material right (including any termination right or any pre-emption right or other option), or (ii) Korek will be in material default or lose any material benefit, right or licence which it currently enjoys, or (iii) a material liability or obligation of Korek will be created or increased;

(ii) which was entered into not in the Ordinary Course of Business or not on arm's length terms;

(iii) which requires, or confers any right to require, the allotment or issue of any shares, debentures or other securities of Korek now or at any future time; and

(iv) which establishes any joint venture, consortium, partnership or profit (or loss) sharing agreement or arrangement other than:

(A) the Regulatory Fee (as such term is defined in the Licence) payable in accordance with the Licence;

(B) the arrangements provided for in the Roaming and Interconnection Agreements and the Distribution Agreements in standard form; and

41

(C) the arrangements provided for in roaming and interconnection agreements and distribution agreements which are not attached to the Disclosure Letter but which are on the same terms as the Roaming and Interconnection Agreements and Distribution Agreements attached to the Disclosure Letter.

(b) <u>Roll-Out.</u>

   (i) In respect of the Roll-Out, Korek has not entered into contracts or arrangements (or agreement to amend any existing contracts or arrangements):

      (A) which are outside the Ordinary Course of Business;

      (B) which are other than on arm's length third party terms;

      (C) which constitute or may constitute Korek being in breach of applicable regulatory standards or requirements; and

      (D) in respect of which the financial obligations of Korek for all contracts or arrangements (or agreement to amend any existing contracts or arrangements) are in aggregate in excess of US$10,000,000 or which exist for more than 3 (three) years from the date of Original Signing.

   (ii) A list of all of the material contracts and arrangements relating to the Roll-Out, other than Distribution Agreements and Roll-Out Agreements, is annexed to the Disclosure Letter.

   (iii) Korek has not:

      (A) received any written notice of any breach by Korek of its obligations under any material contract entered into by it in connection with the Roll-Out and all such contracts are in full force and effect;

      (B) become aware of any material breach by any counterparty to a contract entered into by it in relation to the Roll-Out; or

      (C) received a notice of termination from any counterparty in respect of any material contract entered into by Korek in connection with the Roll-Out.

(c) <u>Defaults.</u> Neither Korek nor, so far as the Current Shareholders are aware, a contract counterparty of Korek is in material default under any material agreement or arrangement to which it is a party (including those specified in (d) below) and, so far as the Current Shareholders are aware, there are no circumstances likely to give rise to such a default.

(d) <u>Specific Contracts.</u>

   (i) So far as the Current Shareholders are aware, at Closing, the NSN Agreement, the Ericsson Agreement, the EMEK Agreement, the Newroztel Agreement and the Darin Agreement will be in full force and effect, will not have expired and will not have been terminated.

   (ii) The prices payable to Ericsson in relation to equipment supply under the Ericsson Agreement are set out in the 2003 Ericsson Agreement.

   (iii) The Delta Agreement is not, and at Closing shall not be, a Related Party Transaction.

   (iv) The agreement disclosed at Tab 6 of the Disclosure Bundle is the entire Delta Agreement and contains all current terms, conditions, arrangements and agreements between the parties thereto.

42

    (v)    Korek has not breached the Delta Agreement and, as far as CS Ltd and the Current Shareholders are aware:

        (A)    the Delta Agreement is in full force and effect and:

        (B)    the terms of the Delta Agreement will not be amended as a result of the Proposed Transaction; and

        (C)    the contract counterparties to the Delta Agreement have not breached the Delta Agreement and are not likely to cease to deal with Korek (whether as a result of the Proposed Transaction or otherwise).

    (vi)    Under the financial terms and conditions of the Delta Agreement:

        (A)    Korek has agreed to pay airtime commission at a rate of no more than 4.5% (four point five per cent.); and

        (B)    there is no contractual right for Delta to receive supplier credit.

(e)    <u>Trading relationships</u>. During the 2 (two) years preceding Original Signing, no individual customer of or individual supplier to Korek accounting either for more than 5% (five per cent.) of the aggregate value of all purchases or for more than 5% (five per cent.) of the aggregate value of all sales of Korek has ceased to deal with Korek or has indicated in writing an intention to do so, either in whole or in part. So far as the Current Shareholders are aware, no such person is likely to cease to deal with Korek or to deal with it on a smaller scale (whether as a result of the Proposed Transaction or otherwise).

(f)    <u>Principal suppliers and customers</u>. Save in connection with the Roll-Out Agreements, no supplier or customer (including any person connected in any way with any supplier or customer) accounts either for more than 10% (ten per cent.) of the aggregate value of all purchases or for more than 10% (ten per cent.) of the aggregate value of all sales of Korek.

(g)    <u>Related party transactions.</u>

    (i)    Korek is not party to any agreement or arrangement entered into with any Current Shareholder or any Affiliate of a Current Shareholder other than the agreements the key terms of which are set out in the Disclosure Letter; and

    (ii)    the Related Party Transactions are on arms' length and non-exclusive terms.

(h)    <u>Grants</u>. Korek has never received, nor is proposing to receive, any grant for use wholly or partly in its business.

(i)    <u>Full force and effect</u>. Korek and, so far as the Current Shareholders are aware, each counterparty has validly executed all material contracts including, without limitation, all material roaming and interconnection agreements to which Korek is a party, and, so far as the Current Shareholders are aware, each such agreement is in full force and effect.

7    **Litigation and investigations**

(a)    <u>Litigation</u>. Other than:

    (i)    as claimant in the collection of debts arising in the ordinary course of business (none of which exceeds US$100,000 and which do not exceed US$2,000,000 in aggregate per annum); or

(ii) in respect of small claims (where the amounts in dispute do not exceed US$250,000 individually and US$5,000,000 in aggregate and which are not otherwise material for Korek),

Korek is not a claimant or defendant in or otherwise a party to any litigation, arbitration or administrative proceedings (including any proceedings before any tribunal) and no such proceedings have been threatened or are pending by or against or concerning it or any of its assets. So far as the Current Shareholders are aware, there are no circumstances currently existing which are likely to give rise to any such proceedings.

(b) Investigations. No governmental, administrative, regulatory or other official investigation or inquiry concerning Korek is in progress or pending and, so far as the Current Shareholders are aware, there are no circumstances likely to lead to any such investigation or inquiry.

8   **Insolvency etc.**

(a) Winding up. No order has been made, petition presented or meeting convened for the winding up of Korek, or for the appointment of any provisional liquidator or in relation to any other process whereby the business is terminated and the assets of Korek concerned are distributed amongst the creditors and/or shareholders or other contributors, and there are no cases or proceedings under any applicable insolvency, reorganisation or similar laws in any relevant jurisdiction, and no events have occurred which, under applicable laws, would be reasonably likely to justify any such cases or proceedings.

(b) Administration and receivership. No person has taken any step, legal proceeding or other procedure with a view to the appointment of an administrator, whether out of court or otherwise, in relation to Korek, and no receiver (including any administrative receiver) has been appointed in respect of the whole or any part of any of the property, assets and/or undertaking of Korek nor has any such order been made (including, in any relevant jurisdiction, any other order by which, during the period it is in force, the affairs, business and assets of Korek concerned are managed by a person appointed for the purpose by a court, governmental agency or similar body).

(c) Voluntary arrangement etc. Neither the Current Shareholders nor Korek have taken any step with a view to a suspension of payments or a moratorium of any indebtedness or has made any voluntary arrangement with any of Korek's creditors.

9   **Conduct of Business.** Since 1 January 2010, Korek has (i) carried on its business in the Ordinary Course of Business, and (ii) not made or agreed to make any payment other than routine payments in the Ordinary Course of Business.

10  **Non Compete.** The Current Shareholders and CS Ltd are not undertaking, or interested in any business which carries out, any Core Restricted Activities (as defined in the Shareholders' Agreement).

11  **Sanatel.**

(a) Dormant. So far as the Current Shareholders are aware Sanatel has not traded since 30 April 2009 and has a licence to operate mobile telecommunication services issued by the Ministry of Communications in the Kurdistan Regional Area.

(b) Payables. There are no amounts owed or outstanding by either Mr Sirwan Saber Mustafa or Korek to Sanatel or any of its subsidiaries or Sanatel to Mr Sirwan Saber Mustafa or Korek and Korek has no other obligations or liabilities to Sanatel and there are no existing circumstances under which an obligation or liability to Sanatel could arise.

(c) Arrangements between Korek and Sanatel. No arrangements or agreements have been entered into between Korek and Sanatel. Sanatel does not render any services to Korek.

12   **Iraqcell**

   (a)   <u>Dormant</u>.  Iraqcell has not traded since 1 July 2009 and has no material assets.

   (b)   <u>Consideration payable</u>.  There are no amounts owed or outstanding by Mr Sirwan Saber Mustafa or Korek to Iraqcell or any of its Affiliates and Korek has no other obligations or liabilities to Iraqcell or any of its Affiliates and there are no existing circumstances under which an obligation or liability to Iraqcell or any of its Affiliates could arise.

   (c)   <u>Arrangements between Korek and Iraqcell</u>.  No arrangements or agreements have been entered into between Korek and Iraqcell or any of its Affiliates (which for this purpose shall not include Mr. Sirwan Saber Mustafa), and neither Iraqcell nor any of its Affiliates renders any services to Korek.

## Part B: IP/IT

1   Business IP.

    (a)   Korek owns all of the rights and interests in and has title to, or has validly licenced to it, all of the Business IP. The Business IP comprises all the Intellectual Property Rights required to carry on Korek's businesses as they are currently carried on.

    (b)   The Owned IP is not subject to amendment, challenge, removal or surrender.

    (c)   No licences or anything similar have been granted for the Owned IP.

    (d)   Korek is the legal and beneficial owner of the rights and interests in and has title to the "Korek" trademarks and brands.

2   Licences. The licences of Intellectual Property Rights granted by, and, so far as the Current Shareholders are aware, to Korek are binding and in force. None of the parties to the licences of Intellectual Property Rights is in default and, so far as the Current Shareholders are aware, there are no grounds existing on which they might be terminated. Neither the Current Shareholders nor Korek has received written notice of any disputes which may have arisen in connection with them.

3   No infringement by Korek. Korek has neither received written notice nor is it otherwise aware that it infringes or has in the last 2 (two) years infringed, the Intellectual Property Rights of a third party. No third party has disputed the right of Korek to use the Business IP.

4   No infringement by third parties and enforcement.

    (a)   Neither Korek nor the Current Shareholders has in the last 3 (three) years received written notification alleging that the operations of Korek infringe the Intellectual Property Rights of a third party. Korek has not disputed the right of a third party to use the Intellectual Property Rights owned or used by the third party and, so far as the Current Shareholders are aware, there are no circumstances existing that are likely to give rise to a dispute.

    (b)   Korek has not acquiesced in the unauthorised use by a third party of the Business IP.

5   Confidential information. Other than confidential information of Korek disclosed to IT Ltd in connection with the Proposed Transaction, confidential information of, or that has been used by, Korek has been kept confidential and has not been disclosed to third parties except in the Ordinary Course of Business and subject to written confidentiality obligations from the third party. These confidentiality obligations have not been breached.

6   Encumbrances. Neither the Business IP which is Owned IP nor, so far as the Current Shareholders are aware is the Business IP which is not Owned IP, is subject to any security interest, option, mortgage, charge or lien.

7   Restrictions on use. There are no agreements or arrangements that restrict the use by Korek of the Business IP.

8   Loss of Business IP. Neither the Owned IP nor, so far as the Current Shareholders are aware, the Business IP which is not Owned IP will be lost, or rendered liable to termination by virtue of the performance of this Agreement.

9   Disclosure, assignment and inventions.

    (a)   There are no outstanding or threatened claims from current or former directors, managers, Key Managers or Employees for compensation or remuneration for Intellectual Property Rights that Korek uses, for inventions invented or copyright works created or anything similar.

46

(b)    Korek has the right to use all Intellectual Property Rights created, developed or invented by any director, manager, Key Manager, Employee and, so far as the Current Shareholders are aware, independent contractor of Korek.

10    <u>Information technology.</u>

(a)    The IT Systems are owned by, or licensed, leased or supplied under third party contracts to Korek (**Third Party Contracts**). In the last 2 (two) years Korek has not received written notice that it is in default under the Third Party Contracts. There are no disputes or material service delivery issues existing.

(b)    So far as the Current Shareholders are aware, there are no circumstances in which the ownership, benefit, or right to use such IT Systems that are material to the operations of Korek may be lost, or rendered liable to termination, by virtue of the Proposed Transaction or the performance of this Agreement.

(c)    The IT Systems have not failed to such an extent as to materially prejudice the business of Korek in the 2 (two) years prior to Original Signing.

(d)    Korek has taken all such precautions as are required to preserve the availability, security and integrity of the IT Systems and the data and information stored on the IT Systems.

(e)    The IT Systems are adequate for the needs of Korek's businesses as carried out at the date of Original Signing and as documented in the Business Plan for the 12 (twelve) months following Original Signing.

11    <u>Data protection</u>. Neither the Current Shareholders nor Korek has, in the 2 (two) years prior to Original Signing, received a written notice alleging that Korek has not complied with applicable data protection laws in the Republic of Iraq.

**Part C : Real Estate**

1    Korek does not own any land or buildings and has no liabilities in respect of any land or buildings previously owned by it.

2    The **Properties** comprise all land and buildings used or occupied by Korek or in relation to which Korek has any right, interest or liability and the Properties comprise all the rights or interests in land required for carrying out by Korek of its business in the manner in which such business has been carried out in the 12 (twelve) months prior to Original Signing.

3    Copies of all material documents relating to the title to and use of the Properties are attached to the Disclosure Letter.

4    There are no material outstanding disputes, actions, claims, demands or complaints in respect of any Property.

5    In relation to each Property, the rent and all other sums payable under the lease have been paid to date and Korek has not received notice of any breach of any of its obligations under all material covenants, conditions, agreements, statutory requirements, planning consents, building regulations, orders and regulations affecting any of the Properties and its use of them.

6    Korek has entered into all leases of the Properties on arm's length terms and all such leases continue to be valid to operate the business of Korek.

7    The leases of the Properties are: (a) on standard terms and do not contain onerous provisions; and (b) currently in force or, in the case of leases relating to base transmission sites only, which have expired, are renewable on similar terms.

8    Korek's lease over the Property located at Kurdistan Street nr. 45, Pirmam, Erbil, Kurdistan, Republic of Iraq has been renewed for a 12 month period commencing on 1 January 2011 on

the same terms as the lease entered into in respect of such Property for the 12 month period commencing 1 January 2010.

### Part D : Environmental Matters

1    In the 12 (twelve) months prior to Original Signing Korek has not received written notice of any material breach of any Environmental Laws in respect of the Properties.

2    Korek is in compliance with all Environmental Laws.

### Part E : Employment

1    Full and accurate details of:

(a)    the terms of all current contracts of employment of any employee whose remuneration (excluding benefits in kind) exceeds US$150,000 per annum (**Key Employees**); and

(b)    all terms of employment or benefits provided of general application or of an application to a particular grade or category of Employee,

are attached to the Disclosure Letter.

2    Korek does not and has never operated any share incentive schemes, share option schemes or profit sharing, bonus or other incentive schemes.

3    Korek has in relation to each of the Employees complied in all material respects with all obligations owed to and in respect of the Employees under the laws of the Republic of Iraq and the terms and conditions of employment including, without limitation, registration of all qualifying employees at the Labour and Social Security Department and the payment of all necessary social security contributions at the Ministry of Labour and Social Affairs and has complied in all material respects with all its obligations concerning the health and safety at work of each of the Employees and has not incurred any liability to any Employee in respect of any accident or injury.

4    No payment has been made or promised to be made or benefit given or promised to be given by Korek in connection with the actual or proposed termination or suspension of employment or variation of any contract of employment of any former employee or Employee.

5    Korek has not made or agreed to make any payment to, or provided or agreed to provide any benefit for, any Employee or any spouse or dependant of any Employee on or following termination of their employment.

6    Korek does not recognise to any extent any trade union or other body representing the Employees or any of them for the purpose of collective bargaining or other negotiating purposes.

### Part F : Retirement Benefits

1    Korek is not and has never been a party to any pension scheme or any scheme, agreement, arrangement or understanding (whether contractual or otherwise) for the provision or funding of any pension or retirement benefits for any past or present employee, or for any dependant of any such person, under or in connection with which Korek has or may have any liability (actual or contingent, present or future).

## Schedule 4

## Limitations on Liability

1    <u>Time Limits.</u> The Current Shareholders, CS Ltd and Korek shall not be liable (save as set out in the proviso at the end of this paragraph 1) for any Non Tax Claim, any Tax Claim or any claim under the Indemnities set out in clauses 9.1(a), 9.1(b), 9.1(e) or 9.1 (f) (**Relevant Indemnities**) unless CS Ltd or the Current Shareholders' Representative receives from IT Ltd written notice of such Non Tax Claim, Tax Claim or claim under the Relevant Indemnities containing a summary of the details as are then known to IT Ltd of the matter giving rise to the Non Tax Claim, the Tax Claim or the claim under the Relevant Indemnities, including IT Ltd's estimate of the amount of the Non Tax Claim, Tax Claim or claim under the Indemnities (**Notice**):

    (a)    prior to the second anniversary of the Closing Date in the case of a Non Tax Claim;

    (b)    for a claim under the Relevant Indemnities prior to the date which is 3 (three) years from Closing; or

    (c)    in relation to a Tax Claim, and subject to paragraph 2 of Part C of Schedule 7, prior to the date which is 6 (six) months after the last date on which the Tax Authorities in the Republic of Iraq (which, for the avoidance of doubt, shall include the Kurdistan Regional Government and all local, regional and national Tax Authorities in the Republic of Iraq, including local and regional Tax Authorities in Kurdistan) are, in the absence of any allegation of fraud or criminal liability, entitled to initiate or open any investigation, enquiry or audit of the Tax affairs of Korek or otherwise raise any assessment to Tax in respect of Korek, in each case in relation to the Accounting Period of Korek during which Closing takes place,

provided that failure to serve the Notice in the form referred to above (that is a failure to provide the relevant summary and estimate, not a failure to comply with the relevant time limits referred to above) shall not of itself prevent IT Ltd from bringing the relevant Non Tax Claim, Tax Claim or any claim under the Relevant Indemnities.

2    <u>Thresholds for Non Tax Claims.</u> Except as set out in paragraph 4 of this Schedule 4, the Current Shareholders and Korek shall not be liable for any single Non Tax Claim:

    (a)    unless the amount of the liability pursuant to that single Non Tax Claim (and, for these purposes, a number of claims arising out of the same or similar subject matter, facts, events or circumstances may be aggregated and form a single Non Tax Claim) exceeds US$100,000, in which case IT Ltd shall be able to claim the full amount of such claim (**De Minimis Threshold**); and

    (b)    unless the aggregate amount of the liability of the Current Shareholders for all Non Tax Claims not prohibited by the De Minimis Threshold exceeds US$5,250,000 (in which case IT Ltd shall be able to claim the full amount of such claim (**Basket**)).

For the avoidance of doubt, IT Ltd may give notice of any single claim in accordance with and for the purpose of paragraph 1 above, irrespective of whether, at the time the notice is given, the Basket or the De Minimis Threshold has been exceeded.

3    <u>Maximum limits for all Non Tax Claims, Tax Claims and claims under the Indemnities.</u> Subject to the provisos set out at the end of this paragraph 3:

    (a)    the aggregate amount of the liability of CS Ltd, the Current Shareholders and Korek after Tax for any Non Tax Claim (excluding Claims in respect of the CS Warranties set out in paragraphs 1, 3(b), 3(d)(vii) and 8 of Part A of Schedule 3) in respect of the CS Warranties shall not exceed US$195,000,000; and

    (b)    the aggregate amount of the liability of CS Ltd, the Current Shareholders and Korek after Tax in respect of any claim under the Relevant Indemnities, any Tax Claim and any Claims in respect of the CS Warranties set out in paragraphs 1, 3(b), 3(d)(vii) and 8 of Part A of Schedule 3 shall not exceed US$525,000,000,

provided that the liability caps described above shall not apply to any additional amounts payable under clauses 11.4, 11.5 or paragraph 1.3 of Part B of Schedule 7 and provided further that the aggregate amount of the liability of CS Ltd, the Current Shareholders and Korek in respect of all Non Tax Claims, Tax Claims and claims under the Relevant Indemnities shall not exceed US$525,000,000.

4    <u>Exceptions to limitations on liability.</u>

    (a)    The limitations on liability set out in paragraphs 1, 2 and 3 of this Schedule shall not apply in respect of the Indemnities set out in clauses 9.1(c) and 9.1(d); and

    (b)    The limitations on liability set out in paragraphs 1 and 2 of this Schedule shall not apply in respect of any claim in respect of a CS Warranty set out in paragraphs 1, 3(b), 3(d)(vii) and 8 of Part A of Schedule 3.

5    <u>Claim to be withdrawn unless arbitration commenced.</u> Any Non Tax Claim shall (if it has not been previously satisfied, settled or withdrawn) be deemed to have been withdrawn unless arbitral proceedings in respect of it have been commenced within 6 (six) months of notification to CS Ltd, the Current Shareholders' Representative pursuant to paragraph 1 except :

    (a)    where the Non Tax Claim relates to a contingent liability, in which case it shall be deemed to have been withdrawn unless arbitral proceedings in respect of it have been commenced within 6 (six) months of it having become an actual liability; or

    (b)    where the Non Tax Claim is a claim of which notice is given for the purpose of paragraph 1 above at a time when the amount set out in paragraph 2(b) has not been exceeded, in which case it shall be deemed to have been withdrawn unless arbitral proceedings in respect of it have been commenced within 6 (six) months of the date of any subsequent notification to the Current Shareholders' Representative pursuant to paragraph 1 above of one or more claims which result(s) in the total amount claimed in all claims notified to the Current Shareholders' Representative pursuant to paragraph 1 exceeding the amount set out in paragraph 2(b) for the first time.

6    <u>Limitations not applicable if fraud etc.</u> None of the limitations contained in this Schedule shall apply to any Claim or any claim under the Tax Covenant or the Indemnities to the extent that the Claim or the claim under the Tax Covenant or the Indemnities (or the delay in discovery of it) is the consequence of, or is increased as a consequence of, dishonest or deliberate mis-statement or concealment or other fraud by any of CS Ltd, the Current Shareholders or Korek.

7    <u>Matters disclosed or taken into account.</u> The Current Shareholders, CS Ltd and Korek shall not be liable for any Claim:

    (a)    if and to the extent that the fact, matter, event or circumstance giving rise to such claim was Fairly Disclosed by this Agreement, any other Transaction Document, or the Disclosure Letter;

    (b)    if it is a Non Tax Claim and if and to the extent the matter is specifically provided or reserved for (and not released prior to Closing) in the Last Accounts.

8    <u>Contingent liabilities.</u> If any Non Tax Claim is based upon a liability which is contingent only, the Current Shareholders and Korek shall not be liable to make payment unless and until the contingent liability gives rise to an obligation to make a payment. This is without prejudice to the right of IT Ltd to give notice of the Claim in accordance with paragraph 1 of this Schedule 4 and to commence arbitral proceedings in respect of it before such time. For the avoidance of doubt, the fact that the liability may not have become an actual liability by the relevant date provided in

paragraph 1 shall not exonerate the Current Shareholders or Korek in respect of any Claim properly notified before that date.

9     No double recovery. IT Ltd shall not be entitled to recover damages or obtain payment, reimbursement, restitution or indemnity more than once in respect of any one liability, loss, cost, shortfall, damage or deficiency, regardless of whether more than one Non Tax Claim, Tax Claim or claim under the Indemnities arises in respect of it. For the avoidance of doubt, IT Ltd shall not be entitled (x) to recover any payment under clause 17.7 of the Shareholders' Agreement to the extent that such payment relates to the same loss or damage as has been previously recovered by IT Ltd for breach of a CS Warranty or (y) to recover under this Agreement any loss or damage arising under paragraph 10 of Part A of Schedule 3 to the extent the same loss or damage has been previously recovered under clause 17.7 of the Shareholders' Agreement

10    The parties' duty to mitigate. Nothing in this Agreement or any other Transaction Document shall be deemed to relieve any party from any common law duty to mitigate any loss or damage which it may suffer in consequence of any breach by CS Ltd, the Current Shareholders or Korek of a CS Warranty provided always that the Parties recognise that for so long as IT Ltd does not control Korek it cannot cause Korek to take any action which may mitigate any loss.

11    Recovery from third party after payment from the Current Shareholders or Korek.

Where:

(a)    the Current Shareholders or Korek have made a payment to IT Ltd in relation to any Claim (other than a Claim under the Tax Warranties) (the amount of such payment, to the extent it does not comprise interest on a late payment, being the **Damages Payment**);

(b)    after the making of such payment, IT Ltd receives from a third party any sum which would not have been received but for the matter or circumstance giving rise to the relevant Claim (**Third Party Sum**);

(c)    the receipt of the Third Party Sum was not taken into account in calculating the Damages Payment; and

(d)    the aggregate of the Third Party Sum (less any Tax payable on it or that would have been payable but for the use or set-off of a relief) and the Damages Payment (less any Tax payable on it or that would have been payable but for the use or set-off of a relief) exceeds the amount required to compensate IT Ltd in full for the matter or circumstance which gave rise to the relevant Claim (such excess being the **Excess Recovery**),

IT Ltd shall, promptly following receipt of the Third Party Sum by it, repay to the Current Shareholders or Korek, as relevant, an amount equal to the Excess Recovery.

12    No liability for Claims or claims under the Indemnities arising from acts or omissions of IT Ltd. The Current Shareholders or Korek, as relevant, shall not be liable for any Claim (other than a Claim under the Tax Warranties) or any claim under the Indemnities to the extent that it would not have arisen but for, or has been increased or not reduced as a result of, any voluntary act, omission or transaction carried out:

(a)    after Closing by the Current Shareholders, CS Ltd or Korek with the express written approval (including but not limited to express approval by email) of IT Ltd; or

(b)    before Closing by the Current Shareholders, CS Ltd or Korek at the express written direction, approval or request (including but not limited to express direction, approval or request by email) of IT Ltd,

in each case, in circumstances where prior to the act, omission or transaction, IT Ltd is either actually aware or should reasonably be aware that the occurrence of such act, omission or transaction will or is likely to give rise to a Claim or any claim under the Indemnities.

51

13    <u>Current Shareholders or Korek to have opportunity to remedy breaches</u>. If a breach of the CS Warranties is capable of remedy, IT Ltd shall be entitled to compensation if it gives the Current Shareholders or Korek, as relevant, written notice of the breach in accordance with paragraph 1 (save as set out in the proviso at the end of paragraph 1 of this Schedule 4) and the breach is not fully remedied within 60 (sixty) days after the date on which such notice is served on the Current Shareholders or Korek. Such period shall be extended to 90 (ninety) days in respect of any breach of the CS Warranties which require the Current Shareholders to enter into discussions with any Governmental Entity. The time limits set out in paragraph 1 shall be extended to take account of such periods. Without prejudice to its duty to mitigate any loss, IT Ltd shall (or shall procure that its Affiliates (or their respective directors, officers, employees, agents or successors in title)) shall provide all reasonable assistance to the Current Shareholders or Korek, as relevant, to remedy any such breach.

14    <u>No liability for legislation or changes in rates of tax</u>. Neither the Current Shareholders nor Korek, as relevant, shall be liable for any Claim (other than a Claim under the Tax Warranties) if and to the extent it is attributable to, or the amount of such Claim is increased as a result of, any (i) legislation not in force on or prior to Closing (ii) change of law or regulation after Closing or (iii) change in the rates of Tax in force at the date of Original Signing.

15    <u>Tax</u>.    Only the provisions of paragraphs 1 (Time Limits), 3 (Maximum limits for all Non Tax Claims, Tax Claims and claims under the Indemnities) 6 (Limitations not applicable if fraud etc) and 9 (No double recovery) of this Schedule shall apply to any claim under the Tax Covenant. The provisions of paragraphs 1, 3, 6, 7(a), 9, 10 and 13 shall apply to any Claim under the Tax Warranties, to the extent stated therein.

16    <u>Boxing of Tax Warranties</u>. Where a Claim under the CS Warranties is a Claim related to Tax which could be made under Schedule 7, such Claim shall be made under Schedule 7 and not under any other CS Warranty.

## Schedule 5

## IT Ltd Warranties

1  IT Ltd is validly incorporated, in existence and duly registered under the laws of its jurisdiction and has full power to conduct its business as conducted at the date of Original Signing.

2  IT Ltd has obtained all corporate authorisations and (other than to the extent relevant to the Condition) all other governmental, statutory, regulatory or other consents, licences, authorisations, waivers or exemptions required to empower it to enter into and perform its obligations under this Agreement and any other Transaction Document to which it is a party.

3  This Agreement and the Transaction Documents which are to be entered into by IT Ltd will, when executed, constitute valid and binding obligations of IT Ltd.

4  Entry into and performance by IT Ltd of this Agreement and/or any Transaction Document to which it is a party will not breach any provision of its memorandum and articles of association, by-laws, or equivalent constitutional documents in any way that would adversely affect to a material extent its ability to enter into or perform its obligations under this Agreement and/or any Transaction Document to which it is a party.

5  Entry into and performance by IT Ltd of this Agreement and/or any Transaction Document to which it is a party will not breach any provision of its memorandum and articles of association, by-laws, or equivalent constitutional documents in any way that would adversely affect to a material extent its ability to enter into or perform its obligations under this Agreement and/or any Transaction Document to which it is a party.

6  Subject to fulfilment of the Conditions, neither entry into this Agreement nor implementation of the Proposed Transaction will: (i) result in violation or breach of any applicable laws or regulations in any relevant jurisdiction, or (ii) amount to a violation or default with respect to any applicable statute, regulation, order, decree or judgment of any relevant court or any relevant governmental or relevant regulatory authority in any jurisdiction, by IT Ltd, where, in each case, the breach, conflict or violation would adversely affect to a material extent its ability to enter into or perform its obligations under this Agreement and/or any Transaction Document to which it is a party.

7  IT Ltd has, and will at Closing have, available funds to pay: (i) the aggregate of, the New IT Ltd Share Consideration and the IT Ltd Shareholder Loan, and (ii) all fees and expenses related to the Proposed Transaction provided for in this Agreement and any other Transaction Documents for which it is actually liable. Notwithstanding anything to the contrary in this Agreement or any other Transaction Documents, IT Ltd acknowledges and agrees that its obligations to effect the Proposed Transaction contemplated by this Agreement and the other Transaction Documents is not subject to the availability to IT Ltd or any of its Affiliates of any new third party or equity or other financing in any amount whatsoever.

8  IT Ltd will, with effect from Closing, be approximately 46% (forty six per cent.) owned by ASN and its Affiliates and approximately 54% (fifty four per cent.) owned by Alcazar and its Affiliates.

### Schedule 6

### Alcazar and ASN Warranties

#### Part A : Alcazar Warranties

1    Alcazar is validly incorporated, in existence and duly registered under the laws of its jurisdiction and has full power to conduct its business as conducted at the date of Original Signing.

2    Alcazar has obtained all corporate authorisations and (other than to the extent relevant to the Condition) all other governmental, statutory, regulatory or other consents, licences, authorisations, waivers or exemptions required to empower it to enter into and perform its obligations under this Agreement and any other Transaction Document to which it is a party.

3    This Agreement and the Transaction Documents which are to be entered into by Alcazar will, when executed, constitute valid and binding obligations of Alcazar.

4    Entry into and performance by Alcazar of this Agreement and/or any Transaction Document to which it is a party will not breach any provision of its memorandum and articles of association, by-laws, or equivalent constitutional documents in any way that would adversely affect to a material extent its ability to enter into or perform its obligations under this Agreement and/or any Transaction Document to which it is a party.

5    Subject to fulfilment of the Conditions, entry into this Agreement and the Promissory Note Transfer Agreements and the implementation of the Proposed Transaction will not: (i) result in violation or breach of any applicable laws or regulations in any relevant jurisdiction, or (ii) amount to a violation or default with respect to any applicable statute, regulation, order, decree or judgment of any relevant court or any relevant governmental or relevant regulatory authority in any jurisdiction, by Alcazar, where, in each case, the breach, conflict or violation would adversely affect to a material extent its ability to enter into or perform its obligations under this Agreement and/or any Transaction Document to which it is a party.

6    Alcazar is the sole legal and beneficial owner of the Promissory Note free from all Third Party Rights.

#### Part B : ASN Warranties

1    ASN is validly incorporated, in existence and duly registered under the laws of its jurisdiction and has full power to conduct its business as conducted at the date of Original Signing.

2    ASN has obtained all corporate authorisations and (other than to the extent relevant to the Condition) all other governmental, statutory, regulatory or other consents, licences, authorisations, waivers or exemptions required to empower it to enter into and perform its obligations under this Agreement and any other Transaction Document to which it is a party.

3    This Agreement and the Transaction Documents which are to be entered into by ASN will, when executed, constitute valid and binding obligations of ASN.

4    Entry into and performance by ASN of this Agreement and/or any Transaction Document to which it is a party will not breach any provision of its memorandum and articles of association, by-laws, or equivalent constitutional documents in any way that would adversely affect to a material extent its ability to enter into or perform its obligations under this Agreement and/or any Transaction Document to which it is a party.

5    Subject to fulfilment of the Conditions, neither entry into this Agreement nor implementation of the Proposed Transaction will: (i) result in violation or breach of any applicable laws or regulations in any relevant jurisdiction, or (ii) amount to a violation or default with respect to any applicable statute, regulation, order, decree or judgment of any relevant court or any relevant governmental or relevant regulatory authority in any jurisdiction, by ASN, where, in each case,

the breach, conflict or violation would adversely affect to a material extent its ability to enter into or perform its obligations under this Agreement and/or any Transaction Document to which it is a party.

**Schedule 7**

**Tax**

**Part A : Tax Warranties**

## 1    General/Compliance

1.1    <u>Last Accounts</u>. All liabilities, whether actual, deferred, contingent or disputed, of Korek for Tax measured by reference to income, profits or gains earned, accrued or received on or before the Last Accounts Date or arising in respect of an Event occurring or deemed to occur on or before the Last Accounts Date have been properly provided for or (as appropriate) disclosed in the Last Accounts in accordance with accounting standards applicable to Korek.    All other warranties relating to specific Tax matters set out in this Schedule 7 are made without prejudice to the generality of this paragraph 1.

    (a)    <u>Position since Last Accounts Date</u>. Since the Last Accounts Date, Korek has not been involved in any transaction which has given rise or may give rise to a liability to Tax on Korek (or would have given or might give rise to such a liability but for the availability of any Relief) other than Tax in respect of normal trading income or receipts of Korek arising from transactions entered into by it in the Ordinary Course of Business.

    (b)    <u>Payment of taxes</u>. All Tax due and payable by Korek prior to the date hereof has been paid in full.

    (c)    <u>Continuing commitments</u>. All sums payable under any obligation incurred by Korek prior to Closing and which will continue to bind Korek after Closing have been and will continue to be deductible for the purposes of corporate income tax.

    (d)    <u>Returns etc</u>. Korek has duly, and within any appropriate time limits, made all returns, given all notices and supplied all other information required to be supplied to any relevant Tax Authority and has maintained all records required to be maintained for Tax purposes; all such information was and remains complete and accurate in all material respects and all such returns and notices were and, so far as the Current Shareholders or Korek are aware, remain complete and accurate in all material respects and were made on a proper basis and do not, and are not likely to, reveal any transactions which may be the subject of any dispute with, or any enquiry raised by, any Tax Authority.

    (e)    <u>Disputes, investigations</u>. Korek has not been involved in any dispute with any Tax Authority and is not and has not been the subject of any investigation, enquiry, audit or non-routine visit by any Tax Authority.   There is no planned investigation, enquiry, audit or non-routine visit by any Tax Authority and there are no facts which might cause such an investigation, enquiry, audit or non-routine visit to be instituted.

    (f)    <u>Penalties, interest, security</u>. Korek has not paid or become liable to pay, and there are no circumstances by reason of which it may become liable to pay, to any Tax Authority, any penalty, fine, surcharge or interest in respect of Tax (including in respect of any failure to make any return, give any notice or supply any information to any relevant Tax Authority, or any failure to keep or preserve any records or to pay Tax on the due date for payment).  Korek has not been required to provide any security in respect of any amount of Tax and no asset of Korek is subject to any charge or power of sale in favour of any Tax Authority.

    (g)    <u>Rulings etc</u>. No transaction in respect of which any consent, ruling, confirmation or clearance (each a **ruling**) was required or sought from any Tax Authority has been entered into or carried out by Korek without such ruling having first been properly obtained.  All information supplied to any Tax Authority in connection with any such ruling fully and accurately disclosed all facts and circumstances material to the giving of such ruling.  Any transaction for which such ruling was obtained has been carried out only in

accordance with the terms of such ruling and the application on which the ruling was based and at a time when such ruling was valid and effective. No facts or circumstances have arisen since any such ruling was obtained which would cause the ruling to become invalid or ineffective.

(h)   Special arrangements. No Tax Authority has operated or agreed to operate any special arrangement (being an arrangement which is not based on relevant legislation or any published practice) in relation to Korek's affairs.

(i)   Withdrawal etc. of reliefs after Closing. No relief has been claimed by and/or given to Korek, or taken into account in determining or eliminating any provision for Tax or deferred Tax in the Last Accounts, which could or might be effectively withdrawn, postponed, restricted or otherwise lost as a result of the Transfer or any other Event or circumstance occurring or arising at any time after the Last Accounts Date.

(j)   Deemed disposals etc. of assets and liabilities. The implementation of the transactions contemplated by this Agreement will not give rise to any deemed disposal or realisation by Korek of any asset or liability for any Tax purpose.

(k)   Withholdings. Korek has made all deductions and retentions of or on account of Tax as it was obliged or entitled to make and all such payments of or on account of Tax as should have been made to any Tax Authority in respect of such deductions or retentions.

## 2   Employees

All amounts due and payable by Korek to any Tax Authority in respect of any Employee (including any Tax deductible from any amounts paid to an employee, and any social security, social fund or similar contributions required to be made in respect of employees) have been duly paid and Korek has made all such deductions and retentions as should have been made under applicable laws and regulations.

## 3   Capital Assets

If Korek disposed of each of its assets other than trading stock, or of any pool of such assets (that is to say all those assets expenditure relating to which would be taken into account in computing whether corporate income tax would arise on a disposal of any of those assets) for a consideration equal to their book value as shown in or adopted for the purpose of the Last Accounts, no taxable profit or other taxable amount would arise in respect of any such asset or pool of assets.

## 4   Company Residence/Permanent Establishment

(a)   Residence/permanent establishment. Korek is and has at all times been resident for Tax purposes in the province of Erbil in the Republic of Iraq and is not and has not at any time been treated as resident in any other jurisdiction for any Tax purpose (including any double taxation arrangement).  Korek is not subject to Tax in any jurisdiction other than its place of incorporation by whether by virtue of having a permanent establishment or other place of business in that jurisdiction or otherwise and is not liable or subject to any Tax in any province of Iraq other than Kurdistan.

(b)   Agency, permanent establishment.  Korek is not liable for any Tax as the agent of any other person or business and does not constitute a permanent establishment of any other person, business or enterprise for any Tax purpose.

## 5   Transfer Pricing, Thin Capitalisation

(a)   Transfer pricing. There are no circumstances which could cause any Tax Authority to make any adjustment for Tax purposes, or require any such adjustment to be made, to

the terms on which any such transaction is treated as taking place, and no adjustment has been made or attempted in fact.

(b)    Thin capitalisation. Without prejudice to the generality of the preceding paragraph, Korek is not and could not be treated as thinly capitalised for any Tax purpose.  There are no circumstances which could cause any Tax Authority to deny relief for interest paid by Korek, and no such relief has been denied in fact.

## 6    Stamp and Capital Taxes

(a)    Stamp duties. In respect of all documents which establish or are necessary to establish the title of Korek to any asset, or by virtue of which Korek has any right, all applicable stamp duties or registration charges or similar duties or charges have been duly paid.

(b)    Capital duties. All duties, fees and penalties payable in respect of the capital of Korek (including any premium over nominal value at which any share was issued) have been duly accounted for and paid, and there are no circumstances under which any Relief obtained against payment of any such amount could be withdrawn.

## 7    Sanatel

Korek has no actual or potential liability to any Tax Authority as a result of any arrangement with or any transaction entered into with Sanatel.

## 8    Iraqcell

Korek has no actual or potential liability to any Tax Authority as a result of any arrangement with or any transaction entered into with Iraqcell.

**Part B : Tax Covenant**

## 1    Tax Covenant

1.1    Subject to the terms of this Agreement and the other provisions of this Part B of Schedule 7, CS Ltd and the Current Shareholders hereby covenant (jointly amongst themselves) with IT Ltd and Korek to pay to IT Ltd an amount equal to:

(a)    the percentage that is equal to IT Ltd's Relevant Percentage Shareholding at the Relevant Claim Time of any liability of Korek to make or suffer an actual payment of Tax:

(i)    which arises in respect of or in consequence of:

(A)    any income, profits or gains earned, accrued or received (or deemed for the purposes of Tax to be earned accrued or received) on or before Closing; or

(B)    any Event which occurs or occurred (or is deemed to occur or to have occurred for the purposes of Tax) on or before Closing; or

(C)    the payment of the Dividend; or

(D)    (without prejudice to the generality of the foregoing) the write off of any loan made by Korek to the Current Shareholders or any of their Affiliates (other than Korek) or any other transaction between Korek and the Current Shareholders or any of their Affiliates (other than Korek), in each case on or before Closing; or

(ii)    which, without prejudice to the generality of the foregoing, arises in respect of or in consequence of the failure of Korek to withhold Tax or the failure of Korek to make any deduction or retention on account of Tax as it was obliged to make (in each case on or before Closing); or

(b)    the percentage that is equal to IT Ltd's Relevant Percentage Shareholding at the Relevant Claim Time of the amount of any Relief comprising a right to repayment of Tax which has been treated as an asset of Korek in the preparation of the Last Accounts and which is to any extent lost or reduced or set off against any liability of Korek to make an actual payment of Tax; or

(c)    the percentage that is equal to IT Ltd's Relevant Percentage Shareholding at the Relevant Claim Time of all reasonable costs and expenses properly incurred by Korek in relation to the subject matter of a successful claim made under paragraph 1.1(a) or 1.1(b); or

(d)    all reasonable costs and expenses properly incurred by IT Ltd in relation to a successful claim made under paragraph 1.1(a) or 1.1(b).

1.2    For the purpose of paragraph 1.1(a), there shall be treated as an actual payment of Tax an amount equal to the amount of Tax saved in consequence of any use or set-off of:

(a)    any Relief arising to Korek in the Ordinary Course of Business of Korek in the period commencing after the Last Accounts Date and ending on Closing; or

(b)    any Relief arising to Korek after Closing; or

(c)    any Relief arising to IT Ltd,

in circumstances where, but for such use or set-off, IT Ltd would have been able to make a claim against the Current Shareholders under either of paragraphs 1.1(a)(i) or 1.1(a)(ii).

1.3     CS Ltd and the Current Shareholders (jointly amongst themselves) hereby covenant with IT Ltd to indemnify and/or reimburse IT Ltd, on demand, against any liability of IT Ltd or any person or company (other than Korek) which is, or has at any time been, treated as being a member of the same group of companies as IT Ltd for any Tax purpose or as being associated with IT Ltd for any Tax purpose to make or suffer an actual payment of Tax which is properly attributable to Korek and in respect of which the Current Shareholders or CS Ltd would be required to make a payment to IT Ltd under paragraph 1.1(a) above if it was Korek which had to make or suffer an actual payment of that Tax (including any amount treated as an actual payment of Tax by virtue of paragraph 1.2 above), together (in each case) with any reasonable costs and expenses properly incurred in connection with such Tax or a successful claim under this paragraph 1.3.

1.4     The Current Shareholders hereby covenant (jointly among themselves) to indemnify and/or reimburse IT Ltd on demand against any liability of IT Ltd to make or suffer an actual payment of Tax which arises in respect of or in consequence of the payments to be made at Closing pursuant to paragraph 3.2 of Schedule 8.

## 2      Exclusions

2.1     The Current Shareholders and CS Ltd shall not be liable under paragraph 1.1 of Part B of this Schedule 7, and shall not be liable for any breach of the Tax Warranties, in respect of any liability of Korek to make an actual payment of Tax (including any amount treated as such by virtue of paragraph 1.2) or the loss, reduction, or setting off against any Tax of any right to repayment of Tax (each a **Tax Liability**) to the extent that:

(a)     specific provision or reserve in respect of that Tax Liability has been made in the Last Accounts; or

(b)     the Tax Liability arises as a result of transactions in the Ordinary Course of Business after the Last Accounts Date, provided that this exclusion shall not apply to the extent that the Tax Liability comprises interest or penalties arising by virtue of an underpayment of Tax prior to Closing, insofar as such underpayment is an underpayment having regard to circumstances existing and Events occurring prior to Closing and provided also that, to the extent this is not already the case, the arrangements contemplated under paragraph 3.2 of Schedule 8 shall be deemed not to be transactions in the Ordinary Course of Business; or

(c)     the Tax Liability was paid or discharged before the Last Accounts Date; or

(d)     the Tax Liability arises or is increased as a result of a change, after Closing, in any accounting policy or Tax reporting practice of Korek (including any change in accounting reference date) other than (i) a change which is necessary to comply with the law or generally accepted accounting principles applicable to Korek as at Closing; or (ii) a change which was not implemented at the request of or with the consent of IT Ltd or its Affiliates (other than Korek); or

(e)     the Tax Liability arises or is increased solely as a result of any default or delay by IT Ltd under this Schedule 7 after Closing (including, without limitation, a delay in paying or satisfying any Tax Liability which is attributable solely to IT Ltd); or

(f)     the Tax Liability arises or is increased as a result of:

(i)     a change, after Closing, in Tax rates or in, or in the judicial interpretation by any court or tribunal of, any legislation, law, directive, regulation or requirement; or

(ii)    a change or withdrawal after Closing of any previously published practice or concession of any Tax Authority; or

(g)     such Tax Liability would not have arisen or been increased but for a voluntary omission or a voluntary act or transaction carried out by IT Ltd or Korek (at the request of or with the

consent of IT Ltd or its Affiliates (other than Korek)) after Closing, except to the extent that such omission, act or transaction is:

    (i)    in the Ordinary Course of Business as such business was conducted at Closing; or

    (ii)   is required by law to which Korek or IT Ltd or any of its Affiliates is subject as at Closing; or

    (iii)  is contemplated by this Agreement; or

    (iv)  is (in the case of Korek) in fulfilment of a legally binding obligation entered into by Korek on or before Closing; or

    (v)   is (in the case of Korek) an act, omission or transaction made or carried out at the request of or with the consent of the Current Shareholders or their Affiliates (other than Korek); or

(h)    the Current Shareholders (or any of them) or any person connected with any Current Shareholder (excluding IT Ltd and its Affiliates) has satisfied or discharged such Tax Liability for any reason at no cost to Korek and in circumstances where the Current Shareholders have not recovered against Korek and have no right of recovery against Korek in respect of such satisfaction or discharge; or

(i)    such Tax Liability has been recovered under a policy of insurance (net of any Tax or expenses in connection with such recovery) or in respect of which Korek has been otherwise compensated or remedied at no cost to Korek, to the reasonable satisfaction of IT Ltd; or

(j)    any Relief arising to Korek before Closing (other than a Relief taken into account in the Last Accounts, or arising in the Ordinary Course of Business after the Last Accounts Date) is lawfully available to set-off against or otherwise reduce the Tax Liability and is so utilised in order to reduce such Tax Liability; or

(k)    such Tax Liability is a liability of Korek to account for withholding Tax in respect of interest payable under the Promissory Note provided that this paragraph (k) shall not apply to any interest or penalties payable to any Tax Authority in relation to such withholding Tax; or

(l)    such Tax Liability arises as a result of or in connection with the conversion or cancellation of the Promissory Note; or

(m)   such Tax Liability is a liability of Korek to account for any and all fines, interest, delayed fines, penalties or other amounts levied by the CMC against Korek in connection with any breach by Korek prior to closing of the Licence (for the avoidance of doubt, including interest accrued and payable in respect of late payments of licence fee instalments under the Licence), any applicable regulation, agreement with or requirement of the CMC where such amounts were Fairly Disclosed at the date of the Agreement.

2.2    Each of the exclusions and limitations in paragraph 2.1 shall be construed independently and none of them shall qualify another or affect its interpretation.

## 3    Due Date for Payment

3.1    The date for payment of any amount which becomes due under paragraph 1.1 of Part B of this Schedule 7 or in respect of the Tax Warranties (including, for the avoidance of doubt, by virtue of paragraph 1.2 of Part B of Schedule 7) shall be as follows:

(a)    where the liability of the Current Shareholders relates to a liability of Korek to make payment of or in respect of Tax, the later of:

      (i)    10 (ten) Business Days after the Current Shareholders' Representative receives a written demand from IT Ltd; and

      (ii)    10 (ten) Business Days before the date on which the Tax is due and payable by Korek; and

  (b)    where the liability of the Current Shareholders relates to the loss, reduction or setting off of any repayment or right to repayment of Tax, the later of:

      (i)    10 (ten) Business Days after the Current Shareholders' Representative receives a written demand from IT Ltd; and

      (ii)    10 (ten) Business Days before the date on which the repayment of Tax would have been received but for the loss, reduction or setting off of the repayment or right to repayment.

3.2    For the purposes of this paragraph 3, Tax shall be deemed to be due and payable on the date on which it is due to the relevant Tax Authority without giving rise to any fines, penalties, interest or surcharges.

## 4    Repayment, Corresponding Savings and Recovery from Third Parties

4.1    The Current Shareholders' Representative may, at any time, require Korek to obtain (at the reasonable expense of the Current Shareholders), a certificate from the auditors for the time being of Korek as to:

  (a)    whether Korek has received and retained any repayment of Tax (other than a repayment the right to which has been taken into account as an asset in the Last Accounts) in respect of any period prior to Closing; or

  (b)    whether any Tax Liability which has resulted in a payment being due from the Current Shareholders under the Tax Covenant or the Tax Warranties has given rise to a benefit or saving for Korek which would not otherwise have arisen and which Korek has received, retained and utilised and which was not taken into account in quantifying the amount of such payment,

and, if so, the amount or value of that repayment, benefit or saving (**Certified Amount**).

4.2    If the auditors of Korek give a certificate in accordance with paragraph 4.1:

  (a)    the Certified Amount shall first be set-off against any payment then due from the Current Shareholders under the Tax Covenant or in respect of a claim under the Tax Warranties;

  (b)    to the extent that the Certified Amount exceeds the amount of any payment then due from the Current Shareholders under the Tax Covenant or in respect of a claim under the Tax Warranties a refund shall be made to the Current Shareholders of any previous payments made under the Tax Covenant or in respect of claims under the Tax Warranties and not previously refunded under this paragraph 4.2(b); and

  (c)    any remaining excess shall be carried forward and set-off against any future payments which may become due from the Current Shareholders under the Tax Covenant or in respect of the Tax Warranties.

4.3    If any payment is made by the Current Shareholders under the Tax Covenant or in respect of a claim under the Tax Warranties and Korek has a right to make any recovery in respect of the Tax Liability to which the claim relates from any other person, then to the extent that any money is unconditionally recovered and retained the amount so recovered (less any costs and expenses, including any additional Tax, incurred in relation to such recovery) shall be dealt with as a Certified Amount in accordance with paragraph 4.1.

Part C : Other tax provisions

**1    Gross Up for Taxes, Withholdings and VAT**

1.1    If any deduction or withholding for or on account of Tax is required by law from any payment by the Current Shareholders or Korek or IT Ltd under this Agreement, or otherwise in respect of a Current Shareholders' Obligation or a Company Obligation (for the avoidance of doubt, excluding any payment made or deemed to be made in respect of the Promissory Note) the Current Shareholders or Korek or IT Ltd (as appropriate) shall pay such additional amount as will, after such deduction or withholding for or on account of Tax has been made, leave the payee with the full amount which would have been received by it had no such deduction or withholding been required to be made.

1.2    If any sum paid in respect of a Current Shareholders' Obligation or a Company Obligation (including in circumstances where any Relief is available in respect of such charge to Tax) is required to be brought into charge to Tax, then (except in relation to any payment by any party of Default Interest under clause 17.5) the Current Shareholders or Korek (as appropriate) shall pay such additional amount as shall be required to ensure that the total amount received, less the Tax chargeable on such amount (or that would be so chargeable but for such Relief), is equal to the amount that would otherwise have been received had no such Tax been chargeable.

1.3    All sums payable under this Agreement are (unless expressly stated otherwise) exclusive of any applicable value added tax or other similar sales or turnover tax (**VAT**).   Where, under or pursuant to this Agreement, any party (**supplier**) makes a supply to any other party (**recipient**) for VAT purposes and VAT is or becomes chargeable on that supply, the recipient shall, subject to the receipt of a valid VAT invoice, pay to the supplier (in addition to, and at the same time as, any other consideration for that supply) an amount equal to such VAT.

**2    Notification of Claims**

2.1    If any Current Shareholder or Korek become aware of any Tax Claim, they shall give notice of that Tax Claim to IT Ltd as soon as reasonably practicable and in any event within 20 (twenty) Business Days.

2.2    The limitation of liability in paragraph 1 of Schedule 4 shall not apply to any liability of which any Current Shareholder or Korek is aware but does not notify to IT Ltd within 2 (two) months of their becoming so aware.

**3    Adjustment to the New IT Ltd Share Consideration**

3.1    If any payment is made by Korek pursuant to the terms of this Agreement or for breach of any CS Warranty, the New IT Ltd Share Consideration shall be treated for Tax purposes as reduced so far as possible by the amount of that payment.

3.2    Any reduction of the New IT Ltd Share Consideration in accordance with this paragraph 3 shall not, for any purposes, affect the number (or percentage as a proportion of the entire issued share capital of Korek) of IT Ltd Shares subscribed for by IT Ltd, nor shall such reduction have any effect whatsoever on the operation of the Shareholders' Agreement.

**Schedule 8**

**Closing Arrangements**

**1    Steps to Closing**

1.1    Promptly following Original Signing, the parties shall procure that the following steps are taken:

    (a)    To the extent not obtained pursuant to clause 5.5, confirmation (in a form reasonably acceptable to each party) is obtained from the Companies Registrar:

        (i)    that the By-Laws and the Korek Resolutions, in the Agreed Form, will be able to be validly registered by the Companies Registrar (as contemplated by this Agreement);

        (ii)    of the number and denomination of the Existing Shares; and

        (iii)    that Korek's file at the Companies Registrar is complete and up to date in respect of the Existing Shares.

    (b)    Confirmation (in a form reasonably acceptable to each party) is obtained from the DIFC Registrar of Companies that the issued share capital of International Holdings is US$50,000 divided into 50,000 shares of nominal value of US$1.00 each, and the identity of the holders of such shares.

    (c)    The authorised share capital of International Holdings shall be increased to US$1.5 billion, approved by a general assembly of International Holdings.

**2    Initial Steps Date**

2.1    Promptly following the CP Satisfaction Date and, in any event, on or prior to the Initial Steps Date, the parties shall procure that the following steps are taken:

    ***Korek Corporate Authorisations***

    (a)    the Current Shareholders shall produce evidence in a form satisfactory to IT Ltd acting reasonably that the Current Shareholders have waived any pre-emption rights which they have in respect of the Proposed Transaction;

    (b)    A general assembly of Korek shall be convened at which the Current Shareholders shall:

        (i)    execute a written waiver of the notice period for the general assembly convened to pass the following:

            (A)    the General Assembly Resolution;

            (B)    the CEO Shareholders' Resolution; and

            (C)    a resolution approving a capital increase of Korek, the amount, method and timing of which shall be determined by agreement between the parties,

        (together **Korek Resolutions**); and

        (ii)    vote or procure that their holding of shares in the capital of Korek is voted in favour of each of the Korek Resolutions;

64

(c)   Korek shall:

    (i)   record the Korek Resolutions in a minute;

    (ii)   submit the Korek Resolutions for registration at the Companies Registrar together with the following documents:

        (A)   the Share Transfer Agreement;

        (B)   the amended By-Laws (in the Arabic language);

        (C)   the CEO Shareholders' Resolution;

        (D)   a power of attorney granted by each of International Holdings, Korek and each of the Current Shareholders in favour of their respective legal representatives for the purpose of making all filings with the relevant authorities necessary to implement the Transfer; and

        (E)   any other documents or confirmations which Iraqi counsel to any party advises is necessary to achieve Closing; and

    (iii)   deliver to IT Ltd, the Current Shareholders and CS Ltd certified or legalized copies of the Korek Resolutions;

*International Holdings Corporate Authorisations*

(d)   International Holdings shall deliver certified or legalized copies of the following documents to the Current Shareholders:

    (i)   the Certificate of Incorporation of International Holdings;

    (ii)   the articles of association of International Holdings; and

    (iii)   a power of attorney or board resolution authorizing any person to sign the Share Transfer Agreement;

(e)   A general assembly of International Holdings shall be convened at which the Current Shareholders shall:

    (i)   execute a written waiver of the notice period for the general assembly meeting;

    (ii)   approve the execution of and performance by it of its obligations under this Agreement and each of the Transaction Documents;

    (iii)   approve the adoption of the amended articles of association of International Holdings, in the Agreed Form, such adoption to take effect from the Closing Date;

    (iv)   approve the appointment of (i) three persons proposed for appointment by CS Ltd as directors of International Holdings (such persons to be identified by CS Ltd at least 2 (two) Business Days prior to the Initial Steps Date), such appointment to take effect at the end of such meeting, (ii) three persons proposed for appointment by IT Ltd as directors of International Holdings (such persons to be identified by IT Ltd at least 2 (two) Business Days prior to the Initial Steps Date), such appointment to take effect on the Closing Date, and (iii) 1 (one) person proposed for appointment by CS Ltd to act as an independent director of International Holdings (such person to be

identified by CS Ltd at least 2 (two) Business Days prior to the Initial Steps Date, such appointment to take effect on the Closing Date); and

(v) vote or procure that their holding of shares in the capital of International Holdings is voted in favour of the resolutions in paragraph 2.1(e)(i) to (iv) (**IH Shareholder Resolution**);

(f) International Holdings shall deliver to IT Ltd, the Current Shareholders and CS Ltd copies of the IH Shareholder Resolution

(g) International Holdings shall deliver to the Current Shareholders the following documents:

(i) a copy of the board resolution resolving to allot and issue to the Current Shareholders the CS IH Shares; and

(ii) a copy of the notice of allotment of shares submitted to the DIFC Registrar of Companies;

(h) carry out all necessary formalities to register such changes with the DIFC Registrar of Companies as appropriate;

*CS Ltd Corporate Authorisations*

(i) A written resolution of the sole director of CS Ltd shall approve the execution of and performance by CS Ltd of its obligations under this Agreement and each of the Transaction Documents (**CS Ltd Shareholder Resolution**);

(j) CS Ltd shall deliver to IT Ltd a copy of the CS Ltd Shareholder Resolution;

*IT Ltd Corporate Authorisations*

(k) A shareholders' meeting of IT Ltd shall be convened at which the shareholders of IT Ltd shall approve the execution of and performance by IT Ltd of its obligations under this Agreement and each of the Transaction Documents (**IT Ltd Shareholder Resolution**);

(l) IT Ltd shall deliver to CS Ltd a copy of the IT Ltd Shareholder Resolution;

*Transfer*

(m) To the extent not already entered into, the Current Shareholders and Korek shall enter into the Share Transfer Agreement and perform all acts necessary to complete the transactions contemplated thereby;

2.2 Upon, or as soon as reasonably practicable following, the Initial Steps Date:

(a) the Current Shareholders shall procure that a decree is issued by the Companies Registrar that International Holdings has been registered as the holder of 100% (one hundred per cent.) of the Existing Shares and that the matters listed above have been registered (**Decree**) and is provided to International Holdings, CS Ltd and IT Ltd as soon as reasonably possible;

(b) Korek shall pay any and all stamp duties arising in respect of the Transfer; and

(c) International Holdings shall issue share certificates to the Current Shareholders in respect of the Transfer.

66

2.3    As soon as possible, and not later than the second Business Day, after the Decree is received by IT Ltd in a form reasonably satisfactory to IT Ltd:

   (a)    the Current Shareholders shall transfer the IT Ltd Initial Shares and the CS IH Shares to CS Ltd;

   (b)    CS Ltd shall issue new shares in CS Ltd to the Current Shareholders in proportion to their existing holdings as consideration for the transfer in paragraph 2.3(a);

   (c)    the Current Shareholders shall (in such proportions as they may agree between themselves) transfer 16% (sixteen per cent.) of the issued share capital of CS Ltd to Mr. Aso Ali Bamoki;

   (d)    the Current Shareholders shall procure that Mr. Aso Ali Bamoki shall enter into non-compete arrangements which reflect the obligations set out in clause 17 of the Shareholders' Agreement;

   (e)    CS Ltd shall provide IT Ltd with an updated copy of the CS Ltd share register; and

   (f)    International Holdings shall carry out all necessary formalities to register the transfer of the IT Ltd Initial Shares and the CS IH Shares to CS Ltd with the DIFC Registrar of Companies as appropriate.

## 3    Closing Date

3.1    As soon as possible after the transactions contemplated in paragraph 2.3 above have been completed, and not later than the fourth Business Day after the Decree is received by IT Ltd in a form reasonably satisfactory to IT Ltd, and provided IT Ltd is reasonably satisfied that the CS Ltd Reorganisation has been completed (**Original Closing Date**), the following shall occur:

   *Transfer of IT Ltd Initial Shares*

   (a)    CS Ltd shall transfer the IT Ltd Initial Shares to IT Ltd in consideration for the payment by IT Ltd to CS Ltd of an aggregate amount equal to US$50,000.

   *IH Closing Arrangements*

   (b)    International Holdings shall:

      (i)    execute each relevant Transaction Document which has not already been executed by International Holdings;

      (ii)    deliver to IT Ltd the following documents:

         (A)    a copy of the board resolution resolving to allot and issue to IT Ltd the Promissory Note Shares and the New IT Ltd Shares; and

         (B)    a copy of the notice of allotment of shares submitted to the DIFC Registrar of Companies; and

      (iii)    deliver to CS Ltd the following documents:

         (A)    a copy of the board resolution resolving to allot and issue to CS Ltd the New CS Ltd Shares; and

         (B)    a copy of the notice of allotment of shares submitted to the DIFC Registrar of Companies;

(iv)    cancel the Share Pledge Agreement and release the shares secured pursuant to its terms from all security interests created, evidenced or conferred thereunder;

### *Korek Closing Arrangements*

(c)    Korek shall:

(i)    execute each relevant Transaction Document which has not already been executed by Korek; and

(ii)    deliver a Change of Control Notice to those contractual counterparties reasonably required by the parties, which shall include, for the avoidance of doubt, the counterparty to the NSN Agreement;

### *CS Ltd Closing Arrangements*

(d)    CS Ltd Shall:

(i)    execute each relevant Transaction Document which has not already been executed by CS Ltd; and

(ii)    the Current Shareholders shall execute each relevant Transaction Documents which has not already been executed by the Current Shareholders;

### *IT Ltd Closing Arrangements*

(e)    IT Ltd shall execute each relevant Transaction Document which has not already been executed by IT Ltd;

### *Management Agreements*

(f)    To the extent not already entered into:

(i)    Alcazar or one of its Affiliates and Korek shall enter into the Alcazar Management Services Agreement;

(ii)    Korek shall, and ASN shall procure that the relevant Affiliate of ASN shall, enter into the Management Consultancy Agreement;

(iii)    Korek and Mr Sirwan Saber Mustafa shall enter into the Management Fee Termination Agreement and the Current Shareholders' Representative Services Agreement; and

(iv)    Korek shall, and ASN shall procure that a relevant Affiliate of ASN shall, enter into the Sourcing and Procurement Agreement.

### *Promissory Note*

(g)    the parties shall procure that the Promissory Note and the benefit of the Convertible Loan Agreement shall be:

(i)    assigned to IT Ltd by Alcazar; and

(ii)    assigned to International Holdings by IT Ltd and International Holdings shall issue the Promissory Note Shares to IT Ltd in respect thereof;

(h)    the parties shall take such other steps as shall be agreed prior to Closing pursuant to clauses 5.3 and 5.4 in respect of the treatment of the Promissory Note;

(i)    International Holdings shall submit a notice of allotment of shares to the DIFC Registrar of Companies in respect of the issue of the Promissory Note Shares and deliver a copy of such notice to IT Ltd;

(j)    International Holdings shall issue share certificates to IT Ltd in respect of the issue of the Promissory Note Shares;

(k)    Korek, Mr Sirwan Saber Mustafa and Alcazar shall execute and deliver a deed of release and waiver in respect of the Promissory Note in the Agreed Form;

***Share Issues, IT Ltd Shareholder Loan and IT Ltd Closing Bank Instructions***

(l)    IT Ltd shall pay the New IT Ltd Share Consideration to International Holdings;

(m)    International Holdings shall allot and issue to IT Ltd the New IT Ltd Shares;

(n)    IT Ltd shall fund the IT Ltd Shareholder Loan;

(o)    CS Ltd shall pay the New CS Ltd Shares Aggregate Par Value to International Holdings;

(p)    International Holdings shall allot and issue to CS Ltd the New CS Ltd Shares;

(q)    International Holdings shall submit a notice of allotment of shares to the DIFC Registrar of Companies in respect of the issue of Shares pursuant to paragraphs 3.1(m) and (p) and deliver a copy of such notice to IT Ltd and CS Ltd (as applicable); and

(r)    International Holdings shall issue share certificates to IT Ltd and CS Ltd in respect of the subscriptions referred to in paragraphs 3.1(m) and (p) above.

3.2    Subject to the steps in paragraphs 2 and 3.1 being completed to the satisfaction of the parties, International Holdings and Korek shall execute such written instructions and agreements as are necessary to ensure that the funds received for the capitalisation of International Holdings from IT Ltd and CS Ltd and the IT Ltd Shareholder Loan and held in the bank account of International Holdings in Dubai are applied as follows:

(a)    an amount of US$162,500,000 in respect of the capital increase of Korek shall be paid to Dar Es Salam Investment Bank in Erbil;

(b)    an amount of US$285,000,000 (net of any fees and charges payable pursuant to the terms of the IT Ltd Shareholder Loan) in respect of the Korek/IH Shareholder Loan Agreement shall be paid to the Korek Bank Account held at the Korek Bank Account held at HSBC in Dubai; and

(c)    an amount of US$32,500,000 (net of any fees and charges payable in connection with the transfer of funds to Korek in respect of the capital increase of Korek) of the New Korek Facility shall be paid to the Korek Bank Account held at HSBC in Dubai.

3.3    Subject to the steps in paragraphs 2, 3.1 and 3.2 being completed to the satisfaction of the parties, International Holdings and Korek shall execute such written instructions and agreements as are necessary to ensure that Korek shall apply the funds received for the capitalisation of Korek and the shareholder loan from International Holdings and held in the Korek Bank Account as follows:

(a)    an amount:

(i)    equal to US$285,372,194 together with accrued interest at a rate of 8% (eight per cent) per annum since 12 August 2010 shall be paid to the bank account of the Current Shareholders' Representative to repay the outstanding amount owing under the Current Shareholders' Representative Loan; and

(ii)     up to US$5,000,000 in aggregate in respect of the items set out in paragraph 3 of Schedule 9 shall be paid in the amounts and to such recipients as are notified by Korek to IT Ltd (such notice to include copies of proper invoices in respect thereof) at least 5 (five) Business Days prior to the Initial Steps Date to pay such invoices,

in a way such that these payments are made in the name and on behalf of Korek and are treated as payments by Korek for all purposes (including tax and accounting purposes);

(b)     to carry out a capital increase of Korek in the amount of US$162,500,000, with the funds paid to the Korek Bank Account at Dar Es Salam Investment Bank in Erbil;

(c)     to repay US$162,500,000 due under the Convertible Loan Agreement to an account of International Holdings at Dar Es Salam Investment Bank in Erbil;

(d)     to carry out a second capital increase of Korek in the amount of US$162,500,000 with the proceeds of the repayment of the Convertible Loan Agreement which shall be paid to the Korek Bank Account at Dar Es Salam Investment Bank in Erbil; and

(e)     following the completion of the transactions set out in paragraphs (a) to (d) above, an amount equal to US$125,000,000 shall be paid to the CMC in respect of the last licence fee instalment payable by Korek prior to Closing in respect of the Licence together with US$37,500,000 in interest and Korek shall request documentary evidence (in a form reasonably satisfactory to IT Ltd) from the CMC of receipt thereof (the repayment of the CMC pursuant to this clause (e) will, subject to paragraph 3.5 below, be subject to the receipt of confirmation (in a form reasonably acceptable to each party) from the Companies Registrar that the issued share capital of Korek has been increased by US$325,000,000.

3.4     On the Closing Date International Holdings and Korek shall execute such written instructions and agreements as are necessary to ensure that Korek shall:

(a)     borrow US$173,500,000 from International Holdings pursuant to the New Korek Facility; and

(b)     repay US$173,500,000 due under the Convertible Loan Agreement,

which shall constitute payment in full of all amounts outstanding thereunder.

3.5     If due to delays with the registration of documents at the Companies Registrar it becomes evident to the parties that within a time period of 10 Business Days from the date of Closing, or such longer period agreed in writing by the parties, it will:

(a)     only be possible to carry out a single capital increase of Korek in accordance with paragraph 3.3(b) of this Schedule 8, then the parties agree that following the completion of such capital increase to the satisfaction of the parties and the repayment of part of the Convertible Loan Agreement pursuant to paragraph 3.3(c), the parties shall increase the New Korek Facility by a sum equal to $162, 500,000 (and amend such agreement accordingly), transfer the corresponding amount to Korek, and immediately carry out the payment to the CMC pursuant to paragraph 3.3(e) and the second capital increase contemplated under paragraph 3.3(d) shall not be completed;

(b)     not be possible to carry out either capital increase of Korek contemplated under paragraphs 3.3(b) and 3.3(d) of this Schedule 8, then the parties shall increase the New Korek Facility by a sum equal to $325,000,000 (and amend such agreement accordingly) in order (i) for an amount of US$162,500,000 to be drawn down by Korek to allow the full redemption of the outstanding amount under the Convertible Loan Agreement and (ii) for $162,500,000 to be drawn in cash and then used  to immediately carry out the payment to the CMC pursuant to paragraph 3.3(e),

70

the parties will then agree such other mechanics, including process, and method and timing, to both perform both increases of the capital of Korek as soon as reasonably practicable. A worked example of the accounting entries to reflect the different scenarios set out in this paragraph 3.5 is set out in Schedule 11.

3.6     Any registration fees, expenses and other costs payable to financial institutions or the Companies Registrar under paragraph 3 shall be paid by Korek.

3.7     Without prejudice to the provisions of clause 23, the parties shall carry out such actions and execute such documents as shall be required to perfect any registrations, filings or other actions contemplated by this Schedule 8.

3.8     Promptly following Closing, the parties shall procure that the constitutional documents of International Holdings (as adopted at Closing) shall be legalised at the Iraqi Embassy in the United Arab Emirates and Korek's records as filed with the Companies Registrar shall be updated accordingly.

**Schedule 9**

**Permitted Leakage**

1.   Payments not in excess of US$4,000,000 in aggregate in respect of Korek's management fee prior to Original Signing paid to Mr. Sirwan Saber Mustafa in the ordinary course at the rate of 1% (one per cent.) per annum of the invoiced revenues of Korek.

2.   Any payments or discharges of liability made at Closing in accordance with this Agreement including repayment of the Current Shareholders' Representative Loan and any conversion of the Promissory Note.

3.   The payment by Korek of amounts not exceeding US$5,000,000 in aggregate to ZR Group in respect of the coordination of auditing, accounting, legal and other expert advice pursuant to an appropriate invoice rendered by ZR Group to Korek, it being agreed for the avoidance of doubt that any amounts payable to auditors, legal advisors and other advisors in respect of advice to Korek or the Current Shareholders in excess of US$5,000,000 shall be paid directly by the Current Shareholders.

**Schedule 10**

**Definitions and Interpretation**

**1      Definitions**

In this Agreement, the following words and expressions shall have the following meanings:

**2003 Ericsson Agreement** means the Supply and Network Rollout Agreement dated 10 November 2003 between Ericsson AB and Korek;

**2010 Indebtedness** means the amount by which the Indebtedness of Korek as at 31 December 2010 exceeds the Indebtedness of Korek as at 31 December 2009, excluding any amounts accrued or capitalised for the year ended 31 December 2010 in respect of (i) interest on the Promissory Note, (ii) interest on the Al Warka facility, (iii) interest on the Current Shareholders Representative Loan, (iv) interest on outstanding amounts owed to the CMC, (v) penalties imposed by the CMC in the year ended 31 December 2010, and (vi) Vendor Financing and guarantees on Vendor Financing entered into during the year ended 31 December 2010.

**2010 Capital Expenditure** means the aggregate amount of Capital Expenditure of Korek for the year ended 31 December 2010 adjusted by (i) adding prepayments and advances  made in 2010 which existed as at 31 December 2010 relating to Capital Expenditure of Korek which is not classified as Capital Expenditure of Korek for the year ended 31 December 2010, (ii) deducting prepayments and advances which existed as at 31 December 2009 relating to Capital Expenditure of Korek for the year ended 31 December 2010, and (iii) deducting financial liabilities (vendor financing or otherwise) arising from Capital Expenditure of Korek for the year ended 31 December 2010 which existed as at 31 December 2010. For the avoidance of doubt, 2010 Capital Expenditure does not include any cash payments made during the year ended 31 December 2010 for Capital Expenditure of 2009 or previous years. . For the avoidance of doubt, no deduction will be made under (iii) in respect of any Vendor Financing amount owed at 31 December 2010 relating to Capital Expenditures that have not been accounted for in the assets of Korek at 31 December 2010;

**31 December Audit** means an audit of the financial statements of Korek as of 31 December 2010;

**31 December Cash Amount** means the aggregate amount of Cash held by Korek as at 31 December 2010 less an amount equal to the aggregate value of:

(a)     any invoices from third party advisors which remain unpaid and outstanding and which were issued in connection with advice given to Korek in respect of any potential investment in Korek other than the Proposed Transaction; and

(b)     any management fee owing to Mr Sirwan Saber Mustafa as at 31 December 2010 relating to periods prior to 1 July 2010, based on an annual management fee payable to Mr Sirwan Saber Mustafa at the rate of 1% (one per cent.) per annum of the gross invoiced revenues of Korek, payable quarterly in arrears,

and adjusted upwards or downwards as appropriate to reflect any distortions in working capital of Korek at 31 December 2010 caused by payments made or not made and receipts collected or uncollected inconsistent with its normal cycle for such payments and collections, provided such adjustments exclude all invoices payable in relation to Capital Expenditure and they have an aggregate upward or downward effect on the 31 December Cash Amount of more than $500,000;

**Accounting Period** means any period by reference to which any income, profits, or gains or any other amounts relevant for the purposes of Tax, are measured or determined;

73

*Accounting Principles* means the accounting principles and policies to be adopted by the Group which shall be International Financial Reporting Standards adapted if necessary and from time to time, for local requirements;

*Accounts* means, in relation to any financial year of Korek, the audited balance sheet of Korek (and, where relevant, the audited consolidated balance sheet of Korek and its subsidiary undertakings) and the audited profit and loss account of Korek (and, where relevant, the audited consolidated profit and loss account of Korek and its subsidiary undertakings), in each case as at the Accounts Date in respect of that financial year, as appended to the Disclosure Letter, together with any notes, reports, statements or documents included in or annexed or attached to them;

*Accounts Date* means 31 December 2008, 31 December 2009 and 30 June 2010;

*AC Dispute Notice* has the meaning given in clause 7.2;

*Adjustment Event* has the meaning given in the IT Ltd Shareholder Loan;

*ADR Rules* has the meaning given in clause 34.2;

*Affiliate* means:

(a)   in the case of a person which is a body corporate, any other entity which, directly or indirectly, owns or controls, is under common ownership or control with or is owned or controlled by, such party, in each case from time to time;

(b)   in the case of a person which is an individual:

   (i)    any spouse and/or any lineal descendants by blood or adoption;

   (ii)   any person or persons acting in its or their capacity as trustee or trustees of a trust of which such individual is the settler; or

   (iii)  anybody corporate or such other entity of which such a person is a director or manager or which, directly or indirectly, is owned or controlled by such a person; in the case of a person which is a limited partnership, the partners of the person or their nominees or a nominee or trustee for the person, or any investors in a fund which holds interests, directly or indirectly, in the limited partnership; and

(c)   any Affiliate of any person in paragraphs (a) and (b) above.

*Agreed Form* means, in relation to a document, the form of that document which has been initialled on the date of Original Signing for the purpose of identification by or on behalf of the Current Shareholders' Representative and IT Ltd (in each case with such amendments as may be agreed in writing by or on behalf of the Current Shareholders' Representative and IT Ltd);

*Alcazar Loan Documents* means: (i) the convertible loan agreement between Korek and Alcazar dated 11 September 2007 as amended from time to time; and (ii) the Share Pledge Agreement, together with any and all other documentation evidencing loans from or amounts outstanding to Alcazar and/or its Affiliates;

*Alcazar Management Services Agreement* means the agreement regarding the provision by Alcazar (or an Affiliate of Alcazar) of certain management services to Korek in the Agreed Form to be entered into by Alcazar and Korek;

*Al Warka Facility* means the US$225,000,000 facility provided to Korek by Al Warka Bank dated 5 September 2007;

*Approvals* has the meaning given in paragraph 4(a)(i) of Part A of Schedule 3;

*Available Funds* has the meaning given in clause 11.1;

*Auditors* means Ernst & Young LLP;

*Auditors' Certificate* has the meaning given in clause 7.1;

*Basket* has the meaning given in paragraph 2(b) of Schedule 4;

*Business Day* means a day other than a Friday, Saturday or Sunday or public holiday in the United Arab Emirates or the Republic of Iraq on which banks are generally open in these countries for general commercial business;

*Business IP* means the Owned IP and all other registered and material unregistered Intellectual Property Rights used by Korek, a complete list of which is set out in the Disclosure Letter together with copies of the relevant registration documents in respect thereof;

*Business Plan* has the meaning given in the Shareholders' Agreement;

*Buy-Back Call Option* has the meaning given in clause 2.8;

*By-Laws* means the by-laws of Korek in Agreed Form;

*Call Option Notice* has the meaning given in clause 2.8;

*Cancellation Notice* has the meaning given in clause 2.9;

*Cancellation Shares* has the meaning given in clause 2.9;

*Capital Expenditure* means any expenditure or obligation in respect of expenditure which is treated as property, plant and equipment (including project in progress). Project in progress includes advance payments on property, plant and equipment;

*Cash* means cash on hand, deposits held at call with banks and financial institutions;

*CEO Shareholders' Resolution* means the resolution in the Agreed Form passed by the shareholders of Korek approving the delegation of authority from the Managing Director to the chief executive officer of Korek;

*Certified Amount* has the meaning given in paragraph 4.1 of Part B of Schedule 7;

*Change of Control Notice* means a notice in the Agreed Form to contractual counterparties of Korek of the change in the shareholding structure of Korek;

*Claim* means any claim for breach of a CS Warranty;

*Closing* means completion of the Proposed Transaction in accordance with the provisions of this Agreement;

*Closing Date* means the Original Closing Date or, if such date is deferred pursuant to clause 10.3, the Deferred Closing Date;

*Closing Share Price* means US$1,000;

*CMC* means the Iraqi National Communications and Media Commission and any successor body;

*CMC Liability Amount* means the aggregate liability of Korek to the CMC in relation to: any fees, penalties and accrued interest due in respect of the Licence, being US$100,343,498.38 as at 31 December 2009 (comprising US$225,343,498.38 as set out in the letter dated 27 May

75

2010 from the CMC to Korek, less US$125,000,000 paid by Korek to the CMC), plus penalties and interest accruing daily on the outstanding fees (including licence fees), penalties and accrued interest due to the CMC by Korek at a rate of 6% (six per cent.) per annum (in aggregate, CMC Liability Amount);

*CMC Reduction* has the meaning given in clause 8.1;

*CMC Reduction End Date* means the date falling 30 months after the Closing Date;

*Companies Registrar* means the Registrar of Companies in Erbil, Iraq, at which Korek is registered;

*Company Law* means Law No. 21 of 1997 (as amended in 2004) from time to time of the Republic of Iraq;

*Company Obligation* means any warranty or undertaking to indemnify given by Korek under this Agreement (including any obligation under Schedule 7);

*Comverse Agreement* means the Purchase and Licence Agreement dated 26 April 2010 between Comverse, Inc. and Korek;

*Conditions* has the meaning given in clause 3.1;

*Confidential Information* has the meaning given in clause 21.1;

*Convertible Loan Agreement* means the convertible loan agreement between Korek and Alcazar dated 11 September 2007;

*corporate income tax* means any tax on income, profits or gains;

*Costs* means losses, liabilities, damages, costs (including all reasonable out-of-pocket costs, fees and expenses of legal and other professional advisers), charges, expenses and taxation, in each case of any nature whatsoever;

*CP Satisfaction Date* has the meaning given in clause 3.2;

*CS Consideration Reduction Amount* has the meaning given in clause 2.5;

*CS IH Shares* means 593,181 Shares, which together with the New CS Ltd Shares shall comprise 56% (fifty six per cent.) of the issued and allotted fully diluted share capital of International Holdings upon Closing;

*CS Ltd Shareholder Resolution* has the meaning given in paragraph 2.1(i) of Schedule 8;

*CS Ltd Reorganisation* means the completion of the transfer of the IT Ltd Initial Shares and the CS IH Shares from the Current Shareholders to CS Ltd and the transfer of 16% (sixteen per cent.) of the shares of CS Ltd to Mr. Aso Ali Bamoki in accordance with clauses 1.1(c) and 5.9, paragraph 2.3 of Schedule 8 and the Sanatel Letter;

*CS Ltd Shares* means 668,181 Shares, which shall equal to 56% (fifty six per cent.) of the issued and allotted fully diluted share capital of International Holdings;

*CS Warranties* means the warranties set out in Schedule 3 and the Tax Warranties;

*Current Shareholders' Obligation* means any warranty or undertaking to indemnify given by the Current Shareholders under this Agreement (including any obligation under Schedule 7);

*Current Shareholders' Representative* has the meaning given in clause 19;

76

**Current Shareholders' Representative Loan** means the US$285,372,194 term loan facility provided to Korek by the Current Shareholders' Representative dated 12 August 2010;

**Current Shareholders' Representative Loan Agreement** means the term loan dated 12 August 2010 between Korek and the Current Shareholders' Representative in respect of the Current Shareholders' Representative Loan;

**Current Shareholders' Representative Loan Release** means the release to be executed by the Current Shareholders' Representative confirming the release at Closing of the obligations of Korek under the Current Shareholders' Representative Loan Agreement in the Agreed Form;

**Current Shareholders' Representative Services Agreement** means the management services agreement in the Agreed Form to be entered into between Mr Sirwan Saber Mustafa and Korek;

**Damages Payment** has the meaning given in paragraph 11(a) of Schedule 4;

**Darin Agreement** means the Entrepreneurship Contract dated 12 May 2010 between Darin Co. General Trade and Construction and Korek;

**December Accounts** means, in relation to the period from 1 January 2009 to 31 December 2009, the audited balance sheet and the audited profit and loss account of Korek together with any notes, reports or statements included in them, as appended to the Disclosure Letter;

**Decree** has the meaning given in paragraph 2.2(a) of Schedule 8;

**Default Interest** means interest at LIBOR plus 4% (four per cent.);

**Deferred Closing Date** has the meaning given in clause 10.3;

**Delta Agreement** means the Entrepreneurship Contract dated 12 November 2007 between Delta Telecommunication (in its capacity as distributor), Link Technology (in its capacity as distribution licence holder) and Korek;

**De Minimis Threshold** has the meaning given in paragraph 2(a) of Schedule 4;

**Disclosure Bundle** means the bundle of documents in the Agreed Form attached to the Disclosure Letter;

**Disclosure Letter** means the letter from Korek, CS Ltd and the Current Shareholders to IT Ltd executed and delivered immediately before Original Signing;

**Dispute** has the meaning given to it in clause 34.1;

**Distribution Agreements** means the distribution agreements attached to the Disclosure Letter;

**DIFC Registrar of Companies** means the Registrar of Companies for the Dubai International Financial Centre;

**Dividend** means the dividend payment by Korek, which was declared by Korek on 30 June 2010, of a dividend of US$25,000,000;

**EBITDA** means earnings before deduction of interest, tax, depreciation and amortisation, as determined in accordance with the Accounting Principles, from time to time;

**Economic Sanctions Law** means any economic or financial sanctions administered by the United Nations, the United States or the European Union;

**EMEK Agreement** means the Entrepreneurship Contract dated 12 May 2010 between EMEKPRES Kalıp İmalat Otomotiv San. Ve Dış Tic. Ltd Şti. and Korek;

**Employees** means the employees of Korek immediately prior to Closing;

**Environment** means all or any of the following media, namely air (including the air within buildings or other natural or man-made structures above or below ground), water or land;

**Environmental Laws** means all international, national, state, federal, regional or local laws (including common law, statute law, civil and criminal law) which are in force and binding at the date of Original Signing, to the extent that they relate to Environmental Matters;

**Environmental Matters** means all matters relating to the pollution or protection of the Environment;

**Ericsson Agreement** means the supply agreement dated 15 January 2008 between Ericsson AB and Korek;

**Event** or **event** includes any act, occurrence, transaction or omission whatsoever, and any reference to an event occurring on or before a particular date shall include events which for tax purposes are deemed to have, or are treated as having, occurred on or before that date;

**Excess Recovery** has the meaning given in paragraph 11(d) of Schedule 4;

**Exchange Rate** means, with respect to a particular currency for a particular day, the spot rate of exchange (the closing mid point) for that currency into US$ on such date as published in the London edition of the Financial Times first published thereafter or, where no such rate is published in respect of that currency for such date, at the average rate quoted by Bank of America, Citibank, HSBC or Deutsche Bank as at the close of business in London on such date;

**Existing Shares** means 100% (one hundred per cent.) of the shares issued in the share capital of Korek;

**Expert** means a partner of an internationally recognised accounting firm (whose identity is agreed between the parties or if the parties cannot so agree, a partner selected by the President for the time being of the Institute of Chartered Accountants in England and Wales) who shall act as expert and not as arbitrator in connection with the giving of the determination in question and whose costs shall be payable by Korek;

**Fair Market Value** has the meaning given in the Shareholders' Agreement;

**Fairly Disclosed** means fairly disclosed in the Disclosure Letter with sufficient detail to identify the nature and scope of the matters disclosed and to allow a reasonable bona fide investor to understand the full impact of such matter;

**Financial Debt** means borrowings and indebtedness in the nature of borrowing (including by way of acceptance credits, discounting or similar facilities, loan stocks, bonds, debentures, notes, overdrafts or any other similar arrangements the purpose of which is to raise money) owed to any banking, financial, acceptance credit, lending or other similar institution or organisation, excluding trade creditors, but including any equipment suppliers (such as Nokia Siemens Networks Oy, Ericsson AB and Darin Co. General Trade and Construction) and their associated lending entities;

**First Tribunal** has the meaning given to it in clause 34.7(b);

**General Assembly Resolution** means a resolution of the general assembly of the shareholders of Korek in the Agreed Form to inter alia (i) approve the execution of and performance by Korek of its obligations under this Agreement and each of the Transaction Documents, (ii) approve the Transfer, (iii) approve the adoption of the amended By-Laws, (iv) appoint the Managing Director and specify and, to the extent set out therein, limit the powers of

78

the Managing Director, and (v) approve the appointment of members of the Korek Supervisory Committee (as defined in the Shareholders Agreement) in accordance with clause 7 of the Shareholders Agreement;

**Governmental Entity** means any supra national, national, state, municipal or local government (including any subdivision, court, administrative agency or commission or other authority thereof) or any quasi governmental or private body exercising any regulatory, importing or other governmental or quasi governmental authority, including the European Commission and any Tax Authority;

**Group** means International Holdings, Korek and their subsidiaries from time to time;

**Guarantee Liabilities** has the meaning given in clause 14.1;

**Guarantors** means ASN and Alcazar;

**Guarantee Proportions** means:

(a)     in respect of any obligations under clause 2.1(c):

    (i)     in respect of Alcazar, 0% (zero per cent.); and

    (ii)     in respect of ASN, 100% (100 per cent.);

(b)     in respect of the obligation under clause 17 of the Shareholders' Agreement:

    (i)     in respect of any breach of the covenant by Alcazar or one of its Affiliates (excluding, for the avoidance of doubt, IT Ltd), 100% (one hundred per cent.) of any amount claimed under clause 14;

    (ii)     in respect of any breach of the covenant by ASN or one of its Affiliates (excluding, for the avoidance of doubt, IT Ltd), 100% (one hundred per cent.) of any amount claimed under clause 14; or

    (iii)     in respect of any breach of the covenant by IT Ltd, in respect of Alcazar, 53.86% (fifty three point eight six per cent.) (being the proportionate shareholder of Alcazar in IT Ltd), and in respect of ASN, 46.14% (forty six point one four per cent.) (being the proportionate shareholding of ASN in IT Ltd); and

(c)     in respect of any obligations under clauses 2, 4 and 5.6 of the IT Ltd Shareholder Loan:

    (i)     in respect of Alcazar, 100/285 of any amount claimed under clause 14; and

    (ii)     in respect of ASN, 185/285 of any amount claimed under clause 14; and

(d)     in respect of any obligation under paragraph 6 of Part A of Schedule 6:

    (i)     in respect of Alcazar, 100% (one hundred per cent.) of any amount claimed under clause 14; and

    (ii)     in respect of ASN, 0% (zero per cent.),

(e)     provided that, in respect of (c) only, if it is demonstrated to the reasonable satisfaction of International Holdings that ASN (or its Affiliates) and/or Alcazar (or its Affiliates) have not complied in full with their obligations to provide funds to IT Ltd and that on that basis IT Ltd has only partially complied with its obligations under the IT Ltd Shareholder Loan, then the defaulting party's guarantee proportion shall be 100% (one hundred per cent.) of the amount demonstrated to be its funding default;

**Halabja Agreement** means the Entrepreneurship Contract dated 23 May 2010 between Halabja Group Co. and Korek;

**ICC** means The International Chamber of Commerce, and any referral to the ICC under a Transaction Document shall be to its Headquarters;

**IFRS** means the international financial reporting standards as adopted by the International Accounting Standards Board;

**IH Shareholder Resolution** has the meaning given in paragraph 2.1(e)(vi) of Schedule 8;

**IH Transfer Notice** has the meaning given in clause 2.6(a);

**IH Transfer Shares** has the meaning given in clause 2.6(a);

**Incorporation Shares Transfer Date** has the meaning given in clause 1.1(a);

**Indebtedness** means any indebtedness for or in respect of (a) moneys borrowed and debit balances at banks or other financial institutions; (b) notes, debentures, loan stock or any similar instrument (but not in respect of trade creditors); (c) receivables sold or discounted (other than any receivables to the extent they are sold on a non-recourse basis); (d) any counter-indemnity obligation in respect of a guarantee, bond, standby or documentary letter of credit or any other instrument issued by a bank or financial institution in respect of an underlying liability (but not, in any case, in respect of trade creditors) of a third party which liability would fall within one of the other paragraphs of this definition; (e) any amount of any liability under an advance or deferred purchase agreement if one of the primary reasons behind entering into the agreement is to raise finance or to finance the acquisition or construction of the asset or service in question (but excluding trade creditors); (f) any amount raised under any other transaction (including any forward sale or purchase, sale and sale back or sale and leaseback agreement) having the commercial effect of a borrowing or otherwise classified as borrowings (but not in respect of trade creditors); (g) any amounts owing under any financing or operating leases, (h) amounts owing in respect of interest payments or financial penalties, and (i) the amount of any liability in respect of any guarantee for any of the items referred to in paragraphs (a) to (h) above;

**Indemnities** has the meaning given to it in clause 9.1;

**Intellectual Property Rights** means patents, trade marks, service marks, logos, signs, trade names, internet domain names, copyright (including rights in computer software) and moral rights, database rights, semi-conductor topography rights, utility models, rights in designs, rights in get-up, rights in inventions, rights in know-how and other intellectual property rights, in each case whether registered or unregistered, and all rights or forms of protection having equivalent or similar effect anywhere in the world and **registered** includes registration and applications for registration;

**Initial Business Plan** means the initial business plan of Korek in the Agreed Form, to be implemented in accordance with the Shareholders' Agreement;

**Initial Steps Date** means a date occurring on or after the CP Satisfaction Date and which shall be no later than the fourth Business Day after the CP Satisfaction Date;

**Investment Licence** means a licence issued by the National Investment Commission in the Republic of Iraq or the Investment Board in Kurdistan (as appropriate);

**Iraqcell** means Iraqcell Telecommunication Limited incorporated on 10 May 2001 in the Republic of Iraq under registered number 1403;

**IT Ltd Bank Account** means such account as IT Ltd may notify to the other parties in writing;

**IT Ltd Closing Bank** means such bank as IT Ltd may notify to the other parties in writing;

**IT Ltd Initial Shares** means 50,000 Shares, which together with the New IT Ltd Shares and the Promissory Note Shares shall comprise 44% (forty four per cent.) of the issued and allotted fully diluted share capital of International Holdings upon Closing;

**IT Ltd Shares** means 525,000 Shares, which shall comprise 44% (forty four per cent.) of the fully diluted share capital of International Holdings at Closing;

**IT Ltd Shareholder Loan** means the US$285,000,000 bridging loan to be provided by IT Ltd to International Holdings pursuant to the IT Ltd Shareholder Loan Agreement;

**IT Ltd Shareholder Loan Agreement** means the loan agreement to be entered into between IT Ltd and International Holdings on or before Closing in the agreed form;

**IT Ltd Shareholder Resolution** has the meaning given in paragraph 2.1(k) of Schedule 8;

**IT Systems** means the information and communications technologies used by Korek, including hardware, proprietary and third party software, services, networks, peripherals and associated documentation;

**Key Employees** has the meaning given to it in paragraph 1(a) of Part E of Schedule 3, a list of which is attached to the Disclosure Letter;

**Key Financial Performance Figures** has the meaning given in clause 7;

**Key Managers** means Mr. Hamid Akrawi, Mr. Nawzad H. Junde and Mr. Humam Amara;

**Korek's Bank Account** means such account as Korek may notify to the other parties in writing;

**Korek Resolutions** has the meaning given in paragraph 2.1(b) of Schedule 8;

**Last Accounts** means, in relation to the period from 31 December 2009 to the Last Accounts Date, the audited interim balance sheet and the audited profit and loss account of Korek in each case as at the Last Accounts Date in respect of the period from 31 December 2009 together with any notes, reports or statements included in them, as appended to the Disclosure Letter;

**Last Accounts Date** means 30 June 2010;

**Leakage** means:

(a)     in each case to, on behalf of, or for the benefit of CS Ltd, any Current Shareholder or any of their Affiliates:

    (i)     any dividend or distribution (whether in cash or in kind) declared, paid or made by Korek;

    (ii)     any management, service or other charges or fees paid by Korek;

    (iii)     any return of capital (whether by reduction of capital or redemption or purchase of shares or otherwise) by Korek or any amount payable on the repurchase, repayment, redemption, reduction or cancellation of any share capital, loan capital or other securities of Korek;

    (iv)     any waiver, deferral or release by Korek of any amount or obligation owed or due to Korek;

    (v)     any payment of interest or principal in respect of any indebtedness owed by Korek;

    (vi)     any transaction other than on arm's length third party terms;

(vii)   any payment of any costs, bonuses or other sums by Korek;

(viii)   any assumption or discharge of any liability (including in relation to any recharging of costs of any kind) by Korek;

(ix)   any guarantee, indemnity or security provided by Korek in respect of the obligations or liabilities of any Current Shareholder or any of its Affiliates;

(x)   any other payments made (whether in cash or kind) or benefits conferred by Korek; and

(b)   any payments made, or liabilities incurred, by Korek to any third party outside the Ordinary Course of Business (and for these purposes payments in respect of the Roll-Out shall be treated as being in the Ordinary Course of Business) and/or relating to the Proposed Transaction (including any transaction or retention bonuses for management or advisers' fees payable in connection with the Proposed Transaction),

but does not include Permitted Leakage.

*Letter Agreement* means the deed dated on or about the date hereof between Korek, the Current Shareholders, IT Ltd, International Holdings, ASN and Alcazar;

*liabilities* means all liabilities, duties and obligations of every description, whether deriving from contract, commercial law, statute or otherwise, whether present or future, actual or contingent, as ascertained or unascertained and whether owed or incurred severally or jointly or as principal or surety;

*LIBOR* means the display rate per annum of the offered quotation for deposits in sterling for a period of 1 (one) month which appears on the appropriate page of the Reuters Screen (or such other page as the parties may agree) at or about 11.00 a.m. London time on the date on which payment of the sum under this Agreement was due but not paid;

*Licence* means Korek's Mobile Telecommunications Services Licence granted by the CMC;

*Listing* means any admission to listing or trading on a securities exchange;

*Longstop Date* has the meaning given in clause 3.6;

*Management Consultancy Agreement* means the agreement regarding the provision by Sofrecom (an Affiliate of ASN) of certain management services to Korek in the Agreed Form to be entered into by Sofrecom and Korek;

*Management Fee Termination Agreement* means the agreement in the Agreed Form by which all management fee agreements in existence at Closing between Korek and any of the Current Shareholders are terminated with effect from Closing;

*Managing Director* means the managing director of Korek from time to time;

*Material Adverse Change* means any event, circumstance, effect, occurrence or state of affairs or any combination of them (whether existing or occurring on or before the date of Original Signing or arising or occurring up to the Closing Date) which is, or is reasonably likely to be, materially adverse to the business, operations, assets, liabilities (including contingent liabilities), Properties or the business or financial condition, results or prospects of Korek, or where the event, circumstance, effect, occurrence or state of affairs arises in connection with the Licence and/or associated regulations, or may otherwise be materially prejudicial to Closing.

*MOC Litigation* means the proceedings commenced against Korek by the Iraqi Ministry of Telecommunications with the case no. 2008/B/2009;

82

**Newroztel Agreement** means the co-location agreement entered into between Korek and Newroz Telecom dated July 1st, 2008;

**New CS Ltd Shares** means 75,000 Shares which, together with the CS IH Shares shall comprise 56% (fifty six per cent.) of the fully diluted share capital of International Holdings upon Closing;

**New CS Ltd Shares Aggregate Par Value** means US$75,000;

**New CS Ltd Shares Aggregate Premium** means US$74,925,000;

**New CS Ltd Shares Par Value per Share** means US$1;

**New CS Ltd Shares Premium per Share** means US$999;

**New Guarantor** has the meaning given in clause 14.9;

**New IT Ltd Shares** means 145,000 Shares, which, together with the IT Ltd Initial Shares and the Promissory Note Shares held by IT Ltd, shall comprise 44% (forty four per cent.) of the fully diluted share capital of International Holdings upon Closing;

**New IT Ltd Share Consideration** means an aggregate amount of US$194,950,000, which amount shall represent a payment in respect of the premium payable for the IT Ltd Initial Shares of US$49,950,000 and a payment in respect of both the nominal value and the premium payable for the New IT Ltd Shares of US$145,000,000;

**New Korek Facility** means the interest-free shareholder loan between International Holdings and Korek in the amount of US$206,000,000 which shall be repayable on demand;

**New Korek Shares** has the meaning given to it in clause 1.1(d)(v);

**New Shares** means the CS IH Shares, the New CS Ltd Shares, the Promissory Note Shares, the New IT Ltd Shares and the New Korek Shares;

**Nominal Value Shares** has the meaning given in clause 2.3;

**Non Tax Claim** means a Claim other than a claim for breach of any of the Tax Warranties or a claim under the Tax Covenant;

**Notice** has the meaning given to it in paragraph 1 of Schedule 4;

**NSN Agreement** means the supply agreement and the care agreement each dated 25 August 2010 between Korek and Nokia Siemens Networks Oy;

**Orbitel Agreement** means the entrepreneurship contract dated 13 May 2010 between Orbitel Telecommunication and Korek;

**Ordinary Course of Business** means any transactions, customs and practices which are normal for the operations, and made in the sole and best interests of Korek's business (and for the purpose of determining the whether a transaction, is in the sole or best interest of Korek, reference shall be made only of the facts, circumstances and condition of Korek existing at the time such transaction was made);

**Original Closing Date** has the meaning given in paragraph 3.1 of Schedule 8;

**Original Signing** means 10 March 2011, the date of signing of the Original Agreement;

**Overdue Amount** has the meaning given in clause 2.9;

*Owned IP* means the registered and material unregistered Intellectual Property Rights and any domain names owned by Korek;

*parent company* means any company which holds a majority of the voting rights in another company, or which is a member of another company and has the right to appoint or remove a majority of its board of directors, or which is a member of another company and controls a majority of the voting rights in it under an agreement with other members, in each case whether directly or indirectly through one or more companies;

*Permitted Leakage* means the payments made, or to be made, by Korek which are set out in Schedule 9;

*Pre-Closing Period* means the period from and including the date of Original Signing to and including the Closing Date;

*Proceedings* has the meaning given in clause 15.2;

*Promissory Note* has the meaning given in clause B of the Recitals;

*Promissory Note Release* means the release, in the Agreed Form, to be executed by Alcazar, Korek and Mr Sirwan Saber Mustafa confirming the release at Closing of all claims arising out of or in connection with the Promissory Note;

*Promissory Note Shares* means 330,000 Shares, which together with the IT Ltd Initial Shares and the New IT Ltd Shares shall comprise 44% (forty four per cent.) of the fully diluted share capital of International Holdings upon Closing;

*Promissory Note Transfer Agreements* means the transfer agreements in the Agreed Form pursuant to which the Promissory Note shall be transferred (i) by Alcazar to IT Ltd, and (ii) by IT Ltd to International Holdings;

*Properties* means the interests of Korek brief particulars of which are set out in Part C of Schedule 3;

*Proposed Transaction* means the transaction contemplated by the Transaction Documents;

*Qualios Agreement* means the entrepreneurship contract dated 13 May 2010 between Qualios Networks s.a.l. and Korek;

*recipient* has the meaning given in paragraph 1.3 of Part C of Schedule 7;

*Regulatory Fee* means any Regulatory Fee (as such term is defined in the Licence) payable in accordance with the Licence;

*Related Party Transactions* means any agreement, transaction or undertaking entered into with an Affiliate;

*Relevant Claim Time* means (i) in a case where paragraph 1.1(a) of Part B of Schedule 7 applies (including by virtue of paragraph 1.2 of Part B of Schedule 7), the date on which Korek makes or suffers an actual payment of Tax which falls within the scope of paragraph 1.1(a) of the Part B of Schedule 7 and, in circumstances where paragraph 1.2 of the Part B of Schedule 7 applies such that an actual payment of Tax is treated as being made, the Relevant Claim Time shall be the last date on which the Tax that has been saved in consequence of any use or set off of any Relief as described in paragraphs 1.2(a), 1.2(b) and 1.2(c) of Part B of Schedule 7 could (but for such use or set off) have been paid to the relevant Tax Authority without giving rise to any liability to interest or penalties; and (ii) in a case where paragraph 1.1(b) of Part B of Schedule 7 applies, the date on which the repayment of Tax would have been received were it not for the loss, reduction or set off;

*Relevant Indemnities* has the meaning given in paragraph 1 of Schedule 4;

84

**Relevant Percentage Shareholding** means, at any time in relation to a shareholder in International Holdings, the proportion, expressed as a percentage, which the shares held by such shareholder bear at that time to all the shares issued by International Holdings at that time (on a fully-diluted basis);

**Relief** means any allowance, credit, deduction, exemption or set-off in respect of any Tax or relevant to the computation of any income, profits or gains for the purposes of any Tax, or any saving or repayment of Tax (including any interest in respect of Tax);

**Representatives** has the meaning given in clause 21.1;

**Republic of Iraq** means all the territories in the Republic of Iraq as at the date of Original Signing;

**Roaming and Interconnection Agreements** means the roaming and interconnection agreements attached to the Disclosure Letter;

**Roll-Out** means each of Roll-Out Commitments, Roll-Out Operations and Roll-Out Agreements;

**Roll-Out Agreements** means the NSN Agreement, the Ericsson Agreement, the EMEK Agreement, the Darin Agreement, the Halabja Agreement, the Orbitel Agreement, the Qualios Agreement, the Sana Agreement and the Comverse Agreement;

**Roll-Out Commitments** means the ongoing expansion by Korek of its cellular network, infrastructure, products and distribution capability across the Republic of Iraq involving the construction and equipping of approximately 1,200 sites across Iraq and the associated completion and upgrade of the backbone and core of Korek's network to cover 90% (ninety per cent.) of the population of the Republic of Iraq;

**Roll-Out Operations** shall mean the establishment of:

(a)   a national distribution network across substantially all of the Republic of Iraq by the addition of new dealer networks and owned retail outlets;

(b)   new nationwide and regional advertising programs; and

(c)   new mass market services based around simplicity and transparency on prices and services offered and on local content and applications developed in partnerships with local and regional firms,

other than individual contracts with a value of US$800,000 or more;

**Rules** has the meaning given to it in clause 34.3;

**ruling** has the meaning given to it in paragraph 1.1(g) of Part A of Schedule 7;

**Sana Agreement** means the entrepreneurship contract dated 5 October 2008 between Sana Company and Korek;

**Sanatel** means Sanatel Limited a company incorporated and existing under the laws of Iraq and having its principal place of business at Salim Street, Sulaimania, Iraq;

**Sanatel Letter** means the letter in Agreed Form in relation to Sanatel;

**Sanctioned Person** means any person or organisation (i) located within, doing business from or operating from or affiliated with the government of a Sanctioned Territory; or (ii) otherwise targeted under any Economic Sanctions Law;

85

***Sanctioned Territory*** means any territory or state which is subject to a general export, import, financial or investment embargo;

***Share Pledge Agreement*** means the share pledge agreement between Mr Sirwan Saber Mustafa and Alcazar dated 11 September 2007 in respect of those shares in Korek registered in the name of Mr Sirwan Saber Mustafa, as amended from time to time;

***Share Transfer Agreement*** means a duly executed transfer instrument, in Agreed Form, in respect of the Transfer in the form required by the Companies Registrar and satisfactory to the parties, which for the avoidance of doubt shall be subject to the terms of this Agreement;

***Shareholder*** means a shareholder in the share capital of International Holdings from time to time;

***Shareholders' Agreement*** means the shareholders' agreement to be entered into between the parties on or around the date of Original Signing;

***Shares*** means shares in International Holdings' capital having the rights and being subject to the restrictions set out in the constitutional documents of International Holdings;

***Shortfall*** has the meaning given in clause 7.5;

***Signing*** means the execution of this Agreement;

***Sourcing and Procurement Agreement*** means an agreement to be entered into between an Affiliate of ASN and Korek in respect of sourcing and procurement for the Group;

***subsidiary*** and ***subsidiaries*** means any company in relation to which another company is its parent company;

***Supplemental Disclosure Letter*** has the meaning given in clause 10.2;

***supplier*** has the meaning given in paragraph 1.3 of Part C of Schedule 7;

***Surviving Provisions*** means clause 4.3, clause 5.12 and clauses 21 to 34 (inclusive);

***Tax*** or ***Taxation*** includes, without limitation, (a) taxes on gross or net income, profits and gains, (b) all other taxes, levies, duties, imposts, charges, withholdings and retentions of any fiscal nature, including any customs, excise, property, value added, sales, use, occupation, transfer, franchise and payroll taxes and any social security or social fund contributions, (c) any Regulatory Fee and any payment whatsoever which the relevant person may be or become bound to make to any person as a result of the discharge by that person of any such taxes, levies, duties, imposts, charges, withholdings retentions or Regulatory Fee which the relevant person has failed to discharge, together with all penalties, charges and interest relating to any of the foregoing or to any late or incorrect return in respect of any of them, and regardless of whether such taxes, levies, duties, imposts, charges, withholdings, retentions, penalties and interest or Regulatory Fee are chargeable directly or primarily against or attributable directly or primarily to the relevant person or any other person and of whether any amount in respect of them is recoverable from any other person;

***Tax Authority*** means any taxing or other authority competent to impose any liability to Tax, or assess or collect any Tax whether at a local, regional or national level (including Tax authorities or the Kurdistan Regional Government and tax authorities of the Republic of Iraq);

***Tax Claim*** means any claim by IT Ltd under Schedule 7;

***Tax Covenant*** means the covenants given by the Current Shareholders pursuant to paragraph 1 of Part B of Schedule 7;

***Tax Liability*** has the meaning given in paragraph 2.1 of Part B of Schedule 7;

86

**Tax Warranties** means the warranties given by the Current Shareholders and Korek pursuant to Part A of Schedule 7;

**Third Party Assurance** means any guarantee, indemnity, counter-indemnity or letter of comfort of any nature given (i) to a third party by Korek in respect of any obligation of a Current Shareholder; and/or (as the context may require) (ii) to a third party by a Current Shareholder in respect of any obligation of Korek;

**Third Party Claim** has the meaning given in clause 15.1;

**Third Party Contract** has the meaning given to it in paragraph 10(a) of Part B of Schedule 3;

**Third Party Right** means any interest or equity of any person (including any right to acquire, option or right of pre emption or conversion) or any mortgage, charge, pledge, lien, assignment, hypothecation, security interest, title retention or any other security agreement or arrangement, or any agreement to create any of the above;

**Third Party Sum** has the meaning given in paragraph 11(b) of Schedule 4;

**Transaction Documents** means this Agreement, the Disclosure Letter, the By-Laws, the IT Ltd Shareholder Loan Agreement, the Alcazar Management Services Agreement, the Management Consultancy Agreement, the Current Shareholders' Representative Services Agreement, the Shareholders' Agreement, the Promissory Note Release, the Promissory Note Transfer Agreements, the Current Shareholders' Representative Loan Release, the Letter Agreement, the Sanatel Letter, the Sourcing and Procurement Agreement  and any other documents in the Agreed Form;

**Transfer** has the meaning given in clause 1.1;

**Unpaid Sum** has the meaning given in clause 2.6;

**VAT** has the meaning given to it in paragraph 1.3 of Part C of Schedule 7;

**Vendor Financing** means the aggregate amounts recorded by Korek in its Accounts owing to suppliers of equipment (including projects in progress) relating to or otherwise connected with the purchase by Korek of new equipment (including projects in progress);

**Working Hours** means 9.30 a.m. to 5.30 p.m. in the relevant location of a Business Day; and

**ZR Group** means ZR Group SAL Holding, a Lebanese company whose registered office is at 81 Al Maraad Street, St Georges Building, 2nd Floor, Beirut Central District, Lebanon.

## 2      Interpretation

In this Agreement, unless the context otherwise requires:

2.1      references to a person include any individual, firm, body corporate (wherever incorporated), government, state or agency of a state or any joint venture, association, partnership, works council or employee representative body (whether or not having separate legal personality);

2.2      headings do not affect the interpretation of this Agreement; the singular shall include the plural and vice versa; and references to one gender include all genders;

2.3      references to any English legal term or concept shall, in respect of any jurisdiction other than England, be construed as references to the term or concept which most nearly corresponds to it in that jurisdiction;

2.4      references to US dollars or US$ are references to the lawful currency from time to time of the United States of America;

2.5      for the purpose of applying a reference to a monetary sum expressed in US dollars, an amount in a different currency shall be deemed to be an amount in US dollars translated at the Exchange Rate at the relevant date (which in relation to a Non Tax Claim, a Tax Claim or a claim under the Indemnities shall be the date of receipt of notice of that claim under Schedule 4);

2.6      any phrase introduced by the terms including, include, in particular or any similar expression shall be construed as illustrative and shall not limit the sense of the words preceding those terms;

2.7      where any statement in this Agreement is qualified by the expression "*so far as the Current Shareholders are aware*", or any similar expression, such statement shall be deemed only to be made on the basis of the actual awareness of (a) the Current Shareholders, or (b) any of the Key Managers (other than the chief financial officer of Korek as at the date of this Agreement) and Philip Moyse, and after due and careful enquiry of each of the Current Shareholders and the Key Managers (other than the chief financial officer of Korek as at the date of this Agreement) and Philip Moyse;

2.8      where any statement in this Agreement is qualified by the expression "so far as IT Ltd is aware", or any similar expression, such statement shall be deemed only to be made on the basis of the actual awareness of Elie Girard, Ehab Aziz, Olivier Froissart, Deepak Jain and Bruno Bourgin and after due and careful enquiry of Elie Girard, Ehab Aziz, Olivier Froissart, Deepak Jain and Bruno Bourgin and after reasonable enquiry of Charbel Abou Jaoude; and

2.9      any references to this Agreement or any other document is a reference to such document as amended, varied, novated or supplemented (other than in breach of the provisions of this Agreement) at any time.

## 3      Consent

Any reference to a person's consent being required shall, unless stated to the contrary, imply that such consent can be given or withheld in such person's sole discretion.

## 4      Enactments

Except as otherwise expressly provided in this Agreement, any express reference to an enactment (which includes any legislation in any jurisdiction) includes references to: (i) that enactment as amended, consolidated or re-enacted by or under any other enactment before or after the date of Original Signing; (ii) any enactment which that enactment re-enacts (with or without modification); and (iii) any subordinate legislation (including regulations) made (before or after the date of Original Signing) under that enactment, as amended, consolidated or re-enacted as described in (i) or (ii) above, except to the extent that any of the matters referred to in (i) to (iii) occurs after the date of Original Signing and increases or alters the liability of any party under this Agreement.

## 5      Schedules

The Schedules comprise schedules to this Agreement and form part of this Agreement.

## 6      Inconsistencies

Where there is any inconsistency between the definitions set out in this Schedule and the definitions set out in any clause or any other Schedule, then, for the purposes of construing such clause or Schedule, the definitions set out in such clause or Schedule shall prevail.

**Schedule 11**

**Capitalisation Worked Examples**

*BASE CASE : 2 CAPITAL INCREASES IN KOREK*

KOREK LEDGER

|  | Debit | Credit | Comments |
|---|---|---|---|
| **KOREK INITIAL BALANCE** | | | |
| Rest of the BS | 433.5 | -65.0 Equity | *For illustrative purposes* |
| | | 336.0 Convert loan | |
| | | 307.1 CSHR Loan | *Current Shareholders' Representative Loan* |
| | | 5.0 Advisors | |
| | | 162.5 CMC | *Only the part to be paid at closing* |
| | | | |
| **CLOSING** | | | |
| Cash | 32.5 | 32.5 New Loan | *Part of IH Cash equity left in Dubai Korek account* |
| Convert loan | 173.5 | 173.5 New Loan | *Amount necessary to swap convert* |
| Cash | 285.0 | 285.0 SH loan | *Mirror loan to the IT Ltd Facility* |
| CSHR Loan | 307.1 | 307.1 Cash | *Paid from Dubai Korek account* |
| Advisors | 5.0 | 5.0 Cash | *Paid from Dubai Korek account* |
| | | | |
| Cash | 162.5 | 162.5 Equity | *Cap increase 1* |
| Convert loan | 162.5 | 162.5 Cash | *Repayment of Convert loan* |
| | | | |
| Cash | 162.5 | 162.5 Equity | *Cap increase 2* |
| CMC | 162.5 | 162.5 Cash | *Repayment of CMC* |

BALANCES AFTER CLOSING

| Account | Debit | Credit | Balance |
|---|---|---|---|
| Equity | 0.0 | 260.0 | -260.0 |
| Convert loan | 336.0 | 336.0 | 0.0 |
| CMC | 162.5 | 162.5 | 0.0 |
| CSHR Loan | 307.1 | 307.1 | 0.0 |
| Advisors | 5.0 | 5.0 | 0.0 |
| New Loan | 0.0 | 206.0 | -206.0 |
| SH Loan | 0.0 | 285.0 | -285.0 |
| | | | |
| Assets | 0.0 | 0.0 | 0.0 |
| Cash | 642.5 | 637.1 | 5.4 |
| | | | |
| *Check* | *1,453.1* | *2,198.7* | *-745.6* |

\* in Balance : (+) is debit  (-) is credit

*1 CAPITAL INCREASE IN KOREK*

**KOREK LEDGER**

| | Debit | Credit | Comments |
|---|---|---|---|
| **KOREK INITIAL BALANCE** | | | |
| Rest of the BS | 433.5 | -65.0 Equity | *For illustrative purposes* |
| | | 336.0 Convert loan | |
| | | 307.1 CSHR Loan | *Current Shareholders' Representative Loan* |
| | | 5.0 Advisors | |
| | | 162.5 CMC | *Only the part to be paid at closing* |
| | | | |
| **CLOSING** | | | |
| Cash | 32.5 | 32.5 New Loan | *Part of IH Cash equity left in Dubai Korek account* |
| Convert loan | 173.5 | 173.5 New Loan | *Amount necessary to swap convert* |
| Cash | 285.0 | 285.0 SH loan | *Mirror loan to the IT Ltd Facility* |
| CSHR Loan | 307.1 | 307.1 Cash | *Paid from Dubai Korek account* |
| Advisors | 5.0 | 5.0 Cash | *Paid from Dubai Korek account* |
| | | | |
| Cash | 162.5 | 162.5 Equity | *Cap increase 1* |
| Convert loan | 162.5 | 162.5 Cash | *Repayment of Convert loan* |
| | | | |
| Cash | 162.5 | 162.5 New Loan | *Cash relent from IH to Korek* |
| CMC | 162.5 | 162.5 Cash | *Repayment of CMC* |

**BALANCES AFTER CLOSING**

| Account | Debit | Credit | Balance |
|---|---|---|---|
| Equity | 0.0 | 97.5 | -97.5 |
| Convert loan | 336.0 | 336.0 | 0.0 |
| CMC | 162.5 | 162.5 | 0.0 |
| CSHR Loan | 307.1 | 307.1 | 0.0 |
| Advisors | 5.0 | 5.0 | 0.0 |
| New Loan | 0.0 | 368.5 | -368.5 |
| SH Loan | 0.0 | 285.0 | -285.0 |
| | | | |
| Assets | 0.0 | 0.0 | 0.0 |
| Cash | 642.5 | 637.1 | 5.4 |
| | | | |
| Check | 1,453.1 | 2,198.7 | -745.6 |

\* in Balance : (+) is debit  (-) is credit

*NO CAPITAL INCREASE IN KOREK*

**KOREK LEDGER**

|  | Debit | Credit | Comments |
|---|---|---|---|
| **KOREK INITIAL BALANCE** | | | |
| Rest of the BS | 433.5 | -65.0 Equity | *For illustrative purposes* |
|  |  | 336.0 Convert loan | |
|  |  | 307.1 CSHR Loan | *Current Shareholders' Representative Loan* |
|  |  | 5.0 Advisors | |
|  |  | 162.5 CMC | *Only the part to be paid at closing* |
|  |  | | |
| **CLOSING** | | | |
| Cash | 32.5 | 32.5 New Loan | *Part of IH Cash equity left in Dubai Korek account* |
| Convert loan | 336.0 | 336.0 New Loan | *Amount necessary to swap convert* |
| Cash | 285.0 | 285.0 SH loan | *Mirror loan to the IT Ltd Facility* |
| CSHR Loan | 307.1 | 307.1 Cash | *Paid from Dubai Korek account* |
| Advisors | 5.0 | 5.0 Cash | *Paid from Dubai Korek account* |
|  |  | | |
| Cash | 162.5 | 162.5 New Loan | *Cash* |
| CMC | 162.5 | 162.5 Cash | *Repayment of CMC* |

**BALANCES AFTER CLOSING**

| Account | Debit | Credit | Balance |
|---|---|---|---|
| Equity | 0.0 | -65.0 | 65.0 |
| Convert loan | 336.0 | 336.0 | 0.0 |
| CMC | 162.5 | 162.5 | 0.0 |
| CSHR Loan | 307.1 | 307.1 | 0.0 |
| Advisors | 5.0 | 5.0 | 0.0 |
| New Loan | 0.0 | 531.0 | -531.0 |
| SH Loan | 0.0 | 285.0 | -285.0 |
|  |  |  | |
| Assets | 0.0 | 0.0 | 0.0 |
| Cash | 480.0 | 474.6 | 5.4 |
|  |  |  | |
| *Check* | *1,290.6* | *2,036.2* | *-745.6* |

\* in Balance : (+) is debit  (-) is credit

## SIGNATURES

This **AGREEMENT** is signed by duly authorised representatives of the parties:

| | | |
|---|---|---|
| **SIGNED**<br>for and on behalf of<br>**IRAQ TELECOM LIMITED** | )<br>)<br>) | SIGNATURE:<br><br>NAME: |

DEEPAK JAIN

| | |
|---|---|
| **SIGNED** by Sirwan Saber Mustafa,<br>Jawshin Hassan Jawshin Barazany and<br>Jiqsy Hamo Mustafa<br>for and on behalf of<br>**KOREK TELECOM COMPANY LLC** | )<br>)<br>)<br>)<br>) |

| | | |
|---|---|---|
| **SIGNED**<br>for and on behalf of<br>**KOREK INTERNATIONAL**<br>**(MANAGEMENT) Ltd.** | )<br>)<br>)<br>) | SIGNATURE:<br><br>NAME: |

SIRWAN SABER MUSTAFA

in the presence of:

Witness
Signature:
Name:        SIMON BRIGGS
Address:     # MINCING LANE
             LONDON, UK

**SIGNED**
by **SIRWAN SABER MUSTAFA**                    )
in his capacity as                             )
Managing Director and Shareholder              )
in the presence of:                            )

Witness
Signature:
Name:        SIMON BRIGGS
Address:     MINCING LANE
             LONDON, UK

**SIGNED**
by **JAWSHIN HASAN JAWSHIN**
**BARAZANY**
in the presence of:

)
)
)
)

Witness
Signature:
Name:        SIMON BRIGGS
Address:     MINCING LANE
             LONDON, UK

**SIGNED**
by **JIQSY HAMO MUSTAFA**
in the presence of:

)
)
)

Witness
Signature:
Name:        SIMON BRIGGS
Address:     MINCING LANE
             LONDON, UK

**SIGNED**
for and on behalf of
**ALCAZAR CAPITAL PARTNERS**

)
)
)

SIGNATURE:

NAME:        DEEPAK JAIN

**SIGNED**
for and on behalf of
**ATLAS SERVICES NETHERLANDS B.V.**

)
)
)

SIGNATURE:

NAME:        O. FROISSAM

**SIGNED**
for and on behalf of
**INTERNATIONAL HOLDINGS LIMITED**

)
)
)

SIGNATURE:

NAME:        SIRWAN SABER
             MUSTAFA

89

# Exhibit C

^NORTON ROSE

CONFIDENTIAL

Dated 10 MARCH 2011

# Shareholders' Agreement

International Holdings Limited

Korek Telecom Company LLC

Mr. Sirwan Saber Mustafa

Korek International (Management) Ltd.

Iraq Telecom Limited

Norton Rose LLP
3 More London Riverside
London
SE1 2AQ

# Contents

| Clause | | Page |
|---|---|---|
| 1 | Definitions and Interpretation | 5 |
| 2 | Closing | 5 |
| 3 | Business of the Group | 5 |
| 4 | Responsibilities of the Parties | 5 |
| 5 | Capital and Further Finance | 5 |
| 6 | International Holdings Board of Directors | 9 |
| 7 | Korek Supervisory Committee | 14 |
| 8 | Senior Management of Korek | 18 |
| 9 | Managing Director of Korek | 19 |
| 10 | Committees | 20 |
| 11 | Shareholder Veto Matters | 23 |
| 12 | International Holdings Board of Director and Korek Supervisory Committee Veto Matters | 26 |
| 13 | Default or Deadlock | 29 |
| 14 | Financial Matters and Dividends | 30 |
| 15 | Information and Reporting | 30 |
| 16 | Confidentiality | 32 |
| 17 | Non-Compete and Investment Opportunities | 34 |
| 18 | Branding | 36 |
| 19 | Management Agreements | 36 |
| 20 | Transfer of Shares and Pre-emption Rights | 36 |
| 21 | Withdrawal Rights | 38 |
| 22 | Liquidity | 40 |
| 23 | IT Ltd Call Option | 41 |
| 24 | Korek Call Option | 45 |
| 25 | Transfer and Subscription Terms | 46 |
| 26 | IPO | 47 |
| 27 | Conversion of Korek to a Private Joint Stock Company | 48 |

28. Related Party Transactions ........................................................................................48

29. Covenant from IT Ltd ...............................................................................................50

30. Counter Covenant from CS Ltd ................................................................................51

31. Further Assurances ..................................................................................................52

32. Assignment ..............................................................................................................52

33. Damages ..................................................................................................................53

34. Gross up for Taxes and Withholdings ......................................................................53

35. Waiver, Rights and Remedies ..................................................................................53

36. Variations .................................................................................................................53

37. Invalidity ..................................................................................................................53

38. No Partnership or Agency ........................................................................................53

39. Announcements ........................................................................................................54

40. Costs ........................................................................................................................54

41. Whole Agreement .....................................................................................................54

42. Conflict with Korek and International Holdings' Constitutional Documents or Applicable Laws ..54

43. Duration ....................................................................................................................55

44. Notices .....................................................................................................................56

45. Counterparts .............................................................................................................57

46. Third Party Rights .....................................................................................................57

47. Governing Law ..........................................................................................................57

48. Dispute Resolution ...................................................................................................58

Schedule 1 Shareholdings in Korek as at Closing ..........................................................60

Schedule 2 Definitions ....................................................................................................61

Schedule 3 Call Option Promissory Note ........................................................................73

Schedule 4 Deed of Adherence .......................................................................................75

**THIS DEED (Agreement) is dated __10__ March 2011 between:**

(1)  **INTERNATIONAL HOLDINGS LIMITED,** a company duly incorporated under the laws of the Dubai International Financial Centre with the registered number 1020 and whose registered office is located at suite 904, Level 9, Park Place, Sheikh Zayed Road, PO Box 506672, Dubai, UAE **(International Holdings);**

(2)  **KOREK TELECOM COMPANY LLC,** a private company limited by shares incorporated with the Registration Directorate of Companies of the Kurdistan Regional Government with registered number 167 and whose registered office is located at Kurdistan Street nr. 45, Pirmam, Erbil, Kurdistan, the Republic of Iraq **(Korek);**

(3)  **MR. SIRWAN SABER MUSTAFA,** a citizen of the Republic of Iraq and holder of Iraqi passport number G1053857, in his capacity as Managing Director (as defined herein);

(4)  **KOREK INTERNATIONAL (MANAGEMENT) LIMITED** an exempted company duly incorporated with limited liability under the laws of the Cayman Islands and whose registered office is located at Close Brothers (Cayman) Limited, Box 1034, 4th Floor Harbour Place, 103 South Church Street, George Town, Grand Cayman KY1-1102, Cayman Islands **(CS Ltd);** and

(5)  **IRAQ TELECOM LIMITED,** a company duly incorporated under the laws of the Dubai International Financial Centre with the registered number 1019 and whose registered office is located at suite 904, Level 9, Park Place, Sheikh Zayed Road, PO Box 506672, Dubai, UAE **(IT Ltd),**

International Holdings, Korek, CS Ltd and IT Ltd each being a **party,** and together the **parties.**

**WHEREAS:**

(A)  International Holdings is a private company limited by shares and incorporated under the laws of the Dubai International Financial Centre. Immediately following Closing, the Shareholders shall be CS Ltd and IT Ltd and their respective shareholdings shall be as set out in Schedule 1.

(B)  Immediately following Closing, International Holdings shall be the sole holder of the total issued and allotted share capital of Korek.

(C)  It is the intention of the parties that the Business shall be carried on and managed in accordance with the terms of this Agreement.

(D)  In order to effectively govern the Group, the parties have agreed that International Holdings shall be governed by a board of directors as set out in clause 6 and Korek shall have (i) a Korek Supervisory Committee as set out in clause 7 who shall act in accordance with the decisions of the International Holdings Board of Directors, and (ii) a Managing Director who shall act in accordance with the decisions made by the Korek Supervisory Committee contemplated by clause 7, as governed by this Agreement.

(E)  At Closing, IT Ltd shall be 46% (forty six per cent.) owned by ASN and its Affiliates and 54% (fifty four per cent.) owned by Alcazar and its Affiliates.

4

**IS AGREED:**

## 1   Definitions and Interpretation

Words and expressions used in this Agreement shall be interpreted in accordance with Schedule 2.

## 2   Closing

This Agreement shall come into full force and effect on the Closing Date.

## 3   Business of the Group

The business of the Group shall be mobile telecommunications and related services (together with such other business or businesses as shall from time to time be carried on in accordance with the provisions of clauses 11 and 12) and any ancillary or incidental businesses, and shall be conducted in the best interests of the Group in accordance with the then current Business Plan and Budget.

## 4   Responsibilities of the Parties

In order to promote the best interests of the Group, the parties shall use their respective reasonable endeavours to ensure that the Group is afforded the best possible business advantages and market position in the telecommunications sector in the Republic of Iraq by utilising (where relevant) their experience, knowledge and contacts in the telecommunications sector in the Republic of Iraq for the benefit of the Group.

## 5   Capital and Further Finance

5.1   The parties agree that the Group has funding requirements, as set out in the Initial Business Plan, and the parties shall exercise their rights to ensure the Group is able to secure such financing in accordance with this clause 5, including, without limitation, providing any written consents or approvals, voting at any meeting of the Shareholders and procuring that any representatives proposed for appointment by such Shareholders to the International Holdings Board of Directors or the Korek Supervisory Committee shall vote in favour of any resolutions and shall approve any decisions or actions to procure such financing and the Shareholders shall not undertake any action or make any omission that would frustrate efforts to procure the financing prescribed in the Initial Business Plan.

5.2   If, at any time, the Group requires additional funds whether to provide the funding required under the Initial Business Plan or otherwise (subject to clauses 11 and 12), such funding shall be obtained from the following sources and in the following order of priority and, for the avoidance of doubt, financing by way of Shareholders Unsecured Loans shall not be used unless the Korek Supervisory Committee is reasonably satisfied that it will not be possible to raise money under an External Unsecured Loan, an External Secured Loan or an External Secured and Guaranteed Loan on terms reasonably satisfactory or on a timely basis, save that, but subject to clause 5.8, in the event that a Shareholder does not provide the guarantees or funding referred to in clauses 5.2(c) or 5.2(d) (as applicable), the other Shareholders shall not be obliged to provide any guarantees or funding thereunder:

(a)   unsecured loans made by financial institutions to the Group on market terms or if such loans are unavailable, an overdraft with the Group's usual bankers on normal commercial terms (**External Unsecured Loan**);

(b)   loans made by financial institutions to the Group on market terms and secured against the assets of the Group (**External Secured Loan**);

5

(c) loans made by financial institutions to the Group on market terms and guaranteed (on a pro rata basis and on terms reasonably acceptable to them) by each of the Shareholders in their respective Relevant Shareholder Percentages in International Holdings (**External Secured and Guaranteed Loan**); and

(d) unsecured loans to International Holdings on market terms (as agreed between the International Holdings Board of Directors and the Shareholders and on terms *pari passu* and substantially the same (other than in respect of conversion rights) as the terms of the IT Ltd Shareholder Loan) made, by each of the Shareholders in their respective Relevant Shareholder Percentages in International Holdings which shall rank ahead of all shares issued from time to time by International Holdings (**Shareholders Unsecured Loan**),

provided that no more than 3 (three) months shall be spent by the Group in seeking to raise financing through External Unsecured Loans and External Secured Loans before the Group shall investigate options to raise finance through External Secured and Guaranteed Loans and/or Shareholders Unsecured Loans. Nothing in this clause 5.2 shall prevent a Shareholder in its sole discretion from providing the entirety of the guarantee required for the External Secured and Guaranteed Loans or the entire amount required by way of Shareholders Unsecured Loans if it, in its sole discretion, sees fit and the other Shareholders have either confirmed in writing that they do not wish to provide their pro rata proportion or have failed to do so within 60 (sixty) days of the request from International Holdings.

5.3 Any Shareholder may provide its pro rata portion of the Shareholders Unsecured Loans directly to Korek rather than to International Holdings or another member of the Group provided that (i) such Shareholder shall provide such evidence as the other parties shall reasonably request to show that (x) the provision of financing directly to Korek rather than to International Holdings shall not have a material adverse effect on the Group or the other parties, and (y) the provision of financing through International Holdings would have a material adverse effect on such Shareholder, (ii) any financing provided directly to Korek shall not be on a convertible basis or give such Shareholder rights to acquire any interest in shares in Korek, (iii) the other Shareholders shall be satisfied that Korek has guaranteed all debts and obligations of International Holdings and (iv) such Shareholder shall enter into an intercreditor agreement in a form agreed by all the parties to the extent required to ensure repayment of any financing provided to International Holdings shall be *pari passu* with any financing provided directly to Korek.

5.4 If a Shareholder is required to provide security in respect of the shares in Korek held by International Holdings in order to obtain any financing under clause 5.2(d) then the parties shall use reasonable endeavours to agree a mechanism for providing such security, provided that such mechanism does not prejudice or impair any of the rights of any party to this Agreement and for the avoidance of doubt, CS Ltd shall not be permitted to grant any security interest over such number of Shares as may be required to satisfy the obligations of CS Ltd under clause 23.

5.5 The parties agree that Korek will take such steps as are necessary and in accordance with clause 5.2 to secure such amount of financing on terms reasonably acceptable to the parties taking into account market conditions in amounts required for the funding purposes of the Group as identified in the Business Plan and Budget and to repay the aggregate principal amount of the IT Ltd Shareholder Loan and any future loans provided by the Shareholders pursuant to this clause 5 together with all accrued but unpaid interest thereon.

5.6 If a Shareholder does not provide its pro rata proportion of the financing by way of a Shareholder Unsecured Loan within 60 (sixty) days of such a request from International Holdings, each of the Shareholders shall be entitled by written notice to International Holdings (**Share Subscription Notice**) to subscribe for Shares on a pro rata basis at a subscription price per Share equal to the Fair Market Value of the Shares, which price per Share shall be determined as follows:

(a) within 5 (five) Business Days of the receipt of a Share Subscription Notice by either Shareholder, IT Ltd and CS Ltd shall meet to try to reach an agreement as to the Fair Market Value of the Shares;

6

(b)   in the event that IT Ltd and CS Ltd are unable to agree the Fair Market Value of the Shares within 15 (fifteen) Business Days of the receipt of a Share Subscription Notice, IT Ltd and CS Ltd shall jointly appoint an Expert to determine the Fair Market Value of the Shares on terms to be agreed jointly by IT Ltd and CS Ltd (provided that neither party shall unreasonably refuse its agreement to those terms proposed by the Expert or the other party), such terms to include a requirement that the Expert shall:

(i)   determine its own procedure which shall include:

(A)   a reasonable opportunity for each of CS Ltd and IT Ltd to make written and oral representations to the Expert;

(B)   a requirement that the parties supply each other with a copy of any written representations at the same time as they are made to the Expert; and

(C)   permit each of CS Ltd and IT Ltd to be present while oral submissions are being made by the other;

(ii)   make its determination as soon as is reasonably practicable but in any event within 60 (sixty) days of appointment; and

(iii)   act as an expert and not as an arbitrator and its determination of any matter falling within its jurisdiction shall be final and binding on the parties save in the event of fraud or manifest mathematical error (when the relevant part of its determination shall be void and the matter shall be remitted to it for correction); and

(c)   in the event that CS Ltd and IT Ltd are unable to agree on the identity of an Expert within the period set out in clause 5.6(b), such Expert shall be appointed by the International Centre for Expertise in accordance with the provisions for appointment of experts under the Rules for Expertise of the ICC,

and the subscription for the Shares shall take place in accordance with clause 25 on the fifth Business Day following the determination or agreement of the Fair Market Value of the Shares under clause 5.6(a) or (b) above.

5.7   In the event that any Shareholder does not provide its pro rata proportion of the financing by way of a subscription for Shares at Fair Market Value under clause 5.6 (**Unfunded Amount**), the other Shareholders may subscribe (at Fair Market Value) for the number of Shares such Shareholder failed to subscribe for up to the Unfunded Amount. The Shareholder which failed to provide the Unfunded Amount shall be diluted and its Relevant Shareholder Percentage in International Holdings shall decrease accordingly.

5.8   Notwithstanding this clause 5, the parties shall (and shall procure that International Holdings shall) in accordance with clause 5.5, be required to repay the IT Ltd Shareholder Loan as soon as reasonably practicable following Closing in accordance with the terms of the IT Ltd Shareholder Loan Agreement (including clauses 7.2 and 7.3) if the Group obtains financing under clause 5.2 from a bank of reasonable standing, which is on market terms and conditions for financing of such type, covering the period up until at least 15 March 2015 and whose overall pricing terms are no less favourable than those of the IT Ltd Shareholders Loan.

5.9   The parties shall (i) exercise their rights under this Agreement and otherwise to procure, and shall not withhold any approval or consent under clause 11 or exercise any voting rights pursuant to clauses 11 and 12 to frustrate the satisfaction of this clause 5 and the issue of Shares under this clause 5, and (ii) without prejudice to the foregoing, ensure that there remains sufficient authorised but unissued share capital to allow conversion of the IT Ltd Shareholder Loan into Shares pursuant to the IT Ltd Shareholder Loan Agreement. Each Shareholder shall provide reasonable co-operation to the others (including the approval of dividends in accordance with clause 14) to enable each Shareholder to provide, in their respective Relevant Shareholder Percentages in International Holdings, any financing pursuant to clause 5.2(c) or 5.2(d).

*Financing Proposal Committee*

5.10 With effect from Closing and in accordance with clause 5.11, the Shareholders shall procure that a financing approval committee (which shall be a committee of the Shareholders and not a committee of the International Holdings Board of Directors) shall be established (**Financing Proposal Committee**) and maintained throughout the duration of this Agreement. The scope and responsibilities of the Financing Proposal Committee shall be to:

(a)  seek proposals in co-ordination with the CFO for the provision of financing for the Group pursuant to clause 5;

(b)  keep the International Holdings Board of Directors and the Korek Supervisory Committee updated as to the progress in obtaining financing;

(c)  seek proposals for the provision of financing for the purpose of refinancing the IT Ltd Shareholder Loan and in accordance with clause 5.8;

(d)  negotiate and approve the terms of any financing arrangement to be entered into by the Group (including any third party loans, shareholder loans (in accordance with clause 5.2(d)) and vendor financing),

((a) to (d) above, **FPC Matters**); and

(e)  to provide recommendations and proposals in respect of FPC Matters (**FPC Proposal**) to the International Holdings Board of Directors or the Korek Supervisory Committee, as the case may be,

and the parties hereby agree that any FPC Proposal made by the Financing Proposal Committee in respect of any FPC Matter shall be referred to the International Holdings Board of Directors or the Korek Supervisory Committee, who shall have the right to either adopt or reject such FPC Proposal. In the event that the International Holdings Board of Directors or the Korek Supervisory Committee does not elect to adopt any FPC Proposal in its entirety, such matter shall be promptly referred back to the Financing Proposal Committee who shall determine whether to make an amended or alternative FPC Proposal in respect of such FPC Matter. For the avoidance of doubt, (i) subject to paragraph (ii) below, the International Holdings Board of Directors and the Korek Supervisory Committee shall not take any action or decision in respect of a FPC Matter other than pursuant to, and in accordance with, a FPC Proposal approved pursuant to this clause 5.10, and (ii) the provisions of clauses 5.10 to 5.18 shall not prevent any Shareholder, in the event that an Emergency Situation has arisen, from providing any Shareholders Unsecured Loan.

The Financing Proposal Committee shall consist of 4 (four) members (**FPC Members**). IT Ltd shall propose for appointment, by written notice to the International Holdings Board of Directors, two FPC Members and may propose the removal of any FPC Member so proposed for appointment and propose the appointment of another in his place (**IT Ltd FPC Members**), and CS Ltd shall propose for appointment, by written notice to the International Holdings Board of Directors, two FPC Members and may propose the removal of any FPC Member so proposed for appointment and propose the appointment of another in his place (**CS Ltd FPC Members**). The chairman of the Financing Proposal Committee (**FPC Chairman**) shall be appointed, prior to the Majority Interest Date, by the CS Ltd FPC Members and, after the Majority Interest Date, by the IT Ltd FPC Members. The FPC Chairman shall not have a casting vote.

The Financing Proposal Committee shall meet periodically as follows (**FPC Meetings**):

(a)  the first FPC Meeting shall be held no later than 2 (two) weeks from the date of Closing;

(b)  subsequent FPC Meetings shall be held upon a mutually agreed schedule, and, in any event, at least every 2 (two) months; and

8

(c)    ad-hoc FPC Meetings shall be convened following written notice from any FPC Member to International Holdings and the other FPC Members.

5.13    FPC Meetings shall be convened by written notice from the FPC Chairman to the FPC Members no less than 5 (five) Business Days before the FPC Meeting, unless with the prior written consent of each FPC Member. The written notice (which for the purposes of this clause 5.13 may be delivered by electronic mail pursuant to clause 44.3) shall include an agenda identifying in reasonable detail the matters to be discussed at the FPC Meeting, together with copies of any relevant documents.

5.14    Decisions of the FPC Meeting shall be by way of a unanimous vote of those FPC Members present (whether in person or represented by an alternate (who must be a FPC Member)), provided always that where any proposed new financing is in accordance with clause 5.8, (i) a CS Ltd FPC Member may not withhold their consent to any refinancing of the IT Ltd Shareholder Loan, and (ii) CS Ltd shall procure that the CS Ltd SC Members and CS Ltd IH Directors shall approve any FPC Matter related to such new financing. The quorum for any FPC Meeting shall be at least 1 (one) IT Ltd FPC Member and at least 1 (one) CS Ltd FPC Member provided that if within 1 (one) hour from the time appointed for any FPC Meeting, including an adjourned meeting, a quorum is not present, the meeting shall be periodically adjourned to such date as shall be agreed between the FPC Members, provided that such date shall not be later than 5 (five) Business Days from the date of the FPC Meeting.

5.15    The FPC Chairman shall procure that a written record (in sufficient detail to enable the Shareholders to comprehend in full the matters contained therein) of any FPC Meeting together with copies of any documentation produced at such FPC Meeting shall be sent (after approval thereof by each FPC Member) to each FPC Member, SC Member, Director and Shareholder within 5 (five) Business Days of such FPC Meeting.

5.16    A written resolution signed and dated by all of the FPC Members, entitled at the relevant time to attend at and vote at FPC Meetings, shall be a valid and effective approval of such matters as if the same had been duly passed at a meeting of the Financing Proposal Committee held in accordance with the provisions of this clause 5.

5.17    Any FPC Member or his alternate (who must be a FPC Member) may validly participate in a meeting of the Financing Proposal Committee by means of conference telephone or any other form of communications equipment, provided that all persons participating in the meeting are able to hear each other throughout such meeting. A person so participating by being present or being in telephone communication with those in the meeting shall be deemed to be present in person at the meeting and shall accordingly be counted in a quorum and be entitled to vote. Such a meeting shall be deemed to take place where the largest group of those participants is assembled, or, if there is no such group, where the chairman of the meeting is.

## 6.  International Holdings Board of Directors

6.1    The parties shall procure that the International Holdings Board of Directors shall be responsible for the overall direction and management of International Holdings. The Directors shall in their capacity as Directors, at all times act in the best interests of International Holdings in accordance with international standards of corporate governance. The International Holdings Board of Directors shall not, however, take any decision (and if it takes any such decision it shall be deemed invalid and ineffective) unless such decision complies with the provisions of clauses 11, 12 and 28.

*Number of Directors*

6.2    Unless the parties agree otherwise, the International Holdings Board of Directors shall consist of 7 (seven) members.

*Appointment and Removal of Directors*

6.3    Subject to clause 6.5 and prior to the Majority Interest Date:

(a) CS Ltd shall propose for appointment by the Shareholders' general meeting 3 (three) Directors as members of the International Holdings Board of Directors and may propose the removal of any Director so proposed for appointment and propose the appointment of another in his place, provided that 1 (one) of the Directors so proposed for appointment by CS Ltd shall be Mr Sirwan Saber Mustafa;

(b) IT Ltd shall propose for appointment by the Shareholders' general meeting 3 (three) Directors as members of the International Holdings Board of Directors and may propose the removal of any Director so proposed for appointment and propose the appointment of another in his place; and

(c) CS Ltd shall propose for appointment by the Shareholders' general meeting, 1 (one) independent person to act as the seventh director of the International Holdings Board of Directors, such person to be selected in accordance with clause 6.15 (**Independent Director**).

Subject to clause 6.5 and following the Majority Interest Date:

(a) IT Ltd shall propose for appointment by the Shareholders' general meeting 4 (four) Directors as members of the International Holdings Board of Directors and may propose the removal of any Director so proposed for appointment and propose the appointment of another in his place; and

(b) CS Ltd shall propose for appointment by the Shareholders' general meeting 3 (three) Directors as members of the International Holdings Board of Directors and may propose the removal of any Director so proposed for appointment and propose the appointment of another in his place, provided that one of the Directors so proposed for appointment by CS Ltd shall be Mr Sirwan Saber Mustafa.

6.5 In the event that either Shareholder's Relevant Shareholder Percentage of International Holdings shall:

(a) be less than 20% (twenty per cent.) but not less than 10% (ten per cent.), such Shareholder shall lose its rights to propose the appointment and removal of Directors pursuant to clauses 6.3 and 6.4 (as applicable) and shall propose for appointment by the Shareholders' general meeting 1 (one) Director only as a member of the International Holdings Board of Directors and may propose the removal of such Director and propose the appointment of another in his place (in the case of CS Ltd, for as long as Mr Sirwan Saber Mustafa's Relevant Shareholder Percentage of International Holdings shall exceed 5.1% (five point one per cent.), such Director shall be Mr Sirwan Saber Mustafa); or

(b) be less than 10% (ten per cent.), such Shareholder shall lose its rights to propose the appointment and removal of Directors pursuant to clauses 6.3, 6.4 and 6.5(a),

and such Shareholder shall (i) procure the prompt removal of such number of Director(s) as have been previously proposed for appointment by such Shareholder and which exceed their rights pursuant to this clause 6.5, and (ii) shall indemnify International Holdings for any damages, whether for compensation for loss of office, wrongful dismissal or otherwise, and any reasonable costs and expenses incurred in defending such proceedings which arise out of the removal of such Director(s) from office.

6.6 The parties shall procure that the Shareholders' general meeting and the International Holdings Board of Directors shall approve and appoint or remove (as applicable) such persons as are proposed pursuant to clauses 6.3, 6.4 and 6.5 for appointment to or removal from the International Holdings Board of Directors promptly upon receiving written notice of such proposal, unless the notice indicates otherwise. Prior to such appointment or removal, the proposing Shareholder shall, as far as practicable, consult with the other Shareholders as to the identity and experience of the proposed nominee and the reasons for the removal of their proposed representative. The Shareholder proposing the removal of any Director in accordance with clauses 6.3 or 6.4 shall indemnify International Holdings for any damages, whether for

10

compensation for loss of office, wrongful dismissal or otherwise, and any reasonable costs and expenses incurred in defending such proceedings which arise out of the removal of such Director from office.

### Quorum

IT Ltd and CS Ltd shall use all reasonable endeavours to ensure that their respective nominees as Directors shall attend each International Holdings Board Meeting and to procure that a quorum is present throughout each such meeting. Subject to clauses 6.14 and 28, a quorum for each International Holdings Board Meeting shall be a majority of Directors including 1 (one) IT Ltd IH Director and 1 (one) CS Ltd IH Director provided that, if within one hour from the time appointed for an International Holdings Board Meeting a quorum is not present, the meeting shall be adjourned to the same calendar day of the next week (or such other date as may be agreed by at least 1 (one) CS Ltd IH Director and at least 1 (one) IT Ltd IH Director (each acting reasonably)) at the same time and place, and with the same agenda, then at such adjourned meeting any 4 (four) Directors present shall constitute a quorum.

### Conflict of Interest

6.8   Subject to clause 28, the Directors may authorise any matter proposed to them in accordance with this Agreement which relates to a situation in which a Director has, or can have, an interest which conflicts, or possibly may conflict, with the interests of the Group, provided that (i) he has disclosed to the International Holdings Board of Directors the nature and extent of his interest in writing as soon as he is aware of such interest, and (ii), he shall not vote on, or be counted in the quorum in relation to, any resolution of the International Holdings Board of Directors or of a committee of the International Holdings Board of Directors concerning such matter.

### Notice of Board Meetings

6.9   Subject to clause 28, International Holdings Board Meetings shall be convened by written notice from the chairman of International Holdings to each Directors no less than 14 (fourteen) days before such International Holdings Board Meeting, unless (i) any Director reasonably determines that an Emergency Situation has arisen, or (ii) at least 1 (one) CS Ltd IH Director and at least 1 (one) IT Ltd IH Director approves in writing a shorter notice period (for the avoidance of doubt and for the purposes of this clause 6.9 such approval in writing may be delivered by electronic mail pursuant to clause 44.3). Any notice shall include an agenda identifying in reasonable detail the matters to be discussed at the meeting. Copies of any relevant papers relating to the items specified in the agenda shall be sent to all the Directors no later than 7 (seven) days prior to the date of the meeting unless (i) at least 1 (one) IT Ltd IH Director and at least 1 (one) CS Ltd IH Director approves a shorter period, or (ii) any Director reasonably determines that an Emergency Situation has arisen. If any matter is not included on the agenda, the International Holdings Board of Directors shall not decide on it unless at least 1 (one) CS Ltd IH Director and at least 1 (one) IT Ltd IH Director agrees otherwise.

### Chairman of Board Meetings

6.10   Subject to clause 28:

(a)   the chairman of International Holdings shall preside as chairman of the International Holdings Board Meeting but, if the chairman of International Holdings is not present within one hour after the time appointed for holding a meeting and willing to act, the Directors present shall elect 1 (one) of their number to be chairman of that International Holdings Board Meeting by simple majority vote;

(b)   at each general meeting of International Holdings at which the annual accounts of International Holdings are approved, the Shareholder whose Relevant Shareholder Percentage of International Holdings exceeds 50% (fifty per cent.) shall propose for appointment the person to act as chairman of the International Holdings Board of Directors;

(c)   at each general meeting of International Holdings at which the annual accounts of International Holdings are approved, the minority Shareholder shall propose for appointment the person to act as vice chairman of the International Holdings Board of Directors and the first vice chairman of International Holdings shall be so appointed at the first general meeting of International Holdings following Closing; and

(d)   neither the chairman nor the vice chairman of an International Holdings Board Meeting shall have a casting vote in any case.

*Attendance at Board Meetings*

The location for the International Holdings Board Meetings shall be the registered office of International Holdings or at such other location as may be agreed in writing by at least 1 (one) IT Ltd IH Director and 1 (one) CS Ltd IH Director. The first International Holdings Board Meeting shall take place immediately upon Closing and thereafter, unless otherwise agreed by the Shareholders, International Holdings Board Meetings shall be held (i) immediately prior to a meeting of the Korek Supervisory Committee, and (ii) at least quarterly. In addition, any Director shall be entitled to require the chairman of International Holdings to convene an International Holdings Board Meeting by giving written notice to the Directors in which case International Holdings shall ensure that such meeting is promptly called in accordance with the provisions of this Agreement and, if relevant, the constitutional documents of International Holdings. The Directors shall be entitled to attend International Holdings Board Meetings by means of conference telephone or any other form of communications equipment, provided that all persons participating in the meeting are able to hear each other throughout such meeting and such person shall accordingly be counted in the quorum and be entitled to vote. The International Holdings Board of Directors may invite the Shareholders, any members of management of any entity of the Group, and any other persons (including advisers) to attend any of its meetings as observers provided, however, that the International Holdings Board of Directors shall be responsible for procuring that any such observer (other than members of management) will comply with any confidentiality undertakings reasonably required by the International Holdings Board of Directors. For the avoidance of doubt, (i) the International Holdings Board of Directors shall decide by a prior simple majority vote if it accepts the attendance of the observers, and (ii) the observers will not have any rights to vote and will not be counted as part of the quorum at meetings of the International Holdings Board Meetings.

*Board Minutes*

6.12   Subject to clause 28, the chairman of International Holdings shall procure that a written record (in sufficient detail to enable the Directors to comprehend in full the matters contained therein) of any International Holdings Board Meeting (IH Minutes) together with copies of any documentation produced at such International Holdings Board Meeting shall be sent to each Director within 5 (five) Business Days of such International Holdings Board Meeting. The IH Minutes shall be ratified by the International Holdings Board of Directors at the next following International Holdings Board Meeting.

*Board Committees*

6.13   If International Holdings establishes any committee, such committee shall consist of at least 2 (two) persons proposed by IT Ltd and at least 2 (two) persons proposed by CS Ltd. Committees of International Holdings shall operate by consensus and shall only have the power to make recommendations to the International Holdings Board of Directors.

*Board Resolutions*

6.14   Subject to clauses 11, 12 and 28 and prior to the Majority Interest Date, no resolution of the Directors proposed at any International Holdings Board Meeting shall be effective, including, for the avoidance of doubt, any approval of the Business Plan or Budget, unless it is voted in favour of by a majority of the Directors present at such International Holdings Board Meeting, including at least 1 (one) IT Ltd IH Director and 1 (one) CS Ltd IH Director. Each Director shall have 1 (one) vote, except that any Director who is absent from a meeting may elect in writing (for the

avoidance of doubt and for the purposes of this clause 6.14 such election in writing may be delivered by electronic mail pursuant to clause 44.3) any other Director to act as his unfettered alternate (who must be a Director) and to vote in his place at the meeting, in which case the Director present shall be entitled to exercise both his own vote and the unfettered vote of the other Director(s) that he represents, and the represented Director shall be deemed to be present and counted for quorum purposes. A person entitled to be present at an International Holdings Board Meeting or of a committee of the International Holdings Board of Directors shall be deemed to be present for all purposes if he is able (directly or by telephonic communication) to speak to and be heard by all those present or deemed to be present simultaneously. A Director so deemed to be present shall be entitled to vote and be counted in a quorum accordingly. For the avoidance of doubt, a written resolution signed and dated by all of the Directors, entitled at the relevant time to attend at and vote at the International Holdings Board Meeting, shall be a valid and effective approval of such matters as if the same had been duly passed at an International Holdings Board Meeting held in accordance with the provisions of this clause 6.

### Appointment of Independent Director

6.15   The Independent Director shall be selected as follows:

(a)   whenever there is a vacancy for the position of Independent Director, each Shareholder may propose 1 (one) or more candidates for appointment as the Independent Director, provided that each of the proposed candidates:

(i)   either:

(A)   has no less than 5 (five) years aggregate experience in a senior position in the telecommunications sector or a sector that a reasonable investor in Korek would deem to be sufficiently relevant to the Business, with 1 (one) or more international companies; or

(B)   has experience of serving on the board of directors of an international listed company; and

(ii)   is a person with knowledge of doing business in, and the market culture of, the Middle East; and

(iii)   has demonstrated a successful track record of taking executive decisions in the carrying on of business with international companies; and

(iv)   is independent of each of the Shareholders and their respective Affiliates,

and each Shareholder shall, when requested in relation to a proposed candidate, provide to the other parties sufficient information required in order to establish that such candidates satisfy all the above criteria;

(b)   CS Ltd shall propose for appointment the Independent Director (in accordance with clause 6.3(c)) from the list of candidates proposed by each Shareholder pursuant to clause 6.15(a).

### Execution of Documents

6.16   Subject to clauses 6.14, 11, 12 and 28, any documents to be entered into by or on behalf of International Holdings shall be executed, only after approval by the International Holdings Board of Directors, by the chairman of the International Holdings Board of Directors (or in the event that the chairman is absent or otherwise unavailable, any other Director duly authorised by the International Holdings Board of Directors) appointed, from time to time, in accordance with clause 6.10.

13

## 7   Korek Supervisory Committee

7.1   The parties and International Holdings shall procure that the Korek Supervisory Committee shall be responsible for the overall direction and management of Korek. Each party shall exercise its powers and rights hereunder to procure that the Korek Supervisory Committee is constituted and operates at all times in the manner set out in this Agreement. The SC Members shall, in their capacity as SC Members, at all times act in the best interests of Korek in accordance with international standards of corporate governance. The Korek Supervisory Committee shall not, however, take any decision (and if it takes any such decision it shall be invalid and ineffective) unless such decision complies (where relevant) with the provisions of clauses 11, 12 and 28.

### Number of SC Members

7.2   Unless the parties agree otherwise, the Korek Supervisory Committee shall consist of 7 (seven) members.

### Appointment and Removal of SC Members

7.3   Subject to clauses 7.5 and 7.6 and prior to the Majority Interest Date:

(a)   CS Ltd shall propose for appointment by the Shareholders' general meeting 3 (three) SC Members as members of the Korek Supervisory Committee and may propose the removal of any SC Member so proposed for appointment and propose the appointment of another in his place, provided that 1 (one) of the SC Members so proposed for appointment by CS Ltd shall be Mr Sirwan Saber Mustafa;

(b)   IT Ltd shall propose for appointment by the Shareholders' general meeting 3 (three) SC Members as members of the Korek Supervisory Committee and may propose the removal of any SC Member so proposed for appointment and propose the appointment of another in his place;

(c)   CS Ltd shall propose for appointment by the Shareholders' general meeting, 1 (one) independent person to act as the seventh SC Member of the Korek Supervisory Committee, such person to be selected in accordance with clause 7.18 (Independent SC Member) and propose the removal of the SC Member so proposed for appointment and, in accordance with clause 7.18, propose the appointment of another in his place; and

(d)   upon Closing, Mr Sirwan Saber Mustafa shall be the first chairman of the Korek Supervisory Committee.

7.4   Subject to clauses 7.5 and 7.6 and following the Majority Interest Date:

(a)   IT Ltd shall propose for appointment 4 (four) SC Members as members of the Korek Supervisory Committee and may propose the removal of any SC Member so proposed for appointment and propose the appointment of another in his place; and

(b)   CS Ltd shall propose for appointment 3 (three) SC Members as members of the Korek Supervisory Committee and may propose the removal of any SC Member so proposed for appointment and propose the appointment of another in his place, provided that one of the SC Members so proposed for appointment by CS Ltd shall be Mr Sirwan Saber Mustafa.

7.5   In the event that either Shareholder's Relevant Shareholder Percentage of International Holdings shall:

(a)   be less than 20% (twenty per cent.) but not less than 10% (ten per cent.), such Shareholder shall lose its rights to propose the appointment and removal of SC Members pursuant to clauses 7.3 and 7.4 (as applicable) and shall propose for appointment 1 (one) SC Member only as a member of the Korek Supervisory Committee and may propose the removal of such SC Members and propose the appointment of another in his place (in the

14

case of CS Ltd, for as long as Mr Sirwan Saber Mustafa's Relevant Shareholder Percentage of International Holdings shall exceed 5.1% (five point one per cent.), such CS Ltd SC Member shall be Mr Sirwan Saber Mustafa); or

(b)   be less than 10% (ten per cent.), such Shareholder shall lose its rights to propose the appointment and removal of SC Members pursuant to clauses 7.3, 7.4 and 7.5(a),

and such Shareholder shall (i) procure the prompt removal of such number of SC Member(s) as have been previously proposed for appointment by such Shareholder and which exceed their rights pursuant to this clause 7.5, and (ii) shall indemnify Korek for any damages, whether for compensation for loss of office, wrongful dismissal or otherwise, and any reasonable costs and expenses incurred in defending such proceedings which arise out of the removal of such SC Member(s) from office.

7.6   Unless the parties otherwise agree, the members of the Korek Supervisory Committee shall, at all times, be the same persons as the members of the International Holdings Board of Directors and in the event that a Shareholder shall propose the appointment or propose the removal of any member of the International Holdings Board of Directors in accordance with clause 6.3 or 6.4, International Holdings and Korek shall procure that such person shall also be appointed or removed (as applicable) as a member of the Korek Supervisory Committee as soon as reasonably practicable. The Shareholder proposing the removal of any member of the Korek Supervisory Committee shall indemnify Korek for any damages, whether for compensation for loss of office, wrongful dismissal or otherwise, and any reasonable costs and expenses incurred in defending such proceedings which arise out of the removal of such member of the Korek Supervisory Committee from office.

*Quorum*

7.7   Subject to clause 28, IT Ltd and CS Ltd shall use all reasonable endeavours to ensure that their respective nominees shall attend each meeting of the Korek Supervisory Committee and to procure that a quorum is present throughout each such meeting. Subject to clause 7.10, a quorum for each meeting of the Korek Supervisory Committee shall be a majority of SC Members including one proposed for appointment by each of IT Ltd and CS Ltd provided that, if within one hour from the time appointed for a meeting of the Korek Supervisory Committee, a quorum is not present, the meeting shall be adjourned to the same calendar day of the next week (or such other date as may be agreed by at least 1 (one) IT Ltd SC Member and at least 1 (one) CS Ltd SC Member (each acting reasonably)) at the same time and place, and with the same agenda, then at such adjourned meeting 4 (four) SC Members shall constitute a quorum.

*Conflict of Interests*

7.8   Subject to clause 28, the SC Members may authorise any matter proposed to them in accordance with this Agreement which relates to a situation in which a SC Member has, or can have, an interest which conflicts, or, possibly may conflict, with the interests of the Group, provided that (i) he has disclosed to the Korek Supervisory Committee the nature and extent of his interest in writing as soon as he is aware of such interest, and (ii) he shall neither vote on, nor be counted in the quorum in relation to, any resolution of the Korek Supervisory Committee or of a committee of the Korek Supervisory Committee concerning such matter.

*Notice of SC Meetings*

7.9   Subject to clause 28, meetings of the Korek Supervisory Committee shall be convened by written notice from the Managing Director to each SC Member at least 14 (fourteen) days prior to such Korek Supervisory Committee meeting, unless (i) any SC Member reasonably determines that an Emergency Situation has arisen, or (ii) at least 1 (one) IT Ltd SC Member and at least 1 (one) CS Ltd SC Member approves in writing a shorter notice period (for the avoidance of doubt and for the purposes of this clause 7.9, such approval in writing may be delivered by electronic mail pursuant to clause 44.3). Any notice shall include an agenda identifying in reasonable detail the matters to be discussed at the meeting. Copies of any relevant papers relating to the items specified in the agenda shall be sent to all the SC Members no later than 7 (seven) days prior to the date of the

meeting unless (i) at least 1 (one) IT Ltd SC Member and at least 1 (one) CS Ltd SC Member approves a shorter period, or (ii) any SC Member reasonably determines that an Emergency Situation has arisen. If any matter is not included on the agenda, the Korek Supervisory Committee shall not decide on it unless at least 1 (one) IT Ltd SC Member and at least 1 (one) CS Ltd SC Member agree otherwise.

*SC Resolutions*

Subject to clauses 11, 12 and 28 and prior to the Majority Interest Date, no resolution of the Korek Supervisory Committee shall be effective, including, for the avoidance of doubt, any approval of the Business Plan or Budget, unless it is voted in favour of by a majority of the SC Members present at such meeting of the Korek Supervisory Committee, including at least 1 (one) IT Ltd SC Members and 1 (one) CS Ltd SC Members. Each SC Member (including the chairman of any meeting of the Korek Supervisory Committee) shall have 1 (one) vote, except that any SC Member who is absent from a meeting may elect in writing (for the avoidance of doubt and for the purposes of this clause 7.10, such election in writing may be delivered by electronic mail pursuant to clause 44.3) any other SC Member to act as his unfettered alternate and to vote in his place at the meeting, in which case the SC Member present shall be entitled to exercise both his own vote and the unfettered vote of the other SC Member(s) that he represents, and the represented SC Member shall be deemed to be present and counted for quorum purposes. A person entitled to be present at a meeting of the Korek Supervisory Committee or of a committee of the Korek Supervisory Committee shall be deemed to be present for all purposes if he is able (directly or by telephonic communication) to speak to and be heard by all those present or deemed to be present simultaneously. A SC Member so deemed to be present shall be entitled to vote and be counted in a quorum accordingly. For the avoidance of doubt, a written resolution signed and dated by all of the SC Members, entitled at the relevant time to attend at and vote at the Korek Supervisory Committee meeting, shall be a valid and effective approval of such matters as if the same had been duly passed at a meeting of the Korek Supervisory Committee held in accordance with the provisions of this clause 7.

*Chairman at SC Meetings*

7.11.   Subject to clause 28, the chairman of the Korek Supervisory Committee shall preside as chairman of the meetings of the Korek Supervisory Committee but, if the chairman of the Korek Supervisory Committee is not present within 1 (one) hour after the time appointed for holding a meeting and willing to act, the SC Members present shall elect 1 (one) of their number to be chairman by simple majority vote. For the avoidance of doubt, the first chairman of the Korek Supervisory Committee on Closing shall be Mr Sirwan Saber Mustafa.

*Attendance at SC Meetings*

7.12   Subject to clause 28, the location for the meetings of the Korek Supervisory Committee shall be in the Republic of Iraq or at such other location as may be agreed in writing by at least 1 (one) IT Ltd SC Member and one CS Ltd SC Member. The first meeting of the Korek Supervisory Committee shall take place immediately upon Closing and thereafter, unless otherwise agreed by the Shareholders, meetings of the Korek Supervisory Committee shall be held at least quarterly. In addition, any SC Member shall be entitled to require the Managing Director to convene a meeting of the Korek Supervisory Committee by giving written notice to the SC Members in which case Korek shall ensure that such meeting is promptly called in accordance with the provisions of this Agreement and, if relevant, the constitutional documents of Korek. The members of the Korek Supervisory Committee shall be allowed to attend the Korek Supervisory Committee by means of conference telephone or any other form of communications equipment, provided that all persons participating in the meeting are able to hear each other throughout such meeting. A person so participating by being present or being in telephone communication with those in the meeting shall be deemed to be present in person at the meeting and shall accordingly be counted in a quorum and be entitled to vote. The Korek Supervisory Committee may invite the Shareholders, any members of management of any entity of the Group, and any other persons (including advisers) to attend any of its meetings as observers provided, however, that the Korek Supervisory Committee shall be responsible for procuring that any such observer will comply with any confidentiality undertakings reasonably required by the Korek Supervisory Committee. For

the avoidance of doubt, (i) the Korek Supervisory Committee shall decide by a prior simple majority vote if its accepts the attendance of the observers and (ii) the observers will not have any rights to vote and will not be counted as part of the quorum at meetings of the Korek Supervisory Committee.

*Minutes*

7.13 Subject to clause 28, the chairman of the Korek Supervisory Committee shall procure that a written record (in sufficient detail to enable the SC Members to comprehend in full the matters contained therein) of any Korek Supervisory Committee Meeting **(SC Minutes)** together with copies of any documentation produced at such Korek Supervisory Committee Meeting shall be sent to each SC Member within 5 (five) Business Days of such Korek Supervisory Committee Meeting. The SC Minutes shall be ratified by the Korek Supervisory Committee at the next following Korek Supervisory Committee Meeting.

*Subsidiary Boards*

7.14 The members of the boards of a subsidiary or undertaking of Korek shall be proposed by the Korek Supervisory Committee. Each relevant board of directors shall consist of at least 1 (one) director proposed for appointment by IT Ltd and at least 1 (one) director proposed for appointment by CS Ltd. The Shareholders shall be entitled to receive reasonable notice of and attend any meeting of the board of directors of a subsidiary or undertaking of Korek. The Shareholders shall not have a right to vote at any meeting of the board of directors of a subsidiary or undertaking of Korek.

*Appointment of Chairman*

7.15 Provided that 20% (twenty per cent.) or more of the Shares are held by CS Ltd, CS Ltd shall propose a candidate (who shall be a CS Ltd SC Member) for appointment by the Korek Supervisory Committee as the chairman of the Korek Supervisory Committee. If such proviso ceases to be correct, the SC Members shall propose a candidate for appointment as the chairman of the Korek Supervisory Committee from among their number.

*Conversion to PJSC*

7.16 The provisions of this clause 7 shall be amended by clause 27 upon Korek converting into a PJSC. Further, references in this Agreement to the Korek Supervisory Committee (and SC Members) shall (upon Korek converting into a PJSC) unless the context otherwise requires be deemed to refer to the PJSC board of directors (and its directors).

7.17 The parties acknowledge and agree that the provisions of this Agreement are deliberately intended to set out the detailed corporate governance arrangements for Korek as agreed between the parties. If any of the provisions of this Agreement conflict with or provides any other additional provisions, then the provisions of this Agreement shall prevail as between the parties.

*Appointment of the Independent SC Member*

7.18 The Independent SC Member shall be selected as follows:

(a) whenever there is a vacancy for the position of Independent SC Member, each Shareholder may propose 1 (one) or more candidates for appointment as the Independent SC Member, provided that each of the proposed candidates:

   (i) either:

      (A) has no less than 5 (five) years aggregate experience in a senior position in the telecommunications sector or a sector that a reasonable investor in Korek would deem to be sufficiently relevant to the Business, with 1 (one) or more international companies; or

17

(B)    has experience of serving on the board of directors of an international listed company; and

(ii)    is a person with knowledge of doing business in, and the market culture of, the Middle East; and

(iii)    has demonstrated a successful track record of taking executive decisions in the carrying on of business with international companies; and

(iv)    is independent of each of the Shareholders and their respective Affiliates,

each Shareholder shall, when requested in relation to a proposed candidate, provide to the other parties sufficient information required in order to establish that such candidates satisfy all criteria;

(b)    CS Ltd shall propose the Independent SC Member for appointment (in accordance with clause 7.3(c)) from the list of candidates proposed by each Shareholder pursuant to clause 7.18(a)

## Senior Management of Korek

8.1    Subject to clauses 8.3 and 8.6, from Closing, all members of the Korek Supervisory Committee may propose candidates for appointment by the Korek Supervisory Committee as Senior Managers of Korek, and may propose the removal of any Senior Manager and the appointment of another in his place (in each case, such person to be proposed for appointment or removal as a Senior Manager of Korek, a **Management Candidate**), provided that such member of the Korek Supervisory Committee shall:

(a)    give the Korek Supervisory Committee 10 (ten) Business Days' notice of the proposal setting out in reasonable detail the reasons why they believe that it is appropriate for such Management Candidate to be appointed or removed (**Appointment Notice**);

(b)    permit any other member of the Korek Supervisory Committee to object, on objective grounds, to such proposal and, to propose an alternative candidate; and

(c)    refer to and take into account the criteria for such appointment or removal as agreed by the Shareholders from time to time, which criteria shall include the bases on which individuals should be removed from office, including (without limitation): (i) a failure to adhere to certain parameters (as specified from time to time by the Shareholders in the then current adopted Business Plan); (ii) bankruptcy; (iii) a breach of law or regulation (except in relation to minor offences such as minor traffic violations); (iv) gross misconduct; and (v) any other criteria as may be agreed between the Shareholders.

8.2    Upon receipt of an Appointment Notice, the Korek Supervisory Committee shall decide by simple majority whether to appoint or remove (as applicable) any Management Candidate proposed pursuant to clause 8.1.

8.3    CS Ltd shall propose the candidate for appointment as the CRO and may propose the removal of the CRO and the appointment of another in his place. Subject to clause 8.6, IT Ltd shall propose candidates for appointment as (i) the CEO, and (ii) the CFO and may propose the removal of the CEO or the CFO and the appointment of another in their place.

8.4    The Managing Director shall be the person to formally appoint and remove the Senior Managers and the CEO proposed pursuant to clauses 8.1, 8.2, 8.3 and 8.6.

8.5    The CEO shall be the sole executive reporting directly to the Managing Director and all discussions, communications and interactions between the Managing Director and the Senior Managers shall be carried out together with the CEO and the Managing Director shall have access to the information provided by the Senior Managers to the CEO at all times.

For the duration of the Management Consultancy Agreement, (i) the CEO shall, and the Senior Managers (other than the CRO) may (where applicable under the Management Consultancy Agreement at that time), be proposed pursuant to the terms of the Management Consultancy Agreement, and (ii) the parties shall take such actions as shall be required to ensure such candidates are able to take up and fulfil such roles for the benefit of the Business.

The parties and the Managing Director shall take all reasonable steps to ensure (so far as they are able) that, at all times:

(a)   the CEO and the Senior Managers will act in accordance with the instructions of the International Holdings Board of Directors and the Korek Supervisory Committee and the terms of this Agreement and the Transaction Documents; and

(b)   the CEO and the Senior Managers shall have full authority, acting in the best interests of Korek, to implement the then current Business Plan in accordance with the then current approved Budget.

The CEO and, if necessary, the Senior Managers shall provide the Korek Supervisory Committee with such access to the CEO and Senior Managers, the documents, reports, records and books of the CEO and the Senior Managers and any other information as it may reasonably require to monitor compliance with this clause 8. The CEO will report to, and advise, the Managing Director and the Korek Supervisory Committee, on a regular basis, in respect of any proposed amendments to the Business Plan and Budget or the activities of Korek that the CEO and Senior Managers believe will be in the best interests of Korek.

## Managing Director of Korek

9.1   Upon Closing, the first Managing Director of Korek shall be Mr Sirwan Saber Mustafa.

9.2   In accordance with the By-Laws, the Managing Director shall be appointed by the Shareholders who may appoint and remove the Managing Director by a simple majority. The Shareholder who holds the majority of the Shares at the time that any new Managing Director is appointed shall appoint the Managing Director, such person to be (i) Mr Sirwan Saber Mustafa, or (ii) one of such Shareholder's SC Members.

9.3   The appointment of a person other than Mr Sirwan Saber Mustafa as Managing Director shall be conditional upon such Managing Director entering into a Deed of Adherence pursuant to which such person shall agree to comply with all the provisions of this Agreement applicable to the Managing Director.

9.4   The parties shall procure that, at all times, the Managing Director shall act in accordance with clause 8.4, the best interests of Korek, the By-Laws, any resolution passed by the shareholders of Korek, the instructions of the Korek Supervisory Committee and any FPC Proposal adopted by the International Holdings Board of Directors or the Korek Supervisory Committee provided that such instructions and the FPC Proposal are not contrary to Iraqi law and are in accordance with the provisions of the National Mobile Licence.

9.5   Subject to clause 9.6:

(a)   prior to the Majority Interest Date, Korek undertakes to indemnify fully and hold the Managing Director harmless against all Costs which the Managing Director suffers, sustains or incurs (in his capacity only as Managing Director and not as Shareholder) directly arising from any act or decision of the Korek Supervisory Committee, save that the Managing Director shall not be indemnified in accordance with this clause 9.5(a) in respect of any acts or decisions of the Korek Supervisory Committee which he and all of the CS Ltd SC Members in attendance or represented at the relevant meeting did not vote against; and

(b)   following the Majority Interest Date, IT Ltd undertakes to indemnify fully and hold the Managing Director harmless against all Costs which the Managing Director suffers,

19

sustains or incurs (in his capacity only as Managing Director and not as Shareholder) directly arising from any act or decision of the Korek Supervisory Committee, save that the Managing Director shall not be indemnified in accordance with this clause 9.5(b) in respect of any acts or decisions of the Korek Supervisory Committee which he (and, in the case of Mr Sirwan Saber Mustafa, all of the CS Ltd SC Members in attendance or represented at the relevant meeting) did not vote against.

9.6 Clause 9.5 shall terminate in its entirety and cease to apply following the conversion of Korek to a PJSC as anticipated by clause 27.

## 10. Committees

10.1 The following committees of the Korek Supervisory Committee shall be established at Closing and maintained throughout the duration of this Agreement:

(a)  the staffing and remuneration committee (**Staffing and Remuneration Committee**);

(b)  the finance, audit and risk committee, which shall, among other things, monitor the Business Plan and the financing of the Group (**Finance, Audit and Risk Committee**); and

(c)  a sourcing and procurement committee (**Sourcing and Procurement Committee** and together with the Staffing and Remuneration Committee and the Finance, Audit and Risk Committee, **Committees**).

Except with the written consent of the parties, no other committee of the Korek Supervisory Committee shall be established.

### Staffing and Remuneration Committee

10.2 Subject to clause 10.11, the scope and responsibilities of the Staffing and Remuneration Committee shall be to make recommendations to the Korek Supervisory Committee on:

(a)  the human resources policies and strategies of the Group, particularly in respect of recruitment, salary and remuneration and industrial relations;

(b)  the remuneration and salaries payable in respect of the employees and contractors of the Group (including both fixed and variable rates of remuneration, the method of calculation and indexation and the provision of any employee stock option plans); and

(c)  the terms and conditions of contracts of engagement or employment to be entered into between the Group and the Management Candidates.

The Staffing and Remuneration Committee shall have the right to request all information from the employees and contractors of the Group to enable it to satisfy its responsibilities pursuant to this clause 10.2.

### Finance, Audit and Risk Committee

10.3 Subject to clause 10.11, the scope and responsibilities of the Finance, Audit and Risk Committee shall be to:

(a)  review the accounting policies of the Group to assess their continuing relevance and to make recommendations to the Korek Supervisory Committee as to whether to retain or propose changes to the accounting policies of the Group;

(b)  provide an initial review of the accounts prepared by the Group, including the half year and annual accounts and assist with interactions between the Auditors and the Korek Supervisory Committee;

20

(c)     review the management accounts prepared by the CEO and the Senior Managers;

(d)     review any significant risks and contingent and non contingent liabilities to be undertaken by the Group;

(e)     review the reports of, and monitor the implementation of any recommendations made by, the Group's internal audit team;

(f)     make recommendations to the Korek Supervisory Committee in respect of the internal quality control of the Group;

(g)     propose changes to the Group's corporate governance policies and constitutional documents;

(h)     review, on a half yearly basis, the Group's financial situation and cash flow forecasts and any financial transactions contemplated or concluded;

(i)     review the amount of any dividends or distributions proposed to be made and the dividend policy of the Group; and

(j)     review the Related Party Transactions before submission to the International Holdings Board of Directors or the Korek Supervisory Committee in accordance with clause 28.

*Sourcing and Procurement Committee*

10.4    Subject to clauses 10.11 and 28, the scope and responsibilities of the Sourcing and Procurement Committee shall be to:

(a)     make recommendations to the Korek Supervisory Committee on all procurement and sourcing activities of Korek;

(b)     establish appropriate procedures, methodologies and documentation to develop best practice in the sourcing and procurement of equipment and services required by Korek in the operation of its business; and

(c)     review and make recommendations to the Korek Supervisory Committee in respect of transactions involving the purchase of goods or services including any such matters which are Related Party Transactions.

and the Sourcing and Procurement Committee shall be periodically reviewed by the Shareholders who may determine that such committee shall be amended, reformed or dissolved according to the requirements of the Business at the relevant time

10.5    Subject to clauses 10.6 to 10.9, the Korek Supervisory Committee shall determine the composition of each of the Staffing and Remuneration Committee, the Finance, Audit and Risk Committee and the Sourcing and Procurement Committee.

*Provisions applying to all Committees*

*Appointment and Removal of Committee Members*

10.6    Each Committee shall consist of 4 (four) members (**Committee Members**). IT Ltd shall propose for appointment, by written notice to the Korek Supervisory Committee, 2 (two) Committee Members and may propose the removal of any Committee Member so proposed for appointment and propose the appointment of another in his place (**IT Ltd Committee Members**), and CS Ltd shall propose for appointment, by written notice to the Korek Supervisory Committee, 2 (two) Committee Members and may propose the removal of any Committee Member so proposed for appointment and propose the appointment of another in his place (**CS Ltd Committee Members**). The chairman of each Committee shall be appointed, prior to the Majority Interest

Date, by the CS Ltd Committee Members and, after the Majority Interest Date, by the IT Ltd Committee Members. No chairman of a Committee shall have a casting vote.

*Committee Meetings*

Each Committee shall meet periodically as follows (**Committee Meetings**):

(a) the first Committee Meeting shall be held no later than 2 (two) weeks from the date of Closing;

(b) subsequent Committee Meetings shall be held upon a mutually agreed schedule, and, in any event, at least every 2 (two) months; and

(c) ad-hoc Committee Meetings shall be convened following written notice from any Committee Member to the Korek Supervisory Committee.

Committee Meetings shall be convened by written notice from the chairman of the relevant committee to the Committee Members no less than 5 (five) Business Days before the Committee Meeting, unless with the prior written consent of each Committee Member, a shorter period is agreed. The written notice shall include an agenda identifying in reasonable detail the matters to be discussed at the Committee Meeting, together with copies of any relevant papers. If any matter is not included on the agenda, the Committee shall not decide on it unless at least 1 (one) IT Ltd Committee Member and at least 1 (one) CS Ltd Committee Member agrees otherwise.

*Quorum for Committee Meetings*

10.9  The quorum for any Committee Meeting shall be at least 1 (one) IT Ltd Committee Member and at least 1 (one) CS Ltd Committee Member (whether present or by proxy) provided in each case that if within 1 (one) hour from the time appointed for any Committee Meeting, including any adjourned Committee Meeting, a quorum is not present, the meeting shall be adjourned to such date as shall be agreed between the Committee Members, provided that such date shall not be later than 5 (five) Business Days from the date of the Committee Meeting. The Committee Members shall be allowed to attend Committee Meetings by means of conference telephone or any other form of communications equipment, provided that all persons participating in the meeting are able to hear each other throughout such meeting. A person so participating by being present or being in telephone communication with those in the meeting shall be deemed to be present in person at the meeting and shall accordingly be counted in a quorum and be entitled to vote. Such a meeting shall be deemed to take place where the largest group of those participants is assembled or, if there is no such group where the chairman of the meeting is.

*Committee Minutes*

10.10  The chairman of the Committee shall procure that a written record (in sufficient detail to enable the Shareholders to comprehend in full the matters contained therein) of any Committee Meeting together with copies of any documentation produced at such Committee Meeting shall be sent to each SC Member, Director and Shareholder within 5 (five) Business Days of such Committee Meeting.

*Role of Committees*

10.11  The role of the Committees shall be to (i) reach a consensus on the matters within their remit, (ii) to make appropriate recommendations to the Korek Supervisory Committee, and (iii) to seek to resolve any disputes in respect of the matters within their remit. In the event that a resolution is passed or vetoed by a Committee (**Committee Recommendation**), it shall provide the Korek Supervisory Committee with a written report setting out details of and reasons for any Committee Recommendation. Korek shall not be bound by any Committee Recommendation and each Committee Recommendation shall be determined by the Korek Supervisory Committee acting in its sole discretion.

**Shareholder Veto Matters**

The parties shall (and shall procure that International Holdings and Korek shall) use their respective powers to ensure, so far as they are legally able, that no action or decision relating to any of the matters set out in clause 11.2 below, is taken (whether by the International Holdings Board of Directors, the Korek Supervisory Committee, any entity within the Group or any of the officers or managers within the Group) without the prior approval or written consent of any party whose Relevant Shareholder Percentage of International Holdings (together with any of their Affiliates) shall exceed 10% (ten per cent.) (**Shareholder Veto Matters**).

The Shareholder Veto Matters are any decision, action or omission which may involve:

(a) constitutional documents: amending the constitutional documents of any entity within the Group save for any immaterial amendments which do not affect the rights of any Shareholder or any amendments which are required by law;

(b) change in nature of the Business: materially changing the nature or scope of the Business (as summarised in clause 3) including the introduction or discontinuance of any field of activity and the relocation or expansions of the Business, or the commencement of any new business not being ancillary or incidental to the Business;

(c) conversion of Korek: converting Korek or any other entity within the Group from a limited liability company to any other type of company;

(d) changes in share capital: changing the number of, or rights, privileges or preferences attaching to, shares in any entity within the Group (including any cancellation, conversion, consolidation or subdivision of shares) or granting any option or interest over any shares or any uncalled capital of any entity within the Group;

(e) equity funding: any funding plan for the Group which is not provided for in the then current adopted Budget or Business Plan or which requires new Shareholder equity contributions;

(f) acquisitions: any entity within the Group acquiring (whether in a single transaction or series of transactions) any business (or any material part of any business) or any material asset, or any shares in any company, or making any other investment, or entering into any other transaction other than in the ordinary course of business and: (i) where the acquisition or investment or transaction is not provided for in the then current adopted Budget or Business Plan; and (ii) where the acquisition price of that business or those shares exceeds the higher of: (I) US$10 million; or (II) 10% (ten per cent.) of the total capital expenditure provided for in the then current adopted Budget or Business Plan;

(g) winding up: any proposal to wind up any entity within the Group or other voluntary proceeding seeking liquidation, administration (whether out of court or otherwise), reorganisation, readjustment or other relief under any bankruptcy, insolvency or similar law or the appointment of a trustee, receiver, administrator (whether out of court or otherwise) or liquidator or similar officer;

(h) establishing subsidiaries: any entity within the Group establishing any subsidiary or undertaking;

(i) dividends: any entity within the Group declaring or paying any dividend or distribution where any dividend or distribution is not provided for in the then current adopted Budget or Business Plan and where declaring or paying any dividend or distribution would result in the Group's Indebtedness being greater than the Group's EBITDA for the preceding 12 (twelve) month period;

(j) exit: a Listing, Sale or refinancing (other than pursuant to the IT Ltd Shareholder Loan) of any entity of the Group;

23

(k)   **accounts or accounting policies:** approving the Group's statutory accounts or modifying the accounting policies of any entity within the Group;

(l)   **auditors:** appointing or removing any auditor of any entity within the Group; and

(m)  **Promissory Note:** save as contemplated pursuant to the Subscription Agreement, any transfer of any rights in the Promissory Note.

11.3  During the period up to the Majority Interest Date, the parties shall (and shall procure that International Holdings and Korek shall) use their respective powers to ensure, so far as they are legally able, that no action or decision (whether by the International Holdings Board of Directors, the Korek Supervisory Committee, any entity within the Group or any of the officers or managers within the Group) is taken which (i) relates to any of the matters specified in clause 11.4 (**IT Ltd Veto Matters**), or (ii) may involve adopting any Business Plan or Budget for the Group or any proposal for financing in excess of the financing for the Group specified in the then current adopted Business Plan or Budget (**Funding Plan**), or approving or ratifying any departure from the then current Business Plan, Funding Plan or Budget for the Group, in each case, without the prior approval or written consent of IT Ltd (provided that IT Ltd shall not withhold its approval or consent in respect of any financing obtained in compliance with clause 5.8).

11.4  The IT Ltd Veto Matters are any decision, action or omission which may involve:

(a)   **financing:** determining that the Group requires further working capital and determining the method of procuring such additional funding, relevant amounts and terms thereof;

(b)   **acquisitions:** any entity within the Group acquiring (whether in a single transaction or series of transactions) any business (or any material part of any business) or any material asset, or any shares in any company, or making any other investment, or entering into any other transaction other than in the ordinary course of business and where the acquisition price of that business or those assets or shares is below: (i) US$10 million; or (ii) 10% (ten per cent.) of the total capital expenditure provided for in the then current adopted Budget or Business Plan for the Group;

(c)   **disposals:** any entity within the Group disposing of (whether in a single transaction or series of transactions) any business (or any material part of any business) or any shares in any company or entering into any other transaction other than in the ordinary course of business and: (i) where the disposal or transaction is not provided for in the then current adopted Budget or Business Plan for the Group; or (ii) where the disposal price of that business or those assets or shares exceeds the higher of: (I) US$10 million; or (II) 10% (ten per cent.) of the total capital expenditure provided for in the then current adopted Budget or Business Plan;

(d)   **partnerships and joint ventures:** any entity within the Group entering into (or terminating) any material partnership, joint venture, profit-sharing agreement, technology licence or collaboration where entry into or termination of the partnership, joint venture, profit-sharing agreement, technology licence or collaboration is not provided for in the then current adopted Budget or Business Plan;

(e)   **capital expenditure:** any entity within the Group incurring any capital expenditure in respect of any single item or project (or related items or projects) where any capital expenditure to be incurred in respect of any single item or project (or related items or projects), is not in the ordinary course of business and: (i) where the incurrence of the capital expenditure is not provided for in the then current adopted Budget or Business Plan; and (ii) where the incurrence of the capital expenditure exceeds the higher of: (I) US$10 million; or (II) 10% (ten per cent.) of the total capital expenditure provided for in the then current adopted Budget or Business Plan;

(f)   **material contracts:** any entity within the Group entering into, terminating or making any material amendment to any contract, liability or commitment which is not provided for in the then current adopted Budget or Business Plan and where the total value of such

24

contract, liability or commitment exceeds the higher of: (i) US$10 million; or (ii) 10% (ten per cent.) of the aggregate contingent and non-contingent liabilities of the most recent audited balance sheet of the Group;

(g)  senior managers: appointing or removing any senior manager of the Group;

(h)  Intellectual Property Rights: any entity within the Group making any material acquisition or disposal (including any assignment, grant or entering into of any material licence) of or relating to any intellectual property owned or used by the Group other than in relation to the Brand Licence Agreement;

(i)  branding: changing the logo, business name or trade marks of the Group other than in accordance with the Brand Licence Agreement;

(j)  material litigation: decisions relating to the initiation and/or conduct (including the settlement) of any material litigation including any legal proceedings to which any entity within the Group is a party which adversely affects or might reasonably be expected to adversely affect the National Mobile Licence;

(k)  National Mobile Licence: any entity within the Group taking any steps or actions or making any decisions which materially adversely affects or might reasonably be expected to have a material adverse effect on the National Mobile Licence or the rights and obligations of any entity within the Group with regard to the CMC or agreeing a settlement of any amounts payable to the CMC (other than in connection with a CMC Reduction in accordance with clause 8.1 of the Subscription Agreement);

(l)  licences: entering into, amending (in any material respect) or terminating any material licence, including the National Mobile Licence;

(m)  cash management: any entity within the Group entering into or terminating any agreements or arrangements, or varying (in any material respects) such agreements or arrangements, in relation to the cash management of the Group (including in relation to decisions relating to hedging, foreign exchange and earning a return on the Group's cash) which is not provided for in the then current adopted Budget or Business Plan;

(n)  ordinary course: any entity within the Group taking any steps or actions or making any decisions other than in the ordinary course of business and: (i) where the decisions, steps or actions are not provided for in the then current adopted Budget or Business Plan; and (ii) where the decisions, steps or actions would result in the incurrence of capital expenditure the higher of (I) US$10 million; or (II) 10% (ten per cent.) of the total capital expenditure provided for in the then current adopted Budget or Business Plan;

(o)  borrowings: any entity within the Group incurring any indebtedness or raising money or guaranteeing, pledging or providing any other form of security for any indebtedness of the Group which would result in the Group's aggregate indebtedness being greater than the higher of: (i) the total amount of indebtedness stated in the then current adopted budget or business plan for the Group; or (ii) 150% (one hundred and fifty per cent.) of the total amount of aggregate indebtedness incurred by the Group in the preceding 12 (twelve) month period (such amount to be increased by a percentage equal to the percentage increase in CPI over the same 12 (twelve) month period);

(p)  release of obligations: any release, modification or abrogation of any significant liabilities, obligations or covenants (whether contingent or otherwise) owed to the Group where such amounts shall be regarded as significant if they are not provided for in the then current adopted Budget or Business Plan and: (i) exceed US$10 million; or (ii) relate to a liability, obligation or covenant from or on behalf of IT Ltd or any of CS Ltd and/or their respective affiliates); .

(q)  Management Consultancy Agreement: following the termination of the Management Consultancy Agreement the entering into of any agreement or arrangement in respect of

25

the same or similar subject matter as the Management Consultancy Agreement with any person who is engaged in any activity that is in direct or indirect competition with ASN or any of its Affiliates;

(r)  Alcazar Management Services Agreement: following the termination of the Alcazar Management Services Agreement, the entering into of any agreement or arrangement in respect of the same or similar subject matter as the Alcazar Management Services Agreement (the **Replacement Services Agreement**) unless Alcazar had been given the opportunity to provide the services offered under such agreement or arrangement and was unable to do so on terms and conditions which were at least comparable in terms of quality and pricing as the Replacement Services Agreement; and

(s)  Shareholders Resolutions: any amendment or replacement of the Shareholders Resolutions or the passing of any resolution of the shareholders of Korek which is contrary to or inconsistent with the Shareholders Resolutions.

11.5  Where any matter is proposed for approval as a Shareholder Veto Matter or an IT Ltd Veto Matter pursuant to clause 11.1 or 11.3 and such matter may be prohibited or restricted under the terms of the IT Ltd Shareholder Loan Agreement (or any other agreement pursuant to which IT Ltd has provided a loan to International Holdings or Korek), including, without limitation, those provisions of the IT Ltd Shareholder Loan Agreement which are permissive if a matter is a Permitted Transaction (as defined in the IT Ltd Shareholder Loan Agreement):

(a)  International Holdings or Korek (as applicable) shall ensure that (i) the notice convening the International Holdings Board Meeting or the Korek Supervisory Committee (as applicable) at which such approval shall be sought (to be sent to the Directors pursuant to clause 6.9 or the SC Members pursuant to clause 7.9 (as applicable)), shall include reasonably comprehensive details of those provisions of the IT Ltd Shareholder Loan Agreement which may prohibit or restrict the matter(s) for which approval is sought (**IT Ltd SLA Requirements**), and (ii) in addition to being sent to the Directors pursuant to clause 6.9 or the SC Members pursuant to clause 7.9 (as applicable), a copy of the notice referred to in (i) above shall also be sent to IT Ltd (in its capacity as lender under the IT Ltd Shareholder Loan) in accordance with clause 44;

(b)  IT Ltd (in its capacity as Lender under the IT Ltd Shareholder Loan) may prior to such meeting being held, notify the IT Ltd IH Directors and/or the IT Ltd SC Members (as applicable) of its view on the matters proposed for approval in light of the IT Ltd SLA Requirements; and

(c)  where any Shareholder Veto Matter or IT Ltd Veto Matter is approved or not approved pursuant to clause 11.1 or 11.3 (as applicable), the parties shall procure that a minute of the decision relating to such Shareholder Veto Matter or IT Ltd Veto Matter shall be provided to IT Ltd (in its capacity as Lender under the IT Ltd Shareholder Loan) within 8 (eight) Business Days of such decision becoming effective, including reasonably comprehensive details of each of the IT Ltd SLA Requirements and whether the Shareholder Veto Matter or IT Ltd Veto Matter was approved in relation to each of such IT Ltd SLA Requirements,

and for the avoidance of doubt, any consent or approval granted by IT Ltd pursuant to clause 11.1 or 11.3 shall not be deemed to be a waiver of, or consent to an amendment of, the terms of the IT Ltd Shareholder Loan Agreement and no view or opinion of IT Ltd provided pursuant to clause 11.5(b) above shall invalidate such consent or approval.

## International Holdings Board of Director and Korek Supervisory Committee Veto Matters

Following the Majority Interest Date, provided that both Shareholders' Relevant Shareholder Percentages in International Holdings shall exceed 20% (twenty per cent.) and subject to clause 12.4, the parties shall (and shall procure that International Holdings and Korek shall) use their

respective powers to ensure, so far as they are legally able, that no action or decision relating to any of the matters specified in clause 12.3 (**Super Majority Approval Matters**) is taken (whether by the International Holdings Board of Directors, the Korek Supervisory Committee, any entity within the Group or any of the officers or managers within the Group) if (by reference to the facts, circumstances and condition of Korek at the time of such decision) such action or decision, individually, or when aggregated with any other actions or decisions taken in respect of Super Majority Approval Matters during the same Calendar Year which were not approved by way of a Super Majority Approval, could reasonably be expected to result in;

(a)   the actual aggregate consolidated EBITDA of the Group for the remaining period covered by the then most recently approved Business Plan being at least 15% (fifteen per cent.) less or 15% (fifteen per cent.) more than the forecasted aggregate consolidated EBITDA of the Group for the same period in the then most recently approved Business Plan; or

(b)   the actual aggregate consolidated Off Balance Sheet Commitments, Capital Commitments and Indebtedness of the Group for the remaining period covered by the then most recently approved Business Plan being at least 15% (fifteen per cent.) less or 15% (fifteen per cent.) more than the forecasted aggregate consolidated Off Balance Sheet Commitments, Capital Commitments and Indebtedness of the Group for the same period in the then most recently approved Business Plan; or

(c)   the aggregate consolidated free cash flow of the Group for the remaining period covered by the then most recently approved Business Plan being at least 15% (fifteen per cent.) less or 15% (fifteen per cent.) more than the forecasted aggregate consolidated free cash flow of the Group for the same period in the then most recently approved Business Plan,

unless it is approved by the prior positive vote of at least 5 (five) members of the International Holdings Board of Directors or the Korek Supervisory Committee (as applicable) (a **Super Majority Approval**) and for the avoidance of doubt, where a matter requires a Super Majority Approval due to it being aggregated with any previous actions or decisions taken in respect of Super Majority Approval Matters during the same Calendar Year which did not require a Super Majority Approval under this clause 12, such prior actions and decisions shall remain valid and effective and shall not require any subsequent approval under this clause 12 or otherwise.

For the purpose of clause 12.1, in the case of any aggregated matters, the then most recently approved Business Plan shall mean (i) until the end of the first Calendar Year post Closing, the Initial Business Plan, and (ii) for subsequent Calendar Years, the Business Plan in operation at the start of such Calendar Year.

The Super Majority Approval Matters are any decision, action or omission which may involve:

(a)   financing: determining that the Group requires further working capital and determining the method of procuring such additional funding, relevant amounts and terms thereof;

(b)   acquisitions: any entity within the Group acquiring (whether in a single transaction or series of transactions) any business (or any material part of any business) or any material asset, or any shares in any company, or making any other investment, or entering into any other transaction other than in the ordinary course of business and where the acquisition price of that business or those assets or shares is below: (i) US$10 million; or (ii) 10% (ten per cent.) of the total capital expenditure provided for in the then current adopted Budget or Business Plan for the Group;

(c)   disposals: any entity within the Group disposing of (whether in a single transaction or series of transactions) any business (or any material part of any business) or any shares in any company or entering into any other transaction other than in the ordinary course of business and where the disposal or transaction is not provided for in the then current adopted Budget or Business Plan for the Group;

(d)   partnerships and joint ventures: any entity within the Group entering into (or terminating) any material partnership, joint venture, profit-sharing agreement, technology licence or

27

collaboration where entry into or termination of the partnership, joint venture, profit-sharing agreement, technology licence or collaboration is not provided for in the then current adopted Budget or Business Plan;

(e)  capital expenditure: any entity within the Group incurring any capital expenditure in respect of any single item or project (or related items or projects) where any capital expenditure to be incurred in respect of any single item or project (or related items or projects), is not in the ordinary course of business and where the incurrence of the capital expenditure is not provided for in the then current adopted Budget or Business Plan;

(f)  material contracts: any entity within the Group entering into, terminating or making any material amendment to any contract, liability or commitment which is not provided for in the then current adopted Budget or Business Plan;

(g)  Intellectual Property Rights: any entity within the Group making any material acquisition or disposal (including any assignment, grant or entering into of any material licence) of or relating to any intellectual property owned or used by the Group other than in relation to the Brand Licence Agreement;

(h)  branding: changing the logo, business name or trade marks of the Group other than in accordance with the Brand Licence Agreement;

(i)  material litigation: decisions relating to the initiation and/or conduct (including the settlement) of any material litigation including any legal proceedings to which any entity within the Group is a party which adversely affects or might reasonably be expected to adversely affect the National Mobile Licence;

(j)  National Mobile Licence: any entity within the Group taking any steps or actions or making any decisions which materially adversely affects or might reasonably be expected to have a material adverse effect on the National Mobile Licence or the rights and obligations of any entity within the Group with regard to the CMC or agreeing a settlement of any amounts payable to the CMC;

(k)  licences: entering into, amending (in any material respect) or terminating any material licence, including the National Mobile Licence;

(l)  cash management: any entity within the Group entering into or terminating any agreements or arrangements, or varying (in any material respects) such agreements or arrangements, in relation to the cash management of the Group (including in relation to decisions relating to hedging, foreign exchange and earning a return on the Group's cash) which is not provided for in the then current adopted Budget or Business Plan;

(m)  ordinary course: any entity within the Group taking any steps or actions or making any decisions other than in the ordinary course of business and where the decisions, steps or actions are not provided for in the then current adopted Budget or Business Plan;

(n)  borrowings: any entity within the Group incurring any indebtedness or raising money or guaranteeing, pledging or providing any other form of security for any indebtedness of the Group which would result in the Group's aggregate indebtedness being greater than the total amount of indebtedness stated in the then current adopted Budget or Business Plan for the Group; and

(o)  release of obligations: any release, modification or abrogation of any significant liabilities, obligations or covenants (whether contingent or otherwise) owed to the Group where such amounts shall be regarded as significant if they are not provided for in the then current adopted Budget or Business Plan or relate to a liability, obligation or covenant from or on behalf of IT Ltd or its affiliates.

28

For the avoidance of doubt, any matter, action or decision (including any Super Majority Approval Matters) relating to an item included or provided for in the Business Plan or Budget shall not require a Super Majority Approval pursuant to clause 12.1.

Where any matter is proposed for approval as a Super Majority Approval Matter pursuant to clause 12.1 and such matter may be prohibited or restricted under the terms of the IT Ltd Shareholder Loan Agreement (or any other agreement pursuant to which IT Ltd has provided a loan to International Holdings or Korek), including, without limitation, those provisions of the IT Ltd Shareholder Loan Agreement which are permissive if a matter is a Permitted Transaction (as defined in the IT Ltd Shareholder Loan Agreement):

(a)     International Holdings or Korek (as applicable) shall ensure that (i) the notice convening the International Holdings Board Meeting or the Korek Supervisory Committee (as applicable) at which such approval shall be sought (to be sent to the Directors pursuant to clause 6.9 or the SC Members pursuant to clause 7.9 (as applicable)), shall include reasonably comprehensive details of the IT Ltd SLA Requirements, and (ii) in addition to being sent to the Directors pursuant to clause 6.9 or the SC Members pursuant to clause 7.9 (as applicable), a copy of the notice referred to in (i) above shall also be sent to IT Ltd (in its capacity as Lender under the IT Ltd Shareholder Loan) in accordance with clause 44;

(b)     IT Ltd (in its capacity as Lender under the IT Ltd Shareholder Loan) may prior to such meeting being held, notify the IT Ltd IH Directors and/or the IT Ltd SC Members (as applicable) of its view on the matters proposed for approval in light of the IT Ltd SLA Requirements; and

(c)     where any Super Majority Approval Matter is approved or not approved pursuant to clause 12.1, the parties shall procure that a minute of the decision relating to such Super Majority Approval Matter shall be provided to IT Ltd (in its capacity as lender under the IT Ltd Shareholder Loan) within 8 (eight) Business Days of such decision becoming effective, including reasonably comprehensive details of each of the IT Ltd SLA Requirements and whether the Super Majority Approval Matter was approved in relation to each of such IT Ltd SLA Requirements,

and for the avoidance of doubt, any consent or approval granted by IT Ltd pursuant to clause 12.1 shall not be deemed to be a waiver of, or consent to an amendment of, the terms of the IT Ltd Shareholder Loan Agreement and no view or opinion of IT Ltd provided pursuant to clause 12.5(b) above shall invalidate such consent or approval.

## Default or Deadlock

No party shall act in a manner which is contrary to the provisions of this Agreement.

If either Shareholder (individually or collectively) acts in a manner which is contrary to the provisions of this Agreement (Defaulting Shareholders), any of the other Shareholders may send a written notice of breach to the Defaulting Shareholder setting out such details of the act or acts of the Defaulting Shareholder which are contrary to the provisions of this Agreement (a Notice of Breach).

The Defaulting Shareholder shall be entitled to remedy a breach of this clause 13, if capable of being remedied, within 30 (thirty) days of receipt of a Notice of Breach.

If a deadlock arises because the parties fail to agree on any of the Shareholder Veto Matters or there is no Super Majority Approval under clause 12.1 the parties agree to use their best efforts to resolve in good faith said deadlock within 30 (thirty) Business Days from the date that such deadlock shall arise. In the event that the parties are unable to resolve the deadlock within such 30 (thirty) Business Day period, the parties shall refer the matter to 2 (two) IT Ltd Representatives and 2 (two) CS Ltd Representatives, who shall attempt to resolve the deadlock. In the event that no resolution has been agreed within 30 (thirty) Business Days after such

referral, the parties shall continue to implement the then current Business Plan and Budget and, notwithstanding the existence of a deadlock, the Shareholders shall continue to fulfil their respective obligations under this Agreement and each of the Transaction Documents, and International Holdings and Korek shall continue to be managed and the Business shall continue to be carried on in accordance with the terms of this Agreement and each of the Transaction Documents

## 14 Financial Matters and Dividends

14.1 Korek and International Holdings shall adopt the Accounting Principles in relation to its financial statements (and those of the other entities within the Group).

14.2 The Shareholders agree that the Group's first auditors shall be Ernst & Young LLP.

14.3 The Financial Year for each member of the Group shall end on 31 December, unless the International Holdings Board of Directors determines otherwise.

14.4 Subject to clause 14.7 and any necessary approvals under clauses 11 or 12, the International Holdings Board of Directors and/or the Korek Supervisory Committee (as applicable) shall determine the level and timing of any dividends to be paid in respect of the Shares and/or the shares in Korek on the basis that in any Financial Year it is intended to distribute so much of the accumulated profits of the Group available for distribution in accordance with applicable law as is reasonable, taking into account the then current adopted Business Plan, the financial position of the Group at the time and applicable provisions of law. The Shareholders shall participate pro rata to their respective shareholdings in the distribution of any such dividends by International Holdings.

14.5 In the event that in connection with any Distribution paid or made by Korek to International Holdings in respect of which a proportionate part of such Distribution received by International Holdings is paid on by way of dividend to CS Ltd there is Excess Tax:

(a)  the parties shall use all reasonable endeavours to find a mechanism for mitigating such Excess Tax; and

(b)  in the event that no such mechanism can be determined, International Holdings shall be required to pay an additional amount to CS Ltd in respect of the Distribution to CS Ltd by International Holdings equal to CS's Ltd's proportionate share of such Excess Tax, such proportion being equal to CS Ltd's Relevant Shareholder Percentage in International Holdings at the time of such Distribution.

14.6 In the event that CS Ltd or any of the shareholders in CS Ltd subsequently receives a credit against, relief or remission for, or repayment of, any Tax as a result of the payment of such additional amount under clause 14.5, CS Ltd shall promptly pay to International Holdings an amount equal to the amount of such credit against, relief or remission for, or repayment of, such Tax.

14.7 No dividends shall be declared or paid in respect of the Shares until an amount equal to 75% (seventy five per cent.) of the aggregate principal amount (together with any accrued unpaid interest) on the IT Ltd Shareholder Loan and all loans made to International Holdings by IT Ltd and/or members of CS Ltd Group, as the case may be, pursuant to clause 5 have been repaid.

## 15 Information and Reporting

Subject to clause 15.6, each Shareholder shall be provided with access to all the books, records, accounts, employees and other information kept by any entity within the Group which it may reasonably require provided such access shall not materially interfere with the operation of the Business. Each party shall be entitled to receive all material information on the operations of the Group, including monthly management accounts and operating statistics and other trading and financial information.

Without prejudice to the generality of clause 15.1 and subject to clause 15.6, International Holdings shall supply the parties with copies of:

(a) the audited accounts for each entity within the Group (complying with all relevant legal requirements) within 7 (seven) days of the receipt by International Holdings of the final audited accounts from International Holdings' auditors;

(b) a Business Plan and itemised revenue and capital Budget for each Financial Year covering each principal division of the Group and showing proposed trading and cash flow figures, manning levels and all material proposed acquisitions, disposals and other commitments for that Financial Year;

(c) following the Transition Date, monthly management accounts of the Group; which shall include a consolidated profit and loss account, balance sheet and cash flow statement (including a statement of progress against the then current adopted Business Plan, a statement of any variation from the quarterly revenue Budget and up-to-date forecasts for the balance of the relevant Financial Year and itemising all transactions referred to in the capital Budget entered into by each principal division of the Group during that period), within 20 (twenty) Business Days of the end of the period to which they relate;

(d) copies of any communication, document, notice or letter received by the Group from any Government Entity in the Republic of Iraq as soon as reasonably practicable;

(e) all documents dispatched by International Holdings to its creditors generally at the same time as they are dispatched;

(f) details of any litigation, arbitration or administrative proceedings which are current, threatened or pending against any entity within the Group by the CMC as soon as reasonably practicable upon becoming aware of them;

(g) details of any litigation, arbitration or administrative proceedings which are current, threatened or pending against any entity within the Group, and which might, if adversely determined, have a material adverse effect on any entity within the Group, as soon as reasonably practicable upon becoming aware of them;

(h) details of any litigation, arbitration or administrative proceedings which are current, threatened or pending against International Holdings by any Third Party Lender as soon as reasonably practicable upon becoming aware of them;

(i) a list of any contingent liabilities; and

(j) any financial data reasonably requested by the parties.

Subject to clause 15.6, a draft of the Business Plan and Budget for each full Financial Year commencing after Closing will be provided by International Holdings for approval (with or without amendments) in accordance with clause 11 no less than 45 (forty-five) Business Days before the start of that Financial Year. The Business Plan and Budget as so approved shall be the Business Plan and Budget adopted for the Financial Year to which they relate.

Subject to clauses 15.6 and 15.7, International Holdings and Korek shall procure so far they are able (and without prejudice to the parties' rights and obligations pursuant to schedule 7 of the Subscription Agreement) that:

(a) the Shareholders are kept fully informed of the progress of any material dispute or potential dispute in relation to the tax affairs of International Holdings and Korek;

(b) the Shareholders are kept fully informed of the progress of any negotiations with the CMC or any other Government Entity and given the opportunity to attend any key meetings with the CMC or any other Government Entity;

(c)   the Shareholders, as soon as reasonably practicable, receive copies of all material correspondence with any tax authority insofar as it is relevant to the dispute or potential dispute; and

(d)   no document will be submitted to any tax authority in respect of the dispute or potential dispute which is not true and accurate in all material respects.

15.5   Unless agreement is reached to the contrary, IT Ltd, CS Ltd and International Holdings shall procure that International Holdings is a tax resident and liable to tax solely in Dubai and that Korek is a tax resident and liable to tax solely in the Republic of Iraq.

15.6   A Shareholder shall cease to have the benefit of the rights set out in clauses 15.1, 15.2 (other than 15.2(a) and 15.2(e)), 15.3 and 15.4 upon its Relevant Shareholder Percentage in International Holdings falling below 20% (twenty per cent).

15.7   The obligations of International Holdings set out in clause 15.4 shall be conditional on the parties supplying such information and/or correspondence as is their respective possession or power in relation to such dispute or potential dispute to International Holdings.

15.8   CS Ltd shall procure that following Signing, Korek shall comply with all applicable corruption, anti-money laundering and anti-terrorist financing legislation of the Republic of Iraq including the guidelines and recommendations of the Iraqi Commission on Integrity.

15.9   The parties shall procure that International Holdings and Korek shall provide such information and assistance as may be reasonably required by the Shareholders to enable the Shareholders to incorporate financial information about the Group in their own or their Affiliates statutory accounts.

15.10   IT Ltd shall provide to CS Ltd a copy of its annual accounts and any interim accounts in each case within 10 (ten) Business Days of such information being provided to the shareholders in IT Ltd.

15.11   CS Ltd shall provide to IT Ltd a copy of its annual accounts and any interim accounts in each case within 10 (ten) Business Days of such information being provided to the shareholders in CS Ltd.

## 16   Confidentiality

Each Shareholder shall (and shall ensure that each other member of its Shareholder Group shall) keep confidential (and use all reasonable efforts to ensure that its officers, employees, agents and professional and other advisers keep confidential) any information:

(a)   which it may have or acquire before or after the date of this Agreement in relation to any entity within the Group's customers, business, assets or affairs (including any information provided pursuant to clause 15);

(b)   which it may have or acquire before or after the date of this Agreement in relation to the customers, business, assets or affairs of IT Ltd or any of its Affiliates (if the Shareholder is a member of the CS Ltd Group) or of any member of the CS Ltd Group (if the Shareholder is IT Ltd or any of its Affiliates) resulting from negotiating this Agreement and the Transaction Documents, being a Shareholder, having nominees on the International Holdings Board of Directors or the Korek Supervisory Committee or exercising its rights or performing its obligations under this Agreement; or

(c)   which relates to the contents of this Agreement (or any agreement or arrangement entered into pursuant to this Agreement including any other Transaction Document).

No party shall use for its own business purposes or disclose to any third party any such information (collectively, **Confidential Information**) without the consent of the other party.

32

The obligation of confidentiality under clause 16.1 does not apply to:

(a) disclosure (subject to clause 16.3) on a 'need to know' basis to an Affiliate of IT Ltd or the CS Ltd Group (as the case may be) where the disclosure is for a purpose reasonably incidental to this Agreement;

(b) information which is independently developed by the relevant party or acquired from a third party to the extent that it is acquired with the right to disclose it;

(c) disclosure of information to the extent required to be disclosed by law, any stock exchange regulation or other regulatory requirement, any binding judgment, order or requirement of any court or other competent authority or for the purpose of any judicial or arbitral proceedings arising out of any of the Transaction Documents;

(d) disclosure of information to any tax authority to the extent reasonably required for the purposes of the tax affairs of the party concerned or any Affiliate or entity within its Group;

(e) disclosure (subject to clause 16.3) in confidence to a party's (or any Affiliate or other entity within its Group's) professional advisers of information reasonably required to be disclosed for a purpose reasonably incidental to this Agreement;

(f) disclosure to a bona fide potential purchaser of shares or other securities in International Holdings or in a Shareholder (or its holding undertaking) provided that before any such disclosure the relevant party obtains from the potential purchaser an undertaking in favour of International Holdings and the other parties in terms equivalent to this clause 16;

(g) information which becomes within the public domain (otherwise than as a result of a breach of this clause 16); or

(h) any announcement made in accordance with the terms of clause 39.

16.3 Each Shareholder shall inform (and shall ensure that any Affiliate or other relevant member of its Shareholder Group shall inform) any officer, employee or agent or any professional or other adviser advising it in relation to the matters referred to in this Agreement, or to whom it provides Confidential Information, that such information is confidential and shall instruct them to keep it confidential and not to disclose it to any third party (other than those persons to whom it has already been disclosed in accordance with the terms of this Agreement). The disclosing party is responsible for any breach of this clause 16 by the person to whom the Confidential Information is disclosed.

16.4 If this Agreement terminates, each of IT Ltd and CS Ltd may by written notice require the other to return all Confidential Information relating to it and any Affiliate or other member of its Shareholder Group. If so, the other Shareholder shall (and shall ensure that the Affiliates and other members of its Shareholder Group and its officers and employees and those of such Affiliates and other members shall): (i) return all documents containing Confidential Information which have been provided by or on behalf of the Shareholder demanding the return of Confidential Information; and (ii) destroy any copies of such documents and any document or other record reproducing, containing or made from or with reference to the Confidential Information (except, in each case, for any submission to or filings with governmental, tax or regulatory authorities). The other Shareholder shall return or destroy the Confidential Information as soon as practicable after receiving notice.

16.5 International Holdings shall (and shall ensure that each other entity within the Group shall) observe a similar confidentiality obligation in favour of the parties in respect of Confidential Information relating to each party or its Affiliates or any member of its Shareholder Group.

16.6 The provisions of this clause 16 shall continue to apply for a period of 3 (three) years following the termination of this Agreement in respect of Confidential Information provided by one party to another prior to such termination.

## Non-Compete and Investment Opportunities

Each party (other than International Holdings and Korek) agrees that:

(a)   (i) in the case of IT Ltd, for so long as IT Ltd and its Affiliates' Relevant Shareholder Percentage of International Holdings is at least 5% (five per cent.) and (ii) in the case of CS Ltd, for so long as CS Ltd and its Affiliates' Relevant Shareholder Percentage of International Holdings is at least 5% (five per cent.), neither IT Ltd, CS Ltd nor any of their respective Affiliates (as applicable) shall compete with the Group in the Republic of Iraq;

(b)   for a period of 2 (two) years after (i) in the case of IT Ltd, IT Ltd and its Affiliates' Relevant Shareholder Percentage of International Holdings ceases to be at least 5% (five per cent.), or (ii) in the case of CS Ltd, CS Ltd and its Affiliates' Relevant Shareholder Percentage of International Holdings ceases to be at least 5% (five per cent.), neither IT Ltd, CS Ltd nor any of their Affiliates (as applicable) shall compete with the Group in the Republic of Iraq; and

(c)   for the purpose of this clause 17:

(i)   **compete** means undertaking, or being interested in any business which carries out, any Core Restricted Activities;

(ii)   **Core Restricted Activities** means (i) the provision of mobile voice and data communications services, (ii) the provision of any service in connection with or in relation to the telecommunications industry permitted by the National Mobile Licence, (iii) the provision of Wimax telecommunication services, (iv) the making, directly or indirectly, of any application for a telecommunications licence in the Republic of Iraq, (v) the carrying on of a mobile virtual network operator business, or (vi) the carrying on of any tower or mobile infrastructure business; in each case in the Republic of Iraq, whether alone or jointly with others or whether as principal, agent, shareholder or otherwise and whether for the relevant entity's or person's own benefit or that of others, and

(iii)   **Unrestricted Activities** means any activity other than a Core Restricted Activity.

The restriction contained in clause 17.1 does not affect or prohibit:

(a)   IT Ltd (together with its Affiliates or the other members of its Shareholder Group) carrying on, directly or indirectly, the resale of fixed and mobile voice and data services and the provision of value added services to its international business customers provided that IT Ltd or its Affiliates, as the case may be, shall use the services of Korek to provide such services to its international business customers, provided Korek provides such services on terms and conditions that are at least comparable in terms of quality and pricing to those offered by an alternative service provider to IT Ltd or its Affiliates and where IT Ltd or its Affiliates is not prohibited from using Korek under the current contractual arrangements in respect of such international business customers;

(b)   any party (together with its Affiliates or the other members of its Shareholder Group) carrying out, or acquiring or holding shares in any company which engages in, any Unrestricted Activities; and

(c)   any party (together with its Affiliates or the other members of its Shareholder Group) acquiring or holding shares amounting to less than 5% (five per cent.) of the capital of a company quoted on any stock exchange.

If a person is appointed to the governing body of a company which competes (as defined in clause 17.1) with the Group in the Republic of Iraq, whether as a result of an acquisition pursuant to clause 17.4 or otherwise, such person may not be appointed to the International Holdings Board of Directors, the Korek Supervisory Committee, the Financing Proposal Committee or any Committee and, if such person is a Director, SC Member or Committee Member prior to such

34

appointment, such person shall immediately be removed from the International Holdings Board of Directors, Korek Supervisory Committee, the Financing Proposal Committee or any Committee by the appointing party and may be replaced by the appointing party in accordance with clauses 5.11, 6, 7 and 10.6.

Without prejudice to clause 17.1, each party agrees that, if it or any of its Affiliates becomes aware of any bona fide opportunity (an **Opportunity**) to invest in or acquire any business or company engaged in the telecommunications sector in the Republic of Iraq, such party shall promptly inform International Holdings and the other parties of the details (so far as known to the relevant party at the time) of such Opportunity, in which case the Shareholders shall jointly determine whether the Group should pursue the Opportunity. If any of the Shareholders does not approve the Group pursuing the Opportunity, then any Shareholder that voted against the relevant resolution agrees for itself and as agent for each of its Affiliates that such Shareholder and its Affiliates shall not be permitted to pursue or exploit the Opportunity (or any investment or acquisition related to the Opportunity), but the other Shareholder who voted in favour of the relevant resolution (**Assenting Shareholder**) (or any Affiliates of such Assenting Shareholder) shall not be subject to such restriction provided that the terms and conditions upon which the Assenting Shareholder (or any Affiliates of any such Assenting Shareholder) pursues the Opportunity are no more favourable than those offered to the Group.

If either CS Ltd or IT Ltd breaches the provisions of this clause 17 (**Competing Party**), any other party may send a written notice of breach to the Competing Party setting out such details as are then reasonably available of the breach of the terms of this clause 17 (**Non-Compete Notice**). Upon receipt of the Non-Compete Notice, the Competing Party shall be entitled to cure a breach of this clause 17 within 30 (thirty) days of receipt of the Non-Compete Notice. If such breach is not cured within 30 days, clauses 48.3 to 48.7 shall apply.

In the event that the recipient of a Non-Compete Notice disputes that a breach of the provisions of this clause 17 has occurred, the parties shall refer the matter to 2 (two) IT Ltd Representatives and 2 (two) CS Ltd Representatives, who shall attempt to determine whether a breach of the provisions of this clause 17 has occurred. In the event that no resolution has been agreed within 15 (fifteen) days after such referral, clauses 48.2 to 48.7 shall apply and, for the avoidance of doubt, the thirty day remedy period set out in clause 17.5 shall not apply.

In the event that the Competing Party invests in a company or business which holds, or is in the process of obtaining, a licence issued by a national or regional Government Entity for the provision of Core Restricted Activities in the Republic of Iraq (**Competing Licence Breach**), and the Competing Licence Breach is not cured, to the reasonable satisfaction of any of the other parties, within 30 (thirty) days of receipt of the Non-Compete Notice the Competing Party shall, without prejudice to any other right of action or redress the other parties have, on demand at the sole election of the other parties make a payment on account of US$100 million to cover the estimated damages suffered by the other parties (**Non-Compete Payment**). The parties agree that the Non-Compete Payment is not a maximum level of common law damages which shall be recoverable from the Competing Party but a genuine estimate of the minimum level of common law damages that would result from a Competing Licence Breach and, for the avoidance of doubt, shall not restrict, prohibit, prejudice or limit any party from seeking alternative and/or additional remedies or relief in respect of such Competing Licence Breach. In the event that the recipient of the Non-Compete Notice disputes that a Competing Licence Breach has occurred, the provisions of clause 17.6 shall apply and no payment shall be due under this clause 17.7 until an Arbitral award is made under the Rules confirming that a Competing Licence Breach has occurred.

Payment of the Non-Compete Payment shall be made in immediately available funds (without any deduction or withholding and without regard to any lien, right of set-off, counterclaim or otherwise) to such bank account as may be notified to the Competing Party by any other party for such purposes.

**Branding**

Prior to 31 December 2011, the parties shall procure that Korek shall engage an independent third party to carry out and complete a brand analysis to establish the brand strategy for the Group (**Brand Survey**) such Brand Survey to assess whether the use of another brand name (including "Orange") could be beneficial for the services provided by the Group.

**Management Agreements**

Management services shall be provided and management fees shall be paid in accordance with the terms of (i) the Management Consultancy Agreement, (ii) the Current Shareholders' Representative Services Agreement, (iii) the Sourcing and Procurement Agreement, (iv) the Alcazar Management Services Agreement, and (v) any other agreement entered into in connection with the management of the Group from time to time (in each case a **Management Agreement**).  The Management Agreements shall be entered into at Closing.

The parties hereby agree that, following the Majority Interest Date, the Sourcing and Procurement Agreement may, subject to clause 28, be replaced by a global services agreement under which Korek will be provided with access to shared services offered to Affiliates of ASN.

The parties shall procure that the Managing Director, the International Holdings Board of Directors, the Korek Supervisory Committee, the CEO and the Senior Managers, the Committees and any legal representative of International Holdings or Korek (as applicable) shall, at all times, provide such assistance and provide access to all information, books and records as may be reasonably required by any person appointed under any Management Agreement in connection with, and to procure the consummation of, the transactions contemplated by the Management Agreements.

**Transfer of Shares and Pre-emption Rights**

IT Ltd shall procure that the shares in IT Ltd are only transferred, including by way of merger or consolidation, in accordance with the applicable provisions of the National Mobile Licence (i) with the prior written consent of CS Ltd (such consent not to be unreasonably withheld and for the avoidance of doubt CS Ltd can withhold its consent if it reasonably believes that the change in ownership would be prejudicial to the interests of Korek), (ii) to a Qualified Affiliate of ASN or Alcazar (or their respective Qualified Affiliates) (provided that if such Qualified Affiliate ceases to be a Qualified Affiliate of the original shareholder, the Qualified Affiliate shall, prior to ceasing to be a Qualified Affiliate, retransfer the shares concerned to the original shareholder or to another Qualified Affiliate of such original shareholder), or (iii) between ASN and Alcazar.  For the avoidance of doubt, a transfer, including by way of merger or consolidation, which results in the shares in IT Ltd being held by a company incorporated in Europe which is owned (whether directly or indirectly) by ASN and Alcazar in the same proportion as their holdings in IT Ltd at such time shall be deemed not to be prejudicial to the interests of Korek or contrary to the applicable provisions of the National Mobile Licence.

Mr Sirwan Saber Mustafa and CS Ltd shall procure that (i) the shares in CS Ltd are only transferred with the prior written consent of IT Ltd (such consent not to be unreasonably withheld) and in accordance with the applicable provisions of the National Mobile Licence, and for the avoidance of doubt, IT Ltd can withhold its consent if it reasonably believes that the change in ownership would be prejudicial to the interests of Korek (including where it would result in a loss of the rebate on the revenue share under the National Mobile Licence) or if the transferee is not a Qualified Purchaser, (ii) Mr. Sirwan Saber Mustafa shall remain the legal and beneficial owner of not less than 51% (fifty one per cent.) of the shares in CS Ltd, it being agreed that if a Withdrawal occurs, Mr. Sirwan Saber Mustafa shall remain the legal and beneficial owner of 51% (fifty one per cent.) of either: (A) the shares in CS Ltd; or (B) the shares in Korek that may be distributed by CS Ltd to its shareholders and subject to the clause 20.2(ii), the shareholders of CS Ltd may transfer shares in CS Ltd between themselves.

20.3 Except in respect of a pledge of shares required in connection with obtaining any financing under clause 5, a Shareholder shall only be entitled to transfer, pledge, charge, dispose of or otherwise deal with any Shares or any right or interest in any Shares (including the grant of any option over or in respect of any Shares or encumbering the Shares in any way) either with the prior written consent of all of the other Shareholders or in accordance with the provisions of this clause 20.

20.4 A Shareholder shall be permitted to transfer, including by way of merger or consolidation, the legal title to and/or beneficial ownership of any Share to a Qualified Affiliate (a **Permitted Transferee**) who shall become a party to this Agreement by entering into a Deed of Adherence and become a "Shareholder" hereunder and be entitled to exercise and be required to perform all the rights and obligations of the departing Shareholder hereunder, provided that (i) if such Qualified Affiliate ceases to be a Qualified Affiliate of the original Shareholder, the Qualified Affiliate shall, prior to ceasing to be a Qualified Affiliate, retransfer the Shares concerned to the original Shareholder or to another Qualified Affiliate of such original Shareholder, and (ii) if IT Ltd proposes to transfer the legal title to and/or beneficial ownership of any Shares to a Qualified Affiliate of IT Ltd and CS Ltd can reasonably demonstrate that such transfer would be detrimental to Korek, IT Ltd shall not be permitted to make such transfer. For the avoidance of doubt, any transfer of such Shares to a company incorporated in Europe which is owned (whether directly or indirectly) by ASN and Alcazar in the same proportion as their holdings in IT Ltd at such time shall be deemed not to be detrimental to Korek. Any Shareholder transferring any Shares to a Permitted Transferee pursuant to this clause 20.4 shall be entitled to transfer any rights and obligations under this Agreement and any other Transaction Documents to such Permitted Transferee.

20.5 Except for a transfer pursuant to clauses 20.1, 20.2, 20.4, 21 or 23 or a pledge pursuant to clause 20.3, no Shareholder shall transfer, pledge, charge, dispose of or otherwise deal with any Shares or any right or interest in any Shares (including the grant of any option over or in respect of any Shares or encumbering the Shares in any way) prior to the third anniversary of Closing (**Lock-up Period**) without the prior written consent of the other parties.

20.6 Following the Lock-up Period, a Shareholder shall be permitted to transfer the legal title to and/or beneficial ownership of some or all of its Shares together with some or all of the Shares collectively held by its Affiliates to any Qualified Purchaser provided that such transfer complies with clauses 20.7 to 20.11 (inclusive). For the avoidance of doubt, a Shareholder shall not be permitted to transfer any interest in any Shares to any person who is not a Qualified Purchaser.

20.7 Except in respect of a transfer pursuant to clauses 20.4, 21 or 23, any Shareholder (**Seller**) proposing to directly or indirectly transfer any interest in any of its Shares pursuant to clause 20.6 (**Sale Shares**), shall prior to completing any transfer of the Sale Shares, first give a written irrevocable notice (a **Pre-emption Notice**) to the other Shareholders (**Continuing Parties**) of the proposed bona fide transfer of the Sale Shares specifying:

(a) the identity and details of the proposed Qualified Purchaser (including the identity of the ultimate beneficial owner of such Qualified Purchaser);

(b) the proposed purchase price and the number of Sale Shares to be transferred; and

(c) the material terms agreed with the Qualified Purchaser, and

shall provide each of the Continuing Parties with copies of any relevant documents and agreements reasonably required by the Continuing Parties in respect of the proposed transfer to the Qualified Purchaser.

20.8 On receipt of the Pre-emption Notice, the Continuing Parties shall have the right to buy, on a pro rata basis, all (but not some only) of the Sale Shares at the price specified in the Pre-emption Notice by giving notice to the Seller (**Acceptance Notice**) within 30 (thirty) Business Days of receiving the Pre-emption Notice (**Acceptance Period**). The Acceptance Notice shall constitute a binding offer to purchase the Sale Shares and the parties' obligations to complete the purchase in accordance with such offer shall be subject to the provisions of clause 20.9 and clause 25.

20.9    The Continuing Parties who have sent the Acceptance Notice to the Seller within the Acceptance Period shall be bound to buy, and the Seller shall be bound to sell, the Sale Shares (subject only to any necessary approvals of their respective shareholders in general assembly and any regulatory approvals) on the terms set out in the Pre-emption Notice (or at such other price as the Seller and the Continuing Parties agree). Completion of the sale and purchase of the Sale Shares shall take place on the earlier of 30 (thirty) Business Days following receipt by the Seller of the Acceptance Notice (if no regulatory approvals are required for the transfer) or 5 (five) Business Days following the obtaining of all regulatory approvals required to effect the transfer provided that the Acceptance Notice and the Continuing Parties' rights to buy the Sale Shares pursuant to this clause 20 shall cease to have effect if: (i) any necessary regulatory approvals are not obtained within 120 (one hundred and twenty) days of the receipt of the Acceptance Notice; or (ii) any relevant authority conclusively refuses to grant any necessary regulatory approvals or grants such approvals on terms and/or subject to conditions which are not acceptable to the Continuing Parties, acting reasonably. Each of the Continuing Parties and the Seller shall use all reasonable efforts to ensure that any necessary approvals are obtained to effect any transfer as soon as practicable following delivery of the Acceptance Notice.

20.10   If the Continuing Parties do not serve an Acceptance Notice under clause 20.8 or any Acceptance Notice given ceases to have effect pursuant to clause 20.9, the Seller may after the earlier of: (i) the expiry of the Acceptance Period; or (ii) the Acceptance Notice ceasing to have effect pursuant to clause 20.9 (subject to clause 25 below) transfer the Sale Shares on a bona fide arm's length sale to the Qualified Purchaser at a price not less than the purchase price specified in the Pre-emption Notice provided that (a) the transfer is completed within 120 (one hundred and twenty) days after the later of: (i) the date on which the Acceptance Period expired; or (ii) the date the Acceptance Notice ceased to have effect pursuant to clause 20.9 and, (b) if any regulatory approvals are required for such transfer, it is provided on terms and/or subject to conditions which are acceptable to the Continuing Parties, acting reasonably.

20.11   The parties shall (or shall ensure that their Affiliates or any members of their respective Shareholder Group shall) give any approvals required by International Holdings' constitutional documents in relation to any transfer of Shares permitted by the terms of this clause 20.

## Withdrawal Rights

21.1    The following events shall each constitute a Withdrawal Event:

(a)     Subject to clause 21.2, following the earlier of (i) the fourth anniversary of Closing in the event that the IT Ltd Shareholder Loan or any other loan provided by IT Ltd has been repaid and satisfied in full, and (ii) the fifth anniversary of Closing, service of a written notice (NBR Withdrawal Notice) by CS Ltd (Notified Withdrawal Right); and

(b)     after the fourth anniversary of Closing, IT Ltd determining that any obligation of International Holdings to gross up any payments made to CS Ltd in respect of a distribution, including pursuant to clause 14.5, shall be material, provided that any amendment to the structure of the share capital of the Group (other than a direct holding of shares in Korek by CS Ltd) shall not have a material adverse effect on CS Ltd (IT Ltd Withdrawal Right, and together with a Notified Withdrawal Right, the Withdrawal Rights),

21.2    CS Ltd shall not be entitled to serve a NBR Withdrawal Notice unless:

(a)     there is no outstanding default under the IT Ltd Shareholder Loan Agreement or any other loan provided by IT Ltd;

(b)     there are no outstanding claims (excluding vexatious or frivolous claims) by IT Ltd against CS Ltd, the Current Shareholders or Korek under the Transaction Documents;

(c)     such Withdrawal Right is not permitted under the terms of any contractual obligations of International Holdings and Korek;

38

(d) following such Withdrawal Event, International Holdings shall retain a Relevant Shareholder Percentage of Korek that shall not be less than 51% (fifty one per cent.) (excluding any Nominal Value Shares from the numerator of such calculation) and, in the event, that such Withdrawal Event shall occur prior to a Listing of Korek, International Holdings shall retain a Relevant Shareholder Percentage of Korek so as to ensure that it would have a Relevant Shareholder Percentage of Korek of not less than 51% (fifty one per cent.) (excluding any Nominal Value Shares from the numerator of such calculation) assuming the offer and sale during the Listing of Korek of the minimum number of shares in Korek required at the time of the Withdrawal Event by the CMC and/or the rules of the relevant stock exchange;

(e) IT Ltd shall be granted pre-emption rights (in a form substantially the same as set out in clause 20.7) over CS Ltd's direct shareholding in Korek; and

(f) such Withdrawal Event shall not have a material adverse effect on Korek.

Following (i) IT Ltd's determination in writing that an IT Ltd Withdrawal Right has arisen (**IT Ltd Withdrawal Notice**), or (ii) delivery of the NBR Withdrawal Notice by CS Ltd, IT Ltd shall have the right to require CS Ltd to procure that all of the Shares held by CS Ltd (other than any Nominal Value Shares and those Shares that are required to be retained by CS Ltd for the purposes of International Holdings retaining the Relevant Shareholder Percentage of Korek as set out in clause 21.2(d)) be redeemed in accordance with their terms and that in connection with such redemption International Holdings transfers to CS Ltd the CS Ltd Relevant Shareholder Percentage of the shares in Korek held by International Holdings at that time corresponding to the Shares redeemed (**Withdrawal**). IT Ltd shall provide CS Ltd with all reasonable assistance to enable CS Ltd to comply with this clause 21.3.

The Withdrawal shall be effected as soon as reasonably practicable and in any event within 60 (sixty) days of either (i) receipt of any third party consents required to complete the Withdrawal, or (ii) delivery of the IT Ltd Withdrawal Notice or the NBR Withdrawal Notice (as applicable) if no third party consents are required.

Immediately prior to completion of the Withdrawal:

(a) CS Ltd (or its Affiliates), International Holdings, IT Ltd and Korek shall enter into a shareholders' agreement, in a form agreed between the parties which reflects all the rights and obligations of the parties under this Agreement at the time at which it is entered into and which shall include provisions to ensure that IT Ltd is not prejudiced as a result of the Withdrawal and CS Ltd having a direct shareholding in Korek and IT Ltd not having a direct shareholding in Korek, and this Agreement shall terminate in accordance with clause 43.1(b); and

(b) CS Ltd, International Holdings, IT Ltd and Korek shall enter into the arrangements which are necessary to (i) effect the transfer of the debts and obligations of International Holdings into debts and obligations of Korek, (ii) effect the release of International Holdings from such debts and obligations on terms reasonably satisfactory to each party, and (iii) procure an amendment to the IT Ltd Shareholder Loan Agreement to permit the conversion of the IT Ltd Shareholder Loan into Korek Shares.

Prior to the service of any NBR Withdrawal Notice, IT Ltd and CS Ltd shall meet to discuss whether there is an alternative arrangement to the Withdrawal which could be implemented to address the concerns leading to the right to exercise the Notified Withdrawal Right. If the parties are able to reach agreement on an alternative arrangement, the parties shall be obliged to implement such alternative arrangement as soon as reasonably practicable.

CS Ltd shall indemnify and hold harmless each of IT Ltd, International Holdings and Korek for all Costs which they suffer or incur in connection with (i) the exercise of any Notified Withdrawal Right; (ii) the exercise of a Share Swap Notice, and (iv) completion of the transfer of the Requested Korek Shares as contemplated under clause 22.

IT Ltd shall indemnify and hold harmless each of CS Ltd, International Holdings and Korek for all Costs which they suffer or incur in connection with the exercise of any IT Ltd Withdrawal Right.

In the event that, after Closing, there is a change in existing law, regulation or order or the enactment of a new tax law, regulation or order having or reasonably likely to have a direct and immediate material adverse effect on CS Ltd or its shareholders or IT Ltd and its shareholders as a direct result of holding its or their interest in Korek indirectly through International Holdings (MAE), the parties shall use reasonable endeavours to agree a mechanism for mitigating the effects of such MAE.

## Liquidity

Following the later to occur of (i) the Majority Interest Date, or (ii) the end of the Lock-Up Period, in the event that CS Ltd wishes to dispose of part of its interest in the Group but finds that it is not possible or practical to sell the Shares in order to achieve the requirements of CS Ltd, CS Ltd shall have the right, subject to clauses 22.2 and 22.4, to request that International Holdings transfers a number of shares in Korek to such Qualified Purchaser as CS Ltd shall direct (**Korek Share Sale**). In order to exercise this right, CS Ltd shall serve a notice on IT Ltd and International Holdings (**Share Swap Notice**) which shall contain full details of the number of shares in Korek requested to be transferred to the Qualified Purchaser (**Requested Korek Shares**), the reason for the service of a Share Swap Notice specifying the reasons why (together with reasonable supporting evidence) a sale of an equivalent percentage of the Shares is not possible or practical in order to achieve the requirements of CS Ltd.

A Share Swap Notice:

(a)   shall specify:

    (i)   the identity and details of the proposed Qualified Purchaser (including the identity of the ultimate beneficial owner of such Qualified Purchaser);

    (ii)   the proposed purchase price and number of Requested Korek Shares to be transferred; and

    (iii)   the material terms agreed with the Qualified Purchaser;

(b)   shall attach copies of any relevant documents and agreements reasonably required by IT Ltd in respect of the proposed transfer to the Qualified Purchaser;

(c)   shall constitute the service of a Pre-emption Notice pursuant to clause 20 of this Agreement and the remaining provisions of clause 20 shall apply as if CS Ltd had served a notice in respect of the IH Buy Back Shares and if an Acceptance Notice is served by IT Ltd, the parties shall procure the transfer of such number of Shares held by CS Ltd as is equal to the number of IH Buy Back Shares (as defined below);

(d)   may not be served to the extent that the Requested Korek Shares are subject to a pledge or any other security in favour of a third party providing financing to the Group or if the proposed Korek Share Sale would or may:

    (i)   result in International Holdings having a Relevant Shareholder Percentage of Korek of less than 51% (fifty one per cent.) (excluding any Nominal Value Shares from the numerator of such calculation) and prior to a Listing of Korek, result in International Holdings having a Relevant Shareholder Percentage of Korek so as to ensure that it would have a Relevant Shareholder Percentage of Korek of not less than 51% (fifty one per cent.) (excluding any Nominal Value Shares from the numerator of such calculation) assuming the offer and sale during the Listing of Korek of the minimum number of shares in Korek required at the time of the receipt of the Share Swap Notice by the CMC and/or the rules of the relevant stock exchange;

40

    (ii)    result in the Qualified Purchaser receiving greater rights in respect of (i) dividends, distributions or any cash extraction from Korek, or (ii) rights under this Agreement, than it would have had as a Shareholder;

    (iii)    result in the Requested Korek Shares being transferred to a person who is not a Qualified Purchaser;

    (iv)    directly or indirectly prevent the ability of IT Ltd to convert all or part of the IT Ltd Shareholder Loan into Shares in accordance with the terms of the IT Ltd Shareholder Loan Agreement including, any effect such that upon conversion the percentage ownership which IT Ltd would have in Korek would not be the same as if the conversion had been exercised prior to the Korek Share Sale; or

    (v)    result in all or part of any shareholder loan or indebtedness owed by International Holdings to a Shareholder (including, without limitation, the IT Ltd Shareholder Loan) to cease to be guaranteed by Korek, and

(e)    may not be served to the extent that IT Ltd or any of its Affiliates has a claim against Mr. Sirwan Saber Mustafa under any guarantee given by him under the Transaction Documents.

23.    Within 60 (sixty) days of the earlier of (i) IT Ltd's pre-emption right having expired in accordance with clause 20.10 and (ii) receipt by CS Ltd of a notification from IT Ltd that it shall not exercise its pre-emption rights pursuant to clause 20, subject to this clause 22.3, upon not less than 35 (thirty five) days prior notice from CS Ltd that it has scheduled its proposed Korek Share Sale:

(a)    the parties shall exercise their rights to:

    (i)    transfer to the Qualified Purchaser the number of Korek Shares specified in the Share Swap Notice (with full title guarantee free from all Third Party Rights and together with all rights attaching to them), such Shares to be transferred from International Holdings to the Qualified Purchaser in exchange for the transfer to International Holdings by CS Ltd of such number of Shares as corresponds to the economic stake in Korek that is representative of the indirect stake in Korek held by CS Ltd (**IH Buy Back Shares**), such IH Buy Back Shares to be either cancelled or held as treasury shares);

    (ii)    pass such resolutions as shall be required to implement the buy-back of the IH Buy Back Shares and transfer of the Requested Korek Shares; and

    (iii)    ensure that CS Ltd, International Holdings, IT Ltd and Korek shall enter into the arrangements which are necessary to effect (x) the transfer (simultaneously with the transfer as per clause 22.3(a)(i)) of the debts and obligations of International Holdings into debts and obligations of Korek and (y) the release of International Holdings from such debts and obligations on terms reasonably satisfactory to each party; and

(b)    CS Ltd shall transfer the IH Buy Back Shares to International Holdings with full title guarantee free from all Third Party Rights and together with all rights attaching to them.

24.    In the event that IT Ltd notifies CS Ltd in writing that it wishes the purchaser under a Korek Share Sale to become a party to this Agreement, CS Ltd shall procure that such purchaser shall enter into a Deed of Adherence.

## IT Ltd Call Option

25.    The provisions of clause 25 shall apply to a transfer of Shares under this clause 23. CS Ltd hereby irrevocably grants IT Ltd (and its transferees or successors in interest) a call option (**Call Option**) pursuant to which CS Ltd shall sell to IT Ltd such number of its fully paid Shares as shall at the date of exercise of the Call Option be required to give IT Ltd an aggregate holding of 51%

(fifty one per cent.) of the total issued and allotted share capital of International Holdings (**Call Option Shares**).

The Call Option may be exercisable by IT Ltd as follows:

(a) at any time during the six month period commencing on 1 January 2014 (**Exercise Period 1**) for a transfer price per Call Option Share payable by IT Ltd to CS Ltd equal to the greater of (i) the Fair Market Value of each Call Option Share as determined by IT Ltd at the date of the Call Option Notice (**Call Option Share Price 1**), and (ii) the Minimum Call Option Transfer Price; or

(b) at any time during the period commencing at the end of Exercise Period 1 and ending on 31 December 2014 (**Exercise Period 2**) as follows:

(i) 50% (fifty per cent.) of the aggregate number of Call Option Shares shall be purchased at a transfer price per Call Option Share equal to the greater of (A) the Fair Market Value of each Call Option Share (calculated as at the date of the exercise of the Call Option) (**FMV1**), and (B) the Minimum Call Option Transfer Price (**Call Option 1st Tranche Consideration**); and

(ii) 50% (fifty per cent.) of the aggregate number of Call Option Shares (**Call Option 2nd Tranche Shares**) shall be purchased at a transfer price equal to the Fair Market Value of such Call Option Shares (calculated as at the date falling 6 (six) months after the date of the calculation of the Call Option 1st Tranche Consideration), subject to clause 23.3(b)(ii), (**Call Option 2nd Tranche Consideration**).

The transfer price payable in respect of the Call Option and determined in accordance with clause 23.2 shall be paid as follows:

(a) in the event that the Call Option is exercised in Exercise Period 1, the transfer price payable in respect of the Call Option Shares shall be payable on the Option Completion Date;

(b) in the event that the Call Option is exercised in Exercise Period 2, the transfer price payable in respect of the Call Option Shares shall be satisfied as follows:

(i) the Call Option 1st Tranche Consideration shall be paid on the Option Completion Date; and

(ii) the Call Option 2nd Tranche Consideration shall be satisfied by (A) the issue of a non-interest bearing promissory note (substantially in the form set out in Schedule 3) with a maturity date of the date that is 6 (six) months after the Option Completion Date and with a value equal to 80% (eighty per cent.) of the aggregate FMV1 for the Call Option 2nd Tranche Shares (**Call Option Promissory Note**), and (B) in the event that the Call Option 2nd Tranche Consideration shall be greater than the value of the Call Option Promissory Note, by the payment by IT Ltd of an amount equal to the positive difference (if any) by which the Call Option 2nd Tranche Consideration exceeds the amount of the Call Option Promissory Note (**Excess Tranche 2 Consideration**),

and for the avoidance of doubt in all cases, all Call Option Shares shall be transferred at the Option Completion Date.

The Call Option shall be exercisable at the discretion of IT Ltd and upon written notice (**Call Option Notice**) from IT Ltd to CS Ltd, such Call Option Notice to specify (i) the number of Call Option Shares (subject to verification upon inspection of the register of Shares), and (ii) IT Ltd's determination of the Call Option Sale Price.

Within 7 (seven) Business Days of receipt of the Call Option Notice, CS Ltd shall have the right to object by written notice to IT Ltd as to the amount of the Call Option Sale Price (an **Objection Notice**).

In the event that IT Ltd receives an Objection Notice, the parties will negotiate in good faith for 5 (five) Business Days to resolve the objections set out in the Objection Notice. If the parties cannot resolve such objections within such period, either (a) International Holdings shall within 7 (seven) Business Days from receipt of the Objection Notice, appoint the Expert which IT Ltd and CS Ltd have mutually agreed upon to determine the Call Option Sale Price as soon as reasonably practicable but in any event within 40 (forty) Business Days, or (b) if IT Ltd and CS Ltd are unable to agree on the identity of the Expert within 7 (seven) Business Days from the date of the Objection Notice, the procedure in clause 23.7 shall apply.

Where CS Ltd and IT Ltd cannot mutually agree on the Expert under clause 23.6:

(a)   each of CS Ltd and IT Ltd shall, within 15 (fifteen) Business Days of the date of the Objection Notice, designate an investment banking firm or qualified appraising firm of recognized international standing, with specific relevant regional and industry expertise (**Qualified Appraiser**) to determine the Call Option Sale Price;

(b)   within 30 (thirty) days after appointment, each Qualified Appraiser shall determine its initial view as to the Call Option Sale Price and consult with 1 (one) another with respect thereto;

(c)   within 60 (sixty) days after appointment, each Qualified Appraiser shall have determined its final view as to the Call Option Sale Price and shall have delivered such final view to each party;

(d)   if the difference between the higher Call Option Sale Price and the lower Call Option Sale Price is less than 10% (ten per cent.) of the higher Call Option Sale Price, then the Call Option Sale Price determined shall be the average of those two views;

(e)   if the difference between the higher Call Option Sale Price and the lower Call Option Sale Price is equal to or greater than 10% (ten per cent.) of the higher Call Option Sale Price, each of CS Ltd and IT Ltd shall instruct the Qualified Appraisers to jointly designate a mutually designated third Qualified Appraiser (**Mutually Designated Appraiser**) within 15 (fifteen) Business Days after the final views of the Qualified Appraisers were delivered and in the event that the Qualified Appraisers are unable to agree on the identity of the Mutually Designated Appraiser, the candidate for appointment as the Mutually Designated Appraiser shall be designated by the International Centre for Expertise in accordance with the provisions for appointment of experts under the Rules for Expertise of the ICC; and

(f)   within 60 (sixty) days of such designation, the Mutually Designated Appraiser shall determine its final view as to the Call Option Sale Price by selecting either the higher Call Option Sale Price or the lower Call Option Sale Price.

In the event that the Call Option Sale Price determined pursuant to clause 23.7 is higher than the price proposed by IT Ltd in the Call Option Notice, IT Ltd shall be entitled to withdraw the Call Option Notice. For the avoidance of doubt, but subject to clause 23.15, once IT Ltd withdraws a Call Option Notice, the Call Option set out in this clause 23 shall terminate.

The sale and purchase of the Call Option Shares shall be completed (i) where no Objection Notice is issued, on the 15 (fifteenth) Business Day after the Call Option Notice is delivered to CS Ltd, and (ii) in the event that an Objection Notice is issued, on the 15 (fifteenth) Business Day after the determination of the Call Option Sale Price under clause 23.6 or 23.7 (**Option Completion Date**).

In the event that IT Ltd fails to pay any amounts due and payable under, and in accordance with the terms of, the Call Option Promissory Note or the Excess Tranche 2 Consideration (**Call

Unpaid Amount), CS Ltd may send a written notice to IT Ltd requiring immediate payment of such amounts (**Call Default Notice**). IT Ltd shall have the right, within 30 (thirty) days of receipt of the Call Default Notice to dispute, by written notice to CS Ltd, the Call Default Notice, in which case, the parties shall refer the matter to 2 (two) IT Ltd Representatives and 2 (two) CS Ltd Representatives, who shall attempt to resolve the dispute. In the event that no resolution has been agreed within 30 (thirty) days after such referral, clauses 48.2 to 48.7 shall apply.

In the event that IT Ltd does not, within 30 (thirty) days, (i) dispute the Call Default Notice pursuant to clause 23.10, or (ii) satisfy the Call Unpaid Amount in full, CS Ltd shall have the right to acquire from IT Ltd such number of Shares as shall equal the product of (x) Call Unpaid Amount and (y) the aggregate number of Call Option 2nd Tranche Shares, divided by the total aggregate value of the Call Option Promissory Note and the Excess Tranche 2 Consideration (once determined or agreed). The purchase price payable in respect of such Shares shall be satisfied by the set-off of the obligation of IT Ltd to pay the Call Unpaid Amount and CS Ltd shall release IT Ltd from, any and all liabilities and obligations of IT Ltd in respect of the Call Option Promissory Note and the Call Unpaid Amount.

The Qualified Appraisers and Mutually Designated Appraisers shall have reasonable access to members of management and to the books and records so as to allow analysis and due diligence examinations in scope and duration are as customary in valuations of this kind.

The respective costs of the appraisals set out in this clause 23 shall be borne separately by each appraising party, and the cost of the Mutually Designated Appraiser shall be shared equally by the parties.

CS Ltd shall:

(a)   upon the Option Completion Date be deemed to have repeated the CS Warranties set out in paragraphs 1(b) and 1(c) and 4(a)(ii) of Part A of Schedule 3, of the Subscription Agreement, such warranties to be:

   (i)   repeated by reference to the facts and circumstances then existing as if references in such CS Warranties to: (A) the date of Signing were references to the date of the Call Option Notice; and (B) "Proposed Transaction" were references to the transfer of the Call Option Shares pursuant to this clause 23; and

   (ii)   be subject to those matters Fairly Disclosed (as such term is defined in the Subscription Agreement) by an amended or supplemented Disclosure Letter delivered by CS Ltd to IT Ltd at any time up until 20 (twenty) Business Days after the date of the Call Option Notice, containing disclosures solely in respect of any material new matter which arises following the date of Closing (and for the avoidance of doubt this shall not include CS Ltd and/or Korek becoming aware after Closing of facts, events or circumstances which arose or occurred before Closing) that would constitute a breach of such CS Warranties as repeated;

(b)   upon the Option Completion Date warrant to IT Ltd that:

   (i)   International Holdings, CS Ltd and Korek have complied in all material respects with the terms of each of the Transactions Documents and CS Ltd are not aware of any circumstances which may give rise to a breach of any term of such agreements; and

   (ii)   there is no information relating to the business, financial condition, operations or tax affairs of the Group which is material to the determination of the Call Option Sale Price which has not been disclosed to IT Ltd.

In the event that CS Ltd shall provide IT Ltd with a supplemental or amended Disclosure Letter pursuant to clause 23.14, CS Ltd and Korek shall use their reasonable efforts to co-operate with IT Ltd's investigations and, to the extent that they are able, to provide any information reasonably requested. IT Ltd shall have the right to elect (i) to determine that such matters shall be included

in the calculation of Fair Market Value pursuant to clause 23, or (iii) withdraw the Call Option Notice (and for the avoidance of doubt, if IT Ltd withdraws a Call Option Notice pursuant to this clause 23.15, it shall not lose its rights under the Call Option).

## Korek Call Option

The provisions of clause 25 shall apply to a transfer of shares under this clause 24.  Following the Option Completion Date, CS Ltd shall have the right to require IT Ltd to issue or procure the sale to CS Ltd, on a pro rata basis and at Fair Market Value, such number of shares (in an entity to be determined by IT Ltd) (**Korek Call Option Shares**) as shall at that time give CS Ltd an indirect economic interest of 2% (two per cent.) of Korek (**Korek Call Option**) and the parties shall use all reasonable endeavours to agree a mechanism (which may include the issue of shares in Korek, International Holdings and/or a direct holding company of IT Ltd) for satisfying the Korek Call Option. The Fair Market Value of such shares shall be determined as follows:

(a)     within five Business Days of the receipt of the Korek Call Option Notice, IT Ltd and CS Ltd shall meet to try to reach an agreement as to the Fair Market Value of such shares;

(b)     in the event that IT Ltd and CS Ltd are unable to agree the Fair Market Value of such shares within fifteen Business Days of receipt of the Korek Call Option Notice, IT Ltd and CS Ltd shall jointly appoint an Expert to determine the Fair Market Value of such shares on terms to be agreed jointly by IT Ltd and CS Ltd provided that neither party shall unreasonably refuse its agreement to those terms proposed by the Expert or the other party, such terms to include a requirement that the Expert shall:

    (i)     determine its own procedure which shall include:

        (A)     a reasonable opportunity for each of CS Ltd and IT Ltd to make written and oral representations to the Expert;

        (B)     a requirement that the parties supply each other with a copy of any written representations at the same time as they are made to the Expert; and

        (C)     permit each of CS Ltd and IT Ltd to be present while oral submissions are being made by the other;

    (ii)     make its determination as soon as is reasonably practicable but in any event within 60 (sixty) days of appointment; and

    (iii)     act as expert and not as an arbitrator and its determination of any matter falling within its jurisdiction shall be final and binding on the parties save in the event of fraud or manifest mathematical error (when the relevant part of its determination shall be void and the matter shall be remitted to it for correction); and

(c)     in the event that CS Ltd and IT Ltd are unable to agree on the identity of an Expert within the period set out in clause 24.1(b), such Expert shall be appointed by the International Centre for Expertise in accordance with the provisions for appointment of experts under the Rules for Expertise of the ICC.

The Korek Call Option shall be exercisable by CS Ltd at any time prior to the second anniversary of the Option Completion Date upon written notice (**Korek Call Option Notice**) from CS Ltd to International Holdings.

The sale and purchase of the Korek Call Option Shares shall be completed within (i) 15 (fifteen) Business Days of the Korek Call Option Notice being delivered to International Holdings, or (ii) in the event that an Expert is appointed pursuant to clause 24.1, within 15 (fifteen) Business Days of such Expert making its determination in accordance with clause 24.1 (in each case, **Korek Call Option Completion Date**).

Upon the Korek Call Option Completion Date, IT Ltd shall warrant to CS Ltd that:

(a)   the entity referred to in clause 24.1 is validly incorporated, in existence and duly registered under the laws of its jurisdiction and has full power to conduct its business as conducted at the Korek Call Option Completion Date;

(b)   the Korek Call Option Shares are fully paid or credited as fully paid;

(c)   there is no encumbrance, and there is no agreement, arrangement or obligation to create or give an encumbrance, in relation to any of the Korek Call Option Shares;

(d)   no person has the right (exercisable now or in the future and whether contingent or not) to call for the allotment or issue of any share or loan capital in IT Ltd; and

(e)   there is no information relating to the business and operations of IT Ltd which is material to the determination of the Fair Market Value referred to in clause 24.1 which has not been disclosed to CS Ltd.

## 25    Transfer and Subscription Terms

This clause 25 sets out the terms on which any Shares are to be transferred under clauses 20, 23 or 24.

In this clause 25:

(a)   **Buyer** means any Continuing Parties or Qualified Purchasers or CS Ltd or IT Ltd (as the case may be);

(b)   **Outgoing Parties Loans** means any loans owing at that time from any entity within the Group to the Sellers or any of its Affiliates or any member of their Shareholder Group;

(c)   **Relevant Notice** means the relevant Pre-emption Notice, Call Option Notice, Call Default Notice, or Korek Call Option Notice (as the case may be);

(d)   **Relevant Consents** means all relevant mandatory consents from any Government Entity required in order to complete the transfer or issue of Shares under this Agreement;

(e)   **Vendors** means the Sellers, IT Ltd or CS Ltd (as the case may be); and

(f)   **Transferring Shares** means the Sale Shares, the Call Option Shares, the Korek Call Option Shares or any Shares transferred pursuant to clause 23.11 (as the case may be).

Any transfer of the Transferring Shares shall be on the following terms:

(a)   the Transferring Shares shall be sold free from all liens, charges and encumbrances and third party rights, together with all rights of any nature attaching to them including all rights to any dividends or other distributions declared, paid or made after the date of the Relevant Notice;

(b)   the relevant transferor and transferee shall use all reasonable endeavours to obtain all Relevant Consents and unless permitted pursuant to applicable law, a transfer shall not be completed until all such Relevant Consents have been obtained;

(c)   other than in respect of clauses 23 and 24, with effect from the completion date the Buyer shall: (i) pay to the Vendors the principal amount of the Outgoing Parties Loans drawn down in accordance with the terms of the loan instrument (together with all accrued interest) and shall take an assignment of the Outgoing Parties Loans; and (ii) assume any obligations of the Vendors, its Affiliates or any other members of their Shareholder Group under (and shall procure the release of) any guarantees, indemnities, letters of comfort and/or counter-indemnities to third parties in relation to the business of the Group;

(d) the Vendors shall deliver to the Buyer duly executed transfer(s) in favour of the Buyer or as it may direct, together with any share certificate(s) for the Transferring Shares and a certified copy of any authority under which such transfer(s) is/are executed and, against delivery of the transfer(s), the Buyer shall pay the consideration for the Transferring Shares to the Vendors for value on the completion date;

(e) the parties shall (and shall procure that, other than in respect of clause 24, International Holdings shall) ensure (insofar as they are able) that the relevant transfer or transfers (subject to their being duly stamped, stamp duty to be paid by the Buyer) are registered in the name of the Buyer or as it may direct;

(f) the Vendors and the Buyers shall do all such other things and execute all other documents (including any deed) as the other party may reasonably request to give effect to the sale and purchase of the Transferring Shares;

(g) other than in respect of clauses 23 and 24, if requested by the Buyer, the Vendors shall ensure that all Directors or SC Members appointed by them resign and the resignation(s) take effect without any liability on International Holdings or any other entity within the Group for compensation for loss of office or otherwise (except to the extent that the liability arises in relation to a service contract with a Director or SC Member who was acting in an executive capacity); and

(h) if the Buyer is a Qualified Purchaser or a Permitted Transferee, it shall enter into a Deed of Adherence agreeing to be bound by the provisions of this Agreement.

15.4 Any issue of new Shares permitted under this Agreement (including new issuances, approved in accordance with clause 11.1 and 11.2) shall be on the following terms:

(a) the parties shall exercise their rights to procure that their relevant nominees on the International Holdings Board of Directors: (i) pass all resolutions of the International Holdings Board of Directors required in order to issues such Shares; (ii) enter the names of the subscribers in the register of members as the holder of such Shares; (iii) execute and deliver share certificates in respect of the Shares issued; and (iv) carry out all other acts and complete all other documents required in order to validly issue such Shares;

(b) the Shareholders shall duly pass all resolutions required in order to complete the issue of such Shares;

(c) International Holdings shall obtain all Relevant Consents and, unless permitted by applicable law, a subscription shall not take place until all such Relevant Consents have been obtained; and

(d) in the case of the issue of Shares to:

(i) IT Ltd, CS Ltd and each of its Affiliates shall waive any pre-emption rights in respect the issue of Shares under such clauses; and

(ii) CS Ltd, IT Ltd and each of its Affiliates shall waive any pre-emption rights in respect the issue of Shares under such clauses.

## 26. IPO

26.1 The parties acknowledge that the terms of the National Mobile Licence provide that Korek must be listed on the Iraq Stock Exchange before 2011. The parties shall work together in good faith with a view to deferring any Listing of Korek until at least 1 January 2015 having regard to the minimum requirements of the National Mobile Licence and the rules of the relevant stock exchange.

26.2 The parties agree that subject to clause 26.1, the parties will work together to agree the most suitable structure for the Listing of Korek.

## Conversion of Korek to a Private Joint Stock Company

Subject to clause 11, the parties shall consider the possibility of a conversion of Korek from a limited liability company to a private joint stock company (a **PJSC**) (**Conversion**) in connection with an eventual Listing of Korek. The parties shall discuss in good faith prior to a proposed Conversion whether a PJSC is the most appropriate form of corporate entity.

As at the date of this Agreement, the parties acknowledge that the following steps are required to implement the Conversion:

(a)    Korek shall prepare an economic and technical report setting out the aims and reasons for the Conversion (**PJSC Report**);

(b)    the PJSC Report shall be submitted to a general meeting of Korek for approval, together with a copy of the amended constitutional documents of Korek;

(c)    a copy of the shareholder approval referred to in clause 27.2(b) above, the amended constitutional documents and the PJSC Report shall be submitted to the registrar within 10 (ten) days of the date of the Shareholder approval;

(d)    if the number of shareholders in Korek is less than the minimum required at such time for a PJSC, a number of shares in Korek shall be transferred to new shareholders in Korek in order to comply with such requirement;

(e)    the minimum number of shares in Korek (if any) as are required at such time in connection with the conversion shall be offered for public subscription within 30 (thirty) days of receipt of the registrar's approval of the Conversion by way of a statement issued by the Shareholders published in the bulletin and at least 2 (two) daily newspapers (**Public Offer**);

(f)    the Public Offer shall include:

(i)    the text of Korek's constitutional documents;

(ii)    the number of Shares being offered, the value of those Shares and the sum paid towards each Share;

(iii)    the minimum and maximum number of Shares each individual may subscribe for;

(iv)    the place and period of the subscription;

(v)    details of the contracts and agreements which the Shareholders have undertaken in the interests of Korek; and

(vi)    any other relevant information; and

(g)    the Public Offer shall be open for a period of not less than 30 (thirty) days and not more than 60 (sixty) days.

Each of the parties confirms its intention to ensure that the corporate governance of Korek post-Conversion complies with the terms of this Agreement, to the greatest extent legally permitted and on such basis shall enter into a new shareholders' agreement.

## Related Party Transactions

Each Shareholder agrees that where it becomes aware that its interests (or those of an Affiliate of such Shareholder) conflict or are reasonably likely to conflict with the interests of the Group in any material respect, each such Shareholder shall immediately give notice in writing to

International Holdings, the Korek Supervisory Committee and the other Shareholder(s) of such conflict or potential conflict.

For the purposes of this clause 28:

(a) **Conflict Restrictions** means the following restrictions and exclusions which are to apply only to the specific circumstances and matters and to the relevant Shareholder (and/or Directors proposed for appointment, or SC Members appointed, by such Shareholder) to which such Conflict Restrictions are expressly stated to apply in this Agreement (and no others):

    (i) exclusion from all decisions directly relating to such circumstance or matter; and

    (ii) complete disentitlement and disenfranchisement from exercising any consent or any votes on any resolutions proposed directly in connection with such circumstance or matter (including any directly connected vote which would otherwise be a Shareholder Veto Matter or a Super Majority Approval Matter) and, to such extent, the requirements as to quorum specified in this Agreement shall be amended so that a quorum may · be present notwithstanding the relevant Shareholder and/or any Director or SC Member proposed for appointment by it may not be in attendance or notified thereof.

(b) **Conflict Exclusions** means the following restrictions and exclusions which are to apply only to the specific circumstances and matters and to the relevant Shareholder (and/or Directors proposed for appointment, or SC Members appointed, by such Shareholder) to which such Conflict Exclusions are expressly stated to apply in this Agreement (and no others):

    (i) exclusion from all decisions directly relating to such circumstance or matter;

    (ii) complete disentitlement and disenfranchisement from attending the relevant parts of any meetings or exercising any consents or votes on any resolutions proposed directly in connection with such circumstance or matter (including any directly connected vote which would otherwise be a Shareholder Veto Matter or a Super Majority Approval Matter) and, to such extent, the requirements as to quorum specified in this Agreement shall be amended so that a quorum may be present notwithstanding the relevant Shareholder and/or any Director or SC Member proposed for appointment by it may not be in attendance or notified thereof; and

    (iii) complete disentitlement and disenfranchisement from receiving or being provided with any information from or by the Group (including any legal advice received by the Group) directly in connection with such circumstance or matter. For the avoidance of doubt nothing in this clause 28.2(b)(iii) shall prevent such Shareholder (and/or any Directors proposed for appointment, or SC Members appointed, by such Shareholder) receiving a redacted notice in respect of a meeting at which such circumstance or matter is discussed.

Each Shareholder agrees that, if it or any member of its Shareholder Group is a party or proposed party in any Related Party Transaction which for the purposes of this clause 28.3 shall include a dispute by International Holdings, as a borrower, of the existence of an event of default under the IT Ltd Shareholder Loan (an **Interested Shareholder**), all matters relating to such Related Party Transaction, including the exercise of rights and/or compliance with obligations by any entity within the Group, but excluding any claims (which shall be dealt with in accordance with clauses 28.4 and 28.5), shall be dealt with by the other Shareholder (or if the other Shareholder so directs, the Korek Supervisory Committee, International Holdings or the International Holdings Board of Directors) and, accordingly, the Interested Shareholder (and/or any Director proposed for appointment, or SC Member appointed, by it together with any alternate or nominee) shall in relation to such matters, be bound by and subject to the Conflict Restrictions unless the other Shareholder otherwise agrees in writing and the rights under

clauses 11 and 12, as the case may be, shall not apply to such Interested Shareholder. For the avoidance of doubt, this clause 28.3 shall not apply to clauses 5.10 to 5.17.

Where either of the Shareholders or any of its Affiliates asserts any claim against any entity within the Group (whether under this Agreement or otherwise),

(a) CS Ltd shall (if such claim is asserted by IT Ltd or one of its Affiliates) be entitled to conduct such claim in the name and at the reasonable expense of the relevant entity within the Group (or if CS Ltd so directs, the Korek Supervisory Committee, International Holdings or the International Holdings Board of Directors shall, conduct such claim) without IT Ltd's further authority or involvement in the defence of the claim and, accordingly, IT Ltd together with any Directors proposed for appointment, or SC Members appointed, by it shall, in relation to such claim, be bound by and subject to the Conflict Exclusions unless CS Ltd otherwise agrees in writing; and

(b) IT Ltd shall (if such claim is asserted by CS Ltd or one of its Affiliates) be entitled to conduct such claim in the name and at the reasonable expense of the relevant entity within the Group (or if IT Ltd so directs, the Korek Supervisory Committee, International Holdings or the International Holdings Board of Directors shall conduct such claim) without CS Ltd's further authority or involvement in the conduct of the claim and, accordingly, CS Ltd together with any Directors proposed for appointment, or SC Members appointed, by it shall, in relation to such claim only, be bound by and subject to the Conflict Exclusions unless IT Ltd otherwise agrees in writing.

Where any entity within the Group has, or either of the Shareholders asserts that any entity within the Group has, any claim against one of the Shareholders or one of its Affiliates, the other Shareholder shall be entitled to conduct such claim in the name and at the reasonable expense of the relevant entity within the Group (or, if such Shareholder so directs International Holdings, the International Holdings Board of Directors or the Korek Supervisory Committee (as applicable) shall conduct such claim) without the other Shareholder's further authority or involvement in the conduct of the claim and, in each case, the Shareholder being claimed against (or whose Affiliate is being claimed against) and any Directors proposed for appointment by it or SC Members appointed by it shall, in relation to such claim, be bound by and subject to the Conflict Exclusions unless the other Shareholder otherwise agrees in writing.

International Holdings, the International Holdings Board of Directors, the Korek Supervisory Committee and the Managing Director hereby irrevocably appoint each Shareholder (and any Director proposed for appointment by it and any SC Member appointed by that Shareholder) as their lawful attorneys irrevocably and by way of security for the purpose of doing any act or thing on behalf of them pursuant to, and in accordance with, the provisions of clauses 28.4 and 28.5. International Holdings, the International Holdings Board of Directors, the Korek Supervisory Committee and the Managing Director (as applicable) undertake to ratify whatever any attorney shall lawfully do or cause to be done in accordance with such power of attorney and to indemnify and keep indemnified the attorney from all claims, expenses, damages and losses which the attorney may suffer or incur as a result of the lawful exercise by him of the powers conferred under such power of attorney. Furthermore, upon the written request of any Shareholder, International Holdings, the International Holdings Board of Directors, the Korek Supervisory Committee and the Managing Director shall procure that each other entity within the Group shall grant identical powers of attorney to those granted pursuant to this clause 28.6. Each of the Shareholders agrees to procure, so far as necessary, that all such powers of attorney remain in full force and effect until such time that any claim has been determined or otherwise settled in full.

## Covenant from IT Ltd

IT Ltd covenants with CS Ltd to pay:

(a) to the Relevant Korek Group Company, an amount equal to any actual liability or increased liability to Tax of such Relevant Korek Group Company which is properly attributable to a member of the IT Ltd Group, (other than a liability to Tax in respect of which IT Ltd could claim payment under Schedule 7 of the Subscription Agreement) and

for which such Relevant Korek Group Company is liable as a result of the failure by a member of the IT Ltd Group to pay such Tax;

(b) to the relevant CS Person, an amount equal to any actual liability or increased liability to Tax of such CS Person which is properly attributable to any member of the IT Ltd Group (other than a liability in respect of which IT Ltd could claim a payment under Schedule 7 of the Subscription Agreement) and for which such CS Person is liable as a result of the failure by a member of the IT Ltd Group to pay such Tax;

(c) to the Relevant Korek Group Company, an amount equal to all reasonable costs or expenses properly incurred by such Relevant Korek Group Company in connection with any such liability or increased liability to Tax in relation to which a successful claim is made under clause 29.1(a);

(d) to the relevant CS Person, an amount equal to all reasonable costs and expenses properly incurred by such Current Shareholders in relation to a successful claim made under clauses 29.1(a) or 29.1(b).

No recovery shall be made under clause 29.1 in respect of any liability to Tax, cost or expense:

(a) unless notice of the liability is given in writing by CS Ltd to IT Ltd specifying (in reasonable detail so far as practicable) the nature of the claim and the amount claimed, not later than 6 (six) years after the liability to Tax arose;

(b) to the extent that (where clause 29.1(a) applies) the Korek Group Company or (where clause 29.1(b) applies) the relevant CS Person recovers an amount in respect of that liability to Tax, cost or expense from any other person (other than the Current Shareholders or their Affiliates) under any relevant statute, law, ordinance, regulation, directive or other legislation; and

(c) to the extent that the aggregate of such liability to Tax, costs and expenses exceeds US$195,000,000.

Any payment which IT Ltd is obliged to make under clause 29.1 shall be made on the date which is 5 (five) Business Days prior to the last day on which the relevant payment of Tax is due to be made by the Current Shareholders in order to avoid incurring a liability to interest or penalties.

## Counter Covenant from CS Ltd

CS Ltd covenants with IT Ltd to pay to:

(a) the Relevant Korek Group Company, an amount equal to any actual liability or increased liability to Tax of such Relevant Korek Group Company which is properly attributable to any CS Person (including, without limitation, any such Tax which arises in respect of or in consequence of either the transfer by the Current Shareholders of the Existing Shares to CS Ltd in accordance with clause 5.9 of the Subscription Agreement) or the Transfer (as defined in the Subscription Agreement)) and for which such Relevant Korek Group Company is liable as a result of the failure by a CS Person to pay such Tax; and

(b) the relevant member of the IT Ltd Group, an amount equal to any actual liability or increased liability to Tax of such member of the IT Ltd Group which is properly attributable to any CS Person (including, without limitation, any such Tax which arises in respect of or in consequence of either the transfer by the Current Shareholders of the Existing Shares to CS Ltd in accordance with clause 5.9 of the Subscription Agreement or the Transfer (as defined in the Subscription Agreement)) and for which such member of the IT Ltd Group is liable as a result of the failure by a CS Person to pay such Tax; and

(c) the Relevant Korek Group Company, an amount equal to all reasonable costs or expenses properly incurred by such Relevant Korek Group Company in connection with

51

any such liability or increased liability to Tax in relation to which a successful claim is made under clause 30.2(a); and

(d) the relevant member of the IT Ltd Group, an amount equal to all reasonable costs and expenses properly incurred by such relevant member of the IT Ltd Group in relation to a successful claim made under clause 30.2(a) or clause 30.2(b).

No recovery shall be made under clause 30.1 in respect of any liability to Tax, cost or expense:

(a) unless notice of the liability is given in writing by IT Ltd to CS Ltd specifying (in reasonable detail so far as practicable) the nature of the claim and the amount claimed, not later than 6 (six) years after the liability to Tax arose;

(b) to the extent that (where clause 30.2(a) applies) the Korek Group Company or (where clause 30.2(b) applies) the relevant member of the IT Ltd Group recovers an amount in respect of that liability to Tax, cost or expense from any other person (other than IT Ltd or its Affiliates) under any relevant statute, law, ordinance, regulation, directive or other legislation; and

(c) to the extent that the aggregate of such liability to Tax, exceeds $195,000,000.

Any payment which the CS Person is obliged to make under clause 30.1 shall be made on the date which is 5 (five) Business Days prior to the last day on which the relevant payment of Taxation is due to be made by the IT Ltd Group in order to avoid incurring a liability to interest or penalties.

## Further Assurances

So far as it is legally able, each party agrees with the others to exercise all voting rights and powers (direct or indirect) available to it in relation to any person, International Holdings, and/or Korek to ensure that the provisions of this Agreement (and the other agreements referred to in it) are completely and punctually observed and performed and generally that full effect is given to the principles set out in this Agreement.

Each party shall take (or procure the taking of) all such steps and execute (or procure the execution of) such further documents as may be required by law or be reasonably necessary to give full effect to this Agreement and the other Transaction Documents.

Each party shall procure that its Affiliates comply with all obligations under this Agreement and/or the Transaction Documents which are expressed to apply to any such Affiliates.

The liability of a party under this clause 31 shall not be discharged or impaired by any amendment to or variation of this Agreement, any release of or granting of time or other indulgence to any other member of its group or any third party or any other act, event or omission which but for this clause 31 would operate to impair or discharge the liability of such party under this clause 31.

## Assignment

Except as provided in this clause 32 or unless the parties specifically agree in writing, no party shall assign, transfer, charge or otherwise deal with all or any of its rights and/or obligations under this Agreement or any of the Transaction Documents nor grant, declare, create or dispose of any right or interest in them (otherwise than pursuant to a transfer of Shares in accordance with the terms of this Agreement).

A party may assign any or all of its rights and obligations under this Agreement and/or of any other Transaction Document to which it is a party (in whole or in part) to, and it may be enforced by, any Permitted Assignee as if it were an original party provided that the assignor shall remain liable for the performance of such Permitted Assignee. Any Permitted Assignee to whom an

assignment is made in accordance with the provisions of this clause 32 may itself make an assignment as if it were an original party under this clause 32 provided that it shall remain liable for the performance of such Permitted Assignee. For this purpose, a **Permitted Assignee** means any person to whom Shares are transferred in accordance with this Agreement.

If an assignment is made by IT Ltd pursuant to this clause 32, the liabilities of the other parties shall be no greater than they would have been had such assignment not occurred.

## Damages

No party shall be entitled to recover damages or obtain payment, reimbursement, restitution or indemnity more than once in respect of any one Cost, regardless of whether more than one claim under this Agreement arises in respect of it.

## Gross up for Taxes and Withholdings

All sums payable under this Agreement shall be paid free and clear of all deductions or withholdings whatsoever, save only as provided in this Agreement, including clause 14.5, or as required by law.

If any deduction or withholding is required by law from any payment made under either clause 29 or 30 of this Agreement, the payer shall pay such additional amount as will, after such deduction or withholding has been made, leave the payee with the full amount which would have been received by it had no such deduction or withholding been required to be made.

If any sum payable under either clause 29 or 30 of this Agreement is required to be brought into charge to Tax, the payer shall pay such additional amount as will ensure that the total amount received, less any Tax chargeable or that would be chargeable but for the availability of any relief is equal to the amount that would otherwise been received had no such Tax been chargeable.

## Waiver, Rights and Remedies

Except as expressly provided in this Agreement, no failure or delay by any party in exercising any right or remedy relating to this Agreement or any of the Transaction Documents shall affect or operate as a waiver or variation of that right or remedy or preclude its exercise at any subsequent time. No single or partial exercise of any such right or remedy shall preclude any further exercise of it or the exercise of any other remedy.

## Variations

No amendment of this Agreement (or of any of the Transaction Documents) shall be valid unless it is in writing and duly executed on behalf of all of the parties to it (except that a variation of any provision of this Agreement which only affects the respective rights and obligations of Shareholders or any of them as between themselves does not need International Holdings, Korek or Mr Sirwan Saber Mustafa's agreement).

## Invalidity

Each of the provisions of this Agreement and any of the other Transaction Documents is severable. If any such provision is held to be or becomes invalid or unenforceable in any respect under the law of any jurisdiction, it shall have no effect in that respect and the parties shall use all reasonable efforts to replace it in that respect with a valid and enforceable substitute provision the effect of which is as close to its intended effect as possible.

## No Partnership or Agency

Nothing in this Agreement (or any of the arrangements contemplated by it) is or shall be deemed to constitute a partnership between the parties nor, except as may be expressly set out

53

in it, constitute either party the agent of any other for any purpose. Unless the parties agree otherwise in writing, none of them shall: (i) enter into any contracts or commitments with third parties as agent for any other entity within the Group or for any other party; or (ii) describe itself as such an agent or in any way hold itself out as being such an agent.

## Announcements

No party (nor any of their respective Affiliates) shall make any announcement or issue any circular in connection with the existence or subject matter of this Agreement (or any other Transaction Document), providing information not previously disclosed to the public without the prior written approval of the others (such approval not to be unreasonably withheld or delayed).

The restriction in clause 39.1 shall not apply to the extent that the announcement or circular is required by applicable law, by any applicable stock exchange or any applicable regulatory or other applicable supervisory body or authority of competent jurisdiction, whether or not the requirement has the force of law. If this exception applies, the party making the announcement or issuing the circular shall (to the extent lawful) use its reasonable efforts to consult with the other parties in advance as to its form, content and timing.

## Costs

Except as otherwise provided in this Agreement (or any other Transaction Document), each party shall be responsible for its own costs, charges and expenses (including those of its Affiliates) incurred in connection with concluding this Agreement (or any other Transaction Document) and completing the Transaction (including, without limitation, costs, charges and expenses incurred by the parties in connection with the drafting, negotiation and signing of the Transaction Documents). For the avoidance of doubt, this provision does not relate to costs incurred by the parties in respect of any Dispute.

Following Closing, to the extent that International Holdings shall incur any costs, charges or expenses, such costs, charges or expenses shall be funded by Korek by means of a dividend or management fee or as otherwise agreed by the parties.

## Whole Agreement

This Agreement sets out the whole agreement between the parties in respect of the matters addressed herein and supersedes any prior agreement (whether oral or written) relating to such matters. It is agreed that:

(a)   no party shall have any claim or remedy in respect of any statement, representation, warranty or undertaking made by or on behalf of any other party which is not expressly set out or referred to in this Agreement; and

(b)   except for any liability in respect of breach of this Agreement, no party shall owe any duty of care or have any liability in tort or otherwise to any other party.

This clause shall not exclude any liability for, or any remedy in respect of, fraudulent misrepresentation.

## Conflict with Korek and International Holdings' Constitutional Documents or Applicable Laws

If the provisions of this Agreement conflict with the constitutional documents of any entity within the Group, the provisions of this Agreement shall prevail as between the parties and International Holdings and/or Korek (as applicable). The parties shall, so far as they are legally able, exercise all voting and other rights and powers available to them to give effect to the provisions of this Agreement (if necessary) to ensure that any required amendment is made to the constitutional documents of any entity within the Group.

If any party reasonably believes that any action or inaction which it is required to take or to refrain from taking pursuant to this Agreement is contrary to applicable law, it shall consult with the other parties and the parties shall use all reasonable efforts to agree an alternative course of action to give effect to the provisions of this Agreement.

Without prejudice to the generality of clause 42.1, the provisions of this Agreement shall prevail in relation to the transfer of any Shares and, accordingly each party shall, so far as it is legally able, promptly give (or ensure that any of its Affiliates or any member of its Shareholder Group promptly gives) any approval which is necessary or appropriate to give full and immediate effect to the procedures contemplated by the provisions of clauses 20, 21 or 23 and/or any transfer of Shares permitted under this Agreement.

Korek and International Holdings are not bound by any provision of this Agreement to the extent that it constitutes an unlawful fetter on any statutory power of International Holdings or Korek. This shall not affect the validity of the relevant provision as between the other parties to this Agreement or the respective obligations of the other parties as between themselves under clause 42.1.

## Duration

This Agreement shall continue in full force and effect until the earlier of:

(a)     each of the parties agreeing in writing to terminate this Agreement;

(b)     any transfer of Shares as a result of which all of the Shares are held by an entity within the same group; and

(c)     a resolution being passed or a binding order being made for the winding-up of International Holdings,

whereupon, subject to the provisions of this clause 43, this Agreement shall terminate and cease to have force and effect.

In addition, save as provided in this Agreement, the rights and obligations under this Agreement shall terminate:

(a)     as regards any Shareholder (other than IT Ltd) upon such Shareholder ceasing to hold any Shares; and

(b)     as regards IT Ltd, upon any transfer of Shares as a result of which no Affiliate of IT Ltd continues to hold any Shares.

Termination of this Agreement, or of the rights and obligations of any party under this Agreement, shall not:

(a)     relieve any party from any liability or obligation for any matter, undertaking or condition which has not been done, observed or performed by that party before such termination;

(b)     affect the terms of any agreement replacing this Agreement entered into by the parties (or any of them);

(c)     affect the terms of the Surviving Provisions; or

(d)     affect the Shareholders' continuing obligations under clause 16 and the corresponding rights of the other Shareholders to enforce the same.

55

## Notices

Any notice in connection with this Agreement shall be in writing, in English and delivered by hand, registered post or courier using an internationally recognised courier company. A notice shall be effective upon actual receipt delivered by hand, registered post or courier.

The addresses of the parties for the purpose of clause 44.1 are:

| | |
|---|---|
| International Holdings<br>International Holdings Limited | Address:<br>Suite 904, Level 9 Park Place.<br>Sheikh Zayed Road<br>PO Box 506672<br>Dubai, UAE |

With copies to IT Ltd and CS Ltd to the addresses set out below:

| | |
|---|---|
| IT Ltd<br>Iraq Telecom Limited | Address:<br>Suite 904, Level 9 Park Place<br>Sheikh Zayed Road<br>PO Box 506672<br>Dubai, UAE |

Copies to:

| | |
|---|---|
| Atlas Services Netherlands B.V. | 1043 BW Amsterdam,<br>Naritaweg 165,<br>The Netherlands |
| Alcazar | c/o Agility Public Warehousing Company KSC<br>Sulaibiya<br>6th Ring Road<br>Besides Land Customs Clearing area<br>PO Box 25418<br>Safat 13115<br>Kuwait<br><br>Attn: Chief Financial Officer and Deputy Group General Counsel (MENA) |

and

| | |
|---|---|
| France Telecom Legal Department M&A and International | Address:<br>6 Place d'Alleray<br>75015 Paris<br>France |
| Korek<br>Korek Telecom Company LLC | Address:<br>Kurdistan Street nr. 45<br>Pirmam<br>Erbil<br>Kurdistan<br>Republic of Iraq |
| For the attention of:<br>Sirwan Saber Mustafa | Address:<br>Kurdistan Street nr. 45<br>Pirmam<br>Erbil<br>Kurdistan<br>Republic of Iraq<br><br>Erbil-Massief-Sallahaddin |

56

|  | Dar Althiafa-House Number 3 |
|  | Erbil |
|  | Kurdistan |
|  | Republic of Iraq |
| Copy to Camille Abousleiman | Dewey & LeBoeuf LLP |
|  | 1 Minster Court |
|  | Mincing Lane |
|  | London EC3R 7YL |
|  | United Kingdom |

CS Ltd
Korek International (Management) Ltd.

Address:
Korek International (Management) Ltd.
Close Brothers (Cayman) Limited
Box 1034
4th Floor Harbour Place
103 South Church Street
George Town
Grand Cayman KY1-1102
Cayman Islands

With a copy to:
Camille Abousleiman

Address:
Dewey & LeBoeuf LLP
1 Minster Court
Mincing Lane
London EC3R 7YL
United Kingdom

Nawzad Junde

English Village
Villa 203
Erbil
Kurdistan
Republic of Iraq

For the purposes of clauses 5.13, 6.9, 6.14, 7.9 and 7.10 only, an approval in writing may be delivered by electronic mail to such address as shall be notified in writing by the parties and will be deemed effective on receipt by the sender of an automated delivery receipt or confirmation of receipt from the relevant server.

## Counterparts

This Agreement may be executed in any number of counterparts, and by each party on separate counterparts. Each counterpart is an original, but all counterparts shall together constitute one and the same instrument. Delivery of a counterpart of this Agreement by e-mail attachment or telecopy shall be an effective mode of delivery.

## Third Party Rights

Except as provided in this Agreement, a person who is not a party to this Agreement shall have no right under the Contracts (Rights of Third Party) Act 1999 to enforce any of its terms.

## Governing Law

This Agreement, including any non contractual obligations arising out of or in connection with this Agreement, shall be governed by and construed in accordance with English law.

## Dispute Resolution

If any dispute, controversy or claim of whatever nature arises under, out of or in connection with this Agreement, including any question regarding its existence, validity or termination or any non contractual obligations arising out of or in connection with this Agreement (a Dispute), the parties shall use all reasonable endeavours to resolve the matter amicably. If one party gives notice that a Dispute has arisen and the parties are unable to resolve the Dispute within 30 (thirty) days of service of such notice then the Dispute shall be referred to two (2) IT Ltd Representatives and two (2) CS Ltd Representatives who shall attempt to resolve the Dispute. The parties agree that such IT Ltd Representatives and CS Ltd Representatives shall have full power to resolve such Dispute on behalf of all parties.

If such IT Ltd Representatives and CS Ltd Representatives are unable to resolve the Dispute within 30 (thirty) days, the parties agree to submit the matter to settlement proceedings under the ICC ADR Rules. If the Dispute has not been settled pursuant to the ICC ADR Rules within 45 (forty five) days following the filing of a Request for ADR (as defined in the ICC ADR Rules) or within such other period as the parties to the Dispute may agree in writing, the parties to the Dispute shall have no further obligations under this clause 48.2. No party shall resort to arbitration against another under this Agreement until the expiry of this 45 (forty five) day period.

If the parties fail to resolve the Dispute in accordance with clauses 48.1 and 48.2, such Dispute shall be referred to and finally resolved by arbitration under the Arbitration Rules of the ICC (Rules), which Rules are deemed to be incorporated by reference into this clause. The number of arbitrators shall be three (3).

In the event that CS Ltd and/or Mr. Sirwan Saber Mustafa, on the one hand, and IT Ltd, on the other hand, are the only parties to the Dispute, (i) 1 (one) of the arbitrators shall be appointed by IT Ltd, (ii) one of the arbitrators shall be appointed by CS Ltd and/or Mr. Sirwan Saber Mustafa, (iii) the third arbitrator shall be jointly appointed by the 2 (two) arbitrators appointed by IT Ltd and CS Ltd and/or Mr. Sirwan Saber Mustafa; and (iv) in the event that such arbitrators are unable to agree on the identity of the third arbitrator, such arbitrator shall be appointed by the ICC in accordance with the Rules.

In the event that CS Ltd and/or Mr. Sirwan Saber Mustafa, on the one hand, and IT Ltd, on the other hand, are not the only parties to the Dispute, the three arbitrators shall be appointed by the ICC in accordance with the Rules.

The parties hereby agree that any restriction in the Rules upon the proposition or appointment of an arbitrator by reason of nationality shall not apply to any arbitration commenced pursuant to this clause. The seat, or legal place, of arbitration shall be Dubai International Financial Centre. The language to be used in the arbitration shall be English.

Consolidation of multiple Disputes:

(a)   If multiple Disputes (as the term is defined in each of the Transaction Documents) arise out of or in connection with one or more of the Transaction Documents, then any or all such Disputes may be determined in a single arbitration, provided that the dispute resolution clauses contained in the Transactions Documents giving rise to the Disputes are compatible and the subject matter of the various Disputes is substantially connected.

(b)   At any time prior to the commencement of the oral phase of the first of any arbitrations commenced under any of the Transaction Documents, the tribunal in such arbitration (First Tribunal) shall have the power to order consolidation of such arbitration with any other existing or pending arbitrations commenced under any of the Transaction Documents where: (a) the existing or pending arbitrations relate to substantially similar questions of law or of fact; (b) none of the parties would be unduly prejudiced; (c) consolidation under these circumstances would not result in undue delay for any existing or pending arbitration; and (d) no arbitral tribunal has yet been constituted in the other existing or pending arbitrations.

(c)  The tribunal in such a consolidated arbitration shall be selected as follows: (a) the parties to the consolidated arbitration shall agree that the First Tribunal remains the tribunal in the consolidated arbitration or (b) failing such agreement within 30 (thirty) days of consolidation being ordered by the First Tribunal, the Court of the ICC will appoint all members of the tribunal within 30 (thirty) days of a written request by any of the parties to the consolidated arbitration.

(d)  The parties agree that upon consolidation, the parties to the existing or pending arbitration proceedings, the subject of which has been consolidated into the arbitration before the First Tribunal in accordance with this clause 48.7, shall promptly take all necessary steps to discontinue such existing or pending proceedings in favour of the consolidated arbitration.

## Schedule 1

## Shareholdings in Korek as at Closing

| Name and address | Percentage of shares in Korek |
|---|---|
| CS Ltd | 56% |
| IT Ltd | 44% |
| Total: | 100% |

## Schedule 2

## Definitions

In this Agreement, the following words and expressions shall have the following meanings:

*Acceptance Notice* has the meaning given in clause 20.8;

*Acceptance Period* has the meaning given in clause 20.8;

*Accounting Principles* means the accounting principles and policies to be adopted by the Group which shall be International Financial Reporting Standards adapted if necessary and from time to time, for local requirements;

*Affiliate* means:

    (a)    in the case of a person which is a body corporate, any other entity which, directly or indirectly, owns or controls, is under common ownership or control with or is owned or controlled by, such party, in each case from time to time;

    (b)    in the case of a person which is an individual:

        (i)    any spouse and/or any lineal descendants by blood or adoption;

        (ii)    any person or persons acting in its or their capacity as trustee or trustees of a trust of which such individual is the settler; or

        (iii)    any body corporate or such other entity of which such a person is a director or manager or which, directly or indirectly, is owned or controlled by such a person,

save that, in the case of CS Ltd and IT Ltd and each of their Affiliates, the definition of Affiliate shall not include the Group or Sanatel or Iraqcell but, for the purposes of clause 17 and clause 28: (i) France Telecom S.A. and its Affiliates shall be deemed to be Affiliates of IT Ltd, and (ii) any shareholder of CS Ltd holding an indirect interest in Shares comprising at least 5% (five per cent.) of the total number of Shares and their Affiliates shall be deemed to be an Affiliate of CS Ltd;

*Agreement* means this Agreement;

*Alcazar* means Alcazar Capital Partners, a company organised under the laws of the Cayman Islands having its registered office at PO Box 309 GT, Ugland House, South Church Street, George Town, Grand Cayman, Cayman Islands;

*Alcazar Management Services Agreement* means the service agreement entered into between Korek and Alcazar (or one of its Affiliates) at Closing;

*Appointment Notice* has the meaning given in clause 8.1(a)

*ASN* means Atlas Services Netherlands, B.V. a private company with limited liability (*besloten vennootschap met beperkte aansprakelijkheid*) registered with the Chamber of Commerce of Amsterdam under number 33157047 and whose corporate seat is at 1043 BW Amsterdam, Naritaweg 165, The Netherlands;

*Assenting Shareholder* has the meaning given in clause 17.4;

*Auditors* means the auditors of the Group from time to time;

**Brand Licence Agreement** means any brand licence agreement entered into between Orange Brand Services Limited and Korek pursuant to clause 18;

**Brand Survey** has the meaning given in clause 18;

**Budget** means a Group budget for a particular Financial Year in a format approved from time to time by the International Holdings Board of Directors, and the Budget shall be treated as having been adopted for a particular Financial Year once it has been approved in accordance with clause 11.3 or, if approval in accordance with that clause is not required, by a majority approval by the Korek Supervisory Committee;

**Business** means the business intended to be carried on by the Group, as described in clause 3;

**Business Day** means a day other than a Friday, Saturday or Sunday or public holiday in the United Arab Emirates or the Republic of Iraq on which banks are generally open in these countries for general commercial business;

**Business Plan** means a rolling 5 (five) year business plan for the Group relating to the then current Financial Year and succeeding Financial Years (in a format agreed from time to time by the Korek Supervisory Committee) and to include a funding plan for the Group and to be updated annually, and the Business Plan shall be treated as having been adopted for a particular Financial Year once it has been approved in accordance with clause 11.3 or, if approval in accordance with that clause is not required, by a majority approval by the Korek Supervisory Committee (except that the Business Plan adopted for the Financial Year from Closing is set out in Exhibit 1);

**By-Laws** means the by-laws of Korek to be adopted at Closing;

**Calendar Year** means a 12 month period commencing on 1 January each year and ending on 31 December of that year;

**Call Default Notice** has the meaning given in clause 23.10;

**Call Option** has the meaning given in clause 23.1;

**Call Option Notice** has the meaning given in clause 23.4;

**Call Option Promissory Note** has the meaning given in clause 23.3(b)(ii);

**Call Option Shares** has the meaning given in clause 23.1;

**Call Option Sale Price** means Call Option Share Price 1 or Call Option Share Price 2 (as applicable);

**Call Option Share Price 1** has the meaning given in clause 23.2;

**Call Option Share Price 2** means the aggregate of Call Option 1st Tranche Consideration and Call Option 2nd Tranche Consideration;

**Call Option 1st Tranche Consideration** has the meaning given in clause 23.2(b)(i);

**Call Option 2nd Tranche Consideration** has the meaning given in clause 23.2(b)(ii);

**Call Option 2nd Tranche Shares** has the meaning given in clause 23.2(b)(ii);

**Call Unpaid Amount** has the meaning given in clause 23.10;

**Capital Commitments** means the contractual commitments for the acquisition of property, plant and equipment;

**CEO** means the chief executive officer;

62

*CFO* means the chief financial officer;

*Closing* shall have the meaning given to it in the Subscription Agreement;

*Closing Date* shall have the meaning given to it in the Subscription Agreement;

*CMC* means the Iraqi Communications and Media Commission;

*CMC Reduction* has the meaning given in clause 8.1 of the Subscription Agreement;

*Committee* has the meaning given in clause 10.1(c);

*Committee Meetings* has the meaning given in clause 10.7;

*Committee Members* has the meaning given in clause 10.6;

*Committee Recommendation* has the meaning given in clause 10.11;

*compete* has the meaning given in clause 17.1(c)(i);

*Competing Licence Breach* has the meaning given in clause 17.7;

*Competing Party* has the meaning given in clause 17.5;

*Confidential Information* has the meaning given in clause 16.1;

*Conflict Exclusions* has the meaning given in clause 28.2;

*Conflict Restrictions* has the meaning given in clause 28.2;

*Continuing Parties* has the meaning given in clause 20.7;

*Conversion* has the meaning given in clause 27.1;

*Core Restricted Activities* has the meaning given in clause 17.1(c)(ii);

*Costs* means losses, liabilities, damages, costs (including all reasonable out-of-pocket costs, fees and expenses of legal and other professional advisers), charges, expenses and taxation, in each case of any nature whatsoever;

*CPI* means the Consumer Price Index published by the Republic of Iraq's Central Organisation for Statistics and Information Technology or equivalent body in the Republic of Iraq;

*CRO* means the chief risk officer;

*CS Ltd Committee Members* has the meaning given in clause 10.6;

*CS Ltd FPC Members* has the meaning given in clause 5.11;

*CS Ltd Group* means CS Ltd and its Affiliates from time to time (excluding for the avoidance of doubt International Holdings, Korek and any other entity within the Group);

*CS Ltd IH Director* means a director appointed pursuant to clauses 6.3 and 6.4;

*CS Ltd Representative* means the representative appointed by CS Ltd from time to time;

*CS Ltd SC Member* means an SC Member appointed by CS Ltd from time to time;

*CS Person* means the Current Shareholders, CS Ltd or any person or company (other than a Relevant Korek Group Company or any member of the IT Ltd Group) which is controlled by the Current Shareholders, CS Ltd (or any of them) or connected or associated with any or all of them;

*CS Warranties* has the meaning given in the Subscription Agreement;

*Current Shareholders' Representative Services Agreement* means the management services agreement to be entered into between Mr Sirwan Saber Mustafa and Korek at Closing;

*Current Shareholders' Representative Loan Release* means the release to be executed by Mr. Sirwan Saber Mustafa at Closing confirming the release at Closing of the obligations of Korek under the Current Shareholders' Representative Loan Agreement;

*Current Shareholders' Representative Loan Agreement* means the term loan dated 12 August 2010 between Korek and Mr. Sirwan Saber Mustafa in respect of the US$285,372,194 term loan facility provided to Korek by Mr. Sirwan Saber Mustafa dated 12 August 2010;

*Current Shareholders* means Mr. Sirwan Saber Mustafa, Mr. Jawshin Hassan Jawshin Barazany and Mr. Jiqsy Hamo Mustafa;

*Deed of Adherence* means a deed in the form set out in Schedule 4;

*Defaulting Shareholder* has the meaning given in clause 13.2;

*Directors* means the directors of International Holdings as appointed pursuant to clause 6 from time to time;

*Disclosure Letter* means the letter from CS Ltd to IT Ltd delivered pursuant to clause 23.14(a)(ii);

*Dispute* has the meaning given in clause 48.1;

*Distribution* means any dividend or other return in respect of the equity investment of International Holdings in Korek, and shall not include any return in respect of any debt or similar facilities provided by it;

*EBITDA* means earnings before deduction of interest, tax, depreciation and amortisation, as determined in accordance with the Accounting Principles, from time to time;

*Economic Sanctions Law* means any economic or financial sanctions administered by the United Nations, the United States or the European Union;

*Emergency Situation* means a situation or circumstances which require immediate decisions to be made in order to safeguard the business assets and operations of Korek or International Holdings;

*Excess Tax* means the aggregate amount of Tax payable by Korek (whether by way of deduction or withholding or otherwise) in respect of such Distribution, to the extent that the aggregate amount of such Tax exceeds the aggregate amount of Tax which would have been payable by Korek in respect of such Distribution if International Holdings were a company resident for Tax purposes in Iraq;

*Excess Tranche 2 Consideration* has the meaning given in clause 23.3;

*Exchange Rate* means, with respect to a particular currency for a particular day, the spot rate of exchange (the closing mid point) for that currency into US$ on such date as published in the London edition of the Financial Times first published thereafter or, where no such rate is published in respect of that currency for such date, at the average rate quoted by Bank of America, Citibank, HSBC or Deutsche Bank as at the close of business in London on such date;

*Exercise Period 1* has the meaning given in clause 23.2(a);

64

*Exercise Period 2* has the meaning given in clause 23.2(b);

*Exhibits* means the exhibits to this Agreement and *Exhibit* shall be construed accordingly;

*Existing Shares* has the meaning given in the Subscription Agreement;

*Expert* means an international investment bank or qualified appraising firm of recognized international standing, with specific relevant regional and industry expertise which is independent from each of the parties, whose identity is agreed between the parties (except pursuant to clauses 5.6(c) and 24.1(c)) and who shall act as expert and not as arbitrator in connection with the giving of the determination in question and whose costs shall be payable by International Holdings;

*External Unsecured Loan* has the meaning given in clause 5.2(a);

*External Secured Loan* has the meaning given in clause 5.2(b);

*External Secured and Guaranteed Loan* has the meaning given in clause 5.2(c);

*Fair Market Value* means the fair market value established pursuant to the procedures set out in this Agreement, which shall take into account two or more recognised valuation methodologies;

*Finance, Audit and Risk Committee* has the meaning given in clause 10.1(b);

*Financial Year* means a financial period of Korek commencing on 1 January and ending on 31 December;

*Financing Proposal Committee* has the meaning given in clause 5.10;

*First Tribunal* has the meaning given in clause 48.7(b);

*FMV1* has the meaning given in clause 23.2;

*FPC Chairman* has the meaning given in clause 5.11;

*FPC Matters* has the meaning given in clause 5.10;

*FPC Meetings* has the meaning given in clause 5.12;

*FPC Members* has the meaning given in clause 5.11;

*FPC Proposal* has the meaning given in clause 5.10;

*Funding Plan* has the meaning given in clause 11.3;

*Government Entity* means any supra national, national, state, municipal or local government (including any subdivision, court, administrative agency or commission or other authority thereof) or any quasi governmental or private body exercising any regulatory, taxing, importing of other governmental or quasi governmental authority, including the European Commission;

*Group* means International Holdings, Korek and their subsidiaries from time to time;

*ICC* means the International Chamber of Commerce;

*IH Buy Back Shares* has the meaning given in clause 22.3;

*IH Minutes* has the meaning given in clause 6.12;

*Indebtedness* means any indebtedness for or in respect of (a) moneys borrowed and debit balances at banks or other financial institutions; (b) notes, debentures, loan stock or any similar instrument (but

not in respect of trade creditors); (c) receivables sold or discounted (other than any receivables to the extent they are sold on a non-recourse basis); (d) any counter-indemnity obligation in respect of a guarantee, bond, standby or documentary letter of credit or any other instrument issued by a bank or financial institution in respect of an underlying liability (but not, in any case, in respect of trade creditors) of a third party which liability would fall within one of the other paragraphs of this definition; (e) any amount of any liability under an advance or deferred purchase agreement if one of the primary reasons behind entering into the agreement is to raise finance or to finance the acquisition or construction of the asset or service in question (but excluding trade creditors); (f) any amount raised under any other transaction (including any forward sale or purchase, sale and sale back or sale and leaseback agreement) having the commercial effect of a borrowing or otherwise classified as borrowings (but not in respect of trade creditors); (g) any amounts owing under any financing or operating leases, (h) amounts owing in respect of interest payments or financial penalties, and (i) the amount of any liability in respect of any guarantee for any of the items referred to in paragraphs (a) to (h) above;

*Independent Director* has the meaning given in clause 6.3(c);

*Independent SC Member* has the meaning given in clause 7.3(c);

*Initial Business Plan* means the Business Plan set out in Exhibit 1;

*Intellectual Property Rights* means patents, trade marks, service marks, logos, signs, trade names, internet domain names, copyright (including rights in computer software) and moral rights, database rights, semi-conductor topography rights, utility models, rights in designs, rights in get-up, rights in inventions, rights in know-how and other intellectual property rights, in each case whether registered or unregistered, and all rights or forms of protection having equivalent or similar effect anywhere in the world and *registered* includes registration and applications for registration;

*Interested Shareholder* has the meaning given in clause 28.3;

*International Holdings Board Meeting* means a meeting of the International Holdings Board of Directors;

*International Holdings Board of Directors* means the board of Directors of International Holdings from time to time;

*Iraqcell* means Iraqcell Telecommunication Limited incorporated on 10 May 2001 in the Republic of Iraq under registered number 1403;

*IT Ltd Committee Member* has the meaning given in clause 10.6;

*IT Ltd FPC Members* has the meaning given in clause 5.11;

*IT Ltd Group* shall include any person or company (other than any Relevant Korek Company or any CS Person) which is, or has at any time been, treated for the purposes of any Tax as being a member of the same group of companies as IT Ltd for any Tax purpose or as being connected or associated with IT Ltd for any Tax purpose;

*IT Ltd IH Director* means a director appointed pursuant to clauses 6.3 and 6.4;

*IT Ltd Representative* means a representative appointed by IT Ltd;

*IT Ltd SC Member* means an SC Member appointed by IT Ltd from time to time;

*IT Ltd Shareholder Loan* means the US$285,000,000 bridging loan to be provided by IT Ltd to International Holdings pursuant to the IT Ltd Shareholder Loan Agreement;

*IT Ltd Shareholder Loan Agreement* means the loan agreement to be entered into between IT Ltd and International Holdings on or before Closing in the agreed form;

*IT Ltd SLA Requirements* has the meaning given in clause 11.5(a);

*IT Ltd Veto Matters* has the meaning given in clause 11.3;

*IT Ltd Withdrawal Notice* has the meaning given in clause 21.3;

*IT Ltd Withdrawal Right* has the meaning given in clause 21.1(b);

*Korek Call Option* has the meaning given in clause 24.1;

*Korek Call Option Completion Date* has the meaning given in clause 24.3;

*Korek Call Option Notice* has the meaning given in clause 24.2;

*Korek Call Option Shares* has the meaning given in clause 24.1;

*Korek Share Sale* has the meaning given in clause 22.1;

*Korek Supervisory Committee* means the Supervisory Committee of Korek as contemplated by clause 7;

*Letter Agreement* means the deed dated on or about the date of this Agreement between Korek, the Current Shareholders, IT Ltd, International Holdings, ASN and Alcazar;

*Listing* means any admission to listing or trading on a securities exchange of the shares of any entity within the Group;

*Lock-up Period* has the meaning given in clause 20.5;

*MAE* has the meaning given in clause 21.9;

*Majority Interest Date* means the date upon which IT Ltd's Relevant Shareholder Percentage shall exceed 50% (fifty per cent.) of the total issued and allotted share capital of International Holdings and/or Korek;

*Management Agreement* has the meaning given in clause 19.1;

*Management Candidate* has the meaning given in clause 8.1;

*Management Consultancy Agreement* means the agreement between Korek and Sofrecom to be entered into at Closing, pursuant to which Sofrecom agrees to provide technical support to the management of Korek;

*Managing Director* means the managing director of Korek from time to time;

*Minimum Call Option Transfer Price* means a price per Call Option Share as is equal to US$2,250 million divided by the total number of Shares in issue at such time;

*Mutually Designated Appraiser* has the meaning given in clause 23.7(e);

*National Mobile Licence* means Korek's Mobile Telecommunications Services Licence granted by the Iraqi Communications and Media Commission (including as amended from time to time, and any replacement or succeeding licence);

*NBR Withdrawal Notice* has the meaning given in clause 21.1(a);

*Nominal Value Shares* has the meaning given in the Subscription Agreement;

*Non-Compete Notice* has the meaning given in clause 17.5;

*Non-Compete Payment* has the meaning given in clause 17.7;

*Notice of Breach* has the meaning given in clause 13.2;

*Notified Withdrawal Right* has the meaning given in clause 21.1(a);

*Objection Notice* has the meaning given in clause 23.5;

*Off Balance Sheet Commitments* means the capital commitments that are not accounted for on the balance sheet including operating and finance leases, letters of guarantee, outstanding letters of credit and acceptances and commitments to extend credit;

*Opportunity* has the meaning given in clause 17.4;

*Option Completion Date* has the meaning given in clause 23.9;

*Permitted Assignee* has the meaning given in clause 32.2;

*Permitted Transferee* has the meaning given in clause 20.4;

*PJSC* has the meaning given in clause 27.1;

*PJSC Report* has the meaning given in clause 27.2(a);

*Pre-emption Notice* has the meaning given in clause 20.7;

*profit* means the consolidated profit after interest (both receivable and payable) and taxation on income of International Holdings or Korek (as applicable), determined in accordance with International Financial Reporting Standards and applying the Accounting Principles;

*Promissory Note* means the Convertible Senior Promissory Note issued by Korek dated September 11 2007 with a principal amount of US$250,000,000 together with accrued interest transferred by Alcazar to IT Ltd at Closing and then transferred by IT Ltd to International Holdings under the Promissory Note Transfer Agreements and pursuant to the Subscription Agreement;

*Promissory Note Release* means the release, in the Agreed Form, to be executed by Alcazar, Korek and Mr Sirwan Saber Mustafa at Closing confirming the release of all claims arising out of or in connection with the Promissory Note;

*Promissory Note Transfer Agreements* means the transfer agreements to be entered into at Closing pursuant to which the Promissory Note shall be transferred (i) by Alcazar to IT Ltd, and (ii) by IT Ltd to International Holdings;

*Public Offer* has the meaning given in clause 27.2(e);

*Qualified Affiliate* means any Affiliate who is not an entity (i) incorporated in Iran, or (ii) which a reasonable investor in International Holdings would deem to be prejudicial to the interests of the Group;

*Qualified Appraiser* has the meaning given in clause 23.7(a);

*Qualified Purchaser* means any person who (a) is not engaged in any activity that is in direct or indirect competition with Korek or ASN (or any of its Affiliates), (b) is able to provide audited financial statements for a period of at least 3 (three) financial years and (c) is not a Sanctioned Person;

*Related Party Transactions* means any transactions with Shareholders or their Shareholder Groups; any entity within the Group or entering into any transaction with any of the Current Shareholders, IT Ltd or the CS Ltd Group and/or their respective Affiliates except for: (i) the Current Shareholders' Representative Services Agreement; (ii) the Management Consultancy Agreement, (iii) the Alcazar Management Services Agreement, (iv) the Sourcing and Procurement Agreement, and (v) the IT Ltd Shareholder Loan;

*Relevant Korek Group Company* means Korek or any company which is controlled by Korek or forms part of the same group for Tax purposes as Korek by virtue of being directly or indirectly owned by Korek;

*Relevant Shareholder Percentage* means, at any time in relation to a shareholder, the proportion, expressed as a percentage, which the shares held (directly or indirectly) by such shareholder in a company bear at that time to all the shares issued and allotted by such company at that time;

*Replacement Services Agreement* has the meaning given in clause 11.4(r);

*Republic of Iraq* means all the territories in the Republic of Iraq as at the date of this Agreement;

*Requested Korek Shares* has the meaning given in clause 22.1;

*Rules* has the meaning given in clause 48.3;

*Sale* means (i) a sale of all of the Shares to a single purchaser (or to 1 (one) or more purchasers as part of a single transaction, or (ii) the sale of all or a material part of the assets of Korek and its subsidiaries by 1 (one) or a series of transactions;

*Sale Shares* has the meaning given in clause 20.7;

*Sanatel* means Sanatel Limited a company incorporated and existing under the laws of Iraq and having its principal place of business at Salim Street, Sulaimania, Iraq;

*Sanatel Letter* means the letter to be executed by Mr Sirwan Saber Mustafa at Closing in relation to Sanatel;

*Sanctioned Person* means any person or organisation (i) located within, doing business from or operating from or affiliated with the government of a Sanctioned Territory; or (ii) otherwise targeted under any Economic Sanctions Law;

*Sanctioned Territory* means a United Nations member state which is subject to a general export, import, financial or investment embargo;

*SC Members* means the members of the Korek Supervisory Committee from time to time;

*SC Minutes* has the meaning given in clause 7.13;

*Seller* has the meaning given in clause 20.7;

*Senior Manager* means the senior managers of Korek who report directly to the CEO, including the CFO and the CRO;

*Shareholder Group* means IT Ltd or CS Ltd (as the case may be) and each of its Affiliates;

*Shareholders* means the holders of Shares;

*Shareholder Veto Matters* has the meaning given in clause 11.1;

*Shareholders Resolutions* means the shareholders' resolutions in respect of Korek to be executed by IT Ltd and CS Ltd and Korek at Closing pursuant to which the shareholders of Korek shall (i)

69

specify and, to the extent set out therein, limit the powers of the Managing Director, and (ii) approve the delegation of authority from the Managing Director to the CEO of Korek;

**Shareholders Unsecured Loans** has the meaning given in clause 5.2(d);

**Shares** means shares in International Holdings' capital having the rights and being subject to the restrictions set out in the constitutional documents of International Holdings;

**Share Subscription Notice** has the meaning given in clause 5.6;

**Share Swap Notice** has the meaning given in clause 22.1;

**Signing** means the date of execution of this Agreement;

**Sourcing and Procurement Agreement** means the agreement to be entered into between an Affiliate of ASN and Korek at Closing in respect of sourcing and procurement for the Group;

**Sourcing and Procurement Committee** has the meaning given in clause 10.1(c);

**Staffing and Remuneration Committee** has the meaning given in clause 10.1(a);

**Subscription Agreement** means the Subscription Agreement dated on or around the date of this Agreement between IT Ltd, CS Ltd, International Holdings, ASN, Alcazar and Korek under which IT Ltd has agreed, among other matters, to acquire shares in International Holdings;

**Subscription Disclosure Letter** means the letter from Korek, CS Ltd and the Current Shareholders to IT Ltd executed and delivered immediately before signing of the Subscription Agreement as updated prior to Closing;

**subsidiary and subsidiaries** means any company in relation to which another company is its parent company;

**Super Majority Approval** has the meaning given in clause 12.1;

**Super Majority Approval Matters** has the meaning given in clause 12.1;

**Surviving Provisions** means clause 16, clause 32, clause 35, clause 37, clause 38, clause 39, clause 40, clause 41, clause 44, clause 46, clause 47, clause 48 and Schedule 2;

**Tax or Taxation** includes, without limitation, (a) taxes on gross or net income, profits and gains, (b) all other taxes, levies, duties, imposts, charges, withholdings and retentions of any fiscal nature, including any customs, excise, property, value added, sales, use, occupation, transfer, franchise and payroll taxes and any social security or social fund contributions, (c) any Regulatory Fee and any payment whatsoever which the relevant person may be or become bound to make to any person as a result of the discharge by that person of any such taxes, levies, duties, imposts, charges, withholdings retentions or Regulatory Fee which the relevant person has failed to discharge, together with all penalties, charges and interest relating to any of the foregoing or to any late or incorrect return in respect of any of them, and regardless of whether such taxes, levies, duties, imposts, charges, withholdings, retentions, penalties and interest or Regulatory Fee are chargeable directly or primarily against or attributable directly or primarily to the relevant person or any other person and of whether any amount in respect of them is recoverable from any other person;

**Tax Authority** means any taxing or other authority competent to impose any liability to Tax, or assess or collect any Tax whether at a local, regional or national level (including Tax authorities or the Kurdistan Regional Government and tax authorities of the Republic of Iraq);

**Third Party Lender** means any bank or financial institution, trust, fund or other entity which has provided financial indebtedness to International Holdings;

**C-008**

*Third Party Right* means any interest or equity of any person (including any right to acquire, option or right of pre emption or conversion) or any mortgage, charge, pledge, lien, assignment, hypothecation, security interest, title retention or any other security agreement or arrangement, or any agreement to create any of the above;

*Transaction* means the transaction contemplated by this Agreement and the Transaction Documents;

*Transaction Documents* means this Agreement, the Subscription Agreement, the Subscription Disclosure Letter, the By-laws, the IT Ltd Shareholder Loan Agreement, the Alcazar Management Services Agreement, the Management Consultancy Agreement, the Current Shareholders' Representative Management Services Agreement, the Promissory Note Release, the Promissory Note Transfer Agreements, the Current Shareholders' Representative Loan Release, the Letter Agreement, the Sanatel Letter, the Sourcing and Procurement Agreement;

*Transition Date* means as soon as practicable following Closing and, in any event, by no later than 9 (nine) months from Closing;

*Unfunded Amount* has the meaning given in clause 5.7;

*Unrestricted Activities* has the meaning given in clause 17.1(c)(iii);

*Withdrawal* has the meaning given in clause 21.3;

*Withdrawal Event* has the meaning given in clause 21.1; and

*Withdrawal Right* has the meaning given in clause 21.1(b).

1   Interpretation.

In this Agreement, unless the context otherwise requires:

(a)   headings do not affect the interpretation of this Agreement; the singular shall include the plural and vice versa; and references to one gender include all genders;

(b)   reference in this Agreement to a document in the **agreed form** is to a document agreed by IT Ltd and CS Ltd and initialled by them or on their behalf for identification purposes (in each case with such amendments as may be agreed in writing by or on behalf of CS Ltd and IT Ltd);

(c)   references to US dollars or US$ are references to the lawful currency from time to time of the United States of America;

(d)   for the purpose of applying a reference to a monetary sum expressed in US dollars, an amount in a different currency shall be deemed to be an amount in US dollars translated at the Exchange Rate at the relevant date;

(e)   where any party undertakes or assumes any obligation in this Agreement, that obligation is to be construed as requiring the party concerned to exercise all rights and powers of control over the affairs of any other person which it is able to exercise (whether directly or indirectly) in order to secure performance of the obligation;

(f)   references to any English legal term or concept shall, in respect of any jurisdiction other than England, be construed as references to the term or concept which most nearly corresponds to it in that jurisdiction;

(g)   any phrase introduced by the terms *including, include, in particular* or any similar expression shall be construed as illustrative and shall not limit the sense of the words preceding those terms; and

(h)  references to this Agreement or any other document is a reference to such document as amended, varied, novated or supplemented (other than in breach of the provisions of this Agreement) at any time.

Consent.

Any reference to a person's consent being required shall, unless stated to the contrary, imply that such consent can be given or withheld in such person's sole discretion.

Enactments.

Except as otherwise expressly provided in this Agreement, any express reference to an enactment (which includes any legislation in any jurisdiction) includes references to (i) that enactment as amended, consolidated or re-enacted by or under any other enactment before or after the date of this Agreement; (ii) any enactment which that enactment re-enacts (with or without modification); and (iii) any subordinate legislation (including regulations) made (before or after the date of this Agreement) under that enactment, as amended, consolidated or re-enacted as described in (i) or (ii) above, except to the extent that any of the matters referred to in (i) to (iii) occurs after the date of this Agreement and increases or alters the liability of any party under this Agreement.

4   Schedules.

The Schedules comprise schedules to this Agreement and form part of this Agreement.

5   Inconsistencies.

Where there is any inconsistency between the definitions set out in this Schedule and the definitions set out in any clause or any other Schedule, then, for the purposes of construing such clause or Schedule, the definitions set out in such clause or Schedule shall prevail.

**Schedule 3**

**Call Option Promissory Note**

Amount: US$ [insert amount]

Date: [insert Option Completion Date]

FOR VALUE RECEIVED, **IRAQ TELECOM LIMITED**, a company incorporated under the laws of the Dubai International Financial Centre with registered number 1019, whose registered office is at suite 904, Level 9, Park Place, Sheikh Zayed Road, PO Box 506672, Dubai, UAE (the **Promisor**) hereby irrevocably and unconditionally promises to pay on demand to, or to the order of **KOREK INTERNATIONAL (MANAGEMENT) LIMITED**, a company incorporated under the laws of the Cayman Islands whose registered office is at Close Brothers (Cayman) Limited, Box 1034, 4th Floor Harbour Place, 103 South Church Street, George Town, Grand Cayman KY1-1102, Cayman Islands (the **Payee**) the amount of [•] (the **Principal Amount**) on [insert date which is six months after the Option Completion Date] (**Due Date**).

**1     Interest**

Interest shall not accrue on this Promissory Note.

**2     Payments**

All payments shall be made in US$ in immediately cleared funds in full and without any deduction, withholding or set-off.

**3     Waiver**

Except for a payment notice required to be issued by the Payee following any payment default by the Promissor, the Promisor hereby waives the demand for payment, notice of dishonour, protest and any and all other notices or demands in connection with the delivery, acceptance, performance, default or enforcement of this Promissory Note.

**4     Prepayment**

The Promisor may prepay the whole or any part of the Principal Amount on not less than 3 (three) Business Days notice.

**5     Governing Law**

4.1     This Promissory Note shall be governed by, and construed in accordance with, English law.

4.2     If any dispute, controversy or claim of whatever nature arises under, out of or in connection with this Promissory Note, including any question regarding its existence, validity or termination or any non contractual obligations arising out of or in connection with this Promissory Note (a **Dispute**), the parties shall use all reasonable endeavours to resolve the matter amicably. If one party gives notice that a Dispute has arisen and the parties are unable to resolve the Dispute within 30 (thirty) days of service of such notice then the Dispute shall be referred to two (2) Promissor Representatives and two (2) Payee Representatives who shall attempt to resolve the Dispute. The parties agree that such Promissor Representatives and Payee Representatives shall have full power to resolve such Dispute on behalf of all parties.

4.3     If such Promissor Representatives and Payee Representatives are unable to resolve the Dispute within 30 (thirty) days, the parties agree to submit the matter to settlement proceedings under the ICC ADR Rules. If the Dispute has not been settled pursuant to the ICC ADR Rules within 45 (forty five) days following the filing of a Request for ADR (as defined in the ICC ADR Rules) or within such other period as the parties to the Dispute may agree in writing, the parties

73

to the Dispute shall have no further obligations under this clause 5.3.  No party shall resort to arbitration against another under this Agreement until the expiry of this 45 (forty five) day period.

4.4   If the parties fail to resolve the Dispute in accordance with clauses 5.2 and 5.3, such Dispute shall be referred to and finally resolved by arbitration under the Arbitration Rules of the ICC (Rules), which Rules are deemed to be incorporated by reference into this clause. The number of arbitrators shall be three (3).

5.5   The number of arbitrators shall be three. The Parties hereby agree that: (i) 1 (one) of the arbitrators shall be appointed by the Payee, (ii) one of the arbitrators shall be appointed by the Promissor, (iii) the third arbitrator shall be jointly appointed by the 2 (two) arbitrators appointed by the Payee and the Promissor; and (iv) in the event that such arbitrators are unable to agree on the identity of the third arbitrator, such arbitrator shall be appointed by the ICC in accordance with the Rules.

5.6   The parties hereby agree that any restriction in the Rules upon the proposition or appointment of an arbitrator by reason of nationality shall not apply to any arbitration commenced pursuant to this clause. The seat, or legal place, of arbitration shall be Dubai International Financial Centre. The language to be used in the arbitration shall be English.

5.7   If this Promissory Note is translated into any language other than English, the English language text shall prevail.

## 6   Assignment

The Payee may not assign or transfer its rights under this Promissory Note without the prior written consent of the Promisor.

In witness whereof this Promissory Note has been entered into as a deed on the date first stated above:

| | | |
|---|---|---|
| SIGNED as a DEED by<br>for and on behalf of<br>IRAQ TELECOM LIMITED | )<br>)<br>)<br>)<br>) | SIGNATURE: _____<br><br>NAME: _____<br><br>SIGNATURE: _____ |
| SIGNED as a DEED by<br>a duly authorised signatory on<br>behalf of KOREK<br>INTERNATIONAL<br>(MANAGEMENT) LIMITED<br>in the presence of: | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | SIGNATURE: _____<br><br>NAME: _____<br><br>SIGNATURE: _____<br><br>NAME: _____<br><br>ADDRESS: _____<br>_____<br><br>OCCUPATION: _____ |

74

## Schedule 4

## Deed of Adherence

**THIS DEED** is made on [                    ]

**BY [**          ] of [            ] (the New party)

**WHEREAS:**

(A) On [ ] 2010 IT Ltd, International Holdings, Mr. Sirwan Saber Mustafa, CS Ltd and Korek entered into a shareholders' agreement governing their relationship as shareholders in International Holdings and establishing the manner in which the affairs of International Holdings would be conducted (such agreement being as amended, supplemented or novated from time to time) ( **Shareholders' Agreement**).

(B) [By a transfer dated [ ], [ ] transferred to the New party [ ] Shares in International Holdings.]

(C) [By an allotment of shares on [ ], International Holdings allotted [ ] Shares to the New party.]

(D) This Deed is entered into in compliance with the terms of clause 22.4 of the Shareholders' Agreement.

**NOW THIS DEED WITNESSES** as follows:

1 Words and expressions defined in the Shareholders' Agreement shall, unless the context otherwise requires, have the same meanings when used in this Deed.

2 The New party hereby undertakes with (a) Korek and each of IT Ltd, Mr. Sirwan Saber Mustafa and CS Ltd; and (b) each such other person who may from time to time expressly adhere to the Shareholders' Agreement, to be bound by and comply in all respects with the Shareholders' Agreement, and to assume the benefits of the Shareholders' Agreement, as if the New party had executed the Shareholders' Agreement and was named as a party to it in place of the transferring party.

3 The New party hereby agrees and undertakes to Korek and to each of the other Shareholders (and each other person who may from time to time expressly adhere to the Shareholders' Agreement) in the terms set out in clause 22.3 of the Shareholders' Agreement, but so that such agreements and undertakings shall be deemed to be given on the date of this Deed and shall be deemed to refer to this Deed of Adherence as well as the Shareholders' Agreement.

4 For the purpose of the Shareholders' Agreement, the New party's address for notices shall be as follows:

Address:

Fax No:

For the attention of:

5 This Deed and any non-contractual obligations arising out of or in connection with this Deed shall be governed by and construed in accordance with English law.

The provisions of clauses 47 and 48 of the Shareholders' Agreement shall apply to this Deed.

**IN WITNESS WHEREOF** this Deed has been duly executed the day and year first above written.

EXECUTED [and DELIVERED]     )
as a DEED by [_____ _____]     )
acting by two directors/a director and   )
the secretary     )

**OR**

SIGNED as a DEED [and DELIVERED]   )
on behalf of [_____ _____ ], a company )
incorporated in [_____ ] by [_____ ] [and )
[_____ ]] being [a] person[s] who, in   )
accordance with the laws of the territory,  )
[is/are] acting under the authority of the  )
company     )

In witness whereof this Deed has been delivered on the date first stated above.

| | | |
|---|---|---|
| SIGNED as a DEED by<br>for and on behalf of<br>**IRAQ TELECOM LIMITED** | )<br>)<br>)<br>)<br>)<br>) | SIGNATURE: _____<br><br>NAME: _____<br><br>SIGNATURE _____<br><br>NAME: _____ |

| | | |
|---|---|---|
| **SIGNED as a DEED by**<br>by a duly authorised signatory<br>on behalf of<br>**KOREK INTERNATIONAL<br>(MANAGEMENT) LIMITED**<br>in the presence of: | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | SIGNATURE: _____<br><br>NAME: _____<br><br>SIGNATURE _____<br><br>NAME: _____<br>ADDRESS: _____<br>_____<br><br>OCCUPATION: _____ |

| | | |
|---|---|---|
| **SIGNED as a DEED by<br>Sirwan Saber Mustafa**<br><br>**Jawshin Hassan Jawshin Barazany<br>and<br>Jiqsy Hamo Mustafa<br>for and on behalf of<br>KOREK TELECOM COMPANY LLC** | )<br>)<br><br>)<br>)<br>)<br>)<br>) | SIGNATURE: _____<br><br><br><br><br><br>NAME: _____ |

| | | |
|---|---|---|
| **SIGNED as a DEED by<br>by SIRWAN SABER MUSTAFA**<br>in his capacity as<br>Managing Director<br>in the presence of | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | SIGNATURE: _____<br><br>NAME: _____<br>SIGNATURE: _____<br><br>NAME<br>ADDRESS _____<br>_____<br>_____<br><br>OCCUPATION _____ |

77

**C-008**

**SIGNED as a DEED by**
**INTERNATIONAL HOLDINGS**
**LIMITED**

)
)
)
)
)
)

SIGNATURE:

NAME: Deepak Jain

SIGNATURE:

NAME:

| P & L ( mUSD ) | 2011 | 2012 | 2013 |
|---|---|---|---|
| **Revenues** | **478** | **653** | **884** |
| | 25% | 37% | 35% |
| **Company All Costs** | | | |
| Revenue Share | (65) | (85) | (113) |
| Network | (57) | (73) | (88) |
| Interconnection | (45) | (86) | (128) |
| Labour Costs | (23) | (30) | (38) |
| Marketing & Sales | (58) | (89) | (128) |
| G&A | (17) | (15) | (19) |
| Other Costs | (15) | (19) | (29) |
| **TOTAL COSTS** | **(280)** | **(397)** | **(544)** |
| **EBITDA** | **197** | **256** | **341** |
| *EBITDA margin* | 41,3% | 39,2% | 38,5% |
| CAPEX | (163) | (151) | (97) |