# Exhibit D

EXECUTION VERSION

# TERM LOAN AGREEMENT

Between

## IBL Bank SAL
(as Lender)

## Korek Telecom Company LLC
(as Borrower)

## Mr. Sirwan Saber Mustafa

(as Guarantor to the Borrower)

Dated as of _31_ December 2011

EXECUTION VERSION

THIS AGREEMENT (this "Agreement") is made on ___ December 2011

**BETWEEN**

(1)  IBL Bank SAL, a joint-stock company duly organized and validly existing under the laws of the Republic of Lebanon registered with the Commercial Registry of Beirut under N-10472 and listed on the list of banks at the Central Bank of Lebanon under N°52 whose registered office is located at Al Iihadia Building, Charles Malek Avenue, Achrafieh, Beirut, Lebanon, as lender (the "**Lender**");

(2)  Korek Telecom Company LLC, a private company limited by shares incorporated with the Registration Directorate of Companies of the Kurdistan Regional Government with registered number 167 and whose registered office is located at 45 Kurdistan Street,, Pirmam, Erbil, Kurdistan, Republic of Iraq, as borrower (the "**Borrower**"); and,

(3)  Mr. Sirwan Saber Mostafa, whose address for purposes of this Agreement is at Dar Althiafa nr. 3, Pirmam, Erbil, Republic of Iraq, as guarantor to the Borrower (the "**Guarantor**").

**RECITALS**

Whereas, the Borrower wishes to obtain financing from the Lender for the purpose of paying amounts due to the Communications and Media Commission (the "**CMC**").

Whereas, subject to the terms and provisions of this Agreement, the Lender is willing to lend to the Borrower an amount of U.S. $150,000,000 (One Hundred and Fifty Million United States Dollars);

Whereas, the Guarantor, as Chairman of the Borrower is willing to guarantee the Borrower's obligations under this Agreement and the repayment, *inter alia*, of the Loan (*as defined below*) including principal, interest, fees, commission and expenses.

**NOW THEREFORE, IT IS AGREED as follows:**

1.  **THE LOAN**

1.1  Subject to the terms of this Agreement, the Lender agrees to lend and provide to the Borrower, and the Borrower agrees to borrow and accept from the Lender, a term loan in the aggregate principal amount of One Hundred and Fifty Million United States Dollars (U.S. $150,000,000 (the "**Loan**").

1.2  Subject to the terms of this Agreement, the Loan will be made available by the Lender to the Borrower on the date of this Agreement in United States Dollars in immediately available funds to the bank account of the Borrower as follows:

Korek Telecom Company LLC account number: 010.002.221.0700716.01 at IBL Bank, Achrafieh – Branch, Beirut Lebanon.

1.3  The Loan shall be used for purpose of paying amounts due to CMC in respect of the Borrower's mobile telecommunications licence granted by CMC.

2

EXECUTION VERSION

2.   INTEREST

2.1   Interest will be charged quarterly on the principal balance of the Loan outstanding from time to time at the rate of 13.25 % per annum, calculated based on the actual number of days elapsed in a year of 360 days, from and including the date of this Agreement to but excluding the Final Maturity Date (as defined below). Accrued and unpaid interest will be payable quarterly, in arrears on each 31 March, 30 June, 30 September and 31 December, commencing 31 December 2011 through the Final Maturity Date of the Loan (each, an "**Interest Payment Date**").

2.2   If any amount payable under this Agreement is not paid by the Borrower when due, interest shall accrue thereon (to the extent permitted by applicable law, both before and after judgment) from and including the date it became due to but excluding the date it is paid in full. Interest accruing pursuant to this Section 2.2 shall be payable together with the overdue amount when it is paid in full or, if earlier, from time to time upon demand, at a rate per annum equal to the aggregate of: (i) 2%; and (ii) the rate of interest stated in Section 2.1. Default interest shall be compounded with the overdue amount on each Interest Payment Date but will remain immediately due and payable.

3.   REPAYMENT AND PREPAYMENT

3.1   Unless the Loan is required to be repaid or prepaid on an earlier date pursuant to this Section 3 or Section 10, the Borrower hereby promises to repay the entire principal amount of the Loan in installments, as follows:

3.1.1   the amount of U.S $40,000,000 (Fourty Million United States Dollars) on the date that is 7 calendar months from the date of this Agreement (the "**Short Term Loan**");

3.1.2   the amount of U.S $110,000,000 (One Hundred and Ten Million United States Dollars) on the date that is 30 calendar months from the date of this Agreement (the "**Long Term Loan**").

3.2   Notwithstanding the provisions of Section 3.1 hereof, the Loan shall become and be subject to mandatory prepayment by the Borrower if any of the following events shall occur:

3.2.1   in the event that the Borrower shall sell, assign, transfer, lease, convey or otherwise dispose of all or substantially all of its property and assets, in one or a series of related transactions, to any person; or

3.2.2   in the event that the Lender determines at any time that any law, regulation or treaty or any change therein or in the interpretation or application thereof makes it unlawful for the Lender to maintain the Loan or to claim or receive any amount (whether principal, interest, fees or any other amount) payable to it hereunder;

whereupon, in either case, the commitment of the Lender hereunder shall terminate and the Borrower shall prepay the entire outstanding principal balance of the Loan on the Interest Payment Date following the date on which notice of the relevant event is given by the Lender to the Borrower in writing; provided, however, that, if the Lender certifies to the Borrower that earlier prepayment is necessary in order to enable the Lender to comply with any relevant law, regulation, treaty or change and specifies an earlier date for the prepayment, the Borrower shall make the prepayment on the date so specified (being no earlier that the last day of any applicable grace period permitted by law).

EXECUTION VERSION

3.3 At any time following the date which is 12 calendar months from the date of this Agreement in relation to the Long Term Loan and at any time in relation to the Short Term Loan, the Borrower may, at its option, exercisable in its sole discretion, by giving the Lender not less than 10 Days notice in writing specifying the date of prepayment and the principal amount to be prepaid, prepay the outstanding principal balance of the Loan, in whole or in part (provided that any prepayment in part shall be a minimum principal amount of Five Million United States Dollars (U.S. $5,000,000) or an integral multiple of Five Hundred Thousand United States Dollars (U.S. $ 500,000) in excess thereof), on any Interest Payment Date. The Lender and the Borrower agree that, in the event that the Borrower makes any optional prepayment of the Loan in part pursuant to this Section 3.3, the principal balance of the Loan remaining outstanding after giving effect to such prepayment and due to be repaid in accordance with Section 3.1 shall be reduced by the amount of the prepayment. Any prepayment of the Loan made by the Borrower pursuant to this Section 3.3, whether in whole or in part, may only be made on an Interest Payment Date.

3.4 Any optional prepayment in accordance with Section 3.3 above, after the date which is 12 calendar months from the date of this Agreement is subject to an early prepayment fee of 0.5% of the amount to be prepaid.

3.5 Any optional prepayment made by the Borrower (in relation to the Short Term Loan only) before the maturity date for the Short Term Loan set forth in Clause 3.1.1 above, shall not be subject to an early prepayment fee.

3.6 Any prepayment made by the Borrower pursuant to Section 3.2 or Section 3.3 hereof shall be made, without penalty together with accrued and unpaid interest, if any, on the amount prepaid to but excluding the date of prepayment.

3.7 Each payment by the Borrower under this Agreement shall be made in United States Dollars, in immediately available funds on the date the payment is due, to the account of the Lender notified by the Lender to the Borrower following the date of this Agreement, or to any other account designated by the Lender by written notice to the Borrower for the purpose. Each such payment shall be made without setoff or counterclaim.

3.8 Any payment stated to be due hereunder on any day that is not a Business Day shall be made on the immediately following Business Day. For purposes of this Agreement, "**Business Day**" shall mean any day other than a Saturday or a Sunday on which commercial banks are generally open for business in Kurdistan, Republic of Iraq and Republic of Lebanon.

4. **FEES AND EXPENSES**

4.1 The Borrower shall pay to the Lender, on the date of this Agreement, an up-front fee of 1% of the aggregate principal amount of the Long Term Loan (being U.S.$110,000,000).

4.2 The Borrower shall also pay to the Lender, quarterly in arrears on each Interest Payment Date, a loan utilisation fee (the "**Loan Utilisation Fee**"), calculated at the rate of 0.10% (10 basis points) of the principal balance of the Loan outstanding on the relevant Interest Payment Date. For the avoidance of doubt, it is hereby agreed that the initial payment of the Loan Utilisation Fee shall be due on 31 December 2011 in the amount of (U.S.$55,342), notwithstanding that the Loan shall have been outstanding for less than one full calendar quarter.

4.3 The Borrower shall promptly pay within 30 Days of written demand the amount of all costs and expenses (including legal fees) reasonably with a maximum limit of US$25,000, incurred and properly documented by the Lender in connection with the negotiation, preparation

4

execution and delivery of this Agreement and the consummation of the transactions contemplated hereby.

5.   **TAX MATTERS**

All payments by the Borrower or the Guarantor in respect of the Loan or as a result of this Agreement will be made free and clear of any present or future tax, levy, duty, withholding, deduction, charge, penalty, or other liability of any nature whatsoever that is required to be imposed, levied, collected, withheld or assessed by any applicable jurisdiction. If, however, the Borrower or the Guarantor is required to withhold or deduct any amounts from any payments in respect of the Loan for, or on account of, any such taxes, the Borrower or the Guarantor, as the case may be, shall pay such additional amounts to the Lender as will result in the payment to the Lender of the amounts that it would have received had no such withholding or deduction been made.

6.   **GUARANTEE**

6.1   The Guarantor hereby irrevocably and unconditionally guarantees the Borrower's obligations under this Agreement and the full repayment of the Loan including principal, interests, commission, fees and expenses, upon the Lender's first written demand stating that the Borrower has failed to make such payments and within five Business Days of the date of such demand. The liability of the Guarantor under this Agreement shall not be released or diminished by any forbearance, neglect or delay in seeking performance of the obligations hereby imposed or any granting of time for such performance.

6.2   The Guarantor acknowledges (i) that his obligations under this Agreement are totally independent of the obligations of the Borrower, (ii) that he shall not have the right to require the Lender to proceed against the Borrower and enforce any security held by the Lender or to pursue any other remedy available to it, prior to making demand or proceedings against him, (iii) that the Lender has full right of recourse against the Guarantor.

6.3   The obligations of the Guarantor under this Agreement are valid until payment in full of all the Borrower's financial obligations under this Agreement. Upon full repayment of all the Borrower's financial obligations pursuant to this Agreement, the guarantee granted under this section 6 shall become automatically null and void.

6.4   The Borrower and the Guarantor acknowledge that the obligations of the Guarantor under this Agreement are in addition to and without prejudice to and not in substitution for any rights or security which the Lender may now or hereafter have or hold for the performance and observance of the obligations and commitments of the Borrower in connection with the Agreement.

6.5   Notwithstanding any other provision of this Agreement, the maximum liability of the Guarantor under this Section 6 shall be $155,000,000.

7.   **REPRESENTATION AND WARRANTIES**

7.1   The Borrower hereby represents, warrants and agrees with the Lender as at the date of this Agreement, as follows:

7.1.1   the Borrower is validly incorporated, in existence and duly registered under the laws of the Republic of Iraq and it has full power to conduct its business as conducted at the date of this Agreement;

5

7.1.2 the execution and delivery by the Borrower of this Agreement, the consummation by the Borrower of the transactions contemplated hereby and the performance by the Borrower of its obligations hereunder are within the Borrower's powers, have been duly authorized by all necessary action (corporate or otherwise) on the Borrower's behalf and require no consent, approval, authorization or order of any court or governmental body, agency or official;

7.1.3 the person signing this Agreement on behalf of the Borrower has been duly authorized by the Borrower to sign this Agreement;

7.1.4 the execution and delivery of this Agreement by the Borrower, the consummation by the Borrower of the transactions contemplated hereby and the performance by the Borrower of its obligations hereunder do not, and will not, contravene to any material extent or constitute a default under any provision of any applicable law or regulation, the Borrower's organizational documents or any agreement or instrument to which the Borrower is a party where such default would adversely affect to a material extent its ability to perform its obligations under this Agreement;

7.1.5 this Agreement constitutes, and the obligations of the Borrower in respect of the Loan upon the making thereof will constitute, the legal, valid and binding obligations of the Borrower, enforceable against the Borrower in accordance with the terms of this Agreement;

7.1.6 the obligations of the Borrower in respect of the Loan and otherwise under this Agreement constitute, and at all times will constitute, the direct, general, unconditional, unsubordinated unsecured obligations of the Borrower and rank, and at all times will rank at least *pari passu* with all other present and future unsubordinated unsecured obligations of the Borrower, except for indebtedness preferred by laws of general application;

7.1.7 the Borrower is not in violation of any provision of any of its organizational documents or in default in the performance or observance of any material obligation, covenant or condition contained in any indenture, mortgage, deed of trust, loan agreement, lease or other agreement or instrument to which it is a party or by which it or any of its property may be bound where in each case such violation or default would adversely affect to a material extent its ability to perform its obligations under this Agreement;

7.1.8 no Event of Default (*as defined below*), or event which with the giving of notice or the passage of time would become an Event of Default, has occured or will occur as a result of the execution and delivery by the Borrower of this Agreement, the consummation by the Borrower of the transactions contemplated hereby and the performance by the Borrower of its obligations hereunder;

7.1.9 the Borrower is not insolvent or unable to pay its debts as they fall due (including subordinated and contingent debts), nor will it become so as a result of entering into this Agreement and/or performing any transaction contemplated by this Agreement; and

7.1.10 the Borrower has not taken any corporate action (including, for the avoidance of doubt, any board resolution or shareholder resolution) nor have any legal proceedings or other procedures or steps been taken, started or threatened in relation to the appointment of a liquidator, receiver, administrator, examiner, administrative receiver, compulsory manager or other similar officer or analogous procedure in respect of the Borrower or any of its property or assets in any relevant jurisdiction.

EXECUTION VERSION

7.2   The representations and warranties of the Borrower in Section 7.1 above (other than pursuant to Sections 7.1.9 and 7.1.10) are and shall be deemed to be made and repeated by the Borrower on each date on which any repayment or prepayment is made pursuant to Section 3 hereof.

7.3   The Guarantor hereby represents, warrants and agrees with the Lender as at the date of this Agreement, as follows:

    7.3.1   The execution and delivery by the Guarantor of this Agreement, the consummation by the Guarantor of the transactions contemplated hereby and the performance by the Guarantor of his obligations hereunder are within the Guarantor's powers and require no consent, approval, authorization or order of any court or governmental body, agency or official;

    7.3.2   the obligations of the Guarantor under this Agreement are legal, valid, binding and enforceable in accordance with their respective terms;

    7.3.3   the Guarantor is not in violation of any provision of, or in default in the performance or observance of, any material obligation, covenant or condition contained in any indenture, mortgage, deed of trust, loan agreement, lease or other agreement or instrument to which the Guarantor is a party or by which the Guarantor or any of its property may be bound where in each case such violation or default would adversely affect to a material extent its ability to perform its obligations under this Agreement;

    7.3.4   the Guarantor is not insolvent or unable to pay his debts (including subordinated and contingent debts), nor will he become so as a result of entering into this Agreement and/or performing any transaction contemplated by this Agreement;

    7.3.5   no litigation, arbitration or administrative or other proceedings of or before any court, arbitral body or agency are pending, or to the best knowledge of the Guarantor, threatened, which, if adversely determined, would have a material adverse effect on the Guarantor's property or assets or on his ability to perform his obligations hereunder; and

    7.3.6   no Event of Default, or event which with the giving of notice or the passage of time may become an Event of Default, has occured or will occur as a result of the execution and delivery by the Guarantor of this Agreement, the consummation by the Guarantor of the transactions contemplated hereby and the performance by the Guarantor of its obligations hereunder.

8.   **COVENANTS**

8.1   The Borrower covenants and agrees with the Lender that, so long as any amount remains outstanding in respect of the Loan or otherwise under this Agreement:

    8.1.1   the Borrower shall (i) preserve and maintain its legal existence and (ii) comply with the requirements of all applicable laws, rules, regulations and orders of governmental authorities in all material respects;

    8.1.2   the Borrower shall not create, incur, assume or suffer to exist any mortgage, lien, pledge, assignment, trust arrangement, option, charge or other security interest securing the obligation of any person or other agreement or arrangement having a similar effect (each, an "**Encumbrance**") in respect of any of its property or assets, except for: (i) such Encumbrances created in the ordinary course of business; or (ii) such other Encumbrances securing indebtedness in an aggregate principal amount

7.



EXECUTION VERSION

which does not exceed in aggregate U.S.\$75,000,000 at any time; or (iii) any Encumbrances created to secure any financing provided to the Borrower in connection with the purchase or leasing by the Borrower of new equipment (including projects in progress);

8.1.3   the Borrower shall not create, incur or suffer to exist any Indebtedness for borrowed money other than the Loan and pursuant to the shareholder loan agreement between Iraq Telecom Limited as lender and International Holdings Limited as borrower dated 27 July 2011 (the "**Shareholder Loan Agreement**") and other outstanding indebtedness of the Borrower as at the date of this Agreement, except for borrowings that: (i) are in the ordinary course of business of the Borrower; (ii) are applied to repay loans existing as at the date of this Agreement, provided that such loans are contractually subordinated to the Loan; (iii) are applied to finance liabilities owed to any governmental or regulatory body or entity arising after the date of this Agreement, provided that such borrowings shall at all times rank at least *pari passu* with the obligations of the Borrower in respect of the Loan and under this Agreement; (iii) are applied in relation to the rollout of the network by the Borrower, provided that such borrowings, (a) are in an aggregate principal amount which does not exceed in aggregate U.S. \$180,000,000 (or its equivalent in any other currency) at any time; and (b) shall at all times rank at least *pari passu* with the obligations of the Loan in respect of the Loan and under this Agreement; (iv) are made available to the Borrower by the suppliers of equipment to the Borrower and relating to or otherwise connected with the purchase or leasing by the Borrower of new equipment (including projects in progress); and (v) are otherwise applied to satisfy or discharge the terms and conditions of the Borrower's licence agreements, including in relation to any amendment or restructuring of such terms and conditions in contemplation or furtherance of any initial public offering or listing of the Borrower or an affiliate of the Borrower.

8.1.4   the Borrower shall not assume, guarantee, endorse or otherwise be or become directly or contingently responsible or liable (including, but not limited to an agreement to purchase any obligation, stock, assets, goods or services or to supply or advance assets, goods or services, or an agreement to maintain or cause such person to maintain a minimum working capital or net worth or otherwise to assure the creditors of any person against loss) for the obligations of any person, except guarantees in the Borrower's ordinary course of business or any guarantee or indemnity provided in connection with indebtedness permitted pursuant to Section 8.1.3 or pursuant to the guarantee made by the Borrower in favour of Iraq Telecom Limited dated 27 July 2011 (the "**Guarantee**");

8.1.5   the Borrower shall procure that no substantial change is made to the general nature of its business as carried out on the date of this Agreement;

8.1.6   the Borrower shall pay all taxes, assessments and other governmental charges of any kind imposed on or in respect of its income or any of its businesses or assets before any penalty or interest accrued on the amount payable and before any lien or other encumbrance on any of its property exists as a result of non-payment, except where adequate reserves are being maintained for such taxes, assessments and/or charges and the amount of such non-payment does not exceed U.S.\$5,000,0000 (or its equivalent in any currency) in any financial year of the Borrower;

8.1.7   the Borrower will not consolidate or amalgamate with or merge into any other person or convey or transfer, in one transaction or a series of transactions, all or substantially all of its property or assets to any other person, provided that no prior consent of the

8

EXECUTION VERSION

Lender is required for any corporate reorganisation or restructuring carried out in connection with any initial public offering or listing of the Borrower or any of its affiliates;

8.1.8    the Borrower will promptly give notice to the Lender of each Event of Default, or event which with the giving of notice or the passage of time would become an Event of Default; and

**8.1.9    the Borrower will pay all of its operating revenues into the bank account opened with the Lender pursuant to Section 9.1.2 below (the "Account").**

9.    **CONDITIONS PRECEDENT**

9.1    The obligation of the Lender to make the Loan to the Borrower is subject to the fulfilment (or waiver) to the satisfaction of the Lender in its sole discretion of the following conditions precedent and the Lender shall notify the Borrower promptly upon being so satisfied:

9.1.1    receipt by the Lender of evidence of the authority of the Borrower to enter into this Agreement, to consummate the transactions contemplated hereby and to perform its obligations hereunder;

9.1.2    evidence that, both immediately prior to the making of the Loan and also after giving effect thereto and to the use of the proceeds thereof, the Borrower has opened the Account; and

9.1.3    the representations and warranties made by the Borrower and the Guarantor in section 7 shall be true and complete in all material respects.

10.    **EVENTS OF DEFAULT**

10.1    If any of the following events (each an "**Event of Default**") shall occur and be continuing (an Event of Default is "continuing" if it has not been remedied or waived by the Lender):

10.1.1    Each of the Borrower or the Guarantor does not pay any amount (whether principal, interest, commission, fees or any other amount) payable by any one of them under this Agreement within 3 Business Days of the due date therefor; or

10.1.2    any representation, warranty or statement made by or on behalf of the Borrower or the Guarantor under, or in connection with, this Agreement is incorrect in any material respect when made and if capable of remedy, the Borrower or the Guarantor do not remedy the same within 20 Business Days of the earlier of the date on which the Borrower and/or the Guarantor become aware of such failure or the date on which they are required to do so by the Lender by written notice of such failure; or

10.1.3    the Borrower and/or the Guarantor fail to comply with any other provision of this Agreement and, to the extent that such non-compliance is capable of remedy, the Borrower and/or the Guarantor do not remedy the same within 20 Business Days of the earlier of the date on which the Borrower and/or the Guarantor become aware of such failure or the date on which they are required to do so by the Lender by written notice of such failure; or

10.1.4    any one of the Borrower and the Guarantor is unable to, or admits that it is unable to, pay its debts as they fall due or any other action, legal proceedings or other step or procedure, whether voluntary or involuntary, is taken in relation to the insolvent winding up, bankruptcy, administration, receivership, administrative receivership or

9

EXECUTION VERSION

similar status under the laws of any relevant jurisdiction of the Borrower or the Guarantor other than a vexatious or frivolous proceeding which is discharged, stayed or dismissed within 30 days of its commencement; or

10.1.5   this Agreement ceases to be in full force and effect or it is or it becomes unlawful for any one of the Borrower and the Guarantor to perform any of its material obligations hereunder;

then the Lender may, by giving written notice to the Borrower: (i) cancel the Loan; (ii) demand immediate repayment of the principal balance of the Loan at the time outstanding, together with any other amounts owned, if any, thereon, all accrued and unpaid fees, if any, then payable to the Lender hereunder; and (iii) enforce all or any part of its rights under this Agreement or otherwise at law or in equity.

10.2   Prior to the occurrence of an Event of Default which is continuing, there shall be no restrictions on the operation of the Account by the Borrower. If any Event of Default shall occur and be continuing, each of the Borrower and the Guarantor authorizes the Lender to proceed, to the fullest extent permitted by applicable law, without prior notice, by right of set-off, banker's lien, counterclaim or otherwise, against any cash of the Borrower in the Account to the full extent of all amounts payable to the Lender hereunder.

10.3   The rights provided for herein are cumulative and are not exclusive of any other rights, powers, privileges or remedies provided by law.

11.   **NOTICES**

All notices and other communications hereunder shall be deemed to have been duly given if in writing and personally delivered, delivered by prompt courier service addressed to the other party hereto, or to such other address specified in a notice given as provided herein, as follows:

| | |
|---|---|
| if to the Borrower, to: | 45 Kurdistan Street<br>Pirnam<br>Erbil<br>Kurdistan<br>Republic of Iraq<br><br>Attention: |
| With a copy to: | International Holdings Limited<br>Suite 904, Level 9 Park Place<br>Sheikh Zayed Road<br>PO Box 506672<br>Dubai, UAE<br><br>Attention: Joseph Tharsis |
| With a copy to: | Mr. Deepak Jain<br>International Holdings Limited<br>Suite 904, Level 9 Park Place<br>Sheikh Zayed Road<br>PO Box 506672<br>Dubai, UAE |

11

EXECUTION VERSION

| With a copy to: | Sirwan Saber Mustafa<br>Dar-Althiafa nr. 3,<br>Pirmam, Erbil<br>Republic of Iraq |
|---|---|
| With a copy to: | Ehab Aziz<br>Agility Logistics Head Office<br>Sulaibia, 6th Ring Road<br>Near Land Customs Clearing Area<br>PO Box 25678; 13115<br>Safat, Kuwait |
| With a copy to: | Ghada Gebara,<br>Korek Telecom<br>45 Kurdistan Street<br>Pirmam<br>Erbil<br>Kurdistan<br>Republic of Iraq |
| With a copy to: | Nawzad Junde<br>English Village<br>Villa 203<br>Erbil<br>Kurdistan<br>Republic of Iraq |
| With a copy to: | Iraq Telecom Limited<br>Suite 904, Level 9 Park Place<br>Sheikh Zayed Road<br>PO Box 506672<br>Dubai, UAE<br><br>Attention: Deepak Jain |
| With a copy to: | France Telecom<br>France Telecom – Orange<br>Financing and Treasury Department<br>208 rue Raymond Losserand<br>75014 Paris<br><br>Attention: Damien Musset |
| If to the Lender, to: | Al Rihadia Building,<br>Charles Malek Avenue,<br>Achrafieh,<br>Beirut, Lebanon |

11

EA1-104

EXECUTION VERSION

Attention:

If to Sirwan Saber Mostafa as Guarantor, to:

45 Kurdistan Street
Pirman
Erbil
Kurdistan
Republic of Iraq

12.   **NO ASSIGNMENT**

12.1   Neither the Borrower nor the Guarantor shall assign, transfer or otherwise dispose of any of its rights or obligations hereunder without the prior written consent of the Lender. The Lender may assign any of its rights and obligations hereunder at any time upon written notice and with the prior written consent of the Borrower and the Guarantor.

