UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN RE:<br><br>EX PARTE APPLICATION OF IRAQ TELECOM LIMITED FOR AN EXPEDITED ORDER TO TAKE DISCOVERY PURSUANT TO 28 U.S.C § 1782<br><br>                            Applicant. | Case No. 18-mc-00458-LGS-OTW |

## DECLARATION OF KENNETH BEALE

1. My name is Kenneth Beale. I am a partner in the London, England office of Boies Schiller Flexner (UK) LLP. I am over the age of 18 and make this Declaration based on my own personal knowledge. I submit this Declaration in support of the Opposition filed by Intervenor Sirwan Saber Mustafa ("Mr. Mustafa") to Iraq Telecom Limited's Petition in the above-captioned case.

2. I specialize in the practice of international arbitration. I am admitted to practice as an attorney before the bar of the State of Maryland. I also am a Registered Foreign Lawyer in England and Wales. I received my law degree (juris doctorate) from the Yale Law School in 2002.

3. My firm represents Mr. Mustafa in the above-captioned case (the "Petition") commenced by Iraq Telecom Limited ("IT Limited" or the "Petitioner"). I and others at my firm also represent Mr. Mustafa and others as Respondents in other proceedings, as described further below. I am familiar with the information set forth in this Declaration either from personal knowledge or on the basis of documents I have reviewed.

4. The facts and matters testified are true to the best of my own knowledge and belief. This Declaration does not contain each and every fact within my knowledge regarding the topics discussed herein.

5. In this Declaration, I address:

    a. The background to the Parties' disputes;

1

    b. The current status of the Parties' disputes and the Petitioner's submissions as to urgency; and

    c. The approach to document discovery in international arbitration.

**Background to the Parties' Disputes**

6. The background to the Petition is complex. For the assistance of the Court I have summarized below the key parties and their relationship.

7. At the heart of the dispute is the ownership of Korek Telecom Company LLC ("Korek"), a major Iraqi incorporated telecommunications company. Korek was founded in 2000 by Mr. Mustafa and various other founding shareholders, whose interests are now represented through a company called Korek International (Management) Limited (incorporated in the Cayman Islands), which is usually referred to as "CS Limited" because it represented the interests of the "current shareholders" at the time of the 2011 Transaction (as such term is defined below).

8. In 2007, the Communications and Media Commission of Iraq (the "CMC"), which is the Iraqi telecommunications regulator, granted to Korek a National License (the "License") to provide telecommunications services throughout Iraq. The total cost of this License was US$1.25 billion. Prior to the involvement of IT Limited and the creation of the current ownership structure, Mr. Mustafa and the other Iraqi founding shareholders in Korek (whose interests are now represented by CS Limited) had already created a successful and developing business and had committed significant investments to Korek.

9. In order to meet instalment payments due to the CMC under the License, in September 2007 Korek obtained a convertible loan from Agility Public Warehousing Company KSC ("Agility"), a Kuwaiti Company that is now the majority shareholder in the Petitioner. Subsequently, significant additional funding was needed to grow Korek's business and to pay the remainder of the instalments due on the License. Korek and its shareholders therefore began looking for additional sources of funding. Korek also required technological assistance to develop into a modern telecommunications company.

10. In order to meet these financing and technical needs, Korek and its shareholders ultimately agreed to enter into a deal (the "2011 Transaction") with Agility and Orange S.A. (formerly France Telecom S.A.) ("Orange"), a French telecommunications company.

11. Agility and Orange together established the Petitioner, IT Limited, a company registered in the Dubai International Finance Center ("DIFC"), to manage their own joint venture relationship, which would, in turn, enter into a joint venture with the founding shareholders through the newly created vehicle International Holdings

Limited, another DIFC entity ("IH Limited"). The parties intended that IT Limited's involvement would enable the further development of Korek by, among other things, assisting it to meet its legal, financial, and technical obligations to the CMC. On 29 May 2011, the CMC gave its conditional consent to the proposed joint venture (the "CMC Consent").

