# PEARL PETROLEUM COMPAN...

Home   » Arbitration - Judgments   • Judgments   » Pearl Petroleum Company Limited & Others v The Kurdistan Regional Government of Iraq [2017] DIFC ARB 003

## Pearl Petroleum Company Limited & Others v The Kurdistan Regional Government of Iraq [2017] DIFC ARB 003

AUGUST 20, 2017   ARBITRATION - JUDGMENTS JUDGMENTS

**Claim No: ARB 003/2017**

**THE DUBAI INTERNATIONAL FINANCIAL CENTRE COURTS**

**In the name of His Highness Sheikh Mohammad Bin Rashid Al Maktoum, Ruler of Dubai**

**IN THE COURT OF FIRST INSTANCE**

**BEFORE JUSTICE SIR JEREMY COOKE**

BETWEEN

**(1) PEARL PETROLEUM COMPANY LIMITED**

**(2) DANA GAS PJSC**

**(3) CRESCENT PETROLEUM COMPANY INTERNATIONAL LIMITED**

Claimant

and

**THE KURDISTAN REGIONAL GOVERNMENT OF IRAQ**

Defendant

Hearing: **8-9 August 2017**

Counsel: Tom Montagu-Smith QC instructed by Gibson, Dunn & Crutcher LLP for the Claimant

Michael Black QC instructed by Addleshaw Goddard (Middle East) LLP for the Defendant

Judgment: **20 August 2017**

---

**JUDGMENT OF JUSTICE SIR JEREMY COOKE**

### Summary of Judgment

The Claimants are claimants in a continuing arbitration against the Defendant, the KRG. Three arbitration awards have been issued in favour of the Claimants against the KRG. The first was declaratory in nature but, of the sums awarded under the subsequent two awards, over USD 2 billion (bn), remains unpaid.

The KRG applied on 3 July 2017 to set aside the Order of this Court made *ex parte* on 29 May 2017 by which it recognised and, subject to its terms, enforced two arbitration awards made in London under the auspices of the LCIA and permitted alternative service of the order made and other documents on the KRG's London solicitors who had acted for them in the arbitration. The KRG further applied on 17 July 2017 to set aside these enforcement proceedings on the ground that the Court had no jurisdiction to make such orders.

There are two main issues which arise on the KRG's applications, namely its claim to sovereign or state immunity from these proceedings and its claim that service could only legitimately have been effected under the terms of the Riyadh Convention and not by the Court ordering alternative service.

<u>Background</u>

The Kurdistan Region of Iraq (the "KRI") is a constituent region of the Federal Republic of Iraq. The KRG is the governmental entity of the KRI.

On 4 April 2007, the parties entered into an agreement (the "Contract"). The Contract was initially entered into between the KRG and Dana. On 17 October 2007, Dana assigned a 50% interest in the Contract to Crescent and on 5 February 2009, Dana and Crescent each assigned their respective interests in the Contract to Pearl.

The Contract was governed by English law and provided for any disputes to go to mediation, or if that failed, arbitration under the LCIA rules in London, England. The 23rd bullet point of Annexure 2 to the Contract stated: "the KRG waives on its own behalf and that of the KRG any claim to immunity for itself and its assets". It is accepted that the second reference to the KRG in that bullet point must refer to the KRI.

<u>State or Sovereign Immunity</u>

It was held that the agreement of the parties that the issue of state or sovereign immunity is a question of procedural law in itself was sufficient to defeat the argument put by Counsel for the KRG that this Court should not decide issues of such immunity, whether as to its existence as a doctrine in the UAE and the DIFC, or its ambit or extent, (whether absolute or restrictive) or any issues of waiver. Like the enforcement of a judgment, the enforcement of an Award as a result of a waiver of immunity is based on consensual obligations undertaken in a commercial contractual context.

Whether or not an entity is to be recognised as a state may be a separate issue. Whether the UAE recognises another state may be a matter of its foreign policy. Where the issue is one of law, however, whether as to the exercise of sovereign powers by an entity or as to the nature of the entity as a constituent arm of the state, the issues fall to be decided by the judiciary. There can be no doubt about this when it comes to construing a waiver and when questions arise as to the extent of the waiver made. Here the contract is governed by English law, with any relevant rules customs or practices of International Law and it is a judicial function to determine the extent of any contractual waiver of any

alleged immunity from the Court's own jurisdiction. The proposition that the extent of the contractual waiver should be determined by any entity other than a court, when determining its own jurisdiction over a defendant is not tenable.

The submission that the issues which arise here were matters for the Executive or Legislature under Article 120 of the UAE Constitution because they concerned foreign affairs and questions of public policy (ordre public) or a matter for the UAE Supreme Court if there was any serious issue/ doubt under the Constitution as to the organ which should determine such questions, falls away once it is seen that waiver of immunity is a question to be determined by the judiciary as part of the contractual and procedural law of the DIFC. The nature of the task when construing a contractual waiver in accordance with the governing law of the contract, when combined with the KRG's acceptance of the doctrine as being a procedural matter, means that its argument that the Court has no jurisdiction to determine the issue of waiver under the Constitution of the UAE is bound to fail.

The judge came to the clear conclusion that the KRG had waived any right to such immunity, whether or not the KRI is a state or the KRG is to be considered an arm of the state, a constituent body of a state or an entity within a state which exercises various functions of a state.

It is clear that the KRG entered into an agreement to arbitrate in London under the auspices of the LCIA and that in agreeing to London as the seat of the Arbitration, it also agreed to the English Court as the supervisory court. It was inherent in that agreement that the KRG had waived any immunity from the exercise of the Court's supervisory powers under English law and its powers under section 66 of the English Arbitration Act. The judge further held that the width of the waiver provisions specifically referred to the assets of the KRG and, as is accepted, of the KRI also, and can only be taken therefore to include a waiver of immunity from execution as well as suit.

The KRG's argument that for waiver of immunity to be effective, it had to be made in the face of the court and refer specifically to the court and the matter in question was rejected on the ground that it was based on what was thought to be the position in England prior to the State Immunity Act of 1978. Moreover, the 2004 UN Convention on Jurisdictional Immunities of States and their Property, to which neither the UAE, nor Iraq or the FRI are party, represents current international thinking at the time of the Contract and now, provides that waiver of suit and execution can be effective in a written contract as well as a submission in the face of the court. Where a clear and unequivocal waiver from suit and enforcement has been given in a contract, there is no good reason why effect should not be given to the words used. Where the construction is governed by English law and any relevant rules, customs or practices of international law, the conclusion which the DIFC court should reach is clear. Effect must be given to the plain words.

Service

As regards KRG's contention that there was only one permissible way in which it could be served, namely in accordance with the Riyadh Convention, to which both the UAE and Iraq are party – the judge considered the key issue to be whether or not it is legitimate to order service by alternative means (or to dispense with service altogether as was suggested at the hearing) in the face of the provisions of the Riyadh Convention.

The judge took the view that there was nothing objectionable in the granting of the *ex parte* order for recognition of the Award since this is the procedure provided in Part 43 of the Rules of the DIFC Courts and there is authority in both England and Australia that this is justifiable where the debtor under the

Award is a state. The Court had jurisdiction to make the order *ex parte* but the order then had to be served so as to give the defendant the opportunity to apply to set it aside.

The clear intention of the alternative service provisions is to cater for the situation where a party is obstructing service and to do so whether the defendant in question resides in or outside the court's territorial jurisdiction.  Under English law, whereas only good reason is needed for an order for alternative service where the treaty in question is permissive as to the means of service, where the treaty is exclusive in setting out the means of service, the Court must find exceptional circumstances before it can make such an order.  Delay would not constitute such exceptional circumstances but the impossibility of service by the method prescribed by the treaty or the likelihood of obstruction of service by such a method would, in the judge's opinion, meet the criterion.

Whereas in England, treaties do not form part of English domestic law but constitute factors to be taken into account, the position is different in the DIFC. International conventions achieve the force of law in the UAE by ratification and are deemed to be part of the applicable domestic laws of the state, so that UAE judges must give effect to them.  Moreover, under Article 238 of the UAE Law of Civil Procedures, the terms of treaties between UAE and foreign countries and international conventions ratified by the UAE are applicable in law in connection with the enforcement and recognition of foreign arbitration awards.  By virtue of the terms of Article 5 of Federal Law No 8 of 2004, although the civil and commercial laws of the UAE are not applicable in the DIFC, it remains bound by the terms of the Treaties which form part of the law of the UAE.

If the DIFC is bound by the terms of treaties which form part of the law of the UAE, it is bound to adhere to the terms of the Riyadh Convention if it is mandatory in its terms in requiring service under Article 6. If that is the position there is no room for circumvention of its terms by alternative service under RDC 9.31 nor 43.11, nor for dispensing with service under RDC 9.34, whether there are exceptional circumstances or not. The Court cannot exercise any general power under RDC 9.1 nor any curative powers under RDC 4.51 in such circumstances. The terms of Article 6 are self- evidently mandatory in respect of the documents to which it refers.  "Legal and non-legal/ judicial and non- judicial documents…required to be served or notified / which are to be published or which are to be transmitted…shall be sent/dispatched" by the prescribed means.  There is no avoiding the mandatory requirement for such documents to be so served or notified if service/ notification is required on/to the KRG.

The Riyadh Convention requires such documents to be delivered, notified or served on the KRG by a prescribed method and there is no escaping that by the Court decreeing that service can be made by a different method in accordance with its own procedures. It is bound to adhere to the terms of the treaty for service, regardless of its own Rules for service.

It followed that the 29 May 2017 *ex parte* Order for alternative service must be set aside as it was incompatible with the treaty obligations of the UAE, which form part of the law of the DIFC and service of the Order for Recognition and Enforcement and of the Application for Disclosure must be set aside. The ex parte Order of the Court for Recognition and Enforcement would remain in place, subject to the issues of non- disclosure.

<u>Non-disclosure</u>

There were essentially 3 areas in which complaint was made against the Claimants in the context of their pursuit of the *ex parte* Order at issue, namely:

(i) failure to disclose the existence of a defence of sovereign or state immunity –  which was rejected as the Claimants did not anticipate that such a defence would be run and had informed the Court in witness statements and/or oral submissions that there was no such defence available because first, the doctrine did not apply in the DIFC and secondly, even if it did, it had clearly been waived;

(ii) failure to disclose the mandatory nature of the Riyadh Convention – the argument on this point turned on the application of the treaty provisions as a matter of the domestic law of the UAE, Dubai and hence the DIFC. The full width of the argument was not readily to be anticipated and there was no culpable conduct on the part of the Claimants in failing to put it before the Court as a point which might be taken against them;

(iii) failure to inform the Court of the need for service to conform to the law of Iraq – there had been nothing untoward in this since the whole basis of the Claimant's argument was that service in Iraq was not practicable under the Riyadh Convention (which was recognised as a means of service) because of Article 10 of the Riyadh Convention. That provision allowed requests for publication or notification to be denied where the contracting party receiving such a request considered that it may be detrimental to its sovereignty or public order. Alternative service appeared to be a permissible method for the Court to order which meant that service in Iraq was not required at all and that service in England on the English solicitors instructed in the Arbitration, by a method permitted in English law, should be ordered.

It is unrealistic to expect a claimant to anticipate in full every argument that may be put by a defendant when it comes before the court on an *ex parte* basis. Whilst the Court now sees the position differently in the light of the material made available to it, that is the result of the *inter partes* hearing. As the order for alternative service is being set aside, the non-disclosure points add nothing to the argument in any event.

