# TAALEEM PJSC V (1) NATIO...

Home   »   Court of First Instance -Judgments   »   Taaleem PJSC v (1) National Bonds Corporation PJSC and (2) Deyaar Development PJSC [2010] DIFC CFI 014

## Taaleem PJSC v (1) National Bonds Corporation PJSC and (2) Deyaar Development PJSC [2010] DIFC CFI 014

MARCH 12, 2013    COURT OF FIRST INSTANCE -JUDGMENTS

**Claim No: CFI 014/2010**

**THE DUBAI INTERNATIONAL FINANCIAL CENTRE COURTS**

**In the name of His Highness Sheikh Mohammad Bin Rashid Al Maktoum, Ruler of Dubai**

**IN THE COURT OF FIRST INSTANCE**
**BEFORE JUSTICE SIR JOHN CHADWICK**

**BETWEEN**

| | |
|---|---|
| **TAALEEM PJSC** | Claimant |
| and | Defendants |
| **(1) NATIONAL BONDS CORPORATION PJSC** | |
| **(2) DEYAAR DEVELOPMENT PJSC** | |

| | |
|---|---|
| Hearing: | **14 January 2013** |
| Counsel: | Tom Montagu Smith (Hogan Lovells LLP) for the ClaimantNicholas Tse (Brown Rudnick) for the First DefendantMr Robin Knowles Q.C (Alfridi and Angel) for the Second Defendant |
| Judgment: | **14 January 2013** |

**JUDGMENT OF JUSTICE SIR JOHN CHADWICK**

1. These proceedings, brought by Taaleem PJSC against National Bonds Corporation PJSC and Deyaar Development PJSC, arise out of transactions that took place in 2008 in relation to the purchase and sale of an interest in a property known as Sky Gardens, which is situated within the DIFC. It is not in dispute that National Bonds Corporation PJSC ("NBC") advanced a substantial sum, in excess of AED 200 million, in connection with that purchase. The dispute is as to whether, in the events which happened, Taaleem or Deyaar are liable to repay that sum.

2. The underlying facts are summarised in a judgment of mine delivered on 21 November 2010, following the hearing of a challenge by NBC to the jurisdiction of this Court; and in a judgment of the Court of Appeal delivered on 5 May 2011 on an appeal from my order rejecting that challenge. It is unnecessary to rehearse those facts in this ruling.

3. There are now before the Court applications by both the Claimant, Taaleem, and the first Defendant, NBC, for Disclosure Orders under rule 28.21 of the rules of the Dubai International Financial Centre Courts. The circumstances which have led to those applications can be stated shortly. On 2 February 2012 the Court made an order for Standard Disclosure, pursuant to RDC 28.6, by 29 March 2012; and for service of requests to produce (if any) pursuant to RDC 28.13 by 19 April 2012. The order went on to provide that each party should produce the documents requested which were in its possession, custody or control and in respect of which no objection to production was made by 31 May 2012 and that objections to produce should be served by the same date. That date was subsequently postponed by agreement to 21 June 2012. The requests to produce were served; and objections were made by each party in respect of certain documents, or classes of documents, requested by the other or others. The matter now comes to the court on applications each dated 1 November 2012 for production orders.

4. The first of those applications, under reference CFI 014/2010/18, is made by the Claimant. Orders are sought in that application against both the first Defendant and the second Defendant. The orders sought are conveniently set out in a draft order which has been provided to the court.

5. There is now no dispute as between the Claimant and the first Defendant as to the orders which should be made in respect of production by the first Defendant on that application. Those are the subject of a consent order which has been put before the court. Nor is there any dispute as to the orders that should be made on the first Defendant's application against the Claimant. Those are also set out in the consent order. It is agreed that there should be no order as to costs as between the Claimant and the first Defendant on the Claimant's application CFI 014/2010/18 or on the corresponding application CFI 014/2010/19 made by the first Defendant. I need say no more about the orders as between the Claimant and the first Defendant.

6. The position in relation to the second Defendant is less straightforward. But I should make it clear at the outset that there is no application by the second Defendant, Deyaar, for Disclosure Orders against either the Claimant or the first Defendant.

