# APPENDIX H

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IN RE:<br><br>EX PARTE APPLICATION OF IRAQ TELECOM LIMITED FOR AN EXPEDITED ORDER TO TAKE DISCOVERY PURSUANT TO 28 U.S.C. § 1782,<br>                    Applicant,<br><br>SIRWAN SABER MUSTAFA, and KOREK TELECOM COMPANY LLC.<br>                    Intervenors. | Case No. 1:18-mc-00458 (LGS) (OTW) |

## <u>SUPPLEMENTAL DECLARATION OF GRAHAM KENNETH LOVETT</u>

Pursuant to 28 U.S.C. § 1746, I, Graham Kenneth Lovett, declare under penalty of perjury as follows:

1.     I am the same Graham Kenneth Lovett who submitted a declaration on September 27, 2018 (the "First Lovett Declaration") in support of Iraq Telecom Limited's *Ex Parte* Application for Expedited Judicial Assistance Pursuant to 28 U.S.C. § 1782 (the "**Application**"). I remain the partner responsible for the claims filed by Iraq Telecom Limited ("**Iraq Telecom**" or the "**Applicant**") in the Dubai International Financial Center ("**DIFC**") Courts, discussed in more detail in the First Lovett Declaration.

2.     I submit this supplemental declaration in response to the DIFC-related aspects of the Corrected Declarations submitted by Mr. Kenneth Beale (the "**Beale Declaration**") and Mr. Michael Black QC (the "**Black Declaration**"), both dated November 21, 2018, which were submitted in support of the Opposition to the Application ("**Opposition**") filed by the Intervenor, Mr. Sirwan Saber Mustafa Barzani (referred to as "Mr. Barzani" in the Application and other documents but referenced herein as "**Mr. Mustafa**").

3.      I am familiar with the information set forth in this declaration either from personal knowledge or on the basis of documents I have reviewed.  The facts and matters testified to are true to the best of my own knowledge and belief.  Because I submit this supplemental declaration specifically in response to certain elements of the Opposition, the Beale Declaration, and the Black Declaration, it does not contain each and every fact within my knowledge regarding the topics discussed herein, nor does it attempt to litigate the underlying matters by taking issue with every point made in these documents.

I.      **STATUS OF DIFC PROCEEDINGS**

A.      **The DIFC Litigation Commenced Upon the Filing of the Claims**

4.      As explained in the First Lovett Declaration (¶ 3) and the Application (at pp. 21-22), Iraq Telecom has filed two complaints in the DIFC Courts (the "**DIFC Litigation**") against Abdulhameed Abdullah Mohammed Salih Aqrawi ("**Mr. Aqrawi**"), Nozad Hussein Jundi ("**Mr. Jundi**"), Raymond Samir Zina Rahmeh ("**Mr. Rahmeh**"), and International Holdings Limited ("**IHL**") (collectively, the "**Defendants**").[1]  Specifically, on March 12, 2018, Iraq Telecom filed a claim with the DIFC Courts against Messrs. Aqrawi, Jundi, and Rahmeh for breaches of various duties under DIFC Law ("**Breach of Duty DIFC Complaint**").  First Lovett Declaration ¶¶ 3, 15, Ex. A.  Then, on April 16, 2018, Iraq Telecom filed a claim with the DIFC Courts against Mr. Rahmeh for, among other things, undisclosed self-dealing and breach of fiduciary duties in violation of DIFC law (the "**Self-Dealing DIFC Complaint**").  *Id*. ¶¶ 3, 20, Ex. B.

5.      By way of clarification, the filing of these Complaints in the DIFC Courts and the issuance of the Claim Forms commenced the DIFC Litigation.  This is stated expressly in Rule 7.3

---

[1]      Unless otherwise noted, all capitalized terms have the same meaning as set forth in the Application and the First Lovett Declaration.

of the DIFC Court Rules, which provides as follows: "*Proceedings are started when the Court issues a claim form at the request of the claimant.*".   The suggestion by Mr. Mustafa (*see* Opposition at 13-14; Beale Declaration ¶¶ 33, 38 (b)) that the DIFC Litigation has not commenced (or is otherwise contingent or speculative) simply because Iraq Telecom has not served certain of the Defendants is without merit.   Service has nothing to do with the commencement of a DIFC proceeding as is made clear by the DIFC Court Rules.

### B.      Service of Defendants in DIFC Litigation

6.      On July 11, 2018 and July 25, 2018, Iraq Telecom served IHL with, respectively, the Breach of Duty DIFC Complaint and the Self-Dealing DIFC Complaint, pursuant to the requirements of DIFC law.   Where a corporation, such as IHL is incorporated in the DIFC, the DIFC Court Rules: (a) require service at the principal office of the corporation or any place within the DIFC or Dubai where the corporation carries on its activities and which has a real connection with the claim; and (b) permit service to be effected by delivering the document to or leaving it at a permitted address[2].   Service of IHL in accordance with the DIFC Court Rules was confirmed in two Certificates of Service verified by me and filed on, respectively, July 12, 2018 and August 9, 2018.   *See* Exhibit A (Certificates of Service) attached hereto.[3]

7.      Iraq Telecom has not, however, served the remaining Defendants in the DIFC Litigation because, as noted in the First Lovett Declaration (¶ 24), service must be effected pursuant to the Riyadh Convention, unless the Defendants voluntarily appear and waive service through the Riyadh Convention.

---

[2]      DIFC Court Rules 9.19 and 9.27.

[3]      I certify that the exhibits attached hereto are true and correct copies of the original documents.

8.　　On September 11, 2018, Iraq Telecom requested and ultimately received an extension from the DIFC Courts until March 12, 2019, in which to serve the Defendants in the Breach of Duty DIFC Complaint.  *See* Exhibit B (September 2018 DIFC Court Order) attached hereto.

9.　　On October 8, 2018, Iraq Telecom requested and ultimately received an extension from the DIFC Courts until April 16, 2019, in which to serve the Defendants in the Self-Dealing DIFC Complaint.  *See* Exhibit C (October 2018 DIFC Court order) attached hereto.

10.　　Although Iraq Telecom hopes to serve Defendants within the extended period for service granted by the DIFC Courts, the precise timing is dependent upon actions taken by the authorities in the UAE and Iraq, which is outside of the Applicant's control.  Nevertheless, it should be noted that service *shall* occur, absent affirmative (and successful) efforts to evade service by Defendants and assuming that the relevant authorities comply with their obligations under the Riyadh Convention.

## II.　　THE REQUESTED DISCOVERY IS URGENTLY NEEDED

11.　　It should be noted that while service of the Defendants is pending, Iraq Telecom continues to remain in the dark regarding Korek Telecom Company LLC's ("**Korek's**") finances and unable to prevent the siphoning off of Korek's assets by the CS Ltd Directors through, among other things, undisclosed and unlawful self-dealing.  *See* First Lovett Declaration ¶¶ 17-21, Exs. A, B.  As noted in the First Lovett Declaration at 8 n.4, the Requested Discovery is therefore urgently needed in aid of an application that Iraq Telecom intends to file with the DIFC Courts in connection with the Breach of Duty DIFC Complaint seeking interim relief, as described in detail in the Claim Form for the Breach of Duty DIFC Complaint under the section headed "Remedy Sought" ("**Interim Relief Application**").  *See id.* at Ex. A.  In sum, Iraq Telecom will seek an

interim order for (amongst other things) the appointment of an authorized representative of IHL (such as an administrator) with certain powers to protect the best interests of IHL and investigate the allegations of mismanagement, as well as the imposition of certain restrictions on Korek and/or IHL from incurring liabilities and entering into certain transactions pending determination of the Breach of Duty DIFC Complaint.

12.     The Requested Discovery is highly relevant to Iraq Telecom's Interim Relief Application because it is very likely to uncover evidence (which is either not in the hands of the Defendants to the Breach of Duty DIFC Complaint and/or could not reasonably be expected to be disclosed by those Defendants given the nature of the allegations) that is material to the allegations of self-dealing, related party transactions and the IBL Loan scheme which underpin the proposed application.

13.     The Interim Relief Application is urgent, given the *ongoing* and very serious breaches of duty alleged against the Defendants in the DIFC Litigation and therefore Iraq Telecom cannot reasonably wait for the discovery to commence in those proceedings (which may not be forthcoming in any event) before filing the Interim Relief Application.