12.2   No failure or delay on the part of the Lender in exercising any right hereunder shall operate as a waiver of or impair any such right. No single or partial exercise of any such right shall preclude any other or further exercise thereof or the exercise of any other right. No waiver of any such right shall be effective unless given in writing. No waiver of any such right shall be deemed a waiver of any other right hereunder.

13.   **MISCELLANEOUS**

13.1   This Agreement shall be executed in three original copies each to be delivered to a party.

13.2   Any determination by the Lender of a rate or amount hereunder is, in the absence of manifest error, conclusive evidence of the matters to which it relates.

13.3   This Agreement shall be binding upon and inure to the benefit of the Borrower, the Guarantor and the Lender and their respective successors and permitted assigns.

13.4   In case any provision in this Agreement shall be invalid, illegal or unenforceable, the validity, legality and enforceability of the remaining provisions hereof shall not in any way be affected or impaired thereby.

14.   **GOVERNING LAW; JURISDICTION**

14.1   This Agreement shall be governed by the laws of the Republic of Lebanon.

14.2   Any dispute, claim, question or disagreement arising out of or relating to this Agreement or the transactions contemplated herein (a "Dispute"), shall be settled by binding arbitration in accordance with the Rules of Conciliation and Arbitration of the Beirut Chamber of Commerce and Industry by one or more arbitrators, and the procedures set forth below. Judgment upon the award rendered by the arbitrator may be enforced in any court having jurisdiction over such dispute. The Arbitration is to take place in Beirut in the English language unless otherwise agreed by the parties. The award shall be final and binding and the parties waive their rights to lodge an appeal against the award. Nothing in this Agreement including this Section 14.2 shall prevent a party from seeking injunctive relief including but not limited to injunctive relief before the Fast Track Judge in the case of any breach or alleged breach by another party.

EA1-105

EXECUTION VERSION

**IN WITNESS WHEREOF**, the parties hereto have caused this Agreement to be duly executed as of the date first above written.

The Borrower:
Korek Telecom Company LLC

By _____

    Name: Ghada Gebara

    Title: CEO - Korek Telecom Company LLC

The Lender:
IBL Bank SAL

By _____

    Name:

    Title:

The Guarantor:
Sirwan Saber Mustafa

By _____

    Name: Sirwan Saber Mustafa

LN 366692 14

13

EA1-106

# Exhibit E

**DATED ___   DECEMBER 2011**

---

**DEED OF INDEMNITY**

**between**

**IRAQ TELECOM LIMITED**

**MR. SIRWAN SABER MOSTAFA**

**KOREK TELECOM COMPANY LLC**

**INTERNATIONAL HOLDINGS LIMITED**

---

## Dewey & LeBoeuf

Dewey & LeBoeuf LLP
1 Minster Court
Mincing Lane
London EC3R 7YL
www.dl.com

## CONTENTS

1.   Definitions and Interpretation ................................................................................. 1

2.   Third Party Rights ................................................................................................... 3

3.   Indemnity ................................................................................................................ 3

4.   Payment Authority .................................................................................................. 4

5.   Protections .............................................................................................................. 4

6.   Representations ....................................................................................................... 5

7.   Undertakings ........................................................................................................... 6

8.   Repayment and Release .......................................................................................... 7

9.   Expenses, Liability and Indemnity ........................................................................ 8

10.  Payments ................................................................................................................. 8

11.  Subordination ......................................................................................................... 8

12.  Future Financings ................................................................................................... 9

13.  Remedies ................................................................................................................. 9

14.  Notices .................................................................................................................... 9

15.  Law and Jurisdiction ............................................................................................. 10

Schedule 1 Initial Administrative Details of the Parties ................................................... 13

**THIS DEED** is dated __ DECEMBER 2011 and is made by:

(A)   IRAQ TELECOM LIMITED, a company duly incorporated under the laws of Dubai International Financial Centre with registered number 1019 and whose registered office is located at suite 904, Level 9, Park Place, Sheikh Zayed Road, PO Box 506672, Dubai, United Arab Emirates ("**IT Ltd**");

(B)   MR. SIRWAN SABER MOSTAFA, whose address for purposes of this Deed is at Kurdistan Street nr. 45, Pirman, Erbil, Kurdistan, Republic of Iraq ("**SSM**");

(C)   KOREK TELECOM COMPANY LLC, a private company limited by shares incorporated with the Registration Directorate of Companies of the Kurdistan Regional Government with registered number 167 and whose registered office is located at Kurdistan Street nr. 45, Pirman, Erbil, Kurdistan, Republic of Iraq ("**Korek**"); and

(D)   INTERNATIONAL HOLDINGS LIMITED, a company duly incorporated under the laws of Dubai International Financial Centre with registered number 1020 and whose registered office is located at suite 904, Level 9, Park Place, Sheikh Zayed Road, PO Box 506672, Dubai, United Arab Emirates ("**IHL**"),

(IT Ltd, SSM and Korek are each a "**Party**" and, together, the "**Parties**").

**IT IS AGREED** as follows:

**Interpretation**

1.   **DEFINITIONS AND INTERPRETATION**

1.1   In this Deed:

**Affiliate** means in the case of a person which is a body corporate, any other entity which, directly or indirectly, owns or controls, is under common ownership or control or is owned or controlled by, such person, in each case from time to time.

**Authorisation** means an authorisation, consent, approval, resolution, licence, exemption, filing, notarisation or registration.

**Business Days** means days other than a Friday, Saturday and Sunday or public holiday in the United Arab Emirates or the Republic of Iraq on which banks are generally open in these countries for general commercial business.

**Final Discharge Date** means the latest to occur of:

(a)   the date on which Korek has satisfied all of its financial obligations pursuant to the IBL Loan Agreement;



1

(b)     the date on which each of the Parties has performed all of its payment obligations hereunder; and

(c)     the date on which Korek has reimbursed each of: (i) SSM for any amounts paid by it in respect of the SSM Guarantee Obligations; and (ii) IT Ltd for any amounts paid by it to SSM pursuant to Clause 3.

**Guarantee** means the guarantee granted by Korek in favour of IT Ltd. dated 27 July 2011;

**IBL Bank** means IBL Bank SAL, a joint-stock company duly organized and validly existing under the laws of the Republic of Lebanon registered with the Commercial Registry of Beirut under N°10472 and listed on the list of banks at the Central Bank of Lebanon under N°52 whose registered office is located at Al Itihadia Building, Charles Malek Avenue, Achrafieh, Beirut, Lebanon.

**IBL Loan** means the US$150,000,000 term loan from IBL Bank to Korek pursuant to the terms of the IBL Loan Agreement.

**IBL Loan Agreement** means the term loan agreement between Korek as borrower, IBL Bank as lender and SSM as guarantor, dated on or about the date of this Deed.

**IHL** means International Holdings Limited, a limited liability company duly incorporated under the laws of the Dubai International Financial Centre with registered number 1020 and whose registered office address is at Suite 904, Level 9, Park Place, Sheikh Zayed Road, PO Box 506672.

**IT Proportion** means forty-four per cent. (44%).

**On-Loan Agreement** means the shareholder loan agreement between IHL as lender and Korek as borrower dated 27 July 2011.

**Right** means any right, privilege, power or immunity, or any interest or remedy, of any kind, whether it is personal or proprietary.

**Shareholder Loan Agreement** means the shareholder loan agreement between IT Ltd. as lender and IHL as borrower dated 27 July 2011.

**SSM Guarantee Obligations** means the obligations from time to time incurred by SSM under or in connection with the IBL Loan Agreement in respect of the irrevocable and unconditional guarantee by SSM of Korek's obligations under the IBL Loan Agreement.

**SSM Proportion** means fifty-six per cent. (56%).

2



**Tax** means any tax, levy, impost, duty or other charge or withholding of a similar nature (including any penalty or interest payable in connection with any failure to pay or any delay in paying any of the same).

**Third Parties Act** means the Contracts (Rights of Third Parties) Act 1999.

**VAT** means value added tax as provided for by the Value Added Tax Act 1994 and any other tax of a similar nature.

1.2    In this Deed:

(a)    the table of contents, the summary and the headings are inserted for convenience only and do not affect the interpretation of this Deed;

(b)    references to clauses and schedules are to clauses of, and schedules to, this Deed;

(c)    references to the IBL Loan Agreement or any other document are to that document as from time to time amended, restated, novated or replaced, however fundamentally;

(d)    references to a person include an individual, firm, company, corporation, unincorporated body of persons and any government entity;

(e)    references to a person include its successors in title, permitted assignees and permitted transferees;

(f)    words importing the plural include the singular and vice versa; and

(g)    references to any enactment include that enactment as amended or re-enacted.

## 2.    THIRD PARTY RIGHTS

2.1    No term of this Deed is enforceable under the Third Parties Act by anyone who is not a party to this Deed.

2.2    The parties to this Deed may terminate this Deed or vary any of its terms without the consent of any third party.

## 3.    INDEMNITY

3.1    IT Ltd irrevocably and unconditionally undertakes:

(a)    to pay to SSM within five (5) Business Days of written demand by SSM an amount (in the corresponding currency) equal to the IT Proportion of each and every amount paid out by SSM under or in connection with the SSM Guarantee Obligations; and

3



(b)    to indemnify SSM on demand and keep SSM indemnified from and against the IT Proportion of all actions, suits, proceedings, claims, demands, damages, costs, expenses, losses or charges whatsoever which may be taken or made against or be incurred or become payable by SSM under the SSM Guarantee Obligations, except to the extent that any such actions, suits, proceedings, claims, demands, damages, costs, expenses, losses or charges arise as a result of SSM's failure to pay amounts when due under, or any other breach by SSM of his obligations under, the IBL Loan Agreement or otherwise as a consequence of SSM's negligence or wilful misconduct.

(c)    to pay interest to SSM on all sums hereby covenanted to be paid by IT Ltd from the date immediately following the date such sums are due until the actual date of payment of such sums (including after as well as before any judgment) at a rate equal to the United States Federal Reserve federal funds overnight deposit rate for US dollars.

## 4.   PAYMENT AUTHORITY

4.1    Subject to Clause 7.3, SSM is authorised to make payments and comply with any claims or demands made under or in respect of any SSM Guarantee Obligations without further authority from IT Ltd.

4.2    SSM may make payment in respect of any such claim or demand which appears on its face to be in order and shall not be concerned with the legality, validity or propriety of the claim or demand or whether it has been properly authorised or as to whether or not there is any dispute between Korek and IBL Bank as to the entitlement of IBL Bank to make such claim or demand.

## 5.   PROTECTIONS

5.1    Neither SSM nor IT Ltd shall exercise any Rights (including, without limitation, rights of set-off) which it may have by reason of performance by it of its obligations under this Deed and the IBL Loan Agreement or by reason of any amount being payable, or liability arising, under any of this Deed and the IBL Loan Agreement:

(a)    to be indemnified or reimbursed by Korek;

(b)    to claim any contribution from any other guarantor of Korek's obligations under the IBL Loan Agreement; or

(c)    to take the benefit (in whole or in part and whether by way of subrogation or otherwise) of any rights of SSM under the IBL Loan Agreement or of any other guarantee or security taken under, or in connection with, the IBL Loan Agreement by SSM;

4



(d)     to bring legal or other proceedings for an order requiring Korek to make any payment, or perform any obligation, in respect of which either IT Ltd has given a guarantee, undertaking or indemnity under this Deed or SSM has given a guarantee, undertaking or indemnity under the IBL Loan Agreement;

(e)     to exercise any right of set-off against Korek; and/or

(f)     to claim or prove as a creditor of Korek,

without the prior written consent of the other party.

5.2     Each of SSM and IT Ltd respectively undertake to each other that it shall not take any action which could reasonably be expected to delay or otherwise prejudice the ability of Korek to perform its obligations under the IBL Loan Agreement.

6.      **REPRESENTATIONS**

6.1     Each of IT Ltd, Korek, and IHL represents and warrants to the other Parties on the date of this Deed that:

(a)     it is duly incorporated with limited liability, and is validly existing under the laws of its jurisdiction of incorporation.

(b)     it has the power to carry on its business as it is being conducted.

(c)     entry into and performance by it of this Deed will not breach any provision of its memorandum and articles of association, by-laws, or equivalent constitutional documents in any way that would adversely affect to a material extent its ability to enter into or perform its obligations under this Deed.

(d)     it has obtained all corporate authorisations and all other governmental, statutory, regulatory or other Authorisations required to empower it to enter into and perform its payment and other material obligations under this Deed and to make this Deed admissible in evidence in its jurisdiction of incorporation.

6.2     Each Party and IHL represents and warrants to the other Parties and IHL on the date of this Deed that:

(a)     this Deed will, when executed, constitute its valid and binding obligations.

(b)     entry into this Deed will not (i) result in violation or breach of any applicable laws or regulations in any relevant jurisdiction or (ii), amount to a violation or default with respect to any applicable statute, regulation, order, decree or judgment of any relevant court or any relevant governmental or relevant regulatory authority in any jurisdiction



applicable to it, where, in each case, the breach, conflict or violation would adversely affect to a material extent its ability to enter into or perform its obligations under this Deed.

## 7.   UNDERTAKINGS

7.1   Each Party shall promptly obtain, comply with and do all that is necessary to maintain in full force and effect any Authorisation required under any law or regulation of its jurisdiction of incorporation to enable it to perform its obligations under this Deed and to ensure the legality, validity, enforceability or admissibility in evidence in its jurisdiction of incorporation of this Deed, unless failure to do so would not be reasonably likely to adversely affect to a material extent its ability to enter into or perform its obligations under this Deed.

7.2   IT Ltd undertakes to SSM that is shall not enter into any amalgamation, demerger, merger or corporate reconstruction or reorganisation without either:

(a)   providing evidence satisfactory to SSM, acting reasonably, that such amalgamation, demerger, merger or corporate reconstruction or corporate reconstruction or reorganisation would not be reasonably likely to adversely affect to a material extent IT Ltd's ability to perform its obligations under this Deed; or

(b)   procuring another entity, reasonably satisfactory to SSM to replace IT Ltd as the indemnifying party under this Deed on terms substantially similar to the terms of this Deed; or

(c)   obtaining the written consent of SSM,

in each such case prior to such amalgamation, demerger, merger or corporate reconstruction or reorganisation taking place.

7.3   SSM undertakes to IT Ltd:

(a)   not to amend, or consent to the amendment of, any provision of the IBL Loan Agreement, including the guarantee contained therein, without IT Ltd's consent;

(b)   to notify IT Ltd upon receipt of a demand for payment from IBL Bank pursuant to the SSM Guarantee Obligations prior to making any such payment;

(c)   to consult with IT Ltd prior to making any payment in respect of the SSM Guaranteed Obligations, provided that any such consultation shall not delay the satisfaction by SSM of a demand for payment pursuant to the SSM Guarantee Obligations by the due date in any way; and

6



(d)    to notify IT Ltd upon SSM making any payment to IBL Bank pursuant to the SSM Guarantee Obligations.

7.4    Korek undertakes to notify IT Ltd and SSM of:

    (a)    any defaults or events of default under the IBL Loan Agreement; and

    (b)    any actions taken or threatened by IBL Bank to exercise remedies against Korek or SSM pursuant to the IBL Loan Agreement.

7.5    IT Ltd further undertakes to SSM that, provided IBL Bank SAL so agrees, it will execute a several guarantee in favour of IBL Bank SAL in substantially similar form as the irrevocable and unconditional guarantee given by SSM of Korek's obligations under the IBL Loan within 90 days of the date of this Deed in an amount not exceeding the IT Proportion of the maximum liability of SSM under its guarantee of the IBL Loan (as in effect at the date of this Deed) and in substitution for an equivalent amount of the liability of SSM under its guarantee of the IBL Loan.

7.6    If the several guarantee described in Clause 7.5 above is entered into with IBL Bank SAL, it shall reduce the liability of SSM under its guarantee of the IBL Loan *pro tanto* and this Deed shall terminate on the date such several guarantee is entered into provided that such termination shall not reduce the liability of any Party from any obligation or liability for any matter or undertaking which was required to be, but has not been, carried out, observed or performed prior to the date of such termination.

## 8.    REPAYMENT AND RELEASE

8.1    Korek agrees that it will not make any payment to either SSM or IT Ltd in respect of any of the SSM Guarantee Obligations unless the total amount of any such payment is apportioned between SSM and IT Ltd in the proportion in which SSM Guarantee Obligations have been paid by them and for these purposes any payment made by IT Ltd to SSM pursuant to Clause 3 shall be deemed to be a payment made in respect of SSM Guarantee Obligations (recognising, in this context, that payments made by SSM in respect of the SSM Guarantee Obligations, and payments by IT Ltd to SSM pursuant to Clause 3 shall create subrogation rights for SSM and IT Ltd respectively against Korek).

8.2    Each of IT Ltd and SSM agrees that to the extent it receives or recovers any payment from Korek other than in accordance with Clause 8.1 in connection with any of the SSM Guarantee Obligations, it shall immediately notify the other Party of the details of such receipt or recovery and pay to such Party an amount equal to the amount that such Party should have received in accordance with Clause 8.1.

8.3    All obligations in this Deed shall remain in full force from the date of this Deed until the Final Discharge Date.

7



9.   **EXPENSES, LIABILITY AND INDEMNITY**

Save in respect of a breach of any party's obligations under this Deed or otherwise expressly provided for in this Deed, no party will be in any way liable or responsible to the other parties for any loss or liability of any kind arising from any act or omission by it of any kind in relation to this Deed, except to the extent caused by such party's own negligence or wilful misconduct.

10.   **PAYMENTS**

10.1   All payments by IT Ltd, and Korek under this Deed shall be made in full, without any set-off or other deduction.

10.2   If any tax or other sum must be deducted from any amount payable by any Party under this Deed, such Party will pay such additional amounts as are necessary to ensure that the recipient receives a net amount equal to the full amount it would have received before such deductions.

10.3   All amounts payable under this Deed are exclusive of VAT. The Parties will, in addition, pay any applicable VAT on those amounts.

10.4   Any certification or determination by a Party of an amount payable by any other Party under this Deed is, in the absence of manifest error, conclusive evidence of that amount.

11.   **SUBORDINATION**

11.1   IT Ltd. and IHL agree that if there is an Event of Default under the IBL Loan Agreement which is continuing (as such term is defined therein):

(a)   IT Ltd. and IHL shall not demand or accelerate payment of any amounts due and payable under the Shareholder Loan Agreement or the On-Loan Agreement respectively or exercise any other remedy rights pursuant to the Shareholder Loan Agreement or the On-Loan Agreement (including, in relation to the Shareholder Loan Agreement, pursuant to clause 21 (*Remedy rights*) therein);

(b)   IT Ltd. shall not demand any payment pursuant to the Guarantee or enforce the Guarantee,

in each such case during the period from and including the date of the occurrence of the Event of Default under the IBL Loan Agreement up to and including the date falling 45 calendar days following any full and final discharge of the outstanding loan made pursuant to the IBL Loan Agreement and/or release or termination of any subordination of the Shareholder Loan Agreement, the On-Loan Agreement and/or the Guarantee by IBL Bank SAL.

8



12. **FUTURE FINANCINGS**

12.1 IT Ltd undertakes to SSM that if further funding is required by Korek pursuant to which the lender of such further funding requires a guarantee to be delivered by an Affiliate of Korek and the several guarantee pursuant to Clause 7.5 above has not been entered into, IT Ltd shall in respect of the first such funding required after the date of this Deed ("**Further Funding**"), provide a guarantee to the relevant lender(s) in an amount equal to the IT Proportion of the aggregate of the IBL Loan and the amount of the Further Funding and IT Ltd's maximum liability under Clause 3 shall be reduced *pro tanto*.

12.2 SSM undertakes that if IT Ltd fulfils its obligations under Clause 12.1 above, SSM shall provide a guarantee to the relevant lender(s) in an amount equal to the SSM Proportion of the sum of the aggregate of the IBL Loan and the amount of the Further Funding less the maximum liability of SSM under its guarantee of the IBL Loan.

13. **REMEDIES**

13.1 The Rights created by this Deed are in addition to any other Rights of the Parties and IHL under any other documentation, the general law or otherwise. They will not merge with or limit those other Rights, and are not limited by them.

13.2 No failure by any Party to exercise any Right under this Deed will operate as a waiver of that Right. Nor will a single or partial exercise of a Right by a Party preclude its further exercise.

13.3 If, at any time, any provision of this Deed is or becomes illegal, invalid or unenforceable in any respect under any law of any jurisdiction, neither the legality, validity or enforceability of the remaining provisions nor the legality, validity or enforceability of that provision in any other respect or under the law of any other jurisdiction will be affected or impaired in any way.

14. **NOTICES**

14.1 Any communication to be made under or in connection with this Deed shall be made in writing and, unless otherwise stated, shall be made by fax or courier with a copy to be provided by electronic mail.

14.2 The initial administrative details of the parties to this Deed are contained in Schedule 1(*Initial administrative details of the parties*) but any such party may amend its own details at any time by notice to the other parties to this Deed.

14.3 Any communication or document made or delivered by one person to another under or in connection with this Deed will only be effective:

    (a)    if by way of fax, when received in legible form;

9



(b)    if by way of courier, when it has been received at the relevant address and proof of delivery is available from the relevant courier company; or

(c)    if by way of electronic mail only when actually received in readable form.

14.4    Any notice given under or in connection with this Deed must be in English.

14.5    All other documents provided under or in connection with this Deed must be:

(a)    in English; or

(b)    if not in English, and if so required by the parties to this Deed, accompanied by a certified English translation and, in this case, the English translation will prevail unless the document is a constitutional, statutory or other official document.

## 15.   LAW AND JURISDICTION

15.1    This Deed and any non-contractual obligations connected with it are governed by the laws of England.

15.2    Any claim, dispute or difference arising under or in connection with this Deed or in connection with the negotiation, existence, legal validity, enforceability or termination of this Deed or in relation to any non-contractual obligations arising out of or in connection with this Deed (a **Dispute**), whether the alleged liability shall arise under the law of England and Wales or under the law of some other country shall be finally resolved by arbitration under the Arbitration Rules of the International Chamber of Commerce (the **Rules**), which Rules are deemed to be incorporated by reference into this Clause 15.2.  The number of arbitrators shall be three.  The parties to this Deed hereby agree that (i) one of the arbitrators shall be nominated by SSM, (ii) one of the arbitrators shall be nominated by IT Ltd (iii) the third arbitrator shall be jointly nominated by the two arbitrators nominated by SSM and IT Ltd; and (iv) in the event that such arbitrators are unable to agree on the identity of the third arbitrator, such arbitrator shall be appointed by the International Chamber of Commerce in accordance with the Rules. The parties to this Deed hereby agree that any restriction in the Rules upon the nomination or appointment of an arbitrator by reason of nationality shall not apply to any arbitration commenced pursuant to this Clause 15.2. The seat, or legal place, of arbitration shall be the Dubai International Financial Centre.  The language to be used in the arbitration shall be English.

**This Deed has been executed as a deed, and it has been delivered on the date stated at the beginning of this Deed.**



Executed as a deed by
**Iraq Telecom Limited**
a company incorporated
under the laws of
Dubai International Financing Centre,
by OLIVIER FROISSART
who in accordance with the laws of
that territory is acting under the
authority of the company

.....................................
Authorised Signatory


Executed as a deed by
**Sirwan Saber Mostafa**

.........................


in the presence of:

.........................