12. As a result of the 2011 Transaction, the current ownership structure of Korek is as set out below:



13. Relations between the parties to the 2011 Transaction are governed by two key documents:

   a. a Shareholders' Agreement dated 10 March 2011 (the "SHA") (*see* Petition, Appendix E, Exhibit C to Declaration of Ehab Bassilios ("Bassilios Decl.")); and

   b. a Subscription Agreement, dated 10 March 2011 and subsequently amended and restated on 27 July 2011, pertaining to the terms and mechanics of the investment in the corporate structure (the "SSA") (*see* Bassilios Decl. Exhibit B).

14. Since the 2011 Transaction, relations between the investors in Korek have deteriorated. While I do not believe that this Declaration is the place to rehearse the different disputes that have arisen, two key events are relevant to this Petition, as set out below.

*The CMC Decision*

15. On 2 July 2014, the CMC issued a decision (the "CMC Decision," attached as Exhibit 1) informing Korek that the conditions to the CMC Consent had not been satisfied and that the CMC considered "*the partnership, desired between you and the foreign French company France Telecom/Agility, as void, null and invalid as the related suspensive conditions have not been met.*" Exhibit 1 at p. 1.

16. Among other things, the CMC identified (in a subsequent letter) that:

    "- *The foreign French company France Telecom/Agility did not provide extensive technical help as necessary to improve the quality, extent and coverage of services throughout Iraq.*

    *- The foreign French company France Telecom/Agility did not provide the necessary financing to enable Korek company to commit to settle the dues payable thereby, which constituted a threat to the license granted to the company.*

    *- Korek company did not expand and develop its services and network, and did not increase the number of dealers in an appropriate way in line with the results desired from partnership ...*"

    *Id.* at p. 6.

17. As a result, the CMC ordered Korek to "*reinstate the status as it was on 13/3/2011, take the procedures to revoke and terminate any contracts assigning shares in your company's capital that were concluded after 13/3/2011, prove this revocation in the legal entries with the companies registrar and provide our company with a new statement proving return of shares to their main owners.*" *Id.* at p. 1.

18. The CMC Decision has never been implemented. In the present Petition, IT Limited appears to insinuate – but does not produce evidence – that the CMC Decision may have been reached improperly. However, that decision has been upheld not just by the CMC Board of Appeal, but also by the Iraq Shura Administrative Court, and on 18 January 2018, by the Iraq Supreme Administrative Court, which is the final court of appeal for such matters in Iraq. The Decision of the Iraq Supreme Administrative Court is attached as Exhibit 2.

19. I understand that Agility, the majority shareholder of the Petitioner, has commenced proceedings before the International Centre for Settlement of Investment Disputes against the Republic of Iraq pursuant to the bilateral investment treaty between Kuwait and Iraq in connection with their indirect investment in Korek.

*The Call Option*

20. Under the SHA, CS Limited accorded to IT Limited a call option (the "Call Option") which, if properly exercised, permitted IT Limited to acquire a further 7% stake in IH Limited, thus giving it a majority stake in that entity. Pursuant to the terms of the License as amended (which is the basis of a dispute between IT Limited and CS Limited) any such transfer would require the approval of the CMC.

21. IT Limited purported to exercise the Call Option by a notice dated 5 November 2014. The validity of IT Limited's exercise of that Call Option is a matter of dispute between the parties. However, on any view, it is unlikely that approval for a transfer of a majority stake to IT Limited will be forthcoming from the CMC, given the CMC Decision, nor indeed has IT Limited ever sought such approval.

22. As a result of the above, IT Limited is faced with an adverse regulatory position for its investment. At the same time, the many economic and security challenges facing Iraq over the past years, combined with IT Limited's unwillingness to support Korek properly, have meant that the value of IT Limited's investment in Korek is likely to be far less than it had hoped.