In conclusion, the Order for enforcement and recognition stands but remains to be validly served in accordance with the Riyadh Convention.  The *ex parte* orders for alternative service of that Order and the Application for Disclosure must be set aside.

### *This summary is not part of the Judgment and should not be cited as such*

**JUDGMENT**

**Introduction**

1.The Court is here concerned with three applications and with part of a fourth application.

(a) The Defendant (the "**KRG**") applied on 3 July 2017 to set aside the Order of this Court made ex parte on 29 May 2017 by which it recognised and, subject to its terms, enforced two arbitration awards made in London under the auspices of the LCIA and permitted alternative service of the order made and other documents on the KRG's London solicitors who had acted for them in the arbitration. Provision was made for any application to be made to set aside the order within 28 days of service on those solicitors which was duly effected.

(b) The KRG applied on 17 July 2017 to set aside these enforcement proceedings on the ground that the Court had no jurisdiction to make such orders.

(c) The Claimants applied on 15 June 2017 for an order that the KRG give disclosure of its worldwide assets and then served that application on the KRG's London solicitors.

(d) The KRG had applied on 6 July 2017 for a stay of the Claimant's application for disclosure until both of its own applications or, at that stage potential applications, had been determined and for an order that service of the Claimants' application be set aside on much the same grounds as its previous application.

(e) On 11 July 2017, the Court ordered that all the applications and prospective applications be heard together, so that only the latter element of the 6 July application is still to be resolved.

2. The Claimants are claimants in a continuing arbitration against the KRG, which is represented in the arbitration by the Minister of Natural Resources of the Government of Iraq, with the London office of the international law firm Wilmer Cutler, Pickering, Hale and Dorr instructed with a team of English Counsel. The Claimants were represented by Freshfields, 3 Crowns Inc and a team of English Counsel also. The Tribunal consisted of Mr John Beechey, Lord Collins of Mapesbury and Lord Hoffman as the presiding arbitrator.

3. Three arbitration awards have been issued in favour of the Claimants against the KRG. The first (the "**First PFA**") was declaratory in nature but, of the sums awarded under the subsequent two awards, over USD 2bn, remains unpaid. An unquantified liability has also been established which remains to be determined by the Tribunal in September 2017, subject to issues of causation, but which the Claimants assess at a figure between USD 26.5bn and USD 39.8bn, depending on what payments are made by the KRG before then and various assumptions in relation to the extent of delay and disruption allegedly caused by the KRG's actions. The Claimants are seeking to enforce the two monetary awards (the "**Second PFA**" and the "**Third PFA**" respectively) in England and in the District Court of Columbia, as well as in the DIFC. Those other enforcement proceedings have not advanced very far yet because of difficulties in effecting service or delay necessitated by the need for service through diplomatic channels in the absence of agreement by the KRG to accept service through its appointed lawyers in the arbitration.

4. There are two main issues which arise on the KRG's applications, namely its claim to sovereign or state immunity from these proceedings and its claim that service could only legitimately have been effected under the terms of the Riyadh Convention and not by the Court ordering alternative service. Whilst a great deal of time, effort and print have gone into the applications, at rock bottom, these are the two issues on which the KRG applications depend. There is a limited dispute as to non-disclosure by the Claimants on making the ex parte application, but if the KRG is correct in its main submissions, the points do not matter and if it is incorrect, the points largely evaporate.

5. The parties suggested that the issues were of some public importance. As claims to state immunity or sovereign immunity should, as a matter of general principle, be heard in open court and as the underlying events are essentially in the public domain and no issues of confidence arise, I decided that the matters should be argued and determined in open court, despite these being applications relating to an arbitration.

**The Background**

6. The most convenient way of setting out the background to this matter is to recite most of the terms of paragraph 9 of the first Witness Statement of Cyrus Benson, a partner in the law firm of Gibson Dunn and Crutcher which acted for the Claimants in these enforcement proceedings (but did not act in the arbitration) ("**Benson 1**"). That background was, as he says, examined in detail by the Tribunal at a five-day hearing in April 2015 which led to the First PFA from which the following appears:

"(a) The Kurdistan Region of Iraq (the "**KRI**") is a constituent region of the Federal Republic of Iraq. It was established as such by the 2005 Iraq Constitution (Article 117 (First)), which was adopted following the Second Gulf War. The KRG is the governmental entity of the KRI.

(b) Crescent is the oldest privately-owned oil and gas company in the Middle East. Dana is the leading publicly listed natural gas company in the Middle East. Pearl is a special purpose vehicle which was incorporated to hold the benefit of the contract at the centre of these Proceedings. Pearl was originally owned 100% by Crescent and Dana and is now owned by a consortium of companies, including Crescent and Dana.

(c) On 4 April 2007, the parties entered into an agreement (the "**Contract**") governed by English law. The Contract was initially entered into between the KRG and Dana. On 17 October 2007, Dana assigned a 50% interest in the Contract to Crescent and on 5 February 2009, Dana and Crescent each assigned their respective interests in the Contract to Pearl.

(d) Under the Contract, the Claimants were granted, *inter alia*: (i) long term, exclusive rights to develop and produce "Petroleum" within the Khor Mor and Chemchemal fields in the KRI; and (ii) title to and the right to market and sell, including by way of export (if possible), the byproducts of gas production, namely condensate and liquefied petroleum gas ("**LPG**") (together, the "**Liquid Petroleum Products**" or "**LPP**"). The Claimants were obliged to pay for and construct gas production facilities at the Khor Mor gas field and a pipeline necessary to supply a certain quantity of gas, free of charge, to two power plants in the KRI (the "**Power Plants**"). The Claimants were also granted the title to and the right to market and sell, including by way of export (if possible), all "excess gas" (*e.* gas in excess of that required to be supplied to the Power Plants).

(e) Income from the sale of the Liquid Petroleum Products was to be applied in the following order: first, to provide the Claimants with a minimum remuneration fee; second, to reimburse the Claimants' costs of producing Petroleum ("**Petroleum Costs**"); third, to an agreed rate of return on the Petroleum Costs; and fourth, for the account of the KRG. To date, and despite fulfilling all their obligations under the Contract, the Claimants have yet to recover their Petroleum Costs from the KRG (second, above) let alone make any return on their investment (first and third, above).

(f) Owing to an ongoing political/constitutional dispute between the KRG and the Federal Government of Iraq in Baghdad (the "**FGI**") about which of the KRG or the FGI had the right to manage hydrocarbons situated within the KRI, the parties agreed to allocate the risk of export being prevented by KRG by providing for a guaranteed international price.

(g) This concern was addressed by an additional protection in bullet point [7] ("**BP [7]**") of Annexure 2 to the Contract, which provided as follows:

"In the event Dana is unable to export and market the LPGs, Condensates by any act or omission of government (including foreign neighbouring governments) and/or for political reasons beyond the control [of] Dana then the KRG shall purchase and lift (or arrange for the lifting by the domestic companies/users) and pay for the liquid petroleum products at international FOB Med market prices as quoted by Platts Oilgram Report or similar journals within 30 days from the month ends".

The KRG's obligations in this respect were supposed to be backed by a bank guarantee or letter of credit. In this way, the Claimants were to be guaranteed a regular income stream.

(h) Gas began to be delivered to the Power Plants in October 2008, at which point the production of condensate also began (production of LPG started in 2011). As the dispute between the KRG and the FGI had not been resolved, the Claimants were unable to export any Liquid Petroleum Products (which remains the case today).  Accordingly, shortly before the production of condensate began in 2008, the Claimants called upon the KRG to purchase and lift such condensate pursuant to the KRG's contractual obligation set out in paragraph (g) above.  From that point, save for discrete periods during which the KRG permitted the Claimants to make local sales, the Claimants have been making all of their sales of condensate (and, starting in 2011, LPG) to the KRG or in accordance with the KRG's instructions.

(i) In breach of its contractual obligations, except for the Claimants' first invoice (which the KRG settled in full), the KRG has made only sporadic payments for the Liquid Petroleum Products, and when it paid, it did so for only about 70% of the outstanding invoiced amounts.

(j) In May 2009, Crescent and Dana each sold a minority part of their respective shareholdings in Pearl to two major European energy companies. The KRG subsequently made a demand for part of the consideration received by Crescent and Dana from those transactions.  When Crescent and Dana refused, the KRG blocked their performance of the Contract and denied their rights thereunder.  While the Contract provided for "*full scale development*" of both the Khor Mor and Chemchemal fields, after May 2009, the KRG confined the Claimants' activities to the limited initial services at Khor Mor, physically evicting the Claimants at gunpoint from Chemchemal and preventing them from completing the appraisal work at either field, which was a necessary precursor to full scale development.  Despite the KRG's breaches, the Claimants have continued to perform their obligations under the Contract to the (limited) extent permitted by the KRG, namely, supplying free gas from Khor Mor to the Power Plants and producing the associated Liquid Petroleum Products."

7. Clause 15 of the Contract provided:

"The HoA/ Service Agreement/ RRC's as applicable , including any dispute arising in relation thereto, shall be governed by English Law (except any rule of English law which would refer the matter to another jurisdiction) together with any relevant rules, customs or practices of international law, as well as principles and practices generally accepted in the international petroleum industry."

8. Clause 16 of the Contract included the following:

"(a) If the Dispute is not settled by mediation within sixty (60) days of the appointment of the mediator, or such further period as the Parties to the Dispute may otherwise agree in writing, any party to the Dispute may refer the Dispute to, and seek final resolution by, arbitration under the LCIA Rules, which Rules shall be deemed to be incorporated by reference into this Article.

(b)  Any arbitration shall be conducted by three (3) arbitrators.

(c)  The KRG and Dana shall each nominate one (1) arbitrator.

(d)  In any event, the two arbitrators so nominated shall, in good faith, use all reasonable endeavours to agree on the nomination of the third arbitrator, who will chair the arbitral tribunal. In case of failure to appoint an arbitrator or to agree on the appointment of the third arbitrator, Rules of the LCIA shall apply.

(e)  Arbitration shall take place in London, England.  The language to be used in any prior negotiation, mediation and in the arbitration shall be English.  During the arbitration procedure and until the arbitral decision, neither entity shall act in a manner that may affect the rights of the other Party under these HoA/Service Agreement.  The arbitral award may include an award of specific performance and may be enforced by any court of competent jurisdiction, including the Kurdistan Region.  Any award shall be expressed in US Dollars.

(f)   The Parties agree that the arbitral award shall be final and not subject to any appeal."

9. The 23 bullet point of Annexure 2 to the Contract stated:

"the KRG waives on its own behalf and that of the KRG any claim to immunity for itself and its assets".

It is accepted that the second reference to the KRG in that bullet point must be refer to the KRI.

10. The history of the arbitration requires recitation also. Whilst parts of the following, which appear in Benson I were disputed, the essential facts are beyond argument:

"12. On 21 October 2013, the Claimants submitted a Request for Arbitration to the LCIA, nominating Mr John Beechey as arbitrator.  On 20 November 2013, the KRG submitted a Response and Counterclaim and nominated Lord Collins of Mapesbury as arbitrator.  Mr Beechey and Lord Collins nominated Lord Hoffmann as presiding arbitrator and on 27 January 2014 the Tribunal was constituted.

13. Following the Claimants' invocation of the dispute resolution procedures in the Contract, in July 2013 the KRG stopped making any payments whatsoever for Liquid Petroleum Products sold and delivered to it under the Contract. The Claimants' position is that, given they had substantial monthly running costs at the Khor Mor facility, the sudden cessation of all income caused them serious financial difficulties. On 21 March 2014, the Claimants applied to the Tribunal for interlocutory relief in the form of an order that the KRG resume paying for Liquid Petroleum Products pending the outcome of the Arbitration.