7. As between the Claimant and the second Defendant, paragraph 2 of the draft order sought by the Claimant sets out relief sought against the second Defendant under nine sub-paragraphs. But, when addressing the court, Mr Montagu Smith, who appeared on behalf of the Claimant, stated that his client was no longer pursuing relief under seven of those nine sub-paragraphs. Relief is sought against the second Defendant only under subparagraphs (2) and (9) of paragraph 2; and, under sub-paragraph (9), only in respect of

two of the five requests to which reference is there made. The position now is that the Claimant seeks an order against the second Defendant for production under paragraph 2(2) of its draft order in relation only to those documents or classes of document referred to in requests (1) and (3) of its request – in relation to which objection to disclose is based on the need to withhold the documents or classes of documents on the grounds of special political or institutional sensitivity – and under paragraph 2(9) in relation only to documents which are the subject of requests (48) and (49) in the request to produce served by the first Defendant (which the Claimant seeks to adopt).

8. In those circumstances it is convenient to address, first, the requests under (48) and (49) of the first Defendant's request, as incorporated in the Claimant's. Those requests are:

> "(48) Production sought of any and all correspondence between Deyaar and the Ruler's Court relating to Sky Gardens between January 2009 to date."

> (49) "Production of any complaint made by Deyaar to Financial Audit Department for the purpose of the latter's investigation into Sky Gardens."

The second Defendant, in a response dated 21 June 2012, resisted production of those documents. As to request (48) it was said:

> *"The second Defendant objects to the production of documents under this category as any such documents would be subject to a legal impediment as they would be confidential to the Ruler's Court."*

And, in relation to request (49):

> *"The second Defendant objects to the production of documents under this category as any such documents would be subject to a legal impediment as they would be confidential to FAD."*

9. In addressing those requests and objections, it is necessary to have in mind the provisions of RDC 28.42:

> *"The Court may, at the request of a party or on its own initiative, exclude from production any document for any of the following reasons: (1) lack of sufficient relevance or materiality; (2) legal impediment or privilege under the legal or ethical rules determined by the Court to be applicable; (3) unreasonable burden to produce the requested evidence; (4) loss or destruction of the document that has been reasonably shown to have occurred; (5) grounds of commercial or technical confidentiality that the Court determines to be compelling; (6) grounds of special political or institutional sensitivity including evidence that has been classified as secret by a government or public international institution that the Court determines to be compelling; or (7) considerations of fairness or equality of the parties that the Court determines to be compelling."*

The grounds of the objection as put forward on 21 June 2012 suggested that the second Defendant relied on paragraph (2) of RDC 28.42: the objection refers to "legal impediment".

10. The objection was advanced on the grounds that the documents would be under a legal impediment "as they would be confidential" to the Ruler's Court or the FAD: that is to say, it is said that the second Defendant is under a legal impediment in the sense that it could be restrained on the grounds of confidence by either the Ruler's Court or the FAD (as the case may be) in respect of documents which came into its possession. That might be so if it were asserted that the documents sought under requests (48) and (49) came into the possession of the second Defendant in circumstances which imposed on the second Defendant an obligation to respect an obligation of confidence in those documents of the Ruler's Court or FAD (as the case may be); so that there was a "legal impediment" in the sense that to disclose them would be a breach of confidence by the second Defendant.

11. I did not read the second Defendant's objection to production of the documents sought under requests (48) and (49) as relying on paragraph (5) of RDC 28.42: that is to say, on "grounds of commercial or technical confidentiality that the Court determines to be compelling". In my view, paragraph (5) is concerned with the familiar case where the party objects to disclosing its own documents because those documents relate to matters which for it are commercially or technically confidential. Obvious examples under paragraph (5) would be pricing schedules or technical information of a confidential nature. I reached that conclusion because it seems to me that, save in circumstances which are almost impossible to conceive, where a document in which a non-party could claim commercial or technical confidentiality had come into the hands of a party, that party would be subject to an obligation of confidence owed to the non-party; and, in such a case, the objection to production would be made under paragraph (2) of RDC 28.42. There would be a legal impediment which prevented disclosure of the document in breach of the obligation of confidentiality. It seemed to me clear that there was nothing in the objection which suggests that the second Defendant was asserting its own commercial or technical confidentiality in the documents sought by requests (48) or (49); and nothing which suggests that the second Defendant was seeking to protect some confidentiality in the Ruler's Court or the FAD which did not of itself impose a legal impediment for the purpose of RDC 28.42(2).