## III.    DELAY AND GAMESMANSHIP BY DEFENDANTS

14.     As noted in paragraph 6 above, the complaints in the DIFC Litigation were served on IHL over four months ago.  The other Defendants to those proceedings are all directors of IHL. It is inconceivable that those proceedings have not come to the attention of those Defendants in their capacity as directors of IHL; yet, they appear to have chosen to deliberately ignore the DIFC Litigation and not voluntarily appear, including by *not* filing Acknowledgments of Service, because the proceedings have not been formally served under the Riyadh Convention.  That is

consistent with the approach that has been taken by Mr. Mustafa and others in related proceedings to date.[4]

15.       In his Declaration (¶ 26), Mr. Beale refers to the DIFC Litigation and specifically notes that his firm, Boies Schiller Flexner (UK) LLP ("Boies Schiller"), does not yet represent any of the parties in the DIFC Litigation, despite the fact that Boies Schiller represents Mr. Mustafa and others in related proceedings (*see* Beale Declaration ¶ 45).

16.       Amongst other proceedings, Boies Schiller represents Mr. Mustafa in respect of an ICC arbitration filed by Iraq Telecom on July 16, 2018 seeking to restrain IHL, CS Ltd, Mr. Mustafa and Korek from granting a pledge over the shares of Korek in favor of IBL Bank without the consent of Iraq Telecom, as per the Shareholders' Agreement between the parties. *See* Exhibit D (Request for Arbitration) ("**Share Pledge Arbitration**").[5]  Despite the fact that Boies Schiller represents all of the respondents to the Share Pledge Arbitration, including Mr. Mustafa, Boies Schiller was not instructed by Mr. Mustafa with respect to the Injunction Proceedings in the DIFC Courts (referenced in the Beale Declaration ¶¶ 35-37), which are proceedings against the *same* respondents as the Share Pledge Arbitration in which interim relief is sought in support of that arbitration (*see* Section IV below).  It can only be surmised that Mr. Mustafa is intentionally avoiding engaging Counsel in connection with the Injunction Proceedings, despite clearly being on notice of the pending matters, so as to prolong the time that it takes for the claims to be formally served (which must occur under the Riyadh Convention).

---

[4]       Although Mr. Mustafa is not a defendant in the DIFC Litigation, he is (1) a director of IHL, (2) the majority shareholder in CS Ltd, (3) a close associate of Mr. Rahmeh, one of the defendants in the DIFC Litigation, and (4) a key figure in the underlying disputes in all the Foreign Proceedings.

[5]       This proceeding is not one of the Foreign Proceedings covered by the Application.

17.     There is a reasonable basis for inferring that the same strategy is being adopted by the Defendants to the DIFC Litigation bearing in mind the likelihood that they are on notice of these proceedings.  In other words, the Defendants in the DIFC Litigation (who are closely aligned with Mr. Mustafa) are avoiding service under the Riyadh Convention to delay the proceedings and then using that delay to, amongst other things, support Mr. Mustafa's arguments in connection with the 1782 application that the DIFC Litigation is speculative and/or has not commenced.

## IV.    INJUNCTION PROCEEDINGS

18.     In his Declaration, Mr. Beale references "Injunction Proceedings" (¶¶ 35-37).[6]

19.     In his summary of these proceedings, Mr. Beale notes that, after the DIFC Court rejected Iraq Telecom's arguments and discharged the injunction, the Applicant sought and received permission to appeal the decision.  *Id*. ¶ 37.  Mr. Beale failed to mention, however, that the DIFC Court has reinstated the injunction, subject to the Arbitral Tribunal in the Share Pledge Arbitration (once constituted) ordering otherwise.  The DIFC Court reinstated the injunction upon submission of evidence by Iraq Telecom that Mr. Mustafa, and the directors of IHL appointed by him, have been involved in matters which cast real doubt as to their trustworthiness and his business probity.[7]

---

[6]     Iraq Telecom filed the Injunction Proceedings in order to seek interim relief in support of the Share Pledge Arbitration.  In these proceedings, Iraq Telecom originally sought an *ex parte* order which was granted by the DIFC Court on October 12, 2017.  That order was discharged at the return hearing on November 12, 2017.  However, permission to appeal the discharge order has been granted and Justice Sir Richard Field has reinstated the interim injunction pending any order to the contrary by the Arbitral Tribunal in the Share Pledge Arbitration (once constituted).  The party-appointed arbitrators are imminently expected to appoint the President of the arbitration, following which Iraq Telecom will file an application for interim relief in the arbitration (seeking the same relief that has been granted by the DIFC Court).

[7]     The judgment is sealed; therefore I cannot include it as an exhibit.

**V.    THE REQUESTED DISCOVERY IS NOT DUPLICATIVE OF EVIDENCE THAT IRAQ TELECOM COULD OBTAIN FROM THE PARTIES IN THE DIFC LITIGATION**

20.     As discussed in the First Lovett Declaration (¶ 9), the DIFC Courts cannot compel third parties located outside of the DIFC (*e.g.*, the Correspondent Banks) to produce documents or provide testimony in the DIFC Litigation.  Accordingly, Iraq Telecom must seek the Requested Discovery through other means, such as the Application.

21.     Furthermore, the parties in each of the relevant proceedings for which the Requested Discovery is sought are different.  For example, IBL Bank is not a party in the DIFC Litigation.  Accordingly, to the extent IBL Bank has any evidence similar or relating to the Requested Discovery, Iraq Telecom cannot obtain such evidence from third party IBL Bank in the DIFC Litigation.

22.     In addition, given the nature of the allegations against the Defendants in the DIFC Litigation (*e.g.*, self-dealing, related party transactions, breach of fiduciary duty etc.) and the manner in which Defendants and Mr. Mustafa have kept Iraq Telecom in the dark regarding vital information concerning Korek to date, it is not reasonably anticipated that the Defendants would produce any documents similar or relating to the Requested Discovery, even if the Defendants' possessed such documents (which is unlikely).

**VI.   THE REQUESTED DISCOVERY IS NOT CONTRARY TO THE CHARACTER AND NATURE OF DIFC PROCEEDINGS AND IS NOT AN ATTEMPT TO CIRCUMVENT DIFC OR IBA RULES**

23.     The First Lovett Declaration (¶¶ 7-14) summarizes the DIFC Rules relating to document discovery and Mr. Black QC does not disagree with my summary.

24.     I agree with Mr. Black QC that the discovery regime in the DIFC Courts is narrower than that in the English Courts and more akin to the regime for production of documents under the

IBA Rules.  However, in my experience, disclosure in the DIFC Courts is not particularly limited or narrow in scope (*cf.* Black Declaration ¶¶ 17-18), and, instead, is in accord with the nature and complexity of the matter at hand.

25.     Although the DIFC Court Rules require that the written requests to produce documents should specify the matters set out in ¶ 17(b) of the Black Declaration, the DIFC Courts have previously ordered parties to produce a large number of categories of documents, particularly in complex commercial disputes such as in the DIFC Litigation.  As described in the First Lovett Declaration (¶¶ 15-21) and in the Application (at 10-16), the underlying claims in the DIFC Litigation give rise to a myriad of factual issues concerning the alleged and extensive breaches of duty by Messrs. Aqrawi, Jundi and Rahmeh.  There are a large number of categories of documents that are relevant to these issues, but unlikely to be in the possession of Iraq Telecom given the nature of the allegations – *e.g.*, undisclosed self-dealing and related party transactions by the Defendants with the suppliers of Korek.

26.     It is presently envisaged that Iraq Telecom will request, and would be entitled to request, a large number of categories of documents in respect of these allegations, including (for example) documents regarding the alleged, undisclosed self-dealing of Messrs. Aqrawi and Rahmeh, the alleged over-payment of various suppliers by Korek, including related party transactions, and the fraudulent IBL Loan scheme.  That is to say, the Requested Discovery, as set forth in pages 18-20 of the Application, includes similar categories of documents to be requested in the DIFC Litigation from Messrs. Aqrawi, Jundi and/or Rahmeh.  In other words, the Requested Discovery is directly relevant and material to the outcome of DIFC Litigation.

27.     In order to illustrate the potential breadth of discovery in DIFC Court proceedings as a matter of practice, I refer to the Disclosure Order made by His Excellency Justice Omar Al

Muhairi in the case of DIFC Court Claim No. CFI 024/2010 *Corinth Pipeworks SA v Barclays Bank Plc*. *See* Exhibit E. This Claim concerned an action in conspiracy, deceit and negligence against Barclays Bank Plc in respect of an alleged fraudulent scheme by a former employee of the Bank and a third party, Mr. Nanda Kumar. *See* Exhibit F (Claim Form). The DIFC Court in that case ordered Barclays Bank Plc to disclose no less than 71 categories of documents that had been requested by Corinth Pipeworks SA (*see* Exhibit E at 1). Having regard to the claims made by Corinth Pipeworks SA against Barclays Bank Plc, in my view this case is analogous, in terms of complexity and the extent of factual issues, to the DIFC Litigation brought by Iraq Telecom. I therefore expect that a similar level of discovery could reasonably be expected to be ordered in the DIFC Litigation.