Name of witness:
Address:


Executed as a deed by
**Korek Telecom Company LLC**
a company incorporated
under the laws of the Kurdistan
Regional Government,
by _____
who in accordance with the laws of
that territory is acting under the
authority of the company

.........................
Authorised Signatory

11

Executed as a deed by
**International Holdings Limited**
a company incorporated
under the laws of
Dubai International Financing Centre,
by _____
who in accordance with the laws of
that territory is acting under the
authority of the company

.........................
Authorised Signatory

12



## SCHEDULE 1
## INITIAL ADMINISTRATIVE DETAILS OF THE PARTIES

| Party | Address | Fax number & Email Address | Attention |
|---|---|---|---|
| SSM | Kurdistan Street nr. 45 Pirman Erbil Kurdistan Republic of Iraq | N/A | Mr. Sirwan Saber Mostafa |
| Iraq Telecom Ltd | Suite 904, Level 9 Park Place Sheikh Zayed Road PO Box 506672 Dubai, UAE | +971 4 329 6967 | |
| Korek Telecom Company LLC | Kurdistan Street nr. 45 Pirman Erbil Kurdistan Republic of Iraq | N/A | Chief Executive Officer or Managing Director |
| International Holdings Limited | Suite 904, Level 9 Park Place Sheikh Zayed Road PO Box 506672 Dubai, UAE | +971 4 329 6967 | |

13



# Exhibit F

EXECUTION VERSION

DATED ___ DECEMBER 2011

**IBL BANK SAL**

and

**KOREK TELECOM COMPANY LLC**

and

**INTERNATIONAL HOLDINGS LIMITED**

and

**IRAQ TELECOM LIMITED**

---

### SUBORDINATION AGREEMENT

---

DEWEY & LEBOEUF

Dewey & LeBoeuf LLP
1 Minster Court
Mincing Lane
London EC3R 7YL
www.dl.com

LN 561180.5

EA1-107

## CONTENTS

PAGE

1.  Subordination .................................................................................................. 3

2.  Notices ............................................................................................................. 4

3.  No Assignment ................................................................................................ 5

4.  Miscellaneous .................................................................................................. 5

5.  Governing Law; Jurisdiction ........................................................................... 6



LN 561180.5

i

EA1-108

EXECUTION VERSION

**THIS AGREEMENT** (this **"Agreement"**) is made on ___ December 2011

**BETWEEN:**

(1) **IBL BANK SAL**, a joint-stock company duly organized and validly existing under the laws of the Republic of Lebanon registered with the Commercial Registry of Beirut under N°10472 and listed on the list of banks at the Central Bank of Lebanon under N°52 whose registered office is located at Al Itihadia Building, Charles Malek Avenue, Achrafieh, Beirut, Lebanon, as lender (**"IBL"**);

(2) **KOREK TELECOM COMPANY LLC**, a private company limited by shares incorporated with the Registration Directorate of Companies of the Kurdistan Regional Government with registered number 167 and whose registered office is located at 45 Kurdistan Street, Pirmam, Erbil, Kurdistan, the Republic of Iraq, as borrower (the **"Korek"**);

(3) **INTERNATIONAL HOLDINGS LIMITED**, a company duly incorporated under the laws of Dubai International Financial Centre with registered number 1020 and whose registered office is located at suite 904, Level 9, Park Place, Sheikh Zayed Road, PO Box 506672, Dubai, United Arab Emirates (**"IHL"**);

**AND**

(4) **IRAQ TELECOM LIMITED**, a company duly incorporated under the laws of Dubai International Financial Centre with registered number 1019 and whose registered office is located at suite 904, Level 9, Park Place, Sheikh Zayed Road, PO Box 506672, Dubai, United Arab Emirates (**"IT"**).

**RECITALS:**

**WHEREAS:**

(A) IT has agreed to subordinate (i) the obligations and liabilities of IHL as borrower (the **"Subordinated Borrower Liabilities"**) pursuant to the shareholder loan agreement between IT as lender and IHL as borrower dated 27 July 2011 (the **"Shareholder Loan Agreement"**) and (ii) the obligations and liabilities of Korek as guarantor of the Shareholder Loan Agreement (the **"Subordinated Guarantee Liabilities"**) pursuant to the guarantee granted by Korek in favour of IT dated 27 July 2011 (the **"Guarantee"**); and

(B) IHL has agreed to subordinate the obligations and liabilities of Korek as borrower pursuant to the shareholder loan agreement between IHL as lender and Korek as borrower dated 27 July 2011 (the **"On-Loan Agreement"**) (the **"Subordinated On-Loan Liabilities"** and, together with the Subordinated Borrower Liabilities and the Subordinated Guarantee Liabilities, the **"Subordinated Liabilities"**),

in each case, to the obligations of Korek to IBL under the term loan agreement between IBL as lender and Korek as borrower, dated on or about the date hereof (the **"IBL Loan Agreement"**).

LN 561180.5

2

EA1-109

EXECUTION VERSION

**NOW THEREFORE, IT IS AGREED** as follows:

1. **SUBORDINATION**

1.1    In consideration of IBL making a loan available to Korek pursuant to the IBL Loan Agreement, IT and IHL agree that the Subordinated Liabilities are postponed and subordinated to the obligations and liabilities of Korek to IBL pursuant to the IBL Loan Agreement on the terms set out in this Section 1 and in accordance with provisions in Section 1.2.

1.2    Prior to the occurrence of an Event of Default which is continuing under the IBL Loan Agreement, IHL and Korek may make payments in principal and interest (including any prepayment, repayment or other discharge) in respect of any of the Subordinated Liabilities then due. Following the occurrence of an Event of Default which is continuing and which is notified in writing by IBL to IT and IHL and until the obligations of Korek pursuant to the IBL Loan Agreement have been discharged:

(a)    IHL shall not make any payments of amounts due and payable pursuant to the Shareholder Loan Agreement to IT;

(b)    Korek shall not make any payment of amounts due and payable pursuant to the Guarantee to IT;

(c)    IT shall not demand or accelerate payment of any amounts due and payable or exercise any other rights pursuant to clause 21 (*Remedy rights*) of the Shareholder Loan Agreement;

(d)    IT shall not demand any payment pursuant to the Guarantee or enforce the Guarantee;

(e)    Korek shall not make any payment of amounts due and payable pursuant to the On-Loan Agreement; and

(f)    IHL shall not demand or accelerate payment of any amounts due and payable or exercise any other rights pursuant to the On-Loan Agreement.

1.3    Nothing in this Section 1 shall restrict the ability of:

(a)    IT to arrange with any person which is not Korek or IHL any assurance against loss in respect of, or reduction of its credit exposure to Korek and/or IHL and IT shall not be obliged to account to IBL for any sum received by it as a result of that action; and

(b)    IHL to arrange with any person which is not Korek any assurance against loss in respect of, or reduction of its credit exposure to Korek and IHL shall not be obliged to account to IBL for any sum received by it as a result of that action.



LN:561180.5

3

EA1-110

2.    **NOTICES**

All notices and other communications hereunder shall be deemed to have been duly given if in writing and personally delivered, delivered by prompt courier service addressed to the other party hereto, or to such other address specified in a notice given as provided herein, as follows:

| if to **Korek**, to: | 45 Kurdistan Street |
| | Pirmam |
| | Erbil |
| | Kurdistan |
| | Republic of Iraq |
| Attention: | |

| if to **IBL**, to: | Al Itihadia Building, |
| | Charles Malek Avenue, |
| | Achrafieh, |
| | Beirut, Lebanon |
| Attention: | |

| if to **IHL**, to: | Suite 904, Level 9 Park Place |
| | Sheikh Zayed Road |
| | PO Box 506672 |
| | Dubai, UAE |
| Attention: | Deepak Jain |
| With a copy to: | Nawzad Junde |
| Address: | English Village |
| | Villa 203 |
| | Erbil |
| | Kurdistan |
| | Republic of Iraq |
| With a copy to: | Ehab Aziz |
| Address: | Agility Logistics Head Office |
| | Sulaibia, 6th Ring Road |
| | Near Land Customs Clearing Area |
| | PO Box 25418, 13115 |
| | Safat, Kuwait |

| if to **IT**, to: | Suite 904, Level 9 Park Place |
| | Sheikh Zayed Road |

LN 561180/5

4

EA1-111

PO Box 506672
Dubai, UAE

| | |
|---|---|
| Attention: | Deepak Jain |
| With a copy to: | Ehab Aziz |
| Address: | Agility Logistics Head Office<br>Sulaibia, 6th Ring Road<br>Near Land Customs Clearing Area<br>PO Box 25418, 13115<br>Safat, Kuwait |
| With a copy to: | Damien Musset |
| Address: | France Telecom<br>France Telecom – Orange<br>financing and treasury department<br>208 rue Raymond Losserand<br>75014 Paris |

3.    **NO ASSIGNMENT**

3.1     No party to this Agreement shall assign, transfer or otherwise dispose of any of its rights or obligations hereunder without the prior written consent of IBL. IBL may assign any of its rights and obligations hereunder at any time upon written notice and with the prior written consent of the other parties.

3.2     No failure or delay on the part of IBL in exercising any right hereunder shall operate as a waiver of, or impair, any such right. No single or partial exercise of any such right shall preclude any other or further exercise thereof or the exercise of any other right. No waiver of any such right shall be effective unless given in writing. No waiver of any such right shall be deemed a waiver of any other right hereunder.

4.    **MISCELLANEOUS**

4.1     This Agreement shall be executed in four original copies each to be delivered to a party.

4.2     Any determination by IBL of a rate or amount hereunder is, in the absence of manifest error, conclusive evidence of the matters to which it relates.

4.3     This Agreement shall be binding upon and inure to the benefit of each of the parties hereto and their respective successors and permitted assigns.

4.4     In case any provision in this Agreement shall be invalid, illegal or unenforceable, the validity, legality and enforceability of the remaining provisions hereof shall not in any way be affected or impaired thereby.



LN 561180.5

5

5.    **GOVERNING LAW; JURISDICTION**

5.1   This Agreement shall be governed by the laws of the Republic of Lebanon.

5.2   Any dispute, claim, question or disagreement arising out of or relating to this Agreement or the transactions contemplated herein (a **"Dispute"**), shall be settled by binding arbitration in accordance with the Rules of Conciliation and Arbitration of the Beirut Chamber of Commerce and Industry by one or more arbitrators, and the procedures set forth below. Judgment upon the award rendered by the arbitrator may be enforced in any court having jurisdiction over such dispute. The Arbitration is to take place in Beirut in the English language unless otherwise agreed by the parties. The award shall be final and binding and the parties waive their rights to lodge an appeal against the award. Nothing in this Agreement including this Section 5.2 shall prevent a party from seeking injunctive relief including but not limited to injunctive relief before the Fast Track Judge in the case of any breach or alleged breach by another party.

LN 561180.5

6

EA1-113

**IN WITNESS WHEREOF**, the parties hereto have caused this Agreement to be duly executed as of the date first above written.

**Korek Telecom Company LLC**

By _____
　　　Name:
　　　Title:

**IBL Bank SAL**

By _____
　　　Name:
　　　Title:

**International Holdings Limited**

By _____
　　　Name: IHAB F. A. BASSILIOS
　　　Title: Board MEMBER

**Iraq Telecom Limited**

By _____
　　　Name: Olivier FROISSART
　　　Title: Board Member

7

LN 561180.5

EA1-114

# Exhibit G



**IBL BANK**

**Korek Telecom Company LLC**
45 Kurdistan Street
Pirmam
Erbil
Republic of Iraq

9 July 2015

Dear Sirs,

**Notice of Event of Default**

We refer to the Term Loan Agreement dated 21 December 2011 and made between IBL Bank SAL (as Lender), Korek Telecom Company LLC (as Borrower) and Mr. Sirwan Saber Mustafa (as Guarantor), as amended (the "**Agreement**").

Unless otherwise specified, terms used but not otherwise defined in this letter shall have the same meaning as in the Agreement.

Clause 3.1 of the Agreement (as amended) requires you to repay the entire principal amount of the Loan in installments as follows: (i) U.S. $40 Million on the 31st of January 2015 (the "**Short Term Loan Repayment Date**") and (ii) U.S. $110 Million on the 21st of June 2015 (together with Short Term Loan Repayment Date, the "**Repayment Dates**"). You have failed to repay the principal amount on the respective Repayment Dates and have not remedied these defaults as of the date of this letter.

Pursuant to clause 10.1 of the Agreement, breach of your obligations in clause 3.1 of the Agreement constitutes an Event of Default. This Event of Default has commenced on 5 February 2015 and is continuing.

As there is an Event of Default which is continuing, we are entitled (in addition to any other right or remedy we may have against you) to require immediate repayment of all amounts due under the Loan.

We hereby request that you repay all such amounts on or before 9 August 2015.

We further request that you immediately comply with Section 1.2 of the Subordination Agreement dated 21 December 2011 among IBL Bank SAL, Korek Telecom Company LLC, International Holdings Limited and Iraq Telecom Limited (the "**Subordination Agreement**"), including ceasing to make any payments in respect of the On-Loan Agreement and the Guarantee. We also demand that IHL and IT comply with their respective obligations under Section 1.2 of the Subordination Agreement. Capitalized terms used in this paragraph are as defined in the Subordination Agreement.

This letter is without prejudice to any other rights which we may have under the Agreement and the Subordination Agreement or under applicable law.

Yours faithfully,

.......................................
For and on behalf of IBL Bank SAL
Date.......................................

Ghassan Rayes                    Dolly Merhy

CC:     **International Holdings Limited**, Suite 904, Level 9, Park Place, PO Box 506672,
        Sheikh Zayed Road, Dubai International Financial Centre, Dubai, UAE

        **Iraq Telecom Limited**, Office 11, Level 3, Gate Village 10, PO Box 506672,
        Sheikh Zayed Road, Dubai International Financial Centre, Dubai, UAE

        **Mr. Sirwan Saber Mustafa**, 45 Kurdistan Street, Erbil, Kurdistan Region, Republic of Iraq

Capital LBP 150 000 000 000 fully paid
List of Banks N° 52, CRB 10472

Charles Malek Avenue, Al Ittihadia Building, Ashrafieh, Beirut 2071 4703 Lebanon
P.O.Box: 11-5292 Riad El Solh 1107 2190 Beirut - Lebanon - Swift: INLELBBE -Tax ID No. 7267
Tel: +961 1 200 350/2/3 - Fax: +961 1 204 505 - E-mail: ibl@ibl.com.lb - www.ibl.com.lb

# Exhibit H



Beirut, August 30, 2017

**Korek Telecom**
Korek Building 45 Kurdistan
Erbil – Iraq

Dear Sirs,

We refer to the Term Loan Agreement dated 21 December 2011, made between IBL Bank SAL (as Lender), Korek Telecom Company LLC (as Borrower) and Mr. Sirwan Saber Mostafa (as Guarantor), as amended from time to time (the "**Agreement**").

Terms used but not otherwise defined in this letter shall have the same meaning as in the Agreement.

Further to our previous correspondences which remained unanswered, we hereby reiterate that the Repayment Dates of each of the Short Term Loan and the Long Term Loan have expired, and IBL Bank SAL insists on a full repayment of the loan.

In the interim, you are requested to provide, within 30 days from the date hereof, additional collateral to IBL Bank SAL to secure the Loan, in the form of a pledge of the Borrower's shares in addition to any other acceptable collateral to IBL Bank SAL.

If we do not receive any positive response from you within the aforementioned delay, we reserve our right to take any and all appropriate actions to safeguard our rights under the Agreement.

This letter is without prejudice to any other rights which the Lender may have under the Agreement or as a matter of general law, which are expressly reserved and are not waived or amended by the terms of this letter, in particular, the terms of the Subordination Agreement which must continue to be complied with by all parties.

This letter and any dispute or claim arising out of or in connection with it or its subject matter or formation (including non-contractual disputes or claims) shall be governed by and construed in accordance with the laws of the Republic of Lebanon.

Yours faithfully,

IBL Bank SAL

CC:     **International Holdings Limited**, Office 11, Level 3, Gate Village 10, PO Box 506672,
        Sheikh Zayed Road, Dubai International Financial Center, Dubai, UAE
        **Iraq Telecom Limited**, Office 11, Level 3, Gate Village 10, PO Box 506672,
        Sheikh Zayed Road, Dubai International Financial Center, Dubai, UAE
        **Mr. Sirwan Saber Mustafa**, 45 Kurdistan Street, Erbil, Kurdistan Region, Republic of Iraq

Capital LBP 150 000 000 000 fully paid
List of Banks N° 57, CRB 10472

Charles Malek Avenue, Al Ittihadia Building, Ashrafieh, Beirut 2071 4703 Lebanon
P.O.Box: 11-5292 / 2190 Beirut - Lebanon - Tax I.D No: 7267 - Swift: INLELBBE
Tel: +961 1 204 505 - E-mail: ibl@ibl.com.lb - www.ibl.com.lb

EA-1/3192

IBL Bank SAL
Charles Malek Avenue
Al Ittihadiah Building
Ashrafieh
Beirut 2071 4703 Lebanon

P.O. Box: 11-5292
Riad El Solh 1107 2190
Beirut, Lebanon

*Attention:*

Mr. Salim Y. Habib (Chairman, General Manager)
Mr. Gaby Mezher (Head of Internal Audit)
Ms. Tania Tayah (Head of Risk Management)
Mr. Ghassan El Rayess (Head of Corporate and Commercial Banking)
Mr. Joe Boustany (Head of Compliance)

25 September 2017

Dear Sirs,

**Term Loan Agreement between IBL Bank SAL ("IBL"), Korek Telecom Company LLC ("Korek") and Mr. Sirwan Saber Mustafa dated 21 December 2011 (the "Agreement")**

1.    We refer to your letter dated 30 August 2017 addressed to Korek, which was received by us on 11 September 2017. We write in our capacity as directors of International Holdings Limited ("**International Holdings**") and members of the Korek Supervisory Committee, nominated by Iraq Telecom Limited ("**IT Ltd**").

2.    You have referred in your letter to the provision of additional collateral in connection with the Short Term Loan and the Long Term Loan (as defined in the Agreement). So that we can properly consider your request in context, please address the following:

(a)    Could you please explain on which ground IBL considers itself entitled to request additional collateral in the form of a pledge of the shares of Korek.

(b)    Could you please describe the collateral that IBL currently holds in connection with the loans that are outstanding, together with details of the sums that you consider are currently due.

(c)    Your letter makes reference to Mr. Mustafa as guarantor. Please also advise whether any call has been made under that guarantee provided by Mr. Mustafa and whether it

1

is the intention of IBL to do so. As you are aware, pursuant to Clause 6 of the Agreement, the foregoing guarantee is a primary obligation.

(d)    Is IBL taking the position that this loan is non-performing? If it is your position that the loan is non-performing, would you please explain how the provision of additional collateral would remedy this.

(e)    IBL has referred to other previous correspondence sent by it and allegedly remained unanswered. We are not aware of such correspondence and request that a copy is sent to us urgently.

3.    In the meantime, please note that a pledge of any shares of Korek as security must be approved by International Holdings (including by the International Holdings board of directors) and the shareholders of International Holdings (including IT Ltd). No such pledge has to date been approved. Unless and until any pledge is duly approved, no rights over the shares in Korek (including the grant of a pledge) can be granted to any third party, including IBL.

4.    You mention in your letter that any dispute arising out of it shall be governed by and construed in accordance with the laws of the Republic of Lebanon. For the record, we do not consider your letter to constitute any form of binding agreement and do not understand the relevance of the statement made in it.

5.    We look forward to receiving the information requested.

6.    In the meantime we also reserve our rights in connection with the Agreement and those of International Holdings and IT Ltd generally.

Yours faithfully,


_____                              _____
**Deepak Jain**                                      **Ehab Aziz**


CC:

Korek Telecom Company LLC, 45 Kurdistan Street, Pirmam, Erbil, Kurdistan, Republic of Iraq

International Holdings Limited, Unit 11, Level 3, Gate Village Building 10, Dubai, International Financial Centre, Dubai 507043, United Arab Emirates

Iraq Telecom Limited, Unit 11, Level 3, Gate Village Building 10, Dubai International Financial Centre, Dubai 507043, United Arab Emirates

Mr. Sirwan Saber Mustafa, 45 Kurdistan Street, Pirmam, Erbil, Kurdistan, Republic of Iraq

IBL Bank SAL
Charles Malek Avenue
Al Ittihadiah Building
Ashrafieh
Beirut 2071 4703 Lebanon

P.O. Box: 11-5292
Riad El Solh 1107 2190
Beirut, Lebanon

*Attention:*

Mr. Salim Y. Habib (Chairman, General Manager)
Mr. Gaby Mezher (Head of Internal Audit)
Ms. Tania Tayah (Head of Risk Management)
Mr. Ghassan El Rayess (Head of Corporate and Commercial Banking)
Mr. Joe Boustany (Head of Compliance)

Dear Sirs,                                                      25 October 2017

**Term Loan Agreement between IBL Bank SAL ("IBL"), Korek Telecom Company LLC ("Korek") and Mr. Sirwan Saber Mustafa ("Mr. Mustafa") dated 21 December 2011 (the "Agreement")**

We write in our capacity as directors of International Holdings Limited ("**International Holdings**") and members of the Korek Supervisory Committee, nominated by Iraq Telecom Limited ("**IT Ltd**").

We refer to your letter dated 30 August 2017 addressed to Korek and to our response dated 25 September 2017, to which we have received no response.

In our letter, we requested that you please:

(a)     explain on which ground IBL considers itself entitled to request additional collateral in the form of a pledge of the shares of Korek;

(b)     describe the collateral that IBL currently holds in connection with the loans that are outstanding, together with details of the sums that you consider are currently due;

(c)     advise whether any call has been made under the guarantee provided by Mr. Mustafa and whether it is the intention of IBL to do so;

(d)     advise whether IBL is taking the position that the loan is non-performing, and if so, please explain how the provision of additional collateral would remedy this; and



1

(e)     urgently provide a copy of the previous correspondence said to be sent and unanswered.

We would appreciate your responses to the above <u>by no later than Friday, 27 October 2017</u>.

Additionally, please would you explain, by Friday, 27 October 2017, the specific provisions (if any) that IBL has made in respect of the Korek loan, as well as any provisions that IBL expects to make with respect to IFRS 9, which will come into force on 1 January 2018.

Yours faithfully,

Deepak Jain

Ehab Aziz

*copy to*:

Korek Telecom Company LLC, 45 Kurdistan Street, Pirmam, Erbil, Kurdistan, Republic of Iraq

International Holdings Limited, Unit 11, Level 3, Gate Village Building 10, Dubai, International Financial Centre, Dubai 507043, United Arab Emirates

Iraq Telecom Limited, Unit 11, Level 3, Gate Village Building 10, Dubai International Financial Centre, Dubai 507043, United Arab Emirates

Mr. Sirwan Saber Mustafa, 45 Kurdistan Street, Pirmam, Erbil, Kurdistan, Republic of Iraq

VIA EMAIL, FAX AND COURIER

IBL Bank SAL
Charles Malek Avenue
Al Ittihadiah Building
Ashrafieh
Beirut 2071 4703 Lebanon

P.O. Box: 11-5292
Riad El Solh 1107 2190
Beirut, Lebanon

Fax: 00961 1 204524

*Attention:*

Mr. Salim Y. Habib (Chairman, General Manager)
Mr. Gaby Mezher (Head of Internal Audit)
Ms. Tania Tayah (Head of Risk Management)
Mr. Ghassan El Rayess (Head of Corporate and Commercial Banking)
Mr. Joe Boustany (Head of Compliance)

shabib@ibl.com.lb
gmezher@ibl.com.lb
ttayah@ibl.com.lb
gelrayess@ibl.com.lb
ibl@ibl.com.lb

17 December 2017

Dear Sirs,

**Term Loan Agreement between IBL Bank SAL ("IBL"), Korek Telecom Company LLC ("Korek") and Mr. Sirwan Saber Mustafa dated 21 December 2011 (the "Agreement")**

1.  We write in our capacity as directors of International Holdings Limited ("**International Holdings**") and members of the Korek Supervisory Committee, nominated by Iraq Telecom Limited ("**IT Ltd**").

2.  We refer to your letter dated 30 August 2017 addressed to Korek and as well as our letters dated 25 September 2017 and 25 October 2017, to which we have received no response.

1

3.    We also refer to the letter sent to you by IT Ltd's legal counsel, Gibson Dunn & Crutcher LLP, dated 12 October 2017, putting you on notice of an interim injunction Order of the DIFC Court of First Instance which:

    (a)    restrains Korek, Mr Sirwan Mustafa, International Holdings and its shareholder Korek International (Management) Ltd. ("**CS Ltd**") from granting a pledge, or any other interest over Korek's shares, other than with IT Ltd's prior approval or written consent in accordance with the International Holdings shareholders agreement dated 10 March 2011 (the "**IH SHA**"); and

    (b)    compels Korek, Mr Sirwan Mustafa, International Holdings and CS Ltd to use their respective powers to ensure that no action or decision relating to a pledge, or any other interest over the shares of Korek, is taken without the prior approval or written consent of IT Ltd in accordance with the IH SHA.

4.    We previously asked that you confirm what collateral IBL currently holds in connection with the loan. In this context, we note that IBL's Annual Reports appear to reference the IBL Loan and the fact that it is cash collateralised. For example, IBL's Annual Report for 2015 states that "*Performing corporate loans to large enterprises, outstanding at year end 2015, include an amount of LBP226billion related to a non-resident customer which is covered by LBP234billion cash collateral. Related interest income and expense amounted to LBP30.7billion and LBP28.83billion respectively during 2015 and 2014.*"

5.    Korek's USD 150 million loan equates to approximately LBP 226 billion (1 USD = 1,506.6 LBP), which accords with the amount of the performing corporate loan to a "non-resident customer" referenced in IBL's accounts. We also note that the interest due on this loan for 2015 is said to be LBP 30.7 billion which is just over 13% of the principal amount said to be owing; this also appears to accord with the interest rate of the IBL Loan of 13.25%. Further, since this single loan constitutes more than 18% of IBL's total loans to customers and related parties of LBP 1,251 billion, as set out in IBL's Annual Report for 2015, we note that it is highly unlikely IBL would permit two loans to comprise more than a third of its total loan book.