23. In short, IT Limited is a party that, more than seven years after investing in Korek, appears to have concluded that it made a bad and unlucky investment and now hopes to force its contractual counterparties to indemnify it for its investment losses through a campaign of litigation.

**Current Status of the Parties' Disputes and the Petitioner's Submissions as to Urgency**

24. IT Limited's litigation strategy is illustrated by the history of the disputes between the parties to the 2011 Transaction. These began with IT Limited's attempts to raise claims in relation to its Call Option but have now sprawled into litigation concerning multiple aspects of the parties' relationship.

25. For the purposes of this Declaration, I shall confine myself to only addressing those proceedings that have been referenced by the Petitioner as the basis for its present Petition, although the scope of the parties' disputes is significantly wider.

26. The Petition is based on five separate commenced or contemplated proceedings, two of which I understand have been commenced in the DIFC, but have not yet been served. While my firm is not at present instructed to represent any of the parties in those two DIFC Court proceedings, I summarize below certain information that I am aware of concerning those proceedings. Those DIFC Court proceedings are:

    a. A claim issued by the Petitioner in the DIFC Courts, with claim number CFI-013-2018, against IH Limited, Mr. Abdulhameed Abdullah Mohammed Salih

       Aqrawi, Mr. Nozad Hussein Jundi, and Mr. Raymond Samir Zina Rahmeh (the "First DIFC Action").

   b. A further claim issued by the Petitioner in the DIFC Courts with claim number CFI-019-2018 against IH Limited and Mr. Rahmeh (the "Second DIFC Action")

27. In addition, I address the following proceedings in which my firm is instructed:

   a. An arbitration seated in Beirut and filed by the Petitioner under the arbitration rules (the "LAMC Rules") of the Lebanese Arbitration and Mediation Center (the "LAMC"), with case number 175/2018, against IBL Bank SAL, IH Limited and Korek (the "LAMC Arbitration"). The LAMC Rules are attached as Exhibit 3.

   b. An arbitration seated in the DIFC and filed by the Petitioner under the arbitration rules of the International Chamber of Commerce (the "ICC"), with claim number ICC 23685/AYZ against CS Limited and Mr. Mustafa (the "First ICC Arbitration"). The ICC Rules are attached as Exhibit 4.

   c. An ICC arbitration that is described as "contemplated" but which has not yet been commenced (the "Second ICC Arbitration"). If commenced, it would be brought against CS Limited and Mr. Mustafa.

28. The Petitioner argues that its Petition is urgent. Indeed, the Petitioner commenced it on 5 October 2018 on an *ex parte* basis.

29. Below I summarize the current status of these sets of proceedings set out above and explain why the Petition is not urgent.

*The First DIFC Action*

30. The First DIFC Action has four defendants: three individuals who are not present in the United Arab Emirates and one company, IH Limited, which is registered in the DIFC.

31. Pursuant to clause 28.4 of the SHA, if IT Limited brings any claim against Korek or IH Limited, CS Limited is entitled to conduct the defence of that claim. *See* Bassilios Decl. Exhibit C. To date, IT Limited has not notified CS Limited of service of any claim.

32. However, Mr. Lovett's Declaration indicates that IT Limited asserts that service of the First DIFC Action has been effected upon IH Limited. Lovett Decl. ¶ 24.

33. Even if IH Limited has been served, IT Limited accepts that the First DIFC Action cannot commence until the remaining defendants have been served, which can only be effected pursuant to the Riyadh Convention. Lovett Decl. ¶ 24. I understand that IT

6

    Limited has sought an extension of time to serve the claim form, but it is not clear from the declarations submitted by the Petitioner in support of the Petition whether that extension has been granted.

34. I therefore struggle to understand Ms. Tahler's statement at the Conference on 7 November 2018 that:

"*In the Dubai proceeding, your Honor, I note that there are certain deadlines coming up in that proceeding as well, again, under the same timetable of the end of December/beginning of January, where any discovery used here would be utilized*".