14. On 10 July 2014, the Tribunal issued an interim order requiring the KRG to continue to make payments for Liquid Petroleum Products at 70% of the applicable international price. The KRG failed or refused to comply with this interim order. On 23 July 2014, the Claimants applied to the Tribunal pursuant to section 41(5) of the English Arbitration Act 1996 for a peremptory order in the same terms.  In response, on 27 July 2014 the KRG applied to discharge the 10 July 2014 order. The Claimants' position is that the KRG's application was wholly without merit and was intended solely to delay the Claimants' application for a peremptory order. On 17 October 2014, following a hearing on 5 September 2014, the Tribunal made a peremptory order that the KRG pay the Claimants the sum of US$ 100 million, to be set off against its liability under the order of 10 July 2014.

15. The KRG did not comply with the Tribunal's peremptory order. The Claimants therefore made an application to the High Court of England and Wales under section 42 of the English Arbitration Act 1996. The Claimants' position is that the KRG's response to that application provides a further illustration of its tactic of delaying this dispute for as long as possible. Notwithstanding that it had instructed Wilmer Hale, London-based solicitors who had represented it at all stages of the London-seated Arbitration and the related High Court proceedings, the KRG refused to give Wilmer Hale permission to accept service of the Claimants' application for a peremptory order, thus obliging the

Claimants to serve that application in accordance with the slow and cumbersome provisions set out in section 12(1) of the English State Immunity Act 1978 and Rule 6.44 of the English Civil Procedure Rules (the "English CPR").......A four-day hearing took place before Mr Justice Burton in October 2015, at which the KRG was represented by Wilmer Hale as well as a barrister team from Essex Court Chambers.  On 20 November 2015, Mr Justice Burton ordered enforcement of the Tribunal's peremptory order, and ordered the KRG to pay the Claimants the sum of US$ 100 million within 14 days (subsequently extended to 26 February 2016 by further order of Mr Justice Burton dated 17 December 2015).  In making that order, Mr Justice Burton also dismissed the KRG's claim to state immunity [under the State Immunity Act of 1978].  The KRG subsequently applied for permission to appeal Mr Justice Burton's order; its application was dismissed by Lord Justice Briggs on 12 May 2016.  Lord Justice Briggs noted that it seemed "*clear that the peremptory order was necessary for the proper conduct of the arbitration.  It stopped the KRG from holding the claimants to ransom by cutting off one claimant from any payment for continuing supplies, threatening its insolvent collapse before the arbitration could be concluded*."  The KRG has so far paid only the sum of US$ 68,835,472 [with subsequent receipts, now  approximately US$ 82m] pursuant to the order of Mr Justice Burton—and only when forced to, after having exhausted every avenue of appeal available to it [by way of an agreement to pay in monthly instalments of approximately $8m].

16. As for the substantive Arbitration proceedings, the Claimants served their Statement of Case on 1 August 2014 and the KRG served a Defence and Counterclaim on 12 December 2014. One of the disputes between the parties, which those statements of case disclosed, was whether at any material time BP [7] of Annexure 2 to the Contract had been engaged, such that the KRG had been obliged to purchase and lift the Liquid Petroleum Products produced at Khor Mor and pay for those products at FOB Med market prices. The Claimants' case was that at all material times such provision had been engaged and they claimed the difference between the sums which the KRG had paid them in respect of the Liquid Petroleum Products produced under the Contract and the sums which they said the KRG was liable to pay them for such products in accordance with BP [7].  The KRG disputed that BP [7] had applied at any material time.

17. On 17 February 2015, the Tribunal issued a final list of preliminary issues arising from the parties' pleadings, to be tried at a five-day hearing commencing on 20 April 2015. Among those issues (which are set out in full at Appendix A to the First PFA) , were: "*Whether, and if so for what period or periods, the Claimants were "unable to export and market the LPFs [sic] Condensates by any act or omission of government (including foreign neighbouring governments) and/or for political reasons beyond the control [of] Dana" within the meaning of point 7 on page 10*" (issue (c)), and: "*What was the meaning of "at international FOB Med market prices as quoted by Platts Oilgram Report" in point 7 on page 10?*" (issue (d)).

18.Following the April 2015 hearing, at which the KRG was again represented by a large team from Wilmer Hale, led by Gary Born and Duncan Speller, and a counsel team from Essex Court Chambers including Graham Dunning QC and Anton Dudnikov, on 30 June 2015 the Tribunal issued its First PFA. The First PFA included the following rulings:

"(c) the Claimants have at all material times been unable to export and market the  LPGs and Condensate by reason of acts of government and/or political reasons beyond their control within the meaning of BP [7] of Annexure 2

(d)  for the period until the date of this award "international FOB Med market prices as quoted by Platts Oilgram Report" in the said BP [7] has meant (i) in respect of condensate, the prices quoted by

Platts for Kirkuk Crude at Ceyhan and (ii) in respect of LPG, the Mediterranean prices quoted by Platts for butane and propane on the assumption that the LPG consists of equal quantities by weight of the two liquids"

19. In light of the First PFA, on 20 July 2015 the Claimants applied to the Tribunal for an award of the amounts which the KRG owed in respect of Liquid Petroleum Products up to 30 June 2015 (*i.e.* the date of the First PFA). Following service of further evidence, a hearing took place on 21 September 2015. KRG was again represented at that hearing by a large team from Wilmer Hale and Essex Court Chambers.

20. Subsequently, on 27 November 2015 the Tribunal issued its Second PFA, in which it found that:

"...Pearl is entitled to payment for (a) the condensate and LPG lifted by or on behalf of the KRG between 2008 and September 2014 at prices calculated in accordance with BP [7] less the sums actually received by way of payments by or on behalf of the KRG and (b) the sums which should have been paid by the KRG for condensates and LPG sold by Pearl to third parties since September 2004 [sic], less the sums actually received upon these sales."

21. The Tribunal quantified Pearl's entitlement, in accordance with those findings, as US$ 1,981,951,322, and made an award on that basis as follows:

"We order that the KRG pay to Pearl within 28 days the sum of US$1,981,951,322 in respect of Pearl's claims under contracts for the sale of condensates and LPG made pursuant to BP [7] of the HoA until 30 June 2015, being USD$1,762,505,521 in respect of sales and deliveries to the KRG and US$219,445,801 in respect of sales to third parties."

22. On 20 January 2016 the Tribunal issued the Memorandum of Correction of the Second Partial Final Award. As the Memorandum of Correction explained, in awarding the sum set out in The Second PFA, the Tribunal had accidentally failed to carry into the operative part of the decision a deduction of US$ 18,581,002 which the Claimants had received from third parties and in respect of which they agreed that the KRG was entitled to credit. The Tribunal therefore ordered:

"that in paragraphs 90 and 105(a) of the Award, the figure US$1,963,370,320 shall be substituted for the figure US$1,981,951,322 and that this Memorandum shall become for all purposes part of the Award."

22. For the avoidance of doubt, the Second PFA which Pearl seeks that the Court recognise and enforce pursuant to Articles 42(1) and 43 of the Arbitration Law is thus the Second PFA as it stands corrected by the Memorandum of Correction. The KRG has not complied with The Second PFA in that it has not paid any part of the sum of US$ 1,963,370,320 which it is liable to pay Pearl under that Award. The KRG has, however (having been ordered to by the High Court of England and Wales and having exhausted all avenues of appeal), so far paid the sum of US$ 68,835,472 [with further payments since, as set out above] pursuant to the order of Mr Justice Burton dated 20 November 2015 (as varied by his order dated 17 December 2015). Since the KRG was ordered to pay that sum in respect of Liquid Petroleum Products, by way of an interim measure pending final determination of the Claimants' claims in that regard, the Claimants have treated it as partial satisfaction of the sum of US$ 1,963,370,320 which the KRG has now been found liable to pay in respect of Liquid Petroleum Products produced up to 30 June 2015.

23. On 22 December 2015, the KRG issued an arbitration claim form in the English High Court seeking to set aside the Second PFA under section 68 of the English Arbitration Act 1996. The KRG

alleged that the proceedings leading to the Second PFA were affected by serious irregularity causing substantial injustice on the basis that:

(a) the Tribunal failed to comply with its duty under section 33 of the Act as it did not give the KRG a fair hearing or a reasonable opportunity to put its case and deal with that of its opponents;

(b) the Tribunal exceeded its powers, including by granting Pearl amounts in addition to the amount actually claimed (*e.* characterising the clerical error described above as an instance of the Tribunal acting in excess of its powers, causing serious irregularity);

(c) the Tribunal failed to conduct the proceedings in accordance with the procedure agreed by the parties;

(d) the Tribunal did not deal with all of the issues that were put to it, including as regards the exclusion of late-served evidence and the KRG's request to adduce additional evidence (if, contrary to its primary position, the late served evidence was admitted); and/or

(e) there was uncertainty or ambiguity as to the effect of the Second PFA.

25. The KRG discontinued that claim almost a year later, just one month before the scheduled hearing, by notice of discontinuance served on 20 October 2016. [no explanation for this was forthcoming until very recently, when an inadequate explanation was proffered]. On 21 October 2016, at the insistence of the Claimants, the KRG undertook, in a letter from Wilmer Hale: "*neither to assert nor to rely on any of the grounds relied on as the basis of its s.68 application in any subsequent proceedings whatever relating to the award, whether in this jurisdiction or anywhere else in the world, and whether in relation to the enforcement of the award or otherwise in relation to the award, without the permission of the English Court*".

26. As to the remainder of the Arbitration, following the Second PFA, on 9 August 2016, afterservice by the parties of revised statements of case and evidence in support, the Tribunal ordered that there be a further hearing on all remaining questions of: (i) the liability of the KRG under the claims advanced by the Claimants; and (ii) the liability of the Claimants under the counterclaims advanced by the KRG.

27. That hearing took place over 10 days commencing on 5 September 2016. The KRG was once again represented by the large team of Wilmer Hale and counsel from Essex Court Chambers. On 21 October 2016, after conclusion of the hearing, the parties exchanged written closing submissions. On 30 January 2017 the Tribunal issued the Third PFA. The Tribunal corrected the Third PFA by way of the Third PFA Memorandum of Correction on 4 April 2017.

28. In the Third PFA (as corrected), the Tribunal made a further award in favour of Pearl in respect of Liquid Petroleum Products lifted by or on behalf of the KRG between 1 July 2015 (*i.e.* the end of the period covered by the Second PFA) and 31 March 2016, in the sum of US$ 121,095,282. The Tribunal awarded Pearl interest on sums owed by the KRG in respect of Liquid Petroleum Products, at LIBOR plus 2%, compounded monthly, both in relation to the sums awarded under the Third PFA (as corrected) and that awarded under the Second PFA (as corrected). The interest is accruing from the payment due dates for the Liquid Petroleum Products until the time when the KRG satisfies the Second PFA and the Third PFA.

29. The Third PFA also awarded Crescent and Dana the sum of US$ 1,654,000, plus simple interest at LIBOR plus 2%, in respect of their claim under a related agreement called the Strategic Alliance Protocol ("SAP") .The dispute under the SAP arose out of, or was related to or connected to the Contract, since the Contract was *a preliminary step in the context of the SAP".* Such dispute therefore fell within the definition of a "*Dispute*" within the Contract and was thus one in respect of which the arbitration agreement in clause 16 of the Contract applied. This was not disputed by the KRG. Finally, the Tribunal dismissed the KRG's counterclaims (which had been said to run to several billions of dollars, and which Wilmer Hale said "*far exceed[ed] the amounts claimed by the Claimants*") "*in its entirety*".