12. But, although that analysis seemed to me apposite to the objection as originally made on 21 June 2012, it became clear in the course of the oral submissions made by Mr Knowles QC on behalf of the second Defendant that he was not seeking to support a "legal impediment" objection under paragraph (2) of RDC 28.42 on the grounds of privilege or confidentiality. He was not able to tell the Court that any of the documents which had come into his client's possession had done so in circumstances which gave rise to an obligation on his client to respect the confidentiality of the Ruler's Court or FAD; or that there was, in some other way, some obligation of confidentiality, which could not have given rise to a legal impediment on the second Defendant's ability to produce the documents. As the submissions developed, it became plain that Mr Knowles' concern was that the documents might be of special political or institutional sensitivity, such that the court should consider as compelling the need to withhold them from production under paragraph (6) of RDC 28.42. But that potential political or institutional sensitivity, as advanced by Mr Knowles, was not a sensitivity of the second Defendant, Deyaar; nor was it any political or institutional sensitivity which, so far as he was able to tell me, had actually been voiced or articulated to the second Defendant (or to anyone else) by the Ruler's Court or by the FAD. As I understood his submissions in this context, he was concerned to draw the attention of the Court to the nature of the documents sought; and to the need to form a view that there was a potential risk that the Ruler's Court or the FAD might wish to advance a claim of special political or institutional sensitivity in relation to them.

13. It is possible I think to deal with the second of the two requests, request (49), shortly. Request (49) seeks documents relating to a complaint made by the second Defendant to the Financial Audit Department in the context of the FAD's investigation into the Sky Gardens transaction. Mr Knowles was able to tell the Court that that complaint had led to a report by the FAD to the public prosecutor. It seems to me that the complaint made by the second Defendant cannot, of itself, be a document of special political or institutional sensitivity: in that it is not a document which emanates from the FAD. A report made by

the FAD following that complaint might well be different; but nothing suggested to me could lead to the conclusion that the second Defendant's complaint to the FAD was, of itself, of special political or institutional sensitivity. There is no reason to think that the complaint, itself, would do more than describe the second Defendant's account of what it thought had happened. In relation therefore, to the document identified in the first Defendant's request (49) – and, by incorporation, in sub-paragraph 2(9) of the Claimant's request against the second Defendant, it seems to me that there is no ground for excluding that document from production in circumstances in which it is plainly accepted that it is of relevance and materiality.

14. In relation to the documents sought under request (48) the position is less obvious. That is because those documents include "any and all correspondence between Deyaar and the Ruler's Court relating to Sky Gardens between January 2009 to date". The relevance of those documents is said by the first Defendant to be that they know of an email dated 21 May 2009 which is in these terms:

> *"Thank you for your instruction to not release the payment of AED 9,501,902 payment to AMLAC which was signed this morning until we receive instructions from the Ruler's Court on Monday."*

So, it said, it can be expected that there may have been instructions from the Ruler's Court; and that there may have been a follow-up in relation to that proposed payment of AED 9 million-odd, which, in the event, was actually made.

15. It seems to me that in relation to request (48), I should order production limited to correspondence between the second Defendant and the Ruler's Court relating to the proposed payment of AED 9,501,902 which is referred to in the email of 21 May 2009; and that I should not order production of correspondence which goes beyond that (at least at this stage), because there is nothing which would enable me to take the view that other correspondence between the second Defendant and the Ruler's Court was of relevance or was material to the issues in this case.

16. Further, I think it appropriate to draw attention to the restriction in RDC 28.56, which requires that a party to whom a document has been produced may use the document only for the purpose of the proceedings in which it has been produced, except where the document has been read to or by the court or referred to at a hearing which has been held in public, the court gives permission, or the party who produced the document and the person to whom the document belongs agree. There are further restrictions in RDC 28.57 which apply in a case where the document has been read to or by the court or referred to at a hearing. If production of documents passing between the second Defendant and the Ruler's Court is to be made to the Claimant and to the first Defendant, it is important that those parties should understand that those documents, and the

information in those documents, is not disseminated any further without a further order of the court or the consent of the Ruler's Court. If, by the time this matter gets to a trial, documents from the Ruler's Court are of sufficient importance to be read in court or referred to in court, then the party proposing to do so should draw the court's attention to the need to consider whether an order should be made under rule 28.57 restricting publication of those documents; and, if necessary, directing that that part of the hearing be held in private. Further, it seems to me that the second Defendant should be at liberty to inform the Ruler's Court of the order that is being made in relation to those documents.