## VII.   THE OPPOSITION MISPRESENTS AND OMITS KEY DETAILS ABOUT THE NATURE AND HISTORY OF THE DISPUTE BETWEEN THE PARTIES

28.     Mr. Beale asserts that Iraq Telecom "*appears to have concluded that it made a bad and unlucky investment and now hopes to force its contractual counterparties to indemnify it for its investment losses through a campaign of litigation*." (*See* Beale Declaration ¶ 23) Notwithstanding the inappropriateness of such a statement by Counsel in a sworn Declaration (*i.e.*, a "throw away" statement not supported by any evidence), with respect to the DIFC Litigation it is certainly not the case that these proceedings have been spuriously brought for the purposes of obtaining an indemnity for investment losses.

29.     To the contrary, the Breach of Duty DIFC Complaint seeks redress from directors of IHL that have engaged in very serious breaches of duty which have caused (and continue to cause) significant losses to IHL. The Self-Dealing DIFC Complaint (issued against Mr. Rahmeh) seeks damages for extensive breaches of fiduciary duty and self-dealing. Both complaints are

ultimately for the benefit of all shareholders of IHL, which would include Mr. Mustafa.  It is therefore difficult to understand upon what basis Mr. Beale makes this extraordinary assertion.

## VIII.   NOTICE OF APPLICATION TO DEFENDANTS IN DIFC LITIGATION NOT REQUIRED

30.     Nothing in the DIFC or IBA Rules can be read as a requirement that Iraq Telecom should have notified the Defendants (or the DIFC itself) of its Application before submitting it to this Court.

## IX.   NO REQUIREMENT THAT IRAQ TELECOM MUST REQUEST DISCOVERY IN DIFC LITIGATION BEFORE FILING APPLICATION

31.     In addition, the DIFC Rules do not require petitioners in proceedings before the DIFC Courts to request discovery from the Defendants before seeking evidence from third parties or foreign sources.

\* \* \* \* \*

I declare under penalty of perjury under the laws of the United States and the DIFC that the foregoing is true and correct.

Executed in Dubai, United Arab Emirates, on this the 30th day of November, 2018.

Graham Lovett, Gibson Dunn & Crutcher LLP

Signed: ............................................................

For and on behalf of **Iraq Telecom Limited**

**Graham Lovett**

**Gibson, Dunn & Crutcher LLP**

**Building 5, Level 4**

**P.O. 506654**

**Dubai International Financial Centre**

**Dubai, United Arab Emirates**

_____

12

# Exhibit A



Ground Level, Building 4
The Gate District
Dubai International
Financial Centre
PO Box 211724,
Dubai UAE

Tel   +971 4 427 3333
Fax   +971 4 427 3330
www.difccourts.ae

# Certificate Of Service

**Issued Date:07/12/18**

## Case Information (as appears on the claim form)

| | | |
|---|---|---|
| **Case No.** | : | CFI-013-2018 |
| **Case Title** | : | Iraq Telecom Limited vs Abdulhameed Abdullah Mohammed Salih Aqrawi |

## Party Filing (as appears on the claim form)

| | | |
|---|---|---|
| **Party Type** | : | Claimant |
| **Claimant's Name** | : | Iraq Telecom Limited |

## Details

| | | |
|---|---|---|
| **What document have you served?** | : | Claim Form and Particulars of Claim |
| **On whom did you serve?** | : | International Holdings Limited |
| **How did you serve?** | : | By delivering to or leaving at a permitted place |
| **Address where service was effected** | : | Unit 11, Level 3, Gate Village Building 10, Dubai International Financial Centre, Dubai |
| **Service date and time** | : | 11/07/2018  &  10:50 AM |
| **Considered date of service** | : | 11/07/2018 |
| **Acknowledgement due date** | : | 26/07/2018 |

## Statement of Truth

**Our Client believes that the facts stated in this claim form are true.**

| | | |
|---|---|---|
| **Full Name** | : | Graham Lovett |
| **Signature** | : | *Graham Lovett* |

## Who is Submitting this Document

| | | |
|---|---|---|
| **Firm/Name** | : | Gibson, Dunn & Crutcher LLP |
| **Court Registration No.** | : | 676A |
| **Address** | : | The Exchange Building 5 Level 4 PO Box |

506654

| **Email** | : | JOwens@gibsondunn.com |
| **Telephone No.** | : | +971 4 318 4605 |

Once your claim form has been submitted successfully you will receive a confirmation and an invoice to be settled before your claim can be accepted and progressed. If your submission is unsuccessful you will receive a message explaining the error and how to rectify it.


If you have any problems filling out the form or need further assistance please contact us on + 97144273333 or by email on registry@difccourts.ae.


The DIFC Courts are open between 10am and 4pm, Sunday to Thursday. Please address all correspondence with the court to the Registry (registry@difccourts.ae) and quote the case number if you don't have a case number yet.





Ground Level, Building 4
The Gate District
Dubai International
Financial Centre
PO Box 211724,
Dubai UAE

Tel  +971 4 427 3333
Fax  +971 4 427 3330
www.difccourts.ae

# Certificate Of Service

**Issued Date:08/09/18**

## Case Information (as appears on the claim form)

| | | |
|---|---|---|
| **Case No.** | : | CFI-019-2018 |
| **Case Title** | : | Iraq Telecom Limited vs Raymond Samir Zina Rahmeh |

## Party Filing (as appears on the claim form)

| | | |
|---|---|---|
| **Party Type** | : | Claimant |
| **Claimant's Name** | : | Iraq Telecom Limited |

## Details

| | | |
|---|---|---|
| **What document have you served?** | : | Claim Form and Particulars of Claim |
| **On whom did you serve?** | : | International Holdings Limited |
| **How did you serve?** | : | By delivering to or leaving at a permitted place |
| **Address where service was effected** | : | Unit 11, Level 3, Gate Village Building 10, Dubai International Financial Centre, Dubai, UAE |
| **Service date and time** | : | 25/07/2018  & 10:15 AM |
| **Considered date of service** | : | 25/07/2018 |
| **Acknowledgement due date** | : | 09/08/2018 |

## Statement of Truth

**Our Client believes that the facts stated in this claim form are true.**

| | | |
|---|---|---|
| **Full Name** | : | Graham Lovett |
| **Signature** | : | *Graham Lovett* |

## Who is Submitting this Document

| | | |
|---|---|---|
| **Firm/Name** | : | Gibson, Dunn & Crutcher LLP |
| **Court Registration No.** | : | 676A |
| **Address** | : | The Exchange Building 5 Level 4 PO Box |

506654

| **Email** | : | JOwens@gibsondunn.com |
|---|---|---|
| **Telephone No.** | : | +971 4 318 4605 |

Once your claim form has been submitted successfully you will receive a confirmation and an invoice to be settled before your claim can be accepted and progressed. If your submission is unsuccessful you will receive a message explaining the error and how to rectify it.

If you have any problems filling out the form or need further assistance please contact us on + 97144273333 or by email on registry@difccourts.ae.

The DIFC Courts are open between 10am and 4pm, Sunday to Thursday. Please address all correspondence with the court to the Registry (registry@difccourts.ae) and quote the case number if you don't have a case number yet.

# Exhibit B

Claim No. CFI 013-2018

**THE DUBAI INTERNATIONAL FINANCIAL CENTRE COURTS**

**IN THE COURT OF FIRST INSTANCE**
BETWEEN

**IRAQ TELECOM LIMITED**

Claimant

and

**(1) ABDULHAMEED ABDULLAH MOHAMMED SALIH AQRAWI**
**(2) NOZAD HUSSEIN JUNDI**
**(3) RAYMOND SAMIR ZINA RAHMEH**
**(4) INTERNATIONAL HOLDINGS LIMITED**

Defendants

---

**ORDER OF JUDICIAL OFFICER NASSIR AL NASSER**

---

**UPON** reviewing the Claimant's Application Notice dated 11 September 2018 to extend the time of service on the First, Second and Third Defendants ("the Application");

**AND UPON** reviewing the witness statement of Mr. Shane Jury dated 11 September 2018;

**AND PURSUANT TO** Rule 7.21 of the Rules of the DIFC Courts;

**IT IS HEREBY ORDERED BY THAT**:

1.  The Application is granted.

2.  The deadline for service of the Claim Form on the First Defendant, Second Defendnat and Third Defendant shall be extended by a period of six months to 12 March 2019.