6.    The existence of such cash collateral was never disclosed to IT Ltd or any of its representatives on the International Holdings board of directors or Korek Supervisory Committee. Had we been aware of the cash collateral and thus the true nature of the transaction, we would never have agreed to the terms of the Agreement (including the 13.25% interest rate), and IT Ltd would never have entered into the subordination agreement purporting to subordinate its own shareholder loan to IBL's loan.

7.    In light of the foregoing, we reiterate our previous requests that you urgently:

    (a)    confirm what collateral IBL currently holds in connection with the loans, including an explanation of the circumstances under which such collateral was obtained;

(b)     confirm the sums that you consider are currently due under the Agreement;

(c)     explain on which ground IBL considers itself entitled to request additional collateral in the form of a pledge of the shares of Korek;

(d)     advise whether any call has been made under the guarantee provided by Mr. Mustafa and whether it is the intention of IBL to do so;

(e)     advise whether IBL is taking the position that the loan is non-performing, and if so, please explain how the provision of additional collateral would remedy this; and

(f)     provide a copy of the previous correspondence said to be sent and unanswered.

8.    We furthermore remind you that (i) a pledge of any shares of Korek as security must be approved by International Holdings (including by the International Holdings board of directors) and the shareholders of International Holdings (including IT Ltd); (ii) no such pledge has been approved; and (iii) unless and until any pledge is duly approved, no rights over the shares in Korek (including the grant of a pledge) can be granted to any third party, including IBL.

9.    In the meantime, we reserve our rights in connection with the Agreement and those of International Holdings and IT Ltd generally.


Yours faithfully,


**Deepak Jain**

**Ehab Aziz**

CC:

Korek Telecom Company LLC, 45 Kurdistan Street, Pirmam, Erbil, Kurdistan, Republic of Iraq

International Holdings Limited, Unit 11, Level 3, Gate Village Building 10, Dubai, International Financial Centre, Dubai 507043, United Arab Emirates

Iraq Telecom Limited, Unit 11, Level 3, Gate Village Building 10, Dubai International Financial Centre, Dubai 507043, United Arab Emirates

Mr. Sirwan Saber Mustafa, 45 Kurdistan Street, Pirmam, Erbil, Kurdistan, Republic of Iraq



1 February 2018

To:     **Mr. Sirwan Saber Mustafa**
        45 Kurdistan Street, Erbil,
        Kurdistan Region,
        Republic of Iraq

Re:     Term Loan Agreement between IBL Bank SAL ("**IBL Bank**"), Korek Telecom Company LLC
        ("**Korek**") and Mr. Sirwan Saber Mustafa dated 21 December 2011 (the "**Loan Agreement**").

Dear Sir,

As you are aware, IBL Bank and Korek have exchanged a number of letters with copies addressed to you,
in relation to the above subject matter.

IBL Bank has been notified by Gibson, Dunn & Crutcher LLP, counsel for Iraq Telecom Limited ("**IT
Ltd**") that on 12 October 2017 the DIFC Court of First Instance issued an interim injunction Order, which,
among other matters, restrains Korek, yourself, International Holdings Limited ("**International Holdings**")
and its shareholder Korek International (Management) Limited from granting a pledge, or any other interest
over Korek's shares, except with IT Ltd's prior approval or written consent in accordance with the
Internationals Holdings shareholders' agreement dated 10 March 2011.

In addition, IBL Bank received two letters dated 25 September 2017 and 17 December 2017, respectively,
from Mr. Deepak Jain and Mr. Ehab Aziz, who are not duly authorized to correspond with IBL Bank as per
the terms of the Loan Agreement, inquiring on the status of the Loan Agreement.

IBL Bank responded to such letters and advised Korek of its position.

As you may appreciate, in light of the prevailing situation in Iraq and especially in Kurdistan, IBL Bank
has been very understanding towards Korek, especially with regards to the repayment of the principal under
the Loan Agreement that is overdue.

We are confident that you will also appreciate that IBL Bank has to protect, at all times, its interests under
the Loan Agreement. On that basis, we would like to invite you to discuss, in your capacity as guarantor
under the Loan Agreement, the possibility of providing IBL Bank additional collaterals that would be duly
authorized by appropriate corporate actions and whose transfer or pledge do not contravene agreements to
which you are a party to, pending the improvement of the financial conditions of Korek.

All of IBL Bank's rights and remedies are reserved and this letter shall not constitute a waiver of such
rights.

Yours faithfully,

IBL Bank SAL

Hassan Rayes                    *Dolly Merhy*

Cc:     **Korek Telecom Company LLC,** Korek building 45 Kurdistan, Erbil - Iraq
        **International Holdings Limited,** Office 11, Level 3, Gate Village Building 10, PO Box 507043,
        Sheikh Zayed Road, Dubai International Financial Center, Dubai, UAE
        **Iraq Telecom Limited,** Office 11, Level 3, Gate Village Building 10, PO Box 507043, Sheikh
        Zayed Road, Dubai International Financial Center, Dubai, UAE



29 January 2018

**To:**   **Korek Telecom Company LLC**

Korek building 45 Kurdistan
Erbil - Iraq

*Attention*: Mr. Sirwan Saber Mustafa

<u>Re:</u>   Term Loan Agreement between IBL Bank SAL ("**IBL Bank**"), Korek Telecom
Company LLC ("**Korek**") and Mr. Sirwan Saber Mustafa dated 21 December 2011 (the
"**Loan Agreement**").

Dear Sir,

As a follow-up on our previous correspondence and in particular our latest letter dated 13 October
2017, we were surprised to receive an additional letter from Mr. Deepak Jain and Mr. Ehab Aziz,
dated 17 December 2017, with a copy to Korek, among others.

We would like, in this respect, to reiterate IBL Bank's position to only correspond with the duly
authorized representative of Korek in accordance with the Loan Agreement.

All of IBL Bank's rights and remedies are reserved and this letter shall not constitute a waiver of
such rights.

Yours faithfully,

IBL Bank SAL

Ghassan Rayes                    Dolly Merhy

**Cc:**   **International Holdings Limited,** Office 11, Level 3, Gate Village Building 10, PO Box
507043, Sheikh Zayed Road, Dubai International Financial Center, Dubai, UAE

**Iraq Telecom Limited,** Office 11, Level 3, Gate Village Building 10, PO Box 507043,
Sheikh Zayed Road, Dubai International Financial Center, Dubai, UAE

**Mr. Sirwan Saber Mustafa,** 45 Kurdistan Street, Erbil, Kurdistan Region, Republic of Iraq

Capital HP 147 000 000 000 fully paid
Inscribed at RC # +30 10127

Charles Malet Avenue el Bitrichi building Ashrafieh Beirut 2074 4063 Lebanon
PO Box 11 6290 Ryad El Solh 1107 2120 Beirut Lebanon Swift IBILBB for IDec Tel 961 1 200 350 Fax 961 1 204 505 E-mail iblbsal@iblbank.com.lb www.iblbank.lb

VIA EMAIL, FAX AND COURIER

IBL Bank SAL
Charles Malek Avenue
Al Ittihadiah Building
Ashrafieh
Beirut 2071 4703 Lebanon

P.O. Box: 11-5292
Riad El Solh 1107 2190
Beirut, Lebanon

Fax:    00961 1 204524
        00961 1 219667

*Attention:*

Mr. Ghassan El Rayess (Head of Corporate and Commercial Banking)
Ms. Dolly Merhy (Head of Accounting & Finance)
Mr. Salim Y. Habib (Chairman, General Manager)
Mr. Gaby Mezher (Head of Internal Audit)
Ms. Tania Tayah (Head of Risk Management)
Mr. Joe Boustany (Head of Compliance)

gelrayess@ibl.com.lb
shabib@ibl.com.lb
gmezher@ibl.com.lb
ttayah@ibl.com.lb
ibl@ibl.com.lb

21 March 2018

Dear Sirs,

**Term Loan Agreement between IBL Bank SAL ("IBL"), Korek Telecom Company LLC ("Korek") and Mr. Sirwan Saber Mustafa dated 21 December 2011 (the "Agreement")**

1.     We write in our capacity as directors of International Holdings Limited ("**International Holdings**") and members of the Korek Supervisory Committee, nominated by Iraq Telecom Limited ("**IT Ltd.**").

1

2. We refer to your letter dated 1 February 2018 addressed to Mr. Sirwan Saber Mustafa (also known as and referred to herein as "**Mr. Barzani**") as well as our letters dated 25 September 2017, 25 October 2017 and 17 December 2017, to which we have received no response.[1]

3. In your letter of 1 February 2018 you assert that we are not duly authorised to correspond with IBL as per the terms of the Agreement. This is incorrect. In fact, Clause 11 of the Agreement makes clear that Messrs Ehab Aziz and Deepak Jain, in addition to others such as IT Ltd. and Orange S.A.'s Financing and Treasury Department, should be included in all communications with IBL (including all notices and other communications under the Agreement sent by IBL to Korek).

4. In your letter to Mr. Barzani you state that IBL responded to our previous letters referenced above. We have not received a copy of any such reply. As you are required to do so pursuant to Clause 11 of the Agreement, we instruct that you provide us immediately with copies of any such response(s) sent by IBL, and ensure that, going forward, IBL complies with Clause 11 of the Agreement.

5. We furthermore note the invitation extended by IBL to Mr. Barzani to discuss, in his capacity as guarantor under the Agreement, the possibility of providing IBL "additional collaterals" that would be duly authorised by appropriate corporate actions and whose transfer or pledge does not contravene agreements to which Mr. Barzani is a party.

6. Although we have invited you on previous occasions to confirm or deny the exact nature of the collateral provided to you by Mr. Barzani, you have repeatedly failed to do so.

7. It is apparent that:

   (a) Korek's entry into the IBL Loan was approved by Korek and its shareholders on the basis of representations made that the loan was an unsecured loan (albeit with a personal guarantee provided by Mr. Barzani). As you are aware, in the Agreement, Korek warranted that its obligations to IBL would constitute its "*direct, general, unconditional, unsubordinated, unsecured obligations*". Indeed, believing the IBL Loan to be unsecured, IT Ltd. agreed in good faith to subordinate its shareholder loan in favour of the IBL Loan.

   (b) In fact, we now understand that, unbeknownst to us, IBL and Mr. Barzani colluded to create a "sham" arrangement in that the IBL Loan is not, in fact, unsecured, but is fully cash collateralised. This fact has been carefully hidden from both Korek and its shareholders. We understand that IBL entered into an agreement with Mr. Barzani pursuant to which IBL undertook to pay to Mr. Barzani an amount equal to 12.75% of the 13.25% total interest received by IBL under Clause 2.1 of the Agreement. In short,

---

[1]   We adopt the definitions set out in our previous letters referenced above.

IBL has agreed to "kick back" to Mr. Barzani more than 96% of the interest expense paid by Korek.

(c)    This arrangement clearly demonstrates that IBL is not the true lender to Korek. Rather, IBL is simply a front for Mr. Barzani. As a result of your actions, we can only assume that you have conspired with Mr. Barzani to set up this sham structure in order to enable Mr. Barzani to do the following:

    (i)    to prioritise Mr. Barzani's creditor rights over those of IT Ltd. (in particular because, as noted above, one of the purported conditions of IBL granting the loan was that it should take priority over the IT Ltd. shareholder loan); and

    (ii)    to effect payments to Mr Barzani alone by having Korek mask these as interest payments to IBL.

(d)    To this day, IBL continues to maintain this deception of having an unsecured loan. In truth, you have the benefit of cash collateral from Mr. Barzani equal to 103.5% of the loan. Therefore, for what conceivable purpose would you require "*additional collaterals*" as requested by you? The fact that your net interest income on this loan is only 0.5% per annum—with the remainder "kicked back" to Mr. Barzani—should attest to the risk-free nature of this loan.

(e)    Your recent invitation extended to Mr. Barzani "*to discuss, in* [his] *capacity as guarantor under the Loan Agreement, the possibility of providing IBL Bank additional collaterals that would be duly authorized by appropriate corporate actions and whose transfer or pledge do not contravene agreements to which* [Mr. Barzani is] *a party*" is now merely another deceitful attempt by IBL to further Mr. Barzani's agenda at the expense of Korek.

8.    IBL's collusive behaviour has resulted in substantial damages to Korek and its shareholders. We estimate that the losses to Korek over the past six years alone as a result of the above described sham are in excess of USD 114 million.

9.    In view of this situation, IBL can no longer ignore our letters. We must warn you one more time that:

(a)    Pursuant to the terms of the interim injunction order of the DIFC Court of First Instance, notified to IBL by letter of 12 October 2017 and expressly acknowledged in IBL's letter of 1 February 2018, Mr. Barzani, Korek, International Holdings and CS Ltd. are restrained from granting a pledge or any other interest over Korek's shares, other than with IT Ltd.'s prior approval or written consent in accordance with Article 25 of the Articles of Association of International Holdings, acting as the sole shareholder of Korek. No such approval or consent has been, or will be, given by IT Ltd.

(b)    Under Iraqi law, Mr. Barzani does not have the authority to provide any security over Korek's assets without a general assembly resolution and such resolution cannot be validly passed without approval by International Holdings. No such approval has been given by the board of International Holdings, and pursuant to Article 25 of the Articles of Association of International Holdings, no such approval can be validly given unless approved by a director of International Holdings nominated by IT Ltd. No such approval or consent has been, or will be, given by IT Ltd.

10.    We put you on notice, therefore, that Mr. Barzani does not have authority to provide any security over Korek's assets. Not only is he not permitted to provide security over Korek's assets directly to IBL but he is not permitted to provide security over any of Korek's assets to any other entity, whether apparently related to Korek or not. Any attempt to circumvent the Order of the DIFC Court will be viewed as contempt of Court and will subject IBL to criminal sanctions in the UAE.

11.    IT Ltd. has no desire to enter into a protracted dispute with IBL. However, we will not accept IBL acting in a deceptive manner to facilitate the unlawful behaviour of Mr. Barzani, against whom a separate claim is in the process of being filed.

12.    We therefore invite IBL one more time to cooperate with us and provide a detailed explanation of the loan extended to Korek, including the exact nature and details of all the collateral granted to secure Korek's loan.

13.    Should we fail to receive an acceptable response from you by no later than 5:00 pm (Beirut) on Monday, 26 March 2018, we will assume that you have elected not to cooperate with us in disclosing the true nature of the IBL Loan. In such event, IT Ltd. (acting in its name, as well as on behalf of International Holdings and Korek) will reserve all of its rights against IBL, including, without limitation, our rights to hold IBL fully liable for damages incurred by Korek as a result of this sham loan arrangement, as well as our right to bring IBL's deceptive behaviour to the attention of the appropriate regulatory authorities.

14.    We look forward to your response.

15.    All rights are hereby reserved.

4

Yours faithfully,
on behalf of IT Ltd. and
the Directors of International Holdings and
Members of the Korek Supervisory Committee
nominated by IT Ltd.

| | | |
|---|---|---|
| **Ehab Aziz** | **Deepak Jain** | **Olivier Froissart** |

CC:

**Korek Telecom Company LLC**, 45 Kurdistan Street, Pirmam, Erbil, Kurdistan, Republic of Iraq

**International Holdings Limited**, Unit 11, Level 3, Gate Village Building 10, Dubai, International Financial Centre, Dubai 507043, United Arab Emirates

**Iraq Telecom Limited**, Unit 11, Level 3, Gate Village Building 10, Dubai International Financial Centre, Dubai 507043, United Arab Emirates

**Mr. Sirwan Saber Mustafa**, 45 Kurdistan Street, Pirmam, Erbil, Kurdistan, Republic of Iraq

**Mr. Nawzad Junde,** English Village, Villa 203, Erbil, Kurdistan, Republic of Iraq

**Orange S.A.** FG/DFT, Financing and Treasury Department, 78 rue Olivier de Serres, Site Alleray, 75505 Paris, Cedex 15 France

5

Yours faithfully,
on behalf of IT Ltd. and
the Directors of International Holdings and
Members of the Korek Supervisory Committee
nominated by IT Ltd.

**Ehab Aziz**    **Deepak Jain**    **Olivier Froissart**

CC:

**Korek Telecom Company LLC**, 45 Kurdistan Street, Pirmam, Erbil, Kurdistan, Republic of Iraq

**International Holdings Limited**, Unit 11, Level 3, Gate Village Building 10, Dubai, International
Financial Centre, Dubai 507043, United Arab Emirates

**Iraq Telecom Limited**, Unit 11, Level 3, Gate Village Building 10, Dubai International Financial
Centre, Dubai 507043, United Arab Emirates

**Mr. Sirwan Saber Mustafa**, 45 Kurdistan Street, Pirmam, Erbil, Kurdistan, Republic of Iraq

**Mr. Nawzad Junde,** English Village, Villa 203, Erbil, Kurdistan, Republic of Iraq

**Orange S.A.** FG/DFT, Financing and Treasury Department, 78 rue Olivier de Serres, Site Alleray,
75505 Paris, Cedex 15 France

5

**From:** Louis AbouCharaf [mailto:Louis.AbouCharaf@korektel.com]
**Sent:** Tuesday, March 27, 2018 2:41 PM
**To:** Sirwan Mustafa <ssb70@korektel.com>; Dr. Hameed Akrawi <Hammed.Akrawi@korektel.com>; Nawzad Junde <Nawzad.Junde@korektel.com>; Raymond Rahmeh (ray.rahmeh@zr-group.net) <ray.rahmeh@zr-group.net>; Ehab Aziz <EAziz@agility.com>; Deepak Jain <DJain@agility.com>; RENNARD Marc AMEA <marc.rennard@orange.com>; 'FROISSART Olivier FG/DFA (olivier.froissart@orange.com)' <olivier.froissart@orange.com>
**Cc:** 'MONZANI Michel AMEA' <michel.monzani@orange.com>; anis.hamdani@orange.com
**Subject:** IBL Bank Correspondence -- Email from the Chairman

Dear Members of the Board of Directors of International Holdings Limited/Korek Supervisory Committee,

The Chairman asked me to forward you his below email:

*"Dear IT Representatives Members of the IH Board/KSC,*

*IBL Bank has advised Korek that it wishes the correspondence regarding the loan to be with its contractual counterparty (i.e., Korek and Sirwan Saber Mustafa as guarantor). Some directors and shareholders have been sending letters directly to IBL Bank thus interfering with and damaging Korek's relationship with IBL Bank.*

*We request that you refrain from addressing further correspondence to IBL Bank.*

*All our rights are reserved.*

*Best Regards,*

*Sirwan"*

Best,

Louis.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*NOTICE\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

All business handled is subject to any compulsory country legislation where applicable or unless specifically agreed will be based by default on our General Trading Conditions, a copy of which will be made available upon request.

This transmittal and/or attachments have been issued by Agility. The information contained here within may be privileged or confidential. If you are not the intended recipient, you are hereby notified that you have received this transmittal in error; any review, dissemination, distribution or copying of this transmittal is strictly prohibited. If you have received this transmittal and/or attachments in error, please notify us immediately by reply and immediately delete this message and all its attachments.

The information contained in this communication is confidential, may be attorney-client privileged, may constitute inside information, and is intended only for the use of the addressee. It is the property of Kirkland & Ellis LLP or Kirkland & Ellis International LLP. Unauthorized use, disclosure or copying of this communication or any part thereof is strictly prohibited and may be unlawful. If you have received this communication in error, please notify us immediately by return e-mail or by e-mail to postmaster@kirkland.com, and destroy this communication and all copies

thereof, including all attachments.

Kirkland & Ellis International LLP is a limited liability partnership established in Delaware, and the liability of its partners is limited in accordance with section 15-306(c) of the Delaware Revised Uniform Partnership Act. It is a multinational practice, the partners of which are Solicitors and Registered Foreign Lawyers (admitted in the U.S. and other jurisdictions), and is authorised and regulated in the UK by the Solicitors Regulation Authority (SRA number 349107). The Solicitors' Code of Conduct can be accessed at http://www.sra.org.uk/code-of-conduct.page. A list of the partners, giving each partner's professional qualification and jurisdiction of qualification, is open for inspection at the address below.

Kirkland & Ellis International LLP
30 St Mary Axe | London | EC3A 8AF | UK
Tel: +44 (0)20 7469 2000 | Fax: +44 (0)20 7469 2001 | Email: econtact@kirkland.com
VAT registration number GB 650 1040 94



29 March 2018

To:  **Korek Telecom Company LLC**
Korek building 45 Kurdistan
Erbil - Iraq

*Attention*: Mr. Sirwan Saber Moustafa

Re:  Term Loan Agreement among IBL Bank SAL ("**IBL Bank**"), Korek Telecom Company
LLC ("**Korek**") and Mr. Sirwan Saber Mustafa dated 21 December 2011 (the "**Loan
Agreement**").

Dear Sir,

As a follow-up on our letter dated February 1, 2018, and further to your latest letter dated March
26, 2018, we have received, yet again, another letter dated March 21, 2018 from Mr. Ehab Aziz,
Mr. Deepak Jain and Mr. Olivier Froissart, on behalf of IT Ltd., all of whom have no standing,
pursuant to the Loan Agreement, to communicate with our Bank.

While Clause 11 of the Agreement provides that certain persons of the addressors of the March
21, 2018, letter must be "copied" to communications addressed to the Borrower, this does not, by
any means, grant those persons, nor any of the addressors of the March 21, 2018 letter, standing
to communicate with IBL Bank regarding the Loan Agreement and its implementation.

IBL Bank's communications pursuant to the Loan Agreement shall continue, pursuant to the
provisions of the Loan Agreement to be addressed to you, with copies to the persons provided for
in the Agreement.

Moreover, we would like, in this respect, to reiterate that IBL Bank has been made aware of the
DIFC Injunction, and that it continues, as always, to act in accordance with all legal, judicial,
regulatory, and contractual obligations that it has, and it need not be reminded by the addressors
of the March 21, 2018 letter, of its obligations. The Loan was granted in full compliance with
Lebanese law, which is the law applicable to IBL Bank's operations and to the Loan Agreement.

We strongly invite Korek again to resolve the disputes amongst its shareholders, without
involving IBL Bank, which role is strictly limited to acting as a Lender. In addition, we welcome
your commitment to deposit the quarterly interest payments on the Loan, prior to their due dates,
in Korek's accounts with IBL Bank, to the extent that the principal remains outstanding. We look
forward to receiving the principal payments of the Loan. We are also keen on further discussing
resuming the channeling of Korek's business and the businesses of its suppliers through IBL
Bank.

With the persistence of groundless claims of collusive and conspiratory conduct, which are
blatantly false and do not warrant an answer by our Bank, IBL Bank will not stay idle and will
consider all appropriate actions to preserve and enforce the Bank's rights, including bringing
claims for defamation and any other similar civil or criminal claims against all parties, who are
engaging in such conduct.

1



Finally, IBL has elected, on a going-forward basis, not to respond to such letters, unless properly addressed through the right channels.

All of IBL Bank's rights and remedies are reserved and this letter shall not constitute a waiver of such rights.

Yours faithfully,

IBL Bank SAL

Cc:    **International Holdings Limited,** Office 11, Level 3, Gate Village Building 10, PO Box 507043, Sheikh Zayed Road, Dubai International Financial Center, Dubai, UAE.

**Iraq Telecom Limited,** Office 11, Level 3, Gate Village Building 10, PO Box 507043, Sheikh Zayed Road, Dubai International Financial Center, Dubai, UAE

**Mr. Sirwan Saber Mustafa,** 45 Kurdistan Street, Erbil, Kurdistan Region, Republic of Iraq

# Exhibit I

**From:** Deepak Jain
**Sent:** Monday, October 2, 2017 3:06 PM
**To:** 'Louis AbouCharaf' <Louis.AbouCharaf@korektel.com>; 'Sirwan Mustafa' <ssb70@korektel.com>; 'Dr. Hameed Akrawi' <Hammed.Akrawi@korektel.com>; 'Nawzad Junde' <Nawzad.Junde@korektel.com>; 'Raymond Rahmeh (ray.rahmeh@zr-group.net)' <ray.rahmeh@zr-group.net>; Ehab Aziz <EAziz@agility.com>; 'RENNARD Marc CXMB' <marc.rennard@orange.com>; 'FROISSART Olivier FG/DFA (olivier.froissart@orange.com)' <olivier.froissart@orange.com>
**Cc:** 'MONZANI Michel MEA/MENA' <michel.monzani@orange.com>; 'anis.hamdani@orange.com' <anis.hamdani@orange.com>; 'Jekhsi' <Jekhsi@korektel.com>; 'Issa Touma' <Issa.Touma@korektel.com>
**Subject:** Legal fees

Dear Sirs,

We have now on a number of occasions asked for further information with respect to Korek's reported consulting and legal fees, most recently on 14 August 2017.

However, to date we have not received any substantive response to our enquiries, which is completely unacceptable.

We note that Korek's financial statements contain generic and unsupported figures in respect of so called consulting and legal fees, which by any measures are exorbitant and out of all proportion.

For example, Korek's annual consulting and legal fees have in the past been as high as USD 18.6 million, and in 2016 amounted to USD 13.2 million.