November 7, 2018 Hearing Tr. 7:19-23.

35. As far as I am aware, there are no such deadlines in the DIFC actions that IT Limited relies on as the basis for the Petition. At most, by the dates mentioned by Ms. Tahler, IT Limited may have effected service upon the defendants in the First DIFC Action. It will not have had to disclose documents or set out its detailed factual allegations.

36. It may be that Ms. Tahler had in mind an appeal hearing in a separate set of proceedings before the DIFC Courts with case number ARB 008/2017 (the "Injunction Proceedings"), which is provisionally expected to take place in December 2018 or January 2019. In the Injunction Proceedings, the Petitioner is seeking to appeal the DIFC Court's revocation of an *ex parte* injunction. While the Injunction Proceedings arise out of the same factual background as the proceedings which underlie the present Petition, they do not form part of those proceedings.

37. The Petitioner was originally granted such an injunction in the Injunction Proceedings on an *ex parte* basis on 12 October 2017. Following a return date hearing on 12 November 2017, His Excellency Justice Ali Al Madhani issued an Order on 29 July 2018 rejecting the Petitioner's arguments and discharging the injunction. The Petitioner has sought, and on 5 November 2018 obtained, permission to appeal that decision. While a hearing date for that appeal has not yet been fixed, at the permission to appeal hearing on 5 November 2018 the judge, Sir Richard Field, indicated that the appeal should be heard on an expedited basis.

*The Second DIFC Action*

38. The position as to the Second DIFC Action is similar to that in respect of the First DIFC Action:

    a. The claim was issued on 16 April 2018. It is unclear whether the claim form and particulars of claim have been served on IH Limited, although IT Limited states that they have been. Lovett Decl. ¶ 24.

7

    b. IT Limited accepts that the claim form and particulars of claim have not been served on Mr. Rahmeh and that proceedings have not yet commenced. Lovett Decl. ¶ 24.

*The LAMC Arbitration*

39. Pursuant to clause 28.4 of the SHA, CS Limited is entitled to conduct the defence of any claim brought against either IH Limited or Korek. On 14 November 2018, Boies Schiller Flexner (UK) LLP entered an appearance on behalf of IH Limited and Korek in respect of the LAMC Arbitration.

40. In his Declaration dated 18 September 2018, Mr. Abdel-Malek, IT Limited's counsel in the LAMC Arbitration, stated that once a party has initiated an arbitration under the LAMC Rules, "[t]*he proceedings then move apace*". Petition, Exhibit D, Declaration of Abdel-Malek ("Malek Decl.") ¶ 10. In fact, the current state of the timeline shows that, far from moving apace, the LAMC Arbitration is still at a very early stage:

    a. On 26 June 2018, the Claimant filed its Request for Arbitration.

    b. On 31 August 2018, the LAMC ruled that the case should be heard by a three-member Tribunal. I note that Mr. Abdel-Malek's Declaration, filed after this date, refers only to a singular arbitrator and does not address the more prolonged process associated with the appointment of the three-member Tribunal. Malek Decl. ¶¶ 8-10.

    c. On the same date, the LAMC extended the deadline for the parties to nominate their arbitrators until 8 October 2018.

    d. The deadline for the Respondents to jointly nominate their arbitrators and for IH Limited and Korek to submit an answer has now been extended until 19 December 2018.

41. Once the parties have nominated their arbitrators and those arbitrators have been confirmed by the LAMC, the next step will be the appointment of a Chair of the Tribunal. The Chair will be appointed by the LAMC, unless the parties agree otherwise. *See* LAMC Rules, Art. 2(4).

42. Following appointment of the Chair and constitution of the Tribunal, the Tribunal will agree its terms of reference, which should be done within two months of constitution of the Tribunal, *id*. Art. 13(2), and set a procedural timetable for further detailed submissions and (if appropriate) document production. The Request for Arbitration filed by the Petitioner in the LAMC Arbitration makes clear that it anticipates being afforded the opportunity to file further detailed submissions and supporting documents. Malek Decl. Exhibit A ¶ 52.