30. The KRG has not complied with the Third PFA: it has not paid any part of the sum of US$ 121,095,282, or the interest on both that sum and the sum of US$ 1,963,370,320 (less the sum received of US$ 68,835,472)[as updated by subsequent payments set out above] which it is liable to pay Pearl, or the sum of US$ 1,654,000 plus interest which it is liable to pay to Crescent and Dana.

31. The only remaining items in the Arbitration are for the Tribunal to quantify the damages that should be awarded to Pearl for certain of its additional claims that it has already successfully proven. The Tribunal needs to determine the amounts owed to Pearl for the KRG's delay or obstruction of the development of the Petroleum fields (estimated to amount to at least US$ 26.5 billion) and for the KRG's failure to reimburse Pearl for the payment of certain third-party invoices. In addition, the Tribunal will quantify the Arbitration costs and legal fees for which the KRG should reimburse the Claimants in relation to the Second PFA, and determine whether the KRG should bear the Claimants' costs and fees for the later stages of the Arbitration.

32. The Claimants have incurred very substantial costs in prosecuting their claims in the Arbitration and defending the KRG's (now dismissed) counterclaims. Up until the date of the Second PFA, the legal fees incurred by the Claimants were in the amount of US$ 17,444,355.39. I am informed by the Claimants that, since the Second PFA, they have since incurred additional legal costs in the amount of approximately US$ 13 million, bringing the total to date to over US$ 30 million."

11. The arguments advanced by the parties turned in part on the sources of the law of the DIFC and the nature of its jurisdiction. It is convenient to deal with that aspect first, before moving on to State Immunity and Service.

**The Basis and Sources of law in the DIFC**

12. It is clear that the basis of the law of the DIFC is statutory. Although the KRG rightly maintained that the DIFC courts are common law courts, the basis of the Courts' jurisdiction lies in the statutes of the UAE and Dubai. Underpinning all is the Constitution of the UAE which provides in Article 99 (inter alia) that the Federal Supreme Court of the UAE has jurisdiction to decide the constitutionality of other laws, if so requested by a court in the UAE, to interpret the constitution if so requested by any federal authority or the government of any Emirate and to decide, according to Federal law, on conflicts of jurisdiction between federal courts and local courts and between the courts of different Emirates. By Article 121, the UAE has exclusive legislative jurisdiction in relation to the regulation of the free financial zones and their establishment and the extent of their exclusion from the application of federal legislative provisions and by Article 151 the provisions of the Constitution are to prevail over the Constitutions of the member Emirates of the UAE and its federal laws are to prevail over the laws of the Emirates. In the event of any dispute as to such conflict, that dispute is to be determined by the Federal Supreme Court.  By Article 120 (inter alia) the UAE has exclusive legislative and executive jurisdiction in relation to foreign affairs.

13. Federal Law No. 10 of 1973 established the Federal Supreme Court and Articles 58 and 59 provided for issues of constitutionality and interpretation of treaties to be referred to it by other courts for decision, with a reasoned decision of that court, where (as interpreted) there is a serious issue of such a nature to be determined and the Court has made a reasoned determination in respect of it.

14. Federal Law No 8 of 2004 provided, by Article 3(2), that the Free Financial Zones and Financial Activities should be subject to all Federal laws, with the exception of Federal civil and commercial laws, but, by Article 5, the Free Zones were not to do anything which might lead to the contravention of any international agreements to which the State was party.

15. By the Judicial Authority Law, as it is known, (Law No 12 of 2004), the jurisdiction of the DIFC Courts was created and Article 5 set out the exclusive jurisdiction of the Court of First Instance (CFI) to hear and determine (inter alia) civil or commercial claims which fall within subparagraphs A(1) (a)-(e). Whilst subparagraph (a) refers to claims involving the DIFC and DIFC bodies of different kinds (a form of personal jurisdiction), the balance of the subparagraphs create subject matter jurisdiction and subparagraph (e) includes "*any claim or action over which the Courts have jurisdiction in accordance with DIFC laws and regulations*". The intervening subparagraphs refer to claims or actions by reference to subject matter which, in one way or another, relates to the DIFC. The basis of this Court's jurisdiction, can therefore be seen to be statutory and wholly dependent on these provisions.

16. For present purposes, the relevant provision is Article 5(A)(1)(e) of the Judicial Authority Law and the relevant DIFC law is the Arbitration Law, DIFC Law No 1 of 2008 (as amended) and in particular Part 4 thereof which deals with the Recognition and Enforcement of Awards. The Court's in personam jurisdiction, as opposed to subject matter jurisdiction, is invoked, in the ordinary way in common law jurisdictions, by service.

17. Under Article 8 of DIFC Law No 3 of 2004, the Law on the Application of Civil and Commercial Laws in the DIFC, there is provision as to the law to be applied in the DIFC, the objective of which, according to Article 7, is to provide certainty as to the rights and obligations of persons in civil and commercial matters arising in the DIFC and to allow persons to adopt the laws of another jurisdiction in relation to such matters. Article 8 is often said to include "waterfall" or "cascade" provisions, since it provides for a hierarchy for determining the applicable law. This Article was not relied on by the KRG but is of some relevance to the debate in which the KRG contended for the applicability of what it termed "common law" in the context of state immunity.  Article 8 provided, after referring to Article 3 of Federal Law No. 8 of 2004 (see above), that, as DIFC law can apply in the DIFC in relation to civil and commercial matters, "*the rights and liabilities between persons in any civil or commercial matter are to be determined according to the laws for the time being in force in the Jurisdiction chosen, in accordance paragraph 2*". Paragraph 2 then provided that "*the relevant jurisdiction is to be the one first ascertained under the following subparagraphs*" of which the first, subparagraph (a) is "*the DIFC Law or any other law in force in the DIFC*", failing which reference is to  be made to the following subparagraphs (b) – (e) which detail respectively the law of any jurisdiction which DIFC Law expressly chooses, the law chosen by the parties, the law with the closest connection to the dispute and finally, in subparagraph (e) the laws of England and Wales.

18. Whilst this Court is a common law court, there is no basis for incorporation of a body of substantive "common law", whatever that may mean, into the substantive law which falls to be applied in the DIFC. The KRG sought to argue for such a body of common law, including state immunity as recognised generally by common law courts throughout the world, to be treated as part of the law of the DIFC, because it was said to incorporate, in turn, customary international law in relation to state immunity. I can see no basis for any such contention as a matter of substantive law, given the nature of the

jurisdiction of the CFI as set out above. That jurisdiction is founded on statutory provision which requires the law of the DIFC to be first applied and only in absentia to move on to the cascading subparagraphs' provisions, of which the last is the law of England and Wales, which for reasons which are apparent, in the light of the decisions of the English Courts set out above (Burton J and Briggs LJ) on the absence of immunity of the KRG in the present case, does not assist the KRG. The KRG effectively wishes to stop the clock at a time prior to the English State Immunity Act of 1978, and to apply in the DIFC what it contended was the common law position at that time, which was said to reflect the common law position throughout the world and which is said to form part of DIFC law. This is untenable.  Whilst the law of the DIFC is interpreted in accordance with the methodology of the common law and proceeds incrementally, the courts have no power to create law by incorporating some external body of law for which there is no provision in Article 8 of DIFC Law No 3 of 2004. The DIFC creates its own precedents on the basis of the law to be applied under the provisions of the statutory framework.

19. It was further, rightly, said by the KRG, in reliance on Dubai Court of Cassation Case 87/2009 that international conventions that have achieved the force of law in the UAE by ratification are deemed to be part of the applicable domestic laws of the state and UAE judges must give effect to them. Equally under Article 238 of the Law of Civil Procedures, the terms of treaties between UAE and foreign countries and international conventions ratified by the UAE are applicable in law in connection with the enforcement and recognition of foreign arbitration awards in the UAE.  By virtue of the terms of Article 5 of Federal Law No 8 of 2004, referred to in paragraph 14 above, although the civil and commercial laws of the UAE are not applicable in DIFC, the DIFC remains bound by the terms of the Treaties which form part of the law of the UAE.

20. Where procedure is concerned, the DIFC Court has its own rules (the RDC) but on other matters of procedure, not governed by the rules, the Court is free to adopt the procedures it considers appropriate which are consonant with the law of DIFC and the overriding objective set out in paragraph 1.6 of the RDC. The terms of Article 8 of Law No 3 of 2008 have no application to such questions, as is clear from the decisions of the DIFC Court of Appeal in <u>Fidel v Felecia</u> CA-002-2015 at paragraph 55 and, more particularly, in <u>Protiviti Member Firm (Middle East) Ltd v Mohammed Bib Hamad Abdul-Karim Al- Mojil and another</u> CA-003-2016 at paragraphs 26- 35, when it considered how the principles of *forum non conveniens* might apply in the DIFC. In this latter case, the Court considered the operation of such principles in other common law jurisdictions and held that it was open to it to apply whatever *forum non conveniens* principles it considered to be most suitable. It was not bound to incorporate any particular "body of common law" principles, if such could be found.

21. Subject to the KRG's overriding contentions that:

(a) because the law of state immunity had to be the same in DIFC as in the UAE as a whole, issues of state immunity were matters for the UAE to determine and not for the courts of Dubai or the DIFC;

(b) that such matters were for the Executive or Legislature under Article 120 of the UAE Constitution;

(c) If there was doubt as to the organ responsible for such determination, the UAE Supreme Court had to decide where the responsibility lay;

the KRG's position as to the application of state immunity principles by the DIFC court appeared to change over the course of the hearing. From seeking to import a body of common law at the outset of the hearing, I understood that, by the end of the hearing, the KRG contended that the same situation applied to the doctrine of state immunity as to the application of the *forum conveniens*

doctrine, both of which, it is accepted by both parties, are matters of procedural, not substantive law. The Court was therefore, subject to the KRG's overriding contentions set out above, free to determine how the doctrine applied in the DIFC.

**State or Sovereign Immunity**

22. The agreement of the parties that the issue of state or sovereign immunity is a question of procedural law in itself is sufficient to defeat the argument put by Counsel for the KRG that this Court should not decide issues of such immunity, whether as to its existence as a doctrine in the UAE and the DIFC, or its ambit or extent, (whether absolute or restrictive) or any issues of waiver. It is for the Court to determine procedural issues and where waiver is concerned, it is for the Court to determine contractual rights. Like the enforcement of a judgment, the enforcement of an Award as a result of a waiver of immunity is based on consensual obligations undertaken in a commercial contractual context. The points made by HH Justice Sir Richard Field in <u>Barclays Bank PLC v Essar Global Fund</u> CFI-036-2016 at paragraphs 31-39 are pertinent in this respect, in relation to the nature and meaning of "foreign affairs", in relation to the terms of Article 120 of the Constitution, and in relation to the effect of Articles 39(2) and 7(3) of Federal Law 8 of 2004. Similarly, where clear conclusions can be reached on issues which might otherwise need referral to the Supreme Court, there is no need to make such a reference, whether on a constitutional issue or an issue of treaty interpretation (see paragraphs 40-42 of his judgment). The situation here is not parallel to that which prevailed in the Court of Final Appeal of the Hong Kong Special Administrative Region in <u>Democratic Republic of Congo and others v FG Hemisphere Associates LLC</u> [2011] HK CFAR 395, where the Basic Law required all issues of "*acts of state such as defence and foreign affairs*" to be determined by the PRC and for certificates to be obtained from the Chief Executive after obtaining a certifying document from that government. It is noteworthy that, in even in that situation, the Hong Kong Court decided the issue of waiver of immunity.