17. Accordingly, I order production of the documents referred to under requests (48) – to the extent indicated – and (49) in the first Defendant's Request, as incorporated in sub-paragraph 2(9) of the Claimant's Request.

18. The documents in classes 1 and 3 under paragraph 2(2) of the Claimant's Request are much more broadly stated. Class 1 is described in these terms:

> *"Documents including any emails, letters or other correspondence or draft contracts recording or containing discussions or negotiations between Deyaar and NBC, or the Sky Gardens transaction, and or Deyaar contemplating a bulk-buying deal, and or the terms upon which Deyaar would purchase and use its interest in Sky Gardens from April 2008 to the end of 2009."*

and Class 3 seeks:

> *"Minutes of any meetings between NBC and Deyaar, or between Deyaar and Taaleem, in which the Sky Gardens transaction is discussed, including any minutes or other record of the meeting between Mr Ziad Azzam and Mr Marcus Gybor in late May 2009."*

The objection, as originally formulated by the second Defendant to the request for documents in Class 1 was:

> *"This is a very broad request that does not sufficiently identify a narrow or specific category of documents. However, all relevant documents in the second Defendant's possession, custody and control under this request have been produced pursuant to the request below."*

In response to request for documents in Class 3, the second Defendant stated:

> *"In addition to those documents already produced, see tab 3 of the document production bundle, in response to the Claimant's request to produce."*

Mr Knowles told me that his client did not pursue an objection on the grounds that Class 1 was too wide: in the sense that it failed to contain a description in sufficient detail of the narrow and specific requested category of documents that are reasonably believed to exist, as it should have done under RDC 28.14(2). Had I been approaching the matter without that concession I should have taken the view that Class 1 was too broad; but Mr Knowles' position was that the relevant documents had been produced anyway and so there was no need to address that objection.

19. An objection that emerged later – but which had not been raised in the original response – was that the description of the documents in Class 1 (at least, and possibly also in Class 3), gave rise to the possibility that they might include documents to which objection to production could be taken by the Ruler's Court or by the FAD on the grounds that they were of special political or institutional sensitivity; and that should be regarded as a compelling reason for not producing them. That objection, or potential objection, is wholly unparticularised.

20. At first sight it seems to me very unlikely that the documents described in Class 3 – that is to say, minutes of meetings between the first and second Defendants or between the second Defendant and the Claimant – would include matters of special political or institutional sensitivity; because there is nothing to suggest that those minutes would have had any input from either the Ruler's Court or the FAD. It is possible that the documents described in Class 1 might perhaps include documents passing between the second Defendant and the Ruler's Court or between the second Defendant and the FAD in which discussions and negotiations between the second Defendant and the first

Defendant were recorded; but, at this stage, it is impossible to be satisfied that an order for production should be refused.

21. Accordingly, I order the documents described in Classes 1 and 3 in paragraph 2(2) of the Claimant's Request to be produced, insofar as that has not already been done.

22. I draw attention, again, to the requirement under rule 28.56; and I indicate, again, that if the second Defendant, who has the relevant documents, takes the view that there are documents emanating from the Ruler's Court or the FAD, they can identify those documents and inform the Ruler's Court or the FAD of the order that has been made.

23. That, I think, disposes of the Claimant's application against the second Defendant; save as to costs. I have been informed that it has been agreed between the Claimant and the second Defendant that the costs of the Claimant's application shall be costs in the case. I make that order subject to the qualification that the costs are costs in the case as between the Claimant and the second Defendant. There is no reason why the costs of the Claimant obtaining documents from the second Defendant should be borne by the first Defendant; save, of course, insofar as the Requests overlap, as they do in relation to requests (48) and (49).

24. That leaves the application of the first Defendant for production orders against the second Defendant (application CFI 014/210/19, insofar as not covered by the consent order as between the Claimant and the first Defendant to which I have already referred). The documents sought by the first Defendant from the second Defendant are found in a Redfern schedule of 21 June 2012, headed "The second Defendant's response to the first Defendant's request to produce". There are 52 requests; of which two, requests (48) and (49), have already been addressed.