3.  Costs in the case.

Issued by:
**Nassir Al Nasser**
Judicial Officer
Date of Issue: 12 September 2018
At: 4pm

# Exhibit C

Claim No. CFI 019-2018

## THE DUBAI INTERNATIONAL FINANCIAL CENTRE COURTS

**IN THE COURT OF FIRST INSTANCE**
BETWEEN

### IRAQ TELECOM LIMITED

Claimant

and

### (1) RAYMOND SAMIR ZINA RAHMEH
### (2) INTERNATIONAL HOLDINGS LIMITED

Defendants

---

### ORDER OF JUDICIAL OFFICER NASSIR AL NASSER

---

**UPON** reviewing the Claimant's Application Notice CFI 019/2018 dated 8 October 2018 to extend the time of service on the First Defendant ("the Application");

**AND UPON** reviewing the Witness Statement of Mr. Shane Jury dated 8 October 2018;

**AND PURSUANT TO** Rule 7.21 of the Rules of the DIFC Courts;

**IT IS HEREBY ORDERED BY THAT**:

1.    The Application is granted.

2.    The deadline for the service of the Claim form on the First Defendant shall be extended by a period of six months to 16 April 2019.

3.    Costs in the case.

Issued by:
**Ayesha Bin Kalban**
Assistant Registrar
Date of Issue: 10 October 2018
At: 10am



# Exhibit D

IN THE MATTER OF AN ARBITRATION
THE RULES OF MEDIATION OF THE
INTERNATIONAL CHAMBER OF COMMERCE

IRAQ TELECOM LIMITED

-and-

INTERNATIONAL HOLDINGS LIMITED

KOREK INTERNATIONAL (MANAGEMENT) LIMITED

SIRWAN SABER MUSTAFA

KOREK TELECOM COMPANY LLC

---

REQUEST FOR ARBITRATION

16 JULY 2018

---

Gibson, Dunn & Crutcher LLP
Building 5, Level 4
PO Box 506654
DIFC Dubai UAE

Jones Day
2 rue Saint-Florentin
75001 Paris
France

Co-counsel for Iraq Telecom Limited

EA-4, 001

TABLE OF CONTENTS

Page

I.      INTRODUCTION ................................................................................. 1

II.     THE PARTIES ..................................................................................... 2
        (a)     IT ..................................................................................................... 2
        (b)     IH ..................................................................................................... 3
        (c)     CS ..................................................................................................... 3
        (d)     Mr Barzani ...................................................................................... 4

III.    NATURE AND CIRCUMSTANCES OF THE DISPUTE .................. 5
        (a)     Introduction .................................................................................... 5
        (b)     Background ...................................................................................... 6
        (c)     The SHA ........................................................................................... 7
        (d)     The IBL Loan – background to the potential share pledge .......... 10
        (e)     Previous breaches of the Shareholder's veto .............................. 11
        (f)     Prejudice to IT ............................................................................... 12
        (g)     The DIFC Court Injunction ........................................................... 12
        (h)     IT's First Notice of Dispute .......................................................... 13
        (i)     IT's Second Notice of Dispute ...................................................... 14

IV.     RELIEF REQUESTED ...................................................................... 15
        (a)     Damages an inadequate remedy – Injunctive relief only adequate remedy ...................... 15

V.      PROCEDURAL MATTERS ............................................................... 16

VI.     SUBMISSION OF REQUEST ........................................................... 20

EA-4, 002

## I.   INTRODUCTION

1. The Claimant, Iraq Telecom Limited ("**IT**"), submits this Request for Arbitration (the "**Request**") against International Holdings Limited ("**IH**"), Korek International (Management) Limited (otherwise known as "**CS**"), Sirwan Saber Mustafa (also known as "**Mr Barzani**"), and Korek Telecom Company LLC ("**Korek**") pursuant to Clause 48 of the Shareholders' Agreement dated 10 March 2011 between IT, IH, CS, Mr Barzani and Korek (the "**SHA**"),[1] and pursuant to the 2017 Arbitration Rules of the International Chamber of Commerce (the "**ICC Arbitration Rules**").

2. Broadly, this dispute was started following a threat of irreparable harm to the Claimant by IH, CS, Korek and Mr Barzani (the "**Other SHA Parties**").  The Claimant has serious concerns that, in breach of the SHA, and in the absence of a permanent injunction granted by this Tribunal, the Other SHA Parties will grant a pledge over Korek's shares to a third party Lebanese bank, IBL Bank SAL ("**IBL**"), which would in turn cause irreparable harm to the Claimant.

3. Because of these concerns, on 12 October 2017, IT obtained an interim injunction order from the DIFC Court of First Instance, restraining the Other SHA Parties from granting a pledge or any other interest over Korek's shares without IT's prior approval in accordance with the SHA, and compelling the Other SHA Parties to uphold IT's shareholder rights (the "**Interim Injunction Order**").[2]  The Interim Injunction Order was granted in aid of the arbitration which IT proposed to commence pursuant to the SHA's dispute resolution provisions.[3]

4. Pursuant to Clause 48 of the SHA, prior to filing this Request for Arbitration, Claimant submitted the present dispute to mediation on 26 March 2018 in accordance with the ICC Mediation Rules of 2014.[4]  The mediation proceedings have not resulted

---

[1]  A copy of the SHA is attached as **Exhibit C-1**.

[2]  The Interim Injunction Order is attached as **Exhibit C-2**.

[3]  The draft Request for Arbitration filed with the DIFC Court of First Instance at the time of requesting the Interim Injunction Order is attached as **Exhibit C-3**.

[4]  The SHA requires mediation pursuant to the ICC ADR Rules (*see* Clause 48.2).  The ICC Mediation Rules replaced the ICC ADR Rules as of 1 January 2014.  Article 10(1) of the ICC Mediation Rules states that where, prior to the date of entry into force of the ICC Mediation Rules, the parties have agreed to refer their dispute to the ICC ADR Rules, the parties shall be deemed to have referred their dispute to the ICC Mediation Rules in the absence of any objection.

in the resolution of the present dispute. The mediation proceedings were terminated on 23 May 2018 as a result.[5] In fact, despite several requests sent before and after the Interim Injunction Order was issued, the Other SHA Parties have refused to engage with Claimant, as further detailed below.

5.      Pursuant to Article 4(3) of the ICC Arbitration Rules, IT sets out the following in this Request:

   a)  the name, description, address and contact details of each of the parties and their respective representatives (Section II);

   b)  a description of the nature and circumstances of the dispute giving rise to the claims and of the basis upon which the claims are made (Section III);

   c)  a statement of the relief sought (Section IV); and

   d)  a presentation of the arbitration agreement with IT's comments as to procedure (Section V).

## II.      THE PARTIES

   *(a)      IT*

6.      IT is a private company limited by shares and duly incorporated in the Dubai International Financial Centre ("**DIFC**") with registration number 1019, having its registered office at Unit 11, Level 3, Gate Village Building 10, DIFC, Dubai, 507043, United Arab Emirates.

7.      IT's contact details are:

> Iraq Telecom Limited
> Unit 11, Level 3, Gate Village 10, PO Box 507043
> DIFC, Dubai, UAE
> Attention: Deepak Jain
> Tel:    +971 50 658 2663
> Fax:    +965 246 73098

8.      In this arbitration, IT is jointly represented by:

---

[5]    See, e.g., letter from the ICC International Centre for ADR dated 30 May 2018 attached as **Exhibit C-10**.

EA-4, 004

Gibson, Dunn & Crutcher LLP
Building 5, Level 4
DIFC Dubai UAE
PO Box 506654
Graham Lovett (glovett@gibsondunn.com)
Nooree Moola (nmoola@gibsondunn.com)
Phone: + 971 4 318 4620
Fax: + 971 4 318 4601

Jones Day
2, rue Saint Florentin
75001 Paris, France
Jean-Pierre Harb (jpharb@jonesday.com)
Pierre Heitzmann (pheitzmann@jonesday.com)
Ileana Smeureanu (ismeureanu@jonesday.com)
Alexander Meyniel (ameyniel@jonesday.com)
Phone: +33.1.56.59.39.39
Fax: +33.1.56.59.39.38

9.   All communications for IT's attention in connection with this arbitration should be jointly directed to Gibson, Dunn & Crutcher LLP and Jones Day.