Separately, we understand from Korek's monthly financials that Korek's legal fees more than doubled from 2014 (USD 3.6 million) to 2015 (USD 7.8 million), coinciding with the shareholder disputes involving Mr. Mustafa and CS Ltd. We understand that in 2016 Korek's legal fees further increased to USD 8.6 million.

In light of the foregoing, we once again request that you provide a detailed breakdown of Korek's consulting and legal fees since 1 January 2014, including details of all relevant payments (identifying the relevant payee, payment amount and payment date), and copies of all underlying invoices.

We furthermore request that you confirm as a matter of urgency whether any of Korek's funds were used to pay Mr. Mustafa's or CS Ltd's legal fees.

In the meantime, all our rights are reserved.

Yours faithfully,

Deepak Jain

*****************************NOTICE*****************************

1

All business handled is subject to any compulsory country legislation where applicable or unless specifically agreed will be based by default on our General Trading Conditions, a copy of which will be made available upon request.

This transmittal and/or attachments have been issued by Agility. The information contained here within may be privileged or confidential. If you are not the intended recipient, you are hereby notified that you have received this transmittal in error; any review, dissemination, distribution or copying of this transmittal is strictly prohibited. If you have received this transmittal and/or attachments in error, please notify us immediately by reply and immediately delete this message and all its attachments.

# Exhibit J

**From:** Deepak Jain
**Sent:** Sunday, July 9, 2017 4:35 PM
**To:** 'Louis AbouCharaf' <Louis.AbouCharaf@korektel.com>
**Cc:** Sirwan Mustafa <ssb70@korektel.com>; Dr. Hameed Akrawi <Hammed.Akrawi@korektel.com>; Nawzad Junde <Nawzad.Junde@korektel.com>; Ray Rahmé <com@comlb.com>; Ehab Aziz <EAziz@agility.com>; marc.rennard@orange.com; FROISSART Olivier FG/DFA <olivier.froissart@orange.com>; MONZANI Michel AMEA <michel.monzani@orange.com>; HAMDANI Anis AMEA <anis.hamdani@orange.com>; Issa Touma <Issa.Touma@korektel.com>; Jekhsi <Jekhsi@korektel.com>
**Subject:** RE: 2016 Audited FS (Draft)


Dear Louis,

Further to our email of 27 June 2017, we have not yet received any substantive response in relation to our questions concerning Korek's draft 2016 financials and the May 2017 financials.

Please could you confirm as soon as possible when we may expect to receive a response?

In this respect, we also wanted to revisit once again the issue of the alleged withholding tax liability in respect of the interest accrued under the Convertible Note from 2007 to 2011. Please could you:
- confirm whether any such withholding tax was ever demanded by the Iraqi tax authorities, and if so, whether such demand was ever challenged by Korek;
- confirm whether any such tax was ever paid to the Iraqi tax authorities, and if so, on what basis; and
- provide copies of any relevant documents in relation to this issue (including copies of any tax assessments, payment demands, legal/tax advice received,  payment confirmations and related correspondence).


Yours sincerely,

Deepak Jain
IT Ltd Representative on the IH Board and KSC
On behalf of Iraq Telecom Limited pursuant to Clause 15 of the IH Shareholders' Agreement

---

**From:** Louis AbouCharaf [mailto:Louis.AbouCharaf@korektel.com]
**Sent:** Tuesday, June 27, 2017 12:02 PM
**To:** Deepak Jain <DJain@agility.com>
**Cc:** Sirwan Mustafa <ssb70@korektel.com>; Dr. Hameed Akrawi <Hammed.Akrawi@korektel.com>; Nawzad Junde <Nawzad.Junde@korektel.com>; Ray Rahmé <com@comlb.com>; Ehab Aziz <EAziz@agility.com>; marc.rennard@orange.com; FROISSART Olivier FG/DFA <olivier.froissart@orange.com>; MONZANI Michel AMEA <michel.monzani@orange.com>; HAMDANI Anis AMEA <anis.hamdani@orange.com>; Issa Touma <Issa.Touma@korektel.com>; Jekhsi <Jekhsi@korektel.com>
**Subject:** Re: 2016 Audited FS (Draft)


Dear Deepak,

Duly noted. I will convey your queries to the company's management.

Best,

Louis.

On 27 Jun 2017, at 11:00 am, Deepak Jain <DJain@agility.com> wrote:

Dear Louis,

Thank you very much for the recent draft 2016 financials for Korek and the monthly financials we've now started receiving again (after long not having received any financial information about the company).

However, as already noted previously, without further information and appropriate context, we are unable to understand properly the information that is being provided. In this context, we have asked a number of clarificatory questions in respect of the information you provided, for example in relation to the February and March 2017 financials, but our questions have gone unanswered.

Without further information, we are simply unable to understand properly the numbers set out in the financials.

We therefore once again request that you please provide the additional information previously requested in respect of the February and March 2017 financials, as well as the following information in respect of (i) Korek's draft 2016 financials, and (ii) the May 2017 financials.

**Korek Draft 2016 Financials**

1.  Please provide details of the provision for Warba Bank. This was never discussed before. Please explain why this was not identified previously. Please also provide details on the policy on provisioning and why this was not even raised in any of the management presentations nor discussed with the board.
2.  Please provide a breakdown by party in respect of the provision for doubtful debts.
3.  Please provide reconciliation of the numbers in the draft financials to the management accounts for 2016 and 2015.
4.  Please provide details of cash balance of US$ 15m.
5.  Please provide details of the US$ 5.8m said to be due to IH.
6.  Please provide details of the US$ 10.2m said to be due from Al Cazar.
7.  We are not entirely clear on Note 25. Please provide further details and provide back-up for all transactions and balances in Note 25 in respect of related parties.
8.  Please provide supporting materials in respect of the cash flow and in particular in respect of the US$ 100m (other liabilities) shown under financing activities.
9.  Please provide details in respect of the US$ 187m interest payment in 2015.
10. Please provide all details which have previously been requested in respect of the management accounts to understand the numbers.

**May 2017 Financials**

1.  Please explain the source of the Capex in light of the fact that there is no budget.
2.  Please provide an explanation for the increased Capex spent when revenues are decreasing (YOY), there is no approved budget and given the cash constraints of the company.
3.  Please provide a full list of all the PO's/Service Agreements raised/entered into by the company.
4.  Please provide details of the legal fees (broken down by law firm/lawyer) paid in 2017.
5.  Please provide further details in respect of vendors and geography of network costs. Please highlight items which are committed by long term contracts etc.
6.  Please provide details of administrative costs.
7.  Please provide details of other accruals etc. as at 31 May 2017.

8. Please provide details of creditors as at 31 May 2017.
9. Please provide details of amounts due to Ericsson, Darin and NSN and when the relevant equipment was purchased, the total payments made as at 31 May 2017, future outstanding debts, and amount of interest etc. included in the amounts.
10. Please provide a detailed breakdown/calculation of capital creditors of all items included in the current liabilities:
    a. Trade Creditors - US$ 44m
    b. Interest Accrued- US$ 323m
    c. Tax Authorities – US$ 135m
    d. Related Parties- US$ 26.8m
    e. Capital Creditors- US$ 186m
    f. Other Creditors- US$ 44m
11. Please provide further details on deferred income.
12. Please provide a detailed fixed asset register as at 31 May 2017.
13. Please provide details of work in progress as at 31 May 2017.
14. Please provide details on land and latest available independent market values in respect thereof.
15. Please provide details of inventory as at 31 May 2017 with ageing.
16. Please provide details of trade debtors as at 31 May 2017 with ageing.
17. Please provide details in respect of deposits on equipment, including details of when such deposits were paid and when the equipment will be received. Please explain why some of these cannot be set off against the liabilities presented in the FPC against capital creditors.
18. Please provide complete details of prepayment and other debtors.
19. Please provide details of cash/bank balances as at 31 May 2017, including names of the relevant banks, names of the account holder(s) and bank reconciliation information.

Please provide the above information within 7 days of this email.

Yours sincerely,

Deepak Jain
On behalf of the IT Ltd Representatives on the IH Board and KSC, and
On behalf of Iraq Telecom Limited pursuant to Clause 15 of the IH Shareholders' Agreement

---

**From:** Louis AbouCharaf [mailto:Louis.AbouCharaf@korektel.com]
**Sent:** Thursday, May 25, 2017 10:36 PM
**To:** Sirwan Mustafa <ssb70@korektel.com>; Dr. Hameed Akrawi <Hammed.Akrawi@korektel.com>; Nawzad Junde <Nawzad.Junde@korektel.com>; 'Ray Rahmé' <com@comlb.com>; Ehab Aziz <EAziz@agility.com>; Deepak Jain <DJain@agility.com>; 'marc.rennard@orange.com' <marc.rennard@orange.com>; FROISSART Olivier FG/DFA <olivier.froissart@orange.com>
**Cc:** MONZANI Michel AMEA <michel.monzani@orange.com>; HAMDANI Anis AMEA <anis.hamdani@orange.com>; Issa Touma <Issa.Touma@korektel.com>; Jekhsi <Jekhsi@korektel.com>
**Subject:** 2016 Audited FS (Draft)

Dear Members of the Board of Directors of International Holdings Limited/Korek Supervisory Committee,

Management would like to share with you Korek's 2016 Draft Audited Financial Statements (attached).

Best,

Louis.

3

*********************************NOTICE*************************************
**

All business handled is subject to any compulsory country legislation where applicable or unless specifically agreed will be based by default on our General Trading Conditions, a copy of which will be made available upon request.

This transmittal and/or attachments have been issued by Agility. The information contained here within may be privileged or confidential. If you are not the intended recipient, you are hereby notified that you have received this transmittal in error; any review, dissemination, distribution or copying of this transmittal is strictly prohibited. If you have received this transmittal and/or attachments in error, please notify us immediately by reply and immediately delete this message and all its attachments.


*********************************NOTICE*************************************

All business handled is subject to any compulsory country legislation where applicable or unless specifically agreed will be based by default on our General Trading Conditions, a copy of which will be made available upon request.

This transmittal and/or attachments have been issued by Agility. The information contained here within may be privileged or confidential. If you are not the intended recipient, you are hereby notified that you have received this transmittal in error; any review, dissemination, distribution or copying of this transmittal is strictly prohibited. If you have received this transmittal and/or attachments in error, please notify us immediately by reply and immediately delete this message and all its attachments.

# Exhibit K

**From:** Deepak Jain
**Sent:** Thursday, May 4, 2017 10:57 AM
**To:** 'Louis AbouCharaf' <Louis.AbouCharaf@korektel.com>; Sirwan Mustafa <ssb70@korektel.com>; Dr. Hameed Akrawi <Hammed.Akrawi@korektel.com>; Nawzad Junde <Nawzad.Junde@korektel.com>; Raymond Rahmeh (ray.rahmeh@zr-group.net) <ray.rahmeh@zr-group.net>; Ehab Aziz <EAziz@agility.com>; RENNARD Marc CXMB <marc.rennard@orange.com>
**Cc:** FROISSART Olivier FG/DFA <olivier.froissart@orange.com>; MONZANI Michel MEA/MENA <michel.monzani@orange.com; anis.hamdani@orange.com; Jekhsi <Jekhsi@korektel.com>; Issa Touma <Issa.Touma@korektel.com>
**Subject:** RE: February and March 2017 Financials

Dear Louis,

Thank you very much for providing copies of Korek's February and March 2017 financials.

We should be grateful if you could please provide:

1.  Details of legal fees (by legal firm/lawyer and case) paid for in 2017 (US$ 2.19mln for Q1 2017), 2016 and 2015;
2.  Details by vendors and geography of network costs of US$ 28.7mln for Q1 2017; please highlight items which are committed by long term contract etc;
3.  Details of administrative cost for Q1 2017;
4.  Details of capitalised interest cost of US$ 6.8mln (included in Capex sheet) as at 31 March 2017 and projections for future if any;
5.  Calculation of the amount due for withholding tax on interest;
6.  Details of management fees outstanding and how it has been calculated;
7.  Details of others accrual etc of US$ 58.2mln as at 31 March 2017;
8.  Details of creditors of US$ 57.7mln as at 31 March 2017;
9.  Details of amount due to Ericson, Darin and NSN and when was this equipment purchased, the total payments made as at 31 March, future outstanding dates, amount of interests etc included in the amounts;
10. Detailed breakdown/ calculation of capital creditors of all items included in current liabilities;
    a.  Trade creditors- US$ 50mln
    b.  Interest accrued- US$ 309.7mln (including an explanation why the shareholder loan interests (ie 87m$) calculation does not include the late payment penalty of 3% ?)
    c.  Tax authorities – US$ 134mln
    d.  Related parties- US$ 26.8
    e.  Capital creditors- US$ 197.5
    f.  Other creditors- US$ 39.3
11. Details of deferred income;
12. Detailed fixed asset register as at 31 March 2017;
13. Details of work in progress as at 31 March 2017;
14. Details of land and latest independent market value available;
15. Details of inventory as at 31 March 2017 with ageing;
16. Details of trade debtors as at 31 March 2017 with ageing;
17. Details of deposits on equipment with details on when the deposits were paid and when the equipment will be received; please explain why some of these cannot be set off against the liabilities presented in the FPC against capital creditors;
18. Complete details of prepayment and other debtors;

19.  Details of cash/bank balances as at date with names of the bank, names of the account holder and the bank reconciliation;

20.  Please provide a write up on the exchange issue due to which payments are not being made towards shareholders interest and management fees; and

21.  Revised annual forecasts based on better than expected results as achieved in March 2017.

Please provide the above information within <u>14 days</u> of this email.

Yours sincerely,

Deepak Jain
On behalf of the IT Ltd Representatives on the IH Board and KSC, and
On behalf of Iraq Telecom Limited pursuant to Clause 15 of the IH Shareholders' Agreement

---

**From:** Louis AbouCharaf [mailto:Louis.AbouCharaf@korektel.com]
**Sent:** Wednesday, April 19, 2017 12:18 PM
**To:** Sirwan Mustafa <ssb70@korektel.com>; Dr. Hameed Akrawi <Hammed.Akrawi@korektel.com>; Nawzad Junde <Nawzad.Junde@korektel.com>; Raymond Rahmeh (ray.rahmeh@zr-group.net) <ray.rahmeh@zr-group.net>; Ehab Aziz <EAziz@agility.com>; Deepak Jain <DJain@agility.com>; RENNARD Marc CXMB <marc.rennard@orange.com>
**Cc:** FROISSART Olivier FG/DFA <olivier.froissart@orange.com>; MONZANI Michel MEA/MENA <michel.monzani@orange.com>; anis.hamdani@orange.com; Jekhsi <Jekhsi@korektel.com>; Issa Touma <Issa.Touma@korektel.com>
**Subject:** February and March 2017 Financials

Dear Members of the Board of Directors of International Holdings Limited/Korek Supervisory Committee,

Please find attached copies of Korek's February and March 2017 Financials.

Best,

Louis.

*********************************NOTICE*****************************************

All business handled is subject to any compulsory country legislation where applicable or unless specifically agreed will be based by default on our General Trading Conditions, a copy of which will be made available upon request.

This transmittal and/or attachments have been issued by Agility. The information contained here within may be privileged or confidential. If you are not the intended recipient, you are hereby notified that you have received this transmittal in error; any review, dissemination, distribution or copying of this transmittal is strictly prohibited. If you have received this transmittal and/or attachments in error, please notify us immediately by reply and immediately delete this message and all its attachments.

**From:** Deepak Jain
**Sent:** Tuesday, June 27, 2017 1:30 PM
**To:** 'Louis AbouCharaf' <Louis.AbouCharaf@korektel.com>; Sirwan Mustafa <ssb70@korektel.com>; Dr. Hameed Akrawi <Hammed.Akrawi@korektel.com>; Nawzad Junde <Nawzad.Junde@korektel.com>; 'Ray Rahmé' <com@comlb.com>; Ehab Aziz <EAziz@agility.com>; 'marc.rennard@orange.com' <marc.rennard@orange.com>; FROISSART Olivier FG/DFA <olivier.froissart@orange.com>
**Cc:** MONZANI Michel AMEA <michel.monzani@orange.com>; HAMDANI Anis AMEA <anis.hamdani@orange.com>; Issa Touma <Issa.Touma@korektel.com>; Jekhsi <Jekhsi@korektel.com>
**Subject:** RE: 2016 Audited FS (Draft)

Dear Louis,

Thank you very much for the recent draft 2016 financials for Korek and the monthly financials we've now started receiving again (after long not having received any financial information about the company).

However, as already noted previously, without further information and appropriate context, we are unable to understand properly the information that is being provided. In this context, we have asked a number of clarificatory questions in respect of the information you provided, for example in relation to the February and March 2017 financials, but our questions have gone unanswered.

Without further information, we are simply unable to understand properly the numbers set out in the financials.

We therefore once again request that you please provide the additional information previously requested in respect of the February and March 2017 financials, as well as the following information in respect of (i) Korek's draft 2016 financials, and (ii) the May 2017 financials.

**Korek Draft 2016 Financials**

1. Please provide details of the provision for Warba Bank. This was never discussed before. Please explain why this was not identified previously. Please also provide details on the policy on provisioning and why this was not even raised in any of the management presentations nor discussed with the board.
2. Please provide a breakdown by party in respect of the provision for doubtful debts.
3. Please provide reconciliation of the numbers in the draft financials to the management accounts for 2016 and 2015.
4. Please provide details of cash balance of US$ 15m.
5. Please provide details of the US$ 5.8m said to be due to IH.
6. Please provide details of the US$ 10.2m said to be due from Al Cazar.
7. We are not entirely clear on Note 25. Please provide further details and provide back-up for all transactions and balances in Note 25 in respect of related parties.
8. Please provide supporting materials in respect of the cash flow and in particular in respect of the US$ 100m (other liabilities) shown under financing activities.
9. Please provide details in respect of the US$ 187m interest payment in 2015.
10. Please provide all details which have previously been requested in respect of the management accounts to understand the numbers.

**May 2017 Financials**

1. Please explain the source of the Capex in light of the fact that there is no budget.
2. Please provide an explanation for the increased Capex spent when revenues are decreasing (YOY), there is no approved budget and given the cash constraints of the company.

3.  Please provide a full list of all the PO's/Service Agreements raised/entered into by the company.
4.  Please provide details of the legal fees (broken down by law firm/lawyer) paid in 2017.
5.  Please provide further details in respect of vendors and geography of network costs. Please highlight items which are committed by long term contracts etc.
6.  Please provide details of administrative costs.
7.  Please provide details of other accruals etc. as at 31 May 2017.
8.  Please provide details of creditors as at 31 May 2017.
9.  Please provide details of amounts due to Ericsson, Darin and NSN and when the relevant equipment was purchased, the total payments made as at 31 May 2017, future outstanding debts, and amount of interest etc. included in the amounts.
10. Please provide a detailed breakdown/calculation of capital creditors of all items included in the current liabilities:
    a.  Trade Creditors - US$ 44m
    b.  Interest Accrued- US$ 323m
    c.  Tax Authorities – US$ 135m
    d.  Related Parties- US$ 26.8m
    e.  Capital Creditors- US$ 186m
    f.  Other Creditors- US$ 44m
11. Please provide further details on deferred income.
12. Please provide a detailed fixed asset register as at 31 May 2017.
13. Please provide details of work in progress as at 31 May 2017.
14. Please provide details on land and latest available independent market values in respect thereof.
15. Please provide details of inventory as at 31 May 2017 with ageing.
16. Please provide details of trade debtors as at 31 May 2017 with ageing.
17. Please provide details in respect of deposits on equipment, including details of when such deposits were paid and when the equipment will be received. Please explain why some of these cannot be set off against the liabilities presented in the FPC against capital creditors.
18. Please provide complete details of prepayment and other debtors.
19. Please provide details of cash/bank balances as at 31 May 2017, including names of the relevant banks, names of the account holder(s) and bank reconciliation information.

Please provide the above information within 7 days of this email.

Yours sincerely,

Deepak Jain
On behalf of the IT Ltd Representatives on the IH Board and KSC, and
On behalf of Iraq Telecom Limited pursuant to Clause 15 of the IH Shareholders' Agreement

---

**From:** Louis AbouCharaf [mailto:Louis.AbouCharaf@korektel.com]
**Sent:** Thursday, May 25, 2017 10:36 PM
**To:** Sirwan Mustafa <ssb70@korektel.com>; Dr. Hameed Akrawi <Hammed.Akrawi@korektel.com>; Nawzad Junde <Nawzad.Junde@korektel.com>; 'Ray Rahmé' <com@comlb.com>; Ehab Aziz <EAziz@agility.com>; Deepak Jain <DJain@agility.com>; 'marc.rennard@orange.com' <marc.rennard@orange.com>; FROISSART Olivier FG/DFA <olivier.froissart@orange.com>
**Cc:** MONZANI Michel AMEA <michel.monzani@orange.com>; HAMDANI Anis AMEA <anis.hamdani@orange.com>; Issa Touma <Issa.Touma@korektel.com>; Jekhsi <Jekhsi@korektel.com>
**Subject:** 2016 Audited FS (Draft)

Dear Members of the Board of Directors of International Holdings Limited/Korek Supervisory Committee,

Management would like to share with you Korek's 2016 Draft Audited Financial Statements (attached).

Best,

Louis.

*********************************NOTICE*************************************

All business handled is subject to any compulsory country legislation where applicable or unless specifically agreed will be based by default on our General Trading Conditions, a copy of which will be made available upon request.

This transmittal and/or attachments have been issued by Agility. The information contained here within may be privileged or confidential. If you are not the intended recipient, you are hereby notified that you have received this transmittal in error; any review, dissemination, distribution or copying of this transmittal is strictly prohibited. If you have received this transmittal and/or attachments in error, please notify us immediately by reply and immediately delete this message and all its attachments.

**From:** Deepak Jain
**Sent:** Monday, August 14, 2017 1:29 PM
**To:** 'Louis AbouCharaf' <Louis.AbouCharaf@korektel.com>; Sirwan Mustafa <ssb70@korektel.com>; Dr. Hameed Akrawi <Hammed.Akrawi@korektel.com>; Nawzad Junde <Nawzad.Junde@korektel.com>; Raymond Rahmeh (ray.rahmeh@zr-group.net) <ray.rahmeh@zr-group.net>; Ehab Aziz <EAziz@agility.com>; RENNARD Marc CXMB <marc.rennard@orange.com>; 'FROISSART Olivier FG/DFA (olivier.froissart@orange.com)' <olivier.froissart@orange.com>
**Cc:** MONZANI Michel MEA/MENA <michel.monzani@orange.com>; anis.hamdani@orange.com; Jekhsi <Jekhsi@korektel.com>; Issa Touma <Issa.Touma@korektel.com>
**Subject:** RE: July 2017 Financials


Dear Louis,

Thank you very much for sending us Korek's June 2017 financials.

In this respect, we have identified a number of omissions, inconsistencies and unexplained items within the June 2017 financials, as set out in the attached document. We should be grateful to receive an explanation in respect of those questions and issues as a matter of urgency.

Separately, we note that we still have not received a substantive response to our questions regarding Korek's draft 2016 financials, as well as the February, March and May 2017 financials, and the withholding tax issue raised in our email of 9 July. We once again reiterate our request that the requested information be provided as soon as possible.

Yours sincerely,

Deepak Jain
On behalf of the IT Ltd Representatives on the IH Board and KSC
On behalf of Iraq Telecom Limited pursuant to Clause 15 of the IH Shareholders' Agreement

---

**From:** Louis AbouCharaf [mailto:Louis.AbouCharaf@korektel.com]
**Sent:** Thursday, August 10, 2017 12:57 PM
**To:** Sirwan Mustafa <ssb70@korektel.com>; Dr. Hameed Akrawi <Hammed.Akrawi@korektel.com>; Nawzad Junde <Nawzad.Junde@korektel.com>; Raymond Rahmeh (ray.rahmeh@zr-group.net) <ray.rahmeh@zr-group.net>; Ehab Aziz <EAziz@agility.com>; Deepak Jain <DJain@agility.com>; RENNARD Marc CXMB <marc.rennard@orange.com>; 'FROISSART Olivier FG/DFA (olivier.froissart@orange.com)' <olivier.froissart@orange.com>
**Cc:** MONZANI Michel MEA/MENA <michel.monzani@orange.com>; anis.hamdani@orange.com; Jekhsi <Jekhsi@korektel.com>; Issa Touma <Issa.Touma@korektel.com>
**Subject:** July 2017 Financials

Dear Members of the Board of Directors of International Holdings Limited/Korek Supervisory Committee,

Please find attached a copy of Korek's July 2017 Financials.

Best,

Louis.


\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*NOTICE\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

All business handled is subject to any compulsory country legislation where applicable or unless specifically agreed will be based by default on our General Trading Conditions, a copy of which will be made available upon request.

This transmittal and/or attachments have been issued by Agility. The information contained here within may be privileged or confidential. If you are not the intended recipient, you are hereby notified that you have received this transmittal in error; any review, dissemination, distribution or copying of this transmittal is strictly prohibited. If you have received this transmittal and/or attachments in error, please notify us immediately by reply and immediately delete this message and all its attachments.