43. While the LAMC Rules provide that any award must be rendered within six months of the signing of the terms of reference, *see* LAMC rules Art. 18(1), this period can be extended by the LAMC. In a case of this magnitude, it would not be unusual for such an extension to occur.

44. In light of the above, I would anticipate that the Claimant will not be required to provide its substantive pleadings on the facts, together with supporting documents, for a number of months.

*The First ICC Arbitration*

45. Boies Schiller Flexner (UK) LLP represents CS Limited and Mr. Mustafa in relation to the First ICC Arbitration.

46. Ms. Bassi states in her Declaration of 27 September 2018, almost two months ago, that "*it is envisioned that Iraq Telecom's statement of case will be required to be filed within the next three months*". Petition, Exhibit C, Declaration of Rajider Bassi ("Bassi Decl.") ¶ 22. As I explain below, this has turned out to be incorrect.

47. The current timeline of the First ICC Arbitration proceeding is as follows:

    a. The ICC Secretariat acknowledged receipt of the Request for Arbitration in the First ICC Arbitration on 5 June 2018.

    b. On 10 September 2018, CS Limited and Mr. Mustafa submitted their Answer.

    c. On 30 September 2018, CS Limited and Mr. Mustafa nominated an arbitrator.

48. In the First ICC Arbitration, the Petitioner, without explanation, referenced certain allegations concerning the alleged relationship between Mr. Rahmeh and Al Bilad Islamic Bank for Investment and Finance PSC ("Al Bilad"). Bassi Decl. Exhibit A ¶ 81. Mr. Rahmeh and Al Bilad are not parties to the Breach of Duty RFA, and it is unclear how the proceedings in relation to the First ICC Arbitration could result in a determination of the rights or interests of either Mr. Rahmeh or Al Bilad (indeed, such relief is not sought in the First ICC Arbitration). The reason for the inclusion of these allegations is unclear, although it appears that they were mentioned for the purpose of summarizing claims that the Petitioner intends to bring in its Second ICC Arbitration, which has not yet been issued.

49. Since May 2018, Al Bilad has been subject to Office of Foreign Assets Control sanctions. As a result, on 21 September 2018 the ICC wrote to the parties requesting detailed information as to the involvement of Al Bilad.

50. Following a series of exchanges between the parties, the ICC stated that its bank had indicated that it would not be able to process payments in relation to the First ICC Arbitration, unless and until the Al Bilad situation is clarified. As a result, the ICC

noted it would not be able to take any further steps in the First ICC Arbitration until payment can be processed by the ICC's bank. Such further steps would include constitution of the Tribunal. The ICC requested the parties to provide any further comments by 30 October 2018 but no further comments have been forthcoming from the Petitioner.

51. As a result, no further steps have been taken, or will be taken, in respect of the First ICC Arbitration until the Petitioner takes steps to resolve the issues presented by its allegations in relation to Al Bilad.

52. If and when such issues are resolved, I would anticipate that the procedural timetable will be as follows:

   a. The party-nominated arbitrators will be confirmed by the ICC. From the date of their appointment, the party-nominated arbitrators will have 30 days to nominate a Chair of the Tribunal.

   b. The Tribunal will then be constituted by the ICC and the file will be transmitted to the Tribunal by the ICC.

   c. The Tribunal will have 30 days from the transmission of the file to draw up its Terms of Reference. *See* ICC Rules, Art. 23(2).

   d. At the same time as or shortly after drawing up its Terms of Reference, the Tribunal will set a procedural timetable for submission of the parties' detailed pleadings. In a case of this magnitude, I would expect that the Claimant would be granted at least three months to prepare its detailed statement of case and supporting documents. I also note that it is common practice in ICC arbitrations for parties to be permitted to produce additional documents where those documents are obtained after the date of the relevant party's submission of its detailed statement of case.