23. Whether or not an entity is to be recognised as a state may be a separate issue, upon which Certificates from the Executive were historically taken in the UK. Whether the UAE recognises another state may be a matter of its foreign policy. Where the issue is one of law, however, whether as to the exercise of sovereign powers by an entity (and the application of the historic distinction between acts *jure gestionis* and acts *jure imperii*) or as to the nature of the entity as a constituent arm of the state, the issues fall to be decided by the judiciary. There can be no doubt about this when it comes to construing a waiver and when questions arise as to the extent of the waiver made. Here the contract is governed by English law, with any relevant rules customs or practices of International Law and it is a judicial function to determine the extent of any contractual waiver of any alleged immunity from the Court's own jurisdiction. The proposition that the extent of the contractual waiver should be determined by any entity other than a court, when determining its own jurisdiction over a defendant is not tenable.  If the Court decides that there is, on the proper view of the contract and in accordance with its own procedural rules, a waiver of such immunity, it is hard to see how any public policy issues can arise and none were suggested here.

24. The submission that the issues which arise here were matters for the Executive or Legislature under Article 120 of the UAE Constitution because they concerned foreign affairs and questions of public policy (*ordre public*) or a matter for the UAE Supreme Court if there was any serious issue/ doubt under the Constitution as to the organ which should determine such questions, falls away once it is seen that waiver of immunity is a question to be determined by the judiciary as part of the contractual and procedural law of the DIFC.  The nature of the task when construing a contractual waiver in accordance with the governing law of the contract, when combined with the KRG's acceptance of the doctrine as

being a procedural matter, means that its argument that the court has no jurisdiction to determine the issue of waiver under the Constitution of the UAE is bound to fail.

25. I do not need to decide whether or not there is a recognition in the law of the UAE, of Dubai and of the DIFC that a sovereign state or an arm or constituent part of it is capable of asserting sovereign or state immunity because I have come to the clear conclusion that the KRG has waived any right to such immunity, whether or not the KRI is a state or the KRG is to be considered an arm of the state, a constituent body of a state or an entity within a state which exercises various functions of a state. It matters not for these purposes whether or not the KRG exercised sovereign functions in foreign relations or whether, in entering into the Contract, it was exercising powers given to it on its own behalf or on behalf of the Federal Government of Iraq. Nor do I need to characterise the sale and purchase arrangements or the Contract as a whole, whether or not there is any estoppel resulting from the decision of Burton J in that respect. The whole purpose of the waiver provisions was to avoid any such arguments and in my judgement, the provisions relied on by the Claimants succeed in doing so. No constitutional or public policy issues can arise about enforcement against the KRG and KRI under Articles 42 and 43 of the Arbitration Law where there is an effective waiver and there is nothing that could be referred to the UAE Supreme Court in that connection.

26. It is clear that the KRG entered into an agreement to arbitrate in London under the auspices of the LCIA and that in agreeing to London as the seat of the Arbitration, it also agreed to the English Court as the supervisory court. It was inherent in that agreement, in my judgment, that the KRG waived any immunity from the exercise of the Court's supervisory powers under English law and its powers under s 66 of the English Arbitration Act. Moore-Bick LJ in giving the judgment of the court in Svenska Petroleum Exploration AB v the Government of the Republic of Lithuania [2007] QB 886, at paragraph 117, stated that arbitration is a consensual procedure and that where a state has agreed to submit to arbitration, it has rendered itself amenable to such process as may be necessary to render the arbitration effective. Whilst this was said in relation to section 9 of the English State Immunity Act of 1978, the principle holds good in respect of any agreement to arbitrate. He went on to say that *"in our view, an application... for leave to enforce an award as a judgment is...one aspect of its recognition and as such is the final stage in rendering the arbitral procedure effective. Enforcement by execution on property belonging to the state is another matter, as section 13 makes clear".*  That is where the distinction lies as a matter of English law. In agreeing to arbitrate, a party agrees that the arbitration shall be effective in determining the rights of the parties. Recognition of the validity of an award goes no further than that. As applied to the stage reached here in the DIFC, the agreement to arbitrate is sufficient waiver to the orders for recognition under Article 42 of the Arbitration Law which are contained in paragraphs 1 and 2 of this Court's order of 29 May 2017, and (though less clearly) the orders for enforcement as a judgment under Article 43 as contained in paragraphs 3 and 4, since they do not deal with execution and actual enforcement on assets. As a matter of principle, I can see no reason for any difference between the position in England and here, even though the DIFC is not the seat of the Arbitration. Its procedures, as adopted thus far, are equally part of rendering the arbitration process effective, without execution.

27. The English Court of Appeal in that case recognised that immunity from execution fell into a different category from immunity from suit, as has been recognised historically by the common law courts in different jurisdictions. There is a distinction to be drawn between a state submitting to the jurisdiction of a court for adjudicative purposes and submitting to a court for the purposes of enforcement. Consequently, any clause enshrining a waiver of state or sovereign immunity must be examined to ascertain the extent of the waiver given.

28. Regardless of what is inherent in the agreement to arbitrate, here the KRG has specifically agreed to waive its rights to immunity in the Arbitration clause in the Contract and in Annexure 2. The matter has effectively been determined by the English courts as a matter of English law. As Burton J and Briggs LJ in the English courts said, the waivers given by the KRG in the Contract are "concise", "robust" and "general". The courts held that the waivers were sufficient to amount to a waiver of injunctive relief, which was the argument pursued before the English courts, which examined the issue. Reference was made to two authorities which were in point, A Company Ltd v Republic of X [1990] 2 Lloyds Law Rep 520 and Sabah Shipyard (Pakistan) v Pakistan [2002] EWCA Civ 1643 (CA). Both at first instance and in the application before the Court of Appeal, the conclusion was reached that the waivers encapsulated in the Arbitration clause and Annexure 2 are clear in providing a full waiver of immunity in relation to both suit and execution in *"any court of competent jurisdiction"*. The authorities establish that the court in question determines its own competence. In my judgment, there is no way of escaping the width of the waiver provisions, which specifically refer to the assets of the KRG and, as is accepted, of the KRI also, and can only be taken therefore to include a waiver of immunity from execution as well as suit. The argument before the English courts was only as to immunity from claims for an injunction not from suit or execution, although it appears that an attempt was made to reserve the position as to immunity from execution. Whether or not the KRG is issue estopped on the point, I am clear in my own mind that the waiver of any claim to immunity for itself and its assets must mean waiver of immunity from execution. The reference to assets is otherwise inexplicable. As a matter of construction, the two provisions amount to a full waiver of immunity.

29. The KRG advanced the argument that for a waiver of immunity to be effective, it had to be made in the face of the court and refer specifically to the court and the matter in question. I cannot accept this submission which was based on what was thought to be the position in England prior to the State Immunity Act of 1978, as the result of the decisions in Mighell v Sultan of Johore [1894]1 QB 149 (CA), Duff Development Co Ltd v Govt of Kelantan [1924] AC 797 (HL) and Kahan v Pakistan Federation [1951] 2 KB 1003 (CA). In NML Capital v Republic of Argentina [2011] 2 AC 495, Lord Collins, whose expertise in the area of conflicts of law is probably unrivalled, examined the position at common law prior to the passing of the State Immunity Act of 1978 at paragraphs 121- 126 of his judgment in the Supreme Court. He stated that the position in English law prior to the enactment of the 1978 Act was thought to be that a prior contractual submission to the jurisdiction of the court was ineffective to amount to a waiver of immunity and that nothing less than an appearance in the face of the court would suffice. He cited the 1894 decision and pointed out that only 2 members of the House of Lords approved of this in Duff (ibid), although the Court of Appeal in Kahan (ibid) relied on three of the speeches in Duff and held that there was no submission to the jurisdiction of the court in the absence of an undertaking given to the court at the time when the other party asked the court to exercise jurisdiction over it. He then referred to articles by Dr F.A. Mann (whose own expertise and reputation in the area were considerable) and Dr E.J. Cohn and pointed out that, from the 19 Century, civil law countries had accepted that a waiver of sovereign immunity by a contract was effective, that the speeches in Duff were obiter and did not constitute a majority and that both Duff and Kahan overlooked the fact that submission in the face of the court was not the only form of valid submission since the introduction of a new Rule in the RSC in 1920 that the English court had jurisdiction to entertain an action where there was a contractual submission. He pointed out that the principle enunciated in Kahan that a state could not submit to the jurisdiction by prior written agreement was reversed by section 2 of the 1978 Act which was consistent with international practice. In doing so, he referred to the US and European provisions and to Article 7(1) (b) of the 2004 UN Convention on Jurisdictional Immunities of States and their Property, which Lord Bingham had referred to in Jones v Saudi Arabia [2007] 1 AC 70 at paragraphs 8 and 26(d) as reflecting

current international thinking. Lord Collins' judgment on this point is referred to by Lady Fox in her book, The Law of State Immunity (3 Edition) at page 379 as the corrected view of the law prior to the 1978 Act.

30. If reference is made to what Counsel for the KRG also described as the embodiment of customary international law, namely the 2004 Convention (see Lord Bingham's comments to which I have just referred), Article 7 is clear in providing that *"a state cannot invoke immunity from jurisdiction in a proceeding before a court of another state with regard to a matter or case if it has expressly consented to the exercise of jurisdiction by the court with regard to the matter or case"* either *" (a) by international agreement; (b) in a written contract; or (c) by a declaration before the court or by a written communication in a specific proceeding."*

31. The terms of Articles 18 and 19 of that 2004 Convention relate to State Immunity from pre-judgment measures of constraint and post judgment measures of constraint. Each repeats the same formulation of the ways in which immunity may be waived, distinguishing between the equally valid methods of waiver in a prior written agreement and an acceptance of the jurisdiction of the court in the face of the court and the proceedings in question.

32. Thus, the Convention (to which neither the UAE, nor Iraq or the FRI are party), but which represents current international thinking at the time of the Contract and now, provides that waiver of suit and execution can be effective in a written contract as well as a submission in the face of the court.

33. The KRG relied on a decision by Court of Final Appeal of the Hong Kong Special Administrative Region in <u>Democratic Republic of Congo and others v FG Hemisphere Associates LLC</u> [2011] HK CFAR 395 where the Court followed <u>Mighell</u> in the context of the PRC rule of absolute immunity, rather than restrictive immunity which does not operate in respect of commercial transactions. At paragraphs 386-393, the Court cited the Judgments of the Court of Appeal in Mighell and the decision of the House of Lords in Duff and held that there was no implied waiver of immunity from suit in the agreement to arbitrate. The Court's own reasoning appears at paragraph 392 where it is said that the rationale of immunity remains the *par in parem* principle and that *"the common law rule as to waiver is consonant with elementary good sense by requiring an unequivocal submission to the jurisdiction of the forum state at the time when the forum's state's jurisdiction is invoked against the impleaded state. Courts would be ill-advised to attempt to deem an impleaded state to have submitted to their jurisdiction when it has not done so explicitly by its words or conduct and where its objection to such jurisdiction is made clear in the recognition proceedings. Such a course is likely to be damaging to the relations between the two states and many very well be ineffectual in any event."*

34. It is to be noted that the peculiarity of the HKSAR's position in relation to the PRC, its Basic Law and the express provision therein requiring reference of matters within the powers of the Central People's Government to the Standing Committee, together with the PRC doctrine of absolute immunity, form the context in which this decision was made. Moreover, the waiver of immunity contended for was an implied waiver, said to arise from the arbitration agreement itself where it was agreed that the Award was to be *"binding on the parties"* and included a provision that the parties undertook *"to carry out any Award without delay and should be deemed to have waived their right to any form or recourse insofar as such waiver can validly be made".* It was held that the agreement to carry out the Award could not be seen as a submission to the Hong Kong Court, whereas the waiver in the present case is express, in writing and clear and unequivocal in waiving immunity in any court of competent jurisdiction in respect of its and the KRI's assets.  The reasoning of the Hong Kong court could not apply to the waivers in the present case. Moreover, it does not appear that the <u>NML</u> decision was cited to the court with the comments of Lord

Collins (both decisions being given in 2011) and it is a safe inference that, had it been, the judgment would not have been in the terms expressed.