25. The remaining requests include requests (9) and (10). Request (9) is for production of a letter from Ziad Azzam to the board of directors of directors of the Claimant, dated 22 October 2008, regarding the net profit of the Claimant. Reference is made to that letter at paragraph 43.1 of the second Defendant's defence and counter-claim dated 1 July 2010. Request (10) is for a memorandum regarding Sky Gardens from Ziad Azzam to the board of directors of directors of the Claimant dated 6 December 2008. Both of those documents are referred to in the second Defendant's defence and counter-claim in terms which suggest that they were then in the possession of the second Defendant. It is now said, on behalf of the second Defendant, that those documents were not, and have never been, in the possession of the second Defendant: it is said that the second Defendant obtained the information that those documents existed – and, to some extent, knowledge of their contents – from a report which had been made by the FAD to the public prosecutor. It was in those circumstances that the objections to both requests (9) and (10) were framed in these terms:

> *"The second Defendant objects to the production of the document from which it obtained the relevant information as it is subject to a legal impediment. The document referred to, forms part of a finding of the Government of Dubai Financial Audit Department (FAD) in a report which is not addressed to the second Defendant and is confidential to the FAD."*

In the events which have happened, both the letter and the memorandum which formed the subject of the original requests have been produced by the Claimant, in whose possession they were; and it has been stated on behalf of the second Defendant that it will provide written confirmation to the other parties that the documents produced by the Claimant are, to the best of its belief, the documents referred to in their defence and counter-claim. The second Defendant cannot be sure that those are those documents referred to – because it is now said that it did not see the documents referred to at the time the defence and counter-claim was drafted and served – but the other parties are entitled, at least, to the comfort that it is not going to be said on behalf of the second Defendant that there is some other document which is the subject of the reference in the relevant paragraphs of the defence and counter-claim.

26. On the basis of that confirmation – which the second Defendant sought to give in a letter which was produced to the Court and the
parties at the hearing but which does not quite meet the point – I do not think it appropriate to order production of the documents described in requests (9) and (10). There is no need to do so.

27. Nevertheless, the first Defendant, alerted by the second Defendant's objection to the existence of the FAD report has sought, as request (9.2), production of that report. As I said, Mr Knowles has told the Court that that report was addressed to the public prosecutor. That information seems to me to indicate that the report may be the sort of document which should lead the Court to consider with care whether it might be of special political or institutional sensitivity: a document addressed to the public prosecutor – on which the public prosecutor will, or is likely, to base decisions on whether or not to prosecute – could well be institutionally sensitive. But it is not necessary, in my view, to pursue that issue further because a report of the FAD to the public prosecutor does not seem to me to meet the criteria of sufficient relevance or materiality to justify an order for production. It is important to keep in mind that the reference to this report only comes in by a side wind: it comes in because it is given as the explanation as to how it was that the second Defendant came to understand what was in a letter and a memorandum which it had not, itself, seen. There is no reason to think that report itself is likely to do more than record what the FAD's view of the facts are; and, although it would, no doubt, be of interest to the parties to know the FAD's view of the facts, the FAD's view is not a matter of

materiality in these proceedings. It is the Court that will have to decide what the facts are; and it will not be assisted in that task by knowing what the FAD thought the position was. In those circumstances, I do not see a proper basis for ordering production of the FAD report which is sought under request (9.2).

28. That leaves two questions in relation to the other documents sought by the first Defendant by its Request: or, to put the point another way, the request for documents, other than those to which I have referred already, attracts two kinds of response. The first response, of which requests 1, 2, 3, 4, 5 and 6 are convenient examples, is in this form: " See tab 1 [or tabs 2, 3, 4, 5, 6] of the document production bundle in response to the first Defendant's request". The "document production bundle" is a bundle of documents, tabulated, which the second Defendant produced in response to the first Defendant's request. As it emerged, what is being asserted by the second Defendant's response in the form to which I have referred is, in effect, "you have what you asked for because it is in the tab in the document production bundle": so that, in relation to a substantial number of the documents requested, the second Defendant's response is: "You already have them. There is no need for a document production order".

29. The second form of response is, "No documents under this category have been located in the possession, custody or control of the second Defendant". An example of that is the objection to request (25): other examples are the objections to requests (30), (31), (34), (35), (36) and (38): there may be others. The problem to which a response in that form has given rise is that the first Defendant's legal advisors have taken the view that a response which states "No documents have been located" is inadequate unless it is known knows what steps have been taken to locate the documents. For example, to take an extreme case, if no steps at all have been taken to locate the documents, it would not be surprising that they had not been located. There is obvious force in that view.