> (b)   IH

10.   IH is also incorporated in the DIFC with registration number 1020, having its registered office at Unit 11, Level 3, Gate Village Building 10, DIFC, Dubai, 507043, United Arab Emirates.  IH's contact details are:

International Holdings Limited
Suite 904, Level 9 Park Place
Sheikh Zayed Road
PO Box 506672
Dubai, UAE

> (c)   CS

11.   CS is an exempted company duly incorporated with limited liability under the laws of the Cayman Islands. Its contact details are:

Korek International (Management) Limited
Close Brothers (Cayman) Limited
Box 1034
4th Floor Harbour Place
103 South Church Street
George Town
Grand Cayman KY1-1102
Cayman Islands

3

with copies to be sent to:[6]

> Nawzad Junde
> English Village
> Villa 203
> Erbil
> Kurdistan
> Republic of Iraq
> nawzad.junde@korektel.com

> *(d)     Mr Barzani*

12.   Mr Barzani is a citizen of the Republic of Iraq and holder of Iraqi passport number C1053857.  Mr Barzani's contact details are:[7]

> Sirwan Saber Mustafa
> Kurdistan Street nr. 45
> Pirmam
> Erbil, Kurdistan, Republic of Iraq

> Erbil-Massief-Sallahaddin
> Dar Althiafa-House Number 3
> Erbil, Kurdistan, Republic of Iraq

13.   Korek is a private limited company incorporated with the Registration Directorate of Companies of the Kurdistan Regional Government in the Republic of Iraq with registered number 167.  Korek's contact details are:

> Kurdistan Street nr. 45
> Pirmam
> Erbil, Kurdistan, Republic of Iraq

14.   In other proceedings, both CS and Mr Barzani were represented by:

> BOIES SCHILLER FLEXNER (UK) LLP
> 5 New Street Square
> London EC4A 3BF
> United Kingdom

> Telephone: +44 203 908 0800

---

[6]   The Clause 44 notice provision also requires a copy to be sent to Camille Abousleiman of Dewey & LeBoeuf LLP, 1 Minster Court, London EC3R 7YL, United Kingdom. However, by letter of 1 April 2017, CS gave notice that notifications in respect of the SHA should no longer be sent to Mr Abousleiman (**Exhibit C-4**, p. 1).

[7]   Similarly, by letter of 1 April 2017, Mr Mustafa gave notice that notifications in respect of the SHA should no longer be sent to Mr Abousleiman (**Exhibit C-4**, p. 2).

EA-4, 006

Fax: +44 203 908 0801

Ken Beale (kbeale@bsfllp.com)
Dominic Roughton (droughton@bsfllp.com)
David Hunt (dhunt@bsfllp.com)

III.    **NATURE AND CIRCUMSTANCES OF THE DISPUTE**

   *(a)    Introduction*

15.    In summary, the present dispute (the "**Dispute**") arises out of: (i) IT's concerns that the Other SHA Parties (*i.e.,* Mr Barzani, CS, IH and Korek) will grant a share pledge over Korek's assets in breach of IT's rights under the SHA; and, (ii) the Other SHA Parties' repeated failures to provide certain information and undertakings requested by IT.

16.    In that respect, despite IT's repeated requests, the Other SHA Parties have failed: (i) to make full disclosure of, *inter alia,* the circumstances behind a US$ 150 million loan provided by IBL to Korek (the "**IBL Loan**") and the circumstances that led to IBL requesting "*additional collateral*" from Korek to support the IBL Loan[8]; and (ii) to provide an undertaking that they will not grant or acquiesce in any other person granting a pledge to any third party over Korek's shares, other than with IT's prior approval or written consent in accordance with the SHA.

17.    In the circumstances, IT remains gravely concerned that in the absence of a permanent injunction restraining them from doing so, the Other SHA Parties will grant or acquiesce in the grant of pledge over Korek's shares in favour of IBL and in contravention of IT's rights under the SHA.

---

[8]   See Paragraph 36 below.

EA-4, 007

(b)      *Background*

18.    IT is a shareholder in IH and owns 44% of IH's issued share capital. CS owns the remaining 56%. IT and CS were established for the purposes of holding shares in IH and, indirectly, Korek. An illustration of the shareholder structure is set out below:



(a)      Agility's interest is held indirectly via a number of holding entities, including amongst others Alcazar Capital Partners (*Cayman Islands*).
(b)      Orange's interest is held indirectly via a number of holding entities, including amongst others Atlas Services Nederland B.V. (*the Netherlands*).

19.    IH owns 100% of the issued shares in Korek. Korek is IH's only asset.

20.    Korek started operations in Iraq in 2000 and is the oldest telecommunications company in Iraq.     Korek operates a valuable Iraqi nationwide mobile telecommunications licence. It is one of Iraq's three telecommunications providers. By its ownership of 44% of IH's shares, IT indirectly owns 44% of Korek; likewise CS indirectly owns 56% of Korek.

6

EA-4, 008

21.     Korek's telecommunications licence, awarded in 2007, required it to pay licence fees totalling US$ 1.25 billion to the government of Iraq (via its regulator). Korek has long faced difficulties raising funds to pay its licence fees. It was for that reason that Korek sought IT's investment. IT acquired its interests in Korek in 2011 for approximately US$ 800 million (provided in cash, shareholder loans and debt for equity swaps); prior to that, Korek was wholly owned by individual Iraqi shareholders (who now hold their interest in Korek via CS), including Mr Barzani.

22.     IT is itself a joint venture vehicle, 54% indirectly owned by Agility Public Warehousing Company KSC ("**Agility**"), a publicly listed Kuwaiti logistics company, and 46% indirectly owned by Orange S.A. (previously known as France Telecom S.A.), a major French multinational telecommunications company ("**Orange**"). Agility and Orange (through IT) joined the Iraqi shareholders as strategic partners with the financial backing and technical knowledge to enable Korek to exploit its telecommunications licence.

23.     Mr Barzani, a prominent Iraqi businessman, is a key member of the Barzani family. The Barzani family is in turn extremely influential in the Kurdistan Region of Iraq. Mr Barzani's uncle, Mr Masoud Barzani, has been the leader of the Kurdish Democratic Party since 1979 and was president of the Kurdistan Regional Government ("**KRG**") from 2005 to November 2017, when he resigned. Mr Barzani's first cousin, Nechirvan Barzani, is the current Prime Minister of the KRG. Mr Barzani is the Managing Director and controlling shareholder of CS. He is also Korek's Managing Director and exercises sole control over Korek on a day-to-day basis.

        (c)     The SHA

24.     The relationship between IH's shareholders (IT and CS) is governed by the SHA. Korek and Mr Barzani are also parties to the SHA. CS controls a majority of IH's board (the "**IH Board**"). The IH Board is comprised of: three directors appointed by IT; three directors appointed by CS (of whom one is Mr Barzani); and one independent director nominated by CS. The independent director has at all material times been Mr Raymond Rahmeh, a close affiliate of Mr Barzani's. There are concerns on the part of IT as to the true independence of Mr Rahmeh (the reasons for which are set out more fully below).

7

EA-4, 009

25.   As described briefly above, IT is concerned that, in breach of the SHA, the Other SHA Parties will grant a pledge over Korek's shares to IBL, and/or that IH (in CS's hands) will acquiesce in Korek pledging its own shares to IBL.  As set out below,[9] IBL has requested the pledge.  Korek is currently in default of the IBL Loan and so there is a serious danger that the pledge will be given and perfected in very short order.  In effect, IBL would seek to step into the shoes of IH as the owner of Korek (or at least a majority of it).  If the pledge is granted, the damage to IT will be irreversible.

26.   The relevant provision of the SHA is Article 11 (Shareholder Veto Matters), which provides as follows:

> *The parties shall **(and shall procure that International Holdings and Korek shall)**[10] use their respective powers to ensure, so far as they are legally able, that no action or decision relating to any of the matters set out in clause 11.2 below, is taken (whether by the International Holdings Board of Directors, the Korek Supervisory Committee, any entity within the Group or any of the officers or managers within the Group) without the prior approval or written consent of any party whose Relevant Shareholder percentage of International Holdings (together with any of their affiliates) shall exceed 10% (ten per cent.) (Shareholder Veto Matters).*
>
> *The Shareholder Veto Matters are any decision, action or omission which may involve:*
>
> ...
>
> (d)   *Changes in share capital: changing the number of, or rights, privileges or preferences attaching to, shares in any entity within the Group (including any cancellation, conversion, consolidation or subdivision of shares) or granting any option **or interest** over any shares or any uncalled capital of any entity within the Group.* **(emphasis added)**

27.   For the purposes of the SHA, Korek is an entity within the "*Group*" and IT's "*Relevant Shareholder percentage*" exceeds 10%.  Put simply, the Other SHA Parties

---

9     See *infra*, ¶ 36.

10    Emphasis added.

8

are not permitted to grant a pledge or allow a pledge to be granted over Korek's shares without IT's approval. IT does not intend to provide that approval. As parties to the SHA, each of the Other SHA Parties are obliged to procure that no action or decision is taken in relation to the pledge of Korek's shares without the prior approval or written consent of IT, as an IH shareholder.

28.    Nonetheless, IT remains very concerned that the pledge will be granted. It is in Mr Barzani's personal interests for Korek to provide a share pledge in order that IBL does not call upon his personal guarantee[11] or execute against what is believed to be his cash collateral.[12]    Mr Barzani's and Korek's interests (or the interests of IT) are not aligned. As noted above, Mr Barzani is also a director of IH and has day-to-day control over Korek.

29.    For the avoidance of doubt, since IH is the owner of the Korek shares, it should be the only party able to grant a pledge over its holding in Korek. However, IT understands that in practical terms, it may be possible for Mr Barzani, without proper authority, to enter a security right on Korek's Company Register in Erbil, Iraq.