**Korek June 2017 Financials**

**- Priority Issues List -**

We have identified a number of omissions, inconsistencies and unexplained items within the June 2017 financial statements ("**June 2017**") and between those financial statements and other documents that you have provided to us. Such documents include the 2017 forecast for the Company and the draft audited financial statements for 2016.

1.  June 2017 reports significant deterioration in results in comparison to May 2017 as well as prior year. Relative to the same period in 2016, your report shows that for the first six months of 2017, revenue has declined 11.2% and EBITDA has declined by 20.7%. Net loss year-to-date has increased by 30.8%, from USD 93.4 million to 122.1 million. Operating cash flow year-to-date has decreased by 17.1%, from USD 15.2 million to 12.6 million. We expect you to provide operational explanations for deteriorating operating results as well as what actions you propose to improve operating results. We request line by line detail of operating expenses (i.e., accounting trial balances) for each month, from January 2016 through present. Also please provide your recommendations for operating expenses that can be reduced, commensurate with the decline in revenue.

2.  In spite of declines in revenues, margin and EBITDA, the Company continues to spend for operating expenses at the same level as last year. Year-to-date, total operating expenses have increased by 2.2% while revenue has declined by 11.2%. The number of staff has barely moved, at approximately 2,000. We request a summary of the number of employees, salary, wages and benefits year-to-date, by department, and by job title. Please provide your recommendations for operational costs that can be reduced, commensurate with the decline in revenue. Also please provide a list of open job postings.

3.  The page Cash Needed for Operations implies that restricted cash totals approximately USD 11 million. Please identify the accounts that are restricted, reasons for the restrictions and for whose benefit; i.e., for which creditors.

4.  The one-page June 2017 report of capex contains blank columns for budget. Please provide an updated budget for review and approval by the KSC. In addition, please provide us with detail of capex approved for 2017 and the reason for each item approved, an updated PO/PR listing, a copy of each PO/PR issued year-to-date, and line-by-line detail of each capital expenditure year-to-date.

5.  June 2017 Cash Flow reports year-to-date Net Movement in Intercompany Balances, USD 6.0 million. Please provide details of all movements in intercompany balances, along with supporting documentation, such as wire transfers, checks, correspondence and calculations.

6.  The page Cash Needed for Operations is not coherent with the page Cash Needed To Cover All Debts (where do the "CMC Frequency & Numbering plan", "Withholding tax on interest", "CMC B. Guarantee for VAS products (15 Billion IQD)" amounts fit in the previous page?). Please provide a reconciliation between the two pages.

7.  Please provide 2017 year-to-date line item detail for Consulting and legal fees, including amount, date, payee, and business purpose.

8.  Please provide full details (underlying contracts, purchase orders, calculations of amounts due, and any communication with creditors about past due amounts) for Ericsson, Darin, and NSN.

| | |
|---|---|
| **From:** | Deepak Jain <DJain@agility.com> |
| **Sent:** | 04 September 2017 16:36 |
| **To:** | Louis AbouCharaf |
| **Cc:** | Sirwan Mustafa; Dr. Hameed Akrawi; Nawzad Junde; Raymond Rahmeh (ray.rahmeh@zr-group.net); *Aziz,Ehab; RENNARD Marc CXMB; FROISSART Olivier FG/DFA (olivier.froissart@orange.com); MONZANI Michel MEA/MENA; anis.hamdani@orange.com; Jekhsi; Issa Touma |
| **Subject:** | RE: July 2017 Financials |

Dear Louis,

Thank you very much for sending us Korek's July 2017 financials, in respect of which we have the following questions:

1. CAPEX (slide 9): Please provide detail of OTHERS (FINANCING INTEREST & CAPITALIZING) for $8,483m.
2. KPI's (slide 11): Why did the number of staff increase from 1,992 in June to 2,009 in July?
3. Cash Flow (slide 12): Cash due to Tax Authorities for sales tax decreased by $(2,163)m in July. Please provide details of any payments or other reductions in July, including: name of authority, amount of payment, date of payment.
4. Cash Flow (slide 12): Please provide detail of net interest paid, $(24,180)m YTD. Please provide the following: who was paid, amount of payment, date of payment, calculation of amount of interest paid, and period of time covered by each interest payment.
5. Balance Sheet (slide 13): Why did the amount Due to Related Parties increase by $1m?
6. Cash Needed to cover all Debts (slide 15): For the vendors included in the Financing & main account, please provide terms of financing for each vendor, including: payment terms; interest rate; guaranties; collateral and other security provided; amount of cash deposited to guarantee debt, including name of bank, amount, type of instrument and interest rate. Please provide copies of written agreements with vendors for financing.
7. Please provide details/breakup of Inventories, Trade Debtors, Prepayments and Other Debtors, other receivables as at July 2017.
8. Please provide breakup/details/calculations of accounts payables, Interest accruals, Capital Creditors, Other creditors, Due to Related parties as at July 2017.
9. Please provide details of network costs of US$ 68.5m incurred till July 2017.
10. Please provide details of Legal costs of US$ 5.175m incurred till July 2017.
11. Please detail the performance in the Mosul region (which has received an important share of the recent investments).

Please provide answers to the above questions and copies of any relevant documents as soon as possible.  As a kind reminder, we are also expecting (amongst other things) answers to the questions listed in the Priority List concerning the June 2017 financials attached to our email of 14 August 2017, as well as our questions regarding Korek's draft 2016 financials, the February, March and May 2017 financials, and the withholding tax issue raised in our email of 9 July 2017.

Yours sincerely,

Deepak Jain
On behalf of the IT Ltd Representatives on the IH Board and KSC
On behalf of Iraq Telecom Limited pursuant to Clause 15 of the IH Shareholders' Agreement

**From:** Louis AbouCharaf [mailto:Louis.AbouCharaf@korektel.com]
**Sent:** Thursday, August 10, 2017 12:57 PM
**To:** Sirwan Mustafa <ssb70@korektel.com>; Dr. Hameed Akrawi
<Hammed.Akrawi@korektel.com>; Nawzad Junde <Nawzad.Junde@korektel.com>;
Raymond Rahmeh (ray.rahmeh@zr-group.net) <ray.rahmeh@zr-group.net>; Ehab Aziz
<EAziz@agility.com>; Deepak Jain <DJain@agility.com>; RENNARD Marc CXMB
<marc.rennard@orange.com>; 'FROISSART Olivier FG/DFA
(olivier.froissart@orange.com)' <olivier.froissart@orange.com>
**Cc:** MONZANI Michel MEA/MENA <michel.monzani@orange.com>;
anis.hamdani@orange.com; Jekhsi <Jekhsi@korektel.com>; Issa Touma
<Issa.Touma@korektel.com>
**Subject:** July 2017 Financials

Dear Members of the Board of Directors of International Holdings Limited/Korek
Supervisory Committee,

Please find attached a copy of Korek's July 2017 Financials.

Best,

Louis.

*******************************NOTICE**************************
***********

All business handled is subject to any compulsory country legislation where
applicable or unless specifically agreed will be based by default on our General
Trading Conditions, a copy of which will be made available upon request.

This transmittal and/or attachments have been issued by Agility. The information
contained here within may be privileged or confidential. If you are not the
intended recipient, you are hereby notified that you have received this transmittal
in error; any review, dissemination, distribution or copying of this transmittal is
strictly prohibited. If you have received this transmittal and/or attachments in
error, please notify us immediately by reply and immediately delete this message
and all its attachments.

<Korek June 2017 Financials Issues List.pdf>

**From:** Deepak Jain <DJain@agility.com>
**Sent:** 17 December 2017 09:34
**To:** Louis AbouCharaf; Sirwan Mustafa; Dr. Hameed Akrawi; Nawzad Junde; Ray Rahmé; *Aziz,Ehab; Marc Rennard; FROISSART Olivier FG/DFA
**Cc:** Michel Monzani; Anis Hamdani; Issa Touma; Jekhsi
**Subject:** RE: October 2017 Financials
**Attachments:** September 2017 Financials Information Request.pdf; October 2017 Financials Information Request.pdf

Dear Louis,

Thank you very much for sending us Korek's September and October 2017 financials.

In this respect, we have identified a number of omissions, inconsistencies and unexplained items within the September and October 2017 financials, as set out in the attached documents. We should be grateful to receive an explanation in respect of those questions and issues as a matter of urgency.

Separately, we note that we still have not received a substantive response to our questions regarding Korek's draft 2016 financials, as well as the February, March, May, June and July 2017 financials, and the withholding tax issue raised in our email of 9 July. We once again reiterate our request that the requested information be provided as soon as possible.

Yours sincerely,

Deepak Jain
On behalf of the IT Ltd Representatives on the IH Board and KSC
On behalf of Iraq Telecom Limited pursuant to Clause 15 of the IH Shareholders' Agreement

---

**From:** Louis AbouCharaf [mailto:Louis.AbouCharaf@korektel.com]
**Sent:** Sunday, November 12, 2017 10:06 PM
**To:** Sirwan Mustafa <ssb70@korektel.com>; Dr. Hameed Akrawi <Hammed.Akrawi@korektel.com>; Nawzad Junde <Nawzad.Junde@korektel.com>; Ray Rahmé <ray.rahmeh@zr-group.net>; Ehab Aziz <EAziz@agility.com>; Deepak Jain <DJain@agility.com>; Marc Rennard <marc.rennard@orange.com>; FROISSART Olivier FG/DFA <olivier.froissart@orange.com>
**Cc:** Michel Monzani <michel.monzani@orange.com>; Anis Hamdani <anis.hamdani@orange.com>; Issa Touma <Issa.Touma@korektel.com>; Jekhsi <Jekhsi@korektel.com>
**Subject:** October 2017 Financials

Dear Members of the Board of Directors of International Holdings Limited/Korek Supervisory Committee,

Please find attached a copy of Korek's October 2017 Financials.

1

Best,


Louis.

**Korek September 2017 Financials**

**- Follow-up Questions -**

We have identified a number of omissions, inconsistencies and unexplained items within the September 2017 financial statements ("**September 2017**") and between those financial statements and other documents that you have provided to us. Such documents include your 2017 forecast for Korek and the draft audited financial statements for 2016.

1.  September 2017 reports a significant deterioration in results in comparison to August 2017 as well as the prior year. Relative to the same period in 2016, the report shows that for the first nine months of 2017, revenue has declined 10.7% and EBITDA has declined by 24.5%. Net loss year-to-date has increased by 24.1%, from USD 147.2 million to 182.6 million. Please provide operational explanations for deteriorating operating results as well as what actions Korek is taking to improve operations.

2.  In spite of declines in revenues, margin and EBITDA, Korek continues to spend for operating expenses at the same level as last year. Year-to-date, total operating expenses have increased by 5.2% while revenue has declined by 10.7%. The number of staff has barely moved, at approximately 2,000. Why has Korek not reduced its operating expenses in line with revenue?

3.  Please provide details of all taxes and interest payments made by Korek. Further, please confirm what taxes were paid to the Central Government in Baghdad or to the Kurdistan Regional Government.

4.  September 2017 Cash Flow reports zero amounts year-to-date in all categories of Financing, which is inconsistent with activity reported for the years 2016 and 2015. Is September 2017 correct? If so, why has there been no Financing activity, unlike prior years?

5.  The page Cash Needed for Operations implies that restricted cash totals approximately USD 10.5 million. Please identify the accounts that are restricted, reasons for the restrictions and for whose benefit; i.e., for which creditors.

6.  Korek continues to spend a significant amount on capital expenditures, USD 74.4 million year-to-date. The one-page September 2017 report of capex contains blank columns for budget and total capex approved. The financials do not provide a full year projection for 2017. Please complete the missing fields. In addition, please provide us with detail of capex approved for 2017 and the reason for each item approved, and a copy of each PO/PR issued year-to-date.

7.  September 2017 Cash Flow reports year-to-date Net Movement in Intercompany Balances, USD 8.9 million. Please provide details of all movements in intercompany balances, along with supporting documentation, such as wire transfers, checks, correspondence and calculations.

8.  The draft audited financial statements as of 31 December 2016 report the amount due to Sirwan Mustafa increased from USD 10,545,133 in 2015 to USD 15,612,091 in 2016. Please provide full details, including dates, amounts and business reason, from 31 December 2015 through 30 September 2017.

9.   Please provide 2017 year-to-date line item detail for Consulting and legal fees, including amount, date, payee, and business purpose.

10.  Please provide full details (underlying contracts, purchase orders, calculations of amounts due, and any communication with creditors about past due amounts) for Ericsson, Darin, and NSN.

11.  September 2017 provides no analysis or explanation of variations from prior period or forecast. Each of the Budget columns are blank. No variances have been calculated, and you have provided no narrative explanations for variances. We expect monthly financial statements to contain the following comparative information, along with narrative explanations of the underlying factors that cause variances:

   (a)   Same month, prior year

   (b)   Year-to-date, prior year

   (c)   Forecast, latest month

   (d)   Forecast, year-to-date

   (e)   Calculation of differences in USD and percentages

12.  Operating cash flow shown on the page "September 2017 P&L" shows no relationship to any amounts on the page "September 2017 Cash Flow". For example, the amounts reported for the month of September 2017 are USD 4,344,000 and 25,560,000, respectively. One or both of these pages are incorrect. Please provide us with a corrected report and explain why the report was presented inconsistently. Please also provide us with copies of all statements and reconciliations for cash on hand and at banks year-to-date.

13.  The draft audited financial statements as of 31 December 2016 report current assets due from shareholder of USD 10.2 million. No comparable account appears on the September 2017 Balance Sheet. Please provide details of all movements in current assets due from shareholder, along with supporting documentation, such as wire transfers, checks, correspondence and accounting work papers.

14.  The page September 2017 Balance Sheet fails to identify or explain any movement in accounts since 31 December 2016. We expect to see a comparison of balance sheet accounts to prior month, budget and beginning of the year, calculation of movement (variance), and narrative explanation of significant movement. We note these questions and inconsistencies between 31 December 2016 and 30 September 2017 balances:

   (a)   Current Assets and Current Liabilities are inconsistently presented compared to the draft audited financial statements. Please present them in a consistent manner and explain movement.

   (b)   Please provide detail as of 30 September 2017 for Trade Creditors, Capital Creditors and Other Creditors.

     (c)     Please provide detailed charts as of 30 September 2017 for Accounts Payable, Accrued Expenses, Interest and Tax Payable, and Direct Expenses and General and Administrative Expenses in the same format as presented on the draft audited financial statements as of 31 December 2016.

15.     Cash Needed for Operation does not cross-reference to the September 2017 Balance Sheet and therefore may be inconsistent with Korek's accounting records. This page also omits any explanation for amounts allegedly due to creditors. Please provide us with a reconciliation of this page to the September 2017 Balance Sheet. Please provide full details (underlying contracts, purchase orders, calculations of amounts due, and any communication with creditors about past due amounts) for:

     (a)     CMC Frequency

     (b)     Sales Tax 20%

     (c)     Withholding tax on interest

     (d)     Ericsson

     (e)     Other Creditors

     (f)     Shareholder loan interest

     (g)     Management fees outstanding

     (h)     CMC B. Guarantee for VAS Products

     (i)     ITPC Claim

16.     September 2017 Cash Flow reports that amounts due to tax authorities for sales tax increased by USD 5.0 million. This amount does not reconcile to the increase in the current liability for sales tax from 31 December 2016, USD 123.0 million, to 30 September 2017, 134.7 million. Please explain the inconsistency.

**Korek October 2017 Financials**

**- Follow-up Questions -**

We have identified a number of omissions, inconsistencies and unexplained items within the October 2017 financial statements ("**October 2017**") and between those financial statements and other documents that you have provided to us. Such documents include Korek's forecast for 2017 and the draft financial statements for the full year ended 31 December 2016 ("**2016 Financial Statements**").

1.  October 2017 reports significant deterioration in results in comparison to September 2017 as well as the prior year. Relative to the same period in 2016, your report shows that for the ten months in 2017, revenue has declined 10.8% and EBITDA has declined by 25.7%. Net loss year-to-date has increased by 23.8%, from USD 165.1 million to 204.5 million. Please provide operational explanations for deteriorating operating results as well as what actions Korek is taking to improve operations.

2.  In spite of declines in revenues, margin and EBITDA, Korek continues to spend for operating expenses at the same level as last year. Year-to-date, total operating expenses have increased by 5.8% while revenue has declined by 10.8%. The number of staff has barely moved, at approximately 2,000. Why has Korek not reduced its operating expenses in line with revenue?

3.  We note that Korek has made interest payments of USD 1.8 million. Please provide the details of these interest payments.

4.  October 2017 Cash Flow reports zero amounts year-to-date in all categories of Financing, which is inconsistent with activity reported for the years 2016 and 2015. Is October 2017 correct? If so, why has there been no Financing activity, unlike prior years?

5.  The page "Cash Needed for Operation" implies that restricted cash totals approximately USD 11.2 million. Please identify the accounts that are restricted, reasons for the restrictions and for whose benefit; i.e., for which creditors.

6.  Korek continues to make significant capital expenditures, USD 100.8 million year-to-date. The one-page October 2017 report of capex contains blank columns for budget and total capex approved. You have failed to provide a full year projection for 2017. Please complete the missing fields. In addition, please provide us with detail of capex approved for 2017 and the business reason for each item approved, and a copy of each purchase order/purchase request issued year-to-date.

7.  October 2017 Cash Flow reports year-to-date Net Movement in Intercompany Balances, USD 9.8 million. Please provide details of all movements in intercompany balances, along with supporting documentation, such as wire transfers, checks, correspondence and calculations.

8.  The 2016 Financial Statements report that the amount due to Sirwan Mustafa increased from USD 10,545,133 in 2015 to USD 15,612,091 in 2016. Please provide full details, including dates, amounts and business reason, from 31 December 2015 through 31 October 2017.

9.  Please provide 2017 year-to-date line item detail for consulting and legal fees, including amount, date, payee, and business purpose.

10. Please provide full details (underlying contracts, purchase orders, calculations of amounts due, and any communication with creditors about past due amounts) for Ericsson, Darin, and NSN.

11. October 2017 provides no analysis or explanation of variations from prior period or forecast. Each of the Budget columns are blank. No variances have been calculated, and Korek has provided no narrative explanations for variances. We expect monthly financial statements to contain the following comparative information, along with narrative explanations of the underlying factors that cause variances:

    (a) Same month, prior year

    (b) Year-to-date, prior year

    (c) Forecast, latest month

    (d) Forecast, year-to-date

    (e) Calculation of differences in USD and percentages

12. Operating cash flow shown on the page "October 2017 P&L" shows no relationship to any amounts on the page "October 2017 Cash Flow". For example, the amounts reported for the month of October 2017 are USD (16,956,000) and 5,272,000, respectively. One or both of these pages are wrong. Please provide us with a corrected report and explain why the report was presented inconsistently. Please also provide us with copies of all statements and reconciliations for cash on hand and at banks year-to-date.

13. The 2016 Financial Statements report current assets due from shareholder of USD 10.2 million. No comparable account appears on the October 2017 Balance Sheet. Please provide details of all movements in current assets due from shareholder, along with supporting documentation, such as wire transfers, checks, correspondence and accounting work papers.

14. The page "October 2017 Balance Sheet" fails to identify or explain any movement in accounts since 31 December 2016, the last date at which an audit has been attempted. We expect to see a comparison of balance sheet accounts to prior month, budget and beginning of the year, calculation of movement (variance), and narrative explanation of significant movement. We also expect Korek to organise interim financial statements in the same format as the 2016 Financial Statements, for comparability. We note these questions and inconsistencies between 31 December 2016 and 31 October 2017 balances:

    (a) Current Assets and Current Liabilities are inconsistently presented compared to the 2016 Financial Statements. Please present them in a consistent manner and explain movement.

    (b) Please provide detail as of 31 October 2017 for Trade Creditors, Capital Creditors and Other Creditors.

    (c) Please provide detail as of 31 October 2017 for Accounts Payable, Accrued Expenses, Interest and Tax Payable, and Direct Expenses and General and Administrative Expenses, all in the same format as presented in the 2016 Financial Statements.

15. Cash Needed for Operations does not cross-reference to the October 2017 Balance Sheet. Said report also omits any explanation for amounts allegedly due to creditors. Please provide us with a reconciliation of this page to the October 2017 Balance Sheet. Please provide full details (underlying contracts, purchase orders, calculations of amounts due, and any communication with creditors about past due amounts) for:

   (a)   CMC Frequency

   (b)   Sales Tax 20%

   (c)   Withholding tax on interest

   (d)   Ericsson

   (e)   Other Creditors

   (f)   Shareholder loan interest

   (g)   Management fees outstanding

   (h)   ITPC Claim

16. October 2017 Cash Flow reports that amounts due to tax authorities for sales tax increased by USD 4.4 million. This amount does not reconcile to the increase in the current liability for sales tax from 31 December 2016, USD 123.0 million, to 30 October 2017, 134.2 million. Please explain the inconsistency.

| From: | Deepak Jain <DJain@agility.com> |
|---|---|
| Sent: | 16 January 2018 20:49 |
| To: | Louis AbouCharaf; Sirwan Mustafa; Dr. Hameed Akrawi; Nawzad Junde; Raymond Rahmeh (ray.rahmeh@zr-group.net); *Aziz,Ehab; RENNARD Marc CXMB; 'FROISSART Olivier FG/DFA (olivier.froissart@orange.com)' |
| Cc: | MONZANI Michel MEA/MENA; anis.hamdani@orange.com; Jekhsi; Issa Touma |
| Subject: | RE: November 2017 Financials |
| Attachments: | November 2017 Financials Questions.pdf |

Dear Louis,

Thank you very much for sending us Korek's November 2017 financials.

In this respect, we have identified a number of omissions, inconsistencies and unexplained items within the November 2017 financials, as set out in the attached document. We should be grateful to receive an explanation in respect of those questions and issues as a matter of urgency.

Separately, we note that we still have not received a substantive response to our questions regarding Korek's draft 2016 financials, as well as the February, March, May, June, July, September and October 2017 financials, and the withholding tax issue raised in our email of 9 July 2017.

In fact, for almost a year now we have not received a single substantive response to any of the information requests we have sent, nor have we been provided with any updates or information regarding key events and/or developments. This is simply unacceptable.

We have raised valid and pressing questions about Korek's financials and have pointed out glaring omissions, inconsistencies, and items requiring further clarification and explanation within the financial statements. We have received no response and our comments have not been addressed in subsequent statements.

Similarly, our questions with respect to alleged significant liabilities such as the USD 150 million ITPC claim or alleged "legal and consulting fees" of more than USD 18 million a year have gone unanswered.

For the avoidance of doubt, we expect Korek and International Holdings to provide substantive answers to all our outstanding information requests (including but not limited to the information requests referenced above and our information request of 10 March 2017).

All of IT Ltd.'s rights are reserved.

Yours sincerely,

Deepak Jain
On behalf of the IT Ltd. Representatives on the IH Board and KSC
On behalf of Iraq Telecom Limited pursuant to Clause 15 of the IH Shareholders' Agreement

---

**From:** Louis AbouCharaf [mailto:Louis.AbouCharaf@korektel.com]
**Sent:** Tuesday, December 12, 2017 12:39 PM
**To:** Sirwan Mustafa <ssb70@korektel.com>; Dr. Hameed Akrawi <Hammed.Akrawi@korektel.com>; Nawzad Junde <Nawzad.Junde@korektel.com>; Raymond Rahmeh (ray.rahmeh@zr-group.net) <ray.rahmeh@zr-group.net>; Ehab Aziz <EAziz@agility.com>; Deepak Jain <DJain@agility.com>; RENNARD Marc CXMB <marc.rennard@orange.com>; 'FROISSART Olivier FG/DFA (olivier.froissart@orange.com)' <olivier.froissart@orange.com>

**Cc:** MONZANI Michel MEA/MENA <michel.monzani@orange.com>; anis.hamdani@orange.com; Jekhsi <Jekhsi@korektel.com>; Issa Touma <Issa.Touma@korektel.com>
**Subject:** November 2017 Financials

Dear Members of the Board of Directors of International Holdings Limited/Korek Supervisory Committee,

Please find attached a copy of Korek's November 2017 Financials.

Best,

Louis.

**Korek November 2017 Financials**

**- Follow-up Questions -**

We have identified a number of omissions, inconsistencies and unexplained items within the November 2017 financial statements (**"November 2017"**) and between those financial statements and other documents that you have provided to us. Such documents include Korek's forecast for 2017 and the draft financial statements for the full year ended 31 December 2016 ("**2016 Financial Statements**").

1.  November 2017 reports significant deterioration in results in comparison to November 2017 as well as the prior year. Relative to the same period in 2016, your report shows that for the eleven months in 2017, revenue has declined 11.2% and EBITDA has declined by 27.2%. Net loss year-to-date has increased by 24.7%, from USD 186.2 million to 232.2 million. Please provide operational explanations for deteriorating operating results as well as what actions Korek is taking to improve operations.

2.  In spite of declines in revenues, margin and EBITDA, Korek continues to spend for operating expenses at the same level as last year. Year-to-date, total operating expenses have increased by 6.5% while revenue has declined by 11.2%. The number of staff has barely moved, at approximately 2,000. Why has Korek not reduced its operating expenses in line with revenue?

3.  We note that Korek has made interest payments of USD 0.8 million. Please provide the details of these interest payments.