53. Therefore, on any view, even if the First ICC Arbitration were to move forward today (which at present is not possible due to the unresolved Al Bilad issue), it could be another six months before the Petitioner needed to rely upon any of the documents at issue in this Petition.

54. Lastly, while this is clearly not the place to engage in a detailed critique of the allegations made by the Petitioner, it is expected that the claimant in an arbitration will be able to articulate the basis for its claims. In particular, in ICC arbitration the Request for Arbitration should contain, among other things, "a description of the nature and circumstances of the dispute giving rise to the claims and of the basis upon which the claims are made." ICC Rules, Article 4(3)(c).

55. I would note that, in the present Petition, much of the Petitioner's description of its substantive case appears to consist of unsubstantiated speculation. To give one

example, the report of Mr. Bortman, the Petitioner's private investigator makes a number of assertions, allegedly with the backing of documentary evidence. However, it is not clear how documents attached to his report evidence the allegations made in the Petition. For instance, Mr. Bortman attaches a document regarding Mr. Mustafa's receipt of USD307 million from Korek. Petition, Exhibit F, Declaration of Bortman ("Raedas Decl.") ¶¶ 9-10. However, this payment was simply a repayment of a shareholder loan that was agreed by the Petitioner and contemplated as part of the mechanics of the 2011 Transaction. *See* Bassilios' Decl. Exhibit C, Schedule 8 ¶ 3.3(a)(i).

*The Second ICC Arbitration*

56. The Second ICC Arbitration has not yet been commenced.

57. Once it is commenced, given that it appears that the Petitioner intends to raise issues in relation to Al Bilad, this claim is likely to encounter similar issues to those in the First ICC Arbitration.

**The Approach to Document Discovery in International Arbitration**

58. As a US-qualified lawyer with over a decade experience in international arbitration, both in the US and in the UK, I am very familiar with the difference between US discovery, as available under 18 U.S.C. § 1782, and the much more limited document production that tends to prevail in international arbitration.

59. Most institutional rules of arbitration (including the ICC Rules) do not contain any express limitations on the availability of discovery. However, in practice there is a strong presumption in international arbitration that document production will be significantly more limited than US-style discovery – a product, in part, of the fact that international arbitration is a hybrid of common law and civil law practices (and in many civil law countries, discovery can be very limited).

60. Accordingly, in my experience it would be unusual for an arbitral tribunal to order broad US-style discovery. To the contrary, to the extent that discovery is permitted in an arbitration (and not every arbitration does include a document production phase), the parties are usually required to provide precise requests as to the specific documents or categories of documents they wish the other side to produce, with the arbitral tribunal ruling on any contested requests.

61. Indeed, a common practice in international arbitration is to limit document production by applying, or taking as a reference, the IBA Rules on the Taking of Evidence in International Arbitration. Article 3 of the IBA Rules requires that the parties must submit Requests to Produce containing either "a description of each requested Document sufficient to identify it" or "a description in sufficient detail (including subject matter) of a narrow and specific requested category of Documents that are reasonably believed to exist". Article 3 further requires that a Request to Produce must

explain "how the Documents requested are relevant to the case and material to its outcome".

62. In my experience, parties frequently consider the limited nature of document production in international arbitration to be an advantage. One of the most commonly-cited features that attract some parties to choose arbitration over litigation is its perceived efficiency and cost-effectiveness (as well as its neutrality and the ease of enforceability of arbitral awards). For this reason, the IBA Rules require the parties to consult at the earliest appropriate time to agree "an efficient, economical and fair process for the taking of evidence". US-style discovery could cause significant delay to the achievement of that goal, and it therefore often is disfavoured by both arbitral tribunals and parties to arbitration.

I, Kenneth Beale, hereby declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on 21 November 2018
London, England, U.K.

*Kenneth Beale*

Kenneth Beale