35. There never was justification for the perceived rule of English law enunciated in <u>Mighell</u> and <u>Kahan</u>, which clearly belongs to a bygone era. The corrected view of the common law position prior to the English Act of 1978 is as expressed by Lord Collins and not as expressed by the Hong Kong Court and the Mighell rule does not reflect current English law, common law, civil law in general nor customary international law at the time of the Contract or now. It therefore cannot reflect the procedural law of the DIFC which is not hidebound by an outdated and superseded rule of English procedural law which was, since 1920, founded on a mistake. Where a clear and unequivocal waiver from suit and enforcement has been given in a contract, there is no good reason why effect should not be given to the words used. Where the construction is governed by English law and any relevant rules, customs or practices of International law, the conclusion which the DIFC court should reach is clear. Effect must be given to the plain words and they cannot be rendered meaningless by the means that the KRG suggest. To accede to the submission of KRG here would be to render the wording meaningless. It would destroy the bargain that the parties had made and enable a state or state body to succeed on an argument that it had expressly agreed not to run.

36. Moreover, although the decision of Burton J was obiter on the point, Briggs LJ saw the waiver as one of two insuperable obstacles to the Defendant succeeding on appeal. Their view accords with my own in any event but, in my judgement, therefore, the decisions of the English Courts do create an issue estoppel against the Defendant in raising the argument that the waiver is insufficient where recognition, enforcement and execution are concerned.

37. In these circumstances, not only do I not need to decide whether the law of DIFC or that of the UAE includes the concept of State or Sovereign Immunity, which was hotly debated before me, but there is also a knock-on effect on other issues which were canvassed, such as issues of unconstitutionality, interpretation of treaties or conflict of treaty obligations, which fall away. This means that I can determine the primary issues between the parties without a judgment of inordinate length.

**Service**

38. Before dealing with the issue of service itself, it is convenient to set out the terms of Articles 42- 43 of the Arbitration Law of the DIFC. This Law provides:

> "**42. Recognition and enforcement of awards**
>
> (1) An arbitral award, irrespective of the State or jurisdiction in which it was made, shall be recognised as binding within the DIFC and, upon application in writing to the DIFC Court, shall be enforced subject to the provisions of this Article and of Articles 43 and 44. For the avoidance of doubt, where the UAE has entered into an applicable treaty for the mutual enforcement of judgments, orders or awards the DIFC Court shall comply with the terms of such treaty.
>
> (2) The party relying on an award or applying for its enforcement shall supply the original award or a duly certified copy thereof and the original Arbitration Agreement referred to in Article 12 or a duly certified copy thereof. If the award or the agreement is not made in English, the DIFC Court may request the party to supply a duly certified translation thereof.
>
> (3) For the purposes of the recognition or enforcement of any award within the DIFC, an original award or an original Arbitration Agreement shall be duly certified if it is a copy that is certified in the

manner required by the laws of the jurisdiction in the place of arbitration or elsewhere. A translation shall be duly certified if it has been certified as correct by an official or sworn translator in the place of arbitration or elsewhere.

(4) Awards issued by the DIFC Court may be enforced within the DIFC in the manner 19 DIFC ARBITRATION LAW prescribed in this Law and any rules of Court made for this purpose. Awards recognised by the DIFC Court may be enforced outside the DIFC in accordance with the Judicial Authority Law and recognition under this Law includes ratification for the purposes of Article 7 of the Judicial Authority Law.

### 43. Recognition

(1) Where, upon the application of a party for recognition of an arbitral award, the DIFC Court decides that the award shall be recognised, it shall issue an order to that effect.

(2) An order recognising an arbitral award shall be issued in English and Arabic unless the DIFC Court shall determine otherwise. Either language version, in its original or certified copy form, shall constitute sufficient proof of recognition."

39. Article 42 provides for the recognition and enforcement of arbitral awards, on application to the DIFC Court, regardless of the origin of the award in question and whether it is a New York Convention award or not. The provisions of Articles 42 and 43 are mandatory in providing that compliant awards "*shall be recognised as binding*" and "*shall be enforced*" in the circumstances set out. Article 42 provides also that where a treaty a for the mutual enforcement of judgements, orders or awards is applicable, the DIFC Court must comply with the terms of that treaty. The New York Convention is such a treaty to which the UAE is a party. The UAE is also a party to the Riyadh Convention.

40. The KRG's case was that there was only one permissible way in which it could be served, namely in accordance with the Riyadh Convention. The Riyadh Convention to which both Iraq and the UAE are party is a treaty to which a number of Arab / middle eastern states have subscribed for "judicial co-operation". It includes provisions for exchange of information between parties and by Article 3 assures the rights of litigants in the party states: "*Citizens of the contracting parties shall enjoy within the borders of each party the right of litigation before legal bodies to demand and defend their rights.*" The Article goes on to bar the requirement of security for exercising such rights and provides that the rights are given to all legal persons established or licensed in accordance with the laws of each of the contracting parties. In Article 6, provision is made for the service, transmission or notification of judicial and other documents or legal and non-legal documents, with differing translations being produced by the parties, with Counsel saying that neither translation exactly reflected the Arabic original.

41. This Convention also includes provisions for requests for evidence on commission, for recognition and enforcement of judgments in civil commercial, administrative and personal status actions and for extradition and execution of sentences against convicted persons in their own states. For present purposes, the recognition and enforcement provisions in civil and commercial matters are of some interest, although this Court is only concerned with the issue of service. By Article 25, each party state undertakes to recognise such judgments in other party states with the exception of judgments made against the government of the requested party or its employees in respect of acts taken on its behalf, as well as judgments where recognition or enforcement would be inconsistent with its international treaties.

42. The translation of Article 6 was the subject of some dispute but I set out below its terms as put forward by the KRG with material differences put forward by the Claimant set out in parenthesis:

"Legal and non- legal [Judicial and non-judicial] documents and papers relating [pertaining] to civil, commercial and administrative cases and cases of  personal status required to be served  or notified to [which are to be published or which are to be transmitted to] persons residing in one of the contracting states shall be sent [dispatched] directly by the authority or the competent legal office [from the judicial body or officer concerned] to the court which the person who is required to be served or notified resides in its jurisdiction area [to the court of the district in which the person to be notified resides]".

43. Article 8 goes on to provide for the enclosures to accompany the request for publication or notification and the information to be given when doing so.  Article 10, under the rubric *"Event of Rejecting to execute the Application for Service of Notice or Notification [Refusal to implement the request for publication or notification]"* provided, in the translation provided by the Claimants, which is no different in meaning apart from referring to a request for publication or notification, as opposed to an application for service of notice or notification (as per the different rubrics), but is more grammatical than that provided by the KRG:

"no request for the publication or notification may be denied in accordance with the provisions of this agreement except where the contracting party receiving such request considers that it may be detrimental to its sovereignty or public order therein."

44. This provision applies therefore, not just to the situation where the state itself is the requested subject of service or notification but generally where the requested subject is a person resident in the state in question. The relevant comparison for both Article 10 and Article 25 is found in the New York Convention in the provision which allows a putative recognising state to refuse recognition on the ground that enforcement of the Award would conflict with its public policy. The Claimants say that, given the track record of the KRG in stalling and obstructing the progress of the arbitration, there is not the slightest doubt that the KRG would purport to exercise rights under Article 10 and that the Courts in Erbil, to which any request would fall to be sent under the Riyadh Convention would therefore, under the KRG's influence and control, refuse to implement the request. Whilst this is denied by the KRG, in circumstances where I asked if an undertaking would be given not to stymie service by this means and Counsel could give none in court and none has been forthcoming since, this appears a fair inference in the light of past history. I am, for present purposes, prepared to proceed on the basis that this is the likely outcome of any request to the Erbil Court under Article 6.

45. There are therefore obvious drawbacks to the process from the standpoint of the Claimants who sought and obtained an ex parte order both for recognition and for alternative service of the order itself on this basis. When making the ex parte order I was informed that the DIFC had no equivalent to the English State Immunity Act and that there was thus no requirement to serve through diplomatic channels. I was referred to the Riyadh Convention and told that if documents were to be served under that Convention, they had to be sent to the court of the district in which the person to be notified resided. The view thus implicitly expressed was that service under the Convention was permissible but not mandatory. The key issue which arises here is whether or not it is legitimate to order service by alternative means (or to dispense with service altogether as was suggested at the hearing) in the face of the provisions of this Convention.

46. There is in my judgment, no objection to the granting of the ex parte order for recognition of the Award since this is the procedure provided in the RDC and there is authority in both England and Australia that this is justifiable where the debtor under the Award is a state. (see Gold Reserve Inc v Bolivarian Republic of Venezuela [2106] 1 WLR 2829 at paragraphs 56-58 and 64ff and Firebird Global Master Fund II Ltd v Republic of Nauru [2015] HCA 43 at paragraphs 211, 213 and 215-216). Under English and Australian rules of court, if the Court takes the view that state immunity is likely to be claimed then the Court will require an inter partes hearing rather than grant the order ex parte and the position is no different under the RDC. Where, as here, there is a clear waiver of any immunity, the Court is likely to take the view, as I did on the ex parte application, that such a claim to immunity was doomed to fail, regardless of the decision of Burton J that there was no entitlement to immunity as a matter of English law and the statement made to the court that there was no doctrine of State Immunity in the DIFC. In such circumstances I, perhaps optimistically, took the view that the point would not be taken and that the order should be made ex parte with the opportunity given to the KRG to challenge it on New York Convention grounds, even though the abandonment of the section 68 challenge in the UK and the undertakings given then would appear to mean that such a challenge in the DIFC would inevitably fail. That is how the procedure is intended and expected to work. The Court has jurisdiction to make the order ex parte but the order then has to be served in order to give the defendant the opportunity to apply to set it aside. On its own terms the order cannot be enforced until the expiry of the time permitted after service for such a challenge to be mounted and, if such a challenge is mounted, after the court has determined the validity of the challenge.

47. It is Section III of Part 9 of the RDC which sets out the rules for service of process outside the DIFC or Dubai. "*Given the international nature of the DIFC, permission to serve process outside the DIFC is not required*", as RDC 9.53 states, but "*it is the responsibility of the party serving process to ensure he complies with the rules regarding service of the place where he is seeking to effect service.*" Under RDC 9.54, "*where a claim form is to be served out of the DIFC or Dubai, it may be served by any method permitted by the law of the place in which it is to be served*" whilst under RDC 9.55, "*nothing in these Rules or in any Court order shall authorise or require any person to do anything in the place where the claim form is to be served which is against the law of that place.*"

48. General rules about service appear in Section 1 of Part 9 of the RDC. RDC 9.1 provides that the Rules in that Section apply to service of documents in the DIFC and Dubai except where any other enactment, a Rule in another part, or a Practice Direction makes a different provision, or where "*the Court orders otherwise*". Section 1 includes at RDC 9.31 a provision authorising alternative service in the following terms: "*where it appears to the Court that there is a good reason to authorise service by a method not permitted by these Rules, the Court may make an order permitting service by an alternative method.*" By RDC 9.34 and 9.35, the Court can dispense with service of a document altogether and can make such an order on application without notice to the other party.