30. Mr Knowles has sought to explain that the reason for the choice of words used in the response – rather than a simple statement that there are no documents of this class in the second Defendant's possession, custody and control – is that the second Defendant's legal advisors have sought to adopt the phrase used in RDC 28.21 of the RDC; and in the document production statement which is the schedule to RDC Part 28. It is said, is that it is perfectly acceptable to respond to a request to produce by saying, "No documents have been located". To my mind, that is a wrong view of the reason why the phrase "No documents have been located" appears (as it does) in RDC 28.21 and the document production statement.

31. It is important, first, to appreciate that the rules as to the production of documents in a DIFC Court (the RDC) are not the same as the rules of the CPR applicable in the High Court in England and Wales. The RDC are much closer, in this respect, to the scheme for production in the IBA rules, applicable to arbitrations. So the RDC provide for the standard production of documents: limited to (1) documents available to the party and on which he relies (including public documents and those in the public domain) except for any documents that have already been submitted by another party and (2) documents which he is required to produce by any law, rule or practice direction. Category (2), in passing, includes any documents to which the party has referred in his Statement of Case: because

there is an obligation under RDC Part 19 to produce documents to which a party has referred in his statement of case. The important feature of the RDC is that a party does not have to produce, in the course of standard production (at least as a general rule), documents on which he does not rely; and, in particular, does not have to produce documents which might harm his case (because those are not likely to be documents on which he relies.

32. Following Standard Disclosure, there is then an opportunity for each party to submit to the Court a request to produce under 28.13; but it is important to have in mind that a request to produce must include either a description of a requested document sufficient to identify it or a description in sufficient detail of a narrow and specific requested category of documents which are reasonably believed to exist. That is the effect of paragraphs (1) and (2) of RDC 28.14. So, requests to produce have to be focused. Further, RDC 28.14(3), requires that requests to produce must include a description of how the documents requested are relevant and material; must include a statement that the documents are not in the possession, custody or control of the requested party; and must state the reason why the requesting party assumes that the requested documents are in the possession of the custody or control of the other party. So requests to produce have to be focused: they have to explain why the documents requested are relevant and material and they have to explain why they are thought to be in the possession, custody and control of the other party.

33. {} provides that a party to whom the request to produce is addressed must produce all documents in his possession, custody or control as to which no objection is made. So the proper response to a document production request is to state: "These are all the documents in my possession, custody or control which fall within your request as to which I make no objection". If the party seeks to object, then he is to state his reasons in writing: those reasons are to be one or other, or more, of those within rule 28.42.

34. So a party who has made a search and found nothing – and who seeks to comply with the RDC – should state: "These are all the documents in my possession, custody or control which fall within your request". If he objects to producing them, then he can state "Your request is too broad because it does not fall within RDC 28.14"; or, perhaps, "You have the documents already" and so they are excluded under 28.4; or "I do not have them and your reasons are not sufficient to establish otherwise". Or he must set up one or other of the grounds for objection under RDC 28.42, of which the first is lack of sufficient relevance or materiality. Another, which is of importance, is that it would be an unreasonable burden to have to carry out the search required to locate the documents.

35. If the Court decides to order production – notwithstanding the objections – then it makes a Disclosure Order which requires the party to do one or more of the following things: disclose documents or classes of documents specified in the order; or carry out a search to the extent stated in the order and disclose any documents located as a result of that search (RDC 28.21). So if the Court is persuaded that there may be documents in the possession of the party to whom the request has been made, but that there has been no proper search for those documents, then it may make a search and produce order, specifying the extent of the search that has to be made. And it may direct that, in

compliance with that order, it is necessary for the party against whom it is made to make a Disclosure Statement which sets out the extent of the search which has been made to locate documents, certifying that he understands his duty to disclose documents and certifying that, to the best of his knowledge, he has carried out the duty.

36. So, by the time a party is in a position to state, in a Disclosure Statement, that, "I have not been able to locate documents", he is doing so in the context of a search which he has been ordered to make and the extent of which has been specified. That provides a context in which the Court and the requesting party can see what has been done to find the documents; and can take a view as to whether the fact they have not been located after a search is a reliable indication that they probably do not exist (or, at least, that they could not be found without a search which amounted to an unreasonable burden). That process is reinforced in the case of electronic documents -which are becoming increasingly important in the discovery process – because RDC 28.19 sets out a number of factors which the Court will take into account in deciding the reasonableness – and so the extent – of any electronic search that should be ordered: and those factors include the ease and expense of retrieval and the significance of any document which is likely to be located by the search.