30.    IT is also concerned that the directors of IH that have been nominated by CS are not acting in IH's best interests. In short, IT is concerned that the CS nominated IH directors have instead sought to favour their own interests and/or those of Mr Barzani, CS and CS's shareholders, including by failing to remove Mr Barzani as Managing Director of Korek despite, *inter alia*, his breaches of statutory duties owed to Korek. To that end, on 12 March 2018, IT commenced proceedings in the DIFC Court against two of the CS nominated IH directors, and IH's "independent director" Mr Rahmeh, for breaches of statutory and fiduciary duties. Further proceedings were commenced against Mr Rahmeh in the DIFC Court on 12 April 2018 alleging specific self-dealing transactions involving Mr Rahmeh and to request, *inter alia*, the removal of Mr Rahmeh from the Board of IH.

31.    There are also ongoing disputes between IH's shareholders. These are the subject of ongoing dispute resolution processes under the SHA and related agreements. The

---

[11]    Deed of Indemnity entered into between IT Ltd., Mr. Barzani, Korek and International Holdings attached as **Exhibit C-11**; Term Loan Agreement between IBL, Korek and Mr. Barzani dated 21 December 2011 attached as **Exhibit C-12**.

[12]    *See* paragraphs 32 to 36 below.

EA-4, 011

disputes relate, among other things, to CS's failure to implement a call option which would have had the effect of increasing IT's shares in IH (and therefore Korek) from 44% to 51%, and which would therefore give IT majority ownership and control of IH and Korek, as well as CS's consistent breaches of several provisions of the SHA and of IT's shareholder rights.

(d)     The IBL Loan – background to the potential share pledge

32.     In December 2011, in order to pay an instalment of its licence fees, Korek entered into the IBL Loan, a US$ 150 million loan agreement between it and the Lebanese bank IBL. IBL charged Korek interest at a rate of 13.25%.[13] IT, as an IH shareholder, approved Korek's entry into the IBL Loan on the understanding that the loan was an unsecured, third party bank loan on market terms. For the same reason, IT also agreed to subordinate a US$ 285 million shareholder loan (which it had extended to IH in July 2011 in order to fund Korek's business), in favour of the IBL Loan. Mr Barzani personally guaranteed Korek's performance under the IBL loan.

33.     It has come to IT's attention that it is very likely that the IBL Loan was not unsecured. In fact, and without disclosing the true position to the IH Board, several elements, including IBL's annual reports, indicate that a full cash collateral for the IBL Loan has been provided by way of cash held in a bank account with IBL. Having recently been confronted with these allegations, IBL and Mr Barzani have neither confirmed nor denied them. The effect of the arrangements would be that the IBL Loan is, in reality, a shareholder loan provided by Mr Barzani on preferential terms.

34.     IT believes that Mr Barzani secretly provided cash collateral to secure the IBL Loan as part of an arrangement with IBL to have Korek pay interest payments under the IBL Loan as unsecured interest payments at a rate of 13.25%, from which Mr Barzani would take a share through interest payments on the cash collateral. This had the effect of Korek paying money indirectly to Mr Barzani. Further, and no doubt consequently, Korek is paying 13.25% interest on what is most likely a fully collateralized loan.

---

[13]   See **Exhibit C-12**.

EA-4, 012

35.   This had the effect of Korek paying money indirectly to Mr Barzani.  Consequently, Korek is paying 13.25% interest on what is most likely a fully collateralised loan for which an appropriate market rate would be substantially lower (as evident based on the arrangement between IBL and Mr Barzani).

36.   The IBL Loan has not been repaid.  IBL has begun making demands for full repayment of the loan.  By letter dated 30 August 2017 (and received on 11 September 2017), IBL demanded that Korek provide "*additional collateral*" for the loan.  As stated above, IT was not previously informed that the IBL Loan was collateralised.  IBL has demanded that Korek provide, within 30 days, a pledge over its shares.  This would have the effect of securitising, in IBL's favour, the entirety of IH's assets.  To the best of IT's knowledge, IBL has not yet called on Mr Barzani's personal guarantee, although it has intimated in recent correspondence that it may do so.

   *(e)   Previous breaches of the Shareholder's veto*

37.   In the past, Korek (through Mr Barzani) has disregarded IT's Shareholders' Veto, in particular IT's veto right under Article 11.3 of the SHA.  In 2014, Mr Barzani caused Korek to enter into an amendment to its licence agreement, which, significantly, amended the change of control provision in Korek's licence.  The effect of the changes was that the Iraqi regulator's consent would be required in respect of *any* transfer of Korek's shares.  Prior to that, the regulator's consent was only required for transfers of 10% or more of Korek's shares.  At the time, IT was seeking to enforce a call option under which it would indirectly acquire a further 7% of Korek's shares and therefore obtain a majority control over IH and Korek (increasing its stake from 44% to 51%). Prior to the amendment of the change of control provision in its licence, the transfer of 7% of the shares under the call option would not have needed the Iraqi regulator's consent.  After the change, which was effected by Mr Barzani shortly after IT exercised its call option right, such consent became required.

38.   At the relevant time that such consent was required, there was an ongoing dispute between IT and the regulator and, in the circumstances, it was very unlikely that the regulator's consent would be forthcoming.  The amendment to the licence agreement therefore protected Mr Barzani's position and prevented CS's majority interests in Korek from being diluted.  Mr Barzani caused Korek to enter into the amendment

11

without authorisation, despite objections by IT's directors and in direct breach of IT's veto rights under Article 11.3 of the SHA.  Furthermore, Mr Barzani had previously represented that he would not cause the licence agreement to be amended, but nevertheless went ahead and effected the change without the knowledge or consent of IT's nominee directors on the IH Board.

(f)     *Prejudice to IT*

39.   IT will be irreversibly prejudiced if, in contravention of its rights under the SHA, the Other SHA Parties grant or procure or allow the grant of a pledge over Korek's shares.

(g)     *The DIFC Court Injunction*

40.   As stated, in light of its concerns, on 11 October 2017, IT applied to the DIFC Court of First Instance for an *ex parte* interim injunction in support of anticipated arbitration proceedings to be commenced pursuant to Clause 48 of the SHA.  IT's intention was to "hold the ring" and protect its contractual shareholder rights pending the multi-stage dispute resolution procedure in Clause 48.

41.   The DIFC Court granted the Interim Injunction Order in IT's favour on 12 October 2017.[14]  By the Interim Injunction Order, and until further order of the Court, the Other SHA Parties are:

- Restrained from granting a pledge, or any other interest over the shares of Korek, other than with IT's prior approval or written consent in accordance with the SHA;

- Compelled to use their respective powers to ensure, so far as they are legally able, that no action or decision relating to the grant of a pledge, or any other interest over the shares of Korek, is taken without the prior approval or written consent of IT in accordance with the SHA.

42.   CS applied to set aside the Interim Injunction Order on 31 October 2017.  Both parties attended a hearing before the DIFC Court on 12 November 2017—IT's position was that Interim Injunction Order ought to be extended permanently; CS' position was that it ought to be set aside.  None of Korek, IH or Mr Barzani appeared.  Following the return hearing held on 12 November 2017, the DIFC Court has not reversed the Order

---

[14]   *See* **Exhibit C-2.**

EA-4, 014

issued on 12 October 2017. As a result, the Interim Injunction Order of 12 October 2017 will remain in place until further order.

#### (h)   IT's First Notice of Dispute

43.   In light of the prejudice to IT that will eventuate if the Other SHA Parties act in contravention of IT's rights under the SHA, and as foreshadowed in the DIFC Court proceedings, IT has invoked the formal dispute resolution process pursuant to Article 48 of the SHA.

44.   IT issued a Notice of Dispute to the Other SHA Parties on 31 October 2017[15] and served it on each recipient by email and courier by 29 November 2017. The first deadline for the parties to have used all reasonable endeavours to resolve the matter amicably (*i.e.* 30 days after service) expired on 29 December 2017.

45.   The Notice of Dispute set out the background to the dispute and requested that the Other SHA Parties:

    a) Provide full disclosure of the circumstances behind the IBL Loan, including details of any collateral provided in relation to the IBL Loan, the dates on which such collateral was provided and the circumstances surrounding the provision of such collateral;

    b) Explain why neither IT nor the IH Board was informed of the full circumstances behind the IBL Loan when the IBL Loan was made and the IT Shareholder Loan was subordinated, or at any point in time since then;

    c) Provide full disclosure of any demands made (or, to the best of the Other SHA Parties' knowledge, contemplated) by IBL in respect of the personal guarantee provided by Mr Barzani;

    d) Provide full disclosure of the circumstances that has led to IBL requesting "additional collateral", including any requests that cash collateral be released or the personal guarantee discharged.

---

[15]   A copy of the First Notice of Dispute is attached as **Exhibit C-5**.