4.  November 2017 Cash Flow reports zero amounts year-to-date in all categories of Financing, which is inconsistent with activity reported for the years 2016 and 2015. Is November 2017 correct? If so, why has there been no Financing activity, unlike prior years?

5.  The page "Cash Needed for Operation" implies that restricted cash totals approximately USD 10.1 million. Please identify the accounts that are restricted, reasons for the restrictions and for whose benefit; i.e., for which creditors.

6.  Korek continues to make significant capital expenditures, USD 117.4 million year-to-date. The one-page November 2017 report of capex contains blank columns for budget and total capex approved. You have failed to provide a full year projection for 2017. Please complete the missing fields. In addition, please provide us with detail of capex approved for 2017 and the business reason for each item approved, and a copy of each purchase order/purchase request issued year-to-date.

7.  November 2017 Cash Flow reports year-to-date Net Movement in Intercompany Balances, USD 10.6 million. Please provide details of all movements in intercompany balances, along

with supporting documentation, such as wire transfers, checks, correspondence and calculations.

8.   The 2016 Financial Statements report that the amount due to Sirwan Mustafa increased from USD 10,545,133 in 2015 to USD 15,612,091 in 2016. Please provide full details, including dates, amounts and business reason, from 31 December 2015 through 30 November 2017.

9.   Please provide 2017 year-to-date line item detail for consulting and legal fees, including amount, date, payee, and business purpose.

10.  Please provide full details (underlying contracts, purchase orders, calculations of amounts due, and any communication with creditors about past due amounts) for Ericsson, Darin, and NSN.

11.  November 2017 provides no analysis or explanation of variations from prior period or forecast. Each of the Budget columns are blank. No variances have been calculated, and Korek has provided no narrative explanations for variances. We expect monthly financial statements to contain the following comparative information, along with narrative explanations of the underlying factors that cause variances:

(a)   Same month, prior year

(b)   Year-to-date, prior year

(c)   Forecast, latest month

(d)   Forecast, year-to-date

(e)   Calculation of differences in USD and percentages

12.  Operating cash flow shown on the page "November 2017 P&L" shows no relationship to any amounts on the page "November 2017 Cash Flow". For example, the amounts reported for the month of November 2017 are USD (10,107,000) and (1,454,000), respectively. One or both of these pages are wrong. Please provide us with a corrected report and explain why the report was presented inconsistently. Please also provide us with copies of all statements and reconciliations for cash on hand and at banks year-to-date.

13.  The 2016 Financial Statements report current assets due from shareholder of USD 10.2 million. No comparable account appears on the November 2017 Balance Sheet. Please provide details of all movements in current assets due from shareholder, along with supporting documentation, such as wire transfers, checks, correspondence and accounting work papers.

14.  The page "November 2017 Balance Sheet" fails to identify or explain any movement in accounts since 31 December 2016, the last date at which an audit has been attempted. We

expect to see a comparison of balance sheet accounts to prior month, budget and beginning of the year, calculation of movement (variance), and narrative explanation of significant movement. We also expect Korek to organise interim financial statements in the same format as the 2016 Financial Statements, for comparability. We note these questions and inconsistencies between 31 December 2016 and 30 November 2017 balances:

(a)   Current Assets and Current Liabilities are inconsistently presented compared to the 2016 Financial Statements. Please present them in a consistent manner and explain movement.

(b)   Please provide detail as of 30 November 2017 for Trade Creditors, Capital Creditors and Other Creditors.

(c)   Please provide detail as of 30 November 2017 for Accounts Payable, Accrued Expenses, Interest and Tax Payable, and Direct Expenses and General and Administrative Expenses, all in the same format as presented in the 2016 Financial Statements.

15.   Cash Needed for Operations does not cross-reference to the November 2017 Balance Sheet. Said report also omits any explanation for amounts allegedly due to creditors. Please provide us with a reconciliation of this page to the November 2017 Balance Sheet. Please provide full details (underlying contracts, purchase orders, calculations of amounts due, and any communication with creditors about past due amounts) for:

(a)   CMC Frequency

(b)   Sales Tax 20%

(c)   Withholding tax on interest

(d)   Ericsson

(e)   Other Creditors

(f)   Shareholder loan interest

(g)   Management fees outstanding

(h)   ITPC Claim

16.   November 2017 Cash Flow reports that amounts due to tax authorities for sales tax increased by USD 5.3 million. This amount does not reconcile to the increase in the current liability for sales tax from 31 December 2016, USD 123.0 million, to 30 November 2017, 135.1 million. Please explain the inconsistency.

**From:**         Deepak Jain <DJain@agility.com>
**Sent:**         19 March 2018 19:02
**To:**           Louis AbouCharaf; Sirwan Mustafa; Dr. Hameed Akrawi; Nawzad Junde; Raymond
                  Rahmeh (ray.rahmeh@zr-group.net); *Aziz,Ehab; RENNARD Marc CXMB;
                  'FROISSART Olivier FG/DFA (olivier.froissart@orange.com)'
**Cc:**           MONZANI Michel MEA/MENA; anis.hamdani@orange.com; Jekhsi; Issa Touma
**Subject:**      RE: December 2017 Financials
**Attachments:**  Korek December 2017 Financials Information Request.pdf


Dear Louis,

Thank you very much for sending us Korek's December 2017 financials.

In this respect, we have identified a number of omissions, inconsistencies and unexplained items within the
December 2017 financials, as set out in the attached document. We should be grateful to receive an explanation in
respect of those questions and issues as a matter of urgency.

Separately, we note that we still have not received a substantive response to our questions regarding Korek's draft
2016 financials, as well as the February, March, May, June, July, September, October and November 2017 financials,
and the withholding tax issue raised in our email of 9 July 2017.

Similarly, our questions with respect to alleged significant liabilities such as the USD 150 million ITPC claim or alleged
"legal and consulting fees" of more than USD 18 million a year have gone unanswered.

As noted previously, we expect Korek and International Holdings to provide substantive answers to all our
outstanding information requests (including but not limited to the information requests referenced above and our
information request of 10 March 2017).

All of IT Ltd.'s rights are reserved.

Yours sincerely,

Deepak Jain
On behalf of the IT Ltd. Representatives on the IH Board and KSC
On behalf of Iraq Telecom Limited pursuant to Clause 15 of the IH Shareholders' Agreement

---

**From:** Louis AbouCharaf [mailto:Louis.AbouCharaf@korektel.com]
**Sent:** Monday, January 15, 2018 6:48 PM
**To:** Sirwan Mustafa <ssb70@korektel.com>; Dr. Hameed Akrawi <Hammed.Akrawi@korektel.com>; Nawzad Junde
<Nawzad.Junde@korektel.com>; Raymond Rahmeh (ray.rahmeh@zr-group.net) <ray.rahmeh@zr-group.net>; Ehab
Aziz <EAziz@agility.com>; Deepak Jain <DJain@agility.com>; RENNARD Marc CXMB <marc.rennard@orange.com>;
'FROISSART Olivier FG/DFA (olivier.froissart@orange.com)' <olivier.froissart@orange.com>
**Cc:** MONZANI Michel MEA/MENA <michel.monzani@orange.com>; anis.hamdani@orange.com; Jekhsi
<Jekhsi@korektel.com>; Issa Touma <Issa.Touma@korektel.com>
**Subject:** December 2017 Financials

Dear Members of the Board of Directors of International Holdings Limited/Korek Supervisory Committee,

Please find attached a copy of Korek's December 2017 Financials.

1

Best,

Louis.

**Korek December 2017 Financials**

**- Follow-up Questions -**

We have identified a number of omissions, inconsistencies and unexplained items within the December 2017 financial statements ("**December 2017**") and between those financial statements and other documents that you have provided to us. Such documents include Korek's forecast for 2017 and the draft financial statements for the full year ended 31 December 2016 ("**2016 Financial Statements**").

1.  December 2017 shows significant deterioration in results compared to November 2017 as well as 2016. Relative to the same period in 2016, your report shows that revenue declined 11.8% and EBITDA declined by 29.2% from 2016 to 2017. Net loss for the year has increased by 24.6%, from USD 209.9 million to 261.5 million. Please provide operational explanations for deteriorating operating results as well as what actions Korek is taking to improve operations.

2.  In spite of declines in revenues, margin and EBITDA, Korek continues to spend for operating expenses at the same level as last year. From 2016 to 2017, total operating expenses increased by 6.9% while revenue declined by 11.8%. The number of staff has barely moved, at approximately 2,000. Why has Korek not reduced its operating expenses in line with revenue?

3.  Please provide details of interest payments of USD 6.7 million reported for December 2017.

4.  The page "Cash Needed for Operation" implies that restricted cash totals approximately USD 10.1 million. Please identify the accounts that are restricted, reasons for the restrictions and for whose benefit; i.e., for which creditors.

5.  Korek continues to make significant capital expenditures, totalling USD 122.1 million in 2017. Please provide us with detail of capex approved for 2017 and the business reason for each item approved, and a copy of each purchase order/purchase request issued in 2017.

6.  December 2017 Cash Flow reports Net Movement in Intercompany Balances, USD 11.3 million. Please provide details of all movements in intercompany balances during 2017, along with supporting documentation, such as wire transfers, checks, correspondence and calculations.

7.  Please provide line item detail for consulting and legal fees in 2017, including amount, date, payee, and business purpose.

8. Please provide full details (underlying contracts, purchase orders, calculations of amounts due, and any communication with creditors about past due amounts) for Ericsson, Darin, and NSN.

9. December 2017 provides no analysis or explanation of variations from prior period or forecast. Each of the Budget columns are blank. No variances have been calculated, and Korek has provided no narrative explanations for variances. We expect monthly financial statements to contain the following comparative information, along with narrative explanations of the underlying factors that cause variances:

   (a)   Same month, prior year

   (b)   Year-to-date, prior year

   (c)   Forecast, latest month

   (d)   Forecast, year-to-date

   (e)   Calculation of differences in USD and percentages

10. Operating cash flow shown on the page "December 2017 P&L" shows no relationship to any amounts on the page "December 2017 Cash Flow". For example, the amounts reported for the month of December 2017 are USD (5,033,000) and 23,027,000, respectively. One or both of these pages are wrong. Please provide us with a corrected report and explain why the report was presented inconsistently. Please also provide us with copies of all statements and reconciliations for cash on hand and at banks as at 31 December 2017.

11. The 2016 Financial Statements report current assets due from shareholder of USD 10.2 million. No comparable account appears on the December 2017 Balance Sheet. Please provide details of all movements in current assets due from shareholder, along with supporting documentation, such as wire transfers, checks, correspondence and accounting work papers.

12. The page "December 2017 Balance Sheet" fails to identify or explain any movement in accounts since 31 December 2016, the last date at which the company has attempted to draft financial statements with accompanying footnote disclosures. We expect to see a comparison of balance sheet accounts to prior month, budget and beginning of the year, calculation of movement (variance), and narrative explanation of significant movement. We also expect Korek to organise financial statements in the same format as the 2016 Financial Statements, for comparability. We note these questions and inconsistencies between 31 December 2016 and 31 December 2017 balances:

   (a)   Current Assets and Current Liabilities are inconsistently presented compared to the 2016 Financial Statements. Please present them in a consistent manner and explain movement.

(b)    Please provide detail as of 31 December 2017 for Trade Creditors, Capital Creditors and Other Creditors.

(c)    Please provide detail as of 31 December 2017 for Accounts Payable, Accrued Expenses, Interest and Tax Payable, and Direct Expenses and General and Administrative Expenses, all in the same format as presented in the 2016 Financial Statements.

13.    Cash Needed for Operations does not cross-reference to the December 2017 Balance Sheet. Said report also omits any explanation for amounts allegedly due to creditors. Please provide us with a reconciliation of this page to the December 2017 Balance Sheet. Please provide full details (underlying contracts, purchase orders, calculations of amounts due, and any communication with creditors about past due amounts) for:

(a)    CMC Frequency

(b)    Sales Tax 20%

(c)    Withholding tax on interest

(d)    Ericsson

(e)    Other Creditors

(f)    Shareholder loan interest

(g)    Management fees outstanding

(h)    ITPC Claim

14.    December 2017 Cash Flow reports that amounts due to tax authorities for sales tax increased by USD 5.8 million. This amount does not reconcile to the increase in the current liability for sales tax from 31 December 2016, USD 123.0 million, to 31 December 2017, 135.6 million. Please explain the inconsistency.

# Exhibit L

**By Email to:**

Mr Abdulhameed Abdullah Mohammed Salih Aqrawi
Mr Nozad Hussein Jundi
Mr Raymond Samir Zina Rahmeh

**Copied to:**

Mr Sirwan Saber Mustafa Barzani
Kurdistan Street nr. 45
Pirmam, Erbil
Kurdistan
Republic of Iraq

Mr Sirwan Saber Mustafa Barzani
Erbil-Massief-Sallahaddin
Dar Althiafa-House Number 3
Erbil, Kurdistan
Republic of Iraq

International Holdings Limited
Unit 11, Level 3
Gate Village Building 10
Dubai International Financial Centre
Dubai, 507043
United Arab Emirates

1 November 2017

Dear Sirs

### Issue Requiring Urgent Action by the Directors of International Holdings Limited
### Misconduct on the part of Mr Barzani

1.  We write in our capacity as members of the board (the "**Board**") of International Holdings Limited (the "**Company**") and members of the Korek Supervisory Committee (the "**KSC**") to you in your capacity as members of the Board.

2.  As explained in further detail below, we have uncovered serious misconduct on the part of Mr Sirwan Saber Mustafa Barzani.

3.  In summary, the misconduct of Mr Barzani is as follows:

    a.  Failure to disclose to the Company that the IBL Loan was a collateralised facility, which means that the interest rate agreed on the IBL Loan (13.25%) was excessive and there was no need for Iraq Telecom Limited ("**IT Ltd**") to subordinate its creditor rights;

    b.  Trading in competition to Korek and the Company through a company called IraqCell Telecommunication Limited ("**IraqCell**"), and breaching warranties given in relation to IraqCell;

c.   Effecting purchases through Korek from companies in which Mr Barzani has a personal interest without disclosing that interest and without seeking the approval of Korek's shareholders;

d.   Causing Korek to enter into an amendment to its telecommunications licence on 10 November 2014 (the "**3G Annex**") in violation of the Shareholders' Agreement;

e.   Failing to appoint a CEO of Korek in accordance with the instruction of IT Ltd contrary to the Shareholders' Agreement;

f.   Failing to provide IT Ltd with information in accordance with the Shareholders' Agreement;

g.   Failing to protect Korek's interests by planning for and reacting to the independence vote for Iraqi Kurdistan, especially after the Ministerial Council for National Security headed by the Iraqi Prime Minister issuing a decision to the effect that all mobile telecommunication operators should be under the authority of the federal government;

h.   Failing to comply with the mandatory requirements of Iraqi company law.

These matters are addressed in further detail below.

A.   Failure to disclose to the Company that the IBL Loan was a collateralised facility with the consequence that the interest rate agreed on the IBL Loan was excessive and there was no need for IT Ltd to subordinate its creditor rights

4.   The enclosed letter dated 30 August 2017 from IBL Bank SAL ("**IBL**") indicates that collateral has previously been provided for the IBL loan. Furthermore, IBL's Annual Report for 2015 appears to refer to the IBL loan and the fact that it is cash collateralised. Those accounts state:

   *"Performing corporate loans to large enterprises, outstanding at year end 2015, include an amount of LBP 226 billion related to a non-resident customer which is covered by LBP 234 billion cash collateral. Related interest income and expense amounted to LBP 30.7 billion and LBP 28.83 billion respectively during 2015 and 2014."*

5.   The IBL loan equates to approximately LBP 226 billion, which is the amount of the corporate loan to the "non-resident customer" referred to in IBL's accounts. The interest on this corporate loan for 2015 is said to be LBP 30.7 billion, which is just over 13% and accords with the interest rate of 13.25% of the IBL loan. Despite this evidence of the IBL loan being collateralised, the existence of the collateral was never disclosed by Mr Barzani or Mr Rahmeh, who both arranged the loan.

6.   The above non-disclosure is particularly troubling in view of the fact that we initially objected to the high cost of the IBL loan and were assured by Mr Barzani and Mr Rahmeh that the terms offered by IBL were appropriate for an unsecured loan. It's also troubling because we have repeatedly, but unsuccessfully, requested information on discussions, communications, and negotiations with IBL. By way of example, on 4 March 2016 we were informed that based on direct exchanges between Mr Rahmeh and IBL, the latter did not appear to insist on the immediate repayment of the loan so long as Korek continued to pay interest. The response prompted additional requests for information and documents from IT Ltd, all of which remained unanswered until August 2016. At that time, IT Ltd was informed that all discussions between Mr Rahmeh and IBL took place orally without any written record.

7. If the IBL loan is a secured loan, then the interest rate of 13.25% is excessive and is detrimental to Korek's, and the Company's, financial position. Furthermore, IT Ltd agreed to subordinate its creditor rights, in relation to its shareholder loan, in favour of IBL's creditor rights, on the basis that the IBL loan was unsecured. It would not have agreed to this subordination of its rights if it had known that the IBL loan was secured, as there would have been no need for the subordination.

B. Trading in competition to Korek and the Company through a company called IraqCell and breaching warranties given in relation to IraqCell

8. Upon entry into the joint venture, Mr Barzani disclosed that he had an 80% shareholding in a competing Iraqi business, IraqCell. At the time, Mr Barzani warranted that IraqCell was dormant and had not traded since 2009. Mr Barzani gave warranties to the effect that IraqCell would not trade, or otherwise compete in any way with Korek, without the prior written consent of IT Ltd, and that he would use all reasonable endeavours to liquidate or dissolve IraqCell as soon as reasonably practicable.

9. However, it has come to our attention that IraqCell continues to operate and compete with Korek, with Mr Barzani acting as its director, contrary to clause 17 of the Shareholders' Agreement and the terms of a letter agreement between Mr Barzani, IT Ltd, and the Company. Amongst other things, we have discovered that in March 2014 IraqCell was awarded a licence to install and operate mobile infrastructure in the form of a fibre-optic network across Kurdistan. Furthermore, Mr Barzani benefits personally from an undisclosed arrangement whereby IraqCell has been engaged to install fibre-optic cable for Korek. Mr Barzani's continued involvement with IraqCell is contrary to his assurances at the time IT Ltd entered into the joint venture and creates a conflict of interest such that his position as a member of the Board, member of the KSC, and the Manager of Korek is no longer tenable.

C. Effecting purchases through Korek from companies in which Mr Barzani has a personal interest without disclosing that interest

10. It has also come to our attention that Mr Barzani has caused significant purchase orders to be issued by Korek to companies in which he has substantial undisclosed personal interests, including the Darin Group (via a nominee shareholding arrangement) and K-Energy. For example, for the period October 2016 to March 2017, Mr Barzani caused Korek to issue purchase orders to:

(a) the Darin Group, which received purchase orders totalling USD 7.5 million during that period; and

(b) K-Energy, which received purchase orders totalling USD 5 million during that period.

11. Apart from being instances of self-dealing transactions which would need to be authorised by Korek's shareholders, the placing of such purchase orders exceeds Mr Barzani's powers set out in Korek's shareholders' resolution dated 24 July 2011, which limits the value of transactions that he may enter into, without requiring further approval, to USD 1 million.

D. Causing Korek to enter into the 3G Annex in violation of the Shareholders' Agreement

12. With reference to the licence issued by the CMC to Korek (the "**Licence**"), as you are aware, Mr Barzani caused Korek to enter into the 3G Annex. The terms of the 3G Annex provide that any transfer of shares in Korek requires the CMC's approval.

13. The entry into the 3G Annex by Korek was five days after IT Ltd exercised its call option under the Shareholders' Agreement requiring CS Ltd to sell 7% of its shares in the Company to IT Ltd. It

appears to have been an attempt to prevent IT Ltd exercising its rights to obtain additional shares in Korek. The entry into the 3G Annex by Korek was despite our previous objections to the same and contrary to IT Ltd's veto rights pursuant to clause 11.3 of the Shareholders' Agreement.

E. Failing to appoint a CEO of Korek in accordance with the instruction of IT Ltd, contrary to the Shareholders' Agreement

14. Pursuant to clauses 8.3 and 8.4 of the Shareholders' Agreement, Mr Barzani must formally appoint the CEO proposed by IT Ltd. We proposed four candidates on behalf of IT Ltd for the position of CEO of Korek, but Mr Barzani has failed to appoint a CEO of Korek in over two years. This is particularly concerning given Mr Barzani's violation of his non-compete obligation and his entering into self-dealing transactions without being authorised to do so.

F. Failing to provide Iraq Telecom Limited with information in accordance with the Shareholders' Agreement

15. Despite numerous previous requests, the directors appointed by IT Ltd to the Board and the KSC have not been furnished with critical information and documents by Mr Barzani so as to have any proper visibility of Korek's financial position. This information includes key financial information relating to the assets and liabilities of Korek, Korek's outstanding liability to the Iraqi Telecommunication and Post Company, and information about significant capital expenditures, such as unspecified and unsubstantiated "consulting and legal fees" of up to USD 18 million per year.

G. Failing to protect Korek's interests by planning for and reacting to the independence vote for Iraqi Kurdistan

16. There is a real prospect that the recent independence vote by Iraqi Kurdistan could have a material impact on Korek and its operations within Kurdistan and the rest of Iraq. In fact, on 9 October 2017 it was widely reported that the Ministerial Council for National Security headed by the Prime Minister issued a decision to the effect that all mobile telecommunication operators should be under the authority of the federal government. However, despite being requested to do so by members of the Board and the KSC, Mr Barzani has taken no steps to assess the potential risks and implications of the independence vote or taken any action to mitigate such risks.

H. Failing to comply with the mandatory requirements of Iraqi company law.

17. Furthermore, we understand that Mr Barzani is in breach of Iraqi law in failing to:

(i) convene a general assembly of Korek since 2011;

(ii) disclose to IH, as sole shareholder of Korek, any information on the compensation of Korek's senior management;

(iii) finalise and submit financial statements or annual reports for Korek since 2011;

(iv) prepare any annual plans comprising Korek's activities and budgets since 2011;

(v) share critical information with the KSC on Korek and its operations; and

(vi) prepare any studies for developing Korek's business.

**Conclusion**

18. As a result of the above misconduct on the part of Mr Barzani, the Board must urgently take appropriate steps to ensure the full disclosure of information and transactions entered into by Mr Barzani on behalf of Korek and assess the financial consequences of these transactions on Korek. To address this point, we request that the Board procure that IH, as sole shareholder of Korek, takes the appropriate steps to obtain the appointment of a professional inspector by the Companies Registrar under Iraqi law with the power to investigate the alleged mismanagement of Korek, gather information related to the transactions concluded by Mr Barzani, and provide a report on the assets and liabilities of Korek.

19. Furthermore, the Board must urgently take appropriate steps to ensure the removal of Mr Barzani as the Statutory Manager of Korek and any other steps to prevent the further deterioration of Korek' financial situation through the conclusion of other transactions detrimental to Korek's interests, and transactions with third parties in which Mr Barzani has a personal interest.

We reserve our rights to take further action should you fail to promptly take the steps mentioned above.

Yours sincerely

Deepak Jain
(on behalf of the directors appointed by IT Ltd)

Enc:   IBL's letter dated 30 August 2017

       Extract from IBL's Annual Report for 2015



**IBL BANK**

Beirut, August 30, 2017

**Korek Telecom**
Korek Building 45 Kurdistan
Erbil – Iraq

Dear Sirs,

We refer to the Term Loan Agreement dated 21 December 2011, made between IBL Bank SAL (as Lender), Korek Telecom Company LLC (as Borrower) and Mr. Sirwan Saber Mostafa (as Guarantor), as amended from time to time (the "**Agreement**").

Terms used but not otherwise defined in this letter shall have the same meaning as in the Agreement.

Further to our previous correspondences which remained unanswered, we hereby reiterate that the Repayment Dates of each of the Short Term Loan and the Long Term Loan have expired, and IBL Bank SAL insists on a full repayment of the loan.

In the interim, you are requested to provide, within 30 days from the date hereof, additional collateral to IBL Bank SAL to secure the Loan, in the form of a pledge of the Borrower's shares in addition to any other acceptable collateral to IBL Bank SAL.

If we do not receive any positive response from you within the aforementioned delay, we reserve our right to take any and all appropriate actions to safeguard our rights under the Agreement.

This letter is without prejudice to any other rights which the Lender may have under the Agreement or as a matter of general law, which are expressly reserved and are not waived or amended by the terms of this letter, in particular, the terms of the Subordination Agreement which must continue to be complied with by all parties.

This letter and any dispute or claim arising out of or in connection with it or its subject matter or formation (including non-contractual disputes or claims) shall be governed by and construed in accordance with the laws of the Republic of Lebanon.