49. The Rules relating to Arbitration Claims appear in RDC 43. RDC 43.11 provides that "*The court may exercise its powers under Rule 9.31 to permit service of an Arbitration Claim Form at the address of a party's legal representatives or other representative acting for him in the arbitration.*" There is, however, no need for an Arbitration Claim Form to be served at all if the Court follows the ex parte procedure for recognition or enforcement of an Arbitration Award under Articles 42(1) or 43 of the Arbitration Law, as set out in RDC 43.61-75. This procedure, like its equivalent in England requires service of the ex parte order and RDC 43.69 caters for this by providing for service outside Dubai "*without permission and in accordance with Section III of Part 9 of the RDC as if the Order were an Arbitration Claim Form.*"

50. The KRG contends that the provisions for alternative service are not available where service is to take place outside the DIFC or Dubai because Rule 9.31 and 9.35 (if relevant) are to be found in Section I of RDC 9 and not in Section III, which is the section relating to service outside DIFC and Dubai. Such an argument, based on the Rules cannot succeed in the light of the directly comparable position under the English CPR and the decision of the Supreme Court in Abela v Baadarani [2013] UKSC 44, where a similar argument was run, based on the different Sections of CPR 6 which made provision for service inside and outside the jurisdiction and in the light of the general power given to the Court by RDC 9.1 to "order otherwise". The clear intention of the alternative service provisions is to cater for the situation where a party is obstructing service and to do so whether the defendant in question resides in or outside the court's territorial jurisdiction. The Abela decision has been applied on numerous occasions in England to defendants outside the jurisdiction and has been applied where there are treaty provisions between the relevant states which make provision for service of process of the courts of one party state in the territory of another.

51. The effect of those decisions where there are treaty provisions of this kind is conveniently summarised in a judgment of David Foxton QC, sitting as a deputy judge in England in Marashen Ltd v Kenvett Ltd and another [2017] EWHC 1706. Reference should be made to paragraphs 37-59 of his judgment in which he explored the effect of Abela (ibid) and succeeding decisions in stating the criteria to be applied by the English Court in deciding whether or not to order alternative service in the face of treaties which made provision for service on the relevant foreign entity. At paragraph 57 he succinctly set out the current state of English law on the topic in these words:

> "57. In my judgment, the current state of the law is as set out in the decisions of Mr Justice Cooke in Deutsche Bank AG v. Sebastian Holdings Inc. and Mr Justice Popplewell in Société Générale v. Goldas Kuyumculuk Sanayi and others [2017] EWHC 667 (Comm), and that in HSC [The Haugh Convention] cases, or cases in which there is a bilateral service treaty which is exclusive in its application:
>
> i) "exceptional circumstances", rather than merely good reason, must be shown before an order for alternative service other than in accordance with the terms of the treaty can be used; and
>
> ii) mere delay or expense in serving in accordance with the treaty cannot, without more, constitute such "exceptional circumstances". I say "without more" because delay might be the cause of some other form of litigation prejudice, or be of such exceptional length as to be incompatible with the due administration of justice."

52. Whereas only good reason is needed for an order for alternative service where the treaty in question is permissive as to the means of service, where the treaty is exclusive in setting out the means of service, the Court must find exceptional circumstances before it can make such an order. Delay would not constitute such exceptional circumstances but the impossibility of service by the method prescribed by the treaty or the likelihood of obstruction of service by such a method would, in my judgement, meet the criterion. The Claimants say that is the position in the present case and that there are therefore exceptional circumstances here. I accept that submission of exceptional circumstances on the basis of the information set out in Benson 1 paragraphs 40-63, and in his later statements ("**Benson 2**" paragraphs 35-44 49-63 and 70-77 and "**Benson 3**" paragraphs 22-25 and 55-91).

53. The Claimants made a number of points in relation to service: first, they said that the Riyadh Convention was permissive in providing for service or notification by the means set out, not mandatory; secondly, they said that if it was mandatory it did not set out the documents which had to be served or

notified in the prescribed manner, which was a matter for the DIFC Court; thirdly, and as an overriding point, if the KRG was not immune from suit, there had to be some way to enforce the Awards and the KRG could not be allowed to stymie service or notification under the Riyadh Convention by effectively claiming sovereign immunity unjustifiably.

54. The Claimants argued that the terms of Article 6 did not mean that there was only one means of service on the KRG. Regardless of differences in translation, the Claimants said that the true position was that the Article did not prescribe what documents had to be served on the resident of the Convention party state. It prescribed the means of service of those documents which had to be so served whilst the Court was free to use its own Rules to authorise service of documents on the KRG in any way it chose, whether in Iraq or elsewhere, including in particular the means which were to be adopted and which were ordered in the ex parte order, namely service on the lawyers in London acting for the KRG in the arbitration under the terms of RDC 9.31 and /or 43.11 and/or 43.69. The Court could apply the principles set out in the English authorities to which I have referred, stemming from <u>Abela</u>, and use its general powers to achieve a just result which would result in effective service which could lead to potential enforcement. I regret that I cannot accept this submission.

55. There is one difference between the position in England and the DIFC, which is to my mind critical in the present case. In England, treaties do not form part of English domestic law but constitute factors to be taken into account. As previously set out in this judgment the position is different in the DIFC. International conventions achieve the force of law in the UAE by ratification and are deemed to be part of the applicable domestic laws of the state, so that UAE judges must give effect to them. Moreover, under Article 238 of the UAE Law of Civil Procedures, the terms of treaties between UAE and foreign countries and international conventions ratified by the UAE are applicable in law in connection with the enforcement and recognition of foreign arbitration awards.  By virtue of the terms of Article 5 of Federal Law No 8 of 2004, although the civil and commercial laws of the UAE are not applicable in the DIFC, it remains bound by the terms of the Treaties which form part of the law of the UAE.

56. Under the express terms of Article 42, the DIFC must comply with the terms of an applicable treaty for the mutual enforcement of judgements, orders and awards. The Riyadh Convention is a treaty for the mutual enforcement of judgements but in my view, it is not an applicable treaty for this purpose, since neither the Claimant, the DIFC Court nor the UAE is seeking to enforce a judgment in Iraq, at least at this stage. The Claimants and the DIFC Court are concerned only with the issue of service of the KRG and the application of the Riyadh Convention to that issue, not with the issue of enforcement per se in Iraq, whether of the Award or any DIFC judgment. I do not consider, therefore, that the terms of Article 42 add anything to the argument here, since the applicable provisions of the Riyadh Convention are those which relate to service not those which relate to enforcement of judgments.

57. If the DIFC is bound by the terms of treaties which form part of the law of the UAE, it is bound to adhere to the terms of the Riyadh Convention if it is mandatory in its terms in requiring service under Article 6. If that is the position there is no room for circumvention of its terms by alternative service under RDC 9.31 nor 43.11, nor for dispensing with service under RDC 9.34, whether there are exceptional circumstances or not. The Court cannot exercise any general power under RDC 9.1 nor any curative powers under RDC 4.51 in such circumstances.

58. If the effect is that service can by stymied lawfully under the terms of the Convention by the engagement of Article 10 by the KRG, as opposed to the Federal Republic of Iraq, which may depend on a number of factors relating to its status and possible questions of issue estoppel and the effect of other treaty obligations, or can be stymied in practice by questionable and unlawful means, that is the result of

the treaty obligation by which DIFC is bound and which it is bound to observe. The fact that the exercise of Article 10 powers or their purported exercise may give rise to a conflict with the rights of the citizen under Article 3 or a conflict between the UAE's obligations under the New York Convention to enforce an Award cannot affect the question whether or not the Court can order a means of service which is not in accordance with the sole means of service prescribed by Article 6.

59. The terms of Article 6 are self- evidently mandatory in respect of the documents to which it refers. "*Legal and non-legal/ judicial and non- judicial documents...required to be served or notified / which are to be published or which are to be transmitted...shall be sent/*dispatched" by the prescribed means. There is no avoiding the mandatory requirement for such documents to be so served or notified if service/ notification is required on/to the KRG. As Counsel for the KRG pointed out, whatever the translation difficulties with Article 6, the ex parte Order was a document which, one way or another, had to be served on the KRG in order to effective. The same must apply to the inter partes application for disclosure of assets. Whatever else may be included in the expression "*non-legal*"" or "*non-judicial*" documents and papers "*pertaining*" or "*relating*" to commercial cases, and whatever notional or practical difficulties might arise in relation to the need for service or delivery of all such documents relating to the proceedings on the KRG (correspondence etc), the Order and the inter partes application, as a matter of DIFC procedural law, had to be served on it and the Article provided that they "*shall be sent/dispatched*" by the "*authority or the competent legal officer /judicial body or officer concerned*" to the court of the district where the defendant resided. As such, the Riyadh Convention requires such documents to be delivered, notified or served on the KRG by a prescribed method and there is no escaping that by the Court decreeing that service can be made by a different method in accordance with its own procedures. It is bound to adhere to the terms of the treaty for service, regardless of its own Rules for service.

60. In these circumstances, the Order for alternative service must be set aside as incompatible with the treaty obligations of the UAE, which form part of the law of the DIFC and service of the Order for Recognition and Enforcement and of the Application for Disclosure must be set aside. The ex parte Order of the Court for Recognition and Enforcement would remain in place, subject to the issues of non-disclosure which I now proceed to determine.

**Non-Disclosure**

61. The principles which apply to issues of non-disclosure on ex parte applications and freezing injunctions or similar applications are well known and I do not need to repeat them here. I was referred to the decision of Teare J in Gold Reserve Inc (ibid) at paragraphs 84-91 and the authorities referred to in his judgment in relation to the Court's approach to setting aside an order where there was no utility in doing so, even where the failure was egregious. Where an inter partes hearing has taken place which determines the substantive issues between the parties, requiring further service if I had been in favour of the Claimants on the issue of service by alternative means, would only have been productive of additional expense and delay without achieving any purpose. As I have decided in favour of the Claimants on the waiver of any sovereign or state immunity, that is a point which has now gone and had I determined that alternative service was permissible, the setting aside of the orders for non- disclosure would lack any utility.

62. As I was the judge who granted the ex parte order I am also in a good position to know what did and did not affect my decision in any event and what difference any disclosure of the alleged elements of non- disclosure would have made. There are essentially 3 areas of which complaint is made, namely: failure to disclose the existence of a defence of sovereign or state immunity; failure to disclose the

mandatory nature of the Riyadh Convention; and failure to inform the court of the need for service to conform to the law of Iraq.

63. The failure to disclose the existence of a defence of sovereign or state immunity: I reject this because the Claimants did not anticipate that such a defence would be run. They informed the Court in witness statements and/or oral submissions that there was no such defence available because first, the doctrine did not apply in the DIFC and secondly, even if it did, it had clearly been waived. The Claimants referred to the existence of the prior claim of the KRG in England to state immunity which was rejected by Burton J and to the likelihood of an unjustified assertion being made under Article 10 of the Riyadh Convention.

64. The issue of the existence of a doctrine of state immunity in the DIFC and the UAE remains unresolved as I have not needed to determine it.