37. It is for those reasons that the first Defendant (or its lawyers) took the view, that a response in the form "documents in this category have not been located" is not of itself sufficient; and it does not become sufficient, in my view, where it is preceded by a statement that the second Defendant confirms that it understands its duty to produce documents and that it has carried out this duty to the best of its knowledge and produced all relevant documents which objections have not been raised in its possession, custody or control. That statement does not tell the requesting party, or the Court, what has been done in carrying out the search which is said to have been carried out.

38. The position is different under the CPR because the disclosure rules in the CPR do prescribe the search that has to be carried out; and, in particular, that the search must be a reasonable one. The RDC do not have that express requirement. It is for that reason that, despite Mr Knowles' strenuous opposition, I formed the view, and remain of the view, that an answer in form, "No documents have been located" in response to a request to produce is not sufficient. It would be sufficient if that answer were made following a Disclosure Order in which the nature of the search had been specified. In that case, it would be sufficient to state: "I have made the search that I was directed to make and the document has not been located". That is what the rules – and the Disclosure Statement – require.

39. Faced with that analysis, Mr Knowles is driven to submit: "Oh well, when we say, 'No documents have been located in our possession, custody and control', what we really mean is that there are not any documents in our possession, custody and control". The trouble is to that, to the properly suspicious mind of another party's lawyer, an answer in the form of that it has been couched, raises the question, "Well, if what you mean is we do not have them, why do you not just say so?" Mr Knowles, I think, was content ultimately to say that: "Well, if that is the problem, we will write to the other parties and say that, in those requests where we have used the phrase 'No documents have been located in the

possession, custody or control of the second Defendant', what we really mean is that we have produced all the documents in our possession, custody or control which are the subject of this request as to which no objection is made". In other words, the second Defendant will make a statement in a form which reflects the obligation imposed under {}.

40. On the basis that that statement is made, and that clarification is provided, I do not find it necessary, at this stage, to make a search and production order in relation to the documents in the classes to which the response "No documents have been located" has been made.

41. That raises the question: should the second Defendant now be required to make a better or more comprehensive search? Is there a need for a search and production order to be made – in particular, in relation to electronic documents – because of a real fear that a sufficient search has not already been made? The concern expressed on behalf of the second Defendant stems from the explanation of the search process already carried out which is contained in a letter of 24 October 2012 from the second Defendant's legal representatives. The letter is written in response to a request made in a letter of 10 October 2012. It follows the sections and paragraphs in that letter.

42. Section A explains what has been done to recreate backup tapes for the files of four named individuals. The first point raised first by the first Defendant is that the exercise should not have been confined to those four individuals. It is said that the searches should be made also against Mr Spencer Brod, Mr Om Singh and Mr Abdullah Al Hanley. In relation to Mr Brod and Mr Singh, the Court was told that since 24 October 2012, searches have been made against backup files created for them; and that the second Defendant would be willing to confirm that in writing. On the basis that it is confirmed that Mr Brod and Mr Singh's files have now been searched by the same process, or substantially the same process, as that described in section A, I do not think it necessary to make an order for a further search in their files. In relation to Mr Al Hanley, the problem is, as I understand it, that the second Defendant does not have access, or did not have access, to all his computer records; but it is said that a search against him will have been completed by 7 February 2013. In those circumstances, I will make an order that the second Defendant takes steps to recreate Mr Al Hanley's files and to search them by 7 February 2013: that being, as I understand it, a step which the second Defendant is proposing to take in any event.

43. The other complaint, or criticism, in relation to the electronic searches is that the key words used for searching are not as extensive as the first Defendant would wish. It is said there should be a search using the key words "premium", "due diligence", "board" and "memorandum of understanding". The second Defendant's response to that criticism is that the likelihood of a document of materiality and relevance turning up in an electronic search which was disclosed only by the use of those key words; and did not contain any of the other key words such as "Sky Gardens", "NBC", "Taaleem", "Nasser", and "First Dubai" is so remote that it would be an unreasonable burden to require backup files to be recreated in order to enable that search to be carried out. That seems to me force in that response. I am persuaded that if a relevant document is not identified by searching against the key words which have been used, it is most unlikely that it would be found if

the words "board" or "memorandum of understanding" were added to that list of key words. If "board" or "memorandum of understanding" are in a document which is of relevance, the strong probability is that one of the other key words which have been used will also be in that document.