EA-4, 015

46.   The Notice of Dispute requested a response within 7 days.  However, none of the Other SHA Parties responded substantively to the Notice of Dispute.  The only response was a brief email from CS, received on 5 December 2017, stating:

> *"We have now received the attached Notice. Please be advised that CS's position is as set out in the related DIFC proceedings. All our rights are reserved."*[16]

   (i)   *IT's Second Notice of Dispute*

47.   There having been no attempt by the Other SHA Parties to resolve the matter amicably, and no resolution of the dispute within 30 days of service of the Notice of Dispute, IT issued a Second Notice of Dispute on 13 January 2018 in accordance with Clause 48.1 of the SHA, referring the matter to two representatives of IT and CS in a further attempt to resolve the dispute.[17]

48.   In its Second Notice of Dispute, IT:

   a)  nominated Messrs Ehab Aziz and Olivier Froissart, two of IT's nominee directors on the IH Board, as its authorised representatives;

   b)  asked CS to notify it of its designated representatives for purposes of clause 48.1 as soon as possible;

   c)  repeated its request for the information requested in the First Notice of Dispute, and requested that the information be provided within 7 days of receipt.

49.   Furthermore, in an attempt to resolve the dispute amicably, in the Second Notice of Dispute IT also requested that each of the Other SHA Parties provide the following undertaking within 7 days:

> *"We undertake not to pledge, or acquiesce in any other entity or person granting any pledge, over the shares of Korek Telecom Company LLC without the prior written consent of Iraq Telecom Limited."*

50.   The Other SHA Parties failed to respond to the Second Notice of Dispute within the time prescribed by Clause 48.1 of the SHA.  However, in early February 2018, IT received copies of two letters from IBL to Korek and to Mr Barzani referring to the

---

[16]   A copy of CS' email dated 5 December 2017 is attached as **Exhibit C-6.**

[17]   A copy of the Second Notice of Dispute is attached as **Exhibit C-7.**

EA-4, 016

IBL Loan and requested that Mr Barzani provide "additional collaterals that would be duly authorised by appropriate corporate actions and whose transfer or pledge do not contravene agreement to which [Mr Barzani] is a party to".[18]   These letters only increased IT's concerns given the silence kept by the Other SHA Parties.

51.   In light of the Other SHA Parties' lack of engagement with IT, and whilst IT remains open to holding discussions with the Other SHA Parties in parallel, the dispute was not resolved by IT and CS representatives by the deadline.

52.   On 26 March 2018, IT therefore submitted the present dispute to mediation in accordance with Clause 48.2 of the SHA. The mediation proceedings were terminated on 23 May 2018.[19]

## IV.   RELIEF REQUESTED

### (a)   *Damages an inadequate remedy – Injunctive relief only adequate remedy*

53.   IT fears that, unless restrained, Korek, Mr Barzani or IH (in the hands of CS and its directors) will provide IBL with a pledge over Korek's shares, and/or that IH will acquiesce in Korek granting that pledge.   This will irreversibly prejudice IT.   If, in breach of IT's veto rights, the Respondents grant or allow Korek to grant the share pledge, IT will have a contractual claim against the Respondents under the SHA only. It will not, for practical purposes, have the ability to remove any share pledge registered with the Erbil Companies Registry in Kurdistan.   Nor would it have the ability to prevent IBL from winding up or appointing receivers and managers over Korek in Kurdistan.   IH's sole asset, Korek, would be devalued if not put into external administration in Kurdistan.   Damages would therefore be an inadequate remedy in the circumstances.

54.   Whilst reserving the right to claim further and/or other relief in due course, Claimant requests that the Arbitral Tribunal render a final award granting IT the following relief:

---

[18]   The letters from IBL to Korek and to Mr Barzani, respectively dated 29 January 2018 and 1 February 2018, are attached as **Exhibits C-8** and **C-9**.

[19]   See, *e.g.*, letter from the ICC International Centre for ADR dated 30 May 2018 attached as **Exhibit C-10**.

EA-4, 017

(a)     an order prohibiting the Respondents from pledging the shares (or facilitating the pledge of shares) of Korek otherwise than in accordance with the terms of the SHA;

(b)     an order directing the Respondents to use their respective powers to ensure, so far as they are legally able, that no action or decision relating to the pledge of shares in Korek is taken (whether by the IH Board, the Korek Supervisory Committee, any entity within the Group or any of the officers or managers within the Group over which the Respondents have control, directly or indirectly) without the prior approval or written consent of IT in accordance with Article 11 of the SHA;

(c)     an order that the Respondents pay all costs in connection with these arbitral proceedings pursuant to Article 38(5) of the DIFC Arbitration Law, including (but not limited to) the ICC arbitrations costs, legal and other fees, costs and/or expenses incurred by the Claimant including attorneys' fees, expert fees and costs in respect of the time spent by the Claimant's representatives on a full indemnity basis;

(d)     an order that the Respondents pay post-award interest on all sums awarded at the maximum permitted rate until payment in full; and

(e)     such other relief as the Tribunal may deem appropriate.

55.     Claimant reserves the right to claim further and/or other relief in due course, and to make further submissions of fact and of law in support of its claims.

## V.     PROCEDURAL MATTERS

56.     Clause 48 of the SHA contains, *inter alia*,[20] an arbitration agreement between the parties:

> *48.1     If any dispute, controversy or claim of whatever nature arises under, out of or in connection with this Agreement, including any question regarding its existence, validity or termination or any non-*

---

[20]   For the purposes of Article 2.1(C) of the ICC Mediation Rules, Clause 48 of the SHA also contains an agreement to use settlement procedures other than mediation, *i.e.*, a 30-day "amicable resolution" phase, a 30-day period during which the dispute must be referred to two representatives of IT and CS, a 45-day mediation period, and finally, arbitration.

EA-4, 018

*contractual obligations arising out of or in connection with this Agreement (a Dispute), the parties shall use all reasonable endeavours to resolve the matter amicably.  If one party gives notice that a Dispute has arisen and the parties are unable to resolve the Dispute within 30 (thirty) days of service of such notice then the Dispute shall be referred to two (2) IT Ltd Representatives and two (2) CS Ltd Representatives who shall attempt to resolve the Dispute. The parties agree that such IT Ltd Representatives and CS Ltd Representatives shall have full power to resolve such Dispute on behalf of all parties.*

48.2    *If such IT Ltd Representative and CS Ltd Representatives are unable to resolve the Dispute within 30 (thirty) days, the parties agree to submit the matter to settlement proceedings under the ICC ADR Rules.  If the Dispute has not been settled pursuant to the ICC ADR Rules within 45 (forth five) days following the filing of a Request for ADR (as defined in the ICC ADR Rules) or within such other period as the parties to the Dispute may agree in writing, the parties to the Dispute shall have no further obligations under this clause 48.2.  No party shall resort to arbitration against another under this Agreement until the expiry of this 45 (forty five) day period.*

48.3    ***If the parties fail to resolve the Dispute in accordance with clauses 48.1 and 48.2, such Dispute shall be referred to and finally resolved by arbitration under the Arbitration Rules of the ICC (Rules), which Rules are deemed to be incorporated by reference into this clause.  The number of arbitrators shall be three (3).***

48.4    *In the event that CS Ltd and/or Mr. Sirwan Saber Mustafa, on the one hand, and IT Ltd on the other hand, are the only parties to the Dispute, (i) 1 (one) of the arbitrators shall be appointed by IT Ltd, (ii) one of the arbitrators shall be appointed by CS Ltd and/or Mr. Sirwan Saber Mustafa, (iii) the third arbitrator shall be jointly appointed by the 2 (two) arbitrators appointed by IT Ltd and CS Ltd and/or Mr. Sirwan Saber Mustafa; and (iv) in the event that such arbitrators are unable to agree on the identity of the third arbitrator, such arbitrator shall be appointed by the ICC in accordance with the Rules.*

48.5    ***In the event that CS Ltd and/or Mr. Sirwan Saber Mustafa, on the one hand, and IT Ltd, on the other hand, are not the only parties to the Dispute, the three arbitrators shall be appointed by the ICC in accordance with the Rules.***

48.6    *The parties hereby agree that any restriction in the. Rules upon the proposition or appointment of an arbitrator by reason of nationality shall not apply to any arbitration commenced pursuant to this clause. The seat, or legal place. of arbitration shall be Dubai International Financial Centre.  The language to be used in the arbitration shall be English.*

EA-4, 019

(emphasis added)

57.   Pursuant to Clause 48 of the SHA, the parties have agreed that:

- the number of arbitrators shall be three;

- the language to be used in the arbitration shall be English; and

- the seat of the arbitration shall be the DIFC.

58.   Clause 48.4 of the SHA provides that if CS and/or Mr Barzani, on the one hand, and IT on the other hand, are the only parties to a Dispute, then one arbitrator shall be nominated by IT, one arbitrator shall be nominated by CS and/or Mr Barzani, and the third arbitrator shall be jointly appointed by the two arbitrators nominated by IT and CS and/or Mr Barzani.  In contrast, Clause 48.5 of the SHA provides that if CS and/or Mr Barzani, on the one hand, and IT, on the other hand, are not the only parties to a Dispute, then the three arbitrators shall be appointed by the ICC in accordance with the Rules.

59.   In the present case, CS, Mr Barzani, and IT are not the only parties to the Dispute, as IH and Korek are also party to the Dispute.  However, IT proposes that the Parties to these proceedings agree to the following procedure to constitute the Arbitral Tribunal: one of the arbitrators shall be nominated by IT, one of the arbitrators shall be jointly nominated by CS, Mr Barzani, IH and Korek, and the third arbitrator shall be nominated jointly by the two arbitrators nominated respectively by IT and by CS, Mr Barzani, IH and Korek within thirty days of their appointment by the ICC Court of Arbitration (the "**ICC Court**").  Claimant further proposes that the President of the Arbitral Tribunal be chosen by the ICC Court only if the co-arbitrators fail to agree upon a suitable chair within the time period agreed upon between the Parties.

60.   Because Article 47 of the SHA provides that the SHA, including any non-contractual obligations arising out of and in connection with the SHA, shall be governed by and construed in accordance with English law, Claimant submits that the members of the Tribunal should be familiar with English law and be familiar with business and company law disputes.

EA-4, 020

61.   In case the Respondents do not agree with the procedure proposed above, IT reserves the right to submit additional comments to the ICC Court with respect to the criterion of the arbitrators who would be appointed by the ICC Court.

EA-4, 021

## VI.   SUBMISSION OF REQUEST

62.   In accordance with Article 1.1 of Appendix III of the Rules, a payment of USD 5,000 has been made to the ICC as filing fee for this Request for Arbitration.

63.   In accordance with Article 3(1) of the Rules, this Request for Arbitration and all the accompanying documents are submitted in eight copies.

Date: 16 July 2018

For and on behalf of Iraq Telecom Limited

Graham Lovett
Gibson, Dunn & Crutcher LLP
Building 5, Level 4
PO Box 506654
DIFC Dubai UAE

Jean-Pierre Harb
Pierre Heitzmann
JONES DAY
2, rue Saint Florentin
75001 Paris, France

20

EA-4, 022

# Exhibit E

## THE DUBAI INTERNATIONAL FINANCIAL CENTRE COURTS

**IN THE COURT OF FIRST INSTANCE**

BETWEEN

### CORINTH PIPEWORKS SA

Claimant

and

### BARCLAYS BANK PLC

Defendant

---

## DISCLOSURE ORDER OF H.E. JUSTICE OMAR AL MUHAIRI

---

**UPON** reviewing the Claimant's Request to Produce dated 23 May 2013 and the parties' Responses and Objections

**AND UPON** reviewing the Defendant's Request to Produce dated 5 May 2013 and the parties' Responses and Objections

**IT IS HEREBY ORDERED THAT:**

1. The Defendant shall disclose to the Claimant any documents within its possession, custody or control relating to or responding to the Claimant's Requests to Produce Nos. 2 and 4 – 74.

2. The Defendant shall conduct a search for documents responsive to the Claimant's Requests to Produce Nos. 5, 8, 15, 26(a), 31, 34, 44 and 65.

3. The Claimant shall disclose to the Defendant any documents within its possession, custody or control relating to or responding to the Defendant's Requests to Produce Nos. 5-7 and 10.

4.  The parties' compliance with the Disclosure Order in the above paragraphs shall be verified by a Disclosure Statement pursuant to RDC Rule 28.22.

5.  The parties are not required to produce documents in respect of which there is a legal impediment or privilege under the legal and ethical rules of the DIFC Courts and which are otherwise irrelevant. Documents may also be redacted to the extent necessary to protect the identity and personal data of third parties.

6.  Costs in the case.

7.  Liberty to apply.

Issued by:
**Amna Al Owais**
Deputy Registrar
Date of Issue: 16 July 2013
At: 1pm



2

# Exhibit F



**2 9 SEP 2010**

*RECEIVED*

By: ........................

The Judicial Authority at Dubai
International Financial Centre.
**DIFC COURTS**

## CLAIM FORM

|  | For court use only |
|---|---|
| Claim No. | CF 1024 2010 |
| Issue date: | 29 - 9 - 2010 |

**Claimant(s)**

CORINTH PIPEWORKS SA

2-4 Mesogeion Av.
115 27 Athens
Greece

**Defendant(s)**

BARCLAYS BANK PLC

Name and address of Defendant receiving this Claim
Form

Level 9, The Gate Buildling, DIFC, PO Box 506504,
Dubai, UAE

Ground Floor, Building No. 6, Emaar Square, Burj
Downtown, Sheikh Zayed Road, PO Box 1891, Dubai,
UAE

1 Churchill Place, London, E14 5HP, United Kingdom

|  | $ |
|---|---|
| Amount | $24,198,231 plus damages under Art. 40(2) of the Law of Damages and Remedies plus interest |
| Court fee | $8,000 (with the balance to be assessed) |
| Lawyer's costs | to be assessed |

(The courts at the Dubai International Financial Centre are open between 10am and 5pm, Sunday to Thursday. When
corresponding with the court, please address forms or letters to the Registry and quote the claim number.)
P7/01 (RDC Part 7 - 02.08)

|  | Total amount | - |
|---|---|---|

Claim No.

**Brief details of Claim:**

Please see attached.

**Remedy Sought:**

(1)     Damages for deceit and/or negligence and/or unlawful conspiracy in the sum of US$24,198,231;

(2)     Damages pursuant to Article 40(2) of the DIFC Law of Damages and Remedies;

(3)     Interest;

(4)     Costs;

(5)     Further or other relief.

**Particulars of Claim**

☐ attached

☒ will follow if an acknowledgment of service is filed that indicates an intention to defend the claim

**Statement of Truth**

☒ I believe          that the facts stated in this claim form are true

☐ I believe          that the particulars of the claim attached to this claim are true

☒ I am duly authorized by the Claimant to sign this statement

**Full name:**     Christophoros Catsambas

**Name of**     claimant          CORINTH PIPEWORKS SA

**Signed**

                    (claimant)

**position or office held**     Chief Executive Officer

                    (If signing on behalf of firm or company or corporation)

INCE & CO
BurJuman Business Tower
Trade Centre Road
Level 21
PO Box 123004
Dubai, UAE

**Claimant's or lawyer's address to which
documents or payments should be sent if
different from overleaf (if appropriate)
details of DX, fax or e-mail.**

(The courts at the Dubai International Financial Centre are open between 10am and 5pm, Sunday to Thursday. When
corresponding with the court, please address forms or letters to the Registry and quote the claim number)
P7/01 (RDC Part 7 - 02.08)

**Brief Details of Claim:**

The Claimant claims damages for deceit and/ or damages for unlawful conspiracy and/or  damages for negligence  together with interest and costs.

AFRAS Limited was indebted to the Claimant in the sum of $24,198,231.25.

By emails dated 28th April 2010, 24th May 2010, 27th May 2010, 1st June 2010, 4th June 2010, 10th June 2010 and/or 16th June 2010 and/or by oral representations made on 27th May 2010, 6th June 2010 and/or 15th June 2010, the Defendant, by its employee or agent, Mr Joseph Figueredo, falsely represented to the Claimant that the Defendant held funds to the account of AFRAS Limited sufficient to satisfy the debt owed by AFRAS Limited to the Claimant and that AFRAS Limited had instructed the Defendant to transmit such funds to the Claimant  and that those instructions would be carried out by the Defendant within a reasonable period of time ("*the representations*").

The Defendant knew that the representations were false. Alternatively the Defendant was reckless and/or negligent in making them.

In reliance on the representations and each of them, the Claimant did not take steps between 28th April 2010 and 7th July 2010 to secure the assets of AFRAS Limited or to prevent AFRAS Limited from dissipating them.

As a result of the representations, the Claimant has suffered loss. AFRAS Limited has dissipated its assets and the Claimant is no longer able to obtain full payment of $24,198,231.25. Further or alternatively, the Claimant has lost the chance to obtain full payment of its claim against AFRAS Limited.

Further or alternatively, the Defendant, by its employee or agent, Mr Joseph Figueredo, conspired unlawfully with AFRAS Limited and/ or Mr Radhakrishnan Nanda Kumar to defraud the Claimant by making the representations. The representations were intended to and did cause loss to the Claimant as aforesaid.

The Defendant's conduct in causing the aforesaid loss was deliberate, egregious and/or offensive. The Claimant seeks multiple damages pursuant to Article 40(2) of the DIFC Law of Damages and Remedies.