Yours faithfully,

IBL Bank SAL

CC:     **International Holdings Limited**, Office 11, Level 3, Gate Village 10, PO Box 506672,
Sheikh Zayed Road, Dubai International Financial Center, Dubai, UAE
**Iraq Telecom Limited**, Office 11, Level 3, Gate Village 10, PO Box 506672,
Sheikh Zayed Road, Dubai International Financial Center, Dubai, UAE
**Mr. Sirwan Saber Mustafa**, 45 Kurdistan Street, Erbil, Kurdistan Region, Republic of Iraq

Capital LBP 150 000 000 000 fully paid
List of Banks N° 52, CRB 10472

Charles Malek Avenue, Al Ittihadia Building, Ashrafieh, Beirut 2071 4703 Lebanon
P.O.Box: 11-5292 Riad El Solh 1107 2190 Beirut - Lebanon - Tax I.D No: 7267 - Swift: INLELBBE
Tel: +961 1 200 350/2/3 - Fax: +961 1 204 505 - E-mail: ibl@ibl.com.lb - www.ibl.com.lb

*3. Risk mitigation policies*

**Collateral:**

The Group mainly employs collateral to mitigate credit risk. The principal collateral types for loans and advances are:

- Pledged deposits
- Mortgages over real estate properties (land, commercial and residential properties)
- Bank guarantees
- Financial instruments (equities and debt securities)
- Business other assets (such as inventories and accounts receivable)

The Group holds collateral against loans and advances to customers in the form of mortgage interests over property, other registered securities over assets, and guarantees. Estimates of fair value are based on the value of collateral assessed at the time of borrowing and generally updated every 2 years and when a loan is individually assessed as impaired. Generally, Collateral is not held over loans and advances to banks, except when securities are held as part of reverse repurchase and securities borrowing activity. Collateral usually is not held against investment securities.

A plan of action is determined in relation to each Class C account. If there is no improvement, a provision is taken in respect of the principal based on the expected debt recovery, and the account is then classified as Class D. Once recovery becomes very remote, the full outstanding balance is provided for; the account is down graded to Class E.

*Impaired loans*

Impaired loans are loans for which the Group determines that it is probable that it will be unable to collect all principal and interest due according to the contractual terms of the loan. These loans are classified C, D and E in the Group's internal credit risk classification.

*Past due but not impaired loans*

Loans and securities where contractual interest or principal payments are past due but the Group believes that impairment is not appropriate on the basis of the level of security/collateral available and/or the stage of collection of amounts owed to the Group.

*Allowances for impairment*

The Group establishes an allowance for impairment losses that represents its estimate of incurred losses in its loan portfolio. The main components of this allowance are a specific loss component that relates to individually significant exposures, and a collective loan loss allowance established for homogeneous assets in respect of losses that have been incurred but have not been identified on loans subject to individual assessment for impairment.

**Write-off policy**

The Group writes-off a loan or security (and any related allowances for impairment losses) when the Group's management and credit business unit determine that the loans/securities are uncollectible in whole or in part. This determination is reached after considering information such as the occurrence of significant changes in the borrower/issuer's financial position such that the borrower/issuer can no longer pay its obligation in full, or that proceeds from collateral will not be sufficient to pay back the entire exposure. For smaller balance standardized loans, charge off decisions generally are based on a product specific past due status.

Loans and advances to customers consist of the following as at December 31:

| | December 31, 2015 | | | December 31, 2014 | | |
|---|---|---|---|---|---|---|
| | Gross Amount Net of Unreal-ized Interest LBP'000 | Impairment Allowance LBP'000 | Carrying Amount LBP'000 | Gross Amount Net of Unreal-ized Interest LBP'000 | Impairment Allowance LBP'000 | Carrying Amount LBP'000 |
| **Performing retail loans** | | | | | | |
| Mortgage loans | 220,666,033 | - | 220,666,033 | 220,435,419 | - | 220,435,419 |
| Personal loans | 37,832,824 | - | 37,832,824 | 42,010,269 | - | 42,010,269 |
| Credit card | 6,266,868 | - | 6,266,868 | 5,655,085 | - | 5,655,085 |
| Overdrafts | 19,743,066 | - | 19,743,066 | 21,812,249 | - | 21,812,249 |
| Allowance for collective provision - performing retail | - | (881,097) | (881,097) | - | (1,335,989) | (1,335,989) |
| | 284,508,791 | (881,097) | 283,627,694 | 289,913,022 | (1,335,989) | 288,577,033 |
| **Non-performing retail loans** | | | | | | |
| Substandard loans | 37 | - | 37 | 18,588 | - | 18,588 |
| Doubtful loans | 2,630,654 | (1,510,570) | 1,120,084 | 2,552,467 | (1,444,744) | 1,107,723 |
| | 2,630,691 | (1,510,570) | 1,120,121 | 2,571,035 | (1,444,744) | 1,126,291 |
| **Performing corporate loans** | | | | | | |
| Large enterprises | 930,503,350 | - | 930,503,350 | 886,427,938 | - | 886,427,938 |
| Small and medium enterprises | 321,495,908 | - | 321,495,908 | 365,024,251 | - | 365,024,251 |
| | 1,251,999,258 | - | 1,251,999,258 | 1,251,452,189 | - | 1,251,452,189 |
| **Non-performing corporate loans** | | | | | | |
| Substandard loans | 3,701,259 | - | 3,701,259 | 5,765,334 | - | 5,765,334 |
| Doubtful loans | 11,776,282 | (8,762,107) | 3,014,175 | 14,627,083 | (9,653,297) | 4,973,786 |
| | 15,477,541 | (8,762,107) | 6,715,434 | 20,392,417 | (9,653,297) | 10,739,120 |
| Allowance for collective impairment | - | (11,110,999) | (11,110,999) | - | (8,898,660) | (8,898,660) |
| Accrued interest receivable | 8,406,070 | - | 8,406,070 | 2,458,752 | - | 2,458,752 |
| | 1,563,022,351 | (22,264,773) | 1,540,757,578 | 1,566,787,415 | (21,332,690) | 1,545,454,725 |

Performing corporate loans to large enterprises, outstanding at year end 2015, include an amount of LBP226billion related to a non-resident customer which is covered by LBP234billion cash collateral. Related interest income and expense amounted to LBP30.7billion and LBP28.83billion respectively during 2015 and 2014.

Loans classified performing include overdue amounts as at December 31 as follows:

|  | 2015 LBP'000 | 2014 LBP'000 |
|---|---|---|
| Between 30-60 days | 261,837 | 1,189,505 |
| Between 60-90 days | 220,056 | 893,999 |
| Between 90-180 days | 554,235 | 994,165 |
| Beyond 180 days | 109,395 | 1,155,494 |
|  | 1,145,523 | 4,233,163 |

Concentration of major financial assets by industry or sector:

| | December 31, 2015 | | | | | December 31, 2015 | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | Sovereign LPB'000 | Financial Services LPB'000 | Real Estate Development LPB'000 | Manufacturing LPB'000 | Trading LPB'000 | Services LPB'000 | Individuals LPB'000 | Others LPB'000 | Allowance For Collective Impairment LPB'000 | Total LPB'000 |
| Cash and Central Banks | 2,007,409,629 | - | - | - | - | - | - | - | - | 2,007,409,629 |
| Deposits with banks and financial institutions | - | 387,989,534 | - | - | - | - | - | - | - | 387,989,534 |
| Loans to banks | - | 71,820,642 | - | - | - | - | - | - | - | 71,820,642 |
| Loans and advances to customers | - | 97,955,719 | 335,073,234 | 111,911,579 | 114,650,504 | 442,765,489 | 424,069,458 | 26,323,689 | (11,992,096) | 1,540,757,576 |
| Loans and advances to related parties | - | 89,002,288 | 1,829,147 | - | 2,996,470 | - | 7,786,874 | 29,652 | - | 101,644,431 |
| Investment securities at fair value through profit or loss | 1,356,242,396 | 4,260,659 | - | - | - | - | - | - | - | 1,360,503,055 |
| Investment securities at fair value through other comprehensive income | - | 1,084,018 | - | - | - | - | - | - | - | 1,084,018 |
| Investment securities at amortized cost | 2,949,026,977 | - | - | - | - | - | - | - | - | 2,949,026,977 |
| | 6,312,679,002 | 652,112,860 | 336,902,381 | 111,911,579 | 117,646,974 | 442,765,489 | 431,856,332 | 26,353,341 | (11,992,096) | 8,420,235,862 |

| | December 31, 2014 | | | | | December 31, 2014 | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | Sovereign LPB'000 | Financial Services LPB'000 | Real Estate Development LPB'000 | Manufacturing LPB'000 | Trading LPB'000 | Services LPB'000 | Individuals LPB'000 | Others LPB'000 | Allowance For Collective Impairment LPB'000 | Total LPB'000 |
| Cash and Central Banks | 22,045,894,066 | - | - | - | - | - | - | - | - | 2,045,894,066 |
| Deposits with banks and financial institutions | - | 512,347,873 | - | - | - | - | - | - | - | 512,347,873 |
| Loans to banks and financial institutions | - | 128,560,551 | - | - | - | - | - | - | - | 128,560,551 |
| Loans and advances to customers | - | 128,144,349 | 374,227,957 | 129,911,734 | 125,182,453 | 399,156,966 | 373,583,596 | 25,482,319 | (10,234,649) | 1,545,454,725 |
| Loans and advances to related parties | - | 9,555 | 2,197,420 | - | 3,587,924 | - | 8,315,268 | - | - | 14,110,167 |
| Investment securities at fair value through profit or loss | 1,160,366,843 | 4,173,460 | - | - | - | - | - | - | - | 1,164,540,303 |
| Investment securities at amortized cost | 2,382,198,941 | - | - | - | - | - | - | - | - | 2,382,198,941 |
| | 5,588,459,850 | 773,235,788 | 376,425,377 | 129,911,734 | 128,770,377 | 399,156,966 | 381,898,864 | 25,482,319 | (10,234,649) | 7,793,106,626 |

# Exhibit M

**By Email to:**

Mr Abdulhameed Abdullah Mohammed Salih Aqrawi
Mr Nozad Hussein Jundi
Mr Raymond Samir Zina Rahmeh

**Copied to:**

Mr Sirwan Saber Mustafa Barzani
Kurdistan Street nr. 45
Pirmam, Erbil
Kurdistan
Republic of Iraq

Mr Sirwan Saber Mustafa Barzani
Erbil-Massief-Sallahaddin
Dar Althiafa-House Number 3
Erbil, Kurdistan
Republic of Iraq

International Holdings Limited
Unit 11, Level 3
Gate Village Building 10
Dubai International Financial Centre
Dubai, 507043
United Arab Emirates

19 November 2017

Dear Sirs

**Issue Requiring Urgent Action by the Directors of International Holdings Limited**
**Misconduct on the part of Mr Barzani**

We write further to our enclosed letter dated 1 November 2017, to which we have not received a response.

Unless we receive your confirmation, within 10 days of the date of this letter, that you intend to take the steps set out in paragraphs 18 and 19 of our previous letter, we reserve our rights to take appropriate action without further notice.

Yours sincerely

Deepak Jain
(on behalf of the directors appointed by IT Ltd)

Enc:    Letter dated 1 November 2017

# Exhibit N

**IRAQ TELECOM LIMITED**
**Office 11, Level 3, Gate Village 10, PO Box 507043, DIFC, Dubai, UAE**
-------------------------------------------------------------------------------------------------------

Sirwan Saber Mustafa
Kurdistan Street nr. 45
Pirmam
Erbil, Kurdistan
Republic of Iraq

Sirwan Saber Mustafa
Erbil-Massief-Sallahaddin
Dar Althiafa-House Number 3
Erbil, Kurdistan
Republic of Iraq

Korek International (Management) Ltd.
Close Brothers (Cayman) Limited
Box 1034
4th Floor Harbour Place
103 South Church Street
George Town
Grand Cayman KY1-1102
Cayman Island

18 January 2018

Dear Sirs,

**IH Shareholders' Agreement / Subscription Agreement**

1.   We refer to the shareholders' agreement dated 10 March 2011 and entered into between International Holdings Limited ("**International Holdings**"), Korek Telecom Company LLC ("**Korek**"), Mr. Sirwan Saber Mustafa ("**Mr. Mustafa**"), Korek International (Management) Ltd. ("**CS Ltd.**") and Iraq Telecom Limited ("**IT Ltd.**") (the "**IH Shareholders' Agreement**").[1]

2.   We also refer to the amended and restated subscription agreement relating to Korek dated 27 July 2011 and entered into between International Holdings, Korek, Mr. Mustafa, Mr. Jawshin Hassan Jawshin Barazany, Mr. Jiqsy Hamo Mustafa, CS Ltd., IT Ltd., Alcazar Capital Partners and Atlas Services Netherlands B.V. (the "**Subscription Agreement**").

3.   It has come to our attention that Mr. Mustafa and other shareholders and/or representatives of CS Ltd. hold substantial undisclosed interests in a number of Korek's key suppliers and service providers and have caused Korek to issue sizable purchase orders to such suppliers/service providers for their own personal benefit and to the detriment of Korek. Amongst other things, we have discovered that:

     (a)   Mr. Mustafa appears to be the beneficial owner of Darin Group, Korek's second largest supplier, which during the years 2011 through 2016 received purchase orders totalling at least USD 262.3 million;

     (b)   Mr. Mustafa and a number of CS Ltd.'s other shareholders (including Messrs Jiqsy Hamo Mustafa and Jawshin Hassan Jawshin Barazany) own K-Energy, which during the same period received purchase orders from Korek totalling at least USD 13.1 million; and

     (c)   Mr. Aso Ali, another of CS Ltd.'s shareholders, is the owner of Halabja Group, which received purchase orders from Korek totalling at least USD 105.3 million during that period.

---

[1]   Terms not otherwise defined herein shall have the meaning given to them in the IH Shareholders' Agreement.

1

**IRAQ TELECOM LIMITED**
**Office 11, Level 3, Gate Village 10, PO Box 507043, DIFC, Dubai, UAE**
----------------------------------------------------------------------------------------------------------

4.    We previously raised our concerns regarding such undisclosed interests in Korek's suppliers and service providers in correspondence with Messrs Aqrawi, Juni and Rahmeh (each appointed to the board of directors of International Holdings by CS Ltd.), and copied to Mr. Mustafa. However, neither our letter of 1 November 2017, nor our follow-up letter of 19 November 2017 received any response and no action was taken to address these concerns.

5.    Your actions (and omissions) are in clear breach of your obligations under the IH Shareholders' Agreement, including but not limited to the obligation to act in the Group's best interest pursuant to Clauses 3 and 4, CS Ltd.'s obligations under Clause 28, and Mr. Mustafa's obligations with respect to his position as a member of the IH Board and the KSC pursuant to Clauses 6 and 7. Furthermore, Mr. Mustafa's actions are also contrary to International Holdings' Articles of Association (including but not limited to Article 18(D)) and in breach of his duties under applicable law as Korek's statutory manager and as a director of International Holdings.

6.    We furthermore note that, pursuant to Clause 14.11 of the Subscription Agreement, Mr. Mustafa unconditionally and irrevocably guaranteed to IT Ltd. as a continuing obligation to procure that CS Ltd. would comply properly and punctually with its obligations under the IH Shareholders' Agreement.

7.    In light of the foregoing, we demand that you to confirm urgently, and in any event within **14 days** of the date of this letter:

   (a)    the exact nature and extent of Mr. Mustafa's, CS Ltd.'s and any of their respective affiliates' (including shareholders), representatives' and/or nominees' direct and indirect interests (whether legal, beneficial or otherwise) in Darin Group, K-Energy, DIL Technology, Halabja Group and any other party involved in any transaction or arrangement with Korek or any other entity within the Group; and

   (b)    the value of any benefit received directly or indirectly by them with respect to any such transactions or arrangements.

8.    We would be happy to schedule a telephone call or in-person meeting in Dubai, Paris or London to discuss the above matters further with a view to finding an amicable resolution to this dispute.

9.    In the meantime, IT Ltd.'s rights are hereby reserved, including in relation to any other instances of self-dealing, concealed and/or undisclosed interests and other wrongful conduct in relation thereto yet to be uncovered.

Yours faithfully,

_____
for and on behalf of
**Iraq Telecom Limited**

2

**IRAQ TELECOM LIMITED**
**Office 11, Level 3, Gate Village 10, PO Box 507043, DIFC, Dubai, UAE**
-------------------------------------------------------------------------------------------------------------

cc:   **Nawzad Junde**, English Village, Villa 203, Erbil, Kurdistan, Republic of Iraq

　　　**International Holdings Limited**, Unit 11, Level 3, Gate Village Building 10, Dubai
International Financial Centre, Dubai 507043, United Arab Emirates

　　　**Korek Telecom Company LLC**, Kurdistan Street nr. 45, Pirmam, Erbil, Kurdistan,
Republic of Iraq

K&E 102693606

| From: | TrackingUpdates@fedex.com |
|---|---|
| Sent: | 21 Jan 2018 10:55:15 +0000 |
| To: | Lona Miranda |
| Subject: | FedEx Shipment 425880404721 Notification |

# This shipment is scheduled to be sent on 01/21/2018.

## See "Preparing for Delivery" for helpful tips

## Tracking # 425880404721

**Anticipated ship date:**
**Sun, 1/21/2018**

Deepak Jain.
Agility Public Warehousing
Company
Sulaibiya Area,
KW



Initiated

**Scheduled delivery:**
**Wed, 1/24/2018 by 6:00 pm**

**KOREK INTERNATIONAL-MANG. LTD.**
CLOSE BROTHER
(CAYMAN)LIMITED.
103 SOUTH CHURCH ST.
GEORGE TOWN.
BOX1034 - 4TH FLOOR
HARBOUR PLACE.
GRAND CAYMAN, KY11102
KY

## Shipment Facts

| | |
|---|---|
| Tracking number: | 425880404721 |
| Reference: | ALCAZAR#2100672. |
| Service type: | FedEx International Priority |
| Packaging type: | FedEx Pak |
| Number of pieces: | 1 |
| Weight: | 0.50 kg. |
| Special handling/Services: | Deliver Weekday |

✉ Please do not respond to this message. This email was sent from an unattended mai box. This report was generated at approximately 4:54 AM CST on 01/21/2018.

All weights are estimated.

The shipment is scheduled for delivery on or before the scheduled delivery displayed above. FedEx does not determine money-back guarantee or delay claim requests based on the scheduled delivery. Please see the FedEx Service Guide for terms and conditions of service, including the FedEx Money-Back Guarantee, or contact your FedEx customer support representative.

To track the latest status of your shipment, click on the tracking number above.

© 2018 Federal Express Corporation. The content of this message is protected by copyright and trademark laws under U.S. and international law. Review our privacy policy. All rights reserved.

Thank you for your business.



Sign In

FedEx ® Tracking



## 425880404721

| | | |
|---|---|---|
| Ship date: | | Actual delivery: |
| **Sun 1/21/2018** | | **Wed 1/24/2018 3:49 pm** |
| SULAIBIYA AREA KW | **Delivered** | GRAND CAYMAN KY |
| | Signed for by: C.BODINGTON | |

### Travel History

| ▲ Date/Time | Activity | Location |
|---|---|---|
| — 1/24/2018 - Wednesday | | |
| 3:49 pm | Delivered | GRAND CAYMAN KY |

### Shipment Facts

| Tracking Number | 425880404721 | Service | FedEx International Priority |
|---|---|---|---|
| Shipper reference | ALCAZAR#2100672. | Special handling section | Deliver Weekday |

**OUR COMPANY**

About FedEx

Our Portfolio

Investor Relations

Careers

FedEx Blog

Corporate Responsibility

Newsroom

Contact Us

**MORE FROM FEDEX**

FedEx Compatible

Developer Resource Center

FedEx Cross Border

**LANGUAGE**

Change Country

English

Ask FedEx

**FOLLOW FEDEX**

| From: | TrackingUpdates@fedex.com |
|---|---|
| Sent: | 21 Jan 2018 11:10:20 +0000 |
| To: | Lona Miranda |
| Subject: | FedEx Shipment 425880404824 Notification |

# This shipment is scheduled to be sent on 01/21/2018.

See "Preparing for Delivery" for helpful tips

Tracking # 425880404824



**Anticipated ship date:**
Sun, 1/21/2018

Deepak Jain.
Agility Public Warehousing
Company
Sulaibiya Area,
KW

Initiated

**Scheduled delivery:**
Mon, 1/29/2018 by 8:00 pm

**MR. SIRWAN SABER MUSTAFA.**
ERBIL-MASSIEF-SALLAHADDIN
DAR ALTHIAFA-HOUSE
NUMBER 3.
ERBIL, KRDISTAN
ERBIL,
IQ

## Shipment Facts

| | |
|---|---|
| Tracking number: | 425880404824 |
| Reference: | ALCAZAR#2100672. |
| Service type: | FedEx International Priority |
| Packaging type: | FedEx Pak |
| Number of pieces: | 1 |
| Weight: | 0.50 kg. |
| Special handling/Services: | Deliver Weekday |

✉ Please do not respond to this message. This email was sent from an unattended mailbox. This report was generated at approximately 5:10 AM CST on 01/21/2018.

All weights are estimated.

The shipment is scheduled for delivery on or before the scheduled delivery displayed above. FedEx does not determine money-back guarantee or delay claim requests based on the scheduled delivery. Please see the FedEx Service Guide for terms and conditions of service, including the FedEx Money-Back Guarantee, or contact your FedEx customer support representative.

To track the latest status of your shipment, click on the tracking number above.

© 2018 Federal Express Corporation. The content of this message is protected by copyright and trademark laws under U.S. and international law. Review our **privacy policy**. All rights reserved.

Thank you for your business.



Sign In

FedEx ® Tracking



**425880404824**

| Ship date: | | | Actual delivery: |
|---|---|---|---|
| **Sun 1/21/2018** | | | **Wed 1/24/2018 11:30 am** |

SULAIBIYA AREA KW    **Delivered**    ERBIL IQ
Signed for by: SAYRWAN

## Travel History

| ▲ Date/Time | Activity | Location |
|---|---|---|
| − 1/24/2018 - Wednesday | | |
| 11 30 am | Delivered | ERBIL IQ |

## Shipment Facts

| Tracking Number | 425880404824 | Service | FedEx International Priority |
|---|---|---|---|
| Shipper reference | ALCAZAR#2100672. | Special handling section | Deliver Weekday |

**OUR COMPANY**

About FedEx

Our Portfolio

Investor Relations

Careers

FedEx Blog

Corporate Responsibility

Newsroom

Contact Us

**MORE FROM FEDEX**

FedEx Compatible

Developer Resource Center

FedEx Cross Border

**LANGUAGE**

Change Country

English

Ask FedEx

**FOLLOW FEDEX**

| | |
|---|---|
| **From:** | TrackingUpdates@fedex.com |
| **Sent:** | 21 Jan 2018 11:10:06 +0000 |
| **To:** | Lona Miranda |
| **Subject:** | FedEx Shipment 425880404802 Notification |

# This shipment is scheduled to be sent on 01/21/2018.

## See "Preparing for Delivery" for helpful tips

## Tracking # 425880404802



Anticipated ship date:
**Sun, 1/21/2018**

**Deepak Jain.**
Agility Public Warehousing
Company
Sulaibiya Area,
KW



**Initiated**

Scheduled delivery:
**Pending**

**MR. SIRWAN SABER
MUSTAFA.**
KURDISTAN STREET NR. 45.
PIRMAM ERBIL.
KURDISTAN,
IQ

## Shipment Facts

| | |
|---|---|
| Tracking number: | 425880404802 |
| Reference: | ALCAZAR#2100672. |
| Service type: | FedEx Priority Overnight |
| Packaging type: | FedEx Pak |
| Number of pieces: | 1 |
| Weight: | 0.50 kg. |
| Special handling/Services: | Deliver Weekday |

✉ Please do not respond to this message. This email was sent from an unattended mai box. This report was generated at approximately 5:10 AM CST on 01/21/2018.

All weights are estimated.

The shipment is scheduled for delivery on or before the scheduled delivery displayed above. FedEx does not determine money-back guarantee or delay claim requests based on the scheduled delivery. Please see the FedEx Service Guide for terms and conditions of service, including the FedEx Money-Back Guarantee, or contact your FedEx customer support representative.

To track the latest status of your shipment, click on the tracking number above.

© 2018 Federal Express Corporation. The content of this message is protected by copyright and trademark laws under U.S. and international law. Review our **privacy policy**. All rights reserved.

Thank you for your business.



Sign In

FedEx® Tracking



## 425880404802

| Ship date: | | Actual delivery: |
|---|---|---|
| **Sun 1/21/2018** | | **Wed 1/24/2018 11:30 am** |

SULAIBIYA AREA KW

**Delivered**
Signed for by: SAYRWAN

KURDISTAN IQ

### Travel History

| ▲ Date/Time | Activity | Location |
|---|---|---|
| − 1/24/2018 - Wednesday | | |
| 11 30 am | Delivered | KURDISTAN IQ |

### Shipment Facts

| Tracking Number | 425880404802 | Service | FedEx International Priority |
|---|---|---|---|
| Shipper reference | ALCAZAR#2100672. | Special handling section | Deliver Weekday |

**OUR COMPANY**

About FedEx

Our Portfolio

Investor Relations

Careers

FedEx Blog

Corporate Responsibility

Newsroom

Contact Us

**MORE FROM FEDEX**

FedEx Compatible

Developer Resource Center

FedEx Cross Border

**LANGUAGE**

Change Country

English

Ask FedEx

**FOLLOW FEDEX**