(a) The Claimants' case on the point at the hearing was made by reference to a Dubai Court of Cassation decision (Central Bank of Sudan v Africa Alpha Capital 1 Co Ltd, Appeal no 480/2012 Commercial, where the defence was put forward that the court lacked jurisdiction under the Vienna and Riyadh Conventions because the Bank was a *"public venture forming a part of the government entities of the Republic of Sudan that enjoys immunity from judicial proceedings and is not subject to the jurisdiction of the State Courts"*.

(b) On the appeal, the Bank argued that it was not a separate entity from the state and that the amount claimed from it was a debt of the country of Sudan. It said it should be treated in the same way as a state and relied on Article 25(c) of the Riyadh Convention, submitting that recognition of mutual judgments should not apply to judgements issued against the government of a contracting state. It relied on a decision of the Swiss Courts refusing attachment of its funds there on the basis of immunity of the assets of a central bank of a foreign state. The Court of Cassation rejected that defence of state immunity, founded, as it appeared to be, on the two conventions referred to, stating that the jurisdiction of the Dubai Courts includes all disputes save for those of a special nature as set out in Article 102 of the UAE Constitution and laws, decrees, bye-laws regulations, orders and instructions issued by the Ruler or His duly appointed delegee. The Court stated its duty to act in all other cases, save where the two conventions applied, which they did not in that case. The Court held that the Bank did not enjoy immunity from its creditors for its commercial and banking transactions with other banks.

(c) The Claimants also relied on four articles in support of the proposition that state immunity was not a part of the law of the UAE or DIFC.

(d) The statement that there was no such state immunity under the law of the DIFC was put forward without knowledge of any authority to the contrary on which the KRG might rely.

(e) At the hearing, the KRG contended that the Court of Cassation case was not concerned with the doctrine of state immunity, but solely concerned with the treaties referred to. It is plain however from a reading of the case that the Bank was looking to sustain a form of state immunity by reference to the two treaties. The Court held that, in the absence of applicable provisions in those treaties, it had to determine the liability of a central bank. If, as appears below, international law concepts of state immunity are taught as part of the education of lawyers in the UAE, had the doctrine been seen as even arguably that of the UAE, the point would have been argued differently. It was submitted by the KRG that the lawyers may have missed a trick, but at first blush, the statements of the court militate against any such applicable rule of law outside the specific terms of

the two conventions and it seems improbable that the existence of a wider argument was unknown to the lawyers or the Court.

(f) At the time of the hearing before me, the KRG was unable to muster any authority in its favour at all as to the application of the doctrine in its absolute or more modern restrictive form, other than part of a chapter of a 2009 textbook on the Civil Procedure Law written by Professor Turky. There he merely stated that *"the international law rules grant a judicial immunity to the international legal personalities (states, organisations and international bodies.) and to their respective members, (presidents, and diplomatic representatives) before the foreign judiciary, thus the jurisdiction of the foreign judiciary shall not include them."* He went on to refer only to the Vienna Convention on Diplomatic Relations and this part of the book appears only to be concerned with that, despite the earlier reference in the same sentence to the position of "*states, organisations and international bodies*". There is no citation of the Court of Cassation decision.

(g) The KRG argued that the doctrine had to exist as a matter of "common law" and/or "customary international law" which was incorporated into the law of the UAE, Dubai and the DIFC and that it was absurd to suggest that it did not, but no case or article other than that of Professor Turki was produced. Reference was made to Egyptian law (which has a restrictive doctrine of state immunity) which is sometimes a point of reference for courts but no attempt was made to show that its law on the point was applicable.

(h) Following the hearing the KRG produced copies of extracts from a textbook –*Al Waseet on Public International* Law – which, it was said, was used in teaching law students at the leading law school in Dubai to show that the concept would be known to UAE lawyers, a point not in issue. The book does not however state that the doctrine is part of UAE law nor state what UAE law is on the subject. It explained the range of the doctrine of state immunity and the relevant principles and theories known in Public International Law.

(i) In these circumstance, it would have been hard for the Claimants to disclose a defence, the basis of which was unknown to them. Had all the information been given to the Court at the ex parte hearing which became available to it before this judgment was written, with a copy of the parts of the textbook, that would not have changed the Court's view at the time, confirmed in this judgment, that there was an effective waiver and would have done no more than show that there was a possible available argument against the Claimant's statement that state immunity was not part of the law of the DIFC.

65. The failure to disclose the mandatory nature of the Riyadh Convention: There was specific mention of the Convention and of the Article 10 power and the likelihood of the KRG seeking to avail itself of that right. It is true that the Claimants failed to disclose that treaty law was part of the law of the DIFC and sought an order on the basis that the Convention was permissive and did not provide an exclusive means of service. The latter point was unclear from the translation which the Claimants had and produced to me and it was only when the point was fully argued with the benefit of further input on the language that the position, as I have now found it to be, emerged. The Claimants sought an order for alternative service on the basis of good reason, rather than exceptional circumstances, which had to be their case in the light of English authorities on service where a treaty made exclusive provision for service in the state in question, but I would have considered the circumstances exceptional in any event in the light of the evidence before me as to the likelihood of the KRG seeking to utilise Article 10 and the stifling, stalling and obstructive tactics adopted by the KRG in the arbitration and enforcement actions in the UK and the District of Columbia, as set out in the relevant witness statements before me at the time,

to which I have already referred.  In the event, as I have held, the argument on this point turned on the application of the treaty provisions as a matter of the domestic law of the UAE, Dubai and hence the DIFC. I do not consider that the full width of the argument was readily to be anticipated or that there was any culpable conduct on the part of the Claimants in failing to put it before the court as a point which might be taken against it.

66. The failure to inform the court of the need for service in Iraq to conform to the law of Iraq and to adduce any evidence to show that alternative service would so conform; Again I see nothing untoward in this since the whole basis of the Claimant's argument was that service in Iraq was not practicable under the Riyadh Convention (which was recognised as a means of service) because of Article 10, and that alternative service was a permissible method for the Court to order which meant that service in Iraq was not required at all and that service in England on the English solicitors instructed in the Arbitration, by a method permitted in English law, should be ordered.

67. It is unrealistic to expect a claimant to anticipate in full every argument that may be put by a defendant when it comes before the court on an ex parte basis. Whilst the court now sees the position differently in the light of the material made available to it, that is the result of the inter partes hearing. I can see nothing in the non- disclosures that ought to give rise to a different result from that in Gold Reserve if I had otherwise found in favour of the Claimants on service, because the matters were fully canvassed and to order further alternative service on London or DIFC lawyer would, in practice, have achieved nothing of value to any party. As the order for alternative service is being set aside, the non-disclosure points add nothing to the argument in any event.

**The Claimants' Application for disclosure**

68. In the light of my decision that the service of the Order for recognition/enforcement and service of the application for disclosure must be set aside, I do not need to determine this issue, but the test, as was common ground between the parties by the end of the hearing, requires only that the Claimants must show credible grounds on which an application for a freezing order might be based or produce credible material to show that an application for a freezing order could be made. The KRG maintained that the test was not satisfied in relation to the requirement for a freezing injunction that a claimant must show a real, not fanciful, risk of dissipation of assets on the part of the defendant with the result that a  judgment would remain unsatisfied.

69. The necessary requirements are conveniently set out at paragraph 33 in the judgment of Eder J in Elektromotive Group Ltd v Christopher Pan [2012] EWHC 2742 (QB) and in particular at subparagraph (i) in relation to the risk of dissipation of assets. Solid evidence of the risk must be shown and where there has been dishonesty on the part of the defendant, the court needs to examine it to see whether or not it justifies the inference that he is likely to dissipate assets if not injunction is granted.

70. Without descending into any detail on this, I am satisfied that the lower threshold for an application for disclosure, namely of credible grounds for making an application for a freezing injunction, is met. The evidence of Mr Benson in his 3 witness statements, to which I have referred, and the conduct of the KRG before and in the arbitration and in relation to the attempts of the Claimants to enforce the Awards reveal a defendant who is prepared to take whatever steps it can to avoid payment of sums due to the Claimants. Its disregard for its commercial bargains, the seizure of the Claimants assets and the attempts to starve them of money are apparent from the Awards. The actions taken in seizing a laptop belonging to a representative of the Claimants and using documents taken from it in the arbitration and the intimidatory actions taken towards the Claimants' officers/ employees speak for themselves in its

disregard ordinary standards of commercial morality. Its advancement and withdrawal of the section 68 proceedings in England constitute strong evidence of an intention to delay and thwart the progress of the arbitration and to avoid payment of any sums awarded. Once the correcting award was produced there could be no rational basis for persisting with the section 68 application. The KRG may be said to have shown "form" in this respect, where parallels can be drawn with the comments of DCJ Sir John Chadwick in <u>Bocimar v ETA</u> [2015] CFI 008 at paragraphs14-22.

71. The Claimants relied on the opacity of the arrangements that the KRG has concluded with oil traders, including pre-payments and on the ship to ship transfers and similar contrivances adopted by it to hide its assets from the Federal Republic of Iraq, when combined with its minister's boasts of success in that field. They also refer to the Minister's professed hope of repaying huge indebtedness owed to others in 2016 for evidence of available assets which the KRG is not prepared to use to pay sums awarded to the Claimants. The material produced amounts to credible evidence that the KRG is not as impecunious as it makes out and has set about concealing assets from creditors or potential creditors or claimants. There is evidence of assets which are available to the KRG which it is using for other purposes. There is also evidence that it has singled out the Claimants for worse treatment than other creditors and that it intends to pay nothing for as long as it can get away with it. The risk of dissipation of assets is inherent in their concealment and the attitude of the KRG to making any payments to the Claimants, when found due. Even if the attempts to avoid payment do not establish the risk, the combination of all that has been said and done does. Regard may be had to the comments of the Tribunal in the Awards, to which Mr Benson's statements refer.

72. Whilst the KRG is subject to any number of pressures from the war with ISIS, the dispute with the FRI, the refugee problem and the fall in the price of oil, it has descended into no detail in giving financial information to the court to satisfy it that it cannot pay the Second PFA or the Third PFA and it has made no effort to pay any sums due under them, above and beyond those ordered by the English Court. It did not as the Tribunal pointed out, pay any sums, when, on its own evidence, it was able to, prior to the Awards and it offered nothing by way of payment until the English Court made its order enforcing the peremptory order of the Tribunal. It is only now paying instalments of the sums ordered by the English Court in enforcement of the peremptory order, which sums fall to be set off against the Second PFA. It has indicated that it has no intention of paying anything further beyond those sums, but will instead resist all attempts to compel it to do so.

73. In the light of all the evidence before me, I would have had little difficulty in concluding that the test was met in the present case and would have made an order for disclosure had I held that alternative service, as ordered, was justified.

**Consequential matters**

74. In the light of my decision, the Order for enforcement and recognition stands but remains to be validly served in accordance with the Riyadh Convention. The ex parte orders for alternative service of that Order and the Application for Disclosure must be set aside. Time will tell if the KRG behaves as it should in accepting such service, without recourse to Article 10 in the light of the waiver of immunity which I have found to be fully effective. It must be given the opportunity to do so.

75. The parties may be able to agree on the form of the orders which follow from my decision. There has been no mention or debate on the subject of costs, but as is plain from the above, each party has succeeded in part and failed in part. If no agreement can be reached as to consequential issues, the form of the order to be made or costs, I will make any necessary ruling on the basis of short submissions

in writing, unless either party can persuade me that a further hearing is necessary for any such determinations to be made.

Issued by:

**Lema Hatim**

Assistant Registrar

Date of Issue: 20 August 2017

At: 3pm