44. That leaves, in particular, the claim to search against "Amlak", "Amlak Sky Gardens" or "ASG". I was told that searches using those key words have been carried out as an independent exercise. On the basis that will be confirmed in writing, I think it unnecessary to require a recreation of all the email accounts in order to enable a search using those words to be carried out.

45. In those circumstances, I am not persuaded that it is appropriate in this case to make a search and produce order to any greater extent than that which I have already indicated: that is to say, an order to produce documents from the files of Mr Al Hanley. I reach that conclusion on the basis that there will be confirmed, in writing to the parties, the matters which were stated by counsel in Court and to which I have referred in the course of this judgment.

46. I am asked also to give some further directions as to case management. The principal direction sought by the first Defendant is as to expert evidence of UAE Law. It is said that that evidence would cover two areas. First, it would explain the duties which, under UAE Law, directors owe to their companies. Secondly, it would explain the circumstances in which, under UAE Law, a Court would order restitution.

47. The reason that the first of those matters is likely to be relevant is that the second Defendant asserts that the existence of fiduciary duties should lead a court, applying the principles of DIFC Law, to set aside the transaction between the Claimant and the second Defendant: in the event that, contrary to the second Defendant's primary contention, that transaction was ever completed anyway. As a matter of law, it seems to me the right approach is, as indicated in a decision of mine in the High Court of England and Wales in about 1994 (*Arab Monetary Fund v Hashim*), to seek to understand what duties are owed by a director to his company under the relevant law governing that relationship – which, in the circumstances in the present case, is likely to be UAE Law – and then to ask whether duties of that nature provide a basis for an equitable response or remedy under DIFC Law. It seems to me, therefore, that the Court will be assisted in knowing what duties of a director owes to his company under UAE Law. Similarly, if there is a claim for restitution which is held to be governed by UAE Law, then the Court will need to know the circumstances in which restitution would be ordered under UAE Law.

48. Nevertheless, I do not think it necessary that those matters should be proved by expert evidence, at least at this stage. It seems to me that the sensible way forward is for the party relying on the provisions of UAE Law – which, primarily at least, is the second Defendant – to set out, first, the issues in relation to which it contends provisions of UAE Law are relevant; and, second, what the applicable provisions of UAE Law are said to be in relation to those issues. If that exercise is done, it can be expected to identify the various articles in the UAE Civil Code on which the party intends to rely. That will enable the other

parties to take a view, after obtaining advice, first, as to whether the issues identified by the second Defendant are issues which would governed by UAE Law – because, if that is in dispute, that question will have to be determined after hearing argument – and, second, whether the applicable provisions of UAE Law in relation to those issues are to be found in the various articles of the UAE Civil Code that have been identified – or are to be found elsewhere, and, if so, where -and, third, whether the effect of those articles is as the second Defendant contends. I suspect that, if that exercise is done, it will turn out that the issues in relation to which there is a dispute will be relatively few and quite short. When the Court knows what those issues are, further consideration can be given as to how best to resolve them.

49. That process will, I hope, save time and expense. It should avoid three freestanding opinions – extending over many pages – on all those provisions of UAE Law which might, possibly, have some reference to this dispute. The scope of the dispute will have been focused; and the Court can consider whether the way forward, then, is to determine the dispute after hearing informed submissions or, perhaps, to ask for the assistance of a court appointed expert.

50. I am also asked to indicate that we should seek to have a trial date this year. I record that I am told a realistic time estimate is three weeks. Without being in any position to indicate that the Court can provide a date this year to accommodate a trial of that length, and I direct that the parties inform the registry of periods after the middle of September during which their counsel are not available and which, for one reason or another, they would seek to avoid. That should not – and I emphasise "not" – be taken as a promise that the registry will fix a hearing to suit the convenience of counsel; but at least the registry will not fix a hearing which is inconvenient without the necessary information. It seems to me likely that, given the apparent intention each party to instruct leading counsel from overseas and the need to find a judge who has three weeks available to devote to hearing this case, some compromises will have to be made if the hearing is to take place this year.

51. Are there any other matters that the parties wish me to deal with? I would ask the first and second Defendants to seek to agree an order between them reflecting the judgment I have given. For that purpose, it would be sensible, I think, for the judgment to be transcribed.

Issued by
**Mark Beer**
Registrar
Date: 12 March 2013
Time: